IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK ex. rel.<br>Attorney General ELIOT SPITZER, et al.,<br><br>                Plaintiffs,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | Civil Action No. 98-1233 (CKK) |

## <u>COMPETITIVE IMPACT STATEMENT</u>

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16(b)-(h), the United States files this Competitive Impact Statement relating to the revised proposed Final Judgment ("Proposed Final Judgment") submitted on November 6, 2001 for entry in this civil antitrust proceeding.

-1-

Dockets.Justia.com

# I.

## NATURE AND PURPOSE OF THE PROCEEDING

On May 18, 1998, the United States filed a civil antitrust Complaint alleging that

Microsoft Corporation ("Microsoft"), the world's largest supplier of computer software for

personal computers, restrained competition in violation of Sections 1 and 2 of the Sherman Act,

15 U.S.C. §§ 1-2.  The case was tried in the United States District Court for the District of

Columbia, which found that Microsoft violated both Sections 1 and 2 of the Sherman Act.

Microsoft appealed to the United States Court of Appeals for the District of Columbia, and the

Court of Appeals affirmed in part and reversed in part the decision of the District Court, and

vacated the Final Judgment that had been entered by the District Court.  After the case was

remanded to District Court for further proceedings, the parties reached the agreement that is

embodied in the Proposed Final Judgment.  The Proposed Final Judgment will provide a prompt,

certain and effective remedy for consumers by imposing injunctive relief to halt continuance and

prevent recurrence of the violations of the Sherman Act by Microsoft that were upheld by the

Court of Appeals and restore competitive conditions to the market.  Entry of the Proposed Final

Judgment will terminate this action, except that the Court will retain jurisdiction to construe,

modify, or enforce its provisions and to punish violations thereof.

# II.

## OVERVIEW OF RELIEF

The Court of Appeals upheld the conclusion that Microsoft had engaged in a variety of

exclusionary acts designed to protect its operating system monopoly from the threat posed by a

type of platform software known as "middleware," in violation of Section 2 of the Sherman Act. Specifically, the Court determined that, in response to the middleware threat, Microsoft: (1) undertook a variety of restrictions on personal computer Original Equipment Manufacturers ("OEMs"); (2) integrated its Web browser into Windows in a non-removable way while excluding rivals; (3) engaged in restrictive and exclusionary dealings with Internet Access Providers, Independent Software Vendors and Apple Computer; and (4) attempted to mislead and threaten software developers in order to contain and subvert Java middleware technologies that threatened Microsoft's operating system monopoly.

The relief contained in the Proposed Final Judgment provides prompt, certain and effective remedies for consumers. The requirements and prohibitions will eliminate Microsoft's illegal practices, prevent recurrence of the same or similar practices, and restore the competitive threat that middleware products posed prior to Microsoft's unlawful undertakings. The provisions benefit consumers by:[1]

- Ensuring that computer manufacturers have contractual and economic freedom to make decisions about distributing and supporting non-Microsoft middleware products without fear of coercion or retaliation by Microsoft, by broadly prohibiting retaliation against a computer manufacturer that supports or distributes alternative middleware or operating systems.

- Further ensuring computer manufacturers' freedom to make middleware decisions by requiring that Microsoft provide uniform licensing terms to the 20 largest and most competitively significant computer manufacturers.

- Ensuring that computer manufacturers have the freedom to configure the personal computers they sell to feature and promote non-Microsoft middleware, and ensuring that developers of these alternatives to Microsoft products are able to

[1]This Section is intended only as a summary of the provisions in the Proposed Final Judgment and should not be read as a substitute for the actual language in those provisions or for the explanations that follow in this Competitive Impact Statement.

feature those products on personal computers, by prohibiting Microsoft from restricting computer manufacturers' ability to install and feature non-Microsoft middleware and competing operating systems in a variety of ways on the desktop and elsewhere.

- Ensuring that computer manufacturers have the freedom to offer, and consumers the freedom to use, non-Microsoft middleware, by requiring Microsoft to provide the ability for computer manufacturers and consumers to customize, without interference or reversal, their personal computers as to the middleware they install, use and feature, and by requiring Microsoft to allow them also to designate non-Microsoft middleware to be invoked automatically in place of Microsoft middleware.

- Ensuring that Microsoft cannot thwart the purposes of the remedies in the Proposed Final Judgment by withholding or providing only in discriminatory fashion necessary intellectual property licenses, by requiring Microsoft to offer necessary related licenses for the intellectual property that it is required to disclose.

- Creating the opportunity for software developers and other computer industry participants to develop new middleware products that compete directly with Microsoft by requiring Microsoft to disclose all of the interfaces and related technical information that Microsoft's middleware uses to interoperate with the Windows operating system.

- Preventing Microsoft from incorporating into the Windows operating system features or functionality with which only its own servers can interoperate by requiring Microsoft to disclose the communications protocols that are necessary for software located on a computer server to interoperate with the Windows operating system.

- Ensuring that software and hardware developers are free to develop, distribute, or write to software that competes with Microsoft middleware or operating system software without adverse action by Microsoft, by prohibiting Microsoft from retaliating against developers or conditioning consideration on a developer refraining from developing, distributing or writing to software that competes with Microsoft platform software.

- Depriving Microsoft of the means with which to retaliate against, or induce the hindering of the development of, competing products by prohibiting Microsoft from entering into agreements that require parties to exclusively, or in a fixed percentage, promote Microsoft middleware or operating system products.

The requirements and prohibitions in the Proposed Final Judgment are supported by strong enforcement provisions, including the power to seek criminal and civil contempt sanctions and other relief in the event of a violation, and the imposition of three full-time, on-site, independent enforcement monitors. The Proposed Final Judgment also provides that, in an enforcement proceeding in which Microsoft has been found to have engaged in willful and systematic violations, the Court may order that the five-year term may be extended by up to two years, in addition to any other relief the Court deems appropriate.

## III.

## DESCRIPTION OF THE PRACTICES GIVING RISE TO THE ALLEGED VIOLATION

A.     <u>Background of the Proceedings</u>

1.     <u>Proceedings in the District Court</u>

On the same day that the United States filed its Complaint against Microsoft, 20 states and the District of Columbia (one state later withdrew and another later reached a separate settlement) filed a similar, although not identical, complaint. The District Court consolidated the cases at Microsoft's request. The Complaint alleged that Microsoft unlawfully maintained its monopoly in the market for operating systems designed to run on Intel-compatible personal computers by engaging in a series of exclusionary, anticompetitive and predatory acts in violation of Section 2 of the Sherman Act. The Complaint also asserted that Microsoft unlawfully attempted to monopolize the market for Web browsers in violation of Section 2 of the Sherman Act, and that certain actions taken by Microsoft as part of its campaign to protect its operating system monopoly power, such as tying its Web browser, Internet Explorer, to its operating

system and entering into exclusive dealing arrangements, constituted unreasonable restraints on competition in violation of Section 1 of the Sherman Act.

After extensive discovery, on October 19, 1998, the Court began a 78-day trial that ended on June 24, 1999. The Court heard testimony from 26 witnesses and admitted depositions of 79 other witnesses and 2,733 exhibits. On November 5, 1999, the Court entered its Findings of Fact. *United States v. Microsoft Corp.*, 84 F. Supp.2d 9 (D.D.C. 1999). On April 3, 2000, after the parties had engaged in four months of intensive but ultimately unsuccessful mediation efforts before Judge Richard Posner, the Court entered its Conclusions of Law. *United States v. Microsoft Corp.*, 87 F. Supp.2d 30 (D.D.C. 2000).

The District Court held that Microsoft engaged in a series of illegal anticompetitive acts to protect and maintain its personal computer operating system monopoly, in violation of Section 2 of the Sherman Act and analogous state laws. The Court also concluded that Microsoft violated Section 2 by attempting to monopolize the market for Web browsers and Section 1 by tying its browser to its Windows operating system. The Court ruled that Microsoft's exclusive dealing arrangements did not separately violate Section 1. The Court then proceeded to consider a remedy for Microsoft's antitrust violations, and on June 7, 2000, issued its Final Judgment, which imposed a remedy that included a break-up of Microsoft into separate operating system and applications businesses, along with interim conduct provisions. *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000).

2.        Proceedings in the Court of Appeals

Microsoft appealed the District Court's decision.  On June 28, 2001, the Court of

Appeals, sitting *en banc*, unanimously affirmed in part, reversed in part and remanded in part the

District Court judgment.  Specifically, the Court affirmed the District Court's finding and

conclusion that Microsoft had illegally maintained its operating system monopoly in violation of

Section 2.  *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.  2001). The Court upheld the

District Court's finding of monopoly power in the market for Intel-compatible personal computer

operating systems.  With certain exceptions, the Court agreed with the District Court's findings

and conclusions that Microsoft had engaged in a variety of exclusionary acts designed to protect

its operating system monopoly from the threat posed by a particular type of software known as

"middleware."   Specifically, the Court upheld the conclusion that, in response to the middleware

threat, Microsoft undertook a variety of restrictions on OEMs; integrated Internet Explorer into

Windows in a non-removable way while excluding rivals; engaged in restrictive and exclusionary

dealings with Internet Access Providers, Independent Software Vendors, and Apple Computer;

and attempted to mislead and threaten software developers in order to contain and subvert so-

called "Java" middleware technologies that threatened Microsoft's operating system monopoly.

Each of these actions, which served to maintain the Windows monopoly, violated Section 2 of

the Sherman Act.

The Court reversed and remanded the Section 1 tying claim for reconsideration under the

more rigorous rule of reason standard.  It also reversed the District Court's determination that

Microsoft had attempted to monopolize the Web browser market in violation of Section 2.  In

light of its finding that an evidentiary hearing on remedy was necessary and the fact that the

District Court's Final Judgment may have rested on liability determinations that did not survive appellate review, the Court of Appeals vacated the Final Judgment and remanded the case to the District Court for new remedy proceedings. Finally, the Court of Appeals disqualified the trial judge retroactively to the date of entry of the Final Judgment based on violations of 28 U.S.C. § 455(a).

       3.      <u>Proceedings in the District Court upon Remand</u>

Upon remand, the District Court ordered the parties to confer and file a Joint Status Report, identifying the issues that remained on remand and the measures to be taken to reach resolution, and proposing a schedule. As part of that process, Plaintiffs advised Microsoft that they did not intend to pursue further proceedings on remand regarding their Section 1 tying claim and did not intend to pursue on remand the restructuring of Microsoft into separate operating system and applications businesses that had previously been ordered by the District Court. Plaintiffs took these steps after careful consideration of the Court of Appeals' decision and its likely impact on prospective remedies, in an effort to obtain prompt, effective and certain relief for consumers.

Subsequently, the District Court ordered the parties into a period of intensive settlement and mediation discussions to attempt to reach a fair resolution, commencing on September 28, 2001, and expiring on November 2, 2001. During that period, the parties expended every effort to comply with the Court's order and, after extensive negotiations, the United States, nine of the States (New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin), and Microsoft were able to reach agreement upon a Proposed Final Judgment that would achieve a prompt, certain and effective remedy for consumers by imposing injunctive

relief to enjoin continuance and prevent recurrence of the violations of the Sherman Act by Microsoft that were upheld by the Court of Appeals, and restore the competitive conditions prevailing prior to Microsoft's unlawful conduct. The Proposed Final Judgment was filed on November 6, 2001.[2/]

B.    Factual Background

1.    Microsoft's Operating System Monopoly

Personal computers consist, *inter alia*, of central processing components (a microprocessor and main memory), software, and data storage (*e.g.*, a hard disk). The software on a personal computer largely consists of an operating system and applications designed to accomplish specific tasks, such as word processing. The operating system controls the allocation and use of computer resources and serves as a "platform" for applications by exposing interfaces (application programming interfaces, or APIs) that applications invoke to perform crucial tasks such as displaying text on a screen.

Microsoft has monopoly power in the market for Intel-compatible personal computer operating systems and undertook an extensive campaign of exclusionary acts to maintain its operating system monopoly. The relevant market for evaluating Microsoft's monopoly power is the licensing of all Intel-compatible personal computer operating systems worldwide. Intel-compatible personal computers are designed to function with Intel's 80x86 and successor families of microprocessors (or compatible microprocessors). Operating systems designed for

---

[2] The United States and Microsoft initially filed their proposed Final Judgment on November 2, 2001. After further mediation, the aforementioned states, the United States and Microsoft all agreed to the Proposed Final Judgment that was filed on November 6, 2001. The States of California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah and West Virginia, along with the District of Columbia, did not join in the Proposed Final Judgment.

Intel-compatible personal computers do not run on other personal computers, and operating systems designed for other personal computers do not run on Intel-compatible personal computers. Moreover, consumers are very reluctant to substitute away from Intel-compatible personal computers (for any reason, including an increase in operating system prices) because to do so would entail incurring substantial costs and would not result in a satisfactory substitute. Thus, a monopolist of operating systems for Intel-compatible personal computers can set and maintain the price of a license substantially above that which would be charged in a competitive market without losing so many customers as to make the action unprofitable.

2. The Applications Barrier To Entry

The operating system serves principally two functions: it enables the computer's hardware to operate and it serves as a platform for applications programs, such as word-processing and spreadsheets. The latter function is the source of an "applications barrier to entry" that protects Microsoft's monopoly power in the operating system market: users do not want to invest in an operating system until it is clear that the system will support generations of applications that will meet their needs, and developers do not want to invest in writing or quickly porting (*i.e.*, adapting) applications for an operating system until it is clear that there will be a sizeable and stable market for it. This self-reinforcing cycle is sometimes referred to as a "network effect," a phenomenon by which the attractiveness of a product increases with the number of people using it.

The ubiquity of the Windows operating system thus induces developers to create vastly more applications for Windows than for other operating systems. The availability of a rich array of applications in turn attracts consumers to Windows. A competing operating system will not

attract large numbers of users unless those users believe that there is and will continue to be a

sufficient and timely array of applications available for use on that operating system.  Software

developers, however, have little incentive to write applications for an operating system without a

large number of users.

       3.       <u>Combating The Middleware Threats</u>

The formidable applications entry barrier may be eroded through platform software

known as "middleware."  A middleware program is not an operating system; rather, it is platform

software that runs on top of an operating system – *i.e.*, uses operating system interfaces to take

advantage of the operating system's code and functionality – and simultaneously exposes its own

APIs so that applications can run on the middleware itself.  An application written to rely

exclusively on a middleware program's APIs could run on all operating systems on which that

middleware runs.  Because such middleware also runs on Windows, application developers

would not be required to sacrifice Windows compatibility if they chose to write applications for a

middleware platform.  Applications developers would thus have incentives to write for widely

used middleware, and users would not be reluctant to choose a non-Windows operating system

for fear that it would run an insufficient array of applications.

Middleware's potential to erode the applications barrier to entry thus poses a threat to

Microsoft's ability to maintain its operating system monopoly.  Recognizing this threat,

Microsoft engaged in an extensive pattern of conduct designed to eliminate the threat posed by

middleware.  To protect its operating system monopoly, Microsoft focused on two incarnations

of middleware that, working together, had the potential to weaken the applications barrier

severely without the assistance of any other middleware: Netscape's Web browser and Sun Microsystems' implementation of the Java technologies.

        a.       <u>Microsoft's Campaign to Eliminate the Netscape Threat</u>

In December 1994, Netscape first marketed a Web browser called Navigator. Within months, Navigator was the preeminent Web browser. Microsoft became deeply concerned that Netscape was moving its business in a direction that could diminish the applications barrier to entry and thus decided to eliminate the threat that Navigator would become a viable alternative platform for applications. Microsoft first tried to reach an agreement with Netscape in June 1995, pursuant to which Netscape would have stopped efforts to develop Navigator into "platform-level" (*i.e.*, API-exposing) browsing software for the Windows 95 operating system that was to be released later that summer; in return, Microsoft proposed to refrain from competing with Netscape in developing browsers for other operating systems.

Microsoft warned Netscape that timely access to critical technical information about Windows APIs – information that Netscape needed to make its browser run well on Windows 95 – depended on its acquiescence. Had Netscape acquiesced in Microsoft's proposal, it would have become all but impossible for Navigator or any other browser rival to pose a platform threat to Windows.

Netscape did not accept Microsoft's proposal, and in response, Microsoft withheld from Netscape crucial Windows-related technical information that it routinely provided to others, and delayed the provision of necessary APIs, so that Netscape was excluded from most of the 1995 holiday selling season. Moreover, once it became clear to senior executives at Microsoft that Netscape would not abandon its efforts to develop Navigator into a platform, Microsoft focused

its efforts on ensuring that few developers would write their applications to rely on the APIs that Navigator exposed.

Microsoft understood that software developers would only write to the APIs exposed by Navigator in numbers large enough to threaten the applications barrier if they believed that Navigator would emerge as the standard software employed to browse the Web. If Microsoft could demonstrate that Netscape would not become the standard and that Microsoft's browser, Internet Explorer, would meet or exceed Netscape's browser usage share, developers would continue to focus their efforts on the Windows platform. Therefore, to protect the applications barrier to entry, Microsoft embarked on a multifaceted campaign to maximize Internet Explorer's share of usage and to minimize Navigator's.

Decision-makers at Microsoft worried that simply developing its own attractive browser product, providing it to consumers free of charge, and promoting it vigorously would not divert enough browser usage from Navigator to neutralize Navigator as a platform. Thus, rather than confine itself to improving and promoting Internet Explorer as a competitor to Navigator, Microsoft decided to constrict Netscape's access to the two distribution channels that led most efficiently to browser usage: installation by OEMs on new personal computers and distribution by Internet Access Providers ("IAPs"). Users rarely switched from whatever browsing software was placed most readily at their disposal, which was usually the browsing software installed on their computer by the OEM or supplied by their IAP when they signed up for Internet service. Microsoft thus sought to ensure that, to as great an extent as possible, OEMs and IAPs bundled and promoted Internet Explorer to the exclusion of Navigator.

Microsoft largely succeeded in exiling Navigator from the crucial OEM distribution channel. By January 1998, Microsoft executive Joachim Kempin was able to report to CEO Bill Gates that Navigator was being shipped through only 4 of the 60 OEM distribution sub-channels, and even then most often in a position much less likely to lead to usage than would Internet Explorer's position. By early 1999, Navigator was present on the desktop of only a tiny percentage of the personal computers that OEMs shipped.

Similarly, Microsoft's IAP channel restrictions significantly hampered Netscape's ability to distribute Navigator: they caused Internet Explorer's usage share to surge; they caused Navigator's usage share to plummet; they raised Netscape's own costs; and they sealed off a major portion of the IAP channel from the prospect of recapture by Navigator.

To help ensure that developers would not view Navigator as truly cross-platform middleware, Microsoft also pressured Apple to make Navigator less readily accessible on Apple personal computers. As leverage to obtain Apple's compliance, Microsoft threatened to cancel development of its "Office for Macintosh" software, which, as Microsoft recognized, was critical to Apple's business. Microsoft required Apple to make Internet Explorer its default browser and restricted Apple's freedom to feature and promote non-Microsoft browsing software, in order to protect the applications barrier to entry.

As part of its effort to hamper distribution of Navigator and to discourage the development of software that used non-Microsoft technology, Microsoft also targeted Independent Software Vendors ("ISVs"). Microsoft contractually required ISVs to use Internet Explorer-specific technologies in return for timely and commercially necessary technical

information about Windows, and precluded important ISVs from distributing Navigator with their products.

Microsoft's actions succeeded in eliminating the threat that the Navigator browser posed to Microsoft's operating system monopoly. Foreclosed from effectively using the OEM and IAP distribution channels by Microsoft's exclusionary conduct, Navigator was relegated to more costly and significantly less effective modes of distribution. The adverse business effects of these restrictions also deterred Netscape from undertaking technical innovations in Navigator that might have attracted consumers and revenues.

Because of its reduced access to efficient distribution channels, Navigator's share of browser use fell precipitously. Even though Navigator's installed base of users increased during the browser war, the population of browser users expanded so quickly that Navigator's usage share fell dramatically even as its installed base grew. Navigator lost its ability to become the standard software for browsing the Web because Microsoft had successfully -- and illegally -- excluded Navigator from that status.

        b.      <u>Microsoft's Efforts to Extinguish Java</u>

Microsoft also feared another middleware technology, Sun Microsystems' Java. Java software presented a means for overcoming the applications barrier to entry by enabling developers to write programs that could be ported to different operating systems with relative ease. Microsoft was concerned about Java because a key to maintaining and reinforcing the applications barrier to entry has been preserving the difficulty of porting applications from Windows to other platforms, and vice versa.

Java software has four elements: a programming language; a set of "class libraries," which are Java programs that expose APIs on which developers writing in Java can rely; a compiler that translates the code written by the developer into Java "bytecode"; and "Java Virtual Machines" ("JVMs"), programs that translate the Java bytecode into instructions comprehensible to the underlying system. The Java class libraries and JVM together form the "Java runtime environment." If a software program relies only on APIs exposed by the Java class libraries, it will run on any personal computer system carrying a Java runtime environment, no matter what operating system is on the computer. Therefore, Java applications require porting only to the extent that those applications rely directly on the APIs exposed by a particular operating system.

In May 1995, Netscape announced that it would include a Sun-compliant Windows JVM with every copy of Navigator, thereby creating the possibility that Sun's Java implementation would achieve the necessary ubiquity on Windows to pose a threat to the applications barrier to entry. Microsoft's determination to cripple cross-platform Java was an important reason for its concern about Navigator. Microsoft thus took numerous steps to interfere with the development, distribution, and use of cross-platform Java. Those steps included: (1) pressuring third parties not to support cross-platform Java; (2) seeking to extinguish the Java threat through technological means that maximized the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa; and (3) other anticompetitive steps to discourage developers from creating Java applications compatible with non-Microsoft JVMs.

Through its actions against Navigator and Java, Microsoft retarded, and perhaps extinguished altogether, the process by which these two middleware technologies could have

facilitated the introduction of competition into the market for Intel-compatible personal computer operating systems.

4. <u>Summary of Effects of Microsoft's Anticompetitive Conduct</u>

The Court of Appeals affirmed that, through its anticompetitive conduct, Microsoft has unlawfully protected and maintained its operating system monopoly in violation of Section 2 of the Sherman Act.

**IV.**

**EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The Proposed Final Judgment seeks to eliminate Microsoft's illegal practices, to prevent recurrence of the same or similar practices and to restore the competitive threat that middleware products posed prior to Microsoft's unlawful conduct. As discussed in further detail below, it seeks to achieve these goals by prohibiting Microsoft from engaging in specified activities, by requiring Microsoft to undertake certain other specified activities, by establishing a three-person independent Technical Committee ("TC") to assist in enforcement and compliance, and by requiring Microsoft to establish an internal antitrust compliance program. The Proposed Final Judgment applies to Microsoft's conduct nationwide.

A. <u>Scope of the Proposed Final Judgment</u>

A number of the definitions contained in the Proposed Final Judgment are essential to understanding the proper construction of the scope of the requirements and restrictions contained in the Proposed Final Judgment.

**"Microsoft Middleware,"** a defined term, is the concept that triggers Microsoft's obligations, including those relating to Microsoft's licensing and disclosure obligations under

Sections III.D. and III.E., in this Proposed Final Judgment. Microsoft Middleware means software code that is distributed separately from a Windows Operating System Product to update that Windows Operating System Product, is Trademarked (as that term is defined in the Proposed Final Judgment), provides the same or substantially similar functionality as a Microsoft Middleware Product and, at a minimum, includes the software code that controls most or all of the user interface elements of the Microsoft Middleware. Microsoft typically develops and distributes a "redistributable" associated with Microsoft Middleware Products. For instance, Microsoft offers a redistributable of Internet Explorer 6, which is a set of software code that is distributed separately under the Internet Explorer trademark and has the same functionality as Internet Explorer in Windows XP. This block of software code is the Microsoft Middleware that corresponds to the Internet Explorer Microsoft Middleware Product. If such a redistributable exists, as they currently do for most Microsoft Middleware Products, then the redistributable is Microsoft Middleware. The primary purpose of the fourth requirement, that the Microsoft Middleware include at least the code that controls most or all of the user interface, is to ensure that the definition captures situations where no such redistributable exists, or where Microsoft chooses to divide up the software code that would otherwise have been a redistributable and to distribute that code not in one block but in various smaller blocks. In such cases, even though the first three requirements would be met, there could be uncertainty as to which of the smaller blocks of code constitute the Microsoft Middleware, particularly if some of the blocks are characterized by Microsoft as operating system updates. The fourth requirement sets a minimum functional requirement that in no case (regardless of the size of, or manner of, distributing the

code) shall the software code constituting Microsoft Middleware be less than that which controls most, or all of, the user interface elements of that Microsoft Middleware.

Software code distributed to update a Microsoft Middleware Product, such as an update to Internet Explorer, is Microsoft Middleware if it is a new "major version" of that Product: *e.g.*, if it is identified by a new name or a new version number that consists of a whole number (*e.g.*, "7.0") or a number with a single digit to the right of the decimal place (*e.g.*, "7.1").  This requirement is intended to focus the definition on code updates that provide commercially meaningful new or improved functionality, rather than simple bug fixes or patches, and uses Microsoft's current, regular versioning practices to differentiate minor fixes from more significant new versions.

**"Microsoft Middleware Product,"** a defined term, is a concept critical to, among other things, identifying software to which user access and defaults must be made removable in favor of competing software pursuant to Section III.H.  Microsoft Middleware Product is broad; it covers not only a variety of existing products, but also sets forth an objective test for products not yet in existence that may become covered by the definition in the future.  Existing products within this definition are those that include the functionality provided to users by a number of identified Microsoft products:  Internet Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger, and Outlook Express.  The definition includes not only the functionality provided by these products, but also functionality provided by any successors to these products distributed by Microsoft.  A future product would also be a Microsoft Middleware Product if it is first licensed, distributed or sold by Microsoft after entry of the Proposed Final Judgment as part of a Windows Operating System Product, and provides functionality similar to

Internet browsers, email client software, networked audio/video client software, and instant messaging software. Thus, for example, future real time communications software that provides functionality similar to instant messaging software would be included, whether that software provides instant messaging via text, audio, and/or video. Alternately, future products would be encompassed within this definition if, in the year preceding commercial release of a new Windows Operating System Product, they are distributed separately from Windows, provide functionality similar to a Non-Microsoft Middleware Product, and are Trademarked.

To be distributed separately from a Windows Operating System Product means that the software code is distributed separately from the original installation on a Personal Computer in any channel. Examples of channels include retail, separate installation by OEMs, downloads, inclusion with third-party software products, mass-mailings, and the Windows Update facility. Any software received in any of these channels after the original installation of a Windows Operating System Product is distributed separately from that Product. Software can be considered to be both part of a Windows Operating System Product and distributed separately from that Product.

**"Non-Microsoft Middleware Product,"** a defined term, is the concept used, among other places, to identify software that may be installed in lieu of a Microsoft Middleware Product, as provided in Section III.H. Generally speaking, "Non-Microsoft Middleware" is third-party software that, similar to the browser, has the potential to create a competitive threat to Microsoft's Windows monopoly by lowering the applications barrier to entry. A Non-Microsoft Middleware Product is any software that both meets the definition of Non-Microsoft Middleware and has at least one million copies distributed in the United States within the previous year. This

requirement of a minimal amount of actual distribution of such products is intended to avoid Microsoft's affirmative obligations -- including the API disclosure required by Section III.D. and the creation of the mechanisms required by Section III.H. -- being triggered by minor, or even nonexistent, products that have not established a competitive potential in the market and that might even be unknown to Microsoft development personnel.

**"Non-Microsoft Middleware"** is any software: (I) not licensed, distributed or sold by Microsoft; (ii) that is capable of running on a Windows Operating System Product; (iii) that itself provides APIs that can be invoked by ISVs to obtain a range of functionality; and (iv) that, if ported to or made to work with a non-Microsoft Operating System, could make it easier for software applications that invoke its functionality to be ported to or run on such non-Microsoft Operating Systems.

It was important to provide some limitations on these and other, related definitions, because not all software that exposes APIs would qualify as "middleware" with competitive significance for purposes of this case. While it is critical that meaningful, future middleware products be captured by the Proposed Final Judgment, such products may not always be readily identifiable as such. Without limitations on the definition, any software developer would be able to claim that any software product was middleware and thereby insist on exercising options and alternatives provided by the Proposed Final Judgment. The limits in the definitions ensure that the provisions of the Proposed Final Judgment apply to products that can credibly be said to pose, alone or in combination with other products, nascent threats to the applications barrier to entry.

The definition of **"Trademarked"** is designed to ensure that the Microsoft Middleware and the Microsoft Middleware Products that Microsoft distributes (either for free or for sale) to the market as commercial products are covered by the Proposed Final Judgment. The definition of Trademarked in all respects applies equally to both trademarks and service marks.

The definition has two categories. The first category covers products distributed in commerce under distinctive names or logos other than by the Microsoft® or the Windows® names by themselves. In order for such products to be Trademarked within the meaning of this definition, Microsoft must claim the name under which the product is distributed, or by which the product is identified, as a trademark or service mark in one of the following ways: (1) by marking the name with trademark notices in connection with a product distributed in the United States; (2) by filing an application for trademark protection for the name in the United States Patent and Trademark Office; or (3) by asserting the name as a trademark in the United States in a demand letter or lawsuit. As long as Microsoft makes a claim in one of these three ways, for any name other than Microsoft® or Windows® by itself, the definition is satisfied. For example, products distributed in commerce under, or identified by, the Windows Media® name are covered.

The second category covers products distributed in commerce under generic or descriptive terms or generic or descriptive terms in combination with either the Microsoft® or the Windows® name, where such terms or combinations of terms do not meet any of the three requirements for being claimed as a trademark or service mark outlined in connection with the first category. Microsoft expressly disclaims all rights in, and abandons any rights it may acquire in the future to, such generic or descriptive terms or combinations of generic or descriptive terms

with either the Microsoft® or the Windows® name. Products falling within this second category are neither Microsoft Middleware nor Microsoft Middleware Products. The second category does not exempt from coverage as Trademarked any product distributed in commerce under, or identified by, marks that consist of any combination of generic or descriptive terms and a distinctive logo or other stylized presentation. For example, the mark MEDIA, although a generic term, would not fall within the second category if it were presented as a part of a distinctive logo or another stylized presentation because the mark itself would not be either generic or descriptive.

The portion of this definition relating to Microsoft's disclaimer of certain trademarks or service marks and its abandonment of any rights to such trademarks or service marks in the future is designed to ensure that, to the extent that Microsoft distributes a product in commerce under generic or descriptive terms or generic or descriptive terms in combination with either the Microsoft® or the Windows® name and claims on that basis that such product does not fall within the definition of Microsoft Middleware or Microsoft Middleware Product, it must forever disclaim and abandon any rights to the name under which any such product is distributed in commerce.

**"Windows Operating System Product"** means the software code commercially distributed by Microsoft for use with Personal Computers under the names Windows 2000 Professional, Windows XP Home and Professional, and successors to these products. In general terms, it refers to Microsoft's line of "desktop" operating systems, as opposed to its server or other operating systems. Windows Operating System Product applies to software marketed under the listed names and anything marketed as their successors, regardless of how that software

code is distributed, whether the software code is installed all at once or in pieces, or whether different license(s) apply.

While the software code that comprises a Windows Operating System Product is determined by Microsoft's packaging decisions (*i.e.*, by what it chooses to ship as "Windows"), software code that is part of a Windows Operating System Product can also meet the requirements of other definitions, such as those for Microsoft Middleware and Microsoft Middleware Product. For example, Internet Explorer is both part of a Windows Operating System Product and a Microsoft Middleware Product.

B. Prohibited Conduct and Anticipated Effects of the Proposed Final Judgment

Appropriate injunctive relief in an antitrust case should: (1) end the unlawful conduct; (2) "avoid a recurrence of the violation" and others like it; and (3) undo its anticompetitive consequences. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947); *United States v. Microsoft Corp.*, 253 F.3d 34, 103, 107 (D.C. Cir. 2001). Restoring competition is the "key to the whole question of an antitrust remedy," *du Pont*, 366 U.S. at 326. Competition was injured in this case principally because Microsoft's illegal conduct maintained the applications barrier to entry into the personal computer operating system market by thwarting the success of middleware that would have assisted competing operating systems in gaining access to applications and other needed complements. Thus, the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future and restore the competitive conditions created by similar middleware threats. The

Proposed Final Judgment imposes a series of prohibitions on Microsoft's conduct that are designed to accomplish these critical goals of an antitrust remedy.

1.     Section III.A.

Section III.A. ensures that OEMs have the contractual and economic freedom to make decisions about distributing and supporting non-Microsoft software products that have the potential to weaken Microsoft's personal computer operating system monopoly without fear of coercion or retaliation by Microsoft.  The District Court found, and the Court of Appeals upheld, that OEMs are a crucial channel for the distribution and ultimate usage of Non-Microsoft Middleware Products such as browsers.  Accordingly, it is critical that the OEMs, through whom the large majority of copies of Microsoft's Windows Operating System Products reach consumers, are free to choose to distribute and promote middleware without interference from Microsoft.

Section III.A. broadly prohibits any sort of Microsoft retaliation against an OEM based on the OEM's contemplated or actual decision to support non-Microsoft software.  Specifically, Microsoft is barred from retaliating by altering its existing commercial relations with an OEM based on the OEM's work with Non-Microsoft Middleware or Operating Systems.  The existing Microsoft-OEM relationship provides a baseline against which any changes Microsoft makes in its treatment of that OEM for prohibited reasons can be detected and assessed.  Microsoft is further prohibited from retaliating against OEMs by withholding newly-introduced forms of non-monetary "Consideration" (a defined term referring to the various means available to Microsoft by which it can retaliate against or reward another firm; specifically, preferential licensing terms; technical, marketing, and sales support; enabling programs; product information; information

about future plans; developer support; hardware or software certification or approval; or permission to display trademarks, icons or logos). For example, if Microsoft begins a new technical support program or a new logo or software certification program that is not yet part of its existing commercial relations with an OEM, Microsoft cannot withhold the new Consideration from that OEM because the OEM is shipping or promoting products that compete with Microsoft Middleware or Operating Systems. Microsoft similarly cannot punish the OEM by withholding participation in a successor version of an existing form of Consideration, for example, in a logo program for calendar year 2003. This effectively bars Microsoft from using either money or the wide range of economic and commercial levers at its disposal to restrain OEMs' support of competing software.

Section III.A. is also broad in the range of OEM activities which Microsoft is prohibited from affecting through retaliation or coercion. Microsoft cannot retaliate against an OEM because Microsoft knows that the OEM either is or is contemplating: (I) developing, distributing, promoting, using, selling, or licensing any software that competes with Microsoft Middleware or a Microsoft Operating System, or any product or service that distributes or promotes Non-Microsoft Middleware; (ii) shipping personal computers that have more than one operating system or that will "dual boot" into different operating systems; or (iii) exercising any other options or alternatives that are assured to OEMs by other provisions of the Proposed Final Judgment. Thus, OEMs will be assured the freedom to make independent decisions about the middleware and other operating systems they install, distribute and promote based on the demands of their customers and not on fear of retaliation by, or coercion from, Microsoft.

Section III.A. does permit Microsoft to provide Consideration to an OEM for a particular Microsoft product or service where the Consideration is commensurate with the level or amount of the OEM's development, distribution, promotion or licensing of that product or service. Thus, Microsoft is limited to providing Consideration for a specific Microsoft product or service in return for the OEM supporting that product or service. Moreover, Microsoft can base such Consideration only on the absolute level or amount of the OEM's support for the Microsoft product or service, rather than on any relative level or amount.

Finally, Section III.A. helps ensure the freedom of OEMs to make decisions about the software they install and promote free from Microsoft's influence by protecting the OEMs from having their vital licenses to Windows Operating System Products canceled without notice. Microsoft is barred from terminating the licenses of any of the 20 largest and most competitively significant OEMs (defined as "Covered OEMs") without first giving written notice of the reasons for the proposed termination and not less than a 30-day opportunity to cure (except for a Covered OEM that has already received two such notices during the term of its license agreement). Without such protection, the threat that key OEMs could suddenly lose their Windows license, and that such loss is at Microsoft's discretion, could act as a powerful deterrent against OEMs taking the risk of promoting and distributing software that competes with Microsoft's.

2.      Section III.B.

In order to ensure freedom for the 20 Covered OEMs from the threat of Microsoft retaliation or coercion, Section III.B. requires that Microsoft's Windows Operating System Product licenses with such OEMs contain uniform terms and conditions, including uniform

royalties.  These royalties must be established by Microsoft in advance on a schedule that is available to Covered OEMs and the Plaintiffs.

Windows license royalties and terms are inherently complex and easy for Microsoft to use to affect OEMs' behavior, including what software the OEMs will offer to their customers.  By eliminating any opportunity for Microsoft to set a particular OEM's royalty or license terms as a way of inducing that OEM to decline to promote non-Microsoft software or retaliating against that OEM for its choices to promote non-Microsoft software, this provision will ensure that OEMs can make their own independent choices.  The provision permits Microsoft to employ volume discounts, but requires that such discounts be based on pre-set, legitimate volume levels.

Section III.B. also prohibits Microsoft from using market development allowances ("MDAs") or programs or other discounts to reward or retaliate against particular OEMs for the choices they make about installing and promoting Non-Microsoft Middleware or Operating Systems or for any other purpose that is inconsistent with the provisions of the Proposed Final Judgment.  If Microsoft utilizes MDAs or similar discounts, they must be available and awarded uniformly to the ten largest OEMs on one discount scale and separately to the ten next largest on the same or another discount scale.  In addition, the discounts must be based on objective, verifiable criteria that are applied uniformly.  These restrictions ensure that Microsoft cannot use MDAs or other discounts to in any way discourage or prevent OEMs from choosing to favor, promote, or ship software that could threaten Microsoft's monopoly or otherwise from exercising the options and alternatives assured to OEMs by the Proposed Final Judgment.

Section III.B. is limited to the 20 OEMs with the highest worldwide volume of licenses of Windows Operating System Products.  Those OEMs together account for a substantial

percentage of all Windows licenses and, consequently, ensuring their freedom to distribute and promote particular types of software that could erode Microsoft's monopoly is competitively significant.

3.  Section III.C.

Section III.C. of the Proposed Final Judgment prohibits conduct -- *e.g.*, Microsoft's restrictions on an OEM's ability to remove or install desktop icons, folders and Start menu entries and to modify the initial boot sequence and to make certain alterations to the desktop -- that the Court of Appeals found to be anticompetitive and unjustified. Section III.C. is designed to ensure that OEMs have the freedom to configure the personal computers they sell by pre-installing, featuring and promoting Non-Microsoft Middleware or non-Microsoft Operating Systems, products that over time could help lower the applications barrier to entry. This Section prevents Microsoft from restricting a wide variety of actions OEMs may take to offer rival middleware to consumers and to feature that middleware in ways that increase the likelihood that consumers will choose to use it. Assuring this flexibility for OEMs is important to prevent the recurrence of conduct found to be illegal by the Court of Appeals and to help restore the competitive conditions that Microsoft's conduct undermined.

Flexibility in Offering and Promoting Non-Microsoft Middleware: The first three subsections of Section III.C. prohibit Microsoft from restricting by agreement (any contract, requirement or understanding) OEMs from pre-installing, distributing, promoting or launching automatically Non-Microsoft Middleware or related products or services. Thus, for example, Microsoft may not include terms in a license agreement, Windows OEM preinstallation kit instructions, MDAs or other programs, or any other contractual document, that restrict OEMs'

freedom to install and feature Non-Microsoft Middleware in the ways specified in subsections III.C.1-3.

These subsections prevent Microsoft from restricting the freedom of OEMs to install and display icons, shortcuts, or menu entries both for Non-Microsoft Middleware and, more broadly, for any other product or service (including IAP products or services) that distributes, uses, promotes or supports Non-Microsoft Middleware. For example, an OEM may promote or install third-party offers for Internet access, subscription on-line music services, or Web-based applications that use or support Non-Microsoft Middleware such as an alternate browser, audio/video client software, or Java Virtual Machine. Subsection III.C.1. ensures that OEMs are free to install such products and services and to place icons, shortcuts or menu entries for them on the Windows desktop or Start menu.

This subsection also provides OEMs the flexibility to display such icons, shortcuts, or menu entries anywhere else in Windows where a list of icons, shortcuts or menu entries for applications are generally displayed. For example, OEMs must be free to feature Non-Microsoft Middleware in the system tray and quick launch bar, "right-click" lists, "open with" lists and lists that appear based on an action or an event, such as connecting hardware or inserting an audio CD. Microsoft may specify that certain lists of icons, shortcuts, or menu entries are limited to products with particular types of functionality; for example, Microsoft may require that OEMs not place icons for media players or browsers in control panel windows that are limited to system-utility type functions, so long as any such requirements apply equally to Microsoft and non-Microsoft products. Thus, by way of example, Microsoft may reserve a particular list for multimedia players, but cannot specify either that the listed player be its own Windows Media

Player or that, whatever multimedia player an OEM chooses to list in that entry, it be capable of supporting a particular proprietary Microsoft data format. Such non-generic specification, which would have the effect of restricting the display of competing Non-Microsoft Middleware, would not be "non-discriminatory" as required by subsection III.C.1.

Subsection III.C.2. prevents Microsoft from restricting an OEM's ability to distribute or promote Non-Microsoft Middleware by installing and displaying on the Windows desktop shortcuts of any size or shape, so long as the shortcut is not of a size or shape that effectively impairs the functionality of the user interface. Thus, Microsoft could prevent an OEM from installing a large "shortcut" that covered the Start button or obscured the entirety of the Windows user interface, but could not generally ban OEMs from installing large or differently-shaped shortcuts.

Subsection III.C.3. requires that Microsoft permit OEMs to configure their products to launch Non-Microsoft Middleware automatically at the conclusion of the first boot sequence or subsequent boot sequences or upon connection to or disconnection from the Internet, if Microsoft has configured any of its Microsoft Middleware Products that provide similar functionality to do so. Thus, if Microsoft configured its products automatically to launch functionality provided by a Microsoft Middleware Product on boot-up or in conjunction with an Internet session, an OEM must be free instead to launch automatically similar functionality of Non-Microsoft Middleware. For example, if Microsoft configured its Windows Media Player automatically to launch in a personal computer's memory upon boot-up or connection to the Internet, an OEM could instead automatically launch a competing media player upon those same events.

The only other limitation Microsoft may impose on OEMs in this circumstance is that any Non-Microsoft Middleware the OEM configures to launch automatically cannot display a user interface that is not of similar size and shape as the Microsoft Middleware Product user interface that would otherwise launch automatically. For example, if Windows Messenger automatically launches after connection to the Internet, but only appears in the system tray, an OEM may configure a competing instant messaging client to launch automatically at the same time, but that product also must appear only in the system tray and not display the full user interface.

Flexibility to Offer Alternate Operating Systems and "Dual Boot" Personal Computers: Subsection III.C.4. ensures that OEMs will be free, if they choose, to offer users the option of launching other Operating Systems during the personal computer's boot-up, either from the initial BIOS program or from a non-Microsoft boot loader that launches prior to the start of the Windows Operating System Product. This provision forbids Microsoft from stopping OEMs from offering "dual-boot" systems -- computers that give users the choice of either launching a Windows Operating System Product or another general- or special-purpose Operating System -- on the same personal computer.

OEM-Specific IAP Offers in the Bootup Sequence: Subsection III.C.5. ensures that OEMs will be free to create and display in the initial Windows boot sequence a customized offer for the user to choose his or her IAP. Microsoft may limit such offers only by requiring that they comply with "reasonable technical specifications," including a requirement that the initial boot sequence be completed upon conclusion of any such offer. Because a user's IAP can be an important source of choices about various middleware for the user, ensuring OEM freedom to

offer customized IAP offers during the initial boot process can have substantial competitive value.

No Contractual Restrictions on OEMs Exercising Other Options in the Decree: Finally, subsection III.C.6. prohibits Microsoft from restricting by agreement an OEM's right to exercise any of the technical configuration options that Microsoft must make available to OEMs under Section III.H., discussed below. This ensures that Microsoft cannot prohibit or impede by contract an OEM's access to or use of what Microsoft must make available through technical facilities in its Windows Operating System Products.

4.      Section III.D.

Section III.D. of the proposed Final Judgment requires Microsoft to disclose to ISVs, IHVs, IAPs, ICPs and OEMs all of the interfaces and related technical information that Microsoft Middleware uses to interoperate with any Windows Operating System Product. This provision ensures that developers of competing middleware -- software that over time could begin to erode Microsoft's Operating System monopoly -- will have full access to the same interfaces and related information as Microsoft Middleware has to interoperate with Windows Operating System Products. Microsoft will not be able to hamper the development or operation of potentially threatening software by withholding interface information or permitting its own products to use hidden or undisclosed interfaces.

Section III.D. requires disclosure of **"Application Programming Interfaces" or "APIs,"** which are the interfaces, including any associated callback interfaces, that Microsoft Middleware running on a Windows Operating System Product uses to call upon that Windows Operating System Product in order to obtain services from it. "Interfaces" includes, broadly, any

interface, protocol or other method of information exchange between Microsoft Middleware and a Windows Operating System Product.

Section III.D. also requires that Microsoft disclose **"Documentation,"** which means all the technical information regarding the identification and means of using APIs that a programmer of ordinary skill requires to make effective use of those APIs. Documentation refers to such information that is of the sort and to the level of specificity, precision and detail that Microsoft currently provides to ISVs and others through the Microsoft Developer's Network ("MSDN"). Through its MSDN service, Microsoft presently makes widely available on the Internet an extensive and detailed catalog of technical information that includes, among other things, information about most Windows APIs for use by developers to create various Windows applications. MSDN access is presently broadly available to developers and other interested third parties. If in the future Microsoft uses another mechanism for disclosure of such information, that mechanism must be similar in scope and availability to that provided today via MSDN.

<u>Microsoft Must Disclose All APIs and Related Documentation</u>: Section III.D. requires Microsoft to disclose to ISVs, IHVs, IAPs, ICPs and OEMs the APIs and related Documentation that any Microsoft Middleware uses to interoperate with a Windows Operating System Product. Third parties may then use those APIs and related Documentation for the purpose of ensuring that their products interoperate with Windows Operating System Products. Microsoft is to provide these disclosures via MSDN or similar mechanisms.

Microsoft's initial obligation to provide the disclosures of APIs and related Documentation under this section arises when Microsoft releases the upcoming first Service Pack

for Windows XP, or twelve months after November 6, 2001 (the date the Proposed Final Judgment was presented to the Court), whichever occurs first. Thereafter, Microsoft is under a continuing obligation to disclose additional APIs and Documentation. Whenever Microsoft develops an updated version of a Windows Operating System Product, it must disclose all relevant APIs and Documentation in a **"Timely Manner,"** meaning at the time Microsoft first releases a widespread beta test version of that Windows Operating System Product (*i.e.*, one made available to 150,000 or more beta testers). If, alternatively, Microsoft develops a new "major version" of Microsoft Middleware, it must disclose any APIs and Documentation used by that middleware to interoperate with any Windows Operating System Product not later than the release of the last major beta version of that middleware (*i.e.*, the version before the release of any "release candidate" version of the middleware). This dual-timing trigger mechanism is important to ensure that ISVs and other third parties learn of all relevant APIs and the information needed effectively to use them well in advance of the actual commercial releases of the relevant Microsoft software, so that the third parties can ensure that their own competing products function on and interoperate with Windows.

The effect of Section III.D. is to assure to Non-Microsoft Middleware meaningful access to the same services provided by the operating system as those available to Microsoft Middleware. Microsoft Middleware will not have access to any hidden or proprietary features of Windows Operating System Products that might allow it to operate more effectively. For example, going forward under this provision, the APIs and related Documentation for the Secure Audio Path digital rights management service that is part of Windows XP must be disclosed and made available for use by competing media players in interoperating with Windows XP.

5.     Section III.E.

Section III.E. of the Proposed Final Judgment ensures that ISVs will have full access to, and be able to use, the protocols that are necessary for software located on a server computer to interoperate with, and fully take advantage of, the functionality provided by any Windows Operating System Product.  The competitive significance of most Non-Microsoft Middleware, including the browser and Java Virtual Machine against which much of Microsoft's illegal conduct was directed, was and will continue to be highly dependent on content, data and applications residing on servers and passing over networks such as the Internet or corporate networks to that middleware running on personal computers.  Section III.E. will prevent Microsoft from incorporating into its Windows Operating System Products features or functionality with which its own server software can interoperate, and then refusing to make available information about those features that non-Microsoft servers need in order to have the same opportunities to interoperate with the Windows Operating System Product.

The terms "Communications Protocols" and "server operating system product" are used throughout this Section.  **"Communications Protocols"** are what Microsoft must make available to third parties.  Communications Protocol is broadly defined to mean the set of rules for information exchange to accomplish predefined tasks between a Windows Operating System Product and a server operating system product connected through any type of network, including, but not limited to, a local area network, wide area network, or the Internet.  These rules govern the format, semantics, timing, sequencing, and error control of messages exchanged over a network.  Every protocol that is implemented in a Windows Operating System Product and that can be used to interoperate with servers without other software being added to that Windows

Operating System Product must be made available by Microsoft for third parties to license at all layers of the communications stack.

The term "server operating system product" includes, but is not limited to, the entire Windows 2000 Server product families and any successors. All software code that is identified as being incorporated within a Microsoft server operating system and/or is distributed with the server operating system (whether or not its installation is optional or is subject to supplemental license agreements) is encompassed by the term. For example, a number of server software products and functionality, including Internet Information Services (a "web server") and Active Directory (a "directory server"), are included in the commercial distributions of most versions of Windows 2000 Server and fall within the ambit of "server operating system product."

Microsoft Must Make Available All Communications Protocols: Starting nine months after submission of the Proposed Final Judgment to the Court, Section III.E. will impose on Microsoft a continuing obligation to license on reasonable and non-discriminatory terms the Communications Protocols implemented in a Windows Operating System Product that are used by a Microsoft server operating system product to interoperate with that Windows Operating System Product without the addition of other software to the client computer. If a Microsoft server interoperates with a Windows Operating System Product such as Windows 2000 Professional or Windows XP Home or Professional using any Communications Protocol that is part of that client operating system (that is, without additional software code being added to the client), then that Protocol must be made available to third parties. Protocols implemented in Windows Operating System Products on or after November 6, 2001 (the date this Proposed Final Judgment was submitted to the Court), must always be available for license. If, in the future,

Microsoft chooses not to implement a new or modified protocol in a Windows Operating System Product, but instead only distributes the code that implements that protocol along with its server software or otherwise separately from the client operating system, as other server software vendors must do, then Microsoft will not be required by this Section to license that protocol. Because the Communications Protocols must be licensed "for use" by such third parties, the licensing necessarily must be accompanied by sufficient disclosure to allow licensees fully to utilize all the functionality of each Communications Protocol.

This provision will protect opportunities for the development and use of Non-Microsoft Middleware by ensuring that competing, non-Microsoft server products on which such Middleware can be hosted and served will have the same access to and ability to interoperate with Windows Operating System Products as do Microsoft's server operating systems. Thus, if a Windows Operating System Product is using all the Communications Protocols that it contains to communicate with two servers, one of which is a Microsoft server and one of which is a competing server that has licensed and fully implemented all the Communications Protocols, the Windows Operating System Product should behave identically in its interaction with both the Microsoft and non-Microsoft servers.

Section III.E. will permit seamless interoperability between Windows Operating System Products and non-Microsoft servers on a network. For example, the provision requires the licensing of all Communications Protocols necessary for non-Microsoft servers to interoperate with the Windows Operating System Products' implementation of the Kerberos security standard in the same manner as do Microsoft servers, including the exchange of Privilege Access Certificates. Microsoft must license for use by non-Microsoft server operating system products

the Communications Protocols that Windows Operating System Products use to enable network services through mechanisms such as Windows server message block protocol/common Internet file system protocol communications, as well as Microsoft remote procedure calls between the client and server operating systems. Communications Protocols that permit a runtime environment (*e.g.*, a Java Virtual Machine and associated class libraries or competing functionality such as the Common Language Runtime) to receive and execute code from a server also will be required to be licensed for use by non-Microsoft servers if those protocols are implemented in a Windows Operating System Product.

Section III.E. must be read in conjunction with subsection III.J.1.a., which exempts from these licensing requirements certain very limited and specific portions or layers of Communications Protocols which would, if disclosed, compromise the system security provided by Microsoft anti-piracy, anti-virus, software licensing, digital rights management, encryption and authentication features. The exception provided by subsection III.J.1.a. is a narrow one, limited to specific end-user implementations of security items such as actual keys, authorization tokens or enforcement criteria, the disclosure of which would compromise the security of "a particular installation or group of installations" of the listed security features. For example, this subsection permits Microsoft to withhold limited information necessary to protect particular installations of the Kerberos and Secure Audio Path features of its products (*e.g.*, keys and tokens particular to a given installation), but does not permit it to withhold any capabilities that are inherent in the Kerberos and Secure Audio Path features as they are implemented in a Windows Operating System Product. This is a critical distinction, because it ensures that Section III.E. will make these features available to competing software and hardware developers and permit them to

offer competing implementations of these features, and products that rely on them, that can do the same things as Microsoft implementations of these features, while protecting the integrity of actual, particular end-user implementations of those systems.

6.      Section III.F.

Section III.F. prohibits Microsoft from retaliating against software and hardware developers based upon either: (I) those developers' development, use, distribution, promotion or support of any software that competes with Microsoft Middleware or Operating System software or any software that runs on such competing software; or (ii) those developers' attempts to exercise the options or alternatives provided for under the Proposed Final Judgment.  This section redresses conduct by Microsoft specifically found unlawful by the District Court and the Court of Appeals.  It prohibits any retaliatory action by Microsoft, while at the same time affording Microsoft a limited opportunity to enter into certain contractual agreements with software developers that limit the developers' ability to promote such competing software if such limitations are reasonably necessary to, and of reasonable scope and duration in relation to, certain bona fide contractual obligations of the software developer.

Subsection III.F.1. embodies the basic prohibitions against retaliation contained in Section III.F.  Subsection III.F.1.a. explicitly prohibits Microsoft from retaliating against software or hardware developers that choose to develop, use, distribute, promote or support software that competes with Microsoft Platform Software or any software that runs on such competing software.  Similarly, Subsection III.F.1.b. makes explicit that Microsoft is precluded from engaging in conduct that frustrates the purpose of the provisions contained in the Proposed Final Judgment.  Thus, Subsection III.F.1.b. ensures that ISVs and IHVs are free to exercise the

options and alternatives available to them under the Proposed Final Judgment without fear of retaliation from Microsoft for doing so.

Subsection III.F.2. prohibits agreements relating to Windows Operating System Products in which a grant of Consideration by Microsoft is conditioned upon a software developer refraining from developing, using, distributing, or promoting any software that competes either with Microsoft Platform Software or any software that runs on such competing software. This subsection contains a limited exception that permits Microsoft to enter into such agreements where such agreements are reasonably limited in scope and duration and reasonably necessary to effectuate bona fide contractual relationships between Microsoft and any ISV relating to the use, distribution or promotion of Microsoft software or the development of software for, or in conjunction, with Microsoft. This subsection prevents Microsoft from entering into agreements with an ISV pursuant to which, for no bona fide purpose, the ISV is prevented from developing, using, distributing or promoting software that rivals Microsoft's, while still permitting ISVs, as they choose, to benefit from legitimate agreements to use or promote Microsoft products. For example, Microsoft could enter into an agreement with an ISV pursuant to which it provides funds to the ISV that can only be used to promote Microsoft software and not rival software; such a restriction would be "reasonably necessary to and of reasonable scope and duration in relation to a bona fide contractual obligations of the ISV . . . ."

Finally, subsection III.F.3. makes clear that nothing in Section III.F. prohibits Microsoft from enforcing either its agreements with ISVs and IHVs or its legitimate intellectual property rights unless doing so is inconsistent with any provision of the Proposed Final Judgment. This subsection again emphasizes that Microsoft may not take any actions, including those relating to

the enforcement activities identified in this subsection, that frustrate the purpose of the provisions contained in the Proposed Final Judgment.

      7.    <u>Section III.G.</u>

Section III.G. of the Proposed Final Judgment prohibits Microsoft from entering into exclusionary agreements with a variety of firms. Subsection III.G.1 forbids agreements in which Microsoft grants Consideration to any IAP, ICP, ISV, IHV or OEM conditioned on that firm's exclusive distribution, promotion, use or support of Microsoft Middleware or Windows Operating Systems Products (defined as "Microsoft Platform Software"). This prohibition will forbid Microsoft from using either money or the wide range of commercial blandishments at its disposal (encompassed in the defined term "Consideration") to hinder the development and adoption of products that, over time, could emerge as potential platform threats to the Windows monopoly. Thus, this provision would bar Microsoft from entering into agreements like the "First Wave" agreements with ISVs whose provisions regarding Java and the browser the Court of Appeals found to be exclusive in effect and illegal.

Subsection III.G.1. further prohibits agreements in which Microsoft grants Consideration conditioned on a firm's distribution, promotion, use or support of Microsoft Middleware or Operating Systems Products in a fixed percentage, since such agreements in practice can serve to exclude rival products. Microsoft is permitted to utilize fixed percentage contracts only in the specific case where the other party to the agreement expressly represents that it is "commercially practicable" for it to undertake equally extensive or greater distribution, promotion, use or support of non-Microsoft software that competes with Microsoft Platform Software. For example, Microsoft could not grant preferential marketing, technical or other support to an ISV

-42-

on the condition that the ISV ship the Windows Media Player along with 70% of the shipments of the ISV's products, unless the ISV affirmatively states that it is commercially practicable for it also to ship competing media players with at least the same (or greater) number of its shipments. This provision is necessitated by the business reality that a fixed percentage requirement, even one that on its face requires less than full exclusivity, frequently will operate as an exclusive or near-exclusive requirement in practice because the other party is unable, due to capacity or other resource constraints, also to deal with competing products. On the other hand, when the other party is not capacity or otherwise restrained from dealing with competing products, the fixed percentage requirement is less likely to operate as an exclusive, and may have pro-competitive benefits.

Subsection III.G.1. requires that Microsoft obtain any such "commercially practicable" representation from firms only in good faith, in other words, with a reasonable belief that the representation is accurate. Plainly, Microsoft could not in "good faith" make this representation a standard part of its agreements with all IAPs, ICPs, ISVs, IHVs or OEMs, nor could it insist on or coerce such a representation where the third party did not independently and affirmatively evaluate and conclude that the representation would be true. Such statements must be genuine and bona fide, and the decision whether or not to make them is entirely within the judgment of the third party.

Subsection III.G.2. prohibits Microsoft from entering into any agreement that conditions placement on the Windows desktop or anywhere else in a Windows Operating System Product of an IAP's or ICP's software, services, content or other material on its agreement to refrain from distributing, promoting, or using software that competes with Microsoft Middleware. The Court

-43-

of Appeals upheld the conclusion that Microsoft violated Section 2 by explicitly conditioning valuable consideration -- specifically the provision of easy access to IAPs' services from the Windows desktop -- on the IAPs' agreements to restrict distribution and promotion of the competing Navigator browser and instead to promote Microsoft's Internet Explorer exclusively. 253 F.3d at 68-69. Such agreements are barred by this subsection.

The restrictions in Section III.G. will not interfere with Microsoft's ability to engage in legitimate joint activities with ISVs, IHVs, IAPs, ICPs or OEMs. Microsoft may enter into bona fide joint ventures or joint development or services arrangements for the creation of new or materially improved products, technologies or services that prohibit the other party from competing with the object of the joint venture for a reasonable period of time, but only so long as the arrangements involve the legitimate and substantial shared contribution of resources that necessarily characterize procompetitive collaborations. By limiting the joint agreement exception to activities that meet these conditions, Section III.G. ensures that Microsoft cannot use the exception to attempt to evade the prohibitions and to engage in exclusionary contracts in the course of normal commercial relations between it and ISVs, IHVs, IAPs, ICPs and OEMs.

Finally, Section III.G. does not apply to agreements in which Microsoft licenses intellectual property in from a third party. This licensing-in exception would, for instance, permit Microsoft to license new technology from an ISV for incorporation into Windows on the condition that the ISV not license the same technology for incorporation into any other personal computer operating system. Such an exception is consistent with the competitive goals of the Proposed Final Judgment because it preserves Microsoft's incentive to invest in successfully using and promoting the intellectual property that it licenses from others. This licensing-in

exception to Section III.G. does not permit Microsoft to enter into agreements, otherwise prohibited by Section III.G., that contain overbroad terms not reasonably related to the licensing-in of intellectual property.

8.    Section III.H.

Section III.H. of the Proposed Final Judgment addresses Microsoft's illegal use of license restrictions and other actions (such as the withdrawal of removal options from OEMs and end users) to exclude rival middleware products. This Section ensures that OEMs will be able to choose to offer and promote, and consumers will be able to choose to use, Non-Microsoft Middleware Products such as Internet browsers, media players, instant messaging programs, and email software. In particular, this Section requires Microsoft to provide the ability for OEMs (through standard preinstallation kits) and end users (through a mechanism such as an Add/Remove utility) to customize their personal computers by removing access to, and automatic invocation of, Microsoft Middleware Products, and by replacing those products with competing Non-Microsoft Middleware Products.

Because Microsoft must make certain technical changes to its Windows 2000 and Windows XP Windows Operating System Products to comply with Section III.H., its requirements will become effective upon the release of the first Service Pack for Windows XP or 12 months after submission of the Proposed Final Judgment to the Court, whichever is earlier. With respect to any new (*i.e.*, post-Windows XP) Windows Operating System Product, Microsoft's obligations under this Section will be determined based on the Microsoft Middleware Products that exist 7 months prior to the last beta test version of that new Windows

Operating System Product.  This time period similarly is intended to give Microsoft the opportunity to make necessary product changes.

For a discussion of the definitions of "Non-Microsoft Middleware Product," "Non-Microsoft Middleware" and "Microsoft Middleware Product," terms which are used throughout this Section, see Section IV.A., *supra*.

<u>End User Access Requirements</u>: Subsection III.H.1. requires Microsoft to allow end users and OEMs to enable or remove access to, and enable or disable automatic invocations of, any Microsoft Middleware Product and Non-Microsoft Middleware Product.  Consumers must be given the ability to make or reverse choices and to switch easily back and forth between the configurations.  For example, Microsoft cannot offer end users or OEMs an option of eliminating access to or default invocation of all Non-Microsoft Middleware Products unless Microsoft permits an equally-obvious and accessible option to undo this choice and restore all Non-Microsoft Middleware Products and defaults.

The mechanism used to offer these choices must be unbiased; that is, it must not present the choices of removing or enabling access or defaults in any way that favors Microsoft's products over third-party products.  The mechanism must offer a separate choice for each middleware product, though it may also offer a choice of enabling all of the Non-Microsoft Middleware Products or all of the Microsoft Middleware Products as a group.

Microsoft must allow the enabling or removal of access to Microsoft Middleware Products and Non-Microsoft Middleware Products via the desktop and Start Menu, as well as anywhere else in a Windows Operating System Product where lists of icons, shortcuts or menu entries are generally displayed.  For instance, Microsoft must allow Non-Microsoft Middleware

Products to appear in the system tray and quick launch bar, "right-click" lists, "open with" lists, and lists that appear based on an event, such as inserting an audio CD. Microsoft may restrict the types of applications that go in these lists only based on functionality, as long as the restrictions are non-discriminatory with respect to non-Microsoft and Microsoft products. For example, Microsoft could require that programs be capable of interacting with or playing audio files in order to be listed when an audio CD is inserted. Because these functionality requirements must be non-discriminatory, competing Non-Microsoft and Microsoft Middleware Products will always be given the same opportunity for placement in these points of access.

Automatic ("Default") Launching of Competing Middleware: Subsection III.H.2. requires Microsoft to allow end users, OEMs and Non-Microsoft Middleware Products to designate Non-Microsoft Middleware Products to be invoked automatically in place of Microsoft Middleware Products, and vice versa. Microsoft is required to provide these points for automatically launching competing middleware, commonly referred to as "defaults," in every case where the displaced Microsoft Middleware Product would be invoked in a separate Top-Level Window and display either all of that product's user interface elements or its Trademark. This requirement is designed to ensure that access to defaults exists whenever the alternative Microsoft product would be launched as the full "product" (*e.g.*, Internet Explorer as the Internet browser), rather than just a portion of its underlying functionality being launched to perform functions in Windows itself (such as code also used by Internet Explorer being used to display part of the Windows user interface), or otherwise where the end user might not necessarily be aware that he or she was using a specific Microsoft Middleware Product. Whereas up to now it has been completely in Microsoft's discretion where, and even if, "default" launching of

-47-

competing products occurs, Subsection III.H.2. will ensure that Microsoft must allow competing programs to be automatically invoked in numerous competitively significant instances.

Preservation of OEM Configuration: Subsection III.H.3. prohibits Microsoft from designing its Windows Operating System Products to automatically alter an OEM's configuration choices -- such as "sweeping" the unused icons the OEM has chosen to place on the Windows desktop -- without first seeking confirmation from the user, and from attempting any such alteration before at least 14 days after the consumer has first booted his or her personal computer. Thus, for example, in Windows XP, the Clean Desktop Wizard cannot run at all until 14 days after the first boot and then not without seeking the user's confirmation to move the unused icons. Additionally, Microsoft cannot change the manner in which a Windows Operating System Product makes automatic alterations other than in new versions of a Windows Operating System Product.

Finally, subsection III.H. permits Microsoft to override existing defaults to Non-Microsoft Middleware Products only when: (I) a Microsoft Middleware Product would be invoked solely for use in interoperating with a server maintained by Microsoft (outside the context of general web browsing -- for example, in the case of the Windows Help feature of Windows); or (ii) the designated Non-Microsoft Middleware Product fails to implement a reasonable technical requirement that is necessary for valid technical reasons to supply the end user with functionality consistent with a Windows Operating System Product. In the latter case, the valid technical reasons must be described in a reasonably prompt manner to any ISV that requests them.

9.      Section III.I.

Section III.I. requires Microsoft to offer necessary related licenses for the intellectual property that it is required to disclose pursuant to the terms of the Proposed Final Judgment (*e.g.*, the disclosures required pursuant to Sections III.D. and III.E.).  This Section is designed to ensure that such intellectual property may actually be used by any entity to which the information is disclosed; it prohibits Microsoft from thwarting the intended goals of the disclosure provisions either by withholding necessary intellectual property licenses or by providing such licenses in an unreasonable or discriminatory fashion.  The overarching goal of this Section is to ensure that Microsoft cannot use its intellectual property rights in such a way that undermines the competitive value of its disclosure obligations, while at the same time permitting Microsoft to take legitimate steps to prevent unauthorized use of its intellectual property.

Subsections III.I.1. and III.I.4. are designed specifically to prevent Microsoft from using its intellectual property rights to frustrate the intended effectiveness of the Proposed Final Judgment's disclosure provisions.  Subsection III.I.1. requires that any licenses granted pursuant to this Section be made on reasonable and non-discriminatory terms.  Microsoft may not impose unreasonable or discriminatory royalties or other terms as a mechanism for subverting the disclosure or other requirements of the Proposed Final Judgment, which are essential to the efficacy of the relief it affords.  Similarly, subsection III.I.4. is designed to guarantee the effectiveness of the disclosure provisions by prohibiting Microsoft from including any terms in any licenses granted pursuant to this Section that subvert the terms of the Proposed Final Judgment.

While the Department's foremost concern regarding Section III.I. is to ensure the effectiveness of the disclosure provisions of the Proposed Final Judgment, it also recognizes that Microsoft has a legitimate interest in limiting its intellectual property licensing to those licenses that are properly related to the terms of the Proposed Final Judgment.  Subsections III.I.2. and III.I.3. are thus designed to address this issue.  Subsection III.I.2. makes clear that licenses granted pursuant to this Section III.I. need be no broader than necessary to permit ISVs, IHVs, IAPs, ICPs or OEMs to exercise the options or alternatives provided for under the Proposed Final Judgment.  Likewise, subsection III.I.3. permits Microsoft to preclude the assignment, transfer or sublicensing of rights granted by Microsoft pursuant to this Section III.I., provided that any such preclusion is reasonable and non-discriminatory as required by subsection III.I.1.

Subsection III.I.5. provides that, to the extent that an ISV, IHV, IAP, ICP, or OEM has any intellectual property relating to its exercise of the options or alternatives provided by the revised proposed Final Judgment, then that ISV, IHV, IAP, ICP, or OEM may be required to grant Microsoft a license to any such intellectual property rights on reasonable and nondiscriminatory terms, if such a cross-license is necessary for Microsoft to provide the options or alternatives set forth in the revised proposed Final Judgment and exercised by the particular ISV, IHV, IAP, ICP or OEM.  This subsection is thus designed to ensure that Microsoft is able fully to comply with the terms of the revised proposed Final Judgment without creating greater infringement liability for itself than it would otherwise have.  This subsection limits Microsoft's access to third-party intellectual property rights through the expressed limitations on the scope of any such cross-licenses.  Therefore, Microsoft will only be entitled to obtain such a license if a license to the ISV's, IHV's, ICP's, IAP's or OEM's intellectual property is necessary for

Microsoft to do its part in ensuring the effective exercise of the options or alternatives set forth in the revised proposed Final Judgment. For example, a company might have a patent on a feature that relates to the interrelationship between the company's system and the operating system, such as a feature that manages operating system resources by making particular calls to the operating system. If, pursuant to the Final Judgment, Microsoft is required to disclose interfaces that might be used by others to support a similar feature in the same fashion, and if the patent-holder seeks a license to exercise any options provided under this Final Judgment, Microsoft is correspondingly entitled by this provision to obtain a limited license to the patent so that Microsoft can comply with its obligation to disclose and license the interface without subjecting itself to claims of direct or contributory infringement of the patent.

      10.    <u>Section III.J.</u>

Section III.J. addresses several security-related issues that may arise from the broad disclosures required of Microsoft by the Proposed Final Judgment. Subsection III.J.1.a. permits Microsoft to withhold from disclosure or licensing certain specific, limited portions of APIs, Documentation, and Communications Protocols that would, if disclosed, compromise the system security provided by a particular installation or group of installations of Microsoft anti-piracy, anti-virus, software licensing, digital rights management, encryption or authentication features. This is a narrow exception, limited to specific end-user implementations of security items such as actual keys, authorization tokens or enforcement criteria, the disclosure of which would compromise the security of "a particular installation or group of installations" of the listed security features. For example, this subsection permits Microsoft to withhold limited information necessary to protect particular installations of the Kerberos and Secure Audio Path

features of its products (*e.g.*, keys and tokens particular to a given installation), but does not permit it to withhold any capabilities that are inherent in the Kerberos and Secure Audio Path features as they are implemented in a Windows Operating System Product.

Subsection III.J.1.b. is intended to permit Microsoft to comply with lawful orders of official government agencies not to disclose, on security grounds, certain APIs or information that Microsoft otherwise would be required to disclose pursuant to this Proposed Final Judgment. This exception only exempts Microsoft from its disclosure obligation in the narrow situation where the direction not to disclose is made lawfully by a government agency of competent jurisdiction, and only to the extent and within the scope of that specific jurisdiction.

Subsection III.J.2. permits Microsoft to take certain limited steps to ensure that any disclosure or licensing of APIs, Documentation, or Communications Protocols related to anti-piracy systems, anti-virus technologies, license enforcement mechanisms, authentication/authorization security, or third party intellectual property protection mechanisms it makes pursuant to this Proposed Final Judgment is to third parties that have a legitimate need for and do not pose a significant risk of misusing that information.  Subsection III.J.2.a. allows Microsoft to condition such disclosure or licensing on the recipient or licensee: (a) having no history of software counterfeiting or piracy or willful violations of intellectual property rights; (b) having a reasonable business need for the information for a planned or shipping product; (c) meeting reasonable and objective standards for the authenticity and viability of its business; and (d) having its programs verified by a third party to ensure compliance with Microsoft specifications for use of the information.

Subsection III.J.2., by its explicit terms, applies only to licenses for a small subset of the APIs and Communications Protocols that Microsoft will have to disclose, namely the specified types of security-related information. Except with respect to the small subset of information covered by this subsection, Microsoft's obligations to make disclosures of, or to license, APIs and Communications Protocols as otherwise required by the Proposed Final Judgment, including the requirements of Sections III.D. and III.E., are unaffected by this subsection. The requirements of this subsection cannot be used as a pretext for denying disclosure or licensing, but instead are limited to the narrowest scope of what is necessary and reasonable, and are focused on screening out only individuals or firms that should not have access to or use of the specified security-related information either because they have a history of engaging in unlawful conduct related to computer software (*e.g.*, they have been found to have engaged in a series of willful violations of intellectual property rights or of one or more violations consisting of conduct such as counterfeiting), do not have any legitimate basis for needing the information, or are using the information in a way that threatens the proper operation and integrity of the systems and mechanisms to which they relate.

B.      Section IV - Enforcement, Technical Committee and Internal Compliance Program

Section IV of the Proposed Final Judgment establishes standards and procedures by which the settling Plaintiffs may obtain access to documents and information from Microsoft related to its compliance with the Final Judgment, and sets forth a procedure for enforcing the Final Judgment. Section IV also establishes a Technical Committee to facilitate evaluation of Microsoft's obligations and compliance, and mandates that Microsoft appoint an Internal

Compliance Officer to administer and supervise Microsoft's compliance with the Final
Judgment.

1. Enforcement Authority

The United States and individual Plaintiff States each have authority to enforce the
Proposed Final Judgment. Plaintiff States will coordinate their enforcement efforts through an
enforcement committee, and in consultation with the United States. Enforcement by the United
States or plaintiff States may include any legal actions or proceedings that may be appropriate to
a particular situation, including petitions in criminal or civil contempt, petitions for injunctive
relief to halt or prevent violations, motions for declaratory judgment to clarify or interpret
particular provisions, and motions to modify the Final Judgment. While Microsoft will be given
a reasonable opportunity to cure violations of Sections III.C., III.D., III.E. and III.H. of the
Proposed Final Judgment prior to the filing of enforcement petitions, *ex post* abatement of
violations will not be a defense to enforcement, through contempt actions or otherwise, of any
knowing, willful or systematic violations by Microsoft or other persons specified in Section II of
the Proposed Final Judgment.

To facilitate monitoring of compliance with the Final Judgment, Microsoft must make
available to Plaintiffs, upon request, records and documents in its possession, custody or control
relating to matters contained in the Final Judgment. Microsoft must also make its personnel
available for interviews regarding such matters. In addition, Microsoft must prepare written
reports relating to the Final Judgment upon request.

2. <u>Technical Committee</u>

The Proposed Final Judgment establishes a three-person Technical Committee ("TC") to monitor Microsoft's compliance with its obligations under the Proposed Final Judgment, and to assist in enforcement and compliance. The TC does not, however, have independent enforcement authority. That authority remains with the United States and the Plaintiff States, just as it would if there were no TC to assist.

TC members will be experts in software design and programming. The Proposed Final Judgment specifies the procedures for establishing the TC as well as its substantive powers. The TC may employ or retain such staff or consultants, including technical staff, as may be necessary to assist the TC in carrying out its duties.

a. <u>TC Establishment</u>: One TC member each will be nominated by Plaintiffs and by Microsoft, and after the Plaintiff and Microsoft nominees are approved and appointed by the Court, those TC members will then nominate the third TC member for the Court's approval and appointment. Each TC member will serve for an initial 30-month term, after which the party that selected the TC member may either request that the Court reappoint the TC member, or may nominate a replacement. A TC member may be removed at any time if the United States in its sole discretion determines that the TC member has failed to act diligently and consistently with the purposes of the Proposed Final Judgment. In the event of a vacancy, the party who originally nominated that TC member will nominate a replacement for approval by the Court.

After appointment by the Court, each TC member will enter into a Technical Committee services agreement with the United States. The TC services agreements will specify the rights, powers, and authority of each TC member, and will provide for compensation at Microsoft's

expense and upon such terms and conditions as Plaintiffs approve. The TC services agreements will contain ancillary confidentiality and pre- and post-employment non-compete provisions necessary to prevent conflicts of interest that could prevent a TC member from performing his or her duties in a fair and unbiased manner. In addition to paying the TC members' fees and expenses as specified in the TC services agreement, Microsoft will indemnify and hold harmless the TC and TC members from any damages, losses, claims, liabilities or expenses arising from the TC's activities, except to the extent that such damages, losses, liabilities or expenses result from misfeasance, gross negligence, willful or wanton acts or bad faith. Microsoft will also provide the TC with permanent offices, telephones, and other support facilities at Microsoft's corporate campus in Redmond, Washington, and at other Microsoft facilities as requested by the TC.

       b. <u>TC Duties</u>: The TC will report to Plaintiffs, and will not be under the control or authority of Microsoft in any way. The TC will receive and investigate complaints or inquiries about Microsoft's compliance with the Proposed Final Judgment from third parties, Plaintiffs, or Microsoft's Compliance Officer. The TC has the power and authority to monitor Microsoft's compliance with the Proposed Final Judgment, and will consult with Plaintiffs regarding its investigations. The TC will meet with Microsoft's Compliance Officer at least once during each investigation to allow Microsoft to respond to the substance of any complaints and to attempt to resolve them informally. This "dispute resolution" function reflects the recognition that the market will benefit from rapid, consensual resolution of issues, where possible. It complements, but does not supplant, Plaintiffs' other methods of enforcement. If the TC concludes that a complaint is meritorious, the TC will so advise Plaintiffs and Microsoft and propose a remedy.

The TC may also communicate with third parties who have made complaints or inquiries about how they or Microsoft might resolve such complaints or inquiries, provided that the TC complies with its confidentiality obligations as explained below. Thus, for example, the TC may explain to a third party various ways of implementing a right granted by the Proposed Final Judgment.

The Plaintiffs and third parties may, but are not required to, submit complaints about Microsoft's compliance with the Proposed Final Judgment to the Compliance Officer. The Compliance Officer will devise a procedure acceptable to the Plaintiffs for submitting such complaints, and post the procedure on Microsoft's Internet website. Any complaint received by the Compliance Officer must be resolved or rejected within thirty days after receipt. The Compliance Officer will promptly advise the TC of the nature of the complaint and its disposition.

Every six months during the term of the Proposed Final Judgment, the TC will prepare written reports summarizing its activities and Microsoft's business practices reviewed. Additionally, whenever the TC has reason to believe Microsoft may have failed to comply with the Proposed Final Judgment, the TC will immediately notify the Plaintiffs in writing and provide relevant details.

The TC will have the power to obtain information from Microsoft in connection with its investigations and duties. The TC may require Microsoft, upon request, to make available records and documents in Microsoft's possession, custody or control, and to provide physical access to Microsoft facilities, systems and equipment. Microsoft must also make its personnel available to the TC for interviews. In addition, Microsoft must prepare written reports, data, and other information upon request. The TC will have access to all of Microsoft's computer software

source code, subject to a confidentiality agreement whose terms are to be approved by Plaintiffs. The United States anticipates that the TC may also require Microsoft to submit for its use all ancillary documentation, tools, test suites, compilers or other materials used in conjunction with the source code to which Microsoft personnel have access. The TC may study, interrogate and interact with Microsoft's source code in connection with performing its duties.

Information obtained from any source by the TC, any TC member, or any TC employee or consultant will remain confidential and will not be disclosed to any person other than the Plaintiffs, Microsoft or the Court. All such information, and any report or recommendations prepared by the TC, will be treated as Highly Confidential under the Protective Order in this case, except as may be otherwise specified by further order of the Court. The TC may preserve the anonymity of any third party complainant in its discretion or when requested to do so by that third party or by Plaintiffs.

Finally, no work product, findings or recommendations of the TC may directly be admitted in any enforcement proceeding before the Court, and TC members may not testify or comment publicly regarding any matter related to the TC's activities or the Proposed Final Judgment. Plaintiffs, however, are not precluded from utilizing, relying on, or making derivative use of the TC's work product, findings or recommendations in connection with any activities relating to enforcement of this Proposed Final Judgment. For example, Plaintiffs may use information obtained from the TC as the basis for commencing a compliance inquiry or investigation.

3. <u>Internal Compliance Program</u>

The Proposed Final Judgment requires Microsoft to maintain an antitrust compliance program to help ensure compliance with the Proposed Final Judgment.  Microsoft must designate an internal Compliance Officer, who may be assisted by other Microsoft employees, with responsibility for administering Microsoft's antitrust compliance program and ensuring compliance with the Proposed Final Judgment.  The Compliance Officer will be responsible for reviewing Microsoft's activities for compliance with the Proposed Final Judgment, and ensuring that Microsoft's internal notification and education responsibilities pursuant to the Proposed Final Judgment are carried out.

Microsoft, through the Compliance Officer, must distribute a copy of the Proposed Final Judgment and additional informational materials to all of present and future officers and directors.  Microsoft must also obtain from each person who receives the Proposed Final Judgment a certification that he or she has read the Proposed Final Judgment and agrees to abide by its terms, and has been advised and understands that he or she must comply with the Final Judgment and that failure to do so may result in conviction for contempt of court.  The Proposed Final Judgment further requires Microsoft to maintain an internal mechanism whereby the recipients of the Proposed Final Judgment are briefed annually on the meaning and requirements of the Proposed Final Judgment and the United States' antitrust laws and advising them that Microsoft's legal advisors are available to confer with them regarding any question concerning compliance with either the Proposed Final Judgment or the United States antitrust laws.

C.    Section V - Termination of the Decree

Section V of the Proposed Final Judgment provides that, unless the Court grants an extension, the Final Judgment will expire five years after the date of entry by the Court.  This time frame provides sufficient time for the conduct remedies contained in the Proposed Final Judgment to take effect in this evolving market and to restore competitive conditions to the greatest extent possible.  Section V further provides that upon a finding by the Court that Microsoft has engaged in a pattern of willful and systematic violations, Plaintiffs may request a one-time extension of the Final Judgment of an additional two years, along with such other relief as the Court may deem appropriate.  This provision is designed to supplement the government's traditional authority to bring contempt actions.  By permitting Plaintiffs to seek a two-year extension upon a showing that Microsoft has engaged in a pattern of willful and systematic violations, this provision is designed to ensure that Microsoft will comply in good faith with the terms of the Final Judgment.

# V.

## ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered a number of alternatives to the Proposed Final Judgment. The United States is satisfied, however, that the requirements and prohibitions contained in the Proposed Final Judgment, supported by strong compliance and enforcement procedures, provide a prompt, certain and effective remedy for the violations Microsoft has committed.

First, the United States considered litigation of the issue of remedy in the District Court. The United States balanced the strength of the provisions obtained in the Proposed Final Judgment; the need for prompt relief in a case in which illegal conduct has long gone

unremedied; the strength of the parties' respective positions in a remedies hearing and the

uncertainties inherent in litigation; and the time and expense required for litigation of the remedy.

The United States determined that the Proposed Final Judgment, once implemented by the Court,

will achieve the purposes of stopping Microsoft's unlawful conduct, preventing its recurrence,

and restoring competitive conditions in the personal computer operating system market, while

avoiding the time, expense and uncertainty of a litigated remedy.  Given the substantial

likelihood that Microsoft would avail itself of all opportunities for appellate review of any non-

consensual judgment, the United States estimated that a litigated result would not become final

for at least another two years.  The remedies contained in the Proposed Final Judgment are not

only consistent with the relief the United States might have obtained in litigation, but they have

the advantages of immediacy and certainty.

Second, the United States considered the remedies set forth in the Final Judgment entered

by the District Court on June 7, 2000.  That June 2000 Final Judgment, which ultimately was

vacated by the Court of Appeals, mandated the structural break-up of Microsoft into separate

operating system and applications businesses and, during the pre-break-up period, interim

conduct requirements.  After remand to the District Court, the United States informed the Court

and Microsoft that it had decided, in light of the Court of Appeals opinion and the need to obtain

prompt, certain and effective relief, that it would not further seek a break-up of Microsoft into

two businesses.  During the settlement discussions that resulted in the Proposed Final Judgment,

the United States considered the interim conduct provisions in the June 2000 Final Judgment.

The provisions in the Proposed Final Judgment are modeled after those earlier provisions, with

modifications, additions and deletions that take into account the current and anticipated changes

in the computer industry, as well as the decision of the Court of Appeals, which reversed certain of the District Court's liability findings.

Finally, the United States received and carefully considered numerous remedy proposals, encompassing a broad range of relief, from industry participants and other interested individuals. Remedies proposed and considered included variations on the following:

- A requirement that Microsoft license the Windows source code to OEMs to enable them to modify, compile and distribute modified versions of the Windows Operating System for certain limited purposes, such as automatically launching Non-Microsoft Middleware, operating systems or applications; setting such non-Microsoft Middleware as the default; and facilitating interoperability between Non-Microsoft Middleware and the Windows Operating System.

- A requirement that Microsoft disclose the entire source code for the Windows Operating System and Microsoft Middleware, possibly within a secure facility for viewing and possibly without such a facility.

- A requirement that Microsoft must carry certain Non-Microsoft Middleware, including but not limited to the Java Virtual Machine, in its distribution of the Windows Operating System.

- A requirement that Microsoft manufacture and distribute the Windows Operating System without any Microsoft Middleware or corresponding functionality included.

- A requirement that Microsoft continue to support fully industry standards if it chooses or claims to adopt them or extends or modifies their implementation.

- A requirement that Microsoft waive any rights to intellectual property in related APIs, communications interfaces and technical information if the Court finds that Microsoft exercised a claim of intellectual property rights to prevent, hinder, impair or inhibit middleware from interoperating with the operating system or other middleware.

The United States carefully weighed the foregoing proposals, as well as others received or conceived, considering their potential to remedy the harms proven at trial and upheld by the Court of Appeals; their potential to impact the market beneficially or adversely; and the chances that they would be imposed promptly following a remedies hearing. The United States ultimately concluded that the requirements and prohibitions set forth in the Proposed Final Judgment provided the most effective and certain relief in the most timely manner.

## VI.

## REMEDIES AVAILABLE TO PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages suffered, as well as costs and reasonable attorney's fees.

## VII.

## PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The parties have stipulated that the Proposed Final Judgment may be entered by this Court after compliance with the provisions of the APPA, provided that the United States has not

withdrawn its consent.  The APPA conditions entry of the decree upon this Court's determination that the Proposed Final Judgment is in the public interest.

As provided by Sections 2(b) and (d) of the APPA, 15 U.S.C. §§ 16(b) and (d), any person may submit to the Department written comments regarding the Proposed Final Judgment. Any person who wishes to comment should do so within sixty days of publication of this Competitive Impact Statement in the Federal Register.

The Department will evaluate and respond to the comments.  All comments will be given due consideration by the Department, which remains free to withdraw its consent to the Proposed Final Judgment at any time prior to entry.  The comments and the responses of the Department will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Renata Hesse
> Trial Attorney
> Antitrust Division
> U.S. Department of Justice
> 601 D Street, N.W., Suite 1200
> Washington, D.C. 20530
> Facsimile: (202)616-9937 or (202) 307-1454
> Email:  microsoft.atr@usdoj.gov

While comments may also be sent by regular mail, in light of recent events affecting the delivery of all types of mail to the Department of Justice, including U.S. Postal Service and other commercial delivery services, and current uncertainties concerning when the timely delivery of this mail may resume, the Department strongly encourages, whenever possible, that comments be submitted via email or facsimile.

The Proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for modification, interpretation, or enforcement of the Final Judgment. As previously set forth, the Proposed Final Judgment would expire five years from the date of its entry.

## VIII.

## STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed final judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed final judgment "is in the public interest." In making that determination

the Court *may* consider:

(1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e) (emphasis added). As the Court of Appeals for the District of Columbia Circuit held, the APPA permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1457-62 (D.C. Cir. 1995).

In conducting this inquiry, "the Court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."[3/] Rather,

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977 WL 4352 at *8, 1977-1 Trade Cas. ¶ 61,508, at 71,980 (W.D. Mo. 1977).

Accordingly, with respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988), *quoting United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir.), *cert. denied*, 454 U.S. 1083 (1981); *see also Microsoft Corp.*, 56 F.3d at 1458. Precedent requires that:

> the balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "within the

---

[3] 119 Cong. Rec. 24598 (1973). *See United States v. Gillette Co.*, 406 F. Supp. 713, 715 (D. Mass.1975). A "public interest" determination may properly be made on the basis of the Competitive Impact Statement and Response to Comments filed pursuant to the APPA. Although the APPA authorizes the use of additional procedures, 15 U.S.C. § 16(f), those procedures are discretionary. A court need not invoke any of them unless it believes that the comments have raised significant issues and that further proceedings would aid the court in resolving those issues. *See* H.R. 93-1463, 93rd Cong. 2d Sess. 8-9, *reprinted in* (1974) U.S. Code Cong. & Ad. News 6535, 6538.

<u>reaches of the public interest.</u>"  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.[4/]

The Proposed Final Judgment, therefore, should not be reviewed under a standard of whether it is certain to eliminate every anticompetitive effect of a particular practice or whether it mandates certainty of free competition in the future.  Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' (citations omitted)."  *United States v. American Tel. and Tel Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983), *quoting Gillette Co.*, 406 F. Supp. at 716; *United States v. Alcan Aluminum, Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985).

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in the complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case."  *Microsoft*, 56 F.3d at 1459.  Because "[t]he court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing the case in the first place," it follows that the court "is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States might have but did not pursue.  *Id*. at 1459-60.  This is particularly true where, as here, the

---

[4]  *Bechtel Corp.*, 648 F.2d at 666 (citations omitted) (emphasis added); *see BNS, Inc.*, 858 F.2d at 463;  *United States v. Nat'l Broad. Co.*, 449 F. Supp. 1127, 1143 (C.D. Cal. 1978); *Gillette Co.*, 406 F. Supp. at 716; *see also United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983).

court's review of the decree is informed not merely by the allegations contained in the Complaint, but also by the extensive factual and legal record resulting from the district and appellate court proceedings.

## IX.

## DETERMINATIVE MATERIALS/DOCUMENTS

No materials and documents of the type described in the Section 2(b) of the APPA were considered in formulating the Proposed Final Judgment. Consequently, none are being filed with this Competitive Impact Statement.

Respectfully submitted,

_____
Phillip R. Malone
Renata B. Hesse
Paula L. Blizzard
Jacqueline S. Kelley
David Blake-Thomas
    Attorneys

U.S. Department of Justice
Antitrust Division
901 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-8276


Dated: November 15, 2001