IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>      Defendant. | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK *ex. rel.*<br>Attorney General ELIOT SPITZER, *et al.*,<br><br>      Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>      Defendant. | Civil Action No. 98-1233 (CKK)<br><br>Next Court Deadline: March 4, 2002<br>         Status Conference |

**DEFENDANT MICROSOFT CORPORATION'S
MOTION TO AMEND THE SCHEDULING ORDER**

Defendant Microsoft Corporation ("Microsoft") hereby moves to amend the Scheduling Order entered on September 28, 2001. The parties have discussed this motion in accordance with LCvR 7.1(m). The non-settling States have stated that they oppose the motion.

**INTRODUCTION**

A lot has changed since the Court entered its Scheduling Order on September 28, 2001. First, Microsoft, the United States and nine of the plaintiff States have agreed to the Revised Proposed Final Judgment ("RPFJ"), thus potentially disposing of Civil Action No. 98-1232 in its entirety and Civil Action No. 1233 in substantial part, if not entirely as well. Second, the non-

settling States have initiated over-broad discovery and have proposed draconian "relief" that cannot be reconciled with plaintiffs' prior representations to the Court in the Joint Status Report or with this Court's statements at the Scheduling Conference on September 28, 2001. Over the last month, the non-settling States have revealed that they intend to pursue a program of litigation that is considerably broader than what plaintiffs collectively proposed in the Joint Status Report and what this Court envisioned when it entered the Scheduling Order.

Microsoft is aware that the Court previously declined to make a preliminary determination as to the outer boundaries of appropriate relief (Sept. 28, 2001 Tr. at 9-10) and that the Court elected not to stay discovery on the non-settling States' request for relief pending review of the RPFJ pursuant to the Tunney Act (Nov. 6, 2001 Tr. at 25-26). Of course, given the intervening events, the Court may choose to revisit those decisions—which Microsoft believes would be the proper course. At the very least, however, the Scheduling Order should be amended in view of the non-settling States' dramatic expansion of the scope of the litigation beyond what the Court reasonably could have anticipated three months ago. Regardless of the resources that Microsoft devotes to this litigation, Microsoft cannot prepare for an evidentiary hearing on the many complex issues raised by the non-settling States' request for "relief" within the time now provided. Microsoft thus respectfully requests that the current schedule be extended by at least four months as detailed below.

In requesting an extension of the current schedule, Microsoft cannot be accused of seeking to delay the imposition of a remedy in this case because Microsoft began complying with the RPFJ—which contains detailed provisions governing numerous aspects of Microsoft's business—on December 16, 2001. The fault for any delay instead lies with the non-settling States,

which have effectively initiated an entirely new case under the guise of pursuing a remedy for the specific acts found to be anticompetitive by the Court of Appeals.

## BACKGROUND

### A. The Joint Status Report

In the Joint Status Report filed with the Court on September 20, 2001, plaintiffs proposed a highly expedited schedule for these proceedings. The basis for their proposal was twofold.

First, plaintiffs emphasized that they had "taken steps to narrow and focus the issues remaining on remand." (Joint Status Report at 21.) In particular, plaintiffs stated that they had decided not to "pursue either the Section 1 tying claim or a structural reorganization of Microsoft" (*id*.) and that the "conduct-related remedies they will seek on remand will be modeled on the interim conduct provisions of the District Court's prior Final Judgment" (*id*. at 22). Although plaintiffs noted that they "may" seek restrictions on Microsoft's conduct in addition to those contained in the prior judgment, their statements in the Joint Status Report clearly implied that the vacated conduct provisions would constitute the bulk of their proposed relief. (*See id*.) Plaintiffs certainly gave no indication that the provisions of the prior judgment would serve only as a starting point for significantly broader remedial proposals that relate to products and services never mentioned at trial.

Second, plaintiffs stressed that "the additional discovery they envision will be limited and can be completed in a short period of time." (*Id*. at 3; *see also id*. at 22 ("The need for further discovery in these remand proceedings is limited.").) Plaintiffs took the position that "many of the facts relevant to fashioning a remedy for Microsoft's violations of Section 2 are already established" and that "[f]urther discovery can be *focused primarily* on updating information relating to Microsoft's on-going conduct." (*Id*. at 23 (emphasis added).) Given the extensive

trial record on the products properly at issue here—Intel-compatible PC operating systems and Web browsing software—plaintiffs sought only "limited additional fact and expert discovery" (*id*. at 3), which they told the Court "can and should be completed quickly and efficiently" (*id*. at 23). Based on these representations, plaintiffs proposed a discovery period of only four months. (*See id*. at 24.)

**B.     The September 28 Scheduling Conference**

The Court relied on plaintiffs' representations in the Joint Status Report in establishing the current schedule. At the Scheduling Conference on September 28, 2001, the Court noted that plaintiffs had stated that they "will be seeking injunctive relief modeled on the relief that [they] sought before Judge Jackson." (Sept. 28, 2001 Tr. at 8.) Although the Court declined to "rule on the scope of relief in the abstract" (*id*. at 10), the Court agreed with Microsoft that "some of the terms of the former judgment are no longer appropriate" because the scope of Microsoft's liability "has been narrowed" (*id*. at 8). The Court thus stated that "the government's first and most obvious task is going to be to determine which portions of the former judgment remain appropriate in light of the appellate court's ruling and which portions are unsupported following the appellate court's narrowing of liability." (*Id*.) The Court also stressed that "the appellate court was very clear with its liability determination" (*id*. at 6) and that "the scope of any proposed remedy must be carefully crafted so as to ensure that the enjoining conduct falls within the penumbra of behavior which was found to be anticompetitive" (*id*. at 8).

On the issue of discovery, the Court stressed that "we're not starting from whole cloth here." (*Id*. at 11.) Based on plaintiffs' representations in the Joint Status Report, the Court established a schedule providing for "approximately four months" of discovery, the exact length of time plaintiffs had requested. (*Id*. at 14.) In so doing, the Court expressed confidence that

discovery could be completed in four months, noting that "if it took five months to do the liability stage, *which was a good deal broader than what this is going to be*, you should be able to do it within this time frame." (*Id*. at 30 (emphasis added).)

**C.    The Non-Settling States' Expansive Discovery Requests**

Despite the Court's assumption that the scope of discovery would be a good deal narrower than it was during the liability phase, the non-settling States have pursued discovery that is significantly broader than the discovery pursued by plaintiffs during the case in chief.

**1.    The Non-Settling States' First Set of 118 Document Requests**

On November 19, 2001, the non-settling States served their first request for production of documents. (A copy of Certain Plaintiff States' First Joint Request for Production of Documents in Remedy Proceedings is included herewith as Exhibit A.) Those requests do not seek "limited" additional discovery. (Joint Status Report at 3, 22.) To the contrary, the non-settling States' numerous document requests are truly breathtaking in scope, addressing aspects of Microsoft's business that have little or nothing to do with Intel-compatible PC operating systems.

Indeed, the non-settling States have already served more requests for documents than plaintiffs served as part of the entire case in chief. During the liability phase, plaintiffs served seven sets of document requests that together consisted of 56 individual requests. By contrast, the non-settling States' *first* request for production of documents alone consists of 118 individual requests—more than double the number of requests served by plaintiffs during the entire liability phase and nearly ten times the number of requests served by Microsoft (12) on the non-settling States.

In addition to the sheer number of requests, the non-settling States' requests for production of documents are exceedingly broad, seeking plenary discovery on nearly every facet of

Microsoft's business.  Unlike discovery during the liability phase, which focused on Intel-compatible PC operating systems and Web browsing software, the non-settling States' requests encompass myriad Microsoft products and services, ranging from server operating systems and server applications to software for handheld devices and Microsoft's new .NET initiatives relating to XML Web services.  Under the guise of pursuing "relief" tailored to the specific conduct found to be anticompetitive by the Court of Appeals, the non-settling States seek massive additional discovery of the sort they might seek had they filed several new and different lawsuits.  *See United States* v. *Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir.) (relief "should be tailored to fit the wrong creating the occasion for the remedy"), *cert. denied*, 122 S. Ct. 350 (2001).  In September, the Court certainly did not envision that plaintiffs would attempt to construct a new case from scratch during the remedy phase.  (Sept. 28, 2001 Tr. at 11 ("we're not starting from whole cloth here").)

Mindful of the Court's instruction that the parties should attempt to resolve all discovery disputes among themselves, Microsoft conferred in good faith with the non-settling States regarding their first set of document requests, and ultimately was able to reach an accommodation with them—despite Microsoft's firm belief that the requests were improper.  In particular, the non-settling States agreed to withdraw four of their 118 requests and to "defer" another request relating to Microsoft Office that was extremely burdensome.  The non-settling States further agreed to limit Microsoft's obligation to search for responsive documents to the files of 54 Microsoft officers and employees.  Despite these "limitations," Microsoft currently estimates that the non-settling States' first set of document requests will require it to review about 3.5 million pages of material.  Microsoft also acceded to the non-settling States' demand that they be given access to the approximately 3.7 million pages of additional documents that Microsoft had

recently produced in a private class action pending in California state court, even though many of those documents relate to products and timeframes not at issue here.

Although Microsoft and the non-settling States were able to reach an agreement—and thereby avoid burdening the Court with a discovery dispute—Microsoft estimates that it will not be able to complete the document production called for by the non-settling States' first set of document requests until January 18, 2002 at the earliest, about a month before the discovery cut-off date. (By contrast, it took Microsoft more than nine months to complete its document production in the California class action referred to above.) Microsoft has a team of 40 lawyers and paraprofessionals working between 60 and 72 hours a week exclusively on this document production. Since the first week of December, Microsoft has been producing responsive documents on a rolling basis every Tuesday and Friday, and it will continue to do so until the production is complete.

### 2. The Non-Settling States' Second Round of Discovery Requests

Apparently not content with 113 document requests covering nearly every aspect of Microsoft's business, the non-settling States served a second set of document requests on December 14, 2001, which consists of another half dozen requests. (A copy of Plaintiff Litigating States' Second Joint Request for Production of Documents in Remedy Proceedings is included herewith as Exhibit B.) That same day, the non-settling States also served 51 requests for admission and 19 interrogatories that seek large quantities of information that is not readily available. (Copies of Plaintiff Litigating States' First Joint Requests for Admission in Remedy Proceedings and Plaintiff Litigating States' First Set of Interrogatories in Remedy Proceedings are included herewith as Exhibits C and D, respectively.) Plaintiffs said nothing about serving requests for admission in the Joint Status Report. (*See* Joint Status Report at 12-14.) With this

last wave of discovery requests—which were served after 6:00 p.m. on the last day for serving such requests under the Scheduling Order—the non-settling States' discovery demands now appear calculated to harass Microsoft. The non-settling States also have served subpoenas on 14 third parties, each consisting of 39 individual requests for production of documents.

### D. The Non-Settling States' Proposed Final Judgment and Preliminary Witness List

The extreme breadth of the non-settling States' discovery requests was only a prelude to their proposed judgment and preliminary witness list, which they served on December 7, 2002. (A copy of Plaintiff Litigating States' Preliminary Witness List is included herewith as Exhibit E.) In preparing their proposed judgment and preliminary witness list, the non-settling States once again completely ignored not only their prior representations to the Court in the Joint Status Report, but also the Court's statements at the September 28 Scheduling Conference.

In the Joint Status Report, plaintiffs stated that they had "taken steps to narrow and focus the issues remaining on remand" (Joint Status Report at 21) and that their proposed relief would be modeled on the vacated conduct provisions of the prior judgment (*see id*. at 2, 22). At the Scheduling Conference, the Court emphasized that some of the provisions of the prior judgment are no longer appropriate because the scope of Microsoft's liability was narrowed on appeal. (*See* Sept. 28, 2001 Tr. at 8.) Indeed, the Court of Appeals expressly stated that it had "drastically altered the scope of Microsoft's liability." *Microsoft*, 253 F.3d at 107. Consequently, this Court told plaintiffs that their first order of business was "to determine which portions of the former judgment remain appropriate in light of the appellate court's ruling and which portions are unsupported following the appellate court's narrowing of liability." (Sept. 28, 2001 Tr. at 8.)

The non-settling States disregarded this instruction. Their proposed judgment includes each and every one of the conduct-related provisions of the prior judgment—and much, much more. In fact, the non-settling States have made many of the vacated conduct provisions significantly broader and more severe, and they have added more than a dozen new provisions of their own, several of which are more extreme than any of the prior conduct provisions.

In proposing such drastic "relief," the non-settling States also ignored the Court's instruction that "the scope of any proposed remedy must be carefully crafted so as to ensure that the enjoining conduct falls within the penumbra of behavior which was found to be anticompetitive." (*Id*. at 8.) As Assistant Attorney General Charles A. James recently explained to the Senate Judiciary Committee:

> The D.C. Circuit . . . significantly narrowed the case, affirming the district court's finding of liability only as to the monopoly maintenance claim, and even there only as to a smaller number of specified anticompetitive actions. Of the twenty anticompetitive acts the court of appeals reviewed, it reversed with respect to eight of the acts that the district court had sustained as elements of the monopoly maintenance claim. Additionally, the D.C. Circuit reversed the lower court's finding that Microsoft's "course of conduct" separately violated Section 2 of the Sherman Act. It reversed the district court's rulings on the attempted monopolization and tying claims, remanding the tying claim for further proceedings under a much more difficult rule of reason standard.

(Statement of Assistant Attorney General Charles A. James Before the Senate Judiciary Committee at 3 (included herewith as Exhibit F).) The non-settling States' proposed remedy extends far beyond the "penumbra" of the 12 specific acts found to be anticompetitive by the Court of Appeals. (*See*, *e.g*., Defendant Microsoft Corporation's Remedial Proposal at 5-11 (discussing the non-settling States' proposed judgment).)

In contrast, the RPFJ negotiated by the United States and nine other States was carefully crafted in light of the Court of Appeals' decision. As the Chief of New York's Antitrust Bureau,

Jay L. Himes, told the Senate Judiciary Committee, the RPFJ "is proportionate to the monopoly maintenance violations that the Court of Appeals for the District of Columbia Circuit sustained." (Statement of New York Antitrust Bureau Chief Jay L. Himes Before the Senate Judiciary Committee at 20 (included herewith as Exhibit G).) It is telling that the two States that previously took the lead in Civil Action No. 98-1233—New York and Wisconsin—and the two States that were the principal representatives of the plaintiff States in the mediation—New York and Ohio—have all agreed to the RPFJ. (*See id*. at 1-2.)

The non-settling States candidly acknowledge the breadth of their proposed remedy and the extent to which it departs from the RPFJ, noting that their proposals "differ substantially from the DOJ settlement." (Plaintiff Litigating States' Remedial Proposals at 38.) In response to an interrogatory served by Microsoft, the non-settling States recently identified 32 separate respects in which they assert that the RPFJ is deficient, and even that list, they claim, is not exhaustive and may be supplemented before trial. (*See* Supplemental Response of the Plaintiff Litigating States to Defendant Microsoft Corporation's First Set of Interrogatories at 6-18 (included herewith as Exhibit H).) For many of these supposed deficiencies, the non-settling States do not even attempt to base their disagreement with the RPFJ on some portion of the Court of Appeals' decision. For instance, they complain that "the RPFJ does not require Microsoft to provide information about transactions that are not subject to the filing requirements of the Hart-Scott-Rodino Act" (*id*. at 15-16), without even entertaining the fiction that the Court of Appeals addressed that issue.

The reason why the non-settling States have proposed "relief" that is significantly broader than the RPFJ—which itself extends beyond the Court of Appeals' liability determinations—is no secret: they unabashedly seek to advance the commercial interests of Microsoft's competi-

tors. Those competitors would like nothing more than to see Microsoft hobbled, without regard to the interests of consumers. For example, the non-settling States' request that Microsoft be required to disclose to them certain information about transactions not subject to federal filing requirements appears to be related to the well-publicized goal of Scott McNealy, the CEO of Sun Microsystems, of restricting Microsoft's ability to make acquisitions. *See* David Kirkpatrick, *Scott McNealy's Plan to Punish Bill Gates*, BUSINESS 2.0 (Oct. 1999) (McNealy "wants a five-year freeze on acquisitions by Microsoft of companies or parts of companies, as well as on cash purchases of intellectual property or products"). As Assistant Attorney General James told the Senate Judiciary Committee:

> While it is certainly true that restrictions and requirements of this sort might be desirable and advantageous to Microsoft's competitors, they would not necessarily be in the interest of competition and consumers overall; many would reduce consumer choice rather than increase it. Moreover, to the extent these restrictions go beyond what is needed to remedy proven antitrust violations, they are not legitimate remedial goals. The objectives of civil antitrust enforcement are remedial, and they focus on protecting and restoring competition for the benefit of consumers, not on favoring particular competitors.

(Statement of Assistant Attorney General Charles A. James Before the Senate Judiciary Committee at 16.) That is why the United States expressly rejected many of the extreme "relief" proposals now advanced by the non-settling States on behalf of Microsoft's competitors. (*See* Competitive Impact Statement at 62-63.)

The identity of the competitors that stand to benefit from the non-settling States' proposed "relief" is also no secret: they are the employers of 12 of the 14 witnesses included on the non-settling States' preliminary witness list—for example, AOL Time Warner, Sun Microsystems, Oracle, Novell, Liberate Technologies, Palm and Red Hat. That witness list not only discloses the proponents of the non-settling States' proposed remedies, but also is, like their

over-broad discovery requests and proposed judgment, inconsistent with the position plaintiffs previously took before the Court. In the Joint Status Report, plaintiff proposed that each side "be limited to 10 witnesses in the remedy hearing." (Joint Status Report at 7.) Although they have not yet identified their expert witnesses, the non-settling States have already exceeded their own proposed limit by four witnesses, while expressly reserving the right to supplement their preliminary witness list. The parties were limited to a total of 12 witnesses per side during the liability phase, and yet the trial (excluding the rebuttal phase) consumed 62 trial days, from October 1998 through the end of February 1999. The trial lasted that long despite the fact that direct testimony was submitted in writing. The non-settling States apparently envision a remedies hearing of equal, if not greater, length—which would be absolutely necessary if they are permitted to delve into all of the issues raised by their sweeping "relief" proposals.

## ARGUMENT

The remedies hearing envisioned by the non-settling States will be very different from what plaintiffs originally proposed and what the Court presumably contemplated when it entered the Scheduling Order. Notwithstanding the Court's understandable desire to proceed expeditiously, Microsoft cannot prepare for a hearing on the extraordinarily broad "relief" proposed by the non-settling States within the time now provided. Moreover, there is much less of a need now than there was in September to proceed expeditiously because Microsoft began complying with the RPFJ on December 16, 2001. (*Cf.* Joint Status Report at 28 ("to date no relief from Microsoft's illegal conduct has been imposed").) Microsoft therefore respectfully requests that the Court extend the current schedule by at least four months. Considering the number of issues raised by the non-settling States' proposed judgment—and the daunting complexity of those

issues—even this extended schedule will be highly ambitious, no matter how many lawyers Microsoft devotes to this litigation.

Given the non-settling States' over-broad discovery requests, extreme proposals for "relief" and preliminary list of 14 fact witnesses, a discovery cut-off date of February 22, 2002 is no longer realistic. A brief overview of the discovery that needs to be completed is set forth below, followed by a proposed revised schedule.

**A.      Fact Discovery from the Parties**

Microsoft will not complete its production of documents in response to the non-settling States' first set of document requests until January 18, 2002 at the earliest, and Microsoft now has to contend with the non-settling States' second batch of document requests. The non-settling States are also continuing to produce documents in response to Microsoft's document requests.

Once Microsoft has completed its document production, the non-settling States presumably will begin noticing the depositions of Microsoft employees. Many of these deponents are likely to be very senior Microsoft executives, whose depositions will be difficult to schedule. The non-settling States also have informed Microsoft that they intend to serve subpoenas for additional documents together with certain witnesses' deposition notices, which will inevitably slow down the process of scheduling depositions. Given their "scorched earth" discovery tactics to date, the non-settling States can be expected to depose the maximum number of fact witnesses allowed by the Court's Scheduling Order—30. Even if the parties are able to schedule three such depositions a week—which will be difficult if the non-settling States serve document subpoenas together with many of their depositions notices—the depositions of Microsoft employees could consume as many as ten weeks. That means that the non-settling States will likely be deposing Microsoft employees into April 2002.

### B. Third-Party Discovery

While attempting to satisfy the non-settling States' over-broad discovery demands, Microsoft will also need to prepare its own case. In mid November, Microsoft served subpoenas for documents on 12 third parties, only two of which have even begun producing documents. None of the 14 third parties that received document subpoenas from the non-settling States over the last few weeks has begun producing any documents in response to those subpoenas.

Following its receipt of the non-settling States' preliminary witness list on December 7, 2001, Microsoft also served document subpoenas on the 11 companies (AOL and Sun Microsystems are producing two witnesses each) and one individual included on that list. At present, Microsoft does not even know what subjects relevant to relief in this case the non-settling States' 14 witnesses intend to address in their testimony. For example, Microsoft has no idea what testimony the non-settling States intend to elicit from Larry Pearson of SBC—the product design manager of a telephone company.

Once these third parties complete their document productions—which could take several months and will likely necessitate motion practice—Microsoft will serve subpoenas for deposition testimony. At the very least, Microsoft will need to depose each of the 14 individuals on the non-settling States' preliminary witness list, as well as other people who work at the companies that employ those individuals. Microsoft has learned that such co-workers often have a different version of events than the witnesses selected by plaintiffs. After the non-settling States serve their final witness list, Microsoft will be required to serve additional subpoenas for documents and deposition testimony to address any new witnesses identified by the non-settling States. As Microsoft told the Court on September 28, 2001, this type of third-party discovery is extraordinarily time-consuming because the targets of Microsoft's discovery requests—Microsoft's

competitors—are typically hostile and resist those requests tooth and nail. (*See* Sept. 28, 2001 Tr. at 22-23.)

Now that it knows the broad contours of the "relief" the non-settling States are seeking, Microsoft also will begin identifying additional third parties to depose and add to its own witness list. Because the non-settling States' proposed "relief" is far more extensive than reasonably could have been imagined based on plaintiffs' prior representations to the Court, Microsoft will likely need to call more third-party witnesses than it had originally contemplated. Microsoft also will need to depose other third parties, whose testimony will be submitted to the Court in the form of depositions.

As Microsoft supplements its witness list, the non-settling States presumably will serve their own subpoenas for documents and deposition testimony on the third-party witnesses added by Microsoft. It then will take time for those third parties to produce documents and for the non-settling States to schedule depositions.

Based on experience, third parties often take two months or longer to produce all of the documents called for by a subpoena—and that assumes the absence of motion practice. Depositions of third-party witnesses then can be expected to consume another two-to-three months, even if the parties are able to schedule two or three such depositions a week. And the parties will not even know the identity of all third-party witnesses in the case until after final witness lists are exchanged. In short, even assuming that all third parties are cooperative and that the parties do not have difficulty scheduling the depositions of busy third-party witnesses, third-party discovery could take six months in this action, and such discovery has not even begun in earnest yet.

## C. Expert Discovery

The parties also need to conduct expert discovery, a critical element of the remedies phase in antitrust litigation. Under the Scheduling Order, the parties are required to identify their expert witnesses and produce expert reports simultaneously on January 25, 2002, and thereafter may commence expert depositions. As things currently stand, fact discovery will not be sufficiently far along to permit the parties to identify their experts and prepare meaningful expert reports by January 25. The parties also should not be required to depose the other side's experts until fact witness depositions are largely completed because experts' views will be affected by what those fact witnesses say. Considering the time that will be required to comply with the non-settling States' extensive discovery demands, depositions of fact witnesses may just be getting underway in late January.

Moreover, because the non-settling States bear the burden of proof here, they should be required to identify their experts first. As plaintiffs noted in the Joint Status Report, during the liability phase, Microsoft was permitted to identify its experts after plaintiffs identified theirs. (*See* Joint Status Report at 24.) The need for staggered identification of experts is even greater now than it was then. As an initial matter, the non-settling States are attempting to make the remedies phase considerably broader and more diffuse than the liability phase, which focused on Intel-compatible PC operating systems and Web browsing software. In addition, during the liability phase, plaintiffs' economists submitted declarations in support of plaintiffs' preliminary injunction motions, which were served together with their complaints. Microsoft thus already knew the identity of some of plaintiffs' experts as well as the broad outlines of their opinions months before plaintiffs were required to serve experts reports. In contrast, Microsoft is completely in the dark now about which subjects the non-settling States may attempt to address

through expert testimony.  As a result, Microsoft should be permitted to identify its experts and produce its expert reports 30 days after the non-settling States do so.  Otherwise, Microsoft will not have a fair opportunity to identify responsive experts and prepare expert reports that address the assertions of the non-settling States' experts.

\*     \*     \*

In sum, Microsoft requests that the remaining dates in the Scheduling Order be amended as follows:

| | |
|---|---|
| States' experts and expert reports: | March 25 |
| Microsoft's experts and expert reports: | April 24 |
| Final witness lists: | May 10 |
| Expert depositions: | March 26-May 24 |
| Discovery cut-off: | July 10 |
| Exhibit lists: | July 12 |
| Joint pre-hearing statements: | July 19 |
| Motions in limine: | July 24 |
| Pre-hearing conference: | July 29 |

This revised schedule would enable the non-settling States to identify their experts and produce expert reports at a time when the factual record will be more fully developed.  Microsoft thereafter would have 30 days in which to depose the non-settling States' experts, identify its own experts and prepare its own expert reports, followed by another 30-day period in which the non-settling States could depose Microsoft's experts.  The revised schedule also would give the parties sufficient time after the exchange of final witness lists to obtain documents and deposition testimony relevant to any new witnesses appearing on those lists.  Lastly, the revised schedule would give the parties several weeks after the discovery cut-off date in which to prepare the other submissions required by the Court's orders.

## CONCLUSION

The parties have now begun discovery and submitted their proposed final judgments. It is thus an appropriate time to consider whether the schedule established in September is still realistic. Because the scope and magnitude of the non-settling States' discovery requests and proposed "relief" are far broader than what anyone reasonably could have foreseen in September—or what plaintiffs represented to the Court in the Joint Status Report—that schedule should be amended.

For the foregoing reasons, the Court should extend the current schedule by at least four months as set forth above. Given the importance of this case to the PC industry and, indeed, the entire nation's economy, fundamental fairness should not be sacrificed for the sake of dispatch, particularly since Microsoft is already complying with the terms of the RPFJ, which provides more relief than is warranted by the Court of Appeals' decision.

Dated: Washington, D.C.
       December 21, 2001

Respectfully submitted,

_____

| | |
|---|---|
| William H. Neukom | John L. Warden (Bar No. 222083) |
| Thomas W. Burt | Richard J. Urowsky |
| David A. Heiner, Jr. | Steven L. Holley |
| Diane D'Arcangelo | Michael Lacovara |
| Christopher J. Meyers | Richard C. Pepperman, II |
| MICROSOFT CORPORATION | Stephanie G. Wheeler |
| One Microsoft Way | Ronald J. Colombo |
| Redmond, Washington 98052 | SULLIVAN & CROMWELL |
| (425) 936-8080 | 125 Broad Street |
| | New York, New York 10004 |
| Dan K. Webb | (212) 558-4000 |
| WINSTON & STRAWN | |
| 35 West Wacker Drive | Bradley P. Smith (Bar No. 468060) |
| Chicago, Illinois 60601 | SULLIVAN & CROMWELL |
| (312) 558-5600 | 1701 Pennsylvania Avenue, N.W. |
| | Washington, D.C. 20006 |
| Charles F. Rule (Bar No. 370818) | (202) 956-7500 |
| FRIED, FRANK, HARRIS, SHRIVER | |
|   & JACOBSON | *Counsel for Defendant* |
| 1001 Pennsylvania Avenue, N.W. |   *Microsoft Corporation* |
| Suite 800 | |
| Washington, D.C. 20004-2505 | |
| (202) 639-7300 | |