IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>MICROSOFT CORPORATION,<br><br>     Defendant. | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK *ex. rel.*<br>Attorney General ELIOT SPITZER, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>MICROSOFT CORPORATION,<br><br>     Defendant. | Civil Action No. 98-1233 (CKK)<br><br>Next Court Deadline: March 4, 2002<br>        Status Conference |

**EXHIBITS TO DEFENDANT MICROSOFT CORPORATION'S
MOTION TO AMEND THE SCHEDULING ORDER**

**INDEX**

Exhibit A       Certain Plaintiff States' First Joint Request for Production of Documents in Remedy Proceedings

Exhibit B       Plaintiff Litigating States' Second Joint Request for Production of Documents in Remedy Proceedings

Exhibit C       Plaintiff Litigating States' First Joint Requests for Admission in Remedy Proceedings

Exhibit D       Plaintiff Litigating States' First Set of Interrogatories in Remedy Proceedings

Exhibit E       Plaintiff Litigating States' Preliminary Witness List

Exhibit F       Statement of Charles A. James, Assistant Attorney General, Antitrust Division, United States Department of Justice, Before the Committee on the Judiciary, United States Senate

Exhibit G       Statement of Jay L. Himes, Chief, Antitrust Bureau, New York State Attorney General's Office, Before the Committee on the Judiciary, United States Senate

Exhibit H       Supplemental Response of the Plaintiff Litigating States to Defendant Microsoft Corporation's First Set of Written Interrogatories

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK *ex rel.* <br> Attorney General ELIOT SPITZER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | Civil Action No. 98-1233 (CKK) <br><br> Next Court Deadline: <br> March 4, 2002 Status Conference |

## CERTAIN PLAINTIFF STATES' FIRST JOINT REQUEST
## FOR PRODUCTION OF DOCUMENTS IN REMEDY PROCEEDINGS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and the

Scheduling Order entered by the Court on September 28, 2001, Plaintiff States

California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah

and the District of Columbia request that defendant Microsoft Corporation produce

for inspection and copying the following documents in its possession, custody or

control, on or before November 29 at 5:00 p.m. at the offices of Williams & Connolly
LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005.

## DEFINITIONS

1. "Actions" means *United States v. Microsoft Corporation*, Civil Action No. 98-
   1232 (CKK), and *State of New York ex rel. Attorney General Eliot Spitzer, et
   al., v. Microsoft Corporation*, Civil Action No. 98-1233 (CKK).

2. "And" and "or" are terms of inclusion and not of exclusion, and shall be
   construed either disjunctively or conjunctively as necessary to bring within
   the scope of a request any document or response that might otherwise be
   construed to be outside of its scope.

3. "Any" shall include, without limitation, "each and every."

4. "Application Programming Interfaces" or "APIs" means all interfaces
   (including any callback interfaces), service provider interfaces, and protocols
   that enable a hardware device or software (including Middleware) to obtain
   services from, provide services to, or otherwise interact with operating
   system software in a personal computer.

5. "Communications Protocols" means all interfaces and protocols that enable
   software installed on other computers (including servers and handheld
   devices) to interoperate with software on a personal computer.

6.    "Communication" means any provision, receipt, or exchange of information, in any manner or form (including but not limited to oral, telephonic, written, or electronic means).

7.    "Document" has the broadest meaning accorded to it by Rule 34 of the Federal Rules of Civil Procedure, and includes but is not limited to all of the matters defined in Rule 1001 of the Federal Rules of Evidence. It includes, but is not limited to, videotapes and multimedia content, however memorialized, each computer file and written, recorded, and graphic material of every kind in the possession, custody or control of Microsoft, electronic correspondence and drafts of documents, electronic mail messages, instant messages, copies of documents that are not identical duplicates of the originals, and copies of documents the originals of which are not in the possession, custody or control of Microsoft. The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems, including back-up tapes. Unless otherwise specified, the term "document" excludes bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature.

8.    "Each" includes all and vice versa.

9. "End-User Access" means the invocation of a software product directly or indirectly by an end-user of a personal computer or the ability of an end-user to invoke such product.

10. "Internet Content Provider" or "ICP" means any entity that creates or otherwise supplies content to users of the Internet, including but not limited to content publishers and content delivery networks.

11. "Internet Access Provider" or "IAP" means any entity that connects consumers to the Internet, with or without proprietary content.

12. "Independent Software Vendor" or "ISV" means any producer of software, excluding Microsoft.

13. "Sun Java Platform" or "Sun Java software" means the Sun Microsystems' Java programming language, Java class libraries, Java foundation classes, Java compiler, and/or Java Virtual Machines.

14. "Microsoft" means Microsoft Corporation, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other person or entity directly or indirectly, wholly or in part, owned or controlled by it, each partnership or joint venture to which any of them is party, and all present and former officers, directors, employees, agents, consultants, or other persons acting for or on behalf of any of them.

15. "Microsoft Middleware Product" means software that provides functionality similar to that provided by Middleware offered by a competitor to Microsoft, regardless of whether such software has ever been distributed separately from a Microsoft Operating System Product.

16. "Microsoft Server Operating System Product" means software (including source code and binary code, and any other form in which Microsoft distributes its Operating Systems for server computers) distributed commercially as Windows Server 2000, Exchange Server 2000, Systems Management Server 2.0, SharePoint Portal Server 2001, SQL Server 2000, and their successor versions.

17. "Microsoft's top twenty OEMs" means in a given year the top twenty OEMs measured by volume of personal computers sold with Windows Operating Systems in the United States.

18. "Middleware" means software that operates, directly or through other software, between an Operating System and another type of software (such as an application, a server Operating System, or a database management system) by offering services via APIs or Communications Protocols to such other software, and could, if ported to or interoperable with multiple Operating Systems, enable software products written for that Middleware to be run on multiple Operating System Products. Examples of Middleware within the meaning of this definition include but are not limited to Internet

browsers, e-mail client software, multimedia viewing or listening software, voice recognition software, instant messaging software, Microsoft Office, and the Sun Java software.

19. "Middleware Product" means any product that fits the definition of Middleware set forth herein, including but not limited to Internet browsers, e-mail client software, multimedia viewing or listening software, voice recognition software, instant messaging software, Microsoft Office and the Sun Java software.

20. "Operating System" means the software that controls the allocation and usage of hardware resources (such as memory, central processing unit time, disk space, and peripheral devices) of a computer, providing a "platform" by exposing APIs that applications use to "call upon" the Operating System's underlying software routines in order to perform functions.

21. "Operating System Product" means an Operating System and additional software shipped with the Operating System, whether or not such additional software is marketed for a positive price. An Operating System Product includes Operating System Product upgrades that may be distributed separately from the Operating System Product.

22. "Original Equipment Manufacturer" or "OEM" means any manufacturer of personal computers.

23. "Platform Software" means an Operating System or Middleware, or a combination of an Operating System and Middleware.

24. "Person" means any natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal, or governmental entity.

25. "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, concerning, or pertaining to, in whole or in part.

26. "Server Operating System" means an Operating System used on a server computer used to connect multiple personal computers, including as part of a local area network, a wide area network or the Internet.

27. "Windows Operating System Product" means software (including source code and binary code, and any other form in which Microsoft distributes its Windows Operating Systems for personal computers) distributed commercially as Windows 95, Windows 98, Windows 98 Second Edition, Windows Millennium Edition, Windows 2000 Professional, Windows XP Home, Windows XP Professional, and their successor versions including Windows Operating Systems codenamed Longhorn and Blackcomb.

## INSTRUCTIONS

1.  If documents responsive to this Request previously have been produced to the United States Department of Justice or any of the Plaintiff States in response to any document request in any of the Actions, you need not re-produce such documents. With respect to previously produced documents that are responsive to this Request, identify each document, including the date of production, the party to whom the document was produced, and the control number for each such document.

2.  All drafts and non-identical copies of responsive documents should be produced.

3.  For each responsive document, or portion thereof, withheld under a claim of privilege, submit a sworn or certified statement from Microsoft's counsel or one of Microsoft's officers that (1) identifies the withheld document by author, addressee, other recipient, date, subject matter, and document control number; (2) specifies the nature and basis of the claimed privilege and the request to which the withheld document is responsive; and (3) identifies each person to whom the withheld document was sent and each person to whom the withheld document or its contents, or any part thereof, was disclosed. Denote all attorneys identified with an asterisk. If a portion of a document is withheld under a claim of privilege, produce the remainder of the document in a timely manner.

4. This Request shall be deemed continuing as provided in the Federal Rules of Civil Procedure, so as to require further and supplemental production if additional documents called for by this Request are obtained or created by Microsoft between the time of the Request and the time of the hearing on remedies.

5. Documents should be produced as they are kept by Microsoft in the usual course of business or should be organized and labeled to correspond to requests below. Copies of all file folders, file labels and other information indicating the source of responsive documents should also be produced.

6. Unless otherwise specified, all requests call for the production of documents created, sent or received on or after September 1, 1998.

## DOCUMENTS REQUESTED

1. One copy of each organizational chart created, dated or in effect for any time period since January 1, 1998.

2. All correspondence between and all documents exchanged by Microsoft and the United States Department of Justice since January 1, 2001.

3. All correspondence between and all documents exchanged by Microsoft and any of the Plaintiff States since January 1, 2001.

4. All documents responsive to any document request previously served by any plaintiff in any of the Actions;

5. Documents sufficient to show the number of Microsoft Operating System licenses sold in 2000 and 2001 for Windows 98, Windows 98 Second Edition, Windows Millennium Edition, Windows 2000 Professional, Windows XP Home Edition, and Windows XP Professional, and the market shares reflected by such sales.

6. Documents sufficient to show the number of Microsoft Operating System licenses sold in 2000 and 2001 for Windows 98, Windows 98 Second Edition, Windows Millennium Edition, Windows 2000 Professional, Windows XP Home Edition, and Windows XP Professional to Microsoft's top twenty OEMs.

7. Two copies each of the backup CD-ROM and gold master, and one copy of all accompanying documentation, for all Windows Operating System Products released since January 1, 1998, including but not limited to Windows 98, Windows 98 Second Edition, Windows Millennium Edition, Windows 2000 Professional, Windows XP Home Edition, and Windows XP Professional, and all product keys, license keys, and any other keys or authorizations necessary so that each such version of each product can be installed and activated, if needed, on at least six separate machines.

8. Two copies each of the CD-ROM media, and one copy of all accompanying documentation, for Windows Server 2000, Exchange Server 2000, Systems

10

Management Server 2.0, SharePoint Portal Server 2001, SQL Server 2000, all client access licenses, product keys, license keys, and any other keys or authorization necessary so that each version of each product can support at least six "authenticated users," within that term's use in the context of Windows 2000 Server licensing.

9. Any draft, final or executed declarations obtained by Microsoft relating to any of the Actions.

10. All executed, proposed, drafts of or considered versions of Windows Operating System Product license agreements (including but not limited to enterprise licenses) between Microsoft and any of Microsoft's top twenty OEMs and all other executed, proposed, draft of or considered agreements that affect the royalty paid by any such OEM to Microsoft.

11. All documents analyzing or discussing the length of term of Windows Operating System Product licenses between Microsoft and any of Microsoft's top twenty OEMs.

12. All executed, proposed, drafts of or considered versions of agreements between Microsoft and any of Microsoft's top twenty OEMs that contain or discuss any monetary or non-monetary consideration (including all non-monetary consideration encompassed within that term's use in the Revised Proposed Final Judgment as well as any: licensing terms; technical, marketing or sales support; enabling programs; product information;

technical information; information about future plans; developer tools or developer support; hardware certification; permission to display trademarks or logos; and new versions of existing forms of non-monetary consideration) provided or withheld by Microsoft to any such OEM.

13. All executed, proposed, drafts of or considered versions of agreements between Microsoft and any of Microsoft's top twenty OEMs that contain, discuss or reflect market development allowances, market development programs, discounts, Business Term Documents, or joint development agreements.

14. One copy of each non-identical Windows Operating System Product OEM Preinstallation Kit provided by Microsoft to any of Microsoft's top twenty OEMs.

15. One copy of each non-identical OEM Resource Guide provided by Microsoft to any of Microsoft's top twenty OEMs.

16. All documents reflecting or discussing any actual, proposed, draft of or considered agreement that provides any form of consideration, incentive, or discount from Microsoft to any of Microsoft's top twenty OEMs with respect to any Microsoft product or service.

17. All correspondence between Microsoft and any of Microsoft's top twenty OEMs relating to negotiations of any agreement, the royalties paid by an

OEM to Microsoft, monetary or non-monetary consideration provided or withheld by Microsoft, market development allowance, market development program, discount, Business Term Document, or joint development agreement.

18. All internal Microsoft documents, including but not limited to documents generated by any consultants or agents of Microsoft, discussing, analyzing or evaluating any executed, proposed, draft or considered agreement, monetary or non-monetary consideration provided or withheld by Microsoft, market development allowance, market development program, discount, Business Term Document, or joint development agreement, between Microsoft and any of Microsoft's top twenty OEMs, any term of any of the foregoing, or the negotiation of any term of any of the foregoing.

19. All documents reflecting or relating to any complaint by any OEM relating to a Windows Operating System Product license agreement, non-monetary consideration provided or withheld by Microsoft, market development allowance, market development program, discount, Business Term Document, joint development agreement, or OEM Preinstallation Kit.

20. All documents relating to any instance in which Microsoft believed that or gave consideration to the possibility that any of Microsoft's top twenty OEMs may have violated any provision of any Windows Operating System Product

license or any other agreement with Microsoft, including but not limited to any correspondence between Microsoft and any such OEM.

21. All documents relating to any consideration given by Microsoft to terminating or any instance in which Microsoft actually terminated any agreement with any of Microsoft's top twenty OEMs.

22. All documents relating to any consideration given by Microsoft to withholding or denying any monetary or non-monetary consideration, market development allowance, market development program, discount, or any other consideration or benefit to any of Microsoft's top twenty OEMs.

23. All documents relating to the Windows Hardware Quality Labs (WHQL) audits of Microsoft's top twenty OEMs, including documents setting forth criteria used in the WHQL audits, the degree of compliance by each such OEM with these audits, the opportunities afforded to OEMs to cure non-compliance, and the consequences of failing such audits.

24. All documents discussing or reflecting the licensing terms relating to Microsoft's Passport service.

25. All documents discussing plans to continue marketing or selling Windows Operating Systems Products offered prior to any versions of Windows XP.

26. All correspondence or agreements between Microsoft and any of Microsoft's top twenty OEMs relating to any actual, proposed, draft, considered or

modifications to any restrictions or requirements relating to any such OEM's ability or obligation to:

(a) install or display any icons on the desktop;

(b) install or display shortcuts or menu entries on the desktop, the Start Menu, system tray, quick launch bar, "right-click" lists, "open with" lists or anywhere else that the user may potentially be able to access any software product;

(c) remove any icons or any other means of end-user access to any software product;

(d) add or remove any functionality of any software product, including the code relating at least in part to the functionality of such product;

(e) make changes to the Start Menu, boot sequence, startup folder, internet connection wizard, preferences, favorites, start page, first screen, user interface, system tray, quick launch bar, "right-click" lists, "open with" lists, or any other means of end-user access;

(f) launch automatically any software product, operating system or software application;

(g) display any user interfaces;

(h) offer any promotion during the boot sequence;

(i) offer sign-up for any third-party service or software product during the boot sequence;

(j) offer an option to make any software product the default product or change any default setting;

(k) install any Microsoft product as the default product providing certain functionality or preventing any non-Microsoft product from becoming the default product providing certain functionality; or

(l) independently alter or design the user interface.

27. All documents discussing, or analyzing any actual, proposed, draft, considered or modifications to any restrictions or requirements relating to the ability or obligation of any OEM to engage in any conduct set forth in Request 26 (a)-(l).

28. All documents relating to Microsoft's decision to offer "computer manufacturers greater flexibility in configuring desktop versions of the Microsoft Windows operating system" as announced in a Microsoft press release dated July 11, 2001, including communications between Microsoft and OEMs relating to this announcement and/or the substance of this announcement, and public reaction to this announcement and/or the substance of this announcement.

29. All documents discussing non-Microsoft software product visibility, advertisement or promotion during the boot up sequence, or as part of any icon, Start Menu, startup folder, internet connection wizard, preferences, favorites, start page, first screen, user interface, default option, system tray, quick launch bar, "right-click" lists, "open with" lists, or anywhere else that the end-user may potentially be able to access software products.

30. All documents relating to plans for current or future Microsoft Operating System Products to have "clean desktops" or no icons appear on the user interface.

31. All documents relating to the functionality of the Add-Remove Programs features in any Windows Operating Systems Product, including but not limited to discussions as to whether or not Internet Explorer, Windows Media Player, Windows Messenger, MSN Explorer, MSN Messenger or any other Middleware Product could be removed using the Add-Remove Program.

32. All documents relating to the ability to change or remove Internet Explorer, Windows Media Player, Windows Messenger, MSN Explorer, MSN Messenger, or any other product as a default option on any Microsoft Operating Systems Product.

33. All documents discussing whether any non-Microsoft Middleware Product or non-Microsoft software product can be the default option on any Microsoft Operating Systems Product.

34. All documents discussing consumer preferences or consumer confusion with respect to the user interface.

35. All documents discussing the placement of icons on the desktop, or any other means of end-user visual access to any Microsoft Middleware Product or software products featured on the desktop, in the Start Menu, or during the boot sequence of any Windows Operating System Product.

36. All documents discussing the automatic launch or the potential automatic launch of any non-Microsoft product at any time.

37. All documents discussing whether to integrate, build in, commingle or otherwise include Middleware Product functionality in a Windows Operating System Product, including discussions as to the advantages or disadvantages of doing so.

38. All documents discussing plans to install additional defaults for Microsoft Middleware Products.

39. All documents discussing the need for Microsoft to obtain licenses for non-Microsoft Middleware Products or other software products in connection with disclosing or licensing Microsoft APIs and Communications Protocols to the owners of such non-Microsoft Middleware Products or software products.

40. All documents relating to any actual, proposed, or considered consideration (whether monetary or non-monetary) given or withheld by Microsoft to any

IAP, ICP, ISV or IHV in connection with the use, marketing, distribution, promotion or support of any Microsoft Platform Software or any software that competes with Microsoft Platform Software.

41. All documents relating to any executed, proposed, draft of considered version of any agreement that conditions the grant of any consideration (whether monetary or non-monetary) on any IAP, ICP, ISV or IHV refraining from developing, using, distributing or promoting any software that competes with Microsoft Platform Software or any software that runs on any Microsoft Platform Software.

42. All internal Microsoft documents discussing, analyzing or reflecting any actual, proposed, or considered consideration (whether monetary or non-monetary) given to or withheld from any IAP, ICP, ISV or IHV in connection with refraining in any degree from developing, using, distributing or promoting any software that competes with Microsoft Platform Software or any software that runs on any Microsoft Platform Software.

43. All documents reflecting or discussing any actual, proposed, draft, considered or contemplated agreement between Microsoft and any ISV or IHV that places limitations on any ISV's or IHV's development, support, use, distribution or promotion of any software that competes with or runs on any Microsoft Platform Software.

44. All documents reflecting or discussing any actual, proposed, draft, considered or contemplated agreement whereby Microsoft provides any form of monetary or non-monetary consideration to any IAP, ICP, ISV, IHV or OEM for distributing, using or promoting Microsoft Platform Software exclusively or in a fixed percentage, or not developing, supporting, distributing, using or promoting any non-Microsoft Platform Software.

45. All documents reflecting or discussing any actual, proposed, draft, considered or contemplated (a) joint venture, or (b) joint development or joint services arrangement between Microsoft and any ISV, IHV, IAP, ICP or OEM.

46. All documents relating to the negotiations between Microsoft and America Online regarding the potential inclusion of any AOL client with Windows XP.

47. All documents discussing or reflecting the differences between the amount, type and timing of disclosure of technical information relating to Microsoft Operating System Products, including APIs and related documentation, Communications Protocols, and any other information disclosed to developers of Microsoft Middleware Products, provided to developers of non-Microsoft Middleware Products on the one hand and developers of Microsoft Middleware Products on the other hand.

48. All documents discussing or reflecting the differences between the amount, type and timing of disclosure of technical information relating to Microsoft Operating System Products, including APIs and related documentation,

Communications Protocols, and any other information used by developers of Microsoft Middleware Products, provided to developers of non-Microsoft Middleware Products on the one hand and other developers of non-Microsoft Middleware Products on the other hand.

49. All agreements (including End-User License Agreements), rules, guides or other standardized documents provided to members of the Microsoft Developer Network.

50. Documents sufficient to show the actual Microsoft Operating System information disclosed, including APIs and related documentation, Communications Protocols, and any other information used by developers of Microsoft Middleware Products, to developers of non-Microsoft Middleware Products and/or developers of Microsoft Middleware Products.

51. All documents discussing or relating to the effect or consequence of changes in the APIs or Communications Protocols of Windows Operating System Products on ISVs, IHVs or OEMs.

52. All documents discussing or relating to a "cleanroom," "secure facility" or other environment in which third parties examine or interrogate Windows Operating System Products to determine the interoperability of third party products with Windows Operating System Products, including any agreements between Microsoft and third parties which allow third parties to

examine or interrogate Microsoft software in a "cleanroom" or "secure facility" type of environment.

53. All documents relating to efforts by Microsoft to port or alter versions of Microsoft software applications or Middleware Products to non-Microsoft Operating Systems, including but not limited to porting Microsoft Office to the Apple MacIntosh Operating System.

54. All documents discussing the differences between the amount, type and timing of disclosure of Windows Operating System information, including APIs and related documentation, Communications Protocols, or any Microsoft other information used by developers of Microsoft Server Operating System Products, provided to developers of non-Microsoft Server Operating System Products on the one hand and developers of Microsoft Server Operating System Products on the other hand.

55. Documents sufficient to show the actual Windows Operating System information disclosed, including APIs and related documentation, Communications Protocols, or any other information used by developers of Microsoft Server Operating System Products, to developers of non-Microsoft Server Operating System Products or developers of Microsoft Server Operating System Products.

56. All documents describing circumstances in which communications between a Windows Operating System Product and a Microsoft Server Operating

System Product are facilitated, improved or optimized by downloading additional software from the Internet to the client personal computer.

57.   All documents relating to the impact that the Sun Java Platform has had or could have on competition among operating system products, the applications barrier to entry or the value of any Windows Operating System Product.

58.   All documents discussing the degree of distribution or lack of distribution, or the degree of integration or lack of integration, of Sun's Java Platform through the sale or license of any Windows Operating System Products or any Microsoft Server Operating System Product.

59.   All documents discussing whether or the extent to which Sun's Java Platform is interoperable with any Windows Operating System Product or Microsoft Server Operating System Product.

60.   All documents relating to the development of, modification to, or lack of development of or modification to Microsoft's Java Virtual Machine or any other Microsoft Java software.

61.   All documents relating to integrating or not integrating Sun's Java Platform with any Windows Operating System Product or Microsoft Server Operating System Product.

62.   All documents discussing or relating to Microsoft's decision or rationale for not including Sun's Java Platform, Microsoft's Java Virtual Machine or any

other Microsoft Java software on any Windows Operating System Product or Microsoft Server Operating System Product.

63. All documents referring or relating to the Java User Migration Path ("JUMP") to .NET or any effort to "clone," through direct copying or independent "cleanroom" development, Sun's Java Platform.

64. All documents relating to the inclusion of the Common Language Runtime as part of any Microsoft Operating System Product, and the impact that such inclusion has had or will have on the Sun Java Platform, the applications barrier to entry or the value of any Windows Operating System Product.

65. Documents sufficient to show for every year since January 1, 1998, the actual, estimated or projected market share of any Internet browser.

66. All documents discussing actual or potential competition among Internet browsers, including the reasons for changes in market share.

67. All documents discussing the promotion, advertising or marketing of the Internet Explorer browser.

68. All documents discussing the desirability or feasibility of having multiple browsers loaded onto a Windows Operating System Product or any other Operating System Product.

69. All documents discussing or relating to the ability or potential for Internet browsers to impact competition among Operating Systems, the applications barrier to entry, or the value of any Windows Operating System Product.

70. All documents discussing Microsoft's goals for, and the importance to Microsoft of increasing its share of distribution of, the Internet Explorer browser, or the Windows Media Player and the consequences and benefits to Microsoft of increasing the share of the Internet Explorer browser or the Windows Media Player.

71. All documents discussing whether any code that performs any functionality for any version of the Internet Explorer browser also performs any other functionality.

72. All documents discussing the potential to market, sell or license any version of the Internet Explorer browser separate from any Windows Operating System Product.

73. All documents discussing any benefits occasioned by incorporating any version of the Internet Explorer browser into any Windows Operating System Product.

74. All documents relating to the interoperability of any non-Microsoft Internet Browser with any Windows Operating System Product, Microsoft Server

Operating System Product, Microsoft Middleware Product, Microsoft software product, web site, or any version of the MSN online service.

75. All documents discussing whether or not to trademark Microsoft Middleware functionality, regardless of whether it is only included as part of a Windows Operating System Product.

76. All documents discussing or reflecting beliefs by anyone at Microsoft regarding threats posed by potential or actual non-Microsoft Middleware Products or competition from such products.

77. All documents referring or relating to distributing or integrating the Windows Media Player with Internet Explorer, any Windows Operating System Product, any Microsoft Server Operating System Product or Microsoft Office.

78. All documents referring or relating to the ability or inability of non-Microsoft Operating System Products or non-Microsoft Server Operating System Products to interoperate with the Windows Media Player or any content developed therefor.

79. All documents referring or relating to the ability or inability of any current or potential Middleware Product to interoperate with any Windows Operating System Product or Microsoft Server Operating System Product.

80. All documents discussing competition between the Windows Media Player and any other product, including but not limited to (a) any versions of Real Networks' RealJukebox, RealPlayer, or RealOne; (b) Musicmatch Jukebox; and (c) America Online's Winamp or Spinner.

81. All documents relating to any communications between Microsoft and any OEM, IAP, ICP, ISV or IHV regarding the use or support of any non-Microsoft multimedia viewing or listening software.

82. All documents discussing the significance of any multimedia viewing or listening software on competition among Operating Systems, the applications barrier to entry, the value of any Windows Operating System Product or the value of any other Microsoft product.

83. All documents referring or relating to distributing or integrating any Microsoft instant messaging software with Internet Explorer, any Windows Operating System Product, any Microsoft Server Operating System Product or Microsoft Office.

84. All documents referring or relating to the ability or inability of non-Microsoft Operating System Products or non-Microsoft Server Operating System Products to interoperate with any Microsoft instant messaging software or any content or application developed therefor.

85.  All documents discussing competition between any Microsoft instant messaging software and any other software product.

86.  All documents discussing the actual or potential impact of any e-mail client software on competition among Operating Systems, the applications barrier to entry, the value of any Windows Operating System Product or the value of any other Microsoft product.

87.  All documents referring or relating to the ability or inability of non-Microsoft Operating System Products or non-Microsoft Server Operating System Products to interoperate with Microsoft's Active Directory.

88.  All documents discussing the impact that including functionality as part of a Windows Operating System Product will have on competing persons who offer such functionality as a separate product apart from an Operating System.

89.  All documents discussing the inclusion of Middleware Products in any Windows Operating System Product and the impact or consequence of such inclusion.

90.  All documents referring or relating to distributing or integrating the .Net Common Language Runtime with Internet Explorer, any Windows Operating System Product, any Microsoft Server Operating System Product or Microsoft Office.

91. All documents referring or relating to the ability or inability of non-Microsoft Operating System Products or non-Microsoft Server Operating System Products to interoperate with Microsoft's .Net Common Language Runtime or any application or content developed therefor.

92. All documents referring or relating to distributing or integrating Passport or Passport Manager with Internet Explorer, any Windows Operating System Product, any Microsoft Server Operating System Product or Microsoft Office.

93. All documents referring or relating to the ability or inability of non-Microsoft products to interoperate with Microsoft's Passport, Passport Manager or any content or application developed therefor.

94. All documents referring or relating to the interoperability of the Passport Log-in Server with non-Microsoft Operating System Products or non-Microsoft Server Operating System Products.

95. All documents discussing the actual or potential impact of web services on competition among Operating Systems, Server Operating Systems, the applications barrier to entry, or the value of any Windows Operating System Product or Microsoft Server Operating System Product.

96. All business plans, projections or documents discussing strategies relating to .Net, Hailstorm, .NET My Services or Passport.

97. All documents discussing the impact that .Net, Hailstorm, .NET My Services or Passport will have on any Windows Operating System Product, Microsoft Server Operating System Product, Windows Middleware Product, non-Microsoft Operating System Product, non-Microsoft Server Operating System Product or non-Microsoft Middleware Product.

98. All documents reflecting or discussing license or other types of agreements relating to Microsoft's .Net, Hailstorm, .NET My Services or Passport initiatives.

99. All documents discussing the potential or actual distribution or integration of Microsoft's implementation of any version of the Kerbcros network authentication service (including any version which is the product of Microsoft modification to the Kerberos network authentication service) with any version of Windows XP, Passport, Passport Manager, Internet Explorer, Internet Information Services ("IIS") or any other Windows Operating System Product, Microsoft Server Operating System Product or Microsoft Middleware Product.

100. All documents relating to any decision by Microsoft to disclose or not disclose APIs, Communications Protocols or other technical information relating to the Windows Media Player.

101. All documents relating to Microsoft to disclosure or non-disclosure of APIs, Communications Protocols or other technical information relating to

Microsoft's digital rights management ("DRM"), secure audio path ("SAP"), or any other security technologies for multi-media on the Internet.

102. All documents discussing the ability or inability of non-Microsoft products to interoperate with any Microsoft version of the Kerberos network authentication and authorization protocols.

103. All documents relating to Microsoft public announcements relating to open standards.

104. All documents discussing initiatives that actually or potentially compete with .Net, Hailstorm, .NET My Services or Passport, including but not limited to the America Online Name Service ("Magic Carpet") the Liberty Alliance, the Catavault All Access Pass to the Internet, and the Sun Open Net Environment (SunONE).

105. All documents discussing marketing strategies or business plans regarding the handheld device or handheld device operating system markets, market shares in either of these markets, and competition in these markets.

106. All documents discussing the interoperability of handheld devices with Windows Operating System Products.

107. All documents discussing plans to release "service packs" or any update for any version of Windows XP, or introduce a new Windows Operating System Product.

108. All documents discussing plans to include additional functionality in Microsoft Office and the consequence or impact of adding such functionality.

109. All documents relating to Microsoft's enforcement, threatened enforcement or considered enforcement of any intellectual property rights against any of its top twenty OEMs, any designer of Non-Microsoft Middleware, or any other Operating System manufacturer.

110. All documents discussing the Final Judgment entered by Judge Jackson in these Actions, including the impact that the judgment would have on Microsoft and/or competition.

111. All documents discussing the Findings of Fact and Conclusions of Law issued by Judge Jackson in these Actions.

112. All documents discussing the June 28, 2001 decision by the United States Court of Appeals for the District of Columbia Circuit in United States v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001).

113. All documents discussing the impact or effect that the provisions set forth in the November 2, 2001 Stipulation and Proposed Final Judgment or the November 6, 2001 Stipulation and Revised Proposed Final Judgment would have on Microsoft or competition.

114. All documents relating to any communications between Microsoft and any actual or potential participant in any Tunney Act proceedings in the Actions.

115. All documents discussing the fact or the possibility that certain persons may testify in these Actions and any action or inaction actually or potentially taken by Microsoft toward such persons as a result or consequence thereof.

116. All documents submitted by Microsoft and/or its counsel to the European Commission or any other foreign antitrust, trade regulation or competition authority in connection with any investigation of Microsoft and all documents received by Microsoft from such authorities or third parties in connection any such investigation.

117. All documents produced by Microsoft and all transcripts of depositions taken in any California state court case coordinated under the caption Coordinated Proceedings Special Title (Rule 1550(b)): Microsoft Cases, J.C.C.P. No. 4106 (San Francisco County Superior Court), and not previously produced in any of the Actions.

118. All documents relating to any executed, proposed, drafts of or considered agreement, including any Windows Operating System Product or Microsoft Server Operating System Product license agreement, between Microsoft and the United States Department of Justice or any of the Plaintiff States.

Dated: November 19, 2001          WILLIAMS & CONNOLLY LLP


_Steven R. Kuney_

Brendan V. Sullivan, Jr. (Bar No. 12757)
Steven R. Kuney
John E. Schmidtlein
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Counsel for Certain Plaintiff States

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-1232 (CKK) |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-1233 (CKK) |
| | ) | |
| MICROSOFT CORPORATION, | ) | Next Court Deadline: |
| | ) | March 4, 2002 Status Conference |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF LITIGATING STATES' SECOND JOINT REQUEST
FOR PRODUCTION OF DOCUMENTS IN REMEDY PROCEEDINGS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and the

Scheduling Order entered by the Court on September 28, 2001, Plaintiff States

California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah,

West Virginia and the District of Columbia request that defendant Microsoft

Corporation produce for inspection and copying the following documents in its

possession, custody or control, on or before December 24 at 5:00 p.m. at the offices of

Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005.

## **DEFINITIONS**

1.    "Actions" means *United States v. Microsoft Corporation*, Civil Action No. 98-1232 (CKK), and *State of New York ex rel. Attorney General Eliot Spitzer, et al., v. Microsoft Corporation*, Civil Action No. 98-1233 (CKK).

2.    "And" and "or" are terms of inclusion and not of exclusion, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request any document or response that might otherwise be construed to be outside of its scope.

3.    "Any" shall include, without limitation, "each and every."

4.    "Application Programming Interfaces" or "APIs" means all interfaces (including any callback interfaces), service provider interfaces, and protocols that enable a hardware device or software (including Middleware) to obtain services from, provide services to, or otherwise interact with operating system software in a personal computer.

5.    "Communications Protocols" means all interfaces and protocols that enable software installed on other computers (including servers and handheld devices) to interoperate with software on a personal computer.

6.    "Communication" means any provision, receipt, or exchange of information, in any manner or form (including but not limited to oral, telephonic, written, or electronic means).

7. "Document" has the broadest meaning accorded to it by Rule 34 of the Federal Rules of Civil Procedure, and includes but is not limited to all of the matters defined in Rule 1001 of the Federal Rules of Evidence. It includes, but is not limited to, videotapes and multimedia content, however memorialized, each computer file and written, recorded, and graphic material of every kind in the possession, custody or control of Microsoft, electronic correspondence and drafts of documents, electronic mail messages, instant messages, copies of documents that are not identical duplicates of the originals, and copies of documents the originals of which are not in the possession, custody or control of Microsoft. The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems, including back-up tapes. Unless otherwise specified, the term "document" excludes bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature.

8. "Each" includes all and vice versa.

9. "End-User Access" means the invocation of a software product directly or indirectly by an end-user of a personal computer or the ability of an end-user to invoke such product.

10.   "Internet Content Provider" or "ICP" means any entity that creates or

otherwise supplies content to users of the Internet, including but not limited

to content publishers and content delivery networks.

11.   "Internet Access Provider" or "IAP" means any entity that connects

consumers to the Internet, with or without proprietary content.

12.   "Independent Software Vendor" or "ISV" means any producer of software,

excluding Microsoft.

13.   "Sun Java Platform" or "Sun Java software" means the Sun Microsystems'

Java programming language, Java class libraries, Java foundation classes,

Java compiler, and/or Java Virtual Machines.

14.   "Microsoft" means Microsoft Corporation, each of its predecessors, successors,

parents, divisions, subsidiaries, and affiliates, each other person or entity

directly or indirectly, wholly or in part, owned or controlled by it, each

partnership or joint venture to which any of them is party, and all present

and former officers, directors, employees, agents, consultants, or other

persons acting for or on behalf of any of them.

15.   "Microsoft Middleware Product" means software that provides functionality

similar to that provided by Middleware offered by a competitor to Microsoft,

regardless of whether such software has ever been distributed separately

from a Microsoft Operating System Product.

16.   "Microsoft Server Operating System Product" means software (including source code and binary code, and any other form in which Microsoft distributes its Operating Systems for server computers) distributed commercially as Windows Server 2000, Exchange Server 2000, Systems Management Server 2.0, SharePoint Portal Server 2001, SQL Server 2000, and their successor versions.

17.   "Microsoft's top twenty OEMs" means in a given year the top twenty OEMs measured by volume of personal computers sold with Windows Operating Systems in the United States.

18.   "Middleware" means software that operates, directly or through other software, between an Operating System and another type of software (such as an application, a server Operating System, or a database management system) by offering services via APIs or Communications Protocols to such other software, and could, if ported to or interoperable with multiple Operating Systems, enable software products written for that Middleware to be run on multiple Operating System Products.  Examples of Middleware within the meaning of this definition include but are not limited to Internet browsers, e-mail client software, multimedia viewing or listening software, voice recognition software, instant messaging software, Microsoft Office, and the Sun Java software.

19. "Middleware Product" means any product that fits the definition of Middleware set forth herein, including but not limited to Internet browsers, e-mail client software, multimedia viewing or listening software, voice recognition software, instant messaging software, Microsoft Office and the Sun Java software.

20. "Operating System" means the software that controls the allocation and usage of hardware resources (such as memory, central processing unit time, disk space, and peripheral devices) of a computer, providing a "platform" by exposing APIs that applications use to "call upon" the Operating System's underlying software routines in order to perform functions.

21. "Operating System Product" means an Operating System and additional software shipped with the Operating System, whether or not such additional software is marketed for a positive price. An Operating System Product includes Operating System Product upgrades that may be distributed separately from the Operating System Product.

22. "Original Equipment Manufacturer" or "OEM" means any manufacturer of personal computers.

23. "Platform Software" means an Operating System or Middleware, or a combination of an Operating System and Middleware.

24.   "Person" means any natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal, or governmental entity.

25.   "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, concerning, or pertaining to, in whole or in part.

26.   "Server Operating System" means an Operating System used on a server computer used to connect multiple personal computers, including as part of a local area network, a wide area network or the Internet.

27.   "Windows Operating System Product" means software (including source code and binary code, and any other form in which Microsoft distributes its Windows Operating Systems for personal computers) distributed commercially as Windows 95, Windows 98, Windows 98 Second Edition, Windows Millennium Edition, Windows 2000 Professional, Windows XP Home, Windows XP Professional, and their successor versions including Windows Operating Systems codenamed Longhorn and Blackcomb.

## INSTRUCTIONS

1.   If documents responsive to this Request previously have been produced to the
     United States Department of Justice or any of the Plaintiff States in response
     to any document request in any of the Actions, you need not re-produce such
     documents.  With respect to previously produced documents that are
     responsive to this Request, identify each document, including the date of
     production, the party to whom the document was produced, and the control
     number for each such document.

2.   All drafts and non-identical copies of responsive documents should be
     produced.

3.   For each responsive document, or portion thereof, withheld under a claim of
     privilege, submit a sworn or certified statement from Microsoft's counsel or
     one of Microsoft's officers that (1) identifies the withheld document by author,
     addressee, other recipient, date, subject matter, and document control
     number; (2) specifies the nature and basis of the claimed privilege and the
     request to which the withheld document is responsive; and (3) identifies each
     person to whom the withheld document was sent and each person to whom
     the withheld document or its contents, or any part thereof, was disclosed.
     Denote all attorneys identified with an asterisk.  If a portion of a document is
     withheld under a claim of privilege, produce the remainder of the document
     in a timely manner.

4.   This Request shall be deemed continuing as provided in the Federal Rules of
Civil Procedure, so as to require further and supplemental production if
additional documents called for by this Request are obtained or created by
Microsoft between the time of the Request and the time of the hearing on
remedies.

5.   Documents should be produced as they are kept by Microsoft in the usual
course of business or should be organized and labeled to correspond to
requests below.  Copies of all file folders, file labels and other information
indicating the source of responsive documents should also be produced.

6.   Unless otherwise specified, all requests call for the production of documents
created, sent or received on or after September 1, 1998.

## DOCUMENTS REQUESTED

1.   All documents referring or relating to the effect (or lack thereof) on Microsoft
(including without limitation its business practices, commercial or technical
plans or financial statements) of the November 6, 2001 Revised Proposed
Final Judgment ("RPFJ") or the Plaintiff Litigating States' Proposed Final
Judgment.

2.   All documents referring or relating to the ability or inability of non-Microsoft
server software (including without limitation non-Microsoft Server Operating
Systems) to interoperate with Microsoft Operating System Products
(including without limitation comparisons with the interoperation ability of

Microsoft server software and Microsoft Operating System Products) or Microsoft Server Operating System Products.

3.     Documents sufficient to show all non-Microsoft Persons who have, or have had at any time since May 1998, access to any portion of Microsoft Platform Software source code (including without limitation licensees under the Microsoft Research University Source Code License Program, the Enterprise Source License Program, any OEM or ISV source code license program, or any other source code licensing program or shared code program) and a copy of all non-identical licenses and related documents governing such access.

4.     All executed, proposed, drafts of or considered versions of Windows XP Embedded Operating System license agreements.

5.     All documents referring or relating to the differences (whether technical, commercial or otherwise) between, on the one hand, Windows XP Home Edition and Windows XP Professional (together, "General Purpose Windows XP") and, on the other hand, Windows XP Embedded, including without limitation (a) the feasibility of Windows XP Embedded (or components thereof) being used as a general-purpose operating system, (b) the componentization of Microsoft software reflected in the design of Windows XP Embedded, (c) competition (whether actual or potential) between Windows XP Embedded and General Purpose Windows XP, and (d) the actual, intentional or potential effect of any contractual restriction preventing

substitution of Windows XP Embedded (or components thereof) for General

Purpose Windows XP or vice versa.

6.    All documents identified or relied upon in responding to Plaintiff Litigating

States' First Set of Interrogatories in Remedy Proceedings.

Dated: December 14, 2001            WILLIAMS & CONNOLLY LLP

Brendan V. Sullivan, Jr. (Bar No.12757)
Steven R. Kuney (Bar No. 253286)
John E. Schmidtlein (Bar No. 441261)
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States
California, Connecticut, Florida, Iowa,
Kansas, Massachusetts, Minnesota, Utah and
the District of Columbia*

Thomas Greene
Office of the Attorney General
of the State of California
455 Golden Gate Ave., Ste 11000
San Francisco, California 94102
Tel: (415) 703-5555

*For the Plaintiff Litigating States*

11

Douglas L. Davis
Assistant Attorney General for the
State of West Virginia
P. O. Box 1789
Charleston, West Virginia 25326
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating
State West Virginia*

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>          Defendant. | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK *ex rel.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>          Defendant. | Civil Action No. 98-1233 (CKK)<br><br>Next Court Deadline:<br>March 4, 2002 Status Conference |

## PLAINTIFF LITIGATING STATES' FIRST JOINT REQUESTS FOR ADMISSION IN REMEDY PROCEEDINGS

Pursuant to Rule 36 of the Federal Rules of Civil Procedure and the Scheduling Order entered by the Court on September 28, 2001, Plaintiff States California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia and the District of Columbia request that defendant Microsoft Corporation ("Microsoft") admit or deny, under oath, each matter as to which an admission is requested as set forth below on or before December 24, 2001.  These

Requests for Admission are to be interpreted and answered in accordance with the Instructions below.

## INSTRUCTIONS

In addition to the specific instructions enumerated below, the instructions set forth in Rule 36 of the Federal Rules of Civil Procedure are incorporated herein by reference.

1.  In answering the requests for admission, you must admit the matter, specifically deny the matter, or set forth in detail why you cannot truthfully admit or deny the matter.

2.  If, after a reasonable and thorough investigation using due diligence, you are unable to answer any part of a request for admission because of a lack of available information, you shall specify in full and complete detail the type of information which is claimed to be not available and what has been done to locate such information.  In addition, you shall specify what knowledge or belief you have concerning the unanswered portion of the request for admission, set forth the facts upon which such knowledge or belief is based, and identify the person who has or is likely to have the information which is claimed to be not available.

3.  Your obligations in response to these requests for admission are continuing in nature, and pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, you are required to supplement or amend your responses based on any and all information obtained after the service of such responses.

- 2 -

4.      In answering the request for admission, use the definition set forth in the

November 6, 2001 Revised Proposed Final Judgement unless otherwise

specified.

## REQUESTS FOR ADMISSION

REQUEST NO. 1
Admit that Microsoft has violated the antitrust laws of the United States of
America, and in particular Section 2 of the Sherman Act, 15 U.S.C. § 2.

REQUEST NO. 2
Admit that "the key to the proper remedy in this case is to end Microsoft's
restrictions on potentially threatening middleware, prevent it from hampering
similar nascent threats in the future and restore the competitive conditions created
by similar middleware threats." Plaintiff United States Department of Justice
Competitive Impact Statement ("CIS") at 24.

REQUEST NO. 3
Admit that "OEMs are a crucial channel for distribution and ultimate usage of Non-
Microsoft Middleware Products such as browsers." CIS at 25.

REQUEST NO. 4
Admit that in order for a remedy in this proceeding to be effective, "it is critical that
the OEMs . . . are free to choose to distribute and promote middleware without
interference from Microsoft." CIS at 25.

REQUEST NO. 5
Admit that in determining whether Microsoft has violated Section III.A. of the
Revised Proposed Final Judgment filed on November 6, 2001 (hereafter "RPFJ"),
"[t]he existing Microsoft-OEM relationship provides a baseline against which any
changes Microsoft makes in its treatment of that OEM for prohibited reasons can be
detected and assessed." CIS at 25.

REQUEST NO. 6
Admit that under the RPFJ, Microsoft can compensate (both monetarily and non-
monetarily) an OEM in return for an agreement to include a Microsoft product or
service with personal computers shipped to customers.

REQUEST NO. 7
Admit that under the RPFJ, Microsoft can withhold Consideration from an OEM if
an OEM chooses not to support, promote or carry any Microsoft product or service.

REQUEST NO. 8
Admit that under the RPFJ, if an OEM chooses to remove user access to any
Microsoft Middleware Product, Microsoft can compensate (both monetarily and non-
monetarily) that OEM less than an OEM that chooses not to remove user access to
any Microsoft Middleware Product.

REQUEST NO. 9
Admit that the majority of Covered OEMs were at one or more times during the
calendar years 2000 and 2001 in violation of the terms of their license agreements
with Microsoft.

REQUEST NO. 10
Admit that "Windows license royalties and terms are inherently complex and easy
for Microsoft to use to affect OEMs' behavior, including what software the OEMs
will offer to their customers."" CIS at 28.

REQUEST NO. 11
Admit that under the RPFJ, Microsoft is free to enforce its licenses with OEMs for
Windows Operating System Products in a non-uniform manner.

REQUEST NO. 12
Admit that under the RPFJ, if an OEM "promote[s] or install[s] third party offers
for Internet access, subscription on-line music services, or Web-based applications
that use or support Non-Microsoft Middleware such as an alternate browser,
audio/video client software, or Java Virtual Machine," CIS at 30, Microsoft may
offer that OEM less Consideration than an OEM that agrees to promote or install
Microsoft software applications, services and/or Middleware Products.

REQUEST NO. 13
Admit that under the RPFJ, if Microsoft designs a Windows Operating System
Product to "reserve a particular list for multimedia players, [Microsoft] cannot
specify either that the listed player be its own Windows Media Player or that,
whatever multimedia player an OEM chooses to list in that entry, it be capable of
supporting a particular proprietary Microsoft data format." CIS at 30-31

REQUEST NO. 14
Admit that under the RPFJ, Microsoft can prevent an OEM from installing a list of
Middleware Products or other software products on a Windows Operating System
Product.

REQUEST NO. 15

Admit that under the RPFJ, Microsoft can prohibit an OEM from launching automatically, at the conclusion of the initial boot sequence or upon connection or disconnection from the Internet, any non-Microsoft Middleware Product so long as a Microsoft Middleware Product with similar functionality would not otherwise launch automatically.

REQUEST NO. 16

Admit that under the RPFJ, Microsoft can prevent an OEM from configuring its products to launch non-Microsoft Middleware automatically, other than when Microsoft Middleware Products launch automatically at the conclusion of the first boot sequence or subsequent boot sequences or upon connection to or disconnection from the Internet.

REQUEST NO. 17

Admit that under the RPFJ, Microsoft can offer an OEM Consideration in return for that OEM configuring its products to launch Microsoft Middleware Products at any time, including at the conclusion of the first boot sequence or subsequent boot sequences or upon connection to or disconnection from the Internet.

REQUEST NO. 18

Admit that under the RPFJ, Microsoft can impose currently unspecified "technical specifications" in connection with any IAP offer presented during the initial boot sequence.

REQUEST NO. 19

Admit that under the RPFJ, Microsoft can restrict by agreement an OEM from promoting any non-Microsoft Middleware or any other ISV product or service during the initial boot sequence.

REQUEST NO. 20

Admit that under the RPFJ, Microsoft can offer an OEM Consideration in return for an agreement to promote only Microsoft products or services, including Microsoft Middleware Products, during the initial boot sequence.

REQUEST NO. 21

Admit that under the RPFJ, Microsoft does not have to disclose to ISVs, IHVs, IAPs, ICPs, and OEMs all of the APIs and related technical information relating to Microsoft Platform Software that are disclosed to developers of Microsoft Middleware Products.

REQUEST NO. 22

Admit that since January 1, 2000 developers of Microsoft Middleware Products have studied, interrogated and/or interacted with the source code and any related documentation of Microsoft Platform Software.

REQUEST NO. 23

Admit that the APIs that must be disclosed under the RPFJ include, "broadly, any interface, protocol or other method of information exchange between Microsoft Middleware and a Windows Operating System Product." CIS at 33-34.

REQUEST NO. 24

Admit that under the RPFJ, Microsoft's obligation to disclose "documentation" only requires Microsoft to disclose the sort of information that Microsoft already provides to ISVs and others through the Microsoft Developer's Network ("MSDN").

REQUEST NO. 25

Admit that developers of Microsoft Middleware have access to APIs and/or related technical information and documentation relating to Microsoft Platform Software that are not disclosed by Microsoft through the MSDN.

REQUEST NO. 26

Admit that under the RPFJ, developers of Microsoft Middleware are permitted access to APIs and/or related technical information relating to Microsoft Platform Software that are not made available to ISVs, IHVs, IAPs, ICPs and OEMs.

REQUEST NO. 27

Admit that under the RPFJ, Microsoft Middleware developers may have access to APIs and/or related technical information relating to Microsoft Platform Software before such information is made available to ISVs, IHVs, IAPs, ICPs and OEMs.

REQUEST NO. 28

Admit that under the RPFJ, Microsoft is not obliged to release the last major beta version of any Windows Operating System Product "well in advance of the actual commercial release" of that Windows Operating System Product. CIS at 35.

REQUEST NO. 29

Admit that under the RPFJ, Microsoft is not obliged to release the last major beta version of any Microsoft Middleware "well in advance of the actual commercial release" of that Middleware. CIS at 35.

REQUEST NO. 30
Admit that under the RPFJ, developers of Microsoft Middleware "will not have access to any . . . features of Windows Operating System Products that might allow it to operate more effectively" that are not also made available to ISVs, IHVs, IAPs, ICPs and OEMs. CIS at 35.

REQUEST NO. 31
Admit that under the RPFJ, all APIs and related technical information, including all documentation, "for the Secure Audio Path digital rights management service that is part of Windows XP must be disclosed and made available for use by competing media players in interoperating with Windows XP." CIS at 35.

REQUEST NO. 32
Admit that the "competitive significance" of non-Microsoft Middleware is "highly dependent on content, data and applications residing on servers and passing over networks such as the Internet or corporate networks . . . ." CIS at 36.

REQUEST NO. 33
Admit that under the RPFJ, Microsoft is not obliged to license to third parties all APIs, technical information and Communications Protocols relating to Windows Operating System Products that Microsoft makes available to Microsoft developers of server software.

REQUEST NO. 34
Admit that under the RPFJ, third party licensees "will have full access to and be able to use, the protocols that are necessary for software located on a server computer to interoperate with, and fully take advantage of, the functionality provided by a Windows Operating System Product." CIS at 36.

REQUEST NO. 35
Admit that notwithstanding the fact that the term "server operating system products" is not defined in the RPFJ, it "includes, but is not limited to, the entire Windows 2000 Server product families and any successors . . . as well as a number of server software products and functionality, including the Internet Information Services . . . and Active Directory." CIS at 37.

REQUEST NO. 36
Admit that under the RPFJ, Microsoft is not required to license Communications Protocols implemented in any Windows Operating System Product that are used by a Microsoft server operating system product to interoperate with that Windows Operating System Product with the addition of other software to the client computer.

REQUEST NO. 37

Admit that under the RPFJ, there is no time period within which Microsoft must make available for license to third parties the Communications Protocols referenced in Section III.E. of the RPFJ.

REQUEST NO. 38

Admit that under the RPFJ, Microsoft is not obliged to license any Communications Protocols distributed only with a Microsoft server or otherwise separately from a Windows Operating System Product.

REQUEST NO. 39

Admit that one of the purposes of Section III.E. of the RPFJ is to "ensur[e] that competing, non-Microsoft server products . . . will have the same access to and ability to interoperate with Windows Operating System Products as do Microsoft's server operating systems." CIS at 38.

REQUEST NO. 40

Admit that one of the purposes of Section III.E. of the RPFJ is to "permit seamless interoperability between Windows Operating System Products and non-Microsoft servers on a network." CIS at 38.

REQUEST NO. 41

Admit that Section III.E. of the RPFJ "requires the licensing of all Communications Protocols necessary for non-Microsoft servers to interoperate with the Windows Operating System Products' implementation of the Kerberos security standard in the same manner as do Microsoft servers, including the exchange of Privilege Access Certificates." CIS at 38.

REQUEST NO. 42

Admit that Section III.E. of the RPFJ requires Microsoft to "license for use by non-Microsoft server operating system products the Communications Protocols that Windows Operating System Products use to enable network services through mechanisms such as Windows server message block protocol/common Internet file system protocol communications, as well as Microsoft remote procedure calls between the client and server operating systems." CIS at 39.

REQUEST NO. 43

Admit that Section III.E. of the RPFJ requires Microsoft to license to third parties "Communications Protocols that permit a runtime environment (e.g., a Java Virtual Machine and associated class libraries or competing functionality such as the Common Language Runtime) to receive and execute code from a server . . . if those protocols are implemented in a Windows Operating System Product." CIS at 39.

REQUEST NO. 44
Admit that Section III.J.1.a. of the RPFJ exempts from disclosure under Section
III.E. only "specific end-user implementations of security items such as actual keys,
authorization tokens or enforcement criteria, the disclosure of which would
compromise the security of 'a particular installation or group of installations' of the
listed security features."  CIS at 39 (quoting RPFJ § III.J.1.a.).

REQUEST NO. 45
Admit that Section III.J.1.a. of the RPFJ "permits Microsoft to withhold limited
information necessary to protect particular installations of the Kerberos and Secure
Audio Path features of its products (e.g., keys and tokens particular to a given
installation) but does not permit it to withhold any capabilities that are inherent in
the Kerberos and Secure Audio Path features as they are implemented in a
Windows Operating System Products."  CIS at 39.

REQUEST NO. 46
Admit that under the RPFJ, Microsoft may contractually prevent an ISV from
developing, using, distributing or promoting any software that competes with
Microsoft Platform Software or runs on any software that competes with Microsoft
Platform Software so long as it is part of an agreement to use, distribute or promote
any Microsoft software or to develop software for, or in conjunction with, Microsoft.

REQUEST NO. 47
Admit that under the RPFJ, Microsoft may enter into an agreement with an ISV in
which Microsoft pays the ISV to make Internet Explorer the default browser for
software developed by the ISV.

REQUEST NO. 48
Admit that under the RPFJ, Microsoft may enter into an agreement with an ISV or
ICP in which Microsoft pays the ISV or ICP to make Windows Media Player the
default media player for software or Internet content developed by the ISV or ICP.

REQUEST NO. 49
Admit that under Section III.G.1. of the RPFJ, Microsoft could not make the
"commercially practicable" representation a standard part of its agreements with
IAPs, ICPs, ISVs, IHVs or OEMs.

REQUEST NO. 50
Admit that under the RPFJ, Microsoft is free to take action it knows or reasonably
should know will directly or indirectly interfere with or degrade the performance or
compatibility of non-Microsoft Middleware when interoperating with Microsoft
Platform Software, without providing notice to the ISV of such non-Microsoft
Middleware prior to taking the action.

## REQUEST NO 51

Admit that Microsoft currently restricts its redistributable code from use with some non-Microsoft Platform Software.

Dated: December 14, 2001                    WILLIAMS & CONNOLLY LLP

Brendan V. Sullivan, Jr. (Bar No. 12757)
Steven R. Kuney (Bar No. 253286)
John E. Schmidtlein (Bar No. 441261)
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States*
*California, Connecticut, Florida, Iowa,*
*Kansas, Massachusetts, Minnesota,*
*Utah and the District of Columbia*

Thomas Greene
Office of the Attorney General
  of the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 703-5555

*For the Plaintiff Litigating States*

- 10 -

Douglas L. Davis
Assistant Attorney General for the State
   of West Virginia
Consumer Protection/Antitrust Division
P. O. Box 1789
Charleston, West Virginia 25326-1789
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating State
West Virginia*

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 98-1232 (CKK) |
| MICROSOFT CORPORATION, | ) | |
| Defendant. | ) | |
| | ) | |
| STATE OF NEW YORK, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 98-1233 (CKK) |
| MICROSOFT CORPORATION, | ) | |
| | ) | Next Court Deadline: March 4, 2002 |
| Defendant. | ) | Status Conference |
| | ) | |

## PLAINTIFF LITIGATING STATES' FIRST SET OF INTERROGATORIES IN REMEDY PROCEEDINGS

Pursuant to Rule 33(b) of the Federal Rules of Civil Procedure and the Scheduling Order entered by the Court on September 28, 2001, Plaintiff States California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia, and the District of Columbia request that defendant Microsoft Corporation respond, under oath, to the following interrogatories by December 24, 2001.

## DEFINITIONS

1. "Actions" means *United States v. Microsoft Corporation*, Civil Action No. 98-1232 (CKK), and *State of New York ex rel. Attorney General Eliot Spitzer, et al., v. Microsoft Corporation*, Civil Action No. 98-1233 (CKK).

2. "Agreement" means any type of agreement, understanding or mutual assent, whether formal or informal, written or oral.

3. "And" and "or" are terms of inclusion and not of exclusion, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of an interrogatory any information that might otherwise be construed to be outside of its scope.

4. "Any" shall include, without limitation, "each and every."

5. "Communication" means any provision, receipt, or exchange of information, in any manner or form (including but not limited to oral, telephonic, written, or electronic means).

6. "Each" includes all and vice versa.

7. "End-User Access" means the invocation of a software product directly or indirectly by an end-user of a personal computer or the ability of an end-user to invoke such product.

8.    "Sun Java Platform" or "Sun Java software" means the Sun Microsystems' Java programming language, Java class libraries, Java foundation classes, Java compiler, and/or Java Virtual Machines.

9.    "Market Development Allowance" means any marketing development allowance, agreement, program, rebate, credit or discount, whereby an OEM or Third-Party Licensee is provided a monetary discount in the applicable royalty for a licensed product in exchange for the OEM or Third-Party Licensee agreeing to some additional licensing term.  For example, Microsoft has previously referred to Marketing Development Allowances as marketing development agreements, or MDAs, and marketing development programs, or MDPs.

10.   "Microsoft" means Microsoft Corporation, each of its predecessors, successors, parents, divisions, subsidiaries, and affiliates, each other person or entity directly or indirectly, wholly or in part, owned or controlled by it, each partnership or joint venture to which any of them is party, and all present and former officers, directors, employees, agents, consultants, or other persons acting for or on behalf of any of them.

11.   "Microsoft Server Operating System Product" means software (including source code and binary code, and any other form in which Microsoft distributes its Operating Systems for server computers)

distributed commercially as Windows Server 2000, Exchange Server 2000, Systems Management Server 2.0, SharePoint Portal Server 2001, SQL Server 2000, and their successor versions.

12. "Microsoft's top twenty OEMs" means in a given year the top twenty OEMs measured by volume of personal computers sold with Windows Operating Systems in the United States.

13. "Office" means all software developed and distributed by Microsoft incorporating the brand name "Microsoft Office" and its successors, including at least the individual Microsoft Middleware Products Word, Excel, Outlook, Power Point, and Access.

14. "Platform Software" means an Operating System or Middleware, or a combination of an Operating System and Middleware.

15. "Person" means any natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal, or governmental entity.

16. "Relating to" means discussing, describing, referring to, reflecting, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, concerning, or pertaining to, in whole or in part.

17.   "Server Operating System" means an Operating System used on a

server computer used to connect multiple personal computers,

including as part of a local area network, a wide area network or the

Internet.

18.   "Windows Operating System Product" means software code (including

source code and binary code, and any other form in which Microsoft

distributes its Windows Operating Systems for Personal Computers) of

Windows 95, Windows 98, Windows 2000 Professional, Windows Me,

Windows XP and their successors (including the Windows Operating

Systems for Personal Computers codenamed "Longhorn," and

"Blackcomb," and their successors), as distributed by Microsoft to any

licensee, whether or not such product includes software code of any one

or more Microsoft Middleware Products.

19.   With respect to terms not defined above, but defined in the November

6, 2001 Revised Proposed Final Judgment ("RPFJ") and used in these

Interrogatories, these terms shall have the meanings set forth in the

definitions of the November 6, 2001 RPFJ unless otherwise specified.

## **INSTRUCTIONS**

1.   Where an interrogatory asks you to "identify" a person, set forth the

name of that person and (i) if that person is a corporation or other

entity, provide the address of the entity's principal place of business, or

(ii) if that person is an individual, provide the last known address and telephone number of the person.

2. If you claim that an interrogatory cannot be answered in full, state why and furnish all available information.

3. If you claim that any information called for by these interrogatories is protected from disclosure by an applicable privilege, provide all information required by Federal Rule of Civil Procedure 26(b)(5).

4. These interrogatories are continuing, and they require further and supplemental answers if additional information called for by these interrogatories is obtained or learned between the time of response and the time of trial.

## **INTERROGATORIES**

1. Identify every Microsoft Middleware Product made commercially available since January 1, 1994, and for each such product, provide the following information: (a) whether it has been offered for license separately from a Microsoft Windows Operating System Product and if so, the year or years in which it was offered; and (b) for those years in which it was made commercially available separately from a Microsoft Windows Operating System Product, the price at which it was offered for sale or license.

2. For each Microsoft Middleware Product made commercially available since January 1, 1994, identify: (a) each product whose software code

has been commingled with the software code of a Windows Operating System Product; and (b) when Microsoft first made commercially available that Windows Operating System Product with the commingled code of the Microsoft Middleware Product.

3.   Describe every instance since January 1, 2000 in which Microsoft has provided Consideration to any Covered OEM with respect to any Microsoft product or service where that Consideration is commensurate with the absolute level or amount of that OEM's development, distribution, promotion or licensing of that Microsoft product or service.

4.   For each Covered OEM for each calendar year since January 1, 1995 to the present, provide separately for each OEM the royalty rate paid by each OEM, and any Consideration given by Microsoft to each OEM pursuant to a market development allowance, program, discount, cross-license or otherwise.

5.   Identify every agreement with a Covered OEM, IAP, ICP, ISV or IHV, in effect for any time during calendar years 2000 or 2001 that is in any way inconsistent with or in violation of the terms of the RPFJ.

6.   For each major new version of a Microsoft Middleware Product or a Microsoft Operating System Product offered since January 1, 1995, provide: (a) the date of the first alpha test release of the product; (b)

the date of the first beta test release to 150,000 or more beta testers of the product; (c) the date of the last major beta test release; and (d) the date of commercial release of the product.

7. Identify the parties to and describe the terms of each agreement entered into since or in effect at any time after January 1, 1995 between Microsoft and any ISV (a) in which limitations are placed on an ISV's development, use, distribution or promotion of any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software, or (b) in which any Consideration was granted to the ISV on the condition that it refrain from developing, using, distributing or promoting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software.

8. Identify and describe the parties to and the terms of each joint venture or joint development or joint services arrangement entered into since or in effect at any time after January 1, 1995 between Microsoft and any ISV, IHV, IAP, ICP or OEM for a new product, technology or service, or any material value-add to an existing product, technology or service that prohibits such ISV, IHV, IAP, ICP, or OEM from competing with the object of the joint venture or other arrangement for any period of time.

9.    For each year calendar year from January 1, 1995 to the present, state in units sold and total revenue earned the volume of each Microsoft Operating System Product, Microsoft network server operating system product, Microsoft web server operating system product, Microsoft handheld device operating system product, and Microsoft set-top box operating system product sold.

10.    Describe with particularity the costs expended by Microsoft on developing and producing the Internet Explorer browser (or any predecessor browser) for each calendar year from January 1, 1993 to the present.

11.    Describe with particularity the costs expended by Microsoft on developing and producing the Windows Media Player (or any predecessor multimedia player) for each calendar year from January 1, 1993 to the present.

12.    Describe with particularity how the RPFJ addresses every one of the anticompetitive acts found by the Court of Appeals.

13.    Describe with particularity why it is "impossible" (*see* Defendant Microsoft's Remedial Proposal at 8), from a technical standpoint or otherwise, for Microsoft to comply with any section of Plaintiff Litigating States' Proposed Final Judgment.

14.    Identify each of the 35 specific acts referenced by Charles F. Rule on page 1 of his December 12, 2001 written statement to the United States Senate Judiciary Committee ("Rule Statement") as supporting the district court's monopoly maintenance claim, and indicate which of these are the 12 specific acts which Mr. Rule testified were affirmed by the Court of Appeals.

15.    Identify each and every Finding of Fact made by the District Court in these Actions, 87 F.Supp.2d 9 (D.D.C. 1999), that Microsoft contends was vacated or otherwise reversed by the Court of Appeals, and describe the basis for your contention.

16.    Describe every change in business practice made or planned to be made by Microsoft as a result of: (a) the District Court's Final Judgment; (b) the Court of Appeals June 28, 2001 decision; or (c) the RPFJ, and identify "the numerous ways in which Microsoft will be forced to alter its conduct" (Rule Statement at 2) in order to comply with the RPFJ, and the individual or individuals with primary responsibility for implementing and monitoring the change in business practices.

17.    Identify all persons who Microsoft has retained as lobbyists, public relations advisers or media consultants, or funded in whole or in part for the purpose of providing lobbying, public relations advice, media

consulting services or public commentary in connection with these Actions or any Congressional inquiry into or oversight of conduct relating to these Actions, and the amount of money paid by Microsoft to these persons and entities since January 1, 1999.

18.   Identify the covered OEMs who have in any manner indicated to Microsoft that they intend to reconfigure Windows or to remove end-user access to Internet Explorer, Windows Media Player, Windows Messenger or any other software now included with the Windows Operating System in the manner provided in the RPFJ.

19.   Identify the APIs, communications protocols and other technical information Microsoft would be obliged to disclose under the terms of the RPFJ that it does not currently disclose.

Dated: December 14, 2001                    WILLIAMS & CONNOLLY LLP

Brendan V. Sullivan, Jr. (Bar No.12757)
Steven R. Kuney (Bar No. 253286)
John E. Schmidtlein (Bar No. 441261)
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States California, Connecticut, Florida, Iowa, Kansas, Massachusetts,*

*Minnesota, Utah and the District of Columbia*

Thomas Greene
Office of the Attorney General
of the State of California
455 Golden Gate Ave., Ste 11000
San Francisco, California 94102
Tel:  (415) 703-5555

*For the Plaintiff Litigating States*

Douglas L. Davis
Assistant Attorney General for the
State of West Virginia
P. O. Box 1789
Charleston, West Virginia 25326
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating
State West Virginia*

# Exhibit E

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-1232 (CKK) |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| STATE OF NEW YORK, *ex rel.*, | ) | |
| Attorney General Eliot Spitzer, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-1233 (CKK) |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | Next Court Deadline: March 4, 2002 |
| Defendant. | ) | Status Conference |
| | ) | |

## PLAINTIFF LITIGATING STATES' PRELIMINARY WITNESS LIST

Pursuant to the Scheduling Order entered by the Court on September 28, 2001, Plaintiff Litigating States California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia and the District of Columbia set forth their preliminary witness list. Plaintiff Litigating States reserve the right to amend and supplement this preliminary list until February 8, 2002, when a final witness list must be exchanged in accordance with the Court's Scheduling Order.

# PRELIMINARY WITNESS LIST

Peter Ashkin
President of Product Strategy
AOL Inc.
(former Senior Vice President and Chief Technology Officer, Gateway, Inc.)

Jim Barksdale
The Barksdale Group

John Borthwick
Vice President
AOL Advanced Services
AOL Inc.

Richard Green
Vice President and General Manager
Java Software
Sun Microsystems, Inc.

Mitchell Kertzman
Chief Executive Officer
Liberate Technologies

Carl S. Ledbetter
Senior Vice President and Chief Technology Officer
Novell, Inc.

Michael Mace
Chief Competitive Officer
Vice President Product Planning
Palm, Inc.

Steven McGeady
(former Vice President, Internet Health Initiative, Intel Corporation)

Larry Pearson
Product Design Manager
Strategic Marketing
SBC Operations, Inc.

William B. Plummer
Vice President
Government and Industry Affairs
Nokia

Jonathan Schwartz
Senior Vice President
Corporate Strategy and Planning
Sun Microsystems, Inc.

Edward Screven
Chief Corporate Architect
Oracle Corporation

Erik Simon
President
VideoBanner.com

Matthew Szulik
Chief Executive Officer
Red Hat, Inc.

Dated: December 7, 2001                    Respectfully submitted,

By: _Brendan V. Sull___.
       Brendan V. Sullivan, Jr. (Bar No. 12757)

By: _Steven R Kuney_
       Steven R. Kuney (Bar No. 253286)

Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff States*
*California, Connecticut, Florida, Iowa,*
*Kansas, Massachusetts, Minnesota,*
*Utah and the District of Columbia*

- 3 -

By: ~~~~~~~~~~~

Thomas Greene
Office of the Attorney General
   of the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 703-5555

*For the Litigating States*

By: ~~~~~~~~~~~

Douglas L. Davis
Assistant Attorney General for the State
   of West Virginia
Consumer Protection/Antitrust Division
P. O. Box 1789
Charleston, West Virginia 25326-1789
Tel: (304) 558-8986

*Counsel for the Plaintiff State*
*West Virginia*

- 4 -

# Exhibit F

STATEMENT

OF

CHARLES A. JAMES
ASSISTANT ATTORNEY GENERAL
ANTITRUST DIVISION

BEFORE THE
COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

CONCERNING

THE MICROSOFT SETTLEMENT:
A LOOK TO THE FUTURE

PRESENTED ON

DECEMBER 12, 2001

Mr. Chairman and members of the Subcommittee, I am pleased to appear before you today to discuss the Department's still-pending antitrust enforcement action against Microsoft Corporation.

On November 2, 2001, the Department stipulated to entry of a proposed consent decree that would resolve the case. Nine states joined in the proposed settlement. We are in the midst of the 60-day public comment period under the Tunney Act, after which we will file a response to the comments, and the district

court will rule on whether the proposed consent decree is in the public interest. Nine other states, and the District of Columbia, have not signed the proposed consent decree.

The Department's position regarding the proposed settlement is set forth in documents filed in the pending Tunney Act proceeding. Because of the pendency of the proceeding, and the somewhat remote possibility that the case will return to litigation, I am somewhat limited in what I can say about the case and settlement. Nonetheless, I am happy to appear before you today to discuss in general terms how the settlement promotes the public interest by resolving the allegations sustained by the court of appeals.

When we in the Department address the Microsoft case, it is important for us to ignore the media spectacle and clash-of-the-titans imagery and focus instead on the actual legal dispute presented to the court. In discussing the case and the proposed consent decree, it is important to keep in mind not only what the Department alleged in our complaint, but how the courts -- in particular, the D.C. Circuit -- ruled. As a result of the appeals court's ruling, the case is in many important respects considerably narrower than the one the Department originally brought in the spring of 1998 and narrower still than Judge Jackson's ruling in June of 2000.

I would like to take a few minutes to refocus attention on the legal allegations charged in the complaint, how those allegations were resolved in the courts, and the remedies in the proposed consent decree presently undergoing Tunney Act review. I believe these proposed remedies fully and demonstrably resolve the monopoly maintenance finding that the D.C. Circuit affirmed.

The complaints filed by the Department, the states, and the District of Columbia alleged: (1) that Microsoft had engaged in a series of specific anticompetitive

acts, and a course of anticompetitive conduct, to maintain its monopoly position in the market for operating systems designed to run on Intel-compatible personal computers, in violation of Section 2 of the Sherman Act; (2) that Microsoft had attempted to monopolize the web browser market, also in violation of Section 2; (3) that Microsoft had illegally tied its web browser, Internet Explorer, to its operating system, in violation of Section 1; and (4) that Microsoft had entered into exclusive dealing arrangements that also violated Section 1. A separate monopoly leveraging claim advanced by the state plaintiffs was dismissed prior to trial. After a full trial on the merits, the district court ultimately sustained the first three claims, while finding that the exclusive dealing claim had not been proved. The D.C. Circuit, however, significantly narrowed the case, affirming the district court's finding of liability only as to the monopoly maintenance claim, and even there only as to a smaller number of specified anticompetitive actions. Of the twenty anticompetitive acts the court of appeals reviewed, it reversed with respect to eight of the acts that the district court had sustained as elements of the monopoly maintenance claim. Additionally, the D.C. Circuit reversed the lower court's finding that Microsoft's Acourse of conduct@ separately violated Section 2 of the Sherman Act. It reversed the district court's rulings on the attempted monopolization and tying claims, remanding the tying claim for further proceedings under a much more difficult rule of reason standard. And, of course, it vacated the district court's final judgment that had set forth the break-up remedy and interim conduct remedies.

The antitrust laws do not prohibit a firm from having a monopoly, but only from illegally acquiring or maintaining a monopoly through interference with the competitive efforts of rivals. There has never been any serious contention that Microsoft acquired its operating system monopoly through unlawful means, and the existence of the operating system monopoly itself was not challenged in this case.

With regard to the monopoly maintenance claim, the court of appeals upheld the conclusion that Microsoft had engaged in unlawful exclusionary conduct by using contractual provisions to prohibit computer manufacturers from supporting competing middleware products on Microsoft's operating system; by prohibiting consumers and computer manufacturers from removing Microsoft's middleware products from the desktop; and by reaching agreements with software developers and third parties to exclude or disadvantage competing middleware products -- all to protect Microsoft's monopoly in the operating system market.

The Department proved that Microsoft had engaged in these anticompetitive practices to discourage the development and deployment of rival web browsers and Java technologies, in an effort to prevent them from becoming middleware threats to its operating system monopoly. Netscape had gained a respectable market share as a technology for navigating the then-burgeoning Internet, and Netscape proponents were touting the prospect of a new world of Internet computing that would make operating systems less relevant. Netscape touted its web browser as a new category of software that came to be known as "middleware," a form of software that, like Microsoft's Windows operating system, exposed a broad range of applications program interfaces ("APIs") to which software developers could write applications. This created the potential that -- if Netscape Navigator continued to gain market share and could run on operating systems other than Microsoft's, and if large numbers of software developers wrote applications programs to it -- computer users would have viable competitive alternatives to Microsoft.

The middleware threat was nascent. That is, as both the district court and the court of appeals acknowledged, it was a potential threat to the operating system monopoly that had not yet become real. It could not be predicted when, if ever, enough applications programs would be written to middleware products for

middleware to significantly displace Microsoft operating systems. Microsoft took this nascent middleware threat to its operating system monopoly seriously. The trial record disclosed a corporate preoccupation with thwarting Netscape and displacing Netscape's Navigator with Microsoft's Internet Explorer as the prevailing web browser. This campaign featured a host of strong-arm tactics aimed at various computer manufacturers, Internet access providers, and independent software developers. Even the decision to integrate its own browser into the operating system -- in effect, giving it away for free -- had an element of impeding the growth of Netscape and once was described as taking away Netscape's oxygen. Microsoft took similar actions against Java technologies. Among other things, Microsoft required software developers to promote its own version of Java technology exclusively and threatened developers if they assisted competing Java products.

The district court ruled not only that Microsoft had engaged in various specified illegal exclusionary practices, but that these acts were part of an overall anticompetitive course of conduct. The D.C. Circuit agreed as to some of the specified practices, while ruling that others -- for example, Microsoft's practice of preventing computer manufacturers from substituting their own user interfaces over the Windows interface supplied by Microsoft -- were justified and thus lawful. The D.C. Circuit also rejected the course-of-conduct theory, under which Microsoft's specific practices could be viewed as parts of a broader, more general monopolistic scheme, ruling that Microsoft's practices must be viewed individually.

Following the appellate court's instructions, we, in considering a possible remedy, focused on the specific practices that the court had ruled unlawful. We took as a starting point the district court's interim conduct remedies. Those remedies, however, were based on a much wider range of liability findings than had been

affirmed on appeal. Accordingly, they had to be tailored to the findings that had actually been affirmed. Further, because the interim conduct remedies were designed to apply only as a stop-gap until the district court's divestiture order was implemented, we broadened them in important respects to more fully address the remedial objectives of arresting the anticompetitive conduct, preventing its recurrence, and restoring lost competition to the marketplace. Finally, we updated the remedies to strengthen their long-term effectiveness in the face of the rapid technological innovation that continues to characterize the computer industry -- so that they will be relevant in the Windows XP operating system world and beyond.

Under the proposed consent decree, Microsoft will be required to disclose to other software developers the interfaces used by Microsoft's middleware to interoperate with the operating system, enabling other software developers to create competing products that emulate Microsoft's integrated functions. Microsoft will also have to disclose the protocols that are necessary for software located in a server computer to interoperate with Windows on a PC.

Microsoft will have to permit computer manufacturers and consumers to substitute competing middleware software on the desktop. It will be prohibited from retaliating against computer manufacturers or software developers for supporting or developing certain competing software. To further guard against possible retaliation, Microsoft will be required to license its operating system to key computer manufacturers on uniform terms for five years.

Microsoft will be prohibited from entering into agreements requiring the exclusive support or development of certain Microsoft software, so that software developers and computer manufacturers can continue to do business with Microsoft while also supporting and developing rival middleware products. And

Microsoft will be required to license any intellectual property to computer manufacturers and software developers necessary for them to exercise their rights under the proposed decree, including, for example, using the middleware protocols disclosed by Microsoft to interoperate with the operating system.

Any assumption that, had we litigated the remedy, we were certain to have secured all of this relief and possibly more misses the mark. The middleware definition, for example, was a very complex issue and would have been hard fought in a litigated remedy proceeding. The term had no generally accepted industry or technical meaning. At the time of trial, the term was used to describe software programs that exposed APIs. But in today's world, by virtue of the extensive degree to which software programs interact with each other, a very broad range of programs -- large and small, simple and complex -- expose APIs. At the same time, middleware had to be defined more broadly than the browser, or it would not provide sufficient protection for the potential sources of competition that might emerge. So we developed a definition of middleware, designed to encompass all technologies that have the potential to be middleware threats to Microsoft's operating system monopoly. It captures, in today's market, Internet browsers, e-mail client software, networked audio/video client software, and instant messaging software. On a going-forward basis, it also provides guidelines for what types of software will be considered middleware for purposes of the decree in the future. These guidelines are critical because, while it is important that future middleware products be captured by the proposed decree, those products will not necessarily be readily identified as such.

The proposed decree protects competition in the middleware market through a variety of affirmative duties and prohibitions, which I listed a minute ago. By requiring disclosure of a broad range of interfaces and protocols that will secure interoperability for rival software and servers, broadly banning exclusive dealing,

giving computer manufacturers and consumers extensive control of the desktop and initial boot sequence, and prohibiting a broad range of retaliatory conduct, the proposed decree will require Microsoft to fundamentally change the way in which it deals with computer manufacturers, Internet access providers, software developers, and others. These prohibitions had to be devised keeping in mind that Microsoft will continue for the foreseeable future to have a monopoly in the operating systems market. While we recognized that not all forms of collaboration between Microsoft and others in the industry are anticompetitive, and that some actually benefit competition, we drafted the non-discrimination and non-retaliation provisions broadly enough to prevent Microsoft from using its monopoly power to apply anticompetitive pressure in this fashion.

We concluded, particularly in light of intervening technological developments in the computer industry, that the remedial objective of restoring lost competition had to mean something different than attempting to restore Netscape and Java specifically to their previous status as potential nascent threats to Microsoft's monopoly. Attempting to turn back the hands of time would likely prove futile and would risk sacrificing important innovations that have moved the industry beyond that point. So we focused instead on the market as it exists today, and where it appears to be heading over the next few years, and devised a remedy to recreate the potential for the emergence of competitive alternatives to Microsoft's operating system monopoly through middleware innovations. With a reported 70,000-odd applications currently designed to run on Windows, the applications barrier to entry is quite formidable. The most effective avenue for restoring the competitive potential of middleware, we concluded, was to ensure that middleware developers had access to the technical information necessary to create middleware programs that could compete with Microsoft in a meaningful way -- that is, by requiring Microsoft to disclose the APIs needed to enable competing middleware developers to create middleware that matches Microsoft's

in efficiency and functionality.

API disclosure had apparently been a very difficult obstacle to resolution of the case at every stage. There had never been any allegation in the case that Windows was an essential facility, the proprietary technology for which had to be openly shared in the industry. So we are very pleased that we were able to secure this crucial provision in the proposed decree.

Similarly, the proposed decree goes beyond the district court's order in requiring Microsoft to disclose communications protocols for servers if they are embedded in the operating system, thereby protecting the potential for server-based applications to emerge as a competitive alternative to Microsoft's operating systems monopoly. Although the issue of Microsoft's potential use of its monopoly power to inhibit server-based competition was barely raised and never litigated in the district court, we believed it was an important concern to resolve in the final negotiations. The proposed decree also requires Microsoft to create and preserve "default" settings, such that certain of Microsoft's integrated middleware functions will not be able to override the selection of a third-party middleware product, and requires Microsoft to create add/delete functionality to make it easier for computer manufacturers and users to replace Microsoft middleware functionality with independently developed middleware. These are other important respects in which, in light of intervening technological changes, the proposed decree goes beyond the relief contemplated in the district court's interim relief order. By giving middleware developers the means of creating fully competitive products, requiring the creation of add/delete functionality, and making it absolutely clear that computer manufacturers can, in fact, replace Microsoft middleware on the desktop, the decree will do as much as possible to restore the nascent threat to the operating system monopoly that browsers once represented.

The proposed decree contains some of the most stringent enforcement provisions ever contained in any modern consent decree. In addition to the ordinary prosecutorial access powers, backed up by civil and criminal contempt authority, this decree has two other aggressive features. First, it requires a full-time, on-site compliance team -- complete with its own staff and the power to hire consultants -- that will monitor compliance with the decree, report violations to the Department, and attempt to resolve technical disputes under the disclosure provisions. The compliance team will have complete access to Microsoft's source code, records, facilities, and personnel. Its dispute resolution responsibilities reflect the recognition that the market will benefit from rapid, consensual resolution of issues whenever possible, more so than litigation under the Department's contempt powers. The dispute resolution process complements, but does not supplant, ordinary methods of enforcement. Complainants may bring their inquiries directly to the Department if they choose.

The decree will be in effect for five years. It also contains a provision under which the term may be extended by up to two additional years in the event that the court finds that Microsoft has engaged in repeated violations. Assuming that Microsoft will want to get out from under the decree's affirmative obligations and restrictions as soon as possible, the prospect that it might face an extension of the decree should provide an extra incentive to comply.

Our practice with regard to enforcement is never influenced by the extent to which we "trust" a defendant. Rather, a decree must stand on its own as an enforcement vehicle to ensure effective relief and must contain enforcement provisions sufficient to address its inherent compliance issues. In this case, those compliance issues are complex, as the decree seeks to address Microsoft's interactions with firms throughout the computer industry. Under the circumstances, I believe the extraordinary nature of the decree is warranted.

Some have criticized the decree for not going far enough. Some have asked why we did not continue to pursue divestiture as a possible remedy. We had several reasons. First, the court of appeals made it clear that it viewed the break-up remedy with skepticism, to put it mildly. The court ruled that on remand the district court must consider whether Microsoft is a unitary company -- i.e., one that could not easily be broken up -- and whether plaintiffs established a significant causal connection between Microsoft's anticompetitive conduct and its dominant position in the market for operating systems -- a finding not reached by the prior judge.

Second, the legal basis for the structural separation the Department had been seeking was undercut by the failure to sustain the two claims that had challenged Microsoft's right to compete outside its operating system monopoly by integrating new functions into Windows, the attempted monopolization claim and the tying claim. The former was dismissed, and the latter was remanded under a much more difficult rule-of-reason standard. The court of appeals ruled that, albeit with some limits, Microsoft could lawfully integrate new functions into the operating system and use the advantages flowing from its knowledge and design of the operating system to compete in downstream markets.

Third, and more generally, the relief in a section 2 case must have its foundation in the offending conduct. The monopoly maintenance finding, as modified by the court of appeals, and without the "course-of-conduct" theory, would not in our view sustain a broad-ranging structural remedy that went beyond what was necessary to address Microsoft's unlawful responses to the middleware threat to its operating system monopoly. Indeed, our new district judge, Judge Kollar-Kotelly, stated in open court that she expected our proposed remedy to reflect the fact that portions of our case had not been sustained.

Finally, from a practical standpoint, even assuming that we could have eventually secured a breakup of Microsoft -- a very dubious assumption in light of what the court of appeals and Judge Kollar-Kotelly have stated -- the time it would have taken to continue litigating the break-up and the inevitable appeals could easily have delayed relief for another several years. By taking structural relief off of the table at the outset of the remedy proceeding on remand, we were able to get favorable procedural rulings that were essential to moving quickly to a prompt resolution.

More generally, a number of critics have suggested ways in which we could have further constrained Microsoft's conduct in the marketplace -- either by excluding it from markets outside the operating system market, restricting it from integrating functions into its products or collaborating with others, or requiring it to widely share its source code as an open platform. While it is certainly true that restrictions and requirements of this sort might be desirable and advantageous to Microsoft's competitors, they would not necessarily be in the interest of competition and consumers overall; many would reduce consumer choice rather than increase it. Moreover, to the extent these restrictions go beyond what is needed to remedy proven antitrust violations, they are not legitimate remedial goals. The objectives of civil antitrust enforcement are remedial, and they focus on protecting and restoring competition for the benefit of consumers, not on favoring particular competitors.

As to more complex questions regarding whether the decree has properly covered all the elements that will be needed for full relief, questions of that nature are entirely appropriate and hopefully will be raised and addressed in the Tunney Act process.

But I believe the decree, by creating the opportunity for independent software

vendors to develop competitive middleware products on a function-by-function basis, by giving computer manufacturers the flexibility to place competing middleware products on Microsoft's operating system, and by preventing retaliation by Microsoft against those who choose to develop or use competing middleware products, fully addresses the legitimate public goals of stopping Microsoft's unlawful conduct and restoring competition lost on its account.

Mr. Chairman, a vigorously competitive computer software industry is vital to our economy, and the Department is committed to ensuring that it remains competitive. I hope that my testimony has helped members of the Committee more fully understand why the Department is completely satisfied that the proposed consent decree now before the district court will provide a sufficient and effective remedy for the anticompetitive conduct in which Microsoft has been found to have engaged in violation of the Sherman Act. I would be happy to answer any questions you or other members of the Committee may have.

# Exhibit G

State of New York
Office of the Attorney General
120 Broadway
NEW YORK, NY 10271

Eliot Spitzer
Attorney General (212) 416-8050


SENATE COMMITTEE ON THE JUDICIARY


HEARING ON


THE MICROSOFT SETTLEMENT: A LOOK TO THE FUTURE

TESTIMONY OF JAY L. HIMES,

CHIEF, ANTITRUST BUREAU

OF THE

NEW YORK STATE ATTORNEY GENERAL'S OFFICE


Washington, D.C.
Wednesday, December 12, 2001


Chairman Leahy and distinguished Members of this Committee, thank you for
inviting me to testify before you today on the important issues relating to the

settlement of the case against Microsoft, brought by the Antitrust Division of the United States Department of Justice, 18 States and the District of Columbia. New York is one of the lead States in this lawsuit, and we have had a central role in the matter going back to the investigation that led to the filing of the case.

As the members of the Committee know, on Friday, November 2, 2001, the DOJ and Microsoft reached a proposed settlement of the lawsuit, which was then publicly announced. After further negotiations between Microsoft and the States, a revised settlement was reached on Tuesday, November 6, 2001. New York — together with the States of Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, Ohio and Wisconsin — agreed to the revised settlement. The remaining State plaintiffs — California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia and the District of Columbia — are seeking a judicially ordered remedy, as is their right.

I, together with an Assistant Attorney General from the State of Ohio, were the principal representatives of the States in the lengthy negotiations that led to the proposed final judgment embodying the settlement. Therefore, I believe that we in New York see the Microsoft settlement from a vantage point that others who were not in the negotiating room may lack. I will do my best to try to share our observations with the Committee. I will begin by presenting an overview of the lawsuit and the settlement reached. After that, I will address in more detail several of the central features of the settlement. Then, I wish to turn to the settlement process itself, particularly insofar as it bears on criticism of the proposed final judgment.

1. Overview of the Case and the Settlement

In May 1998, New York, 18 other States and the District of Columbia began a lawsuit against Microsoft, alleging violations of federal and state antitrust laws.

The States' case was similar to an antitrust case commenced that same day by DOJ, and the two cases proceeded on a consolidated basis. In summary, the litigation against Microsoft charged that the company unlawfully restrained trade and denied consumers choice by: (1) monopolizing the market for personal computer ("PC") operating systems; (2) bundling (or "tying") Internet Explorer — Microsoft's web browser — into the Windows operating system used on most PCs; (3) entering into arrangements with various industry members that excluded competitive software; and (4) attempting to monopolize the market for web browsers.

After a lengthy trial, the District Court upheld the governments' claims that Microsoft had unlawfully: (1) maintained a monopoly in the PC operating system market; (2) tied Internet Explorer to its Windows operating system monopoly; and (3) attempted to monopolize the browser market. The District Court issued a final judgment breaking up Microsoft into two separate businesses, and ordering certain  conduct remedies intended to govern Microsoft's business activities pending completion of the break-up. These remedies were stayed while Microsoft appealed.

In June of this year, the Court of Appeals for the District of Columbia Circuit issued its decision on appeal. United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001). The Court of Appeals broadly upheld the lower court's monopolization maintenance ruling, although it rejected a few of the acts of monopolization found by the District Court including the Court's determination that Microsoft's overall course of conduct itself amounted to monopoly maintenance. On the tying claim, the Court of Appeals reversed the lower court's holding of an antitrust violation, and ordered a new trial under the rule of reason — a standard more favorable to Microsoft than the standard previously used by the trial court. In view of these rulings, the Circuit Court vacated the final judgment, including the break-up

provisions. Finally, the Court of Appeals disqualified the trial judge from hearing further proceedings. Thereafter, the Court of Appeals denied a rehearing petition by Microsoft, and the Supreme Court declined to hear an appeal by Microsoft concerning the Court of Appeals' disqualification ruling.

The Court of Appeals returned the case to the District Court in late August of this year. At that point, a new judge — Hon. Colleen Kollar-Kotelly — was assigned. Shortly after that, DOJ and the States announced their intention, in the forthcoming proceedings before the District Court, to refrain from seeking another break up order — and to focus instead on conduct remedies modeled on those included in the earlier District Court judgment. DOJ and the States also announced that they would not re-try the tying claim under the rule of reason test that the Court of Appeals had adopted. These decisions by the government enforcers were made in an effort to jump-start the process of promptly obtaining a strong and effective remedy for Microsoft's anticompetitive conduct, as upheld by the Court of Appeals' decision.

The parties appeared before Judge Kollar-Kotelly for the first time at a conference held on September 28, 2001. The Court directed the parties to begin a settlement negotiation and mediation process, which would end on November 2. Specifically, the Court noted that "I expect [the parties] to engage in settlement discussions seven days a week around the clock in order to see if they can resolve this case." (Transcript of September 28, 2001 proceedings, page 5) The Court also adopted a detailed schedule governing the proceedings leading to a hearing on remedies, which the Court tentatively set for March 2002, if no settlement could be reached.

The settlement process that the District Court thus set in motion resulted in a proposed final judgment agreed to by Microsoft , DOJ and nine of the plaintiff

States. The overarching objective of this settlement is to increase the choices available to consumers (including business users) who seek to buy PCs by promoting competition in the computer and computer software industries. More specifically (and as I will explain further below), the proposed final judgment includes the following means to increase consumer choice and industry competition:

Microsoft will be prohibited from using various forms of conduct to punish or discourage industry participants from developing and offering products that compete or could compete with the Windows operating system, or with Microsoft software running on Windows.

Microsoft will be prohibited from restricting the ability of computer manufacturers to make significant changes to Windows, thereby encouraging manufacturers to offer consumers more choice in the features included in PCs available for purchase.

Microsoft will be required to disclose significant technical information that will help industry participants to develop and offer products that work well with Windows, and, in this way, potentially aid in the development of products that will compete with Windows itself.

Microsoft will be subject to on-site scrutiny by a specially selected three-person committee, charged with responsibility to assist in enforcing Microsoft's obligations under the settlement, and to help resolve complaints and inquiries that arise by virtue of the settlement.

New York decided to settle the Microsoft case because we believe that the deal hammered out over the many weeks of negotiations will generate a more competitive marketplace for consumers and businesses throughout the country, and, indeed, throughout the world. In summary, the settlement that the parties

have submitted to the District Court for approval will accomplish the following:

2. Empowering Computer Manufacturers to Offer Choices to Consumers
First, the proposed final judgment will empower computer manufacturers — the "OEMs" — to offer products that give consumers choice. Under the settlement, OEMs have the opportunity to add competing middleware to the Windows operating system in place of middleware included by Microsoft. (Section III, paragraphs C and H) Middleware here refers not only to software like the Netscape browser, one of the subjects of the liability trial, but also to other important PC functions, such as email, instant messaging, or the media players that enable consumers to receive audio and visual content from the Internet. (Section VI, paragraphs K and M) Middleware is important, in the context of this case, because it may help break down barriers that protect Microsoft's Windows monopoly.

The government negotiators insisted on, and eventually obtained, a broad definition of middleware so that the proposed decree covers both existing middleware and middleware not currently in existence, but which Microsoft and its competitors may develop during the term of the decree. The reason for our pressing a broad definition is plain enough: the broader the definition of middleware, the more software covered by the settlement, and the greater the opportunity for a software product to develop in a fashion that challenges the Windows monopoly.

Under the proposed decree, OEMs will have the ability to customize the PC's that they offer. They may, for example, add icons launching both competing middleware — and products that use competing middleware — to the Windows desktop or Start menu, and to other places in the Windows operating system. OEMs also will have the ability to suppress the existence of the competing

middleware that Microsoft included in the Windows operating system licensed to the OEM. Microsoft itself will have to redesign Windows to the extent needed to permit this sort of substitution of middleware, and to ensure that the OEMs' customization of Windows is honored. (Section III, paragraphs C and H)

The options available to OEMs under the settlement mean that the Windows desktop is up for sale. Companies offering a package of features that includes middleware, and middleware developers themselves, who desire to put their product into the hands of consumers can go to OEMs and buy a part of the real estate that the Windows desk top represents. This opportunity for additional revenue should further empower OEMs to develop competing computer products that offer choice to consumers.

The OEMs' ability to offer consumers competing middleware is backed up by a broad provision that prohibits Microsoft from "retaliating" against OEMs for any decision to install competing middleware (as well as any operating system that competes with Windows). (Section III, paragraph A) This provision forbids Microsoft from altering any of its commercial relations with an OEM, or from denying an OEM a wide array of product support or promotional benefits, based on the OEM's efforts to offer competitive alternatives. (Section VI, paragraph C) Then, to back up the non-retaliation provision, Microsoft also is required to license Windows to its 20 largest OEMs (who comprise roughly 70% of new PC sales) under uniform, non-discriminatory terms. (Section III, paragraph B) Microsoft also is prohibited from terminating any of its 20 largest OEMs for Windows licensing violations without first giving the OEM notice and an opportunity to cure the alleged violation. (Section III, paragraph A)

3. Empowering Software Developers and Others to Offer Competing Middleware

Second, the proposed final judgment seeks to encourage independent software

developers — referred to as "ISVs" — to write competing middleware. This is accomplished by forbidding Microsoft from retaliating against any ISV based on the ISV's efforts to introduce competing middleware or a competing operating system into the market. (Section III, paragraph F) The literally thousands of ISVs in the industry are protected by this additional non-retaliation provision, and they are protected whether or not they have an on-going business relationship with Microsoft. ISVs, and many other industry participants, are further protected by provisions that prohibit Microsoft from entering into exclusive dealing arrangements relating to middleware or operating systems. Exclusive dealing arrangements are a device that Microsoft used to deny competitors access to the distribution lines needed to enable their products to gain acceptance in the marketplace. (Section III, paragraphs F, G) We have effectively closed off that practice to Microsoft.

4. Requiring Microsoft to Disclose Information to Facilitate Interoperation

Third, the proposed final judgment requires Microsoft to provide the technical information — "interfaces" and "protocols" — that industry members need to enable competing middleware to work well with Windows. Middleware uses functions of the Windows operating system through connections or "hooks" called "applications programming interfaces" — "APIs" for short. Microsoft will now be required to disclose the APIs that its own middleware uses to interoperate with Windows, and to provide technical documents relating to those APIs, so that ISVs who wish to develop competing middleware will have the information needed to make their products work well with Windows. (Section III, paragraph D)

This is, again, a place where the broad definition of middleware, covering both existing and yet to be developed products, matters. (Section VI, paragraph J) The broader the definition, the greater the number of APIs that Microsoft must

disclose and document. The greater the technical information made available, the greater the likelihood that industry participants will be able to develop competing middleware that works well on Windows.

The proposed decree goes beyond requiring disclosure of APIs between Windows and Microsoft middleware. More and more, at-home consumers and computer users in the workplace can obtain functionality that they need from either the Internet or from network servers operating in a business setting. This trend means that computer applications running on servers may be an emerging location for developing middleware that could challenge the Windows monopoly at the PC level. Thus, the settlement is designed to prevent Microsoft from using Windows to gain competitive advantages in the way that PCs talk to servers. This is accomplished by requiring Microsoft to disclose, via a licensing mechanism, what are called "protocols" used to enable PCs and servers to communicate with each other. (Section III, paragraph E)

This particular provision — sometimes referred to as the "client/server interoperability" section — was especially important to the States. The provision included in the November 2 version of the final judgment between the DOJ and Microsoft did not seem to us in New York to go quite as far as we felt it needed to go. As a result, this was a place that we and other States focused on in the negotiations leading to the revised settlement signed on November 6. The changes that resulted did not involve many words, but we believe that they enhanced Microsoft's disclosure obligations in this critical area.

5. The Enforcement Mechanism

The subject matter of the Microsoft lawsuit is complex, and so too are many parts of the remedy embodied in the final judgment. This complexity creates the potential for good faith disagreement, as well as for intentional evasion. For this

reason, from the outset of the settlement negotiations, New York held to the view that enforcement provisions going beyond those typically found in antitrust decrees would be needed here. We worked closely with DOJ to achieve this objective. What you find in the proposed final judgment is an enforcement mechanism that we believe is unprecedented in any antitrust case.

The proposed consent decree expressly recognizes the "exclusive responsibility" of the United States DOJ and the antitrust officials of the settling States to enforce the final judgment against Microsoft. (Section IV, paragraph A (1)) To assist this federal and state enforcement and compliance effort, the proposed decree will create a three person body, the "Technical Committee" or "TC." (Section IV, paragraph B) The TC is empowered, among other things: (1) to interview any Microsoft personnel; (2) to obtain copies of any Microsoft documents — including Microsoft's source code — and access to any Microsoft systems, equipment and physical facilities; and (3) to require Microsoft to provide compilations of documents, data and other information, and to prepare reports for the TC. (Section IV, paragraph B(8)(b), (c)) The TC itself is authorized to hire staff and consultants to carry out its responsibilities. (Section IV, paragraph B(8)(h)) Microsoft also is required to provide permanent office space and office support facilities for the TC at its Redmond, Washington campus. (Section IV, paragraph B(7))

In other words, for the five year term of the decree, the TC will be the on-site eyes and ears of the government enforcers. The TC and government enforcers may communicate with each other as often as they need to, and the TC may obtain advice or assistance from the enforcers on any matter within the TC's purview. In addition, the TC is subject to specific reporting requirements — every six months, or immediately if the TC finds any violation of the decree. (Section IV, paragraph B(8)(e), (f)) The TC further will be expected to field and promptly

resolve complaints and inquiries from industry members, or from government enforcers themselves. (Section IV, paragraph B(8)(d), paragraph D)
All of this will be paid for by Microsoft, subject to possible review by federal and state officials, or the Court. To discourage Microsoft from mounting dubious court challenges to the TC's costs and expenses, the proposed decree authorizes the TC to recover its litigation expenses, including attorneys' fees, unless the Court expressly finds that the TC's opposition was "without substantial justification." (Section IV, paragraph B(8)(i))

These enforcement provisions are probably the strongest ever crafted in an antitrust case. Federal and state enforcers will have at their disposal their regular enforcement powers, which may be invoked at any time independent of anything that the TC may do. (Section IV, paragraph A(2), (4)) Meanwhile, the TC will augment these traditional powers in significant respects. In addition, Microsoft itself is required to appoint an internal compliance officer to assist in assuring discharge of the company's obligations under the settlement. (Section IV, paragraph C)

I am mindful that concern has been expressed regarding the enforcement provision that "[n]o work product, findings or recommendations of the TC may be admitted in any enforcement proceeding before the Court . . . ." (Section IV, paragraph D(4)(d)) But the impact of this provision should not be great. As noted, the TC may report to the government enforcers, who may use the TC's work to seek from Microsoft a consensual resolution of, for example, any non-compliant conduct, to initiate (and inevitably shortcut) enforcement-looking activity, to pursue leads, and for other enforcement purposes. Moreover, the TC's work product, once known, should be readily susceptible of prompt replication by enforcement officials for use in judicial proceedings.

6. The Settlement Process

As the very fact of these hearings attests, the proposed settlement of the Microsoft case is a subject of significant public interest and debate. For years, many have asserted that the case itself should never have been filed to begin with. For these individuals, the government should be satisfied to get any remedy at all. We in New York profoundly disagree with this view. As the liability trial and appeal confirmed, this case was properly brought to remedy serious anticompetitive activity by Microsoft. The trial and appellate proceedings further confirmed that the antitrust laws are alive and well in technological industries, just as they are in other parts of our nation's economy. Accordingly, the public is entitled to a strong, effective remedy.

In this regard, however, some have criticized the settlement for not going far enough, or for having exceptions and limitations. We reject this view as well. In announcing the decision by New York and eight other States to settle the case, New York Attorney General Eliot Spitzer noted that "a settlement is never perfect." A settlement is an agreed-upon resolution of competing positions and objectives. Do I wish that the DOJ and the States had gotten more? Of course I do. Do our counterparts on the Microsoft side wish that they had given up less? There is no doubt about the answer. So, asking these questions does not take us very far. Settlement necessarily means compromise. It is in the nature of the beast.

This particular settlement is the product of roughly five weeks of consuming negotiations, much of which took place under the guidance of two experienced mediators. I am unaware of any calculation of the total person-hours consumed by this effort. Certainly it was in the thousands, if not tens of thousands, of hours. The process required the two sides to explore, both internally and in face-to-face negotiations, a host of factors that bear on terms of the settlement eventually

reached, such as: (1) the competitive consequences of varying courses of action; (2) the design, engineering and practical implications and limitations of various remedy approaches, as well as their impact on innovation incentives; (3) the issues actually framed for trial in the liability phase of the case and their resolution by the Court of Appeals; (4) the law governing remedies for the monopoly maintenance violation that the Court of Appeals upheld, which the District Court would be called on to apply in the absence of a settlement; and (5) the resources, effort and time otherwise needed to resolve the sharp factual disputes that would be presented in a full-blown remedies hearing. New York and the other States, as well as the DOJ, were aided in this process by experienced staff and retained experts.

In the final analysis, the DOJ, New York and the other settling States concluded that the benefits to consumers and to the competitive process that are likely to result from the negotiated settlement reached here outweigh the uncertain remedy that a contested remedies proceeding might bring. In assessing the soundness of that conclusion, the members of the Committee should recall that the settlement's critics have a luxury that those of us who settled did not have: they have the settlement floor created by the final judgment that we have offered. Absent this settlement, however, a judicial remedies hearing had not simply potential rewards, but significant risks as well.

During the September 28 court conference, the District Court expressed its views regarding the appropriate scope of the conduct remedies that might emerge from a judicial hearing on relief. Among other things, the District Court stated the following:

The Supreme Court long ago stated that it's entirely appropriate for a district court to order a remedy which goes beyond a simple prescription against the

precise conduct previously pursued . . . . The Supreme Court has vested this
court with large discretion to fashion appropriate restraints both to avoid a
recurrence of the violation and to eliminate its consequences. Now, case law in
the antitrust field establishes that the exercise of discretion necessitates
choosing from a range of alternatives.

\* \* \*

So the government's first and most obvious task is going to be to determine
which portions of the former judgment remain appropriate in light of the appellate
court's ruling and which portions are unsupported following the appellate court's
narrowing of liability.

Now, the scope of any proposed remedy must be carefully crafted so as to
ensure that the enjoining conduct falls within the number [sic, penumbra] of
behavior which was found to be anticompetitive. The government will also have
to be cautiously attentive to the efficacy of every element of the proposed relief.

(Transcript of September 28, 2001 proceedings, pages 9, 8)
These remarks highlight risks that both sides confronted if the decision were
made to press for a court-ordered remedy. Several concrete examples, from the
settlement actually reached, will further drive home this point.

Microsoft's API disclosure obligations, and its obligations to permit OEMs to
customize the Windows desktop and operating system more generally, revolve
around a series of related middleware definitions that the parties agreed to.
Absent a settlement, there could no assurance that the courts would adopt
middleware definitions as broad as those that DOJ and the settling States
negotiated.

The liability trial in the case centered on Microsoft's conduct directed to efforts by

Netscape and Sun to get Netscape's web browser and Sun's Java technologies installed on individual PCs. Plaintiffs' theory of the case — which the trial and appellate courts upheld — was that these forms of middleware could, if sufficiently pervasive at the PC level, erode the applications barrier to entry that protects Microsoft's Windows monopoly. Microsoft therefore set out to exclude this middleware from PCs. In the settlement negotiations leading to the client/server interoperability provision, the government negotiators argued that applications running at the server level can be analogous to middleware running at the PC level. On this approach, middleware developed at the server level could also break down the applications barrier to entry into the PC operating system market. Therefore, the remedy in this case requires Microsoft to disclose ways that PCs running Windows talk to servers running Microsoft software. Absent a settlement, however, there could be no assurance that the courts would order disclosure of this PC/server line of communications. Microsoft resisted this provision during the settlement negotiations, and would similarly have opposed it at a remedies hearing.

Finally, as I noted above, there does not seem to be any antitrust precedent for an enforcement mechanism that puts a monitor on site, with full access to the defendant's documents, employees, systems and physical facilities — all at the defendant's expense. Absent a settlement, Microsoft would have vigorously opposed such a far-reaching enforcement regime, and there plainly could be no assurance that the courts would have ordered comparable relief.

As these examples reflect, I believe that the proposed final judgment compares favorably to — and in some respects may well exceed — the remedy that might have emerged from a judicial hearing.

The existence of a settlement has also accelerated the point in time at which a

remedy will begin to take effect. Microsoft has agreed to begin complying with the proposed final judgment starting on December 16, 2001. (November 6 Stipulation, paragraph 2) Assuming further that the District Court approves the proposed final judgment in Tunney Act proceedings in early 2002, there will be a remedy in place a year or more before the trial and appellate level proceedings, needed to resolve the appropriate remedy in the absence of a settlement, would be concluded. In this rapidly changing sector of the industry, the timeliness of a remedy is an important consideration.

6. Conclusion

In sum, the settlement in the Microsoft case promotes competition and consumer choice. It is proportionate to the monopoly maintenance violations that the Court of Appeals for the District of Columbia Circuit sustained. The settlement represents a fair and reasonable vindication of the public interest in assuring the free and open competition that our nation's antitrust laws guarantee.

Microsoft is reported recently to have issued a company-wide email stating its commitment to making the settlement "a success" and to "ensuring that everyone at Microsoft complies fully with the terms" of the decree. D. Ian Hopper, Associated Press State & Local Wire (Nov. 30, 2001). We expect nothing less, and we intend to see to it that Microsoft honors that commitment. New York is one of the members of the States' enforcement committee, created under the proposed decree. Our State Antitrust Bureau will be vigilant in monitoring Microsoft's discharge of its obligations, and we look forward to working closely with the DOJ to make sure that the settlement is, indeed, a success. The American public is entitled to nothing less.

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>MICROSOFT CORPORATION, )<br><br>Defendant. )<br><br>———————————————— ) | Civil Action No. 98-1232 (CKK) |
| STATE OF NEW YORK, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MICROSOFT CORPORATION, )<br><br>Defendant. )<br><br>———————————————— ) | Civil Action No. 98-1233 (CKK)<br><br>Next Court Deadline:  March 4, 2002<br>Status Conference |

**SUPPLEMENTAL RESPONSE OF THE PLAINTIFF LITIGATING
STATES TO DEFENDANT MICROSOFT CORPORATION'S
<u>FIRST SET OF WRITTEN INTERROGATORIES</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 26.2 of the Local Rules of the United States District Court for the District of Columbia, plaintiff States California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia and the District of Columbia (collectively the "Plaintiff Litigating States," and each a "Plaintiff Litigating State") hereby supplement certain of their previous responses, and by their attorneys continue to object, as set forth below, to Defendant Microsoft Corporation's First Set of Written Interrogatories (collectively the "Interrogatories," and each an "Interrogatory").

The responses set forth herein are based on such information as is presently available and the Plaintiff Litigating States reserve the right to supplement, amend, clarify or correct these responses if and when it becomes necessary.

The responses set forth herein and any responsive documents produced by the Plaintiff Litigating States are subject to the Stipulation and Protective Order entered in this action (the "Protective Order").

## GENERAL OBJECTIONS

1.     The Plaintiff Litigating States object to the Interrogatories to the extent that they seek discovery that is expressly or more appropriately directed to others, including the Antitrust Division of the United States Department of Justice ("Government") or the States that have agreed to the Revised Proposed

2

Final Judgment ("Settling States"), including Illinois, Kentucky, Louisiana, Maryland, Michigan, New York, North Carolina, Ohio and Wisconsin.

2.     The Plaintiff Litigating States reserve all objections to the admission of any responses to these Interrogatories at the remedies trial.  The identification of or reference to any document or the supplying of any information does not constitute an admission by the Plaintiff Litigating States that such document or information is relevant to the remedies proceeding.  By responding to the Interrogatories, the Plaintiff Litigating States do not concede the truth or accuracy of any characterization, allegation or statement made in such Interrogatories.  The Plaintiff Litigating States reserve the right to object to further inquiry with respect to any subject matter.

3.     The Plaintiff Litigating States object to the Interrogatories on the grounds that they are overly broad and unduly burdensome and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

4.     The Plaintiff Litigating States object to the Interrogatories to the extent they seek to impose burdens and obligations greater than those imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Columbia.

5.     The Plaintiff Litigating States object to the Interrogatories because they do not provide date restrictions.  Without waiving this objection, the

Plaintiff Litigating States interpret the Interrogatories to encompass the time period from May 18, 1998 to the present and respond accordingly.

6.    The Plaintiff Litigating States object to the definition of the term "concerning" as set forth at ¶ 10 in the Definitions section of the Interrogatories as vague, ambiguous, overly broad and unduly burdensome.

7.    The Plaintiff Litigating States object to the Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the joint defense or common interest privilege, the informants' privilege, the deliberative privilege and/or the investigative privilege, or any other applicable privilege, law or rule.  The Plaintiff Litigating States will not provide information that was obtained pursuant to any Plaintiff Litigating State's law enforcement authority and is prohibited from disclosure under relevant State law.

8.    The Plaintiff Litigating States object to the Interrogatories to the extent that they improperly seek to impose discovery obligations on agencies or subdivisions of the Plaintiff Litigating States or any agents thereof other than the offices of the Plaintiff Litigating States Attorneys General (which term includes the District of Columbia Corporation Counsel), in their capacity as antitrust enforcement agencies which have investigated and are prosecuting this action in their sovereign capacities, and as *parens patriae* on behalf of the general welfare and economy of each of their states, and not in any proprietary capacity, and on the grounds that such an imposition is overly broad, unduly burdensome, and not

4

reasonably calculated to lead to the discovery of admissible evidence.  Consistent with this objection, the Plaintiff Litigating States will provide information only within the knowledge of the offices of the Plaintiff Litigating States' Attorneys General.

9.     The Plaintiff Litigating States object to the Interrogatories to the extent they seek information already in the possession and/or control of the Defendant.

10.    The Plaintiff Litigating States object to the Interrogatories to the extent they seek the production of documents (and the disclosure of information related thereto) received from private citizens and entities that reflect commentary on proposed remedies in this action on any basis other than with such documents and information (including without limitation as to the identity of such individuals and entities) being designated as Highly Confidential Information under the terms of the Protective Order.

11.    The Plaintiff Litigating States object to some Interrogatories as premature in that they seek information the release of which is addressed by the Federal Rules of Civil Procedure and/or the Scheduling Order entered in this action on September 28, 2001 ("Scheduling Order").

Without waiving these objections, the Plaintiff Litigating States incorporate these general objections into each and every response and respond as follows:

5

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

1.     State in the most specific and detailed manner possible each and
every respect in which you claim that the Revised Proposed Final Judgment is
deficient, and explain why.

RESPONSE:  The Plaintiff Litigating States object to this
Interrogatory as a contention interrogatory that is premature and more
appropriately answered at a later time, *see* Fed. R. Civ. P. 33(c), and therefore the
Plaintiff Litigating States reserve the right to amend, supplement or modify the
response to this Interrogatory to incorporate information gained through discovery.
Subject to and without waiving this objection or the General Objections, the
Plaintiff Litigating States respond that, as highlighted in Plaintiff Litigating States'
Remedial Proposals filed on December 7, 2001, the Revised Proposed Final
Judgment (the "RPFJ") is deficient in many respects, including without limitation
the following:

(1)     the RPFJ does not require Microsoft to license an "uncommingled" or
unbundled version of Windows, even though (a) the Court of Appeals
found that Microsoft's commingling of middleware code with its
monopoly operating system was anticompetitive (*see United States v.
Microsoft Corp.*, 253 F.3d 34, 66 (D.C. Cir.) ("*Microsoft*"), *cert. denied*,
122 S. Ct. 350 (2001), and (b) such a remedy would enable competing
middleware developers to gain access to the OEM channel of
distribution, recognized by Microsoft, and the District Court, as one of

the two most important distribution channels (*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 46 (D.D.C. 1999) ("*Microsoft Findings of Fact*"));

(2)     the RPFJ provides for overly broad exceptions to the OEM uniform licensing requirement, including without limitation (a) market development allowances, and (b) consideration tied to the level of an OEM's promotion or distribution of Microsoft's products or services, even though the Court of Appeals and District Court found Microsoft's discrimination between OEMs in its contractual relationships a critical lever in several types of anticompetitive conduct (*see Microsoft*, 253 F.3d at 59-64; *Microsoft Findings of Fact*, 84 F. Supp. 2d at 66-68);

(3)     the RPFJ does not adequately provide for timely and broad disclosure of interfaces and other technical information to third parties, despite the fact that (a) the Court of Appeals found that Microsoft illegally used the discriminatory disclosure of technical information to ISVs as an incentive to obtain their agreement to certain anticompetitive conditions, including curtailment of the use and promotion of Internet Explorer (*see Microsoft*, 253 F.3d at 71-72; *see also Microsoft Findings of Fact,* 84 F. Supp. 2d at 93-94), and (b) the District Court found that Microsoft deliberately withheld technical information necessary to ensure the interoperation of a rival platform (Netscape's Navigator) and the Windows operating system (*see Microsoft Findings of Fact,* 84

F. Supp. 2d at 33-34) and thereby hampered the rise of this threat to Microsoft's monopoly;

(4)     the RPFJ limits the disclosure of interfaces and technical information to those that concern the interoperation of only Microsoft middleware and its Windows operating system, even though (a) there are many other currently existing nascent threats to Microsoft's operating system monopoly such as alternative platforms like network servers, web servers, handheld computing devices and set-top boxes, (b) disclosure of information relating to interoperation between these products is as important as information relating to interoperation with Windows, and (c) an antitrust remedy must be forward looking to prevent a recurrence of analogous harm and not simply seek to remedy specific past misconduct (see Nat'l Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 697 (1978));

(5)     the RPFJ mandates the disclosure of communications protocols only in the context of client-server interoperation, even though the disclosure of such protocols is necessary to permit third parties to develop other nascent threats to Microsoft's operating system monopoly that communicate with personal computers such as widely interoperable handheld devices and middleware installed thereon;

(6)     the RPFJ delays the impact of the disclosure provisions for up to nine months in the case of communications protocols that concern the

interoperation of client personal computers and servers, and twelve months in the case of interfaces relating to the interoperation of middleware and operating systems -- given the necessity of prompt disclosure in the light of the pace of change in the computer industry, such delays are simply unjustifiable;

(7)     the RPFJ delays the required disclosure of middleware / operating system interoperability interfaces, in the case of new releases of Microsoft operating systems, until Microsoft releases a beta test version of the new release to 150,000 or more beta testers -- this test is not only subject to manipulation to avoid timely disclosure but on its face means that disclosure will not be required until very close to the release date of the new product, thereby disadvantaging Microsoft's rivals;

(8)     the RPFJ does not require disclosure of the technical information required by third parties to make full use of the disclosed interfaces and protocols;

(9)     the RPFJ permits only members of a three person "Technical Committee" (one of whose members is appointed by Microsoft) to have access to Microsoft's source code, even though third parties wishing to make meaningful use of Microsoft's interoperability disclosures need direct access to source code through some means, such as a secure facility at which they can view and interrogate such code;

(10)     the RPFJ imposes unjustifiable qualifications in the provisions that
         appear to provide for flexibility in product configuration (e.g., (i)
         Microsoft can limit the addition of icons, shortcuts and menu entries
         for non-Microsoft products to only those places where Microsoft has
         decided to promote a Microsoft product with similar functionality (thus
         blocking such additions if Microsoft does not make that decision and/or
         does not offer a competing product), and (ii) the automatic launching of
         competing software may be prohibited if such software displays a user
         interface that is not of a similar size and shape to the interface
         displayed by the equivalent Microsoft software or a Microsoft product
         would not otherwise launch automatically);

(11)     the RPFJ does not adequately require Microsoft to respect OEM and
         end-user preferences for non-Microsoft software because the provisions
         which appear to have that aim are encumbered with unjustifiable
         qualifications (e.g., (i) the ability to designate a non-Microsoft
         middleware product to be invoked in place of a Microsoft middleware
         product is available only where the Microsoft middleware would be
         launched in a separate Window and would display all of the user
         interface elements or a trademark; and (ii) the restriction on Microsoft
         asking an end user to alter an OEM's product configuration lasts for
         only fourteen days and there is no restriction on the number of such
         requests Microsoft may make thereafter);

(12)     the RPFJ does not require Microsoft to license previous versions of

Windows, even though (a) the guaranteed existence of previous

versions of Windows encourages the creation of middleware threats to

Microsoft's operating system monopoly by giving software developers

confidence that the operating system with which their middleware

would be designed to interact will be available to end users for a

reasonable length of time, and (b) the District Court found that

Microsoft used its control of information regarding a new release of

Windows to thwart the growing popularity of a threat to its operating

system monopoly (*see Microsoft Findings of Fact,* 84 F. Supp. 2d at 33-

34), and efforts to use such leverage would be less effective if the

previous version were still to be available;

(13)     the RPFJ does not require Microsoft to notify third parties regarding

its knowing interference with non-Microsoft middleware, despite the

fact that (a) the Court of Appeals found that one aspect of Microsoft's

anticompetitive conduct regarding the middleware threat of Sun's Java

was to deceive software developers into writing programs using

Microsoft Java development tools that did not interact with Sun's

Virtual Java Machine (*see Microsoft*, 253 F.3d at 76-77), (b) the District

Court found that Microsoft made technical changes to Windows and

Internet Explorer to ensure that the interoperation of Windows and a

non-Microsoft browser was a "jolting experience" for users (*see*

11

*Microsoft Findings of Fact*, 84 F. Supp. 2d at 50), and (c) the District Court found that Microsoft deliberately withheld from Netscape vital information required to ensure the interoperability of Navigator and a new version of Microsoft's Windows operating system (*see Microsoft Findings of Fact*, 84 F. Supp. 2d at 33-34) -- in other words the remedy fails to curb Microsoft's anticompetitive tendency to hinder the interaction of non-Microsoft products with Microsoft-sponsored products;

(14)    the RPFJ does not adequately restrict Microsoft's exclusive arrangements, despite the Court of Appeals condemnation of such practices as anticompetitive (*see Microsoft*, 253 F.3d at 67 – 74), because, for example, the provisions that appear to be aimed at such practices are subject to overbroad and unjustifiable qualifications (e.g., (i) a joint venture exception that does not define with any specificity the minimum criteria for the existence of such an arrangement and thus appears subject to manipulation; (ii) an exception where the third party represents that it could devote greater resources to non-Microsoft products than to Microsoft products, whether or not it actually does so; and (iii) an exception for any agreement under which Microsoft licenses intellectual property from a third party, no matter how anticompetitive the other terms of such agreement);

(15)    the RPFJ does not prohibit contractual tying of Microsoft middleware

to Microsoft's Windows operating system, even though (a) such

arrangements could unreasonably foreclose competing middleware

providers, (b) such a remedy would help to prevent Microsoft's ability

to further reap benefits from its illegally maintained operating system

monopoly, and (c) the Court of Appeals found that Microsoft

manipulated contractual relationships with various third parties to

stifle middleware threats to its operating system monopoly (*see*

*Microsoft*, 253 F.3d at 59-64, 69-72, 75-76);

(16)    the RPFJ does not adequately protect against retaliation by Microsoft

(e.g., the prohibition on retaliation against OEMs is limited to

particular types of actions, instead of broadly banning any adverse

action, and lists OEM activities only in connection with middleware

and operating systems, instead of referring to any activities relating to

products or services that compete with Microsoft);

(17)    the RPFJ does not effectively restrict agreements limiting competition,

despite the Court of Appeals clear holding that such arrangements

were anticompetitive (see *Microsoft* 253 F.3d at 71-72), because, for

example, (a) the provision apparently aimed at restricting such

conduct is subject to an exception where an ISV has agreed to use,

distribute or promote Microsoft software, even though such an

exception could be construed as effectively nullifying the applicable

13

restriction, (b) the restriction does not apply to agreements with any entity other than an ISV (<u>i.e.</u>, presumably such agreements with an OEM, ICP, IAP, IHV or any other third party would not be prohibited), and (c) the restriction only applies to agreements relating to Windows operating system products (<u>i.e.</u>, an exclusive dealing arrangement that related to other Microsoft platform software would not be prohibited);

(18)   the RPFJ does not address specifically the status of Microsoft's Internet browser, Internet Explorer, which benefited directly from much of Microsoft's anticompetitive conduct (*see, e.g., Microsoft,* 253 F.3d at 59-74);

(19)   the RPFJ does not address specifically Microsoft's anticompetitive conduct aimed at elimination of Sun's Java as a threat to its operating system monopoly (*see, e.g., Microsoft,* 253 F.3d at 74-78);

(20)   the RPFJ does not require Microsoft to port its Office suite of applications to Apple's Macintosh, even though the Court of Appeals found that Microsoft's threat to terminate such support for Office had been deliberately used as a "club" to force Apple to enter into an anticompetitive exclusive dealing arrangement (*see Microsoft,* 253 F.3d at 72-74);

(21)   the RPFJ does not provide a mechanism to ensure that Office is ported to other operating systems, despite the Court of Appeals' recognition of the importance of this suite of applications and acknowledgment that

14

the absence of Office on a rival operating system, Mac OS, would

eliminate such competition (*see Microsoft*, 253 F.3d at 72-73), and the

fact that ensuring the availability of Office on other platforms is likely

to weaken the applications barrier to entry and enhance the potential

of other platforms to compete with Microsoft's monopoly operating

system;

(22)   the RPFJ requires licensees of required Microsoft intellectual property

to pay for such license and to cross license their intellectual property to

Microsoft, even though the premise of this remedy is that such

intellectual property is required to allow third parties to exercise their

rights under the final judgment -- it is unjustifiable for Microsoft to be

paid and benefit from cross-licensing rights simply for ensuring the

efficacy of remedies imposed as a result of its illegal conduct;

(23)   the RPFJ does not address Microsoft's undermining of industry

standards, despite the Court of Appeals holding that Microsoft

sabotaged the Java standard by deceiving software developers into

believing that the Microsoft Java programming tools had cross-

platform capability with Sun-based Java (*see Microsoft*, 253 F.3d at 75-

76);

(24)   the RPFJ does not require Microsoft to provide information about

transactions that are not subject to the filing requirements of the Hart-

Scott-Rodino Act, even though such transactions could be used by

Microsoft to maintain its operating system monopoly;

(25)   the RPFJ does not protect from retaliation individuals and entities

that participate in this litigation, despite the District Court and Court

of Appeals findings that Microsoft is no stranger to retaliation and

threats when it does not get its own way (e.g., (i) retaliation against

IBM (see *Microsoft Findings of Fact*, 84 F. Supp. 2d at 40); (ii) threats

against Apple (see *Microsoft*, 253 F.3d at 72-74); and (iii) threats

against Intel (see *Microsoft*, 253 F.3d at 77-78);

(26)   the RPFJ contains other unjustifiable exceptions and carve-outs that

hobble the provisions they qualify (e.g., (i) the restriction on retaliation

against, and discriminatory treatment of, OEMs that promote non-

Microsoft products is qualified by an exception that permits Microsoft

to provide additional consideration to OEMs that, *inter alia*, promote

Microsoft products; (ii) Microsoft's disclosure obligations may be

construed as not extending to areas of activity that Microsoft has

identified as important enough to its monopoly operating system to

include in its latest Windows operating system release, such as

authentication and security / encryption systems and digital rights

management; and (iii) Microsoft's disclosure obligations relating to

certain matters such as authentication systems are subject to

Microsoft's subjective determination as to whether, *inter alia*, the recipient has a "reasonable" business need and a "viable" business);

(27)   the RPFJ contains ineffective compliance provisions (<u>e.g.</u>, (i) there is no independent office or body such as a special master to assist the Court with compliance and enforcement; (ii) there is no annual compliance certification by Microsoft; (iii) there is no periodic reporting to the Court by an independent body regarding Microsoft's compliance; (iv) there is no mandatory document retention provision; (v) there is no mechanism for Microsoft employees to submit evidence of violations on a confidential basis to a third party; and (vi) no work product, findings or recommendations of the body empowered to consider complaints against Microsoft may be used in court, necessitating a duplication of effort if a complaint is not adequately dealt with on an extra-judicial basis);

(28)   the RPFJ does not provide for a sanctions regime making clear the potential consequences to Microsoft of non-compliance and thus providing a strong incentive to comply;

(29)   the RPFJ's middleware definitions are drawn too narrowly, excluding from protection competitors of Microsoft in critical middleware markets and excluding from the restrictions of the judgment important Microsoft products -- for example, (a) software cannot qualify as a "Non-Microsoft Middleware Product" unless at least one million copies

17

were distributed in the U.S. in the previous year, meaning that by definition nascent or developing middleware threats receive no protection under the user configuration flexibility remedy, (b) certain important software categories such as web-based software and digital imaging software are not present in any of the middleware definitions, (c) software developed in the future by Microsoft that does not perform a pre-identified function (e.g., Internet browsing) but that does exhibit the characteristics of middleware, such as API exposure, would be excluded from the definition of "Microsoft Middleware Product" if it is not trademarked (e.g., Microsoft's photo editing software), had not been distributed by Microsoft separately from an operating system product (e.g., many of the new features on Windows XP) or was not similar to a competitor's product;

(30)   the RPFJ's definition of "Windows Operating System Product" leaves Microsoft to determine its scope, a freedom that could potentially eviscerate major portions of the judgment;

(31)   the RPFJ does not define certain key terms (e.g., "Interoperate," "Bind," "Web-Based Software") and narrowly defines other key terms (e.g., "Communications Protocol"); and

(32)   the RPFJ's term is limited initially to five years -- given the scope of Microsoft's violations and the time needed to restore effective competition, this term is too short.

2. Specify in the most specific and detailed manner possible what

relief not contained in the Revised Proposed Final Judgment you claim is necessary

to remedy the liability determinations affirmed by the Court of Appeals in the

Opinion.

RESPONSE: The Plaintiff Litigating States object to this

Interrogatory as a contention interrogatory that is premature and more

appropriately answered at a later time, *see* Fed. R. Civ. P. 33(c), and therefore the

Plaintiff Litigating States reserve the right to amend, supplement or modify the

response to this Interrogatory to incorporate information gained through discovery.

Subject to and without waiving this objection or the General Objections, the

Plaintiff Litigating States respond that Plaintiff Litigating States' Remedial

Proposals filed on December 7, 2001 provides a clear indication of the relief that is

necessary to remedy Microsoft's illegal conduct and achieve the other forward-

looking goals of an effective antitrust remedy. This filing demonstrates that, at the

very least, to implement a meaningful remedy faithful to the Court of Appeals

decision and antitrust precedent Microsoft must be required, *inter alia*: (1) to license

an unbundled version of Windows (i.e., in which code for Microsoft's middleware

and its monopoly operating system is not commingled); (2) to provide early and

broad disclosure of interfaces so that rival software companies have a fair

opportunity to bring their products to market at the same time as Microsoft; (3) to

disclose technical information so that rival nascent operating system monopoly

threats such as handheld devices, servers and networks can interoperate with

Microsoft's dominant Windows operating system; (4) to fully respect OEM and end-user preferences for non-Microsoft software, so that consumers have real freedom of choice unbiased by Microsoft; (5) to license previous versions of Windows, so that competing platform developers are guaranteed that the version of Windows with which their software will be designed to interact will be available to consumers for a reasonable length of time, and to ensure that Microsoft cannot stifle threats to its monopoly by withholding crucial information relating to new operating system releases; (6) to notify third parties regarding its knowing interference with non-Microsoft middleware, so that such parties can take remedial action or challenge such interference; (7) to refrain from exclusive dealing that has anticompetitive or potentially anticompetitive effects; (8) to refrain from contractual tying of Microsoft middleware to avoid stifling non-Microsoft middleware threats to its operating system monopoly and to restrict Microsoft's ability to further reap the benefits of its monopoly; (9) to refrain from entering into agreements limiting competition; (10) to make Internet Explorer, the browser that benefited from so many of Microsoft's anticompetitive acts, available on an open source basis, so that Microsoft does not benefit from its anticompetitive acts that attempted to destroy its main rival, Netscape's Navigator, in order to maintain its operating system monopoly; (11) to carry Java, which Microsoft also attempted to destroy, along with its own operating system, so that the anticompetitive harm inflicted on Java by Microsoft might be substantially reversed; (12) to continue to port Office to Macintosh and to offer licenses to third parties to port Office to other operating systems, so that

20

competition in the operating systems market may be stimulated through wide availability of this important software package; (13) to license necessary intellectual property to third parties on a royalty-free basis with the right to sub-license and without a cross-licensing requirement or a requirement conditioning the license on the use of any Microsoft software, information or services, so that third parties may effectively exercise their rights under the other remedy provisions without unjustified benefit to Microsoft; (14) to provide adequate disclosure about its compliance with industry standards, to comply with such standards when it so claims, to continue support for non-proprietary industry versions of a standard if it should develop a proprietary version, and to refrain from requiring third parties to use or adopt a Microsoft version of an industry standard, all to ensure that Microsoft's undermining of interoperability standards is curtailed; and (15) to provide information in advance about transactions that are not subject to the filing requirements of the Hart-Scott-Rodino Act, to ensure that Microsoft cannot use such transactions to illegally maintain its monopoly.

In addition: (1) carefully crafted carve-outs and exceptions must be avoided, because of their tendency to render potentially useful provisions impotent; (2) an effective remedy must incorporate strict requirements for internal compliance, strong incentives (including a clear sanctions regime), and an enforcement mechanism (a special master) that promises prompt resolution of differences and minimal burden on the Court's resources; (3) third parties that choose to participate

in this litigation must be protected from retaliation by Microsoft; and (4) other defects highlighted in the response to Interrogatory No. 1 must be avoided.

7.    State in the most specific and detailed manner possible which, if any, of the conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion is not fully redressed by the Revised Proposed Final Judgment.

RESPONSE:  The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered at a later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory to incorporate information gained through discovery. Subject to and without waiving this objection or the General Objections, the Plaintiff Litigating States respond that the defects identified in the response to Interrogatory No. 1 are examples of the limitations of the RPFJ when measured against the Court of Appeals opinion in conjunction with the purposes of an antitrust remedy mandated by applicable precedent.  The aspects of an effective remedy identified in the response to Interrogatory No. 2 are examples of areas that any effective final judgment must address.  These responses are incorporated herein as indicators of the deficiencies of the RPFJ.  At the very least, the following conduct that the Court of Appeals held to be anticompetitive is not fully redressed by the RPFJ:

(1)    Microsoft's restrictive and discriminatory contractual relations with OEMs and anticompetitive manipulation of such relations;

(2)     Microsoft's illegal commingling of middleware and operating system
        code;

(3)     Microsoft's illegal discrimination in its release of technical information,
        including those interfaces and protocols necessary for interoperability
        of competing products;

(4)     Microsoft's anticompetitive contractual relations with IAPs;

(5)     Microsoft's anticompetitive contractual relations with software vendors
        and developers;

(6)     Microsoft's threats against, and forced exclusive dealing arrangements
        with, Apple as an OEM and a developer of rival operating system
        platform;

(7)     Microsoft's anticompetitive conduct that directly or indirectly benefited
        its Internet Explorer middleware;

(8)     Microsoft's anticompetitive conduct that was aimed at eliminating the
        threat of Sun's Java;

(9)     Microsoft's attempt to undermine the Java industry standard by
        deceiving software developers; and

(10)    Microsoft's threats and retaliation against third parties including
        OEMs and Intel.

        We note also that any effective remedy must take into account
the conduct described in the District Court's findings of fact (*United States v.
Microsoft Corp.*, 84 F. Supp. 2d 9, 46 (D.D.C. 1999)).  None of these findings were

set aside by the Court of Appeals, although many were not directly referenced in the Opinion.

8.     State in the most specific and detailed manner possible how, if at all, Section 3.a.i of the Vacated Final Judgment relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE:  The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery.  The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence.  *See* General Objection No. 3.  Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.a.i formed part of an interim remedy that sought to place limitations on certain aspects of Microsoft's relations with OEMs.  The Court of Appeals found that aspects of Microsoft's relations with OEMs, in particular various license restrictions Microsoft imposed, constituted anticompetitive conduct.  *See Microsoft*, 253 F.3d at 59–64. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.  Further, Section 3.a.i. has a particular focus on potential threats and retaliation and the Court of Appeals found that, among other things, threats issued by Microsoft to Intel and an exclusive agreement forced by Microsoft on Apple, in

24

the context of threats to withdraw support for the Mac Office applications suite,

formed part of Microsoft's anticompetitive conduct. *See Microsoft*, 253 F.3d at 72–

74, 77–78.  Further, the District Court made findings, not set aside by the Court of

Appeals, that Microsoft threatened and/or implemented adverse actions against

OEMs that did not immediately accede to its demands to promote and distribute its

middleware or curtail distribution or promotion of rival middleware. *See Microsoft*

*Findings of Fact*, 84 F. Supp. 2d at 68.

        9.     State in the most specific and detailed manner possible how, if

at all, Section 3.a.ii of the Vacated Final Judgment relates to conduct that the Court

of Appeals held to be anticompetitive in Section II.B of its Opinion.

        <u>RESPONSE</u>:  The Plaintiff Litigating States object to this

Interrogatory as a contention interrogatory that is premature and more

appropriately answered after the close of discovery or other later time, *see* Fed. R.

Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to

amend, supplement or modify the response to this Interrogatory after the close of

discovery. The Plaintiff Litigating States further object to this Interrogatory on the

ground that it is not calculated to lead to the discovery of admissible evidence. *See*

General Objection No. 3.  Subject to and without waiving these objections or the

General Objections, the Plaintiff Litigating States note that Section 3.a.ii formed

part of an interim remedy that sought to place limitations on certain aspects of

Microsoft's relations with OEMs, with a particular focus on the terms of operating

system licenses.  The Court of Appeals found that restrictions in licenses issued to

OEMs constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 59–64.

Further, the District Court made findings, not set aside by the Court of Appeals,

that Microsoft provided significant additional consideration to OEMs who promoted

Microsoft's Internet Explorer or curtailed distribution or promotion of Netscape

Navigator. *See Microsoft Findings of Fact*, 84 F. Supp. 2d at 66–68.   In contrast, the

remedy mandates uniformity of terms.   Thus, there is a clear connection between

the remedy and the Court of Appeals' opinion.

      10.    State in the most specific and detailed manner possible how, if

at all, Section 3.a.iii(1) of the Vacated Final Judgment relates to conduct that the

Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

      <u>RESPONSE</u>:  The Plaintiff Litigating States object to this

Interrogatory as a contention interrogatory that is premature and more

appropriately answered after the close of discovery or other later time, *see* Fed. R.

Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to

amend, supplement or modify the response to this Interrogatory after the close of

discovery.  The Plaintiff Litigating States further object to this Interrogatory on the

ground that it is not calculated to lead to the discovery of admissible evidence.  *See*

General Objection No. 3.  Subject to and without waiving these objections or the

General Objections, the Plaintiff Litigating States note that Section 3.a.iii(1) formed

part of an interim remedy that sought to place limitations on certain aspects of

Microsoft's relations with OEMs, with a particular focus on OEM flexibility in

product configuration.  The Court of Appeals found that provisions in licenses

issued to OEMs which restricted product configuration constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 59–64. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

   11. State in the most specific and detailed manner possible how, if at all, Section 3.a.iii(2) of the Vacated Final Judgment relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

   <u>RESPONSE</u>: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.a.iii(2) formed part of an interim remedy that sought to place limitations on certain aspects of Microsoft's relations with OEMs, with a particular focus on OEM flexibility in product configuration. The Court of Appeals found that provisions in licenses issued to OEMs which restricted product configuration constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 59–64. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

12.     State in the most specific and detailed manner possible how, if at all, Section 3.a.iii(3) of the Vacated Final Judgment relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.a.iii(3) formed part of an interim remedy that sought to place limitations on certain aspects of Microsoft's relations with OEMs, with a particular focus on OEM flexibility in product configuration. The Court of Appeals found that provisions in licenses issued to OEMs which restricted product configuration constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 59–64. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

13.     State in the most specific and detailed manner possible how, if at all, Section 3.a.iii(4) of the Vacated Final Judgment relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

28

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.a.iii(4) formed part of an interim remedy that sought to place limitations on certain aspects of Microsoft's relations with OEMs, with a particular focus on OEM flexibility in product configuration. The Court of Appeals found that provisions in licenses issued to OEMs which restricted product configuration constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 59–64. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

14.     State in the most specific and detailed manner possible how, if at all, Section 3.b of the Vacated Final Judgment (including all subsections thereof) relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R.

Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to

amend, supplement or modify the response to this Interrogatory after the close of

discovery.  The Plaintiff Litigating States further object to this Interrogatory on the

ground that it is not calculated to lead to the discovery of admissible evidence.  *See*

General Objection No. 3.  Subject to and without waiving these objections or the

General Objections, the Plaintiff Litigating States note that Section 3.b of the

Vacated Final Judgment sought to require Microsoft to disclose certain technical

information to third parties.  The Court of Appeals found that exclusive dealing

arrangements in which Microsoft promised preferential treatment for certain third

parties (including the provision of technical information thereto) constituted

anticompetitive conduct.  *See Microsoft*, 253 F.3d at 71–72.  Further, the District

Court made findings, not set aside by the Court of Appeals, that Microsoft

deliberately withheld vital technical information necessary to ensure the

interoperability of competing middleware with Microsoft's operating system.  *See*

*Microsoft Findings of Fact*, 84 F. Supp. 2d at 33–34.  This middleware was a threat

to Microsoft's monopoly operating system.  Thus, there is a clear connection

between the remedy and the Court of Appeals' opinion.

   15. State in the most specific and detailed manner possible how, if

at all, Section 3.c of the Vacated Final Judgment relates to conduct that the Court

of Appeals held to be anticompetitive in Section II.B of its Opinion.

   <u>RESPONSE</u>:  The Plaintiff Litigating States object to this

Interrogatory as a contention interrogatory that is premature and more

appropriately answered after the close of discovery or other later time, *see* Fed. R.

Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to

amend, supplement or modify the response to this Interrogatory after the close of

discovery.  The Plaintiff Litigating States further object to this Interrogatory on the

ground that it is not calculated to lead to the discovery of admissible evidence.  *See*

General Objection No. 3.  Subject to and without waiving these objections or the

General Objections, the Plaintiff Litigating States note that Section 3.c of the

Vacated Final Judgment sought to restrict Microsoft from secretly and

unreasonably hindering the interaction of non-Microsoft products with Microsoft

products.  The Court of Appeals found that one aspect of Microsoft's anticompetitive

conduct regarding Java was to deceive software developers into writing programs

using Microsoft Java development tools that did not interact with Sun's Java

Virtual Machine (*see Microsoft*, 253 F.3d at 76–77) -- in other words, Microsoft

sought without disclosure to hinder the interaction of Microsoft sponsored products

with non-Microsoft products.  Further, the District Court made findings, not set

aside by the Court of Appeals, that Microsoft made technical changes to its

operating system and browser to ensure that the interoperation of its operating

system and a non-Microsoft browser was a "jolting experience" for users, and

Microsoft withheld vital technical information necessary to ensure the

interoperability of competing middleware with Microsoft's operating system.  *See*

*Microsoft Findings of Fact*, 84 F. Supp. 2d at 33–34, 50.  These are yet further

examples of Microsoft's anticompetitive policy to restrict the interoperability of

threats to its monopoly operating system. There is therefore a clear connection between the remedy and the Court of Appeals' opinion.

16. State in the most specific and detailed manner possible how, if at all, Section 3.d of the Vacated Final Judgment (including all subsections thereof) relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.d of the Vacated Final Judgment sought to place limitations on certain aspects of the relationship between Microsoft and particular third parties, including independent software and hardware vendors, precluding adverse actions and incentives linked to support for non-Microsoft products or Microsoft products, respectively. The Court of Appeals found that certain arrangements between Microsoft and third parties, including independent software vendors and developers and Apple, in which Microsoft promised preferential treatment or threatened retaliation in exchange for

support of Microsoft middleware instead of rival middleware, constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 71–74. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

17.   State in the most specific and detailed manner possible how, if at all, Section 3.e of the Vacated Final Judgment (including all subsections thereof) relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.e of the Vacated Final Judgment sought to restrict exclusive dealing arrangements. The Court of Appeals found that certain exclusive dealing arrangements between Microsoft and third parties, including IAPs, software developers and vendors, and Apple, constituted anticompetitive conduct. *See Microsoft*, 253 F.3d at 67–74. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

33

18.     State in the most specific and detailed manner possible how, if at all, Section 3.f of the Vacated Final Judgment (including all subsections thereof) relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE:  The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery.  The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence.  *See* General Objection No. 3.  Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.f of the Vacated Final Judgment sought to restrict certain contractual relationships between Microsoft and third parties that tie Microsoft operating system products and Microsoft middleware.  The Court of Appeals found that Microsoft's licensing practices and/or other dealings with various third parties, including OEMs, IAPs, ISVs and Apple were designed to stifle competition in the form of middleware.  *See Microsoft*, 253 F.3d at 59–64, 67–76.  This remedy seeks to prohibit contracts that could unreasonably foreclose competing middleware providers.  Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

19.     State in the most specific and detailed manner possible how, if at all, Section 3.g of the Vacated Final Judgment (including all subsections thereof) relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE:  The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery.  The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3.  Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.g of the Vacated Final Judgment sought to restrict the binding or commingling of Microsoft middleware products to Microsoft operating system products.  The Court of Appeals found that Microsoft's commingling of the code for a Microsoft middleware product and a Microsoft operating system product was anticompetitive. *See Microsoft*, 253 F.3d at 64–67.  Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

20.     State in the most specific and detailed manner possible how, if at all, Section 3.h of the Vacated Final Judgment (including all subsections thereof)

relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.h of the Vacated Final Judgment sought to prohibit certain anticompetitive contractual relationships between Microsoft and third parties where Microsoft seeks agreement from the third party to curtail distribution, development or promotion of rival product. The Court of Appeals found that several exclusive contractual relationships between Microsoft and third parties (e.g., IAPs, software vendors and developers, and Apple), designed in part to stifle the threat of Netscape's Navigator, were anticompetitive. *See Microsoft*, 253 F.3d at 67–74. Thus, there is a clear connection between the remedy and the Court of Appeals' opinion.

      21.    State in the most specific and detailed manner possible how, if at all, Section 3.i of the Vacated Final Judgment (including all subsections thereof)

relates to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

RESPONSE: The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, see Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery.  The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence.  See General Objection No. 3.  Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States note that Section 3.i of the Vacated Final Judgment sought to require Microsoft to license predecessor versions of its operating system products after releasing a new version.  The Court of Appeals found that Microsoft took anticompetitive actions to eliminate non-Microsoft middleware threats to its operating system monopoly.  See Microsoft, 253 F.3d at 59–78.  This remedy seeks to encourage the creation of non-Microsoft middleware by giving software developers confidence that the operating system product with which their middleware would be designed to interact will be available to end-users for a reasonable length of time.  Thus there is a clear connection between the remedy and the Court of Appeals opinion.  Further, the District Court made a finding, not set aside by the Court of Appeals, that Microsoft had deliberately withheld from Netscape technical information required to ensure the

interoperability of Netscape's Navigator middleware a new version of Microsoft's Windows operating system. *See Microsoft Findings of Fact*, 84 F. Supp. 2d at 33–34. This remedy seeks to restrict such behavior by ensuring that any new version of Microsoft's Windows operating system is not the only supported version. Thus there is an additional apparent connection between the remedy and the Court of Appeals opinion.

       22.    State in the most specific and detailed manner possible how, if at all, those remedies in Plaintiff Litigating States' Remedial Proposals that do not appear in the Vacated Final Judgment relate to conduct that the Court of Appeals held to be anticompetitive in Section II.B of its Opinion.

       <u>RESPONSE</u>:  The Plaintiff Litigating States object to this Interrogatory as a contention interrogatory that is premature and more appropriately answered after the close of discovery or other later time, *see* Fed. R. Civ. P. 33(c), and therefore the Plaintiff Litigating States reserve the right to amend, supplement or modify the response to this Interrogatory after the close of discovery. The Plaintiff Litigating States further object to this Interrogatory on the ground that it is not calculated to lead to the discovery of admissible evidence. *See* General Objection No. 3. Subject to and without waiving these objections or the General Objections, the Plaintiff Litigating States incorporate herein by reference their response to Interrogatory No. 2 and the full text of the Plaintiff Litigating States' Remedial Proposals filed on December 7, 2001.

Dated:  December 13, 2001                    Respectfully submitted,

*Steven R. Kuney*

Brendan V. Sullivan, Jr. (Bar No. 12757)
Steven R. Kuney (Bar No. 253286)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States*
*California, Connecticut, Florida, Iowa,*
*Kansas, Massachusetts, Minnesota,*
*Utah and the District of Columbia*

*Thomas Greene*

Thomas Greene
Office of the Attorney General
   of the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel:  (415) 703-5555

*For the Plaintiff Litigating States*


Douglas L. Davis
Assistant Attorney General for the State
   of West Virginia
Consumer Protection/Antitrust Division
P. O. Box 1789
Charleston, West Virginia 25326-1789
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating State*
*West Virginia*

Dated:  December 13, 2001          Respectfully submitted,

_____

Brendan V. Sullivan, Jr. (Bar No. 12757)
Steven R. Kuney (Bar No. 253286)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States
California, Connecticut, Florida, Iowa,
Kansas, Massachusetts, Minnesota,
Utah and the District of Columbia*

_____

Thomas Greene
Office of the Attorney General
   of the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel:  (415) 703-5555

*For the Plaintiff Litigating States*

_____
Douglas L. Davis
Assistant Attorney General for the State
   of West Virginia
Consumer Protection/Antitrust Division
P. O. Box 1789
Charleston, West Virginia 25326-1789
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating State
West Virginia*