IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

---

Civil Action No. 98-1232 (CKK)

Next Court Deadline: March 6, 2002
Tunney Act Hearing

## MEMORANDUM OF THE UNITED STATES IN SUPPORT OF ENTRY OF THE PROPOSED FINAL JUDGMENT

CHARLES A. JAMES
  *Assistant Attorney General*
DEBORAH P. MAJORAS
  *Deputy Assistant Attorney General*
PHILLIP R. MALONE
RENATA B. HESSE
DAVID BLAKE-THOMAS
PAULA L. BLIZZARD
KENNETH W. GAUL
ADAM D. HIRSH
JACQUELINE S. KELLEY
STEVEN J. MINTZ
BARBARA NELSON
DAVID SEIDMAN
DAVID P. WALES
  *Attorneys*

U.S. Department of Justice
Antitrust Division
601 D Street N.W., Suite 1200
Washington, D.C. 20530
(202) 514-8276

PHILIP S. BECK
  *Special Trial Counsel*

February 27, 2002

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.   THE TUNNEY ACT GOVERNS THE COURT'S DISPOSITION OF THE REVISED
     PROPOSED FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.  THE UNITED STATES HAS COMPLIED WITH ALL TUNNEY ACT PROCEDURAL
     PREREQUISITES TO THE COURT'S PUBLIC INTEREST DETERMINATION . . . . . 17

     A.  Summary Of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.  The United States Fully Complied With All Tunney Act Requirements
         Regarding The CIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         1.  "The Nature And Purpose Of The Proceeding" . . . . . . . . . . . . . . . . . . . . 22

         2.  "A Description Of The Practices Or Events Giving Rise To The Alleged
             Violation Of The Antitrust Laws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         3.  "An Explanation Of The Proposal For A Consent Judgment, Including An
             Explanation Of Any Unusual Circumstances Giving Rise To Such Proposal Or
             Any Provision Contained Therein, Relief To Be Obtained Thereby, And The
             Anticipated Effects On Competition Of Such Relief" . . . . . . . . . . . . . . . . . . . 23

         4.  "The Remedies Available To Potential Private Plaintiffs Damaged By The
             Alleged Violation In The Event That Such Proposal For The Consent Judgment
             Is Entered In Such Proceeding" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

         5.  "A Description Of The Procedures Available For Modification Of Such
             Proposal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

         6.  "A Description And Evaluation Of Alternatives To Such Proposal Actually
             Considered By The United States" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

         7.  Including Information Not Required By The Tunney Act Cannot Result In A
             Noncompliant CIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     C.  The United States Fully Complied With All Tunney Act Requirements Regarding
         Determinative Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.    The United States Fully Complied With All Tunney Act Requirements Regarding Publication of Summaries In Newspapers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.    The United States Has Fully Complied With The Tunney Act Requirement That It Respond To Public Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

F.    The United States Will Fully Comply With the Tunney Act Requirement That It Publish the Comments and Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

G.    The Second Revised Proposed Final Judgment Needs No Separate Round Of Public Comment And Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.   THE COURT MUST ENTER THE PROPOSED DECREE IF IT IS WITHIN THE REACHES OF THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.    Whether The Proposed Decree Is Within The Reaches Of The Public Interest Is Determined By The Test Of *Microsoft I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.    The Court's Task In Entering A Consent Decree Differs From Adjudicating A Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.   ENTRY OF THE REVISED PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.    The Revised Proposed Final Judgment Satisfies The Goals Of An Antitrust Remedy And Properly Addresses All Bases Of Liability Affirmed By The Court Of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

a.    Stops The Unlawful Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b.    Prevents Recurrence Of Unlawful Conduct . . . . . . . . . . . . . . . . . . . . . . . . 56

c.    Restores Competitive Conditions To The Market . . . . . . . . . . . . . . . . . . . 57

B.    The Revised Proposed Final Judgment Compares Favorably To The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1.    The Revised Proposed Final Judgment Relies On Conduct Restrictions, Rather Than Structural Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2.    Remedying Tying Is No Longer An Objective . . . . . . . . . . . . . . . . . . . . . . . . . 65

    3.    The New Conduct Restrictions Compare Favorably To Those In The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

        a.   Substantive Provisions Included In Both The Initial Final Judgment And The Revised Proposed Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

        b.   The RPFJ Contains Provisions Not Included In The Initial Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

C.    The Revised Proposed Final Judgment Creates Competitive Conditions . . . . . . . . . 70

V.    THE COURT SHOULD MAKE ITS PUBLIC INTEREST DETERMINATION AND ENTER THE DECREE AS EXPEDITIOUSLY AS POSSIBLE . . . . . . . . . . . . . . . . . . . . 70

A.    The Court Should Not Hold An Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . 71

B.    The Court Should Not Delay Entry Of The Decree Pending The Remedies Hearing In *New York v. Microsoft* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    1.    Linking This Case To The Remedies Hearing In *New York* Would Be Bad Law And Bad Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    2.    The Claimed Benefits Of Linkage Are Illusory . . . . . . . . . . . . . . . . . . . . . . . . . 77

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

APPENDIX A: COMPARISON OF COURT OF APPEALS' FINDINGS ON LIABILITY TO PROVISIONS OF THE REVISED PROPOSED FINAL JUDGMENT

APPENDIX B: UNITED STATES v. MICROSOFT CORP. — NEWSPAPER NOTICE

APPENDIX C: DECLARATION OF DAVID S. SIBLEY

# TABLE OF AUTHORITIES

**Prior Decisions in This Case**

*Microsoft Corp. v. United States*, 122 S. Ct. 350 (2001) (Denying Certiorari) . . . . . . . . . . . . . . 8

*Microsoft Corp. v. United States*, 530 U.S. 1301 (2000) (Declining to Accept
    Appeal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per
    curiam) (Appellate Decision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Microsoft Corp.*, 2001 WL 931170 (D.C. Cir. Aug. 17, 2001) (en
    banc) (per curiam) (Denying Stay of Mandate) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000) (Initial Final
    Judgment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 27, 51, 63
                                                       65, 66, 67, 68

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) (Conclusions
    of Law) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 8, 16, 23, 40

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) (Findings of
    Fact) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 8, 16, 23
                                                       40, 64, 70

**Cases**

*Adams v. Bell*, 711 F.2d 161 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*American Can Co. v. Mansukhani*, 814 F.2d 421 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 72

*American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1974) . . . . . . . . . . . . . . 34

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001), *petition
    for certiorari filed*, 70 U.S.L.W. 3465 (Jan. 11, 2002), (No. 01-1050) . . . . . . . . . . . . . . 49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . 49

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967) . . . . . . . 16, 43, 75

*Commissioner v. Lundy*, 516 U.S. 235 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587 (2d Cir. 1949) . . . . . . . . . . . . . . . . . . . . 15, 43

*Ford Motor Co, v. United States*, 405 U.S. 562 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 41

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hyperlaw, Inc. v. United States*, 1998 WL 388807, 159 F.3d 636 (D.C. Cir. 1998)
        (unpublished table decision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re IBM Corp.*, 687 F.2d 591 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*International Salt Co. v. United States*, 332 U.S. 392 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Janus Films, Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Local No. 93, International Association of Firefighters v. City of Cleveland*, 478
        U.S. 501 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Maryland v. United States*, 460 U.S. 1001 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776
        (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 35, 36, 37, 49

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998) . . . . . . . . . . . . . . . . 12

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sullivan v. Stroop*, 496 U.S. 478 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd mem. sub. nom.*
        *Maryland v. United States*, 460 U.S. 1001 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Alex. Brown & Sons*, 963 F. Supp. 235 (S.D.N.Y. 1997), *aff'd sub*
        *nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Alex. Brown & Sons*, 169 F.R.D. 532 (S.D.N.Y. 1996), *aff'd sub*
        *nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Armour & Co.*, 402 U.S. 673 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Automatic Data Processing, Inc.*, 1996-1 Trade Cas. (CCH)
    ¶ 71,361 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bechtel Corp.*, 648 F.2d 660 (9th Cir. 1981) . . . . . . . . . . . . . . . . 17, 32, 41, 45

*United States v. Blackstone Capital Partners II Merchant Banking Fund*, 1999-1
    Trade Cas. (CCH) ¶ 72,484 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Borden Corp.*, 347 U.S. 514 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Central Contracting Co.*, 537 F. Supp. 571 (E.D. Va. 1982) . . . . . . . . . . . . . 31

*United States v. City of Miami*, 614 F.2d 1322 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) . . . . . . . . . . . . 38, 41, 50

*United States v. Enova Corp.*, 107 F. Supp. 2d 10 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Figgie International Inc.*, 1997-1 Trade Cas. (CCH) ¶ 71,766
    (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Foodmaker, Inc.*, 1996-2 Trade Cas. (CCH) ¶ 71,555 (D.D.C.
    1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) . . . . . . . . . . . . . . . . . . . 45

*United States v. Grinnell Corp.*, 384 U.S. 563 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Input/Output, Inc.*, 1999-1 Trade Cas. (CCH) ¶ 72,528 (D.D.C.
    1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Mahle GmbH*, 1997-2 Trade Cas. (CCH) ¶ 71,868 (D.D.C.1997) . . . . . . . . . 13

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) . . . . . . . . . . . 36, 37, 38, 39, 41
                                                                                    42, 45, 49, 73, 74

*United States v. National Lead Co.*, 332 U.S. 319 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Oregon State Medical Society*, 343 U.S. 326 (1952) . . . . . . . . . . . . . . . . . . . . 38

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) . . . . . . . . . . . . . . 15, 16, 41, 43

*United States v. RCA*, 46 F. Supp. 654 (D. Del. 1942), *appeal dismissed*, 318 U.S. 796 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Swift & Co.*, 286 U.S. 106 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Loewen Group Inc.*, 1998-1 Trade Cas. (CCH) ¶ 72,151 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Titan Wheel International, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,406 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Trump*, 1988-1 Trade Cas. (CCH) ¶ 67,968 (D.D.C. 1988) . . . . . . . . . . . . . . 14

*United States v. United Artists Theatre Circuit, Inc.*, 1971 Trade Cas. (CCH) ¶ 73,751 (E.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Western Elec. Co.*, 900 F.2d 283 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Western Elec. Co.*, 993 F.2d 1572 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . 42

*Utah Public Service Commission v. El Paso Natural Gas Co.*, 395 U.S. 464 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statutes and Rules**

Sherman  Act, 15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Sherman  Act, 15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Clayton Act, § 5(a), 15 U.S.C. § 16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

Clayton Act, ch. 323, § 5, 38 Stat. 730, 731 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tunney Act (Antitrust Procedures and Penalties Act, § 2), 15 U.S.C. § 16(b)-(h) . . . . . . . *passim*

15 U.S.C. § 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 17, 18, 20 22, 28, 30, 31, 71
15 U.S.C. § 16(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 30, 31, 32
15 U.S.C. § 16(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 32
15 U.S.C. § 16(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13, 35, 36 37
15 U.S.C. § 16(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 78

15 U.S.C. § 12(a) ........................................................................ 13

15 U.S.C. § 18a(g) ...................................................................... 13

15 U.S.C. § 21(*l*) ......................................................................... 13

Expediting Act, 15 U.S.C. § 29(b) ................................................. 3

28 U.S.C.§ 455(a) ........................................................................ 8

Fed. R. Civ. P. 41(a)(1)(ii) ........................................................ 43

**Legislative Materials**

119 Cong. Rec. 3452 (1973) ..................................... 21, 22, 24, 27

119 Cong. Rec. 24,600 (1973) .................................................... 45

119 Cong. Rec. 24,604 (1973) .................................................... 28

The Antitrust Procedures & Penalties Act: Hearings on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the Senate Committee on the Judiciary, 93d Cong. (1973) .................................. 16, 21, 27, 28, 71

Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies & Commercial Law of the House Comm. on the Judiciary, 93rd Cong. (1973) ........................................ 15, 21

H.R. Rep. No. 93-1463 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535 ....... 20, 35, 36, 39, 75

S. Rep. No. 93-298 (1973) ................................. 20, 28, 32, 36, 45
71

**Miscellaneous**

47 Fed. Reg. 21,214 (1982) ........................................................ 22

59 Fed. Reg. 59,426 (1994) ........................................................ 22

66 Fed. Reg. 59,452 (2001) ............................................... 10, 17, 19

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (rev. ed. 1996) .............. 7, 64

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE viii

Maimon Schwarzschild, *Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform*, 1984 Duke L.J. 887, 903 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Note, *The Scope of Judicial Review of Consent Decrees under the Antitrust Procedures and Penalties Act of 1974*, 82 Mich. L. Rev. 153 (1974) . . . . . . . . . . . 40, 43

*Webster's Third International Dictionary* (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline: March 6, 2002
Tunney Act Hearing

**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF
ENTRY OF THE PROPOSED FINAL JUDGMENT**

The proposed final judgment, as revised and modified, represents the culmination of six

years of investigation, litigation, appeals, and negotiation. It is a comprehensive remedy that puts

into place meaningful, effective, and enforceable restrictions on Microsoft and, critically,

comports with both the legal standards for relief in an antitrust case and the decision by the Court

of Appeals in this case. Just as important, it provides relief effective *now*. Failure to enter the

proposed final judgment would mean that Microsoft's anticompetitive practices likely would

continue unabated for several more years, an eternity in this ever-changing market. Accordingly,

in the United States' best judgment, entry of the proposed final judgment is in the public interest.

**BACKGROUND**

1. On May 18, 1998, the United States filed a civil complaint alleging that Microsoft had

engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1, 2. At Microsoft's request, the case was consolidated with a similar action brought

by twenty[1] states and the District of Columbia.[2]  The United States and the States jointly

presented the case in a 78-day bench trial that began on October 19, 1998, and ended on June 24,

1999.  The court heard testimony from 26 witnesses and admitted depositions of 79 other

witnesses and 2733 exhibits.  On November 5, 1999, the court entered 412 findings of fact.

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ("*Findings of Fact*").  On

April 3, 2000, after the parties attempted unsuccessfully to settle the suit through months-long

mediation before Judge Richard Posner,[3] the district court entered its conclusions of law.  87 F.

Supp. 2d 30 (D.D.C. 2000) ("*Conclusions of Law*").  On June 7, 2000, after further proceedings

on remedy, the district court entered its final judgment.  97 F. Supp. 2d 59 (D.D.C. 2000)

("Initial Final Judgment" (IFJ)).

Plaintiffs never contended that Microsoft unlawfully *obtained* its monopoly in Intel-

compatible personal computer (PC) operating systems.  Plaintiffs alleged, and the district court

ruled, that Microsoft successfully had engaged in anticompetitive acts to *protect* and *maintain*

that monopoly, in violation of Section 2 of the Sherman Act.  *Conclusions of Law* at 37-44.  The

district court also ruled that Microsoft had attempted to monopolize the Internet Web browser

market, in violation of Section 2, and had tied its Web browser, Internet Explorer (IE), to its

Windows operating system, in violation of Section 1.  *Id.* at 45-51.  The district court rejected

plaintiffs' claim that Microsoft's exclusive dealing contracts violated Section 1 of the Sherman

---

[1]One State later withdrew, and another settled in July 2001.

[2]On February 1, 2002, this Court de-consolidated the cases.  Order at 3 (Feb. 1, 2002).

[3]At the time, Judge Posner was Chief Judge of the United States Court of Appeals for the Seventh Circuit.

Act. *Id.* at 51-54. To remedy the violations, the court ordered Microsoft to break up into separate operating system and applications businesses. Initial Final Judgment, 97 F. Supp. 2d at 64-65. The Initial Final Judgment also ordered transitional conduct restrictions until the structural relief became effective. *Id.* at 66-69.

Microsoft filed notices of appeal,[4] and the Court of Appeals, sua sponte, ordered that any proceedings before it be heard en banc. Order, No. 00-5212 (D.C. Cir., June 13, 2000). The district court certified the case for direct appeal to the Supreme Court pursuant to the Expediting Act of 1903, as amended, 15 U.S.C. § 29(b), and stayed its judgment pending completion of the appellate process. Order (June 20, 2000). The Supreme Court declined to accept the appeal and remanded the case to the Court of Appeals. *Microsoft Corp. v. United States*, 530 U.S. 1301 (2000).

2. After extensive briefing and two days of oral argument, the en banc Court of Appeals issued a unanimous and comprehensive decision affirming in part, reversing in part, and remanding in part for proceedings before a different district judge. *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ("*Microsoft*").

a. The Court of Appeals affirmed the district court's ruling that Microsoft maintained its operating system monopoly, in violation of Section 2 of the Sherman Act, by engaging in specific acts that impeded the emergence of two nascent "middleware" threats to that monopoly. *Id.* at 50-80.[5] "Middleware" is platform software that runs on top of an operating system but

---

[4]Plaintiffs did not cross-appeal the dismissal of their Section 1 claim alleging exclusive dealing.

[5]The Court of Appeals also rejected Microsoft's procedural challenges to the trial court proceedings, finding the district court's actions "comfortably within the bounds of its broad

simultaneously exposes its own application programming interfaces (APIs) so that applications

can run on the middleware itself. *Id.* at 53; *Findings of Fact*, ¶ 28. An application written to rely

exclusively on a middleware program's APIs could run on all operating systems on which that

middleware runs (i.e., would be "cross-platform"). The Court of Appeals found that middleware

posed a potential threat to Microsoft's operating system monopoly because if enough

applications developers (known as independent software vendors (ISVs)) wrote enough

applications for widely used middleware, computer users no longer would be reluctant to choose

a non-Windows operating system for fear that it would run an insufficient array of applications.

*Microsoft*, 253 F.3d at 53. Over time, this widely used middleware might have the potential to

erode the "applications barrier to entry" that protected Microsoft's Windows monopoly.

     Microsoft's anticompetitive acts centered on two particular middleware threats:

Netscape's Web browser (Navigator), and Sun Microsystem's Java technologies. Microsoft set

out to ensure that its own Web browser, IE, gained dominant usage so that ISVs would continue

to focus their efforts on the Windows platform rather than the Navigator platform. Microsoft

took steps to constrict Netscape's access to the distribution channels that led most efficiently to

browser usage: pre-installation by computer manufacturers (known as original equipment

manufacturers (OEMs)), distribution by Internet access providers (IAPs), and the ISVs

themselves. Through restrictions placed in its Windows licenses to OEMs, exclusive deals with

IAPs and ISVs, and a combination of inducements to — and threats of retaliation against —

other third-parties, Microsoft sought to impede the emergence of middleware as a potential threat

to its operating system monopoly. *Id.* at 58-74.

_____

discretion to conduct trials as it sees fit." *Microsoft*, 253 F.3d at 98, 100-01.

Java technologies posed a middleware threat to Microsoft by enabling developers to write programs that could be ported to different operating systems with relative ease.  In May 1995, Netscape announced that it would include a Sun-compliant Windows Java Virtual Machine (JVM), a key component of Java technologies, with every copy of Navigator, thereby creating the possibility that Sun's Java implementation would achieve the necessary ubiquity on Windows to pose a threat to the applications barrier to entry.  *Id.* at 74.  Thus, by limiting the usage of Navigator, Microsoft simultaneously would limit the distribution of Java.  Microsoft, however, took additional steps directed specifically to interfere with the development, distribution, and use of cross-platform Java.  Those steps included:  (1) pressuring third parties not to support cross-platform Java (*id.* at 75); (2) seeking to extinguish the Java threat through technological means that maximized the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa (*id.* at 74-75); and (3) other anticompetitive steps to discourage developers from creating Java applications compatible with non-Microsoft JVMs (*id.* at 75-78).

In affirming liability for monopoly maintenance, however, the Court of Appeals upheld 12 of the 20 district court findings that particular acts constituted bases for violations of Section 2.  *See id.* at 59-78.  In particular, the court rejected the findings that Microsoft had violated Section 2 by prohibiting OEMs from "automatically launching a substitute user interface upon completion of the boot process" (*id.* at 63); overriding the user's choice of browser in certain circumstances (*id.* at 67); giving away its Internet Explorer browser to IAPs and ISVs (*id.* at 67-68, 71-72); offering IAPs a bounty for each customer the IAP signs up for service using the IE browser (*id.* at 67-68); developing and giving away the Internet Explorer Access Kit (IEAK) (*id.*

at 68); entering into exclusive agreements with Internet Content Providers (ICPs) (*id.* at 71); and creating a JVM that runs faster on Windows but lacks the cross-platform attributes that Sun's (hence Navigator's) JVM possesses (*id.* at 74-75). In addition, and importantly, the Court of Appeals expressly rejected the district court's conclusion that, "apart from Microsoft's specific acts, Microsoft was liable under § 2 based upon its general 'course of conduct.'" *Id.* at 78. The court found that the district court had failed to "point to any series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability." *Id.*

b. The Court of Appeals also reversed the district court's determination that Microsoft had attempted to monopolize the Web browser market in violation of Section 2. *Id.* at 80-84. The court found that plaintiffs had failed to define and prove a market for Web browsers, a necessary element of the claim. *Id.* at 81-82.

c. The Court of Appeals vacated the district court's judgment on the Section 1 tying claim as well, and remanded that claim to the district court for reconsideration under the rule of reason. *Id.* at 84-97. In so holding, the Court of Appeals held that the market for platform software presented unique issues under tying law. The "nature of the platform software market affirmatively suggests that per se rules might stunt valuable innovation" (1) because "the separate-products test is a poor proxy for net efficiency from newly integrated products"; and (2) "because of the pervasively innovative character of platform software markets, tying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived." *Id.* at 92-93. The court directed that on remand, plaintiffs would be limited to proving that the anticompetitive

effects from tying outweigh the benefits in the *tied* product market, not just that those effects outweigh the benefits overall. *Id.* at 95. In addition, plaintiffs would be "precluded from arguing any theory of harm that depends on a precise definition of browsers or barriers to entry . . . other than what may be implicit in Microsoft's tying arrangement." *Id.*

d. In light of its determination that it had "drastically" (*id.* at 105, 107) altered the district court's conclusions on liability, and its finding that an evidentiary hearing on remedy was necessary prior to the district court's imposting a remedy (*id.* at 101-103), the Court of Appeals vacated the final judgment and remanded the case to the district court for further proceedings. *Id.* at 107. The court also offered guidance "to advance the ultimate resolution of this important controversy." *Id.* at 105. Though recognizing that, "[a]s a general matter, a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful," *id.*, the Court of Appeals directed this Court to "reconsider whether the use of the structural remedy of divestiture is appropriate with respect to Microsoft, which argues that it is a unitary company." *Id.*

Critically, the Court of Appeals admonished the district court on remand to bear in mind the role of causation when fashioning relief, directing this Court to "consider whether plaintiffs have established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position in the [operating system] market." *Id.* at 106. Absent "clear[]" indication of a "'*significant causal connection* between the conduct and creation or maintenance of the market power,'" Microsoft's unlawful behavior "should be remedied by 'an injunction against continuation of that conduct.'" *Id.* at 106 (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a, at 67 (rev. ed. 1996) ("*Antitrust Law*")) (emphasis added by Court of

Appeals).  The court emphasized that it had "found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market only through inference," *id.* at 106-07, but that even the district court "expressly did *not* adopt the position that Microsoft would have lost its position in the [operating system] market but for its anticompetitive behavior."  *Id.* at 107 (quoting *Findings of Fact*, ¶ 411) (emphasis added).  The court concluded that the remedy should be "tailored to fit the wrong creating the occasion for the remedy."  *Id.* at 107.

e.  Finally, the Court of Appeals concluded that the district judge's contacts with the press violated the Code of Conduct for United States Judges and warranted disqualification under 28 U.S.C. § 455(a).  *Id.* at 107-118.  The court vacated the remedy on the additional basis that the district judge's misconduct infected the remedial phase.  *Id.* at 117.

3.  After the Court of Appeals rejected Microsoft's petition for rehearing, Microsoft filed a petition for a writ of certiorari based on the Court of Appeals' failure to vacate the *Findings of Fact* and *Conclusions of Law* — and not just the remedy — in light of the district judge's misconduct.  Petition for a Writ of Certiorari, No. 01-236 (Aug. 7, 2001) ("Cert. Petition").  Although Microsoft's petition was limited to the issue of judicial misconduct, it promised a future petition on several issues relating to liability when the case becomes final — after the remand to the district court and another appeal to the D.C. Circuit.  *Id.* at 15.  On October 9, 2001, the Supreme Court denied Microsoft's petition.  *Microsoft Corp. v. United States*, 122 S. Ct. 350 (2001).

Meanwhile, on the same day it filed its petition for certiorari, Microsoft moved the Court of Appeals to stay its mandate pending disposition of the petition by the Supreme Court.  The

Court of Appeals denied Microsoft's motion, *United States v. Microsoft Corp.*, 2001 WL 931170 (D.C. Cir. Aug. 17, 2001) (en banc) (per curiam), and issued its mandate on August 24, 2001. That same day, a random selection assigned the case to this Court.

4. On September 6, 2001, plaintiffs advised Microsoft that they did not intend to pursue the Section 1 tying claim on remand, and that they did not intend to pursue on remand the restructuring of Microsoft into two separate companies. As explained to the Court in the Joint Status Report filed on September 20, 2001, Plaintiffs' goal was to achieve the expeditious imposition of relief that would effectively remedy Microsoft's illegal conduct. Joint Status Report at 21 (Sept. 20, 2001).

5. On September 28, 2001, this Court ordered the parties to "concentrate all of their resources" on a new round of intense settlement negotiations and probable mediation. Order at 2-3 (Sept. 28, 2001). The Court emphasized the importance of these efforts in light of the passage of time — more than six years since plaintiffs' claims arose and more than four years of litigation, *id.* at 2. The Court expressly directed plaintiffs to "determine which portions of the former judgment remain appropriate in light of the appellate court's ruling and which portions are unsupported following the appellate court's narrowing of liability." Tr. 9/28/01 at 8. The Court also adopted a fast-track discovery and evidentiary hearing schedule in case the parties failed to settle.[6]

On November 2, 2001, following five weeks of intensive negotiation and mediation as ordered by the Court, the United States and Microsoft agreed on terms of a proposed final

---

[6]Indeed, the evidentiary hearing in *New York v. Microsoft Corp.*, No. 98-CV-1233 (CKK) (D.D.C.), between the Non-Settling States and Microsoft is scheduled to begin on March 11, 2002. Order at 2 (Oct. 2, 2001).

judgment. Stipulation at 1 (Nov. 2, 2001). Further negotiations with several of the plaintiff States resulted in submission on November 6, 2001, by the United States, the Settling States,[7] and Microsoft of the Revised Proposed Final Judgment (RPFJ). Pursuant to the requirements of Section 2 of the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. §§ 16(b)-(h), the United States filed its Competitive Impact Statement (CIS) on November 15, 2001, and published the RPFJ, CIS, and description of the procedures for submitting public comments on the proposed decree in the *Federal Register* on November 28, 2001. 66 Fed. Reg. 59,452 (2001). The public comment period closed on January 28, 2002 — with more than 30,000 comments submitted — and the United States' response to those comments is being filed concurrently with this Motion and supporting Memorandum. Under the Tunney Act, this Court must now determine whether the RPFJ is in the "public interest." 15 U.S.C. § 16(e).

6. On January 30, 2002, the Court ordered the parties to address "whether, in response to the comments received by the Department of Justice in accordance with 15 U.S.C. § 16(b), the United States and Microsoft are considering any modifications of the Proposed Final Judgment." Order at 1 (Jan. 30, 2002). Responding in a Joint Status Report filed on February 7, 2002, the parties stated that they were considering making modifications and would submit any proposed modifications to the Court on or before February 27, 2002. Joint Status Report at 7 (Feb. 7, 2002). Simultaneously with this Memorandum, the parties have filed a Second Revised Proposed Final Judgment (SRPFJ), which includes modifications to which the United States,

---

[7]New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin (the "Settling States") — each a party to *New York v. Microsoft Corp.*, No. 98-CV-1233 (CKK) (D.D.C.) — have signed the Revised Proposed Final Judgment.

Microsoft, and the Settling States have agreed.[8] This Memorandum is couched in terms of, and generally refers to, the proposed decree before modification (i.e., the RPFJ), addressing the modifications of the SRPFJ only as required. However, the decree the Court should enter is the *modified* version of the RPFJ — that is, the SRPFJ.

## DISCUSSION

### I. THE TUNNEY ACT GOVERNS THE COURT'S DISPOSITION OF THE REVISED PROPOSED FINAL JUDGMENT

By its express terms, the Tunney Act applies to "*[a]ny* proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws," 15 U.S.C. § 16(b) (emphasis added), without regard to when the United States submits it. Moreover, the Court is required to make its Tunney Act public interest determination "[b]efore entering *any* consent judgment proposed by the United States under this section." *Id.* § 16(e) (emphasis added). The Revised Proposed Final Judgment on its face is a proposal for a consent judgment submitted by the United States for entry in a civil proceeding brought by the United States under the antitrust laws. By the plain and unambiguous statutory language, the Tunney Act applies and governs the Court's consideration of the RPFJ.

The Tunney Act applies even though the parties proposed the RPFJ after trial and after the Court of Appeals affirmed Microsoft's liability for monopoly maintenance. These

---

[8]The United States also filed, simultaneously with this Memorandum, a Memorandum Regarding Modifications Contained in Second Revised Proposed Final Judgment. As explained briefly below, *see* Section II.G, page 34, the SRPFJ is a logical outgrowth of the RPFJ, its incremental modifications responding to public comments, and the overall result further advances the public interest.

circumstances[9]  have led some to suggest, *see* AAI Tunney Act Comments, at 4-9 (MTC # 0030600); ProComp's Comments to the Proposed Final Judgment, at 1-2 (MTC # 0030608) ("ProComp Comments"); Memorandum of Points and Authorities in Support of the California Plaintiffs' Motion to Intervene at 18-21 (Jan. 23, 2002)) ("Cal. Plaintiffs' Br.")), that the Tunney Act does not apply to some proposals for consent judgments submitted by the United States for entry in a civil proceeding brought by the United States under the antitrust laws, including the RPFJ, because of the stage at which they are proposed.  It has been variously suggested that the Act does not apply to proposals that arise after the taking of testimony begins (*id.* at 10, 18-19 n.9); after litigation to judgment (*id.* at 11, 18), apparently whether or not that judgment is vacated on appeal; and after litigation through judgment and appeal (*id.* at 18), again apparently without regard to the result on appeal.

Because, then and now, most consent judgments in government antitrust cases are entered before trial, Congress undoubtedly focused on pre-trial consent judgments when it enacted the Tunney Act.  But Congress knew that consent judgments could be proposed at later stages, *see* pages 15-16 below, and it did not exempt them from the Tunney Act.  Even if Congress had failed to foresee later-arising proposals, in the face of an "unambiguous statutory text [such a failure] is irrelevant," *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998), because application of an unambiguous statute "in situations not expressly anticipated by

---

[9]The United States has never before initiated a Tunney Act proceeding so late in a lawsuit, although the settlement in the *AT&T* case came after the trial court had "already heard what probably amounts to well over ninety percent of the parties' evidence." *United States v. AT&T*, 552 F. Supp. 131, 152 (D.D.C. 1982), *aff'd mem. sub. nom. Maryland v. United States*, 460 U.S. 1001 (1983).  The *AT&T* court followed Tunney Act procedures without deciding that the Tunney Act applied to what the parties characterized as the modification of a consent decree in one case and the dismissal of a different case.  *See id.* at 144-45.

Congress" merely shows the statute's breadth. *Id.* (citation and internal quotation marks omitted).

The plain meaning of "[a]ny proposal for a consent judgment" is sufficient to support the conclusion that the Tunney Act applies here. But if one wants more support for reading "any" to mean "any," that support is readily at hand. First, nothing in the language of the Tunney Act suggests that the Act reaches only proposals for consent judgments in government civil antitrust cases that are submitted at some appropriate time.[10] And the context of the Tunney Act suggests a broad reading of the statute's coverage — at the very least, a reading not limited to consent judgments before testimony is taken.[11] The term "Tunney Act" refers to Sections 5(b)-(h) of the

---

[10]It has been suggested that the Tunney Act provision permitting a court to consider, as part of its public interest determination, "the public benefit, if any, to be derived from a determination of the issues at trial," 15 U.S.C. § 16(e)(2), limits the reach of the Act to pre-trial settlements. *See* Cal. Plaintiffs' Br. at 18. But that subsection demonstrates only that a consent decree may be proposed prior to trial, not that the Act is limited to pre-trial proposals. Indeed, in this case, the alternative to entry of the RPFJ likely would be trial of outstanding remedy issues. Pursuant to the statute, the Court may properly consider "the public benefit, if any" of requiring determination of those issues at trial.

[11]The United States has consistently maintained that Tunney Act procedures are not required with respect to judgments addressing only claims for civil penalties under the antitrust laws. The antitrust laws do not provide civil penalties for violation of their substantive, competition-regulating, provisions. There are civil penalties under the "antitrust laws" as defined in the Clayton Act, *see* 15 U.S.C. § 12(a) (defining "antitrust laws"), only for failure to comply with provisions relating to premerger notification and waiting periods, *id.* § 18a(g), and for violation of certain orders issued by certain federal agencies (not including the Department of Justice), *id.* § 21(*l*). Courts in this district have consistently entered agreed upon settlements for civil penalties under 15 U.S.C. § 18a(g) without employing Tunney Act procedures; each such entered judgment states that its entry is in the public interest. *See, e.g.*, *United States v. Input/Output, Inc.*, 1999-1 Trade Cas. (CCH) ¶ 72,528 (D.D.C. 1999); *United States v. Blackstone Capital Partners II Merchant Banking Fund*, 1999-1 Trade Cas. (CCH) ¶ 72,484 (D.D.C. 1999); *United States v. Loewen Group Inc.*, 1998-1 Trade Cas. (CCH) ¶ 72,151 (D.D.C. 1998); *United States v. Mahle GmbH*, 1997-2 Trade Cas. (CCH) ¶ 71,868 (D.D.C. 1997); *United States v. Figgie Int'l Inc.*, 1997-1 Trade Cas. (CCH) ¶ 71,766 (D.D.C. 1997); *United States v. Foodmaker, Inc.*, 1996-2 Trade Cas. (CCH) ¶ 71,555 (D.D.C. 1996); *United States v. Titan*

Clayton Act.  Section 5(a), originally enacted in 1914 as Section 5, gives prima facie evidence

effect to certain consent decrees, subject to the proviso that the section does not give that effect

to "consent judgments or decrees entered before any testimony has been taken."  15 U.S.C.

§ 16(a).  If Congress in 1914 had understood the words "consent judgments or decrees" to refer

only to ones entered before any testimony had been taken, there would have been no need to

draw the distinction, and the proviso would have been surplusage.[12]  *See South Dakota v.*

*Yankton Sioux Tribe*, 522 U.S. 329, 347 (1998) ("the Court avoids interpreting statutes in a way

that 'renders some words altogether redundant'") (quoting *Gustafson v. Alloyd Co.*, 513 U.S.

561, 574 (1995)).  Had Congress used the term "consent judgment" in Section 5(b) of the

Clayton Act to mean something different than its meaning in Section 5(a), it surely would have

said so.  *See Commissioner v. Lundy*, 516 U.S. 235, 250 (1996) ("the normal rule of statutory

construction [is] that identical words used in different parts of the same act are intended to have

_____

*Wheel Int'l, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,406 (D.D.C. 1996); *United States v. Automatic Data Processing, Inc.,* 1996-1 Trade Cas. (CCH) ¶ 71,361 (D.D.C. 1996); *United States v. Trump*, 1988-1 Trade Cas. (CCH) ¶ 67,968 (D.D.C. 1988).  In each case, the United States noted the issue in a motion for entry of judgment, explaining to the court that it believed Tunney Act procedures were not required.

[12]As enacted in 1914, the prima facie evidence provision made even clearer congressional understanding that there could be consent judgments or decrees entered after testimony had been taken.  The text included this additional proviso, rendered superfluous by the passage of time:

> *Provided further*, This section shall not apply to consent judgments or decrees rendered in criminal proceedings or suits in equity, now pending, in which the taking of testimony has been commenced but has not been concluded, provided such judgments or decrees are rendered before any further testimony is taken.

Clayton Act, ch. 323, § 5, 38 Stat. 730, 731 (1914).  This language not only clearly contemplates consent judgments or decrees entered after some testimony has been taken, but also gives prima facie evidence effect to some of them.

the same meaning") (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990), and *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted)).

Second, Congress clearly was aware that consent judgments could arise relatively late in the course of an antitrust case. Not only were there examples ready at hand involving well-known antitrust cases, *see, e.g., Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587, 592-93 (2d Cir. 1949) (consent decrees with some defendants entered on remand, after Supreme Court affirmed liability in part and reversed in part in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)),[13] but the legislative history contained prominent references to the possibility. Representative Hutchinson, then the ranking minority member of the House Judiciary Committee and of its Monopolies and Commercial Law subcommittee, inserted into the hearing record a statement plainly recognizing that circumstances arising during prosecution of a case might make settlement seem appropriate.[14] And Thomas Kauper, then Assistant Attorney General-Antitrust

---

[13]*See also Utah Pub. Serv. Comm'n v. El Paso Natural Gas Co.*, 395 U.S. 464, 467-68 (1969) (Supreme Court refers to a decree it had rejected (for failure to comply with its mandate) as a "consent decree" even though it had been agreed to following a trial on the merits and a Supreme Court determination of liability).

[14]"[S]uppose that during the prosecution of a case against an oil company the government decided to settle for less relief than it could win on the merits because of the adverse impact full relief might have on a recently intervening energy crisis." Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies & Commercial Law of the House Comm. on the Judiciary, 93rd Cong. 41 (1973) ("House Hearings") (statement of Hon. Edward Hutchinson).

Similarly, Miles Kirkpatrick, who had recently stepped down as chairman of the FTC, testified at the same hearings about circumstances under which the government might file a proposed consent decree "with relief significantly different from that originally claimed." These circumstances included "the post complaint realization by the Antitrust Division that there are certain aspects of its case that do not have the strengths that were initially believed to be present: *that realization could come . . . after the partial trial of the case itself*." *Id.* at 145 (statement of Miles W. Kirkpatrick) (emphasis added).

Division, specifically noted in his testimony that "a consent decree . . . may come after trial." The Antitrust Procedures & Penalties Act: Hearings on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the Senate Committee on the Judiciary, 93d Cong. 117 (1973) ("Senate Hearings") (testimony of Thomas E. Kauper).

Finally, a reading of the statutory language that precludes its application at this stage would lead to anomalous results. Nothing plausibly explains why Congress would want a court to enter consent judgments in the later stages of government civil antitrust cases without following Tunney Act procedures — publication of the decree and CIS, a public comment period, and so forth. Nor is it plausible that Congress intended, sub silentio, to prohibit courts from entering consent judgments at certain stages of the litigation. Courts have long entered consent judgments reached after the taking of evidence, after determinations of liability, and even after affirmance of liability by the Supreme Court, as the *Paramount Pictures* history just cited demonstrates. Moreover, the Supreme Court has expressly acknowledged the authority of the Attorney General to settle cases at any stage. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (Court does "not question the authority of the Attorney General to settle suits after, as well as before, they reach here").

We do not, of course, suggest that this Court approach its public interest determination in this proceeding as if the RPFJ had been filed simultaneously with the complaint. The trial record, *Findings of Fact*, *Conclusions of Law*, and appellate decisions in this case all exist, and the Tunney Act does not require the Court to ignore them. But as we discuss below, *see* pages 39-42, the history of this case does not change the nature of the Court's public interest determination; it changes only the circumstances in and to which that standard is applied.

**II.    THE UNITED STATES HAS COMPLIED WITH ALL TUNNEY ACT PROCEDURAL PREREQUISITES TO THE COURT'S PUBLIC INTEREST DETERMINATION**

With the filing today of the public comments and the government's responses, the United States has completed all of the steps required of it before the Court enters a proposed consent judgment under the Tunney Act, 15 U.S.C. §§ 16(b)-(d), except for the publication of those comments and responses. We expect to publish as required, in the manner described below in Section II.F, and we will promptly notify the Court when we have done so. The United States will then have complied completely with the requirements of the Act.[15]

**A.    Summary Of Compliance**

On November 6, 2001, the United States (together with the Settling States and Microsoft) submitted to the Court the Revised Proposed Final Judgment. The United States filed its Competitive Impact Statement with the Court on November 15, 2001, and published the RPFJ and CIS in the *Federal Register* on November 28, 2001 (66 Fed. Reg. 59,452), as required by 15 U.S.C. § 16(b);[16] *see also* Order at 2-3 (Nov. 8, 2001) ("Nov. 8 Order"). The CIS included each

---

[15]Although the United States has fully complied with each Tunney Act requirement, even substantial compliance that fulfills the purposes of the statute would suffice, for a court should "decline to read the . . . statute as making strict technical compliance with the [Tunney Act] a condition to final entry of the decree." *United States v. Bechtel Corp.*, 648 F.2d 660, 664 (9th Cir. 1981).

[16]"Any proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court before which such proceeding is pending and published by the United States in the Federal Register at least 60 days prior to the effective date of such judgment." 15 U.S.C. § 16(b).

"Simultaneously with the filing of such proposal, unless otherwise instructed by the court, the United States shall file with the district court, publish in the Federal Register, and thereafter furnish to any person upon request, a competitive impact statement." *Id.*

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 17

of the six required recitals, *see* 15 U.S.C. §§ 16(b)(1)-(6),[17] as well as other material. Copies of

the RPFJ and CIS were made available to the public at the Court's website.[18] The United States

also made them available at the Department of Justice website. Because there were no "materials

and documents which the United States considered determinative in formulating" the proposed

judgment ("determinative documents"), 15 U.S.C. § 16(b), the United States was not required to

make copies of such documents available at the Court.[19] The United States furnished copies of

the CIS to those who requested them.[20]

     As required by 15 U.S.C. § 16(c) and the Court's Order of November 8, 2001, the United

States published in the *Washington Post* (November 16 – 22, 2001), the *San Jose Mercury News*

---

[17] Section 16(b) requires that the CIS "recite":

(1) the nature and purpose of the proceeding;
(2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;
(3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;
(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;
(5) a description of the procedures available for modification of such proposal; and
(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

15 U.S.C. § 16(b).

[18] *See* 15 U.S.C. § 16(b) (materials "shall also be made available to the public at the district court and in such other districts as the court may subsequently direct"). This Court did not direct that any materials be made available at any other district court.

[19] *See supra* note 18.

[20] *See supra* note 16.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 18

(November 17 – 23, 2001), and the *New York Times* (November 17 – 23, 2001) a notice

complying with the requirements of that statutory provision and the Order.[21]

On November 28, 2001, the United States published procedures for submitting comments

on the RPFJ. 66 Fed. Reg. 59,452 (2001). The 60-day public comment period (*see* 15 U.S.C.

§ 16(d)), began the same day and ended on January 28, 2002.[22] During that period, the United

---

[21]Section 16(c) provides:

The United States shall also cause to be published, commencing at least 60 days prior to the effective date of the judgment described in subsection (b) of this section, for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct--

(i) a summary of the terms of the proposal for the consent judgment,

(ii) a summary of the competitive impact statement filed under subsection (b) of this section,

(iii) and a list of the materials and documents under subsection (b) of this section which the United States shall make available for purposes of meaningful public comment, and the place where such materials and documents are available for public inspection.

15 U.S.C. § 16(c). The Court designated three newspapers, including one of general circulation in the District of Columbia. Nov. 8 Order at 2.

[22]Section 16(d) provides:

During the 60-day period as specified in subsection (b) of this section, and such additional time as the United States may request and the court may grant, the United States shall receive and consider any written comments relating to the proposal for the consent judgment submitted under subsection (b) of this section. The Attorney General or his designee shall establish procedures to carry out the provisions of this subsection, but such 60-day time period shall not be shortened except by order of the district court upon a showing that (1) extraordinary circumstances require such shortening and (2) such shortening is not adverse to the public interest.

15 U.S.C. § 16(d). The United States treated as Tunney Act comments various communications

States received over 30,000 public comments. *See* Joint Status Report 3-4 (Feb. 7, 2002). The United States is filing those comments and its response to them, *see* 15 U.S.C. §§ 16(b), (d),[23] simultaneously with the filing of this Memorandum. The United States believes that it will have completed all Tunney Act procedural requirements when it publishes the public comments and its response to these comments in the manner described below in Section II.F. The United States will notify the Court when publication occurs.

**B.     The United States Fully Complied With All Tunney Act Requirements Regarding The CIS**

The CIS filed by the United States in this case fully satisfies all Tunney Act requirements. In enacting the Tunney Act, Congress sought, among other things, "to encourage additional comment and response by providing more adequate notice [concerning a proposed consent judgment] to the public," S. Rep. No. 93-298, at 5 (1973) ("Senate Report"); H.R. Rep. No. 93-1463, at 7 (1974) ("House Report"), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6538; the CIS is the primary means by which Congress sought to do so. Introducing his bill, Senator Tunney explained that the six items of information required in a CIS would "explain to the public[,] particularly those members of the public with a direct interest in the proceeding, the basic data about the decree to enable such persons to understand what is happening and make informed

_____

received between the first business day following submission of the initial Proposed Final Judgment to the Court and the beginning of the statutory comment period.

     [23]"Any written comments relating to such proposal and any responses by the United States thereto, shall also be filed with such district court and published by the United States in the Federal Register within such sixty-day period." 15 U.S.C. § 16(b).

     "At the close of the period during which such comments may be received, the United States shall file with the district court and cause to be published in the Federal Register a response to such comments." 15 U.S.C. § 16(d).

comments o[r] objections to the proposed decree during the 60-day period."  119 Cong. Rec. 3452 (1973) (remarks of Sen. Tunney) ("Tunney Remarks").[24]  The purpose could be achieved, Senator Tunney suggested, without adding greatly to the government's workload because the six prescribed items "do not require considerably more information than the complaint, answer and consent decree themselves would provide and, therefore, would not be burdensome requirements."  Senate Hearings at 3 (statement of Sen. Tunney) ("Tunney Statement").

The CIS in this case succeeded beyond all expectations in achieving the congressional goal.[25]  As noted above, over 30,000 public comments were submitted, a number apparently beyond the wildest imaginings of the Tunney Act's sponsor in 1973, see House Hearings at 45 (testimony of Sen. Tunney) (predicting that "in the typical case, you will have [no public comments], but perhaps you will have 10 to 15 in a highly controversial case").  Indeed, the number of comments received on the RPFJ exceed the number received in the *AT&T* case by more than an order of magnitude, *see United States v. AT&T*, 552 F. Supp. 131, 135 (D.D.C. 1982) ("over six hundred comments"), *aff'd mem. sub. nom. Maryland v. United States*, 460 U.S.

_____

[24]Senator Tunney also noted that the need to file a CIS would help to focus the parties' attention during settlement negotiations.  Tunney Remarks, 119 Cong. Rec. at 3452.

[25]We attribute this success not only to the CIS itself, but also to the Internet's contribution to making the CIS, the RPFJ, the decisions of this Court and the Court of Appeals, and a wealth of other material readily available to the American public, far more available than mere publication in the *Federal Register* and distribution of paper copies by the United States and through this Court and other district courts would have accomplished.  *See* ABA Section of Antitrust Law, Report to the Council of the Section of Antitrust Law Re: Proposed "Antitrust Procedures and Penalties Act," *reprinted in* Senate Hearings at 427, 431 (citing "the minimal attention which the average citizen devotes to the daily contents of the *Federal Register*").  The United States posted the RPFJ and the CIS on the Department of Justice website; they also were (and continue to be) available to PACER account holders at the Court's website; and they therefore are instantly available at any hour of day or night to anyone in the world with an Internet connection.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 21

1001 (1983); 47 Fed. Reg. 21,214, 21,214-24 (1982) (listing name and address of each

commentor on proposed *AT&T* decree, with length of comment in pages).[26]

Although many of the comments received are unlikely to contribute new insights

concerning the RPFJ,[27] approximately 2,900 — a number nearly five times the total number of

comments in *AT&T* — contain "a degree of detailed substance concerning the RPFJ."  Joint

Status Report at 4 (Feb. 7, 2002).  Although the Court has only just received the full set of

comments, the United States provided the Court with an advance installment of 47 of the most

extensive comments on February 14, 2002.  The Court therefore is aware already of substantial

evidence that the public did not lack the raw material for formulating "informed comments o[r]

objections to the proposed decree" (Tunney Remarks, 119 Cong. Rec. at 3452).

Having established that the CIS in this case richly fulfilled the statutory purpose, we turn

to whether its content met the formal requirements of the statute.  In addressing that question, we

proceed through the six recitals the statute specifies, and then address additional aspects of CIS

content.  As the statute requires, the CIS "recite[s]":

### 1.    "The Nature And Purpose Of The Proceeding"

Section I of the CIS, CIS at 2, describes the nature and purpose of the proceeding, as the

statute requires.  15 U.S.C. § 16(b)(1).  We are aware of no suggestion that this description is

inadequate or otherwise fails to satisfy the statutory requirement.

---

[26]By contrast, the Department's 1994 consent decree with Microsoft generated only five
public comments.  *See* 59 Fed. Reg. 59,426, 59,427 (1994).

[27]As previously noted, Joint Status Report at 3 (Feb. 7, 2002), over 1,000 comments were
unrelated to this case or the RPFJ, nearly 3,000 are form letters, and nearly 20,000 contain an
overall view of the RPFJ but no particularized discussion of it.

## 2. "A Description Of The Practices Or Events Giving Rise To The Alleged Violation Of The Antitrust Laws"

Section III of the CIS, CIS at 5-17, describes the practices giving rise to Microsoft's antitrust violation.[28]  We are aware of no suggestion that this recital is inadequate or otherwise fails to satisfy the statutory requirement.

## 3. "An Explanation Of The Proposal For A Consent Judgment, Including An Explanation Of Any Unusual Circumstances Giving Rise To Such Proposal Or Any Provision Contained Therein, Relief To Be Obtained Thereby, And The Anticipated Effects On Competition Of Such Relief"

Section IV of the CIS, CIS 17-60, the bulk of the document, explains the proposed consent judgment, provision by provision, in considerable detail.  Subsection B, CIS 24-60, links the underlying theory of violation in the case ("[c]ompetition was injured in this case principally because Microsoft's illegal conduct maintained the applications barrier to entry . . . by thwarting the success of middleware that would have assisted competing operating systems"), *id.* at 24, to the primary remedial approach adopted ("the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware [and] prevent it from hampering similar nascent threats in the future" and thereby "restore the competitive conditions created by similar middleware threats").  *Id.*  The remainder of the subsection explains how particular provisions contribute to this remedial strategy, and therefore to the anticipated competitive effect of the proposed judgment.  *See*, *e.g., id.* at 33 (explaining role of required interface disclosures in overall remedial strategy and remedial impact).

---

[28]Considerably more detail can be found in the *Findings of Fact*, *Conclusions of Law*, and the Court of Appeals' opinion, all readily available on the Internet.

Although, as commentors point out, e.g., Comments of the Progress & Freedom Foundation on the Revised Proposed Final Judgment and the Competitive Impact Statement, 16-17 (MTC # 0030606) ("P&FF Comment"), the 40-plus-page analysis offered in the CIS is less elaborated and detailed than might be required by Executive Order for a cost/benefit analysis of a major executive branch regulatory analysis, that is irrelevant because the analysis plainly satisfies the requirements of the Tunney Act. The CIS meets the statutory requirement and provides "the basic data about the decree to enable [members of the public] to understand what is happening and make informed comments o[r] objections to the proposed decree." Tunney Remarks, 119 Cong. Rec. at 3452.[29] There has been no sign that any alleged inadequacy handicapped potential commentors. P&FF, for example, was able to reach its conclusion — with which we disagree — that the RPFJ is not an adequate remedy despite these alleged inadequacies of the CIS. The Court will have ample information to conclude that entry of the decree is in the public interest.[30]

4. **"The Remedies Available To Potential Private Plaintiffs Damaged By The Alleged Violation In The Event That Such Proposal For The Consent Judgment Is Entered In Such Proceeding"**

Section 6 of the CIS, CIS at 63, identifies the remedies available to private plaintiffs, with concise reference to damage actions under the federal antitrust laws, which may provide some

---

[29]No Executive Order governs the content of a CIS, and the Tunney Act nowhere refers to cost/benefit analysis. We are also unaware of any requirement that a court, before imposing a remedy in a case litigated to final judgment or before entering a consent judgment, either itself perform such an analysis or insist that the parties do so.

[30]For purposes of its public interest determination, the Court, of course, is not limited to the information in the CIS, but instead has available as well the trial record, the Court of Appeals' decision, the public comments, and the United States' response to public comments. And the Court can easily obtain additional information, whether by requesting it from the parties, or though the flexible procedures specified in the Tunney Act, *see* 15 U.S.C. § 16(f).

private plaintiffs with a remedy.[31]  The proposed judgment does not itself provide any remedy that can be invoked by potential private plaintiffs who may have been damaged by violations alleged in this case, and so the CIS does not refer to any such remedy.  The description complies with the terms of the statute, and there is no ground for requiring more.

It has been suggested that the CIS should go into more details with respect to private remedies and, specifically,[32] that it should address any impact the RPFJ might have on the collateral estoppel effect of the findings of fact and the conclusions of law in this case, and on the prima facie evidence effect of a final judgment under the Clayton Act, *see* 15 U.S.C. § 16(a).  But nothing in the language of the Tunney Act requires the United States to offer, in the CIS or elsewhere, its views about legal questions that may arise in subsequent litigation.[33]  The Tunney Act does not direct the United States to discuss the effect of the proposed judgment on private litigation; rather, it requires only a recital of the remedies available to private plaintiffs.  The evidentiary or collateral estoppel effect of determinations this Court makes is a question to be addressed by the courts in which future litigants might seek to use those determinations.  *See*

---

[31]The CIS does not address potential remedies available under state law or the laws of foreign countries.  We do not believe that the Tunney Act plausibly can be read to require this.  Indeed, requiring that the United States in effect provide legal advice regarding the laws of 50 states, let alone over a hundred foreign jurisdictions, would be unreasonably burdensome, take us far outside our area of expertise, and provide little or no benefit to anyone.

[32]This point was raised, for example, in a lawsuit filed by one commentor, the American Antitrust Institute, *American Antitrust Institute v. Microsoft Corp.*, No. 02-CV-0138 (CKK) (D.D.C., filed Jan. 24, 2002) ("*AAI*"), and in a Memorandum filed in this Court and attached to a filed comment, Comments of Relpromax Antitrust Inc., Ex. 11, at 3 (MTC # 00030631).

[33]The United States did, however, discuss related issues recently.  *See* Memorandum of Plaintiff United States in Response to the California Plaintiffs' Motion for Intervention, or in the Alternative, for Leave to File a Brief Amicus Curiae in the Tunney Act Settlement Proceedings Currently Pending in this Court, at 4-8 (Feb. 11, 2002).

*AT&T*, 552 F. Supp. at 211 (declining to "enter any specific decision or finding regarding" applicability of prima facie evidence aspect of § 16(a) because "the ultimate decision with respect to this issue must rest with the court in which such litigation may be brought"); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979) (granting trial courts broad discretion to determine whether offensive collateral estoppel should be applied in matters before them).  It is not a question for this Court or for the United States to determine.  The United States does not seek to inject itself into private litigation by making public statements in other forums, and its views with respect to matters contested in such cases carry no determinative legal effect.

### 5. "A Description Of The Procedures Available For Modification Of Such Proposal"

Section VII of the CIS, CIS at 63-65, notes that the United States may withdraw its consent to the RPFJ prior to its entry and informs the public of procedures for submitting written comments regarding the RPFJ.  That describes the procedure available for modifying the proposal prior to entry of the judgment, as required.  The section then describes, briefly, the procedure for modifying the judgment after entry.  We are aware of no suggestion that this description is inadequate or otherwise fails to satisfy the statutory requirement.

### 6. "A Description And Evaluation Of Alternatives To Such Proposal Actually Considered By The United States"

Section V of the CIS, CIS at 60-63, describes alternatives the United States considered and rejected,[34] and indicates the reasons why they were rejected. It explains why we viewed the RPFJ as a superior alternative to continued litigation. *See id.* at 60-61. It describes why, following remand, the United States decided not to continue to seek a break-up of Microsoft, a remedy that would have required further litigation and delay and would likely not have been achieved. *See id.* at 61; *see also* pages 63-65 below. The CIS explains the reasons for differences between the interim conduct provisions of the Initial Final Judgment (vacated by the Court of Appeals) and the provisions of the RPFJ. *See id.* at 61-62; *see also* pages 66-70 below. And it lists a number of other remedy proposals, the criteria used to evaluate them, and the results of that evaluation. *Id.* at 63.

To be sure, the description and the evaluations of alternatives presented are brief.[35] But they are consistent with Senator Tunney's purpose of providing "basic data about the decree to enable [members of the public with a direct interest] to understand what is happening and make informed comments o[r] objections to the proposed decree," Tunney Remarks, 119 Cong. Rec. at 3452, and with his understanding that the statutory requirements would not be burdensome. *See*

---

[34]As the CIS makes clear, CIS at 63, it does not describe literally *every* remedial proposal considered, no matter how fleetingly, and rejected. The statute does not impose such a requirement, which would be unduly burdensome and serve no useful purpose. As Senator Tunney said, the CIS ought to provide "*some* of the alternatives that were considered by the Department." Senate Hearings at 108 (remarks of Sen. Tunney) (emphasis added).

[35]The CIS does not document the evaluative process, as might be suitable in a technical report or an article prepared for publication in a scholarly journal of economics. Instead, the CIS reports the "result of evaluating," Webster's Third International Dictionary 786 (1981) (defining "evaluation"), together with evaluative criteria.

Tunney Statement, Senate Hearings at 3.  Indeed, the sheer volume and comprehensiveness of the comments received suggest that the level of detail was more than adequate to stimulate informed public comment about the proposed remedy and about the relative merits of alternative remedies.

A commentor contends, in separate litigation, that the CIS is inadequate because it "failed to explain adequately how alternative remedies (those not being pursued in the [R]PFJ) would have affected competition in the marketplace." *AAI*, Complaint ¶ 19.  *See also* P&FF Comment, at 15 (criticizing CIS for failing to evaluate likely impacts on competition of alternative remedies).  The Tunney Act, however, does not require *any* explanation of how alternative remedies would have affected competition in the marketplace.  That is no accident.  The version of Senator Tunney's bill reported out of the Senate Committee would indeed have required that CIS recitations include "the anticipated effects on competition of such alternatives."  Senate Report at 9 (proposed 15 U.S.C. § 16(b)(6)).  But on the Senate floor, Senator Hruska offered an amendment to strike that requirement, stating:

> There is no reason . . . to require the staff of the Antitrust Division . . . to make a public prediction as to the competitive effects of various alternatives which it has considered.  It is sufficient if the various alternatives are disclosed to the court and to the public.

119 Cong. Rec. 24,604 (1973).[36]  Senator Tunney agreed with the amendment's "basic intent," and the Senate adopted it by voice vote.  *Id.*

---

[36] Senator Hruska explained that "[t]hese anticipated effects quite clearly can be speculated upon by the district court considering a proposed consent judgment or by other interested parties." 119 Cong. Rec. 24,604 (1973).

### 7. Including Information Not Required By The Tunney Act Cannot Result In A Noncompliant CIS

Several commentors contend that the CIS is inadequate because it contains material beyond that required by the statute and the additional material is incorrect or insufficient. That some commentors wish that the CIS contained more or different material, even though not required by statute, provides no basis for concluding that the CIS is deficient. Thus, Section VIII, CIS at 65-68, provides a brief discussion of the standards courts apply in determining whether entry of a proposed consent judgment is in the public interest. Intended to provide general information to the public, *cf.* pages 35-46 below (more substantial discussion of legal standard intended for the Court), Section VIII has been the target of several commentors. *E.g.,* Comments of Software & Information Industry Association on Proposed Final Judgment, at 11 (MTC # 0030614) ("SIIA Comments") (contending that legal standard commentor finds in CIS is "simply the wrong standard of review for the remedy in *this* case"). The Court will determine the standard of review it will apply and, as discussed below, *see* pages 35-46, the appropriate standard of review corresponds to the standard expressed in the CIS. But because there is no requirement that the CIS discuss the standard of review at all, any alleged shortcomings of that discussion in the CIS are no basis for finding that the CIS fails to satisfy the statutory requirements.

Similarly, the CIS contains two sentences explaining that the United States is not filing any determinative documents in this case because there are none within the meaning of the statute. CIS at 68. One commentor has alleged, in a separate lawsuit, that the CIS is deficient because the disclosure in this discussion is inadequate, AAI Complaint ¶ 27, and in particular because that discussion does not include our "definition or interpretation" of the word

"determinative," *id.* ¶ 28. Because the CIS is not required to discuss determinative documents (and the statute does not require the United States to provide an interpretation or definition of the term "determinative"), this allegation provides no basis for concluding that the CIS fails to comply with the statute.

### C. The United States Fully Complied With All Tunney Act Requirements Regarding Determinative Documents

The United States did not file any determinative documents with the Court, *see* 15 U.S.C. § 16(b), did not otherwise make determinative documents available to the public, and did not list any determinative documents in the required newspaper notices, *see id.* § 16(c)(iii), for one simple reason: there are no such documents in this case. Moreover, although not required to do so, we stated as much in the CIS. *See* CIS at 68.

Commentors have nevertheless, and without any basis, questioned our compliance. One commentor, without further explanation, suggests we failed to comply with the statute because "no documents considered determinative in formulating the RPFJ throughout the negotiation process were disclosed as required by 15 U.S.C. § 16(b)." Relpromax Comment, Ex. 11, at 3. As noted above, another, in a separate lawsuit, challenged our failure to provide a definition of "determinative" in the CIS, implying that under the commentor's preferred definition, there were in fact determinative documents. *See* Memorandum in Support of Motion for Preliminary Injunction and Expedited Hearing at 16-19 (Jan. 31, 2002), *AAI*.

There are no "determinative" documents in this proceeding. The Court of Appeals addressed the definition of "determinative documents" in a recent Tunney Act case. *See Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997) ("*MSL*"). The United States had argued that the statute referred to documents "'that individually had a

significant impact on the government's formulation of relief — i.e., on its decision to propose or accept a particular settlement.'" *Id.* at 784 (quoting brief of the United States). The court concluded that the statutory language "seems to point toward the government's view . . . and confines § 16(b) at the most to documents that are either 'smoking guns' or the exculpatory opposite." *Id.* The court added that "[t]he legislative history in fact supports the government's still narrower reading." *Id.* In this case, the United States did not consider *any* document to be a "smoking gun or its exculpatory opposite" with a significant impact on our formulation of our decision regarding the RPFJ, and so there were no determinative documents.[37]

**D.      The United States Fully Complied With All Tunney Act Requirements Regarding Publication of Summaries In Newspapers**

As noted above, the United States published notices in three newspapers for the periods required by the Tunney Act and this Court's Order of November 8, 2001. The notice (the text of which is attached as Appendix B) contained "a summary of the terms of the proposal for the consent judgment" as required by 16 U.S.C. § 16(c)(i), and "a summary of the competitive

---

[37]In the separate lawsuit it filed, a commentor relies on the concept of determinative documents applied in *United States v. Central Contracting Co.*, 537 F. Supp. 571, 575 (E.D. Va. 1982), under which, even if documents are individually not determinative, they can be determinative "in the aggregate." AAI Mem. at 17 n.10. We do not believe there are determinative documents in this case even under *Central Contracting*. But in any event, *Central Contracting*'s broad definition of determinative documents has not been followed by any Tunney Act court, has been squarely repudiated by one district court, *United States v. Alex. Brown & Sons*, 169 F.R.D. 532, 541 (S.D.N.Y. 1996) ("*Central Contracting*'s broad definition of 'determinative documents' may conflict with Congress's intent to maintain the viability of consent decrees") (cited with approval in *MSL*, 118 F.3d at 785), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998), and cannot be reconciled with decisions of this Circuit and the Second Circuit. *See MSL*, 118 F.3d at 784; *Bleznak*, 153 F.3d at 20 (citing *MSL* and quoting "'smoking gun' or exculpatory opposite" with approval). *Central Contracting* is simply not good law in this regard.

impact statement" as required by 16 U.S.C. § 16(c)(ii).[38]  Although required to do so by neither

statute nor Order, the notice also stated where copies of the complaint, the RPFJ, and the CIS

could be viewed and obtained and where comments could be sent.  Because there were no

determinative documents, the notice did not list them.  *See* 15 U.S.C. § 16(c)(iii).  The United

States complied with the newspaper notice requirements of the Tunney Act, and no commentor

has suggested otherwise.

     **E.**     **The United States Has Fully Complied With The Tunney Act Requirement That It Respond To Public Comments**

The Tunney Act requires that the United States respond to public comments and file its

response with the Court "[a]t the close of the period during which such comments may be

received."  15 U.S.C. § 16(d).  The statutory language allows the United States "some additional

time after the end of  [the comment period] to prepare and file responses," *United States v.*

*Bechtel Corp.*, 648 F.2d 660, 664 (9th Cir. 1981), and this Court allowed 30 days.  Nov. 8 Order

at 3.  The comment period closed on January 28, 2002, and we are filing our responses with the

Court, concurrently with this Memorandum, on February 27, 2002, thereby complying with the

requirement.

---

[38]The summary of the CIS included in the notice is brief, but sufficient to serve what we understand to be its purpose.  The Senate Judiciary Committee added the newspaper provision to a bill that already included *Federal Register* publication of the CIS and proposed decree.  Senate Report at 1-2 (Amendment No. 5).  It did so "to enhance the degree of notice afforded the public," since "[p]ublication in the Federal Register alone was not felt to be meaningful public notice." *Id.* at 3.  The notice in this case was plainly sufficient to put the public on notice of a proposed settlement of a major antitrust case potentially of interest; of the availability of additional information concerning that settlement; and of the opportunity to comment on the proposed judgment.  Whatever else may be true of *United States v. Microsoft*, it is surely true that the proposed settlement has been amply noticed by the public at large.

**F.  The United States Will Fully Comply With the Tunney Act Requirement That It Publish the Comments and Response**

In light of the Court's Memorandum and Order of February 22, 2002, denying as non-justiciable at that time the United States' Motion for Leave of Court to Adopt an Alternative Procedure for Comment Publication ("Alternative Procedure Motion"), the United States will pursue two parallel approaches to compliance with the remaining requirement of the Tunney Act, publication of the public comments and our response thereto in the *Federal Register*.  Approach 1 will consist of the steps set forth in our Alternative Procedure Motion and the United States' Supplement to Prior Motion for Leave of Court to Adopt an Alternative Procedure for Comment Publication ("Supplement"), filed February 21, 2002, with one difference in timing.  Even with the additional demands of simultaneously pursuing Approach 2, described below, the posting of the full text of the 32,329 public comments described in the Alternative Publication Motion[39] on the Department of Justice's website will likely be accomplished by March 4, 2002.  We estimate that all of the other steps described in our Alternative Procedure Motion and Supplement will be completed by March 15, 2002.  In the view of the United States, completion of these steps will constitute full, and certainly no less than substantial,[40] compliance with the statutory requirement that comments be published in the *Federal Register*, for the reasons set forth in our Alternative Procedure Motion and Supplement.[41]

---

[39]*See* Alternative Publication Motion at 6 (descriptions of comments to be published and of a small category of wholly unrelated or duplicate comments that will not be published).

[40]*See supra* note 15.

[41]*See* Alternative Publication Motion at 2, 9-11; Supplement at 2-3 & n.1.

Approach 2, which we will pursue in addition to and simultaneous with Approach 1, consists of publication in the *Federal Register* of the full text of the public comments. We will begin the process of publication of the comments in their entirety by providing the full text to the *Federal Register* no later than March 1, 2002; the *Federal Register* will then commence its process of preparing the text for publication.[42] We estimate that publication of the full text of the comments in the *Federal Register*, if ultimately necessary, will occur approximately six weeks after submission to the *Federal Register*.

### G. The Second Revised Proposed Final Judgment Needs No Separate Round Of Public Comment And Response

The Tunney Act does not require a new round of publication and comment in light of the SRPFJ. The publication and comment provisions of the Act serve "to enable the district court to make" its public interest determination. *Hyperlaw, Inc. v. United States*, 1998 WL 388807, at *3, 159 F.3d 636 (D.C. Cir. 1998) (unpublished table decision). Accordingly, a "court should treat notice and comment under the Tunney Act as analogous to agency rulemaking notice and comment." *Id.* (quotation marks omitted). Applying that analogy, "there is no need for successive rounds of notice and comment on each revision," provided the final decree "is a 'logical outgrowth' of the proposed decree. . . . Further notice and comment should be required only if it 'would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its [proposal].'" *Id.* (quoting *American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1974)).

---

[42]During approximately the first three to four weeks of this period before publication occurs, it would still be possible to terminate the remaining publication process and save a significant portion of the total cost of full publication.

The proposed decree as modified is a logical outgrowth of the RPFJ and so requires no further notice and comment. As explained in the United States' Memorandum Regarding Modifications Contained in Second Revised Proposed Final Judgment, each of the modifications clarifies decree language in response to public comments on the RPFJ. They thus are in fact a natural outgrowth of the notice and comment process. Taken separately or together, the modifications do not fundamentally change the RPFJ. All contribute to the public interest. The purpose of the notice and comment has thus been well satisfied, and further notice and comment would merely delay the court's public interest determination without sound reason.[43]

## III. THE COURT MUST ENTER THE PROPOSED DECREE IF IT IS WITHIN THE REACHES OF THE PUBLIC INTEREST

Courts have long applied a public interest standard in determining whether to enter an antitrust consent decree. *See, e.g.*, *United States v. RCA*, 46 F. Supp. 654, 655 (D. Del. 1942) (decision to enter a consent decree "involves a determination by the chancellor that it is equitable and in the public interest"), *appeal dismissed*, 318 U.S. 796 (1943). That standard is now embodied in the Tunney Act, 15 U.S.C. § 16(e) ("the court shall determine that the entry of such judgment is in the public interest" before entering it); *see AT&T*, 552 F. Supp. at 149 n.74 (Tunney Act "represents an endorsement of the line of cases in which courts examined proposed consent decrees to determine whether they were in the public interest"); House Report at 11,

---

[43]Entry of a decree following modification without a new round of notice and comment is conventional in Tunney Act practice. For example, after notice and comment in *AT&T*, the court said it would enter the decree as in the public interest if the parties agreed to a number of modifications, and the Court entered the modified decree without a new round of notice and comment. *AT&T*, 552 F. Supp. at 225-26; *see also MSL*, 118 F.3d at 778.

1974 U.S.C.C.A.N. at 6542 ("Preservation of antitrust precedent, rather than innovation in the usage of the phrase, 'public interest,' is, therefore, unambiguous").

The court of appeals in *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) ("*Microsoft I*"), set forth the factors that a Tunney Act court's public interest determination entails. That inquiry differs fundamentally from the inquiry a court conducts in resolving, by adjudicated judgment, a dispute between the litigants before it. Regardless of the stage at which the parties resolved their disputes and reached a settlement in this case, the Court's task is to determine whether it would be in the public interest to enter that settlement as a judgment, not to devise its own remedy.

A.    **Whether The Proposed Decree Is Within The Reaches Of The Public Interest Is Determined By The Test Of *Microsoft I***

In determining whether the proposed decree is in the public interest,[44] a district court properly considers whether "the remedies [are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft I*, 56 F.3d at 1461. In *Microsoft I*, and again in *MSL*, 118 F.3d at 783, the D.C. Circuit explained that this inquiry entails consideration of four specific factors:

> The district court must examine the decree in light of the violations charged in the complaint and should withhold approval only [1] if any of the terms appear ambiguous, [2] if the enforcement mechanism is inadequate, [3] if third parties will be positively injured, or [4] if the decree otherwise makes "a mockery of judicial power." See [*Microsoft I*, 56 F.3d] at 1462.

*MSL*, 118 F.3d at 783.

---

[44]The statute lists a number of factors a court "*may* consider," 15 U.S.C. § 16(e) (emphasis added); *id.* § 16(e)(1)-(2) (listing factors), but consideration of these factors is entirely discretionary. Senate Report at 6.

The inquiry with respect to the first two factors, ambiguity and enforceability, is straightforward and governed by a reasonableness standard, not a search for perfection. As the Court of Appeals explained, "the district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable." *Microsoft I*, 56 F.3d at 1461-62. Similarly, the Court's consideration of the "compliance mechanisms," *id.* at 1462 — *see also* 15 U.S.C. § 16(e)(1) ("provisions for enforcement") — is addressed to real and foreseeable problems relating to "actual compliance." *Microsoft I*, 56 F.3d at 1462.

The third factor a Tunney Act court properly considers is whether a decree would inflict "positive injury" on third parties, *id.* at 1461 n.9, 1462. In so doing, the Court must distinguish between positive injury and injury from a decree's "mere failure to secure better remedies for a third party" for whatever reason. *MSL*, 118 F.3d at 780. The Court "should not reject an otherwise adequate remedy simply because a third party claims it could be better treated." *Microsoft I*, 56 F.3d at 1461 n.9.

The heart of a district court's public interest determination, however, is whether the proposed remedy adequately meets the requirements for an antitrust remedy, *AT&T*, 552 F. Supp. at 153, or instead whether "the discrepancy between the remedy and undisputed facts of antitrust violations could be such as to render the decree 'a mockery of judicial power,'" *MSL*, 118 F.3d at 782 (quoting *Microsoft I*, 53 F.3d at 1462). The requirements of an antitrust remedy are familiar. As the Court of Appeals noted in remanding this case:

> a remedies decree in an antitrust case must seek to "unfetter a market from anticompetitive conduct, *Ford Motor Co.[ v. United States]*, 405 U.S. [562, ] 577

[(1972)], to "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 . . . (1968); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 577 . . . (1966).

253 F.3d at 103.

As the Court of Appeals also emphasized, however, the "'[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition.'" *id.* at 106 (quoting 3 *Antitrust Law* ¶ 650a, at 67). Thus, in *Microsoft I*, the Court of Appeals, while noting the familiar standard that an antitrust remedy should "pry open to competition a market that has been closed by defendants' illegal restraints," 56 F.3d at 1460 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)), clearly required that the scope of the appropriate remedy be related to the anticompetitive effects of the illegal conduct. Although an antitrust conduct remedy is not limited to enjoining precisely the conduct found to be unlawful, *e.g., Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945); *AT&T*, 522 F. Supp. at 150 n.80, nevertheless "the remedies must be of the 'same type or class' as the violations, and the court is not at liberty to enjoin 'all future violations of the antitrust laws, however, unrelated to the violations found by the court.'" *Microsoft I*, 56 F.3d at 1460.[45]

This Court's assessment of the adequacy of the RPFJ also must take into account the risks and uncertainties of further litigation that would be required before there could be an adjudicated final judgment, safe from further challenge on appeal, that would remedy the anticompetitive harm attributable to conduct found to violate the Sherman Act. The Court of Appeals explained

---

[45]Nor may relief in a civil antitrust case be punitive. *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952); *United States v. Nat'l Lead Co.*, 332 U.S. 319, 338 (1947).

in *Microsoft I* that it is "inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial. Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district court to assume that the allegations in the complaint have been formally made out is quite unwarranted." *Id.* at 1461.[46]

This case differs from *Microsoft I* in that there have been both findings of fact and conclusions of liability affirmed on appeal. But the difference is one of degree, not kind. Although the Court of Appeals in this case affirmed the district court's judgment of liability for monopolization, it emphasized that neither it, nor the district court, had so far found "a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market," 253 F.3d at 106-07, sufficient to justify structural relief (although it did not rule out the possibility that this Court would find such a connection on remand). Absent such a causal connection, the court continued, only conduct relief is justified.[47] *Id.* at 106. Moreover, the Court of Appeals vacated the district court's judgment of liability with respect to tying, *id.* at 84 (leaving open the possibility of further litigation on remand using a more demanding

---

[46]Congress intended that the statutory "public interest" concept encompass "compromises made for non-substantive reasons inherent in the process of settling cases through the consent decree procedure." House Report at 12, 1974 U.S.C.C.A.N. at 6542.

[47]Among the goals of an antitrust decree are "terminat[ing] the illegal monopoly" and "deny[ing] to the defendant the fruits of its statutory violation." *Microsoft*, 253 F.3d at 103 (internal quotation omitted). But plaintiffs never alleged, and neither this Court nor the Court of Appeals found, that Microsoft *acquired* its monopoly unlawfully. *See id.* at 58 (Microsoft "violated § 2 by engaging in a variety of exclusionary acts . . . to maintain its monopoly"); *see also Microsoft I*, 56 F.3d at 1452. Thus, whether, and to what extent, Microsoft now has an "illegal monopoly" depends on whether its unlawful conduct increased or extended Microsoft's monopoly — that is, whether the fruits of its statutory violations included increments to the magnitude or duration of its market power. Again, neither the district court nor the Court of Appeals found this direct causal connection between the conduct and the continuance of the monopoly.

standard); reversed as to attempted monopolization, *id.* at 80-84; and limited the scope of the conduct found to constitute illegal monopolization, *id.* at 67 (overriding of user's choice of default browser), 71 (deals with ICPs), 75 (development and promotion of a JVM), 78 (course of conduct considered separately). The remedy ultimately imposed on remand, the court directed, "should be tailored to fit the wrong creating the occasion for the remedy." *Id.* at 107.

In the absence of a settlement, therefore, the United States would face the prospect of extended litigation with respect to the numerous issues related to relief in this case. An appeal likely would follow the conclusion of the proceedings in this Court. Microsoft also might choose to seek Supreme Court review of the Court of Appeals' decision affirming its liability for monopoly maintenance. *See* Cert. Petition at 15 (listing issues for future petition). Despite the *Findings of Fact* and *Conclusions of Law*, and despite the Court of Appeals' affirmance of a number of the holdings, including liability for monopolization, the ultimate outcome of continued litigation is uncertain, and the path of litigated remedy proceedings would be both risky and costly in terms of resources that might otherwise be devoted to other antitrust enforcement concerns.[48]

Thus, although the litigation risks the United States faces here are not identical to the litigation risks it faces when it negotiates a settlement prior to trial, the teaching of *Microsoft I* remains applicable. This Court's evaluation of the RPFJ is properly informed by the public interest in a certain and timely remedy for Microsoft's unlawful conduct and must take account

---

[48]*See* Note, *The Scope of Judicial Review of Consent Decrees under the Antitrust Procedures and Penalties Act of 1974*, 82 Mich. L. Rev. 153, 175 n.142 (1974) ("The legislative history of the [Tunney Act] should make the courts sensitive to the efficient allocation of the Department's resources in making their public interest determinations.")

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT - PAGE 40

of the uncertainties and risks of further litigation, an inquiry that properly respects the realistic

choices the United States faced in deciding to settle the case on the negotiated terms of the RPFJ.

Moreover, in making its determination, the Court properly accords significant weight to

the United States' predictive judgments as to the efficacy of remedial provisions. Indeed, such

deference is proper even outside the consent decree context. *See Ford Motor Co, v. United*

*States*, 405 U.S. 562, 575 (1972) ("'once the Government has successfully borne the considerable

burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its

favor'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)).

Similarly, it is proper to defer to the United States as representative of the public interest when

the parties are requesting entry of an agreed-upon judgment.[49]

As the Court of Appeals has explained, the degree of deference the trial court gives to

"the government's predictions as to the effect of the proposed remedies" in a Tunney Act

proceeding may vary with the extent of the court's familiarity with the market and other factors,

*Microsoft I*, 56 F.3d at 1461. But, as the Court of Appeals also emphasized, even a court that has

extensive relevant expertise should not lightly reject the government's predictions. For example,

in the case of the *AT&T* decree — "a decree the oversight of which had been the business of a

district judge for several years," *Microsoft I* at 1460 — the court of appeals instructed that the

district judge should not reject an agreed-upon modification of the decree unless it had

"'exceptional confidence that adverse antitrust consequences [would] result — perhaps akin to

the confidence that would justify a court in overturning the predictive judgments of an

---

[49]*See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 177 (1948); *United States v. Borden Corp.*, 347 U.S. 514, 518 (1954); *Bechtel*, 648 F.2d at 666.

administrative agency.'"  *Id.* (quoting *United States v. Western Elec. Co.,* 993 F.2d 1572, 1577

(D.C. Cir. 1993)).  Indeed, if courts do not give appropriate deference to the United States'

views, Tunney Act proceedings will become equivalent to the proceedings that lead to

adjudicated judgments with adjudicated remedies.

**B.  The Court's Task In Entering A Consent Decree Differs From Adjudicating A Remedy**

The fact of settlement here determines the Court's role in this proceeding and the inquiry

it must make.  Because the parties to this case have agreed to the Revised Proposed Final

Judgment, the Court now faces a task that differs fundamentally from the task the Court of

Appeals envisioned when it remanded *United States v. Microsoft Corp.*[50]  The Court of Appeals

anticipated the necessity of  "a relief-specific evidentiary hearing," providing a basis for "judicial

resolution" of factual issues in dispute between the United States and Microsoft — although it

recognized that no such hearing would be required if the parties did not dispute the facts.

*Microsoft*, 253 F.3d at 101.  Moreover, anticipating continued litigation between the parties over

issues related to relief, the Court of Appeals contemplated that this Court would exercise its

"broad discretion to enter that relief it calculates will best remedy the conduct it has found to be

unlawful," *id.* at 105, in light of its findings as to the causal connection between that conduct and

the maintenance of Microsoft's market power, *id.* at 103-07.  That is, the Court of Appeals

envisioned that this lawsuit would terminate in an "adjudicated judgment," with the wording of

that judgment "determined by the judge, who may draft it, accept the draft proposed by the

---

[50]Some of the States that are plaintiffs in *New York v. Microsoft Corp.*, No. 98-CV-1233, have settled with Microsoft on identical terms, while others have not settled and continue to litigate.  We do not address here the nature of the task the Court now faces in *New York*.

winning party, or adopt portions of draft language proposed by any of the parties," *Janus Films, Inc. v. Miller*, 801 F.2d 578, 581-82 (2d Cir. 1986), to achieve the result the Court views as appropriate — subject to review on appeal.

The parties, however, have chosen to forgo, at least conditionally, their rights to continue litigating to an adjudicated judgment, as well as their rights to further appellate review.[51] In order to achieve a prompt and certain resolution of this case (*see* CIS at 2, 60-61), they have chosen the alternative means of terminating litigation "by agreement of the parties," *Janus Films*, 801 F.2d at 581, a choice that is clearly permissible at this stage of the litigation. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (government antitrust case in which the Supreme Court noted that it did "not question the authority of the Attorney General to settle suits after, as well as before, they reach here"); *see also Fifth & Walnut, Inc. v. Loew's Inc.*, 176 F.2d 587, 592-93 (2d Cir. 1949) (consent decrees with some defendants entered on remand, while other defendants continued to litigate, after Supreme Court affirmed liability in part and reversed in part in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)).[52]

---

[51]More particularly, each party has conditionally abandoned the right to seek from the Court a remedy order to which the other has not agreed; each has abandoned the right to seek appellate review of the remedy order; and Microsoft has abandoned the right to seek Supreme Court review of the liability determinations and factual findings in *this* case (No. 98-1232) that were affirmed by the Court of Appeals. *See United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) (parties to a consent decree "waive their right to litigate the issues involved in the case"). These abandonments are conditional, because the United States has expressly reserved the right to withdraw its consent to the RPFJ prior to entry (Stipulation ¶ 1 (Nov. 6, 2001)), and the consent of both parties is contingent upon the Court's approval of the RPFJ (*id.* ¶ 2).

[52]In principle, the parties could have simply agreed between themselves on a purely contractual version of the RPFJ and terminated the litigation, without the Court's further action, by stipulation of dismissal, *see* Fed. R. Civ. P. 41(a)(1)(ii); *Janus Films*, 801 F.2d at 582; Michigan Note, 83 Mich. L. Rev. at 168 n.98 (as an alternative to a consent decree, government could "settle the case by contract with the defendant"); *see also In re IBM Corp.*, 687 F.2d 591,

In these circumstances, the parties themselves have resolved their differences, and the

Court therefore does not have the classic judicial task of "[r]esolving contested disputes" of fact,

law, and remedy.  Maimon Schwarzschild, *Public Law by Private Bargain: Title VII Consent*

*Decrees and the Fairness of Negotiated Institutional Reform*, 1984 Duke L.J. 887, 903 (1984).

Rather, the Court's task is only to determine whether to perform the "judicial act," *United States*

*v. Swift & Co.*, 286 U.S. 106, 115 (1932), of entering the decree proposed by the parties for entry

as the Court's decree.

In cases involving only private interests, the decision to enter settling parties' agreements

as judgments requires little judicial attention.  *See United States v. City of Miami*, 614 F.2d 1322,

1330 (5th Cir. 1980) ("In what can be termed 'ordinary litigation,' that is, lawsuits brought by

one private party against another private party that will not affect the rights of any other persons,

settlement of the dispute is solely in the hands of the parties . . . .  [T]he court need not and

should not get involved"); *Janus Films*, 801 F.2d at 582 ("court normally has only a limited role

so long as the dispute affects only private interests").  But in considering whether it "should enter

a consent decree affecting the public interest," *Adams v. Bell*, 711 F.2d 161, 170 n.40 (D.C. Cir.

1983) (en banc), "[t]he court has a larger role."  *Janus Films*, 801 F.2d at 582.  Most

_____

600-03 (2d Cir. 1982) (Tunney Act does not apply to stipulations of dismissal).  That alternative
was unacceptable to the United States, which insisted, for various reasons including the
availability of enforcement "by citation for contempt of court," that the agreement carry "the
legal force and character of a judgment entered after a trial."  *Local No. 93, Int'l Ass'n of
Firefighters v. City of Cleveland*, 478 U.S. 501, 518 (1986); *see Rufo v. Inmates of Suffolk
County Jail*, 502 U.S. 367, 378 (1992) (consent decree "is an agreement that the parties desire
and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules
generally applicable to other judgments and decrees.").  *Cf. United States v. United Artists
Theatre Circuit, Inc.*, 1971 Trade Cas. (CCH) ¶ 73,751, at 91,183 (E.D.N.Y. 1971) (in case
where government sought preliminary injunction, government advised the court "that it was its
policy not to accept stipulations unless 'So Ordered.'").

fundamentally, the reason for that larger role is that a court of equity must avoid letting its decree become "an instrument of wrong" to the public. *Swift*, 286 U.S. at 115.[53]

The Court's role in making a public interest determination differs from its role in formulating an adjudicated judgment. Because the Court "is evaluating a settlement, it is not as free to exercise its discretion in fashioning a remedy," *AT&T*, 552 F. Supp. at 151, as it would be in a case litigated to an adjudicated judgment. The Court is not "empowered to reject [the remedies sought] merely because [it] believe[s] other remedies [are] preferable." *Microsoft I*, 56 F.3d at 1460. In this procedural setting, the Court's "function is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting settlement is '"within the *reaches* of the public interest."'" *Id.* (quoting *United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (emphasis in original), in turn quoting *Bechtel*, 648 F.2d at 666, in turn quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).

This standard reflects not only the proper role of a court of equity asked to lend its authority to the parties' agreement, but also the critical role that consent decrees play in effective public antitrust enforcement. *See* Senate Report at 5 ("the consent decree is of crucial importance as an enforcement tool, since it permits the allocation of resources elsewhere"); 119 Cong. Rec. 24,600 (1973) (Statement of Sen. Gurney) (Tunney Act "is designed to enhance the value and effectiveness of the consent decree as a tool of public policy"). A consent decree, such

---

[53] *Cf. United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (analogizing public interest determination to decision on decree modification, where "a court should not reject an agreed-upon modification unless 'it has exceptional confidence that adverse antitrust consequences will result'") (citation omitted).

as the RPFJ, is the product of negotiation.  The parties weigh the benefits of prompt and certain resolution of the case against the possibility that continued litigation might improve their respective positions.  Settlements potentially offer the public the benefits of more timely and certain relief, as well as significant savings in judicial and prosecutorial resources.  But if courts refused to enter any consent decree that did not match precisely the relief the court would have imposed in the absence of a settlement, "defendants would have no incentive to consent to judgment and this element of compromise would be destroyed.  The consent decree would thus as a practical matter be eliminated as an antitrust enforcement tool, despite Congress' directive that it be preserved."  *AT&T*, 552 F. Supp. at 151.

Thus, even in the *AT&T* case, a case of unparalleled public importance in which the trial court had unusual familiarity with both the evidence and the legal arguments of the parties, *see id.* at 152, the court determined to approve the parties' settlement "[i]f the [proposed] decree meets the requirements for an antitrust remedy."  *Id.* at 153.  The court made clear that it intended to follow that standard whether or not the proposed decree corresponded to the decree the court itself would have imposed had the parties pushed forward to an adjudicated judgment. *See id.* at 166 n.147 (noting that if the case "were to proceed to final judgment and liability were found, the Court might determine that [certain measures not part of the proposed decree] are appropriate remedies, either as alternatives to the divestiture of the Operating Companies or in addition to such divestiture").

## IV. ENTRY OF THE REVISED PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST

The RPFJ is a sound and appropriate response to the violations found by the district court and affirmed by the court of appeals, recognizing, as it must, the substantial narrowing of the case that has taken place since its commencement in 1998. In fashioning appropriate relief, the United States was bound to confine its remedial proposals to the sole basis of liability sustained by the Court of Appeals — *i.e.*, specific acts by Microsoft to impede the emergence of middleware as a threat to the operating system monopoly. The United States also was mindful of the risks associated with tampering too greatly with market mechanisms or seeking to dictate some preferred view of how these markets should develop. While Microsoft's violations must be redressed, the purpose of an antitrust decree is to restore and preserve competition, not to displace competition with a regulatory regime.

The RPFJ meets the goals of public antitrust enforcement. First, it prohibits the conduct found by the court of appeals to be unlawful. The RPFJ contains specific affirmative prohibitions addressing each of the 12 practices the court determined to be acts of monopoly maintenance. This being a monopolization decree, the RPFJ then goes beyond the specific unlawful acts to provide fencing-in relief to address other practices that Microsoft might use to replicate the adverse effects of the offending conduct. For example, although there was no finding that Microsoft had priced its operating systems in an unlawful manner, the RPFJ requires uniform pricing and terms to the major OEM's to prevent retaliatory discrimination against those who might promote competing middleware products. Finally, the RPFJ takes affirmative steps to restore competition by creating favorable conditions under which competing middleware products can be developed and deployed. Among other things, the RPFJ requires the

documentation and disclosure of applications interfaces and communications protocols to facilitate third-party development efforts and, in some instances, modifications of the operating system to accommodate competing middleware. Again, these restorative provisions go beyond the specific findings of unlawful behavior, with the goal of creating a forward-looking and comprehensive remedial scheme. Nothing in the RPFJ exempts Microsoft from the mandates of the antitrust laws; it continues to face antitrust exposure for conduct beyond that which has been litigated in this case.

Many commentors, especially many of Microsoft's competitors, urge the Court to withhold Tunney Act approval, advocating their own views of the public interest. Although many such commentors assert that alternatives to the RPFJ might advance their own private strategic and financial interests, such proposals typically lack a foundation in the court's liability findings and likely would be harmful to both competition and consumers. The most persistent complaint is that the fencing-in and restorative provisions are not absolute prohibitions on competitive activity by Microsoft or absolute requirements that Microsoft surrender its technology for the benefit of competitors. Characterizing the RPFJ's limitations as "loopholes," these commentors fail to recognize that the limitations merely permit Microsoft to compete through actions that are not prohibited by the antitrust laws, were never at issue in this case, or were challenged under theories of liability expressly rejected by the court of appeals.

Protecting competitors from legitimate competition from Microsoft is not a goal of public antitrust enforcement. The goal of the decree is not to secure specific advantages for particular competitors or to dictate for consumers which products or technologies will succeed. In fashioning the RPFJ, the United States has taken pains to remedy the violations without seeking

to dictate market outcomes. We have had to balance certain competing interests, recognizing that provisions benefitting firms at one level in the chain of distribution have potential effects on firms at other levels. In striking such balances, the United States has remained faithful to the axiom that the U.S. antitrust laws protect competition not competitors. *E.g.*, *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 812 (D.C. Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), *petition for certiorari filed*, 70 U.S.L.W. 3465 (Jan. 11, 2002), (No. 01-1050). On that basis, the United States has concluded that further fencing-in or restorative relief based upon hypothetical concerns about Microsoft's behavior not only would be unnecessary and unwarranted, but also might be affirmatively harmful to competition.

Moreover, the RPFJ bears none of the infirmities that would justify the Court's withholding of approval. *See MSL*, 118 F.3d at 783 (listing factors that would justify withholding approval); *Microsoft I*, 56 F.3d at 1462 (same). The decree is comprehensive and complex, like the computer industry itself, but its terms are carefully defined and not ambiguous.[54] The enforcement mechanisms are creative and fully adequate. *See* pages 60-62 below.[55] No third party has demonstrated positive injury that would flow from entry of the RPFJ.

---

[54]For a response to commentors' claims of specific ambiguities, see Response of the United States To Public Comments on the Revised Proposed Final Judgment, *passim*, *esp.* § III (Definitions) ("Response").

[55]For a response to commentors' claims of specific shortcomings of the enforcement mechanisms of the RPFJ, see Response, § VIII (Enforcement); *see also* Declaration of David S. Sibley ("Sibley Decl.") (attached as Appendix C).

**A.     The Revised Proposed Final Judgment Satisfies The Goals Of An Antitrust Remedy And Properly Addresses All Bases Of Liability Affirmed By The Court Of Appeals**

The Revised Proposed Final Judgment provides stringent, effective, enforceable, and immediate relief that fully comports with the purposes of relief in antitrust cases and with Microsoft's degree of liability as affirmed by the Court of Appeals.  Restoring competition is the "key to the whole question of an antitrust remedy," *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).  Competition was injured in this case principally because Microsoft's illegal conduct contributed to the applications barrier to entry into the personal computer operating system market by impeding the emergence of middleware products that had the potential to assist competing operating systems in gaining access to applications and other needed complements.  Thus, the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future, and restore competitive conditions like those that existed prior to the unlawful conduct.  Moreover, in fashioning relief, the United States, as the public enforcer of the federal antitrust laws, must take care that the remedy not burden the economy or distort market outcomes through unnecessarily regulatory or otherwise inappropriate restraints.  The RPFJ responds to these concerns; it imposes a series of requirements and carefully crafted prohibitions on Microsoft's conduct that are designed to accomplish the critical goals of an antitrust remedy without damaging the economy.  *See* Sibley Decl. ¶¶ 86-90.

As instructed by the Court of Appeals and this Court (*see* Tr. 9/28/01 at 8), the United States fashioned its relief by focusing on the specific practices for which Microsoft's liability was affirmed.  Significantly, and quite properly, the RPFJ does not seek to eliminate Microsoft's

operating system monopoly, *see* Sibley Decl. ¶ 8, though many commentors suggest it should. There was never any allegation — let alone any finding — in this case that Microsoft acquired its position in operating systems unlawfully. Further, the district court and the Court of Appeals both determined that they could not conclude that, absent Microsoft's illegal actions, any middleware product or products would have succeeded in toppling the monopoly.

In fashioning the decree, the United States began with the district court's interim conduct remedies of June 2000. *See* Initial Final Judgment, 97 F. Supp. 2d at 66-69. As this Court recognized (Tr. 9/28/01 at 8), however, those remedies were based on a much wider range of liability findings than were affirmed on appeal. *See Microsoft*, 253 F.3d at 105 ("[t]his court has drastically altered the District Court's conclusions on liability"). Accordingly, the conduct restrictions of the Initial Final Judgment had to be tailored to the findings the Court of Appeals upheld. At the same time, however, because the interim conduct restrictions were designed to apply only as a stop-gap until the district court's structural remedy was implemented (Initial Final Judgment, 97 F. Supp. 2d at 66), they had to be broadened to address more fully the remedial objectives of arresting the anticompetitive conduct, preventing its recurrence, and restoring competitive conditions in the marketplace. No longer merely a stop-gap, the conduct restrictions now must stand on their own as full relief.

In addition, the remedies needed to be updated to strengthen their long-term effectiveness in the face of the rapid technological innovation that continues to characterize the computer industry. The Court of Appeals noted that the six years that had elapsed between Microsoft's initial anticompetitive conduct and the appeal was an "eternity" in this market, *Microsoft*, 253 F.3d at 49 (quoted by Order at 2 (Sept. 28, 2001)), and the facts bear that out. When the

complaint was filed in May 1998, Microsoft's then-current operating system was Windows 95.

Shortly thereafter, Microsoft revised and updated the operating system with Windows 98, which

fully integrated Internet Explorer into Windows.  In October 2001, just after the case was

remanded to this Court, Microsoft introduced the latest generation of its operating system,

Windows XP.  The remedy crafted now must be relevant in the new world of Windows XP, and

beyond.  The RPFJ accomplishes these objectives by fundamentally changing — for the ultimate

benefit of consumers — the way Microsoft deals with OEMs, IAPs, ISVs, and others in the

computer industry.

1.      **The RPFJ Stops The Unlawful Conduct, Prevents Its Recurrence And Restores Competitive Conditions To The Market**

The Court of Appeals affirmed the district court's ruling that Microsoft unlawfully

maintained its operating system monopoly through various actions designed to protect the

operating system from the potential threat posed by middleware.  However, the court reversed the

district court's finding that Microsoft was liable based upon its general "course of conduct," and

limited liability to twelve specific anticompetitive acts out of twenty found violative by the

district court.  The RPFJ provides consumers with prompt, certain, and effective relief by

stopping each of the specific acts found unlawful by the Court of Appeals, preventing their

recurrence, and restoring competitive conditions in the market.

a.      **Stops The Unlawful Conduct**

Each of the twelve acts found unlawful by the Court of Appeals is listed below with a

brief description of the specific provisions of the RPFJ that effectively address the conduct.[56]

_____

[56]For a fuller discussion of how the Court of Appeals addressed the twenty acts found by
the district court to violate Section 2, see Appendix A (attached hereto), and Sibley Decl. ¶ 16

<u>**Agreements with Computer Manufacturers (OEMs)**</u>

**1.** ***Prohibiting removal of desktop icons, folders or Start menu entries*** (*see* 253 F.3d at 61)

**Section III.H.1** of the RPFJ prevents Microsoft from engaging in this conduct by allowing end users or computer manufacturers to enable or remove access to each middleware product by displaying or removing icons, shortcuts, or menus in the Microsoft operating system in the same place they are normally displayed. *See* Sibley Decl. ¶ 24.

**2.** ***Prohibiting alteration of initial boot sequence*** (*see* 253 F.3d at 61)

**Section III.C.3** prohibits Microsoft from restricting OEMs from launching middleware automatically at the end of the initial boot sequence or subsequent boot sequences. **Section III.C.4** prohibits Microsoft from restricting OEMs from offering users the option of launching a non-Microsoft operating system before Windows starts up. **Section III.C.5** prohibits Microsoft from preventing OEMs from presenting their own Internet access offer in the initial boot sequence. *See* Sibley Decl. ¶ 25.

**3.** ***Prohibiting addition of icons or folders of different shape or size*** (*see* 253 F.3d at 62)

**Section III.C.1** prohibits Microsoft from preventing OEMs from installing and displaying middleware on the desktop. **Section III.C.2** prohibits Microsoft from preventing OEMs from distributing or promoting middleware by placing on the desktop shortcuts of any size or shape, as long as they do not impair the functionality of the user interface. **Section III.H.3** ensures that Microsoft's operating system does not automatically override the "default" settings to replace competing middleware products without first seeking confirmation from the user. *See* Sibley Decl. ¶¶ 26, 27.

**4.** ***Prohibiting use of "Active Desktop" to promote others' products*** (*see* 253 F.3d at 62)

This specific conduct is no longer at issue because Microsoft has discontinued the use of the Active Desktop. **Sections III.C.1** and **III.C.2** nevertheless broadly restrict Microsoft from preventing OEMs from promoting rival products. *See* Sibley Decl. ¶ 28.

---

(Table One).

### *Binding Internet Explorer To Windows*

5.      ***Excluding Internet Explorer from the "Add/Remove" utility*** (*see* 253 F.3d at 65)

   **Section III.H.1** requires Microsoft to allow end users and OEMs to enable or remove access to any Microsoft middleware product. *See* Sibley Decl. ¶ 29.

6.      ***Commingling code to prevent removal of Internet Explorer*** (*see* 253 F.3d at 64-66)

   **Section III.C.1** prohibits Microsoft from preventing computer manufacturers from installing and displaying rival middleware products on the desktop. **Section III.H.1** requires Microsoft to allow end users and computer manufacturers to remove access to any Microsoft middleware product. *See* Sibley Decl. ¶ 30.

### *Agreements with Internet Access Providers (IAPs)*

7.      ***Placement of IAP's product on desktop in return for its agreement to exclusively promote Internet Explorer (or to limit shipments of Navigator)*** (*see* 253 F.3d at 68)

   **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the condition that such entity distribute, promote, use, or support any Microsoft middleware or operating system exclusively or in a fixed percentage. **Section III.G.2** prohibits Microsoft from entering into any agreement with an IAP or ICP granting placement in Windows to the IAP or ICP on the condition that it refrain from distributing, promoting, or using any product competing with Microsoft middleware. *See* Sibley Decl. ¶ 31.

### *Agreements with Internet Content Providers, Independent Software Vendors, and Apple*

8.      ***Agreement with ISVs to make Internet Explorer their default hypertext-based user interface*** (*see* 253 F.3d at 71-72)

   **Section III.F.2** forbids Microsoft from conditioning the grant of consideration on an ISV's refraining from developing, using, distributing, or promoting software that competes with Microsoft's operating system or middleware. **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the

condition that such entity distributes, promotes, uses, or supports any Microsoft middleware or operating system exclusively or in a fixed percentage. *See* Sibley Decl. ¶ 32.

9. ***Threat to end support of Apple Computer's Office product unless Apple bundled Internet Explorer with the Macintosh operating system and made Internet Explorer the default browser*** (*see* 253 F.3d at 73)

Sections **III.F.1** and **III.F.2**, discussed above, prohibit Microsoft from retaliating against ISVs and IHVs, including Apple, for supporting competing products and from offering consideration to such entities for refraining from supporting competing products. In addition, **Section III.G.1** prohibits such exclusive arrangements. Sibley Decl. ¶ 33.

### *Efforts to Exclude Sun's Java*

10. ***Contracts requiring ISVs to exclusively promote Microsoft's Java product*** (*see* 253 F.3d at 75)

Section **III.F.2** forbids Microsoft from conditioning the grant of consideration on an ISV's refraining from developing, using, distributing, or promoting software that competes with Microsoft's operating system or middleware. **Section III.G.1** prohibits Microsoft from entering into any agreement with an IAP, ICP, ISV, or OEM that grants consideration on the condition that such entity distribute, promote, use, or support any Microsoft middleware or operating system exclusively or in a fixed percentage. *See* Sibley Decl. ¶ 34.

11. ***Deception of Java developers about Windows-specific nature of tools distributed to them*** (*see* 253 F.3d at 76)

Section **III.D** addresses this conduct by requiring Microsoft to disclose certain APIs required for competing middleware to interoperate with its operating system. This makes the means by which middleware producers interoperate with the operating system more transparent, and thus hinders Microsoft's ability to disadvantage these competitors. *See* Sibley Decl. ¶ 35.

12. ***Coercion of Intel to stop assisting Sun in improving its Java technology*** (*see* 253 F.3d at 77)

Sections **III.F.1** and **III.F.2**, discussed above, prohibit Microsoft from retaliating against ISVs and IHVs, including Intel, for supporting

competing products and from offering consideration to such entities for refraining from supporting competing products. *See* Sibley Decl., ¶ 36.

Thus, the RPFJ effectively stops each of the specific acts found unlawful by the Court of Appeals. *See* Sibley Decl. ¶ 40.

### b. Prevents Recurrence Of Unlawful Conduct

In addition to stopping and preventing the recurrence of the specific acts found unlawful by the Court of Appeals, the RPFJ guards against the broad range of potential strategies Microsoft might develop to impede the emergence of competing middleware products. *See* Sibley Decl. ¶¶ 41-51.

*Middleware Definition.* The various definitions of middleware within the RPFJ (*see* **"Microsoft Middleware"** (Section VI.J), **"Microsoft Middleware Product"** (Section VI.K) **"Non-Microsoft Middleware"** (Section VI.M), and **"Non-Microsoft Middleware Product"** (Section IV.N)) are broad. They cover not only the middleware products addressed by the Court of Appeals — Internet browsers and Java — but also additional current middleware products, such as email client software, networked audio/video client software, and instant messaging software, as well as future middleware products not yet in existence. *See* Sibley Decl. ¶¶ 41-42. To ensure inclusion of future products, the definitions set forth an objective test for products not yet existing; the definitions are qualified, however, in recognition that not all software that exposes APIs qualifies as competitively significant "middleware." Consequently, third-party software that, like Web browsers or Java, has the potential to create a competitive threat to Microsoft's operating system monopoly, will be covered in the future.

*Non-Discrimination and Non-Retaliation.* **Sections III.A, III.B,** and **III.F** impose broad prohibitions and obligations on Microsoft to ensure that it cannot implement new forms of

exclusionary behavior against middleware. *See* Sibley Decl. ¶¶ 41-42, 51. **Section III.A** of the RPFJ ensures that OEMs have contractual and economic freedom to make decisions about distributing and supporting non-Microsoft middleware products without fear of coercion or retaliation by Microsoft, by broadly prohibiting retaliation against a computer manufacturer that supports or distributes alternative middleware or operating systems. Because the Court of Appeals agreed with the district court's conclusion that OEMs are a crucial channel of distribution for competing products (*see* 253 F.3d at 60-61), it is critical that OEMs are free to choose to distribute and promote competing middleware products without interference from Microsoft. **Section III.B** strengthens Section III.A further by requiring Microsoft to provide uniform licensing terms to the twenty largest and most competitively significant OEMs. Windows license royalties and terms are inherently complex, making it easy for Microsoft to use them to coerce OEM conduct. By eliminating the opportunity for Microsoft to use license terms as a club, the provision ensures that OEMs can make their own choices. **Section III.F** prohibits Microsoft from retaliating against ISVs and IHVs or conditioning consideration on a developer's refraining from developing, distributing, or writing to software that competes with Microsoft platform software. At the same time, it allows Microsoft to enter into lawful agreements with software developers that include provisions relating to Microsoft software, as long as the provisions are limited and reasonably necessary to effectuate the bona fide contractual relationship.

c.        **Restores Competitive Conditions To The Market**

The RPFJ restores competitive conditions to the market by requiring Microsoft to, among other things: (1) disclose APIs and license communications protocols that will give ISVs the

opportunity to match Microsoft's middleware and server software functionality; and (2) allow

OEMs and end users to replace Microsoft middleware and preserve "default" settings that will

ensure that Microsoft's middleware does not override the selection of competing middleware

products.  *See* Sibley Decl. ¶ 52 & Table Two.

*APIs and Communications Protocols.*  **Section III.D** of the RPFJ requires Microsoft to

disclose all of the interfaces and related technical information, including APIs, that Microsoft's

middleware uses to interoperate with the Windows operating system.  This includes APIs and

other information that Microsoft has not previously disclosed.  This Section creates the

opportunity for ISVs, IAPs, ICPs, and OEMs to develop new middleware products that compete

directly with Microsoft on a function-by-function basis, assured that their products will

interoperate with the Windows operating system.

**Section III.E** requires Microsoft to license the communications protocols that are

necessary for software located on a computer server to interoperate with the Windows operating

system.  This means that ISVs will have full access to, and be able to use, the protocols that are

necessary for software located on a server computer to interoperate with, and fully take

advantage of, the functionality provided by the Windows operating system.  The competitive

significance of most non-Microsoft middleware, including the browser and Java technologies —

against which much of Microsoft's illegal conduct was directed — was and will continue to be

highly dependant on content, data, and applications residing on servers and passing over

networks (such as the Internet or corporate networks) to that middleware running on personal

computers.  Section III.E prevents Microsoft from incorporating into Windows features or

functionality with which only its own servers can interoperate, and then refusing to make

available information about those features that non-Microsoft servers need in order to have the same opportunities to interoperate with the Windows operating system. Although plaintiffs presented limited evidence about servers at trial, and no server-related violations were alleged or found, the United States believed that the RPFJ's effectiveness would be undercut unless it addressed the rapidly growing server segment of the market.

**Section III.I** requires Microsoft to offer the necessary related licenses of the intellectual property that are required to disclose and license under the RPFJ. Section III.I ensures that Microsoft's obligations to disclose the technical information in Sections III.D and III.E are meaningful. This Section ensures that Microsoft cannot use its intellectual property rights in such a way that undermines the competitive value of its disclosure obligations, while at the same time permitting Microsoft to take legitimate steps to prevent unauthorized use of its intellectual property.

**Section III.J** permits Microsoft to take certain limited acts to address security-related issues that may arise from the broad disclosures required in Sections III.D and III.E. Section III.J provides a narrow exception for disclosure of APIs and other information for disclosures that would compromise system security. *See* Sibley Decl. ¶ 65.

***Power to Replace Microsoft Middleware and Preserve Defaults.*** **Section III.H** further ensures that OEMs will be able to offer and promote, and consumers will be able to use, competing middleware products. Section **III.H.1** requires Microsoft to allow end users and OEMs to enable or remove access to each Microsoft middleware product. Thus, all middleware products will have equal opportunity for desktop placement. **Section III.H.2** requires Microsoft to allow end users, OEMs, and Non-Microsoft Middleware Products to designate non-Microsoft

middleware to be invoked in place of the Microsoft middleware. This will allow competing programs to be launched automatically, as defaults, in numerous competitively significant instances.

### 2. The RPFJ Contains Stringent Enforcement Mechanisms

**Sections IV, V, and VII** of the RPFJ contain some of the most stringent enforcement provisions ever contained in any modern consent decree. **Sections IV and VII** provide that the United States' full enforcement powers are available to enforce the judgment. As with any other decree, the United States will have prosecutorial access powers to monitor compliance, and authority to bring: (1) both civil and criminal contempt petitions; (2) petitions for injunctive relief to halt or prevent violations; (3) motions for declaratory judgment to clarify or interpret particular provisions; and (4) motions to modify the Final Judgment, as appropriate.[57] Though not required by the RPFJ, the United States has charged a core team of lawyers and economists experienced in the software industry with enforcing the RPFJ. Section IV also provides, as the United States typically requires, that Microsoft maintain an antitrust compliance program to help ensure compliance with the RPFJ. Microsoft is required to appoint an internal compliance officer responsible for supervising the review of Microsoft's activities to determine whether they comply with the RPFJ and for ensuring that Microsoft undertakes internal notification and education responsibilities as required.

But the enforcement provisions do not stop there; rather, they contain two other, aggressive features. First, the RPFJ establishes the Technical Committee, a full-time, on-site compliance team of software design and programming experts, with the means to hire its own

[57]Of course, each Settling State also has authority to enforce the RPFJ.

staff and consultants, as needed. The Technical Committee will facilitate enforcement by monitoring compliance with the RPFJ and reporting violations to the United States. Additionally, the Technical Committee is available to mediate compliance issues in a manner that will not supplant legal enforcement by the United States. This dispute resolution function reflects the recognition that the market will benefit from rapid, consensual resolution of issues, whenever possible, more so than litigation under the United States' contempt powers. Dispute resolution complements, but does not supplant, the other methods of enforcement. Furthermore, should the United States bring an enforcement action against Microsoft, it will not have to start from scratch. Rather, it will have the Technical Committee's work product, findings, and recommendations to help start any investigation.

In order to fulfill these important responsibilities, the Technical Committee will have complete access to Microsoft's records, facilities, systems, equipment, and personnel. Significantly, this includes access to Microsoft's source code and related materials, which will assist in resolving or identifying any disputes relating to Microsoft's disclosure obligations. The Technical Committee will also have the benefit of written reports and data, which Microsoft must prepare.

Second, under **Section V**, the RPFJ is scheduled to terminate in five years, but may be extended by two years if the Court finds that Microsoft has engaged in a pattern of wilful and systemic violations. The five-year duration provides sufficient time for the remedies to take effect in this evolving market and to restore competitive conditions to the greatest extent possible. And, because Microsoft will have an incentive to get out from under the RPFJ's

restrictions and affirmative obligations as soon as possible, the prospect that it might face a two-year extension will provide an extra incentive to comply.

### 3. The RPFJ Fully Addresses The Unlawful Conduct While Avoiding An Unnecessarily Regulatory Decree That Would Distort Market Outcomes

As discussed above, the United States carefully crafted the RPFJ to fully address the conduct found unlawful by the Court of Appeals. In doing so, the United States was mindful not to implement an overly broad, unnecessarily regulatory decree that would interfere with competitive conditions in the market. As discussed more fully in the Response to Comments, many commentors seek remedies that preordain market outcomes, require extensive on-going regulation, are vulnerable to manipulation by Microsoft's rivals, or are simply crafted to weaken Microsoft as a competitor.[58] Such remedies would create inefficiencies in the market and likely result in harm to consumer welfare. *See* Sibley Decl. ¶¶ 19-21, 86-88.

-----

[58]For example, several commentors have urged that the RPFJ require Microsoft to distribute Sun-compatible Java products with each copy of the Windows operating system shipped by Microsoft. *E.g.*, SIIA Comments, at 49-51;Comments of SBC Communications, Inc. on the Proposed Final Judgment, at 145 (MTC # 00029411) ("SBC Comment"); ProComp Comment, Att. A, at A18-19 (Declaration of Kenneth J. Arrow) ("Arrow Decl."). This remedy would go beyond restoring the competitive conditions existing prior to Microsoft's unlawful conduct — where Sun's Java product *competed* for space on Windows — and instead preordain the market outcome by ensuring Java placement on the operating system. *See* Sibley Decl. ¶ 80. As another example, a commentor proposes that Microsoft be required to offer, at a lower price, a separate, "stripped down" version of Windows that does not include Microsoft middleware products. SBC Comment, at 48-49. However, determining the appropriate discount for each of the middleware products stripped out of Windows, including an accounting for the shared costs between multiple projects, would result in a highly regulatory pricing apparatus susceptible to further litigation. *See* Sibley Decl. ¶¶ 71-74.

## B. The Revised Proposed Final Judgment Compares Favorably To The Initial Final Judgment

In the Joint Status Report filed September 20, 2001, plaintiffs informed the Court that their proposal for relief would be modeled on the conduct restrictions in the Initial Final Judgment. Joint Status Report at 2 (Sept. 20, 2001). A week later, the Court admonished plaintiffs to determine which relief was no longer appropriate given the Court of Appeals' narrowing of the underlying liability. *See* Tr. 9/28/01 at 8. Although some commentors have argued that any relief short of the Initial Final Judgment is inadequate, that is contrary to the Court's statements, as well as the Court of Appeals' ruling.

The RPFJ parallels the Initial Final Judgment in many ways, provides for greater relief in some respects, and, in light of the Court of Appeals' decision, omits some provisions. A comparison of the two decrees highlights why the RPFJ is in the public interest.

### 1. The Revised Proposed Final Judgment Relies On Conduct Restrictions, Rather Than Structural Relief

The most significant difference between the Initial and Revised Proposed Final Judgment is that the former required a break-up of Microsoft while the latter does not. *See* IFJ §§ 1-2. Shortly after remand, plaintiffs informed Microsoft and this Court that, in light of the Court of Appeals' decision, we would no longer seek to break up the company. Joint Status Report 2 (Sept. 20, 2001). Thus, even if the United States had not entered into a negotiated settlement and instead litigated a remedy, we would not have sought structural relief. Plaintiffs abandoned the effort to break up Microsoft for both legal and practical reasons.

First, although the Court of Appeals merely vacated — but did not reverse — the Initial Final Judgment, it also made clear that it viewed structural relief in this case skeptically, at best.

The court questioned whether plaintiffs had "established a sufficient causal connection between

Microsoft's anticompetitive conduct and its dominant position in the [operating system] market"

to justify divestiture.  *Microsoft*, 253 F.3d at 106.  The court continued that "[a]bsent such

causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction

against continuation of that conduct.'"  *Id.* (quoting 3 *Antitrust Law* ¶ 650a, at 67).  The court

also suggested that the necessary causation might be lacking, noting that even the district court

"expressly did *not* adopt the position that Microsoft would have lost its position in the [operating

system] market but for its anticompetitive behavior."  *Id.* at 107 (quoting *Findings of Fact*,

¶ 411) (emphasis added).  Moreover, the Court of Appeals accepted Microsoft's argument that

divestiture is usually reserved for "dissolution of entities formed by mergers and acquisitions,"

and directed this Court to "reconsider" whether "divestiture is appropriate with respect to

Microsoft, which argues that it is a unitary company."  *Id.* at 105.  And the court emphasized

that, when fashioning a new remedy, the district court should bear in mind that the Court of

Appeals had "drastically" altered the basis of liability (*id.* at 105, 107) and that the new remedy

should reflect the "limited ground of liability" upheld on appeal.  *Id.* at 107.

Second, if plaintiffs had pursued structural relief on remand, Microsoft would have been

entitled to present evidence challenging a "wide range of plaintiffs' factual representations,

including the feasibility of dividing Microsoft, the likely impact on consumers, and the effect of

divestiture on shareholders."  *Id.* at 101.  This not only would have been time consuming — both

in the district court and then, assuming this Court actually ordered structural relief anew, again in

the Court of Appeals — but also would have permitted Microsoft to introduce a plethora of new

evidence.  Foregoing a structural remedy permitted plaintiffs to speed along the remand

proceedings and obtain quicker relief and relief that was more likely to be affirmed on appeal.

## 2.    Remedying Tying Is No Longer An Objective

The Revised Proposed Final Judgment also departs significantly from the Initial Final

Judgment by omitting a prohibition on tying.  *See* IFJ § 3.f ("Ban on Contractual Tying").  The

Court of Appeals vacated Microsoft's liability on the tying claim (*Microsoft*, 253 F.3d at 84-97),

and soon thereafter plaintiffs informed Microsoft and this Court that, in light of the appellate

court's decision, we would no longer pursue allegations of tying.  Joint Status Report 2 (Sept. 20,

2001).  Thus, even if the United States had not entered into a negotiated settlement and instead

continued its litigation, we would not have pursued the tying claim.  As with structural relief,

plaintiffs abandoned the tying claim for both legal and practical reasons.

The Court of Appeals vacated and remanded, rather than reversed, the tying claim, but

left clear instructions on what it expected on remand.  See *Microsoft*, 253 F.3d at 95-97.  First,

plaintiffs would have to pursue the claim under the rule of reason — with its rigorous proof

requirements — rather than the per se rule, which obviates many difficult problems of proof.  *Id.*

at 89-95.  Second, plaintiffs would be required to show that Microsoft's conduct "unreasonably

restrained competition . . . in the tied good market," but would be "precluded from arguing any

theory of harm that depends on a precise definition of browsers or barriers to entry . . . other than

what may be implicit in Microsoft's tying arrangement."  *Id.* at 95.  Plaintiffs considered these to

be significant legal hurdles.

Of course, pursuing the tying claim on remand also would have raised many of the same

practical difficulties as discussed with respect to pursuing structural relief on remand.  For

example, continued pursuit of tying would have delayed the remand proceedings significantly, thereby further delaying any relief for consumers.  Also, Microsoft would have been entitled to introduce a whole host of new evidence relating to its claimed procompetitive justifications for its actions.  Thus, the decision to abandon the tying claim was a sound exercise of prosecutorial discretion.

The United States' decision to abandon the tying claim, coupled with the Court of Appeals' decision to reject the attempted monopolization count, had a significant impact on the scope of relief the United States could obtain.  The tying and attempted monopolization claims were the only two considered by the Court of Appeals that asserted a direct anticompetitive impact in the market for Web browsers.  The remaining count, monopoly maintenance, asserted an anticompetitive impact in the operating system market.  The only connection that Web browsers had to this claim was that they were one of the nascent middleware threats that Microsoft had impeded.  Therefore, without a claim asserting a direct impact in the Web browser market, the United States' was entitled to relief that restored nascent threats like those that Web browsers had presented, not relief that addressed some broader injury in the browser market.

> **3.      The New Conduct Restrictions Compare Favorably To Those In The Initial Final Judgment**

The Revised Proposed Final Judgment is based on the interim conduct restrictions of the Initial Final Judgment of June 7, 2000.

> **a.      Substantive Provisions Included In Both The Initial Final Judgment And The Revised Proposed Final Judgment**

Both decrees prohibit Microsoft from retaliating against OEMs that support non-Microsoft products.  *Compare* IFJ § 3.a.i *with* RPFJ § III.A.  Both decrees also require Microsoft

to license its Windows operating system products to the 20 largest OEMs on uniform terms.

*Compare* IFJ § 3.a.ii, *with* RPFJ § III.B. The Initial Final Judgment also afforded OEMs flexibility in product configuration, as does the Revised Proposed Final Judgment. *Compare* IFJ § 3.a.iii, *with* RPFJ § III.C. The Initial Final Judgment also barred Microsoft from prohibiting OEMs from automatically launching a substitute user interface upon completion of the boot process (IFJ § 3.a.iii(3)), but the Court of Appeals expressly rejected this basis for liability (*Microsoft*, 253 F.3d at 63), so the Revised Proposed Final Judgment has no equivalent provision. And both decrees require Microsoft to provide OEMs and consumers the means to remove access to any Microsoft middleware that comes with Windows so that rival middleware may be substituted. *Compare* IFJ§ 3.g.i, *with* RPFJ § III.H.

Section 3.b of the Initial Final Judgment required Microsoft to disclose to ISVs and OEMs all Windows APIs necessary for interoperation, including interoperation with servers; Sections III.D and III.E of the RPFJ accomplish the same result. The Initial Final Judgment also required Microsoft to establish a "secure facility" where ISVs, OEMs, and others could "study, interrogate and interact" with the Windows source code to help ensure interoperability. *See* IFJ § 3.b. The RPFJ omits this provision, but provides for affirmative disclosure of interfaces and protocols, and empowers the Technical Committee to ensure that those disclosures are being made. *See* RPFJ § IV.B. This approach strikes the appropriate balance by ensuring that developers will have the access they need, while protecting Microsoft's intellectual property from misappropriation.

Both decrees also comprehensively address Microsoft's relations with ISVs and IHVs to ensure that developers can create or use rival software. Both decrees accomplish this objective

by broadly prohibiting Microsoft from threatening or retaliating against ISVs or IHVs' actual or contemplated action to develop, use, distribute, promote, or support software that competes with Microsoft middleware or operating system software. *Compare* IFJ §§ 3.d, 3.h, *with* RPFJ § III.F. Similarly, both decrees prohibit Microsoft from entering into exclusive agreements with third parties that would require them to refrain from distributing, promoting, using, or supporting rival software. *Compare* IFJ § 3.e, *with* RPFJ § III.G.

There are also similarities with respect to enforcement of the two decrees. For example, both decrees require Microsoft to maintain an internal antitrust compliance program (*compare* IFJ § 4, *with* RPFJ § IV.C), and both give plaintiffs access to Microsoft's source code, books, correspondence, personnel, etc. and the right to require Microsoft to submit written reports under oath. *Compare* IFJ § 5, *with* RPFJ § IV.A.2.

### b. The RPFJ Contains Provisions Not Included In The Initial Final Judgment

Although the Initial Final Judgment required Microsoft to disclose its APIs to facilitate interoperation (IFJ § 3.b), the RPFJ goes further by requiring Microsoft to offer the necessary related licenses for the intellectual property that Microsoft must disclose. *See* RPFJ §§ III.I.1, III.I.4. This ensures that Microsoft cannot use its intellectual property rights to undermine the competitive value of its disclosure obligations.

The RPFJ also significantly enhances enforcement of the decree as compared to the Initial Final Judgment. As previously discussed (*see* page 60 above), the RPFJ establishes a Technical Committee — a full-time, on-site compliance team of computer experts, complete with its own staff and the power to hire consultants — to monitor compliance with the decree, report violations to the Department, and attempt to resolve technical disputes under the disclosure

provisions.  RPFJ §§ IV.B.8, IV.D.4.  The Technical Committee will have complete access to Microsoft's source code (RPFJ § IV.B.8.c), records, facilities, and personnel.  Its dispute resolution responsibilities (RPFJ § IV.D) reflect the recognition that the market will benefit from rapid, consensual resolution of issues whenever possible, more so than litigation under the Department's contempt powers.  The dispute resolution process complements, but does not supplant, ordinary methods of enforcement.  Complainants may still bring their inquiries directly to the Department, and need not go first to the Technical Committee (RPFJ § IV.D.1).  The Technical Committee represents an innovation in consent decrees that the United States believes will improve the speed and quality of enforcing a decree in a field as technical and fast-paced as the computer industry.

The Revised Proposed Final Judgment provides for extending the decree's duration in the event Microsoft is found to have engaged in a "pattern of willful and systematic violations" of its terms.  RPFJ § V.B.  This potential threat is yet another means to ensure that Microsoft will comply with all of the decree's provisions, to the ultimate benefit of consumers.

Finally, the United States updated the RPFJ in several key ways to improve the clarity of the decree and account for changes in the industry since the IFJ was proposed.  First, the RPFJ contains a new provision in Section III.H.3 that prohibits Microsoft from designing Windows to automatically alter an OEMs middleware configurations on the desktop without first seeking confirmation from the user no sooner than 14 days after the consumer has first booted the computer.  This provision was included in response to Microsoft's inclusion of the Clean Desktop Wizard product in Windows XP that "sweeps" the unused icons that the OEM has chosen to place on the desktop.  Second, the definition of middleware products in the RPFJ was

updated by including the actual names of the current Microsoft middleware products — Internet

Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger and

Outlook Express.  (RPFJ § VI.K).  This significantly improves the clarity of the decree because

the IFJ had not explicitly indicated which current Microsoft products constituted middleware.

The RPFJ's middleware definitions were also updated to account for the increased emphasis on

downloading as a distribution mechanism in the market.

###### C.    The Revised Proposed Final Judgment Creates Competitive Conditions

There can be no guarantee that consumers and industry participants will prefer rival

middleware over Microsoft's software, or that rival middleware will ever displace — or facilitate

the displacement of — Microsoft's monopoly position, but the RPFJ restores competitive

conditions that foster such threats.  Indeed, even the district court, in its extensive findings of fact

and conclusions of law, expressly disclaimed the conclusion that but for Microsoft's

anticompetitive acts, Netscape's browser and/or Sun's Java technologies *necessarily* would have

eroded Microsoft's monopoly position.  *See Findings of Fact*, ¶ 411; *Microsoft*, 253 F.3d at 107.

Thus, consistent with the antitrust laws, the RPFJ refrains from picking winners and losers, and

sticks to restoring the competitive conditions.  Consumers benefit from competition, and the goal

of the antitrust laws is to protect it, not weight it to a particular result.

###### V.    THE COURT SHOULD MAKE ITS PUBLIC INTEREST DETERMINATION AND ENTER THE DECREE AS EXPEDITIOUSLY AS POSSIBLE

Time is of the essence.  When the Court five months ago ordered the parties to "expend

and concentrate all of their resources upon resolving these cases through a fair settlement for all

parties," Order at 2 (Sept. 28, 2001), the Court recognized:

> The claims by Plaintiffs of anticompetitive conduct by Microsoft
> arose over six years ago, and these cases have been litigated in the
> trial and appellate court for over four years. As the Court of
> Appeals has noted, the relevant time frame for this dispute spans
> "an eternity in the computer industry."

Order at 2 (Sept. 28, 2001). The public has waited long enough. The Court should make a

determination that entry of the proposed final judgment is in the public interest, and then enter it

as expeditiously as possible.

### A.    The Court Should Not Hold An Evidentiary Hearing

As the Court has recognized, the Tunney Act does not require an evidentiary hearing as

part of this proceeding,[59] Tr. at 20 (Feb. 8, 2002), although the Court left open the possibility that

it will decide to hold one. *Id.* at 20-21. The question lies within the Court's sound discretion,

guided by the principle that "the trial judge will adduce the necessary information through the

least complicated and least time-consuming means possible." Senate Report at 6; *accord* House

Report at 8.

In our view, at the conclusion of the one- or two-day hearing the Court has ordered, Order

(Feb. 15, 2002); *see* Tr. 2/15/02 at 5, at which the Court is considering allowing oral argument by

---

[59]The various materials the Tunney Act does require, *see* 15 U.S.C. § 16(b), together with
any record created prior to settlement, will usually suffice. *See United States v. Enova Corp.*,
107 F. Supp. 2d 10, 17 (D.D.C. 2000) ("Tunney Act expressly allows the court to make its public
interest determination on the basis of the competitive impact statement and response to
comments alone"); Senate Hearings at 152-53 (testimony of Hon. J. Skelly Wright) ("an
experienced judge, who does have the facility of getting to the point and getting others to get to
the point, can arrive at a public interest determination in most cases without using" additional
tools); Senate Report at 6 ("[w]here the public interest can be meaningfully evaluated simply on
the basis of briefs and oral arguments, that is the approach that should be utilized"). Even absent
a settlement, no evidentiary hearing on relief is required where there are "no disputed factual
issues regarding the matter of relief." *Microsoft*, 253 F.3d at 101.

UNITED STATES' MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED FINAL
JUDGMENT - PAGE 71

third parties, *id.* at 9, the Court will have more than ample information on which to base its public interest determination.  The Court should not hold an evidentiary hearing.

First, the very length and size of this case, to which some commentors point as justification for an evidentiary hearing, actually show that there is no need for one.  The Court already has available to it a massive trial record — including testimony and thousands of exhibits — plus tens of thousands of comments (some including affidavits, technical reports, and other evidentiary presentations) submitted as part of the Tunney Act process.  This record contains extensive information about the competitive structure of the industry and myriad other matters relevant to the public interest determination.  Little if anything more would be learned from live witnesses and cross-examination than is already known from the record, comments, and the United States' responses to the comments.[60]

Second, the most analogous precedent, *AT&T*, does not support an evidentiary hearing. In that case, considering the entry of a decree that would massively restructure the entire telecommunications industry, Judge Greene held two days of hearings, permitting some organizations to "present[] oral argument"  *AT&T*, 552 F. Supp. at 147 n.65.  But the court "concluded that none of the issues before it require[d] an evidentiary hearing.  That being so, there [was] obviously no need, nor indeed any occasion, for the presentation by a third party of

---

[60]For example, commentor ProComp submitted a lengthy declaration from Professor Arrow, Arrow Decl., in opposition to the RPFJ, but fails to identify, in either its comments, ProComp Comment, or its filed memorandum, ProComp's Memorandum in Support of Its Motion for Limited Intervention or Tunney Act Participation (Feb. 7, 2002), anything specific that Professor Arrow would say at an evidentiary hearing beyond what already appears in his declaration.  *Cf. American Can Co. v. Mansukhani*, 814 F.2d 421, 425 (7th Cir. 1987) (defendants not entitled to a hearing on remedies because they failed "to explain to the district court what new proof they would present to show" that the proposed remedy was unwarranted).

its own witnesses or for the cross-examination of adverse witnesses." *Id.* at 219. *See also id.* at 188 n.233 (rejecting contention that "the Court should not assess the propriety of the restrictions without holding evidentiary hearings with regard to the need therefor").[61]

Third, it is clear that much of the impetus behind the call for an evidentiary hearing comes from commentors who want that hearing to inquire into the Department of Justice's decision to enter into a settlement. The drive to challenge the propriety of prosecutorial decisions provides no warrant for an evidentiary hearing, because "the district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself." *Microsoft I*, 56 F.3d at 1459. *See also Maryland v. United States*, 460 U.S. 1001, 1005-06 (1983) (Rehnquist, J., dissenting) (considerations that led the Department of Justice to settle are not amenable to judicial review).

Fourth, an evidentiary hearing would further complicate the Tunney Act process and invite unwarranted delay in entering the RPFJ. Given the number of commentors and persons interested in participating in the Tunney Act process, it could prove difficult to manage an evidentiary hearing equitably without causing substantial delay. The public interest in achieving a prompt resolution of this case and rapid implementation of remedies[62] should not be frustrated absent a showing of very good cause.

---

[61]Judge Greene also denied all motions to intervene prior to the court's public interest determination. *AT&T*, 552 F. Supp. at 146 & n.61.

[62]Although Microsoft has agreed to be bound by much of the RPFJ pending its entry (Stipulation ¶ 2 (Nov. 6, 2001)), some important provisions become effective only after entry. *See, e.g.,* RPFJ § IV.B (Technical Committee must be created "[w]ithin 30 days of entry of this Final Judgment"); *id.* § IV.C (Microsoft's internal compliance program begins "within 30 days of entry").

### B.     The Court Should Not Delay Entry Of The Decree Pending The Remedies Hearing In *New York v. Microsoft*

The remedies hearing in *New York v. Microsoft Corp.*, No. 98-CV-1233, is currently scheduled to begin on March 11, 2002.  Some commentors have suggested that the Court delay its public interest determination in this case pending the results of that hearing, evidently so that the record, and perhaps the Court's adjudicated judgment, in *New York* can be imported into this Tunney Act proceeding.  The suggestion that the Court link the two proceedings in this manner is legally flawed and ill-advised.  Were the Court to follow the suggestion, it would undermine the foundations of the Tunney Act, bring into question the authority of the Department of Justice to settle lawsuits, threaten the viability of the consent decree as a tool of antitrust enforcement, and risk serious damage to federal/state cooperation in the prosecution of antitrust cases.  It would be an unfortunate precedent for this Court to set.

### 1.     Linking This Case To The Remedies Hearing In *New York* Would Be Bad Law And Bad Policy

Linking this case to the remedies hearing, and outcome, in *New York* would transform the nature of this proceeding in ways Congress did not intend and the law does not countenance.  The Tunney Act establishes a complete framework for review and entry of a consent decree in a civil antitrust suit brought by the United States, a framework that does not encompass separate litigation brought by other plaintiffs.  The Court's role in this case is to determine whether the judicial act of entering a proposed decree arrived at by agreement of the parties is "within the reaches of the public interest."  *Microsoft I*, 56 F.3d at 1458 (quotation marks and emphasis omitted).  In contrast, the role of the Court in *New York* is that of judicially resolving disputes between the parties — according to the applicable evidentiary standard — and ultimately

imposing an adjudicated judgment.  The Court's ability to play different roles in the two cases is not in doubt.  But the Tunney Act does not provide for mixing those roles.

To the extent the Court delays this proceeding so as to rely on the *New York* record or result, the Court brings adversary litigation, with all that entails, into the Tunney Act process, which is intended to be something quite different.  The Tunney Act, intended "to encourage[] settlement by consent decrees as part of the legal policies expressed in the antitrust laws," *United States v. Alex. Brown & Sons*, 963 F. Supp. 235, 238-39 (S.D.N.Y. 1997) (quoting House Report at 6, 1974 U.S.C.C.A.N. at 6537), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998), would become the continuation of litigation by other means.

Linking the two proceedings would also leave the United States with two equally improper alternatives.  Either the United States would have to participate, through intervention or other means, in litigation in *New York* (where it is too late to participate in remedy-phase discovery), or if not, it would have to let the outcome of its own case turn on a litigation record to which it is a stranger.  Each alternative effectively deprives the United States of its ability to resolve a case by consent decree.  Each deprives the Department of Justice of its authority to settle cases, Supreme Court precedent to the contrary notwithstanding, *see Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967) (Court does "not question the authority of the Attorney General to settle suits after, as well as before, they reach here"), because the case effectively continues in full litigation despite the settlement agreed to by the parties.  The only difference between the alternatives left to the government is that the first continues to draw upon the resources a settlement should have freed up for use in other antitrust enforcement as the

price of continued influence over the outcome of the government's own case, while the second provides a resource savings, but at the cost of that very influence.

Both the United States and antitrust defendants would have a substantially reduced incentive to settle cases at all if Tunney Act proceedings could be linked to other litigation. Why settle, if the entry of judgment in the "settled" case could be delayed pending the outcome of parallel litigation that remains unsettled, and if the result in the "settled" litigation could depend on what happens in the remaining litigation? That result may satisfy those who think government antitrust cases in general, or at least this government antitrust case in particular, should not be settled, but it is inconsistent with the Tunney Act policy favoring settlement as a viable tool in the antitrust enforcement arsenal.

The possibility of this linking comes about here only because the United States, 20 States, and the District of Columbia joined forces in a cooperative effort to challenge anticompetitive conduct by a monopolist. This case and *New York* were consolidated for all purposes, and the plaintiffs worked closely to bring the matter to a successful resolution.[63] Last November, the remaining plaintiffs reached a point where they could not all agree on the next step; the United States and nine States settled with Microsoft, while the other nine plaintiff States (including the District of Columbia) chose to continue litigating. If that fact means, as a result of linkage between the remedy phase of *New York* and this Tunney Act proceeding, that the United States effectively has been prevented from settling its own lawsuit, the United States surely will view

---

[63]Had the plaintiffs not embarked on this creative collaboration, it is highly unlikely that two cases against Microsoft would have gone forward, parallel but separate, with each reaching more or less the same result at more or less the same time.

the prospect of future such collaborative enforcement efforts in a less favorable light.  Such a result would be exceedingly unfortunate for the future of antitrust enforcement.

Finally, of course, linkage inevitably would delay entry of a final judgment, thereby further thwarting the public interest in prompt resolution of this case.  *Cf. AT&T*, 552 F. Supp. at 213 (deferring approval of the proposed decree "would be unfair to the parties and to the public"; delay "can only multiply the costs of uncertainty that have plagued the industry far too long").

### 2.     The Claimed Benefits Of Linkage Are Illusory

Perhaps these costs of linkage would be acceptable if the gains to be had were substantial.  They are not.

Some argue that delaying this proceeding until after the remedies phase of *New York* will avoid the risk that the Court will prejudge that remedies phase by its determination here.  But that risk is trivial.  What the two cases share is one defendant (Microsoft), and a common record as of November 6, 2001.  Two things principally set them apart.  One is their different records from November 6 forward.  The other, more important, distinction is that the Court faces two radically different tasks and addresses two radically different questions in the two proceedings.  *See* pages 42-46, above.  The Court's task here is to determine whether entry of a negotiated settlement is in the public interest according to a deferential standard of review; its task in *New York* is to enter an adjudicated judgment, perhaps devised by the Court itself, that the Court, in the exercise of its "broad discretion . . .[,] calculates will best remedy the conduct it has found to be unlawful," *Microsoft*, 253 F.3d at 105, in light of the facts proven before it.  The risk that its determination here would lead the Court to prejudge the result in *New York* is therefore minuscule.

Some also suggest that delay here until a remedy is determined by adjudication in *New York* will avoid the risk of inconsistent remedies in the two cases. This risk, too, is small. Although it is quite possible that the remedy in *New York* might impose on Microsoft requirements not imposed here, or not impose on Microsoft requirements that are imposed here, that possibility need not give rise to inconsistency. Only if the two remedies actually conflict — for example, one remedy requires Microsoft to do something the other prohibits, or one remedy requires Microsoft to provide access to a facility the other takes away from Microsoft — is there a troubling inconsistency. There is no reason to expect such an inconsistency to arise, especially given that the Court will be well aware of the specific terms of the RPFJ when it eventually enters judgment in *New York*. If an inconsistency does arise, however, there are ample means to deal with it. *See, e.g.,* RPFJ § VII (Court retains jurisdiction to modify decree).

Finally, some have suggested that delaying the proceedings here would conserve judicial resources. But apart from study of the existing record, which is necessary for both cases, judicial resources in the two proceedings will be devoted primarily to the remedies trial in *New York* and to the review of the public comments and the United States' response in this matter. The Court could not properly reduce the resources it devotes to these two tasks whatever the sequence of the two proceedings. Moreover, the Tunney Act provides the Court broad latitude to streamline its review process, 15 U.S.C. § 16(f). Linking that review to separate litigation makes the Tunney Act review dependent on trials or hearings that are far less flexible, which can only complicate and delay the Tunney Act review.

## CONCLUSION

The proposed final judgment satisfies all of the requirements of an antitrust remedy,

complies with the decision of the court of appeals, and, most importantly, is in the public interest.

Accordingly, the Court should enter the decree as soon as possible.

Respectfully submitted,

_____

CHARLES A. JAMES
  *Assistant Attorney General*
DEBORAH P. MAJORAS
  *Deputy Assistant Attorney General*
PHILLIP R. MALONE
RENATA B. HESSE
DAVID BLAKE-THOMAS
PAULA L. BLIZZARD
KENNETH W. GAUL
ADAM D. HIRSH
JACQUELINE S. KELLEY
STEVEN J. MINTZ
BARBARA NELSON
DAVID SEIDMAN
DAVID P. WALES
  *Attorneys*

U.S. Department of Justice
Antitrust Division
601 D Street N.W., Suite 1200
Washington, D.C. 20530
(202) 514-8276

PHILIP S. BECK
  *Special Trial Counsel*

February 27, 2002