IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline:
March 6, 2002 Tunney Act Hearing

**DEFENDANT MICROSOFT CORPORATION'S MEMORANDUM IN SUPPORT
OF THE SECOND REVISED PROPOSED FINAL JUDGMENT**

February 27, 2002

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 6

      A.    The Events Leading to the RPFJ................................................................. 6

      B.    Microsoft's Implementation of and Compliance with the RPFJ ........................... 9

III.  THE TUNNEY ACT PROCEEDINGS........................................................................ 11

      A.    The Court Should Rule that the SRPFJ is in the Public Interest.......................... 11

            1.    Tunney Act Standard of Review............................................................ 11

            2.    The Court Should Accord Deference to the Executive Branch's
                  Decision to Resolve the Case by Consent Decree .................................... 12

            3.    The Same Deferential Standard of Review Applies Throughout the
                  Litigation, Including on Remand Following Appeal ................................ 13

                  (a)    The Executive Branch Always Retains The Full Power and
                         Discretion to Control its Case, Including the Decision to
                         Settle ................................................................................... 13

                  (b)    If The Liability Finding Precludes Application of the
                         Tunney Act, This Court Should Accord Even Greater
                         Deference to the Parties' Decision to Settle ................................ 15

                  (c)    The Court Should Not Compel the Parties to Litigate a
                         Case They Have Elected to Resolve ........................................... 16

IV.   THE SRPFJ ADDRESSES THE ANTITRUST VIOLATION, AND MORE................. 17

      A.    The Outer Limits Of This Court's "Public Interest" Inquiry are Bounded
            by the Antitrust Violation Sustained on Appeal .................................................. 18

      B.    There Can Be No Dispute that The Scope of Microsoft's Antitrust
            Liability — and Accordingly the Scope Of Possible Remedial Relief
            Available to Plaintiffs — Was Sharply Limited by the Court Of Appeals........... 18

      C.    If The Case Had Been Litigated to Judgment Rather Than Amicably
            Resolved, the Limited Scope of Microsoft's Antitrust Liability Still Would
            Have Controlled the Remedies This Court Could Have Imposed ....................... 19

      D.    The SRPFJ Fully Addresses the Sole Antitrust Violation Remaining in the
            Case at the Time of Settlement ......................................................................... 22

            1.    OEM Licensing....................................................................................... 23

            2.    Designing Windows to Prevent Removal of End-User Access  to
                  IE............................................................................................................ 24

i

|   | 3. | Exclusive Agreements | 26 |
|   | 4. | Java | 27 |
| E. | | The SRPFJ Affords Relief Beyond the Violation Found by the Court of Appeals | 28 |
| F. | | The SRPFJ Directly and Forcefully Redresses the Antitrust Violation | 30 |
|   | 1. | The SRPFJ Terms and Provisions Unambiguously Articulate Microsoft's Obligations | 31 |
|   | 2. | The SRPFJ Imposes Upon Microsoft Enforcement Provisions that are Unprecedented For a Civil Antitrust Decree | 32 |
|   | 3. | No Third Parties Are Injured by the SRPFJ Provisions | 34 |

V. PROPOSED REFINEMENTS TO THE RPFJ ............... 35

A. The Definition of "API" in Sections III.D and VI.A ............... 36

B. Communications Protocols in Section III.E ............... 36

C. Unbiased Mechanisms in Sections III.H.2 and III.H.3 ............... 36

D. Deleting RPFJ Section III.I.5 ............... 37

E. Clarifying the Meaning of "Microsoft Middleware" and "Timely Manner" ............... 38

VI. MICROSOFT HAS MADE THE REQUISITE TUNNEY ACT DISCLOSURES ............... 38

A. Microsoft Has Made The Disclosures Required By Section 16(g) Of The Tunney Act ............... 38

    1. Section 16(g) Requirements And Microsoft's Disclosures ............... 39

    2. Complaints Regarding The Scope Of Microsoft's Disclosures Are Erroneous ............... 40

        (a) Microsoft's Counsel Of Record Are Exempt From Section 16(g) ............... 40

        (b) Legislative Contacts Are Not Within The Scope Of The Act ............... 42

        (c) The Substance Of The Disclosures Is Sufficient ............... 43

B. Any Alleged Non-Compliance With Section 16(g) Does Not Affect The Public's Ability To Comment On The RPFJ And Any Additional Disclosures Would Not Require A New 60-Day Period For Public Comment ............... 44

VII. CONCLUSION ............... 46

ii

# TABLE OF AUTHORITIES

(Authorities on which Microsoft chiefly relies are marked with asterisks.)

## CASES

*Berkey Photo v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ................................................................................. 18

*California v. American Stores Co.*,
    495 U.S. 271 (1990) ......................................................................................... 21

*Caminetti v. United States*,
    242 U.S. 470 (1917) ......................................................................................... 14

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
    386 U.S. 129 (1967) ......................................................................................... 14

*Center for Science in the Public Interest v. Regan*,
    802 F.2d 518 (D.C. Cir. 1986) ........................................................................... 14

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) ........................................................................... 43

*In re International Business Machines Corp.*,
    687 F.2d 591 (2d Cir. 1982) ............................................................................. 16

*In re Subpoena of Persico*,
    522 F.2d 41 (2d Cir. 1975) ............................................................................... 14

*In the Matter of American Online, Inc. and Time Warner, Inc.*,
    Docket No. C-3989 ........................................................................................... 34

*Interstate Commerce Comm'n v. Southern Ry. Co.*,
    543 F.2d 534 (5th Cir. 1976) ............................................................................. 14

*Lewis v. Casey*,
    518 U.S. 243 (1996) ......................................................................................... 19

*Maryland v. United States*,
    460 U.S. 1001 (1983) ....................................................................................... 15

* *Massachusetts Sch. of Law at Andover, Inc. v. Unites States*,
    118 F.3d 776 (D.C. Cir. 1997) ...................................................................... passim

*Microsoft Corp. v. United States*,
    Nos. 00-5212, 005212 (D.C. Cir. Jan. 29, 2001) .................................................. 38

*Mississippi Poultry Ass'n Inc. v. Madigan*,
    992 F.2d 1359 (5th Cir. 1993) ........................................................................... 43

*Morrison v. U.S. Dep't of Labor*,
    713 F. Supp. 664 (S.D.N.Y. 1989) ...................................................................... 14

*National Soc'y of Prof'l Eng'rs v. United States,*
435 U.S. 679 (1978) ............................................................................20

*Orrego v. 833 West Buena Joint Venture,*
943 F.2d 730 (7th Cir. 1991) ..............................................................42

*Pierce v. Underwood,*
487 U.S. 552 (1988) ............................................................................42

*Seven Gables Corp. v. Sterling Recreation Org. Co.,*
686 F. Supp. 1418 (W.D. Wash. 1988) ........................................18, 19

*United States v. Addyston Pipe & Steel Co.,*
85 F. 271 (6th Cir. 1898) ....................................................................27

*United States v. Apfelbaum,*
445 U.S. 115 (1980) ............................................................................14

*United States v. AT&T,*
552 F. Supp. 131 (D. D.C. 1982) ........................................11, 14, 34, 35

\*    *United States v. Automobile Mfrs. Ass'n Inc.,*
307 F. Supp. 617 (C.D.Cal. 1969) ................................................14, 16

\*    *United States v. Bechtel Corp.,*
648 F.2d 660 (9th Cir. 1981) ........................................................11, 12, 45

*United States v. Cannons Eng'g Corp.,*
899 F.2d 79 (1st Cir. 1990) ................................................................13

*United States v. Comunidades Unidas Contra La Contaminacion,*
204 F.3d 275 (1st Cir. 2000) ..........................................................13, 32

*United States v. E.I. du Pont de Nemours & Co.,*
366 U.S. 316 (1961) ............................................................................20

*United States v. G. Heileman Brewing Co., Inc.,*
563 F. Supp. 642 (D. Del. 1983) ........................................................12

*United States v. Gillette Co.,*
406 F. Supp. 713 (D. Mass. 1975) ................................................11, 12

*United States v. Glaxo Group Ltd.,*
410 U.S. 52 (1973) ..............................................................................20

*United States v. GTE Corp.,*
603 F. Supp. 730 (D. D.C. 1984) ........................................................11

*United States v. Gypsum Co.,*
340 U.S. 76 (1950) ..............................................................................20

\*    *United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) ........................................................passim

\*    *United States v. Microsoft Corp.,*
56 F.3d 1448 (D.C. Cir. 1995) ......................................................passim

iv

*United States v. Microsoft Corp.,*
   No. CIV.A.98-1232-TPJ & CIV.A.98-1233-TPJ
   1998 WL 614485 at*1 (D. D.C. Sept. 14, 1998)..........................................6

\* *United States v. National Ass'n of Broadcasters,*
   553 F. Supp. 621 (D. D.C. 1982).............................................................14, 16

*United States v. National Lead Co.,*
   332 U.S. 319 (1947)............................................................................................21

*United States v. Oregon State Medical Soc'y,*
   343 U.S. 326 (1952)............................................................................................20

*United States v. Pearson,*
   55 F. Supp. 2d 43 (D. D.C. 1999)..................................................................12

*United States v. Thomson Corp.,*
   949 F. Supp. 907 (D. D.C. 1996)..................................................................20

*United States v. W.T. Grant Co.,*
   345 U.S. 629 (1953)............................................................................................20

*United States v. Walcott,*
   972 F.2d 323 (11th Cir. 1992).........................................................................14

\* *United States v. Western Elec. Co.,*
   993 F.2d 1572 (D.C. Cir. 1993)......................................................................11

*United States v. Western Electric Co., Inc. and American Tel. & Tel. Co.,*
   Civil Action No. 82-0192................................................................................43

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   395 U.S. 100 (1969)............................................................................................21

## STATUTES

15 U.S.C. § 16(b) ...............................................................................................38, 43

15 U.S.C. §§ 16(b)-(c) ..............................................................................................44

15 U.S.C. §§ 16(b)-(h) .................................................................................................4

15 U.S.C. § 16(c) .................................................................................................43, 44

15 U.S.C. §§ 16(d)-(f), (h), (i) ................................................................................43

15 U.S.C. § 16(e) ........................................................................................................11

15 U.S.C. § 16(g) ............................................................................................. passim

28 U.S.C. § 516...........................................................................................................13

## LEGISLATION

S. Rep. No. 298, 93rd Cong., 1st Sess. 7 (1973)...............................................16

H.R. No. 93-1463 ..................................................................................................................41

**MISCELLANEOUS**

II Areeda & Hovenkamp, ANTITRUST LAW ¶ 345 (1995) ..........................................................20

III Areeda & Hovenkamp, ANTITRUST LAW ¶ 653(b) (1996) ....................................................21

Posner, Richard A., *Antitrust in the New Economy*,
    68 ANTITRUST L.J. 925 (2001)..........................................................................................7

## MEMORANDUM IN SUPPORT OF
## SECOND REVISED PROPOSED FINAL JUDGMENT

Pursuant to the Court's Order dated February 13, 2002, Defendant Microsoft Corporation ("Microsoft") respectfully submits this Memorandum in support of the Second Revised Proposed Final Judgment ("SRPFJ").  For the reasons set forth herein, Microsoft requests that the Court find that entry of the SRPFJ is in the "public interest" and thus enter the SRPFJ as a final judgment in this action.

## I.        INTRODUCTION

Following years of litigation, a lengthy trial, appellate proceedings and intense mediation efforts suggested and facilitated by this Court, Microsoft and the United States, along with half of the remaining State plaintiffs, entered into an agreement that fully and finally resolves this antitrust dispute.  The Stipulation and Revised Proposed Final Judgment ("RPFJ"), which Microsoft already has begun to implement, was a product of the intensive mediation efforts ordered by the Court on September 28, 2001 and completed on November 6, 2001.  *See* Sept. 28, 2001 Hrg. Tr. at 5 (Court:  "I think this case should be settled and I think this is the optimum time to do so.").

As the independent, Court-selected Mediator advised the Court, the RPFJ "is indeed the product and outcome of hard, good-faith negotiations between all the parties [during which] every paragraph, every sentence, every phrase, every comma, every parenthetical [was] debated, negotiated and scrutinized by all parties . . . ."  *See* Nov. 2, 2001 Hrg. Tr. at 5.  These thorough negotiations resulted in a consent decree that addresses not only the particular antitrust violation sustained by the Court of Appeals, but also imposes upon Microsoft numerous other affirmative conduct obligations (with enforcement mechanisms) that extend well beyond the remedies this Court properly could have ordered on its own, if this case had proceeded to a Court-imposed judgment.  As the Mediator, who was intimately involved in the negotiations, confirmed in his assessment to the Court:

1

>  [the RPFJ] addresses *all* of the issues addressed by the Court of
>  Appeals whose decision has been the critical organizing text and
>  starting point for the negotiations.  However, *the parties have not
>  stopped at the outer limits of the Court of Appeals decision.  [I]n
>  some important respects the proposed final judgment goes beyond
>  the issues affirmed by the Court of Appeals* to deal with issues
>  important to the parties in this rapidly-changing technology.

*Id.* (emphasis added).  The Mediator's objective assessment is entirely accurate.  The United

States and the settling State plaintiffs have achieved by settlement a broader set of remedies than

they could have anticipated achieving through continued litigation.

There should be nothing startling about this result.  Microsoft understood that, in

order to settle, it would have to agree to concrete remedies that redress most of the

anticompetitive acts affirmed by the Court of Appeals.[1]  At the same time, Microsoft was of the

view — supported by statements of this Court — that the United States was only entitled to relief

for conduct for which this Court could have imposed remedies on remand.  *See* Sept. 28, 2001

Hrg. Tr. at 8 ("The scope of any proposed remedy must be carefully crafted so as to ensure that

the enjoining conduct falls within the [penumbra] of behavior which was found to be

anticompetitive.").  The United States (as well as the State plaintiffs), however, was adamant not

only that any settlement prohibit continuation of the "monopoly maintenance" conduct found by

the Court of Appeals to be anticompetitive, but also that the settlement include provisions

designed to create wholly new opportunities for third party developers of middleware to develop

and market middleware software in competition with Microsoft.  The United States further

insisted on additional provisions addressing, *inter alia*, client-server interoperability with respect

to conduct that neither the trial court nor the Court of Appeals' decision ever mentioned.

---

[1] Of course, as a settlement of pending litigation, the SRPFJ need not address all antitrust
violations found by the Court of Appeals in order to be in the public interest.   All settlements involve
compromise.  In this case, Microsoft still retains the right to seek a writ of certiorari from the Supreme
Court on all liability issues after a final judgment is entered.  Therefore, it may well have been in the
public interest for the Department of Justice to have agreed to a settlement in which less than all antitrust
violations were addressed, especially when, as discussed below, many of the activities that led to those
violations were ended years ago.  Nevertheless, in the negotiations, the United States insisted on terms
addressing all areas of liability affirmed by the Court of Appeals, and Microsoft ultimately agreed.

To put this time-consuming, expensive, and distracting litigation to rest and to embark on a new less confrontational relationship with the antitrust enforcement agencies, Microsoft acceded to plaintiffs' demands and agreed to the imposition of remedies — unrelated to any proven antitrust violation — demanded by the United States and the States as the price of a settlement.  Indeed, as the Court is well aware, it was only *after* Microsoft capitulated to the States' demands that it learned that certain States (the non-settling States) — the interests of which had been represented in the mediation but which were less directly involved in the negotiations — opted out of the agreement and began pursuing an agenda largely dictated by Microsoft competitors resident in some of their jurisdictions.

There can be no question that all parties (and the public) benefit from a carefully negotiated, crafted, and documented decree that allows the parties to achieve a certainty and precision that can be elusive in a Court-drafted judgment in a complicated and technically complex case of this nature.  As the Mediator observed,

> the parties have recognized, as [the Court] advised them, that it is advantageous to all involved, the company and the public, to try to fashion a remedy themselves rather than receive one fashioned by the Court through a judicial decree.

*See* Nov. 2, 2001 Hrg. Tr. at 5-6.  The parties and the public also benefit from a decree negotiated with care to prevent anticompetitive conduct while carefully preserving the incentives for Microsoft to continue engaging in pro-competitive conduct, such as continuing to invest in research and development, adding innovative new features to Windows and other products, and engaging in pro-competitive and mutually beneficial agreements of many types with other participants in the PC industry.  The resolution of the case without further legal proceedings and risks, the swift imposition of judgment and avoidance of further appeals, the consensual decision to accept remedial measures extending beyond the purview of the proven antitrust violation, the precise definition of Microsoft's obligations going forward, and the preservation of pro-competitive incentives, all serve both the efficient administration of justice and the public interest.

3

Notwithstanding the many comments filed under the Tunney Act, [2] it remains clear that the settlement reached by the United States, the settling States and Microsoft is a fair and reasonable resolution of this case.  Microsoft also continues to believe that there is a complete meeting of the minds among all the settling parties and that the remediation process resulted in a decree that describes Microsoft's obligations in a manner understood by the parties. Nevertheless, after reviewing the public comments, the United States proposed several refinements in the language of the RPFJ to state more clearly the parties' agreement.  *See* Section V below.  Microsoft concurs with the desirability of those changes and agrees that the more refined SRPFJ should be entered, consistent with the public interest.

The public interest, of course, is the sole focus of this current proceeding. Pursuant to the Tunney Act, this Court must review the SRPFJ to determine whether the United States has adequately protected the "public interest" with respect to the one proven antitrust violation.

The Court's statutory role under the Tunney Act is important, but limited.  The Court of Appeals has made clear on numerous occasions that the district court's review is almost "ministerial" in nature and one that must afford substantial deference to the United States' determination that the consent decree is the most appropriate mechanism to resolve the competing interests at stake.  Indeed, to the extent that a court's Tunney Act review veers into the realm of substituting the court's own judgment of appropriate antitrust remedies for that of the United States, separation of powers concerns arise.

The fact that a consent judgment like the SRPFJ is negotiated and agreed to on remand, following a trial and appeal, in no way justifies an expansion of this Court's Tunney Act powers and responsibilities.  To the contrary, because the Court of Appeals *reduced* the scope of the antitrust violations for which any remedy could be applied, and did not mandate any

---

[2]     *See* Antitrust Procedures and Penalties Act ("Tunney Act" or "Act"), 15 U.S.C. §§ 16(b)-(h).

particular form of relief, the "public interest" determination to be made by this Court is bounded by those actual liability findings, rather than the broader allegations raised in the complaint.

The Tunney Act process predictably has fostered critiques from some quarters, including some meritless complaints that Microsoft has not fulfilled its disclosure obligations under Section 16(g) of the Act.  Pursuant to the Court's request, Microsoft addresses this issue in Section VI below.  As reflected therein, Microsoft has fully complied with the letter and spirit of the Act in this regard.

Perhaps most germane to the "public interest" analysis, however, is the fact — highlighted in Section IV below — that the United States has achieved through the SRPFJ *all* that it could have achieved in further litigation, *plus* several key remedies that it could not have obtained from this Court.  It is critical for purposes of any public interest evaluation that the remedies in the SRPFJ be measured against the antitrust violation that was actually sustained on appeal, and not against either the alleged antitrust violations that did not survive the litigation process or against speculation about possible market developments that have nothing to do with the case tried by the district court and reviewed by the Court of Appeals.  The United States has achieved, by any objective measure, significant remedial relief that protects the public interest on the one antitrust violation sustained by the Court of Appeals.  Section IV demonstrates that fact with a comparison of the acts found to be anticompetitive by the Court of Appeals with the provisions of the SRPFJ.  Since the SRPFJ addresses each and every act, and affords additional, concrete relief that would not have been attainable in remanded proceedings litigated to judgment, entry of the SRPFJ is in the public interest.

For all of these reasons, Microsoft urges the Court to determine that the SRPFJ is in the public interest, and to enter final judgment in this matter.

## II.       BACKGROUND

### A.       The Events Leading to the RPFJ

The litigation began in May 1998 with the simultaneous filing of separate antitrust complaints by the United States and the States.  By the time the cases came to trial, the alleged antitrust violations pursued by both the United States and the States were functionally equivalent, although the statutory basis for seeking relief has always been different.  The United States proceeded under Section 15 of the Clayton Act and the States proceeded as "persons" — in a *parens patriae* capacity — under Section 16 of the Clayton Act (in addition to their state law antitrust claims).

Even though the district court consolidated the two actions for all purposes at the outset, it is important to recall that the original States' complaint alleged two antitrust violations not pursued by the United States.  First, the States originally asserted a claim that Microsoft had unlawfully monopolized the market for "office productivity suite" software applications. *See* Complaint, ¶¶ 109-110.  They abandoned this claim in their First Amended Complaint.  Second, the States originally asserted that Microsoft had unlawfully "leveraged" a monopoly in PC operating systems in order to gain a competitive advantage in other markets.  *See* Complaint, ¶¶ 112-119.  The district court granted Microsoft summary judgment, dismissing that claim as a matter of law.  *See United States v. Microsoft Corp.,* No. CIV.A.98-1232-TPJ & CIV.A.98-1233-TPJ, 1998 WL 614485 at *1, 27 (D. D.C. Sept. 14, 1998).  The rejection of these alleged antitrust violations at an earlier stage of this litigation is important because some commentors have attempted to resurrect these accusations as a justification for rejecting the RPFJ.

During discovery, counsel for the United States and the States acted in concert in seeking to prove various alleged antitrust violations.  At trial, the United States and the States continued to act in concert, both in terms of a complete identity of the substantive violations alleged and the remedies to be imposed as a result.  Following trial, the district court sustained

certain of the alleged violations, dismissed others and imposed certain remedies.[3]  The district court did not award separate relief on any state law claim.  No plaintiff appealed the dismissal of any cause of action.

Thereafter, on appeal, the Court of Appeals sustained one antitrust violation and rejected the others.  *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).  The Court reversed the district court's holding that Microsoft attempted to monopolize the "browser market" (the only market alleged other than the market for operating systems for Intel x86 computers) and entered judgment for Microsoft.  *Id.* at 103.  The Court also vacated the district court's holding that Microsoft had engaged in tying in violation of Section 1 of the Sherman Act, leaving open the possibility that the plaintiffs could retry the claim on remand under a more challenging legal standard.  *Id.* at 103-4.  Although the Court of Appeals in part affirmed the district court's holding that Microsoft had illegally maintained a monopoly over Intel-compatible PC operating systems, it based that affirmance on a small subset of the findings of fact originally relied upon by the district court.  *Id.* at 104.  In sum, as the Court of Appeals noted, it "drastically altered the district court's conclusions on liability."  *Id.* at 105.

Given the reduced liability findings, the Court of Appeals then vacated the remedies imposed by the district court, and remanded the case to this Court for a new remedies proceeding tailored to the antitrust violation actually affirmed.  253 F.3d at 105-7.  The Court ruled that the remedies had to be vacated for other independent reasons as well.  On remand, plaintiffs — still acting in concert — voluntarily abandoned pursuit of their tying claim against Microsoft.  *See* Sept. 20, 2001 Joint Status Report at 2.  They also abandoned any claim for a

---

[3] After issuing its findings of fact but before reaching its conclusions of law, the parties attempted, at the Court's instruction, to seek a mediated settlement.  Chief Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit served as mediator.  After several months, Judge Posner terminated the mediation.  Judge Posner later published an article advocating the elimination of the States' authority to sue as *parens patriae* on behalf of their quasi-sovereign interests.  *See* Richard A. Posner, *Antitrust in the New Economy*, 68 ANTITRUST L.J. 925, 940-41 (2001).

"structural" remedy, further narrowing the scope of prospective relief they could obtain from this Court.  *Id.*

Shortly after remand and in light of the September 11th tragedy, the Court perceived an opportunity for the parties to resolve this dispute and, accordingly, directed the parties to engage in intense settlement negotiations over a five-week period.  With the involvement of the Court-appointed Mediator, all parties entered into intense negotiations, ultimately resulting in the proposed final judgment submitted to the Court on November 2, 2001.  As the Mediator told the Court, he "work[ed] with *all the parties* continuously day and night . . . to try to find a mutually agreeable resolution to this complex and important matter," and "all parties participat[ed] in the mediation process from start to finish, without exclusion of any party."  *See* Nov. 2 Hrg. Tr. at 3, 4.  In the Mediator's own words, the proposed judgment that emerged from those negotiations included remedial provisions that even "went beyond the issues affirmed by the Court of Appeals."  *Id.* at 5.

The rupture in plaintiffs' united front did not occur until the proposed final judgment was presented by the United States and Microsoft to the Court on November 2, 2001.  Notwithstanding that *all* the plaintiff States had indicated to Microsoft, the United States and the Mediator that they were represented by the state officials who participated in the negotiations, the States on November 2 asked the Court for four additional days to brief all the States on the settlement.  *Id.* at 12.  During that short period, the States were subjected to an intense lobbying campaign by Microsoft's competitors, who pressured the States not to settle.  Competitors benefit if Microsoft is tied up in distracting litigation and subjected to remedies that impede its ability to develop and market innovative products.

By November 5, 2001, some of the plaintiff States (plus the District of Columbia) began pursuing a separate agenda and attempted to convince the remaining States to seek draconian and punitive measures unrelated to the single antitrust violation that was affirmed in

part on appeal.  After consulting with the United States, Microsoft agreed to several clarifying changes in an effort to address all legitimate issues raised by the States.[4]  Despite intense lobbying from a few states in which Microsoft's most vocal (and well-funded) competitors have significant operations, nine States, including New York, Ohio and Wisconsin — the three States that were most active in the litigation and mediation — agreed to the RPFJ submitted to the Court on November 6, 2001.  The remaining holdouts, in concert with Microsoft's fiercest competitors, are pursuing relief along what this Court refers to as "Track II."

**B.**     **Microsoft's Implementation of and Compliance with the RPFJ**

In accordance with the provisions of the Stipulation, Microsoft already has begun to comply with the RPFJ, meaning that the public already is realizing some of the benefits of the consent decree.[5]  For instance, many of the provisions of the RPFJ required immediate compliance as of December 16, 2001, and Microsoft has already been abiding by those provisions.  With respect to certain other provisions — *i.e.*, Sections III.D, III.E, and III.H — which require Microsoft to undertake engineering and documentation work, Microsoft has embarked on a significant effort to implement those provisions as soon as possible.  Some RPFJ provisions, however, will not be implemented until a fixed period following entry of the judgment by this Court.  Any delay in the completion of the Tunney Act review will adversely affect the public by delaying these particular remedial measures.

---

[4] Even after November 6, the non-settling States apparently continued taking suggestions for draconian provisions from Microsoft's competitors.  A number of the provisions of the non-settling States' proposed relief were never raised by any of the States in the mediation.

[5] In addition, by late July 2001, Microsoft had voluntarily ended all the conduct that the Court of Appeals said violated the Sherman Act.  Many of the agreements the Court found to be illegal had been waived or had expired in 1998 – 2000.  Microsoft had modified its J++ development tool in December 1998 and January 1999.  In July 2001, promptly after the Court of Appeals ruled, Microsoft advised its OEMs and Apple that they were released from applicable provisions of their agreements and announced that it would provide OEMs with an "Add/Remove" function for IE in Windows.

To date, Microsoft has expended significant effort and resources in its efforts to comply with the RPFJ, including the following:

- Microsoft has established a uniform royalty rate schedule and standardized terms and conditions for licensing Windows to OEMs, as required by Section III.B.  Microsoft has voluntarily extended the new royalty rate schedule (designed to be revenue-neutral), along with the uniform licensing terms to all of the hundreds of OEMs who acquire licenses directly from Microsoft, rather than just the top 20 required by Section III.B;

- Microsoft has granted OEMs greater rights to modify the Windows desktop and initial boot sequence, as required by Section III.C;

- Engineering efforts are well underway to redesign Windows to enable OEMS and others to remove end-user access to certain of the key features in Windows and to change the default settings in Windows, as required by Section III.H;

- Substantial engineering efforts are being directed to identifying and documenting interfaces and communications protocols that Microsoft is obligated to disclose and license under Sections III.D and III.E; and

- A massive training effort has begun, with several hundred Microsoft lawyers and managers receiving intensive training on the obligations imposed on Microsoft by the SRPFJ and the actions required to comply, and nearly 3,000 employees worldwide having attended training sessions as well.

All of these efforts are ongoing, with additional requirements triggered with the passage of time.  As Microsoft's progressive implementation of the RPFJ makes clear, the affirmative conduct obligations imposed by the RPFJ require substantial effort and resources, including training of employees.  The substantial efforts by Microsoft belie the contention from some opponents that the RPFJ is superficial or permits Microsoft to continue its prior conduct unaltered.

### III.    THE TUNNEY ACT PROCEEDINGS

**A.    The Court Should Rule that the SRPFJ is in the Public Interest**

### 1.    Tunney Act Standard of Review

In its Tunney Act review, this Court "must determine whether the entry of [the SRPFJ] is 'in the public interest.'"  *United States v. Western Elec. Co.,* 993 F.2d 1572, 1576 (D.C. Cir. 1993) (*quoting* 15 U.S.C. § 16(e)).  The Court's public interest inquiry "begin[s] by defining the public interest in accordance with the antitrust laws."  *United States v. AT&T*, 552 F. Supp. 131, 149 (D. D.C. 1982).  The Tunney Act provides as follows with respect to the "public interest" determination:

> Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest.  For the purpose of such determination, the court may consider —
>
> (1)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
>
> (2)    the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e).

In discharging its Tunney Act obligations, "the Court's function is not to determine whether the resulting array of rights and liabilities 'is one that will best serve society,' but only to confirm that the resulting settlement is 'within the reaches of the public interest.'" *Western Elec. Co*., 993 F.2d at 1576 (*quoting United States v. Bechtel Corp*., 648 F.2d 660, 666 (9th Cir. 1981), *cert. denied* 454 U.S. 1093 (1981); *United States v. GTE Corp.,* 603 F. Supp. 730, 736 n.27 (D. D.C. 1984) ("the Court's role in a Tunney Act proceeding is not to require adoption of a remedy which it regards as perfect"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).  Courts must leave "[t]he balancing of competing social and political

interests affected by a proposed antitrust consent decree . . . to the discretion of the Attorney General." *Bechtel Corp.*, 648 F.2d at 666; *see also United States v. G. Heileman Brewing Co., Inc.*, 563 F. Supp. 642, 647 (D. Del. 1983) (quoting *Gillette Co.*, 406 F. Supp. at 715-16 ("In making that determination, it is not necessary for the Court to decide whether the proffered decree 'is the best possible settlement that could have been obtained if, say, the government had bargained harder,' for the 'court is not settling the case'; instead, it is called upon to determine only 'whether the settlement achieved is within the reaches of the public interest.'")).

Courts are to withhold approval only if "any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes 'a mockery of judicial power.'"[6]  *Massachusetts Sch. of Law at Andover, Inc. v. United States,* 118 F.3d 776, 783 (D.C. Cir. 1997) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995)).  As another court in this district recently noted, "Appellate decisions issued since 1974 . . . have made it clear that the public interest inquiry authorized by the Tunney Act is so limited in scope as to be *very nearly a ministerial task*."  *United States v. Pearson,* 55 F. Supp. 2d 43, 45 (D. D.C. 1999) (emphasis added).

Hence, both the Tunney Act and the case law interpreting it make clear that the "public interest" determination with respect to the SRPFJ is limited in scope, with judicial deference to the Attorney General's decision to resolve the litigation in this manner.

> **2.     The Court Should Accord Deference to the Executive Branch's Decision to Resolve the Case by Consent Decree**

The reason for affording deference derives not only from the Tunney Act itself, but also from the separation of powers doctrine.  The D.C. Circuit has made this point clear.  For example, in *Massachusetts Sch. of Law at Andover, Inc.,* the appellate court rejected an intervenor's attempt to challenge a proposed consent decree under the Tunney Act, noting:

---

[6]     As discussed below at Section V, none of these circumstances applies here.

> In part because of the constitutional questions that would be raised
> if [we] were to subject the government's exercise of its
> prosecutorial discretion to non-deferential review, we have
> construed the public interest inquiry narrowly.

118 F.3d at 783 (citing *Microsoft,* 56 F.3d at 1457-59).  In its 1995 decision concerning

Microsoft, the Court of Appeals reversed the district court's rejection of a consent decree in part

due to concerns "as to the constitutional difficulties that inhere in this statute."  *Microsoft,* 56

F.3d at 1459.  Plainly, separation of powers principles must be applied here, according deference

to the Attorney General's decision to settle this case.  *See also United States v. Cannons Eng'g*

*Corp.,* 899 F.2d 79, 84 (1st Cir. 1990) (holding that the court should accord deference to the

government "agency's expertise" and that "the policy of the law to encourage settlements . . . has

particular force where, as here, the government actor committed to the protection of the public

interest has pulled the laboring oar in constructing the proposed settlement"); *United States v.*

*Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000) (there is a

"strong public policy in favor of settlements, particularly in very complex, regulatory contexts

[and] such a policy has added bite where the settlement has been advanced for entry by a

government actor 'committed to the protection of the public interest' and specially trained and

oriented in the field").

### 3.     The Same Deferential Standard of Review Applies Throughout the Litigation, Including on Remand Following Appeal

#### (a)     The Executive Branch Always Retains The Full Power and Discretion to Control its Case, Including the Decision to Settle

The scope of this Court's public interest determination does not expand because

the Tunney Act proceedings are occurring on remand, following a full trial and appeal.  If

anything, the Court's role is diminished, since the public interest determination is bounded by the

actual antitrust violation that has survived the proceedings, as opposed to the far broader

allegations raised in the complaint.  Accordingly, contrary to what some commentators have

urged,[7] full deference to the Attorney General's decision to resolve the case still should be accorded.

The law is clear that "the conduct of litigation in which the United States, an agency, or officer thereof is a party . . . is reserved to officers of the Department of Justice."  28 U.S.C. § 516.  Moreover, it is well established that the Executive Branch, acting through the Attorney General, is vested by law with the exclusive authority to conduct or supervise litigation on behalf of the United States.  *See Morrison v. U.S. Dep't of Labor*, 713 F. Supp. 664, 669 (S.D.N.Y. 1989).  Similarly, "the Attorney General [as] the chief legal officer of the United States and absent express congressional directive to the contrary [ ] is vested with plenary power over all litigation to which the United States or one of its agencies is a party."  *United States v. Walcott,* 972 F.2d 323, 326 (11th Cir. 1992); *see also Interstate Commerce Comm'n v. Southern Ry. Co.*, 543 F.2d 534, 535-36 (5th Cir. 1976); *In re Subpoena of Persico*, 522 F.2d 41, 54 (2d Cir. 1975).

Nothing in the Tunney Act suggests an alternative standard in instances where settlement is reached after a liability finding is affirmed on appeal.[8]  Indeed, *United States v. National Ass'n of Broadcasters*, 553 F. Supp. 621 (D. D.C. 1982), is instructive on this point.  In

---

[7] Some proponents of a *less* deferential review by this Court erroneously rely on *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967).  The case is inapposite for several reasons.  First, *Cascade* was decided prior to the Tunney Act.  Second, the Court emphasized that it did *not* "question the authority of the Attorney General to settle suits after, as well as before, they reach [the appellate stages of litigation]."  386 U.S. at 136.  Third, *Cascade* involved a consent decree that disregarded a specific mandate from the Supreme Court requiring a highly specific one-time divestiture remedy.  None of those factors is present here.  Finally, as the proponents of less deferential review fail to mention, and as this Court pointed out in *AT&T*, "[t]he cases are virtually unanimous in limiting the *Cascade* decision to its peculiar facts."  *AT&T*, 552 F. Supp. at 218 n.362 (collecting cases); *see also United States v. Automobile Mfrs. Ass'n Inc.*, 307 F. Supp. 617, 619 n.3 (C.D. Cal. 1969) ("In any event, in light of subsequent cases it now appears that the ruling [in *Cascade*] is *sui generis* and must be limited to the facts of that case.").

[8] "It is a well-established principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language." *United States v. Apfelbaum*, 445 U.S. 115, 121 (1980); *Caminetti v. United States,* 242 U.S. 470, 490 (1917); *Center for Science in the Public Interest v. Regan*, 802 F.2d 518, 521 (D.C. Cir. 1986).

14

that case, the court granted partial summary judgment against a defendant who committed a *per se* violation of the antitrust laws.  Following the grant of summary judgment, but before commencement of trial on the remaining counts, the parties negotiated a consent decree and presented it to the district court for a public interest review under the Tunney Act.  The court approved the consent decree, applying a deferential public interest standard that was no different from the standard applied by the courts in other Tunney Act decisions.  *See id.*  at 622-25.  This approach, in keeping with the plain language of the Tunney Act, should be followed here.

Accordingly, there is no authority for the proposition that the Executive's constitutional authority to prosecute actions on behalf of the United States diminishes in the late stages of litigation.  The same separation of powers principles apply throughout, particularly with respect to a decision to terminate litigation via settlement.  Only the Department of Justice has full awareness of all the relevant factors that must be weighed in deciding to avoid further litigation through a consent judgment.  Numerous considerations — such as litigation risk, litigation costs, deployment of resources, and, particularly, evaluation of the merits of the settlement itself — all come into play.  The courts cannot and should not second-guess those decisions.  *See, e.g., Maryland v. United States*, 460 U.S. 1001, 1005 (1983) (Rehnquist, J., dissenting from summary affirmance) (noting that courts lack the information needed to assess how the Justice Department's resource allocation decisions may have affected its decision to settle a particular case).

> **(b)**    **If The Liability Finding Precludes Application of the Tunney Act, This Court Should Accord Even Greater Deference to the Parties' Decision to Settle**

Some third parties have suggested that the Tunney Act may not apply at all because a liability finding already has been affirmed.[9]  For the reasons set forth above, Microsoft disagrees.  If the Court determines that the Tunney Act is inapplicable, however, the SRPFJ still

---

[9] *See, e.g.,* "California Plaintiffs" Motion for Intervention, January 23, 2002, at 20.

should be entered without further delay since the scope of this Court's review in the absence of the Tunney Act is even more limited and requires more deference to the parties' determination to settle their disputes.  *See United States v. Automobile Mfrs. Ass'n Inc.*, 307 F. Supp. 617, 620 (C.D. Cal. 1969) (stating, in context of pre-Tunney Act filing of antitrust consent decree: "The decision to settle an anti-trust case in this fashion, like the decision to commence it in the first place, is an administrative decision and is a part of the implementation of the general policy of the Executive branch of government.  As such, it is not subject to review by this court."). Indeed, as the Second Circuit noted in the IBM case, the Tunney Act establishes "a narrow exception to a long-standing rule" that "district courts need not subject consent decrees to a public interest litmus test."  *See In re International Business Machines Corp.*, 687 F.2d 591, 601 (2d Cir. 1982).  Accordingly, without the Tunney Act inquiry, this Court's review of the consent judgment is even narrower.

### (c)   The Court Should Not Compel the Parties to Litigate a Case They Have Elected to Resolve

Tunney Act proceedings should not be conducted in a manner that would deter parties from resolving antitrust litigation through consent judgments.  Indeed, Congress has made it clear that "[t]he Tunney Act was not intended to create a disincentive to the use of the consent decree."  *Microsoft,* 56 F.3d at 1456 (quoting *S. Rep. No. 298*, 93rd Cong., 1st Sess. 7 (1973)) ("The [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool").  The Court of Appeals has held likewise, noting that "a district court's refusal to accept the decree cannot but have enormous practical consequences for the government's ability to negotiate future settlements."  *Microsoft,* 56 F.3d at 1456.  Apart from the separation of powers issues, it makes no sense as a practical matter to attempt to compel the government (or Microsoft) to continue with litigation that it wishes to settle.  *Id.* at 1459 (attempts to block settlement raise "the perplexing question of how the district judge could insure a trial if the government did not wish one."); *see also National Ass'n of Broadcasters,* 553 F. Supp. at 624 n.5 (compelling the government to proceed in litigation "would certainly be

16

contrary to the public interest"). This is particularly true where, as here, the settlement is the result of court-ordered mediation, facilitated by a court-appointed mediator.

## IV.    THE SRPFJ ADDRESSES THE ANTITRUST VIOLATION, AND MORE

The matter comes before this Court after a full trial and appellate review, a process during which many of the plaintiffs' original claims for relief either were (1) withdrawn voluntarily by plaintiffs, (2) rejected by the district court (in rulings not appealed by plaintiffs), (3) rejected by the Court of Appeals on Microsoft's appeal, or (4) dropped by plaintiffs following remand to this Court. Under these circumstances, the determination of the "public interest" is not properly measured against the broad allegations of wrongdoing that were never proven, or the whims of competitors who seek particular "remedial" gifts, but rather against the sole antitrust violation that survived the appeal process. As set forth below, the liability findings that implicate the "public interest" review are quite narrow and limited. Accordingly, the Court of Appeals' decision — not rejected or dropped claims or claims never made — was the focal point for the settlement negotiations and now must be the guiding force behind the public interest determination. Indeed, this Court recognized from the outset that even a court-ordered remedy must be closely related to the "behavior which was found to be anticompetitive." *See* Sept. 28, 2001 Hrg. Tr. at 8.

The SRPFJ fully vindicates these principles. As the Mediator related to the Court, the RPFJ "addresses all of the issues addressed by the Court of Appeals, *whose decision has been the critical organizing text and starting point for the negotiations.*" Nov. 2, 2001 Hrg. Tr. at 5 (emphasis added). Indeed, the SRPFJ includes remedies beyond that which this Court properly could have granted.

In this Section, Microsoft focuses on the SRPFJ remedy provisions, as compared with the conduct found to be anticompetitive by the Court of Appeals. This exercise fully supports a finding that the SRPFJ redresses the antitrust violation in a manner that is clear,

unambiguous, and enforceable.  The SRPFJ plainly is in the public interest and should be entered by the Court.

### A.   The Outer Limits Of This Court's "Public Interest" Inquiry are Bounded by the Antitrust Violation Sustained on Appeal

The fact that the scope of the antitrust violation is precisely defined by the Court of Appeals actually facilitates the "public interest" inquiry because it strips away the rhetoric, unproven claims, and other extraneous allegations that no longer have any bearing on this litigation.  Whereas in most Tunney Act proceedings, the court evaluates the "public interest" against the allegations in the complaint because the consent decree is filed at an early stage of the litigation, *e.g., Massachusetts Sch. of Law at Andover, Inc.*, 118 F.3d at 783, here the broad allegations of the Complaint are no longer relevant since — as this Court stated — "the appellate court was very clear with its liability determination [and] we know exactly what the liability is." Sept. 28 Hrg. Tr. at 6; *see also Microsoft*, 253 F.3d at 107 ("While we do not undertake to dictate to the District Court the precise form that relief should take on remand, we note again that it should be tailored to fit the wrong creating the occasion for the remedy.").  Under the circumstances of this case, where the scope of the liability is established, the inquiry must be tailored accordingly.[10]

### B.   There Can Be No Dispute that The Scope of Microsoft's Antitrust Liability — and Accordingly the Scope Of Possible Remedial Relief Available to Plaintiffs — Was Sharply Limited by the Court Of Appeals

The Court of Appeals itself recognized that its decision "drastically altered the scope of Microsoft's liability."  *Microsoft*, 253 F.3d at 107.  Indeed, the Court of Appeals' ruling was the culmination of a multi-year process during which the scope of Microsoft's potential

---

[10] *See Seven Gables Corp. v. Sterling Recreation Org. Co.*, 686 F. Supp. 1418, 1428 (W.D. Wash. 1988) (where plaintiff prevailed on some but not all counts, "[i]t would be improper for the court to enjoin conduct that the jury found did not violate the antitrust laws"); *see also Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 293 (2d Cir. 1979) ("[I]t does not lie within the discretion of the trial judge to restructure a market that [a defendant] has neither monopolized nor attempted to monopolize.").

antitrust liability steadily decreased.  Of the five counts in the complaints, two — monopoly leveraging and exclusive dealing — did not survive the district court.  With respect to the remaining three counts, the Court of Appeals rejected liability findings as to two — attempted monopolization of an alleged browser market and *per se* illegal tying of IE to Windows.[11]  Even the sole remaining claim that Microsoft had illegally maintained a monopoly over operating systems for Intel-compatible PCs was pared back, with the Court of Appeals rejecting several specific practices on which the district court had based liability, and reversing the district court's conclusion that Microsoft had engaged in a pattern of conduct that violated the Sherman Act.  *Id.* at 78.

Microsoft does not recite this history to suggest that the remaining finding of liability is insignificant.  Rather, the narrowed scope of Microsoft's actual liability — as opposed to what it faced at the outset of the case — is critical to the remedies assessment and cannot be ignored.[12]

C.    **If The Case Had Been Litigated to Judgment Rather Than Amicably Resolved, the Limited Scope of Microsoft's Antitrust Liability Still Would Have Controlled the Remedies This Court Could Have Imposed**

If this case had proceeded to a litigated judgment, certain principles would have guided the Court's selection of an appropriate remedy.  Even though the action has been resolved by consent decree, many of those principles are relevant to the Court's assessment of whether the relief provided by the SRPFJ adequately serves the public interest.

---

[11] The Court of Appeals reversed the District Court's finding on the attempted monopolization claim because plaintiffs failed to prove the existence of a distinct antitrust market for browsing software. *Microsoft*, 253 F.3d at 81.  On the tying claim, the Court of Appeals held that, given the potential benefits to consumers of integrated product design, *per se* illegal treatment was inappropriate in this case, remanding the issue for consideration under the rule of reason standard.  *Id.* at 94.  The tying claim subsequently was expressly abandoned by all plaintiffs.  *See* Sept. 20, 2001 Joint Status Report at 2.

[12] *See Seven Gables Corp.*, 686 F. Supp. at 1428; *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

The Supreme Court has established that "the purpose of relief in an antitrust case is 'so far as practicable, [to] cure the ill effects of the illegal conduct, and to assure the public freedom from its continuance.'" *United States v. Glaxo Group Ltd.,* 410 U.S. 52, 64 (1973) (quoting *United States v. Gypsum Co.,* 340 U.S. 76, 88 (1950)). Upon a finding of an antitrust violation, the court is "empowered to fashion appropriate restraints on [the defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978). If an injunction against the illicit activity is all that is necessary to be effective, no further remedy is appropriate.[13] *See* II Areeda & Hovenkamp, ANTITRUST LAW ¶ 345, at 162 (1995). Civil antitrust proceedings — such as this action — are not a forum for punishing antitrust violators or exacting punitive relief. *See, e.g., United States v. E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 326 (1961).

If this action had proceeded to the remedies phase, plaintiffs — including the United States — still would have borne the burden of proof. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Permanent, prospective injunctive relief is not automatic upon a finding of a violation. The United States instead would have had to prove that there remains a danger of recurrence or continuation of that violation, and Microsoft would have been accorded the full opportunity to challenge that proof. *See, e.g., United States v. Oregon State Medical*

---

[13] In generally describing the justifications for Section 2 remedies in prior cases — in the context of criticizing the district court's failure to "provide an adequate explanation for the relief it ordered" — the Court of Appeals quoted the Supreme Court's recognition that such remedies may "'terminate the illegal monopoly, deny the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Microsoft*, 253 F.3d at 103 (citations omitted). However, the relevance of any one of those objectives depends on the Section 2 violation that the court seeks to remedy. Thus, in a case in which the defendant has unlawfully *acquired* a monopoly, seeking to "terminate the illegal monopoly" may be appropriate. In the present case, however, the monopoly was lawfully acquired and the issue is monopoly maintenance. Moreover, as the Court of Appeals observed, "the District Court expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior." *Id.* at 107. There is, in other words, no *illegal* monopoly to terminate.

*Soc'y,* 343 U.S. 326, 333 (1952).[14]  Where a plaintiff fails to establish that a particular remedy is "necessary" to enforce effectively the antitrust laws, courts must reject that remedy.  *See, e.g., United States v. National Lead Co.*, 332 U.S. 319, 349 (1947).

Moreover, the Court of Appeals itself provided important guidance on the issue of remedies.  It noted that this Court must be particularly careful in crafting injunctive relief that is to apply to a highly dynamic industry like the computer industry.  *Microsoft*, 253 F.3d at 49.  The Court of Appeals also directed the Court to "base its relief on some 'clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'"  *Id.* at 105 (*quoting* III Areeda & Hovenkamp, ANTITRUST LAW ¶ 653(b), at 91-92 (1996)).  The Court of Appeals' decision expressed some skepticism that such a connection could be established because "the District Court expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior."  *Id.* at 107.  The Court of Appeals therefore stated that "the precise form that relief should take on remand … should be tailored to fit the wrong creating the occasion for the remedy."  *Id.*

Plainly, to make the necessary showings of a continuing violation justifying prospective injunctive relief and the necessity of a given remedy, there first must be a determination of the violation qualifying for redress.  Here, the Court of Appeals clearly identified the antitrust liability that gives rise to the remanded remedies proceeding.  As these findings necessarily shape and limit the scope of the remedy that could have been obtained by the United States on remand, they also inform the "public interest" inquiry by setting the outer

---

[14] Private antitrust plaintiffs — including the States — bear the additional burden of proving a significant threat of injury to a cognizable interest from the antitrust violation.  *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969); *California v. American Stores Co.*, 495 U.S. 271, 295-96 (1990) ("In a government case the proof of the violation of law may itself establish sufficient public injury to warrant relief . . . .  A private litigant, however, must have standing – in the words of § 16, he must prove 'threatened loss or damage' to his own interests in order to obtain relief.") (citations omitted).

bounds of what the public could have obtained had the case not settled.  In the circumstances of this case, the "public" actually achieved more by settlement than it would have through continued litigation.

**D.    The SRPFJ Fully Addresses the Sole Antitrust Violation Remaining in the Case at the Time of Settlement**

As explained, the Court of Appeals reversed two of the three antitrust violations found by the District Court — the tying and attempted monopolization claims.  Even with respect to the sole remaining claim — monopoly maintenance — the claim did not survive appellate review intact.  Of the 35 different acts taken by Microsoft that the district court found supported its conclusion that Microsoft illegally maintained a monopoly, the Court of Appeals reviewed and affirmed liability as to only 12 acts.  After reviewing seven of the other 23 acts, the Court concluded that they were not anticompetitive under Section 2.  Although the Court of Appeals did not systematically review the remaining 16 acts, it implicitly rejected those acts as bases for Microsoft's Section 2 liability when it reversed the district court's conclusion that Microsoft was liable based on its general "course of conduct."  *Microsoft,* 253 F.3d at 78-9.

Thus, just 12 acts of monopoly maintenance survived to be remedied on remand.  Those acts fall into the following four categories, each of which, as shown below, is amply covered by the SRPFJ provisions:

(1)    certain aspects of Microsoft's licensing agreements with OEMs,

(2)    designing Windows in such a way as to prevent OEMs from hiding end-user access to Internet Explorer,

(3)    exclusive agreements between Microsoft and a variety of third parties relating to distribution of IE (IAPs, ICPs, ISVs, and Apple), and

(4)    certain aspects of Microsoft's response to Sun's Java technology.

All four categories of conduct involved actions that had a potentially exclusionary impact on Navigator, a "web browser" that competed with IE, and/or on Java, a Sun Microsystems technology that had the potential to allow ISVs to "write once, run anywhere."

Alone or together, the district court held and the Court of Appeals affirmed, that Navigator and Java at least held the potential of developing and exposing a broad set of Application Programming Interfaces ("APIs") that might eventually have become a general purpose platform threat to Windows.  Because Java and Navigator exposed APIs and were designed to run on multiple operating systems, both the District Court and the Court of Appeals dubbed them "middleware."  *Id.* at 53.

While Navigator and Java were somewhat unique in their potential for evolving into general purpose platform software, one of the distinctive features of the SRPFJ is how broadly the term "middleware" is defined.  *See* SRPFJ §§ VI.J, VI.K, VI.M, VI.N.  Rather than being limited to software that exposes or could potentially expose a sufficient range of APIs to become a general purpose platform, software that exposes only special purpose APIs — such as instant messaging functionality — is captured by the definition.  As a result, the SRPFJ applies to a variety of software products that extend substantially beyond the rather unique characteristics of Java and Navigator.  For example, Windows Messenger and Windows Media Player, two technologies that perform special purposes and hold virtually no prospect of ever evolving into general purpose platforms, fall within the SRPFJ's definition of Microsoft Middleware Products.

### 1.        OEM Licensing

The district court held that several aspects of Microsoft's Windows license agreements to OEMs violated Section 2 of the Sherman Act.  In particular, the court focused on the licensing provisions that prohibited OEMs from (a) removing any desktop icons, folders, or start menu entries; (b) altering the initial boot sequence; and (c) substituting a new user interface for the Windows desktop.  *Microsoft*, 253 F.3d at 61.

On appeal, this finding was partially reversed.  The Court of Appeals held that it was reasonable for Microsoft to prevent an OEM from hiding the Windows desktop from the end user, but that the remaining licensing restrictions were unlawful.  *Id.*  The Court of Appeals

accepted the district court's finding that OEMs, in practice, would be less likely to load two programs to provide similar functionality, based in large part on the increased training and product support costs, and so not allowing them to remove access to IE could result in the *de facto* exclusion of Navigator.  *Id.* at 62.

Several SRPFJ provisions remedy the Microsoft licensing found to be unlawful. Section III.C gives OEMs the flexibility to (1) alter the Windows desktop by displaying icons, shortcuts or menu entries for non-Microsoft middleware, (2) include its own Internet offers in the initial boot sequence, and (3) give users the option of booting an alternate operating system. Section III.H requires Microsoft to design future versions of Windows to enable OEMs to hide end user access to Microsoft Middleware Products and replace those features with access to non-Microsoft middleware, including the ability to designate non-Microsoft middleware as the default choice in certain circumstances.  These options and alternatives are bolstered by Section III.A, which prohibits Microsoft from retaliating against, or withholding any newly introduced forms of non-monetary consideration from, any OEM for exercising any options provided by the SRPFJ.[15]

**2.    Designing Windows to Prevent Removal of End-User Access to IE**

The district court determined that Microsoft had designed Windows in several ways that impeded the willingness and ability of OEMs to distribute Navigator: (a) Microsoft excluded IE from the "add/remove" utility in Windows; (b) Microsoft allegedly designed Windows to "override" the user's choice of a non-Microsoft browser as the default in certain

---

[15] In addition, as explained herein, Microsoft has agreed to go beyond Microsoft's OEM-licensing conduct found by the Court of Appeals to violate Section 2 of the Sherman Act.  Although it has no analog in this case (and has made a number of OEMs unhappy), Section III.B requires Microsoft to license Windows to the top 20 OEMs "pursuant to uniform license agreements with uniform terms and conditions."  The United States and the States insisted on that provision in order to foreclose any possibility that Microsoft might use negotiating flexibility as either a "carrot" or a "stick" to induce (or coerce) OEMs into favoring Microsoft Platform Software.

circumstances; and (c) Microsoft "commingled" code for IE and Windows.  *Microsoft*, 253 F.3d at 66.

The Court of Appeals reversed the district court's finding of liability for "overriding" browser defaults in certain circumstances, holding that plaintiffs had failed to rebut Microsoft's explanations that it made sense technically to use technology within Windows, such as IE, to perform certain Windows functions.  *Id.* at 67.  The remaining two anticompetitive acts were sustained.  As the States argued to the Supreme Court, Microsoft's "commingling" of IE and Windows, like Microsoft's exclusion of IE from the "add/remove" utility, was anticompetitive because it "preclud[ed] OEMs and users from removing *user access* to Internet Explorer" and so "deter[ed] OEMs from pre-installing a rival web browser."  *See* Br. in Opp. for the State Resp., *Microsoft v. United States,* No. 01-236, Sept. 6, 2001, at 2 (emphasis added).

The SRPFJ provides remedies for both concerns.  As noted, Sections III.C and III.H in combination give OEMs the option to remove end user access to Microsoft Middleware Products (including IE) and to display in its place access to non-Microsoft middleware in a number of situations, free from retaliation.  This is precisely the remedy that plaintiffs have consistently sought in these proceedings.[16]  In effect, the SRPFJ requires Microsoft to design Windows to facilitate the removal of "end-user access not just to Internet Explorer but also to all other Microsoft Middleware Products and to enable OEMs to provide access to non-Microsoft Middleware.

---

[16] *See* Plaintiffs' Reply Memorandum in Support of Proposed Final Judgment, May 17, 2002, at 62 ("Section 3.g. requires that OEMs and end users be able to remove access only to the middleware product — in this case the browser — *not to the API's or code.*") (emphasis added); Brief for Appellees United States and the State Plaintiffs at 103 ("Microsoft could provide a version of Windows without IE … *by simply removing the user access to browser functionality while retaining whatever code is necessary to enhance the functionality of other applications.*") (emphasis added).

Section III.H is a truly stunning remedy.[17]  Never before has an antitrust decree so directly regulated a company's product design.  This provision requires Microsoft to devote substantial time, effort, and money to the redesign of its Windows Operating System.  Microsoft invests literally billions of dollars developing new versions of Windows with new features like IE and the Windows Media Player, to name just two, that make the operating system more accessible, easier to use, and more valuable to end users.  Now the SRPFJ requires Microsoft to design mechanisms that allow OEMs (who have invested nothing) to "hide" the best features of Windows from users in order to create opportunities for Microsoft's middleware competitors to be featured in Windows.

### 3.    Exclusive Agreements

The district court held that Microsoft's agreements with various Internet content providers ("ICPs"), ISVs, Internet access providers ("IAPs") and Apple Computer relating to IE violated Section 2 of the Sherman Act.[18]  *Microsoft*, 253 F.3d at 71.  These findings were partially reversed on appeal.  In particular, the Court of Appeals determined that Microsoft's efforts to "give away" IE, pay IAPs for signing up new customers using IE, and develop and distribute new tools to promote IE all were perfectly legitimate competitive practices.  *Id.* at 68. The Court of Appeals also rejected the claim that Microsoft's agreements with ICPs violated Section 2 because there had been no demonstration of a substantial effect on competition.  *Id.* at 71.  However, the Court of Appeals sustained a liability finding arising out of certain agreements in which Microsoft secured a pledge to use or promote IE exclusively.  *Id.*

The SRPFJ directly addresses the Court of Appeals' ruling with respect to the exclusive agreements.  Section III.G.1 prohibits Microsoft from entering into any agreement on

---

[17]     Section III.H. is all the more amazing when one considers that the Court of Appeals vacated and remanded the tying claim and plaintiffs then abandoned the claim.

[18] Although plaintiffs alleged that those same agreements also violated Section 1 of the Sherman Act, the district court rejected that claim, and plaintiffs did not appeal.  *Microsoft*, 253 F.3d at 70.

the condition that the other party use or support Microsoft platform software exclusively or in *any* fixed percentage (even a low percentage), unless it would be commercially practicable for the other party to provide equal or greater support for competing software.  The prohibition extends far beyond the IE distribution agreements that were reviewed by the Court of Appeals and that Microsoft long ago terminated.  Section III.G.1 applies to all Microsoft Platform Software, including Windows, Windows Media Player, Outlook Express, Windows Messenger, IE, and future Microsoft Middleware Products.

Similarly, Section III.G.2 prohibits any agreement between Microsoft and any IAP or ICP whereby the IAP/ICP is granted placement on the Windows desktop on the condition that the IAP or ICP refrain from supporting or using non-Microsoft middleware.  Section III.F offers several additional protections, prohibiting Microsoft from retaliating against ISVs and IHVs for developing, using, distributing, promoting, or supporting any competing platform software and also from conditioning any Windows agreement on a promise to refrain from working with any competing platform software.[19]

### 4.    Java

The district court held that four specific practices with respect to Sun's Java technology violated Section 2:  (a) Microsoft's development of a version of Java that included innovations not sanctioned by Sun, (b) Microsoft's "First Wave" agreements with ISVs requiring use of Microsoft's Java Virtual Machine as the default for running any Windows program

---

[19] There is a limitation built into Section III.F.2 under which Microsoft is able to enter into exclusive agreements that are "reasonably necessary to and of reasonable scope and duration in relation to a bona fide contractual obligation."  This limitation is narrow and designed to enable Microsoft to enter into procompetitive arrangements that benefit consumers.  *See*, *e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898).  For example, exclusive agreements are common and procompetitive in the context of joint ventures, where two or more parties combine productive resources to realize efficiencies or otherwise benefit consumers.  *See generally* Antitrust Guidelines for Collaborations Among Competitors, Issued by the Federal Trade Commission and the U.S. Department of Justice (April 2000).

written in Java, (c) the failure to adequately disclose to Java developers that use of certain keywords and directives in Microsoft's Java tools would result in programs that took advantage of unique features of Windows and thus are not cross-platforms, and (d) Microsoft's discussions with Intel about halting its support of Sun's Java (which Intel did not do).  *Microsoft*, 253 F.3d at 74.

The Court of Appeals reversed the first conclusion concerning Microsoft's development of an improved Java Virtual Machine, holding that this amounted to legitimate competition on the merits.  *Id.* at 75.  However, the Court of Appeals sustained antitrust liability with respect to the remaining practices.  *Id.* at 75-8.

The SRPFJ also addresses these practices.  Section III.F prohibits Microsoft from retaliating against an ISV or an IHV (such as Intel) because the ISV or IHV develops, uses, distributes or supports technology such as Java that competes with Windows or Microsoft Middleware.  Section III.G prevents Microsoft from entering into exclusive agreements with ISVs and others.[20]

**E.    The SRPFJ Affords Relief Beyond the Violation Found by the Court of Appeals**

As described above, the SRPFJ addresses each and every practice found by the Court of Appeals to be anticompetitive.  Yet, as the Mediator observed, the parties did not stop "at the outer limits of the Court of Appeals decision, but in some important respects the [RPFJ] goes beyond the issues affirmed by the Court of Appeals . . . ."  Nov. 2 Hrg. Tr. at 5.  Three provisions of the SRPFJ, in particular, stand out as examples of strong remedies that have no basis in the Court of Appeals' opinion.

---

[20] Microsoft's J++ Java development tool was changed in January 1999 to eliminate any concern about that software.

First, Section III.B requires Microsoft to license Windows on uniform terms and conditions to the top 20 OEMs.[21]  Nowhere in the Court of Appeals' opinion is there any holding that condemns Microsoft for individually negotiating different license terms with different OEMs.  Nevertheless, the United States (and particularly the States) wanted to eliminate completely Microsoft's ability to treat OEMs differently out of a concern (albeit one without foundation in the Court of Appeals' opinion) that Microsoft might use that ability to induce OEMs not to ship or support non-Microsoft platform software.[22]

Second, Section III.D obligates Microsoft to disclose the interfaces and related documentation that Microsoft Middleware uses to interoperate with Windows.  Again, the Court of Appeals affirmed no finding that Microsoft "hides" APIs from ISVs – much less that Microsoft should be required to disclose software interfaces wholly internal to Windows.  Indeed, the Court of Appeals' conclusion that Microsoft's operating system is protected by an "applications barrier to entry" is directly contrary to such a concern — the reason so many applications run so well on Windows is that Microsoft has done such a good job of disclosing, supporting and "evangelizing" Windows APIs.  Nevertheless, the SRPFJ mandates additional disclosure.

Third, Section III.E requires Microsoft to make available communications protocols used by a Windows PC operating system to interoperate natively with a Windows

---

[21] Microsoft has voluntarily extended those terms to all OEMs.

[22] Ironically, the non-settling States, who during the mediation were represented to be among the strongest proponents of this provision, are now attempting to make a significant issue out of it.  They complain that as a result of Section III.B, the biggest OEMs have lost their ability to negotiate for more favorable terms than smaller OEMs.  The largest OEM ships more than thirty times the value of Windows than the twentieth largest OEM and thus in the absence of Section III.B, would be well positioned to negotiate more favorable terms.  That, however, was precisely what the States said they wanted to achieve — they wanted to deprive Microsoft of any ability to negotiate more favorable license terms with select OEMs for fear Microsoft would use that ability to induce OEMs to refrain from supporting competing third-party platform software.  Microsoft resisted imposition of Section III.B because of the inevitable displeasure of its largest OEM customers; yet, the States insisted on the provision as the price of settlement.

server operating system.  This provision has nothing to do with the case tried by plaintiffs, much less with the decision of the Court of Appeals.  There was no evidence in the case about so called "client-server interop."  Moreover, the concern that motivates this provision is that Microsoft will use proprietary protocols to "leverage" its monopoly in PC operating systems to gain an unfair competitive advantage in server operating systems.  The district court, however, dismissed the sole monopoly leveraging claim (brought by the States) at the summary judgment stage.  Notwithstanding the absence of any basis for Section III.E, Microsoft agreed to it in the hope and expectation that the concession would induce the States to agree to the decree.

Taken together, the provisions of the SRPFJ create significant new opportunities for the development of middleware that actually or potentially competes with Microsoft platform software.  Provisions like Section III.D give third parties access to the same interfaces that Microsoft Middleware uses to call on Windows functionality.  Other provisions, like Sections III.A, III.C, and III.H, give OEMs and other members of the PC ecosystem greater ability to support and promote competing middleware.  Perhaps most importantly, middleware is broadly defined to include software that even remotely has some potential to compete with Windows as a platform.  The SRPFJ thus creates ample opportunities for current and future middleware developers to compete with Microsoft; all that remains is for bright young software developers to seize the opportunities.

**F.      The SRPFJ Directly and Forcefully Redresses the Antitrust Violation**

As the foregoing analysis makes clear, the SRPFJ directly addresses the core government case — the middleware threat posed by Navigator and Java.  The SRPFJ does not merely enjoin existing or past conduct, but looks forward to identify and protect likely future competitive threats.  It ensures that ISV's have the opportunity and information they need to develop competitive middleware that will interoperate with Windows.  At the same time, OEMs are guaranteed the flexibility to configure the PCs they sell to include non-Microsoft middleware (including as a replacement for Microsoft middleware) as they see fit.

Given that the SRPFJ addresses all of the acts found to be anticompetitive on appeal and much more, the only remaining question — in terms of this Court's "public interest" inquiry under the Tunney Act — is whether the SRPFJ affords meaningful relief by stating Microsoft's obligations in clear terms and establishing a compliance and enforcement regimen that will ensure that those obligations are met.  In these circumstances, this Court should withhold approval of a consent decree *only* if "any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes 'a mockery of judicial power.'"  *Massachusetts Sch. of Law at Andover, Inc.*, 118 F.3d at 782 (*quoting United States v. Microsoft Corp.*, 56 F.3d at 1462).  None of these factors is present here.

### 1.    The SRPFJ Terms and Provisions Unambiguously Articulate Microsoft's Obligations

There is no merit to the suggestions that the SRPFJ is permeated by vague and ambiguous language, or that Microsoft's obligations are illusory.  To the contrary, it sets forth precise, albeit highly technical terms that were carefully crafted by all parties in a process overseen by the Court-appointed Mediator (and, through the SRPFJ modifications, the terms have been defined even further).  Certainly, the parties themselves — who are intimately familiar with the technology at issue, the practices in question, and the tasks that need to be accomplished — were in the best position to make sure that Microsoft's obligations were stated with unambiguous precision.  Indeed, a great portion of the successful mediation effort was devoted to developing technical concepts and clear language to avoid ambiguity and future disputes.  As the Mediator advised the Court, "every paragraph, every sentence, every phrase, every comma, every parenthetical [in the RPFJ] has been debated, negotiated and scrutinized by all parties in the most open frank and fair manner and arena during this process . . . ."  Nov. 2, 2001 Hrg. Tr. at 5.

There is no question that certain provisions of the decree may be difficult for the lay person or even a non-technical lawyer to understand.  That is not the SRPFJ's audience.  The

31

test is whether the terms are understandable and make technical sense to the Microsoft engineers and technical support personnel who must comply with those terms. Because the terms were painstakingly developed over weeks with the active involvement of technical experts, the SRPFJ passes this test with high marks.[23]

To the extent that certain technical compliance questions may arise notwithstanding the parties' best efforts to avoid them, the SRPFJ expressly anticipates and addresses that scenario. The Technical Committee to be formed pursuant to Section IV.B is designed to ensure prompt resolution of any issues that arise over the application of the technical language in particular circumstances. In short, the language of the SRPFJ is "sufficiently precise" to ensure meaningful relief in this case. *United States v. Thomson Corp.*, 949 F. Supp. 907, 914 (D. D.C. 1996) ("The court should pay 'special attention' to the clarity of the proposed consent decree … in order to assure that the decree is sufficiently precise … to enable the court to manage the implementation of the consent decree and resolve any subsequent disputes.").

Despite the parties' continued conviction that they have a common understanding of the terms of the RPFJ, the United States did call to Microsoft's attention a small number of areas where the intent of the parties could be made clearer in light of the public comments. As explained in Section V below, Microsoft has agreed to the requested changes. In light of those refinements, all perceived ambiguities (at least, all those that had any conceivable merit) have been eliminated in the SRPFJ.

## 2. The SRPFJ Imposes Upon Microsoft Enforcement Provisions that are Unprecedented For a Civil Antitrust Decree

Microsoft's affirmative obligations under the SRPFJ are buttressed by an unusually strong set of compliance and enforcement provisions that are unprecedented in a civil antitrust decree. The SRPFJ provides the Department of Justice and the settling States with the

---

[23] *See Comunidades Unidas Contra La Contaminacion*, 204 F.3d at 280.

full panoply of enforcement powers provided in the most stringent antitrust conduct decrees.  For example, the enforcement provisions are far more extensive than the enforcement provisions in the 1994 Microsoft decree; yet, those provisions were more than adequate to ensure Microsoft's compliance with that decree.

More significantly, the three enforcement and compliance provisions of the SRPFJ go far beyond what the United States has obtained in any other modern antitrust consent decree.  Section IV.B, for instance, creates an independent three member Technical Committee, resident on the Microsoft campus and with full access to Microsoft facilities, personnel, documents, proprietary technical data (including source code) and other resources, to monitor Microsoft's compliance with the SRPFJ.  The Technical Committee will provide the Justice Department and the settling States with independent technical expertise should compliance questions arise.  Actual enforcement authority remains with the Justice Department and the settling States, each of whom retains the ability to monitor compliance (with access to the same Microsoft resources as the Technical Committee), initiate enforcement actions and seek a broad range of remedies in the event of a violation.  While at the insistence of the Justice Department and the settling States (in order to protect their enforcement discretion) the work product of the Technical Committee cannot be admitted as evidence in any SRPFJ enforcement proceeding (Section VI.D.4.d), the Justice Department and States may use any leads developed by the Technical Committee to guide their separate investigations.

In addition, the SRPFJ expressly provides that this Court retains jurisdiction to oversee Microsoft's compliance.  The five-year term of the SRPFJ may be extended for an additional two year period (under Section V.B) if there is evidence that Microsoft has engaged in a pattern of willful and systematic violations.  Given the rapidly-changing nature of the software industry, the five-year term is more than adequate to redress the violation sustained on appeal.[24]

---

[24] As the Court of Appeals observed, "six years seems like an eternity in the computer industry." *Microsoft*, 253 F.3d at 49.  Moreover, an identical five-year term was used by the Federal Trade Commission in its recent consent order imposing substantial conduct remedies to address the antitrust

**Footnote continued**

These rigorous enforcement provisions adequately "ensure that the parties comply in full with the principles mandated by the decree," *AT&T*, 552 F. Supp. at 214, and thus satisfy the public interest requirements of the Tunney Act.

### 3.    No Third Parties Are Injured by the SRPFJ Provisions

A final consideration for the Court is the adverse effect — if any — that the decree may have on third parties.  As the Court of Appeals expressed in *United States v. Microsoft,* "[w]hile the district court may inquire into whether a decree will result in any positive injury to third parties, in the absence of such injury, it should not reject an otherwise adequate remedy simply because a third party claims it could be better treated."  56 F.3d at 1461 n.9. Here, while the public comment period has surfaced a number of Microsoft competitors who claim that the SRPFJ does not adequately address their own concerns (most of which have scant relation to this lawsuit),[25] there have been no serious claims that the SRPFJ will result in actual injury to third parties.  With the United States and all plaintiff States having actively participated in the negotiations leading to the SRPFJ, it should be apparent that the substantial interests of third parties were considered and protected.

Given this record, there is no occasion for this Court to reject the SRPFJ on the ground that third parties would be injured by its implementation.[26]

---

**Footnote continued from previous page**

issues raised by the merger of AOL and Time Warner, involving primarily broadband Internet access.  *In the Matter of America Online, Inc., and Time Warner, Inc.*, Docket No. C-3989 (Decision and Order *available at* www.ftc.gov).

[25] The competitors' concerns are aimed primarily at the extent to which the SRPFJ does not *promote* their particular interests, as opposed to concerns that the SRPFJ actually *impairs* those interests. This is an important distinction.  *See Massachusetts Sch. Of Law at Andover*, 118 F.3d at 780 ("Failure to promote and interest [cannot be equated] with its impairment").  Moreover, "mere failure to secure better remedies for [third parties]" is an insufficient ground for rejecting the RPFJ.  *Id.*

[26] As the Court is aware, the non-settling States have raised the prospect that some third parties are being adversely affected by SRPFJ Section III.B which requires Microsoft to apply standard licensing and royalty terms and conditions to OEMs.  The non-settling States have their facts wrong.  Microsoft has "bent over backwards" to listen to concerns from OEMs and has been willing to change the uniform terms

**Footnote continued**

34

## V.   PROPOSED REFINEMENTS TO THE RPFJ

Microsoft remains convinced that the language of the RPFJ negotiated during intense mediation last fall represents a full and reasonable resolution of this case, without the risk of anticompetitive effects inherent in many alternative forms of relief proposed by others.  As explained above, not only does the RPFJ extend beyond even the penumbra of the acts that the Court of Appeals found to constitute illegal monopoly maintenance, but it also creates new opportunities for actual and potential platform competitors of Windows operating systems. Moreover, it does all this using terms that, while technical, are commonly understood by the parties.  Finally, the entire decree is backed by enforcement and compliance provisions that are every bit as complete and strong as those in any prior antitrust decree obtained by the United States.

Having said all that, the United States, after reviewing all the public comments has concluded that a few refinements in the language will make the RPFJ clearer to third parties. With one exception, the refinements do not change the meaning of the decree.  Microsoft has agreed to consent to the changes (now included in the SRPFJ).[27]  Those clarifications are summarized below.[28]

---

**Footnote continued from previous page**

in its license agreement based on feedback from OEMs.  In addition, the non-settling States fail to apprise the Court that their own proposed final judgment contains an even more onerous standardization provision that would exacerbate the very concern they complain about here.  *See* Plantiffs' Proposed Final Judgment, ¶ 2, p. 3-4.

[27] The settling States have also agreed to make the following changes.

[28] As these modifications make clear, they are a logical outgrowth of the RPFJ and, under the Tunney Act, provide no occasion for a new notice and comment period.  *See, e.g., United States v. AT&T,* 522 F. Supp. at 225-26; *see also Massachusetts Sch. of Law v. United States*, 118 F.3d at 778.

### A.        The Definition of "API" in Sections III.D and VI.A

As originally drafted, the definition of "API" in the RPFJ (Section VI.A) was focused on those interfaces that Microsoft is required to disclose by Section III.D of the RPFJ and was accordingly very specialized.  It was the parties' intention, however, that "API" would have a broader, more generic meaning in several other places where it appears in the RPFJ (*e.g.*, Section VI.M, the definition of "Non-Microsoft Middleware").  The new language in SRPFJ Section III.D (the definition of "API" in the RPFJ) and in SRPFJ Section VI.A makes the parties' intention clearer.

### B.        Communications Protocols in Section III.E

Section III.E of the RPFJ clearly would require Microsoft to make available *all* Communications Protocols that are in a Windows Operating System Product and are used to interoperate natively with a Windows server operating system.  Some competitors of Microsoft have erroneously claimed the language is unclear.  This assertion apparently is based on Microsoft's consistently stated view that third-party server operating systems currently can and do interoperate effectively with Windows Operating System Products in a variety of ways without access to Microsoft's proprietary Communications Protocols.  The critics speciously argue that Microsoft will refuse to make available all (or perhaps any) of its Communications Protocols on the ground that those proprietary protocols are not necessary to "interoperate" with a Windows Operating System Product.  This argument is belied by the plain language of the RPFJ — *all* Communications Protocols in a Windows Operating System Product used to interoperate natively with a Windows server operating system must be made available.  Nevertheless, in order to make *crystal* clear what is now clear, the United States has proposed, and Microsoft has agreed, to add the word "communicate" (and "communication") to Section III.E.

### C.        Unbiased Mechanisms in Sections III.H.2 and III.H.3

Section III.H of the RPFJ obligates Microsoft, in the future, to design Windows Operating System Products in a way that enables end-users in various ways to substitute access

to a Microsoft Middleware Product with access to a Non-Microsoft Middleware Product.  In implementing Section III.H, Microsoft understood that the end-user choices between Microsoft and Non-Microsoft Middleware Products provided for in the section had to be presented to end-users in an unbiased fashion.  Indeed, Section III.H.1 of the RPFJ made clear that the mechanisms must be unbiased.  Nevertheless, in order to avoid any doubt, additional language has been added at various points to make explicit that the mechanisms must be unbiased.[29]

### D.   Deleting RPFJ Section III.I.5

Section III.I.5 in the RPFJ was a narrow provision for which Microsoft bargained in the mediation.  The provision made clear that Microsoft could seek licenses to protect itself against claims of indirect infringement by third parties that obtain access to APIs and related Documentation under Section III.D or Communications Protocols under Section III.E.  Under Section III.I.5, Microsoft would have been able to seek a license "no broader than necessary" to enable Microsoft to provide the options and alternatives required by the RPFJ without fear of claims that in so doing Microsoft had engaged in indirect infringement.  Nevertheless, the provision apparently generated a great deal of misunderstanding and wild charges that Microsoft would use the right to misappropriate the intellectual property of others.  (Section III.I.5 provided no such right.)  The non-settling States even claimed erroneously that the provision had some relationship to Microsoft's well-established ability to insist on "non-assert provisions" in its Windows licenses to OEMs.  (Section III.I.5 had no such relationship.)  In light of all the confusion caused by this narrow provision, the United States asked that Microsoft agree to drop Section III.I.5 altogether.  Microsoft continues to believe that the provision was reasonable and justified, but in the interests of eliminating confusion and facilitating the expeditious entry of the decree, Microsoft has consented to the removal of Section III.I.5.

---

[29] In addition, language from the end of Section III.H.3 of the RPFJ has been moved to a more natural location at the end of Section III.H.2 of the SRPFJ.  Subsections 1 and 2 have been redesignated "a" and "b."  This change is purely cosmetic.

**E.      Clarifying the Meaning of "Microsoft Middleware" and "Timely Manner"**

The SRPFJ also refines the definition of "Microsoft Middleware" (SRPFJ Section VI.J) and "Timely Manner" to eliminate any doubt concerning the intention of the parties.  Microsoft agrees that, although the changes do not alter the substance of the definitions, the refinements do further clarify the intended meaning of the two terms.

**VI.      MICROSOFT HAS MADE THE REQUISITE TUNNEY ACT DISCLOSURES**

As the Court is aware, some of the comments received by the Justice Department pursuant to the Tunney Act — and some comments the Court has received directly through various intervention motions or requests to be heard as *amici* — are aimed not at the sufficiency of the RPFJ, but rather of the Tunney Act process itself.  In particular, questions have been raised regarding Microsoft's compliance with Section 16(g) of the Tunney Act.[30]  As the Court has directed, Microsoft responds to these questions in this section, demonstrating that it has fully complied with its obligations under the Tunney Act.

**A.      Microsoft Has Made The Disclosures Required By Section 16(g) Of The Tunney Act**

Any claim that Microsoft has not fully complied with its disclosure obligations under Section 16(g) of the Tunney Act is unfounded.  The third-party complainants on this issue — who seek to derail the RPFJ — ignore a basic point, namely that the disclosures are made not to the public, but rather to the Court.  *Compare* 15 U.S.C. § 16(b) *with* 15 U.S.C. §16(g).  There is no private right of action by the public for any non-disclosure because the public has no statutory right to the information in the first place.  The Tunney Act does not authorize the public, for whatever motive, to comment on the extent or the substance of any disclosable contacts Microsoft may have had.

---

[30] Other comments have been directed at the United States' compliance with its Tunney Act obligations.  Microsoft defers to the United States to respond to those comments.

Moreover, this disclosure issue provides no basis for halting or delaying the Tunney Act proceedings.  The remedy for any inadequate disclosure is for the offending party promptly to provide the information to the Court.  Even if that were required here — and it should not be for the reasons discussed below — the disclosure could be made swiftly, with no effect on the Tunney Act review schedule.

### 1.  Section 16(g) Requirements And Microsoft's Disclosures

Under Section 16(g) of the Tunney Act, a defendant is required to file with the court descriptions of all written and oral communications on its behalf concerning the proposed consent decree with any officer or employee of the United States, *other than* communications by its counsel of record with the Attorney General or other employees of the Department of Justice. 15 U.S.C. § 16(g).

On December 10, 2001, Microsoft submitted to this Court a complete description of its communications with the Department of Justice and the Executive Branch concerning the RPFJ.  Specifically, Microsoft represented as follows:

> (1)   Following the Court's Order dated September 27, 2001, and continuing through November 6, 2001, counsel for Microsoft met on a virtually daily basis with counsel for the United States and the plaintiff States in Washington, D.C. After the Court appointed Professor Eric Green of Boston University School of Law as mediator on October 12, 2001, Professor Green and his colleague Jonathan Marks participated in many of those meetings.  From October 29, 2001 through November 2, 2001, Will Poole, a Microsoft vice president, also participated in some of the meetings.

> (2)   On October 5, 2001, counsel for Microsoft met with representatives of the United States and the plaintiff States in Washington, D.C. to answer a variety of technical questions.  Linda Averett, Michael Wallent, Robert Short and Chad Knowlton of Microsoft attended this meeting, as

did Professor Edward Felten of Princeton University, one
of plaintiffs' technical experts.[31]

While, as provided by the Tunney Act, Microsoft's Section 16(g) disclosures did not expressly

reference communications between Microsoft's counsel of record and the Attorney General or

employees of the Department of Justice, the fact remains that the mediated negotiations with the

United States are disclosed in Microsoft's submission (and are otherwise known to the Court in

any event).

### 2. Complaints Regarding The Scope Of Microsoft's Disclosures Are Erroneous

#### (a) Microsoft's Counsel Of Record Are Exempt From Section 16(g)

The focus of some third parties on this issue centers on the contacts between one

of Microsoft's counsel of record, Charles F. Rule, and the Justice Department.[32]  Yet, the fact

Mr. Rule's involvement in the negotiations with the Justice Department is a secret to no one, let

alone to this Court.  Any formalistic disclosure to the Court at this juncture would be of no

moment since the Court knew — even at the time of the contacts — of Mr. Rule's involvement

in the negotiations and that he was acting as Microsoft's counsel in those communications.

Even so, Section 16(g) exempts from disclosure "communications made by

*counsel of record* alone with the Attorney General or the employees of the Department of Justice

alone . . . ."  15 U.S.C. § 16(g) (emphasis added).  While the term "counsel of record" is not

defined in the Act, it clearly includes counsel such as Mr. Rule, who is listed as counsel on

papers filed in this Court, in the Court of Appeals and in the Supreme Court in this very action.[33]

---

[31] *See* Defendant Microsoft Corporation's Description of Written or Oral Communications Concerning the Revised Proposed Final Judgment and Certification of Compliance Under 15 U.S.C. § 16(g), *United States v. Microsoft Corp.*, at 1-2.

[32] *See* Memorandum of Points and Authorities in Support of the Motion of Relpromax Antitrust Inc. for Limited Participation as an *Amicus Curiae*, at 9-12.

[33] *See, e.g.,* Jurisdictional Statement, *Microsoft v. United States,* U.S. Supreme Court, July 26, 2000; Brief of Defendant-Appellant, *Microsoft Corporation v. United States*, Nos. 00-5212, 00-5213

**Footnote continued**

Nothing in the Tunney Act suggests that the term "counsel of record" is limited to the definition of an "appearance" in the local rules (which vary from court to court). Congress plainly contemplated a more generic notion of "counsel of record" and would not have left the applicability of the exemption to the vagaries of the local court rules. Indeed, because most consent decrees are negotiated and settled before the commencement of any litigation, in the vast majority of situations, the counsel of record for a particular matter would not have filed an entry of appearance under the local rules.[34]

Most importantly, Mr. Rule plainly and openly acted as "counsel of record" for Microsoft in the RPFJ negotiations.[35] Certainly, he was recognized by the Court-Appointed Mediator as a lead negotiator for Microsoft in direct negotiations with the Department of Justice and the States. In this capacity, Mr. Rule easily falls within the Section 16(g) exemption for "counsel of record."

The legislative history of the Tunney Act supports the conclusion that Mr. Rule's communications are exempt from disclosure. The focus of the exemption was to distinguish "lawyering" contacts from "lobbying contacts," exempting the former while requiring disclosure of the latter. *See* H.R. No. 93-1463 at 9. Mr. Rule is a practicing antitrust lawyer and former Assistant Attorney General in charge of the Antitrust Division of the U.S. Department of Justice. Microsoft retained him to represent the company in these legal proceedings, and his activities on

---

**Footnote continued from previous page**

(D.C. Cir. Nov. 27, 2000) (listing Charles F. Rule as counsel for Microsoft); Reply Brief for Defendant-Appellant, *Microsoft Corporation v. United States*, Nos. 00-5212, 00-5213 (D.C. Cir. Jan. 29, 2001) (listing Charles F. Rule as counsel for Microsoft).

[34] Mr. Rule formally entered his appearance in this Court on November 15, 2001. Local Civil Rule 83.6(a) does not require such notices to be signed by the party entering an appearance. The rule merely states that an attorney may enter an appearance "by filing a written notice of the entry of an appearance listing the attorney's correct address, telephone number and bar identification number."

[35] Mr. Rule also represented Microsoft in the earlier attempt by Chief Judge Posner, discussed above, to mediate a settlement of this case.

Microsoft's behalf in this litigation were public knowledge and never sheltered.  Mr. Rule's role in the Court-ordered mediation and settlement negotiations was classic "lawyering," not "lobbying."  Mr. Rule's representation of Microsoft in negotiations with the United States — well known to the Court and the Court-appointed Mediator who brokered the settlement — falls squarely within the confines of the Section 16(g) exemption.

Given all of these factors, Microsoft has no duty under Section 16(g) to disclose Mr. Rule's contacts with the Department of Justice beyond those already contained in Microsoft's Section 16(g) disclosure.

### (b)    Legislative Contacts Are Not Within The Scope Of The Act

Based on a plain reading of the statute, there is no basis for any argument that the requisite disclosures extend to contacts between a defendant and the Legislative Branch.  Rather, Section 16(g) pertains to communications between the defendant and "any officer or employee of the United States concerning or relevant to such proposal."  Members of Congress and their staffs are not "covered" under this provision.[36]

A fundamental canon of statutory construction is that "a word used in different parts of the statute should be construed to have the identical meaning throughout the entire

---

[36] As the Court may be aware, former Senator Tunney has submitted an affidavit for the Court's consideration.  *See* Affidavit of John V. Tunney, dated January 22, 2002.  Senator Tunney urges a broad reading of the disclosure obligations, even to include contacts between the defendant and members of the Judiciary.  Tunney Aff. at 6.  Senator Tunney's interpretation, however, finds no support in the actual text of the statute that was enacted and, in all events, his opinion — coming over 25 years after enactment of the statute — is irrelevant as a legal matter.  *See Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730, 736 n. 9 (7th Cir. 1991) (Courts do "not need to defer to the post-enactment views of individual legislators regarding legislative intent") (*citing Pierce v. Underwood,* 487 U.S. 552, 566 (1988)).  If Congress had intended to mandate disclosure of an antitrust defendant's communications with the Members of Congress and the Judge assigned to the case, it would not have done so by inference.  Indeed, it would make no sense to require a defendant to "disclose" to the Court any communications it had with the Court, since the Court obviously would have been aware of that fact already.  As the Senator elsewhere indicates, "the disclosure provisions were designed to help ensure that no defendant can ever achieve through the political activities what it cannot obtain through the legal process."  Tunney Aff. at 7. Here, there is no dispute that the consent decree was solely the product of Court-ordered settlement negotiations brokered by an independent Mediator.  None of the concerns that prompted the statute is implicated here.

statute." *Mississippi Poultry Ass'n Inc. v. Madigan*, 992 F.2d 1359, 1363 (5th Cir. 1993); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 589 (D.C. Cir. 2001) ("a legislative body generally uses a particular word with a consistent meaning in a given context.").  Other provisions of the Tunney Act make it clear that the term "United States" refers to the Executive Branch alone.  For example, Section 16(b) refers to "[a]ny proposal for a consent judgment submitted by the *United States* for entry in any civil proceeding brought by or on behalf of the *United States* under the antitrust laws . . . ." 15 U.S.C. § 16(b) (emphasis added).  Similarly, Section 16(c) uses the term "United States" to indicate the entity responsible for publishing summaries of the consent judgment and competitive impact statement in newspapers.  15 U.S.C. § 16(c).  *See also* 15 U.S.C. §§ 16(d)-(f), (h), and (i) (same).  Plainly, in this context, the term "United States" refers to the Executive Branch and its agent, the Justice Department.  It would make no sense to include the Legislative Branch in this definition, any more than it would to include the Judicial Branch. [37]  As a matter of law, therefore, Congress' use of the term "United States" in Section 16(g) is limited to Executive Branch contacts.[38]

### (c)        The Substance Of The Disclosures Is Sufficient

Accordingly, pursuant to Section 16(g), Microsoft properly and fully has disclosed to the Court a description of its communications with any "officer or employee of the United States" concerning the proposed settlement, other than exempted communications

---

[37] It is also worth noting that the U.S. Constitution consistently uses the term "officer" to refer to the appointed agents of government, in contrast to its use of the terms "Member," "Representative" or "Senator" to refer to legislators.

[38] The third parties who urge the Court to rule that Section 16(g) disclosures extend to legislative contacts cite no case law authority supporting their position, nor do they point to any example of Section 16(g) disclosures including such information.  On its own, Microsoft counsel has reviewed dozens of Section 16(g) disclosures from other cases and has not come across a single instance in which a defendant disclosed legislative contacts.  Even in *United States v. Western Electric Co., Inc. and American Tel. & Tel. Co*., Civil Action No. 82-0192, the settlement that resulted in the break up of AT&T, perhaps the most controversial and far-reaching of any settlement for the past half century, the defendants did not list any contacts with the Legislative Branch.

between its counsel of record and the Justice Department.  Because the States and the Mediators — neither of whom are Microsoft counsel of record — participated in the negotiations, Microsoft's disclosure describes the negotiations and mediation.  Microsoft's description, which provides the names and dates of those involved, provides a level of detail that is typical for Section 16(g) disclosures.  There is no legal basis for requiring any further disclosure.

**B.      Any Alleged Non-Compliance With Section 16(g) Does Not Affect The Public's Ability To Comment On The RPFJ And Any Additional Disclosures Would Not Require A New 60-Day Period For Public Comment**

Even if this Court were to conclude that Microsoft should provide additional information pursuant to section 16(g), this would have no impact on the public's right to comment on the RPFJ under the Tunney Act.  Section 16(g) does not provide a basis for public comments.  Rather, the information that must be furnished to the public under the Act is limited to the complaint, the proposed final judgment and the Competitive Impact Statement.  15 U.S.C. §§ 16(b)-(c).  To facilitate public access to the necessary information, the Tunney Act requires these items to be published in the Federal Register and to be made available to the public upon request.  15 U.S.C. § 16(b).  The United States also must make "any other materials and documents which the United States considered determinative . . . available to the public at [various court locales]."  *Id.*

The Tunney Act also requires summaries of, among other things, the proposed final judgment and Competitive Impact Statement to be published "for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct . . . ."  15 U.S.C. § 16(c).  The newspaper summaries must be accompanied by "a list of the materials and documents under subsection (b) of this section which the United States shall make available *for the purposes of meaningful public comment,* . . . ."  *Id.* (emphasis added).

44

The detailed requirements for making such information publicly available stand in stark contrast to the requirements for Section 16(g), which does not require or even suggest publication in the Federal Register or in any newspaper.  Nor is there any inference that such information is part of the public comment process.  Rather, the disclosure information is furnished to the Court.  Microsoft has made all required disclosures to the Court.  Moreover, in evaluating the adequacy of disclosures, the Court should not ignore its own involvement with this settlement.  In virtually every other United States antitrust judgment submitted for a court's approval under the Tunney Act, the statutory disclosures provide the totality of the Court's knowledge of the settlement process.  Here, however, the Court was very much involved in the process from its inception.  Indeed, the Court ordered the negotiations and was provided with periodic reports on their progress.  Also, the Court approved the appointment of a mediator who regularly reported to the Court.  Before any of the disclosures were filed, the Court's knowledge of the negotiations — who was involved and how the settlement was reached — was almost certainly more extensive than in any United States antitrust settlement ever submitted for review under the Tunney Act.

Nonetheless, should the Court order Microsoft to file additional information, that should have no impact on the statutory public comment period, which has now ended.  *See, e.g., Bechtel,* 648 F.2d at 664 ("government's failure strictly to comply with the [Tunney Act's] time requirements . . ." did not entitle defendants to relief from the consent decree).

45

## VII.   CONCLUSION

For all the foregoing reasons, Microsoft respectfully requests that the Court find that the SRPFJ is in the public interest and thus enter the SRPFJ as a final judgment in this case.


DATED:        February 27, 2002                    Respectfully submitted,


                                                   _____

William H. Neukom                                  John L. Warden (Bar No. 222083)
Thomas W. Burt                                     Richard J. Urowsky
David A. Heiner, Jr.                               Steven L. Holley
MICROSOFT CORPORATION                              Richard C. Pepperman
One Microsoft Way                                  SULLIVAN & CROMWELL
Redmond, Washington 98052                          125 Broad Street
(425) 936-8080                                     New York, New York  10004
                                                   (212) 558-3000
Dan K. Webb
Bruce R. Braun                                     Bradley P. Smith (Bar No. 468060)
WINSTON & STRAWN                                   SULLIVAN & CROMWELL
35 West Wacker Drive                               1701 Pennsylvania Avenue, N.W.
Chicago, Illinois 60601                            Washington, D.C.  20006
(312) 558-5600                                     (202) 956-7500


Charles F. Rule (Bar No. 370818)                   *Counsel for Defendant*
Douglas W. Baruch (Bar No. 414354)                   *Microsoft Corporation*
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON
1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20004-2505
(202) 639-7300