IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
UNITED STATES OF AMERICA        )
                                )
        Plaintiff,              )
                                )        Civil Action No. 98-1232 (CKK)
    v.                          )        Next Court Deadline:
                                )        March 6, 2002
MICROSOFT CORPORATION,          )        Hearing
                                )
        Defendant.              )
_____)
```

MEMORANDUM OF LAW OF THE SETTLING STATES
IN SUPPORT  OF THE PROPOSED FINAL JUDGMENT

ELIOT SPITZER
Attorney General of the State of New York

JAY L. HIMES
Assistant Attorney General
Chief, Antitrust Bureau

RICHARD L. SCHWARTZ
Assistant Attorney General
120 Broadway
New York, New York 10271
(212) 416-8282

February 27, 2002                    On Behalf of the Settling States

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point I  -  THE SRPFJ IS IN THE PUBLIC INTEREST AND
            ITS ENTRY SHOULD BE APPROVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point II -  THE SRPFJ IS DESIGNED TO RESTORE
            COMPETITION WHICH MICROSOFT SUPPRESSED . . . . . . . . . . . . . . . . . . . . 4

        A.      Middleware Competition May Threaten Microsoft's Monopoly . . . . . . . . . . . . 5

        B.      Microsoft's Own Anticompetitive Actions Provide Guidance
                In Assessing the Efficacy of Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      The SRPFJ Empowers OEMS to Promote Middleware
                Competition by Making Market-Driven Choices . . . . . . . . . . . . . . . . . . . . . . . 8

        D.      The SRPFJ Lowers Entry Barriers by Mandating Disclosure of
                Interfaces Between Windows and Middleware Products . . . . . . . . . . . . . . . . . . 11

        E.      By Requiring Disclosure of Client-Server Connections, The Decree
                Prevents Microsoft from Impeding Server-Based Threats to Windows . . . . . . . 14

        F.      The Purpose of the Decree's Licensing Provisions
                Is to Facilitate Microsoft's Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Point III  -  THE DECREE'S ENFORCEMENT PROVISIONS
              ARE POWERFUL AND COMPREHENSIVE . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      The Role of the Technical Committee in Enforcement . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Columbia Artists Management, Inc. v. United States*,
   381 U.S. 348 (1965), *affg. per curiam*, 1963 Trade Cas.
   (CCH) ¶ 70,955 (S.D.N.Y. 1963)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*International Salt Co. v. United States*,
   332 U.S. 392 (1947)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*National Society of Professional Engineers v. United States*,
   435 U.S. at 679 (1978)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*NLRB v. Express Pub. Co.*,
   312 U.S. 426 (1941)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State of New York v. Microsoft Corp.*,
   No. 98-1233(CKK)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Bechtel Corp.*,
   *648 F.2d 660 (9th Cir.), cert.denied., 454 U.S. 1083 (1981)*  . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Grinnell Corp.*
   384 U.S. 568 (1966)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir.), *cert. denied*, 122 U.S. 350 (2001)  . . . . . . . . . . . . . . . . . . . . 4

*United States v. Microsoft Corp.*,
   84 F.Supp 2d 9  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. United Shoe Mach. Corp.*
   391 U.S. 244 (1968)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Cases**                                                                **Page**

*Zenith Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


**Statutes and Rules**

15 U.S.C.
    § 16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    § 16(b)-(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------

UNITED STATES OF AMERICA    )

                                      )

           Plaintiff,        )

                                      )       **Civil Action No. 98-1232 (CKK)**

           v.             )       **Next Court Deadline:**

                                      )       **March 6, 2002**

MICROSOFT CORPORATION,    )       **Hearing**

                                        )

           Defendant.      )

---------------------------------------------

## MEMORANDUM OF LAW OF THE SETTLING STATES
## IN SUPPORT OF THE PROPOSED FINAL JUDGMENT

The States of New York, Ohio, Wisconsin, Illinois, Kentucky, Louisiana, Maryland, Michigan, and North Carolina (the "Settling States") submit this Memorandum of Law in support of the entry of the second revised proposed Final Judgment ("Second Revised Proposed Final Judgment" or "SRPFJ"),

### PRELIMINARY STATEMENT

Together with the United States Department of Justice, the Settling States have participated in all phases of this civil antitrust matter, beginning with the investigation of Microsoft's anticompetitive practices, through litigation before this Court, the Court of Appeals and the Supreme

Court, and finally in the negotiations and mediation that resulted in the decree submitted to the Court for approval pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "Tunney Act").

As the Court noted in its November 8, 2001 Order, the requirements and procedures of the Tunney Act apply only to proposals for "consent judgments submitted by the United States." 15 U.S.C. §6(b). Therefore, the SRPFJ is subject to the Tunney Act's procedures — and to its requirement that the Court determine that its entry is in the public interest — only to the extent that it is "submitted by the United States." Nevertheless, the Court reasonably anticipated that the Settling States would play a role in the Tunney Act proceedings, and it is appropriate for them to do so for several reasons.

First, the Settling States brought this action to protect competition and innovation in the software industry, from which their citizens and economies benefit. Entry of the SRPFJ in both the action brought by the United States and that brought by the Settling States will serve those goals and is, therefore, in the public interest. Second, the Settling States' representatives were directly and continuously involved in negotiating the provisions of the proposed decree. Accordingly, their views as to the purpose and intent of those provisions may be helpful to the Court in conducting its public interest analysis. Finally, the SRPFJ *is* the decree intended to conclude *State of New York v. Microsoft Corp.*, No. 98-1233(CKK), as to the Settling States. The parties' stipulation approving the SRPFJ conditions its entry in the States' case on Tunney Act approval of the decree in this case brought by the United States. *See* Stipulation dated February 27, 2002.. Strictly speaking, however, settlement of the claims brought by the Settling States is not subject to court approval pursuant to the Tunney Act or any other provision of law.

2

Here, the Settling States address two areas. We will first describe how the SRPFJ grows out of the case that was litigated by the plaintiffs, decided by the District Court, and upheld by the Court of Appeals, in light of the legal standards governing relief in antitrust cases and the public interest determination under the Tunney Act. After that, we respond to the comments submitted during the Tunney Act process relating particularly to the enforcement and compliance provisions of the SRPFJ.

## ARGUMENT

### Point I

### THE SRPFJ IS IN THE PUBLIC INTEREST AND ITS ENTRY SHOULD BE APPROVED

The SRPFJ seeks to resolve a complex and historic government antitrust action by imposing wide-ranging conduct relief on Microsoft, which is designed to redress the harm to competition that Microsoft's anticompetitive actions inflicted, and so to vindicate the public interest in protecting competition in the software industry.

It is, therefore, unsurprising that the terms of the decree are themselves complex, and in many instances represent the result of balancing competing considerations within the constraints of a negotiated resolution of the action. For all of the reasons set forth below, the SRPFJ is in the public interest and should be approved. *See, e.g. United States v. Microsoft Corp.,* 56 F.3d 1448, 1457-62 (D.C. Cir. 1995); *United States v. Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir.)*, cert.denied.,* 454 U.S. 1083 (1981).

### Point II

3

## THE SRPFJ IS DESIGNED TO RESTORE
## COMPETITION THAT MICROSOFT SUPPRESSED

The starting point for assessing the appropriateness of the injunctive relief in this civil antitrust action is the unlawful conduct that gave rise to it. *See, e.g., National Society of Professional Engineers v. United States,* 435 U.S. 679, 697 (1978). Here, the District Court found, and the Court of Appeals unanimously affirmed, Microsoft's liability for monopolization in violation of Section 2 of the Sherman Act. *United States v. Microsoft,* 253 F.3d 34, 50 (D.C. Cir.), *cert. denied*, 122 U.S. 350 (2001). Microsoft's anticompetitive conduct had the purpose and effect of crushing competitive initiatives that might have threatened Microsoft's monopoly of operating system software for Intel-compatible PCs.

The goals of the remedy are, therefore, not only to end the violations and prohibit their recurrence, but also to restore competitive conditions in the affected market. *National Society of Professional Engineers,* 435 U.S. at 697. As the Court of Appeals noted in its unanimous decision, "[t]he Supreme Court has explained that a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' *Ford Motor Co.,* 405 U.S. at 577, 92 S.Ct. 1142, to 'terminate the illegal monopoly, deny to the defendant the fruits of the statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.' *United States v. United Shoe Mach. Corp.* 391 U.S. 244 (1968) ... *see also United States v. Grinnell Corp.* 384 U.S. 568, 577 (1966) ...." 253 F.3d at 103. *See also International Salt Co. v. United States,* 332 U.S. 392, 401 (1947) (public interest served by government Sherman Act equity suits "is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints").

4

Equally important, as the Supreme Court has ruled, "[a] federal court has broad power to restrain acts which are of the same type or class as the unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Corp. v. Hazeltine Research, Inc.,* 395 U.S.100, 132 (1969) (quoting *NLRB v. Express Pub. Co.,* 312 U.S. 426, 435 (1941)). Indeed, in light of the objective of restoring competition to the market, the Court may prohibit otherwise lawful conduct if doing so "represents a reasonable method of eliminating the consequences of the illegal conduct" or preventing its resumption. *National Society of Professional Engineers,* 435 U.S. at 698.

The task for this Court is to assess, within the framework of the Tunney Act public interest standard, whether the forward-looking injunctive relief embodied in the SRPFJ can reasonably be expected to achieve these objectives. In making that judgment, the Court may be guided, first, by what the record of the action shows as to the dynamics of competition in the relevant markets. On this score, the principal point that emerges from that record is the central role played by certain software products, termed "middleware," as a means to lower or eliminate the barriers that protect Microsoft's monopoly in PC operating systems from competitive challenge.

## A.    Middleware Competition May Threaten Microsoft's Monopoly

The Court of Appeals upheld "the primary focus of the plaintiffs' § 2 charge," which was "on Microsoft's attempts to suppress middleware's threat to its operating system monopoly." 253 F.3d at 54. Middleware, as the Court of Appeals explained, refers to software products, such as Netscape Navigator and Java, which could run on multiple operating system products – not just on Windows – and which could "take over some or all of Windows's valuable platform functions – that is, developers might begin to rely upon APIs exposed by the middleware for basic routines rather than

relying upon the API set included in Windows." 253 F.3d at 53.  Such a shift by software developers would, in turn, lower the applications barrier to entry that protects Microsoft's monopoly in PC operating system software.

The applications barrier to entry arises because the value of an operating system product to consumers depends largely on the availability of other products that are compatible with it, particularly software applications. As the Court of Appeals observed, "most consumers prefer operating systems for which a large number of applications have already been written; and ... most developers prefer to write for operating systems that already have a substantial consumer base .... This 'chicken-and-egg' situation ensures that applications will continue to be written for the already dominant Windows, which in turn ensures that consumers will continue to prefer it over other operating systems." 253 F.3d at 55. Without access to a rich variety of complementary products and applications, no operating system rival to Microsoft's Windows can be competitive. "Because the applications barrier to entry protects a dominant operating system irrespective of quality, it gives Microsoft power to stave off even superior new rivals." *Id.* at 56.

A middleware product is not in itself a competitor to Microsoft's Windows operating system products.  Rather, it is the catalyst for a multi-step process that may, by lowering the applications barrier to entry, bring about conditions under which other PC operating system products can compete with Windows on their competitive merits.  Microsoft's unlawful conduct therefore consisted of destroying competitive threats while they were still in their infancy. No certain prediction could or can be made whether such threats would in fact mature into actual competition in the PC operating system market. Nevertheless, the Court of Appeals correctly held that by excluding such nascent threats, Microsoft maintained its monopoly power in ways that violate Section 2 of the Sherman Act.

The Court unanimously found that it would be "inimical to the purpose of the ... Act to allow monopolists free reign to squash nascent, albeit unproven competitors at will — particularly in industries marked by rapid technological advance and frequent paradigm shifts." 253 F.3d at 78. Clearly, then, to effectively remedy the Section 2 violation, the SRPFJ must safeguard the nascent threats that the Sherman Act protects.

**B.    Microsoft's Own Anticompetitive Actions Provide Guidance
In Assessing the Efficacy of Relief**

In assessing the adequacy of relief, the Court may also be guided by what the record evidence reveals about the ways that Microsoft used the power derived from its dominance in operating systems to block developing middleware threats. Two of those ways deserve particular notice.

First, Microsoft used its power over OEMs to force distribution of Internet Explorer ("IE"), its own browser product, and to limit distribution of Netscape's Navigator browser and Sun Microsystem's Java, two competing middleware products. Because there was (and still is) no viable commercial alternative to Windows, OEMs had no choice but to accept Windows licensing terms that severely limited their ability to offer competing middleware products.

Second, in order to exclude Navigator and Java, Microsoft also discriminated in the disclosure of Windows-related technical information required for interoperability. For example, the Court of Appeals held unlawful agreements with third-party producers of software products – "independent software vendors" ("ISVs") – in which Microsoft "conditioned receipt of Windows technical

information upon the ISV's agreement to promote Microsoft's JVM exclusively." 253 F.3d at 74.[1]

One objective of a remedy is to reduce the barriers to competition in the PC operating system market, which Microsoft raised by these means. Middleware products such as Navigator and Java threatened to reduce or, eventually, even to eliminate certain of those barriers. But Microsoft used these anticompetitive means, as well as others, to deny those middleware threats access to the distribution channels they required to mature. Similarly, Microsoft used its control over Windows-related technical information, which ISVs needed to achieve timely compatibility with Windows, in order to disadvantage its rivals. The task of a remedy is to reverse, to the extent feasible, the anticompetitive impact of Microsoft's actions by lowering such entry barriers, and to prohibit the foreseeable means by which Microsoft might again use its monopoly power to crush future nascent middleware threats.

**C.     The SRPFJ Empowers OEMS to Promote Middleware
          Competition by Making Market-Driven Choices**

One of the SRPFJ's principal objectives is to empower OEMs to make market-driven choices as to the middleware products they distribute. This in turn requires depriving Microsoft of the means that it used, or that it foreseeably might use, to foreclose this important distribution channel to competing middleware products. Sections III.A and III.B of the SRPFJ are among the provisions addressing this objective. Section III.A broadly prohibits Microsoft from retaliating against an OEM

---

[1] A "Java Virtual Machine" or "JVM" is part of the set of Java technologies developed by Sun Microsystems, which are themselves a form of middleware. PCs with a "Java runtime environment" — a software layer consisting of a JVM and Java applications programming interfaces ("APIs"), called "class libraries" — are enabled to run programs written for those Java APIs, rather than for the APIs exposed by Windows. Java is thus a form of middleware that threatened to make PCs less dependent on Windows. 253 F.3d at 73.

based on that OEM's support for non-Microsoft middleware or operating system software. Section III.B. requires Microsoft to license its Windows Operating System Products to the 20 largest OEMs on uniform terms and conditions, and for uniform royalties. The uniform licensing terms are designed to thwart efforts to evade the prohibition on retaliation.  Section III.B does not, however, authorize any refusal by Microsoft to negotiate licensing terms and conditions with any individual OEM; the provision requires only that any term or condition extended to any of the 20 largest OEMs be made available to each of them.

Other parts of the SRPFJ address another tactic that Microsoft used to exclude Navigator from the OEM distribution channel: Microsoft bound its competing middleware product, IE, to its monopoly Windows operating system product. As the Court of Appeals found, Microsoft used its control over both the design of and the licensing terms for Windows to impose costs on OEMs and consumers who sought to distribute or use Navigator.

Microsoft bound IE technologically to the Windows operating system by excluding IE from the "Add/Remove Programs" utility, thereby rendering it impractical for users to remove Microsoft's browser.  253 F.3d 64-67. Microsoft also "commingled code related to browsing and other code in the same files, so that any attempt to delete the files containing IE would, at the same time, cripple the operating system." *Id.*, at 64-65. And, in its Windows licenses Microsoft prohibited OEMs from removing the "visible means of user access" to IE, or from modifying the initial boot sequence the first time a consumer turned on the PC. 253 F.3d at 60-64. This conduct forced OEMs to distribute Microsoft's IE,  raised Netscape's costs, and effectively foreclosed Netscape from the OEM distribution channel. The Court of Appeals held these actions exclusionary and violative of Section 2 of the Sherman Act.  *Id.* at 67.

To address this conduct, the SRPFJ requires Microsoft to assure that certain conditions and Windows design characteristics exist whenever Microsoft decides to change its monopoly operating system product in ways that could have important competitive consequences. Specifically, any decision by Microsoft's to add middleware  into its monopoly operating system product triggers obligations under Sections III.C and III.H of the SRPFJ.  Section III.C assures OEMs the ability (among others) to replace Microsoft middleware with non-Microsoft middleware on the desktop, start menu, or other appropriate menus, and to launch non-Microsoft middleware automatically where a Microsoft Middleware Product providing similar functionality would otherwise launch. Section III.H requires Microsoft (among other things) to provide OEMs with a mechanism permitting them to designate non-Microsoft Middleware Products to be invoked in certain specified instances where the Microsoft Middleware Product would be launched in ways identifiable to the user.[2] In other words, OEMs (as well has end users) will be able to add competing middleware to Windows in lieu of Microsoft-installed middleware, and establish that competing middleware as the "default" software that will launch when invoked by the user.  The objective is to preclude Microsoft from foreclosing distribution of competing middleware and to allow marketplace competition to determine which middleware is used.  At the same time, the SRPFJ does not prohibit Microsoft from adding new features, including new middleware, to its operating system products, thus offering consumers the potential benefits of bundling. Thus, these provisions address the exclusionary conduct held unlawful

---

[2] A non-Microsoft Middleware Product must be able to be invoked "in any case where the Windows Operating System Product would otherwise launch the Microsoft Middleware Product in a separate Top-Level Window and display either (i) all of the user interface elements or (ii) the Trademark of the Microsoft Middleware Product."  Section III.H.2.

and provide forward-looking relief to foster competition, while recognizing Microsoft's interest in determining the content of its own products.[3]

Though OEMs (and end users) will be able to substitute or add competing middleware to Windows, the software code included by Microsoft will not be removed from Windows. Plaintiffs maintained throughout the case that removal of end user access to Microsoft middleware, and not the actual removal of code, was what was required to give competitive marketplace forces the opportunity to operate. Consistent with this position, the SRPFJ avoids the software design and platform fragmentation issues that might arise if Microsoft were required to design Windows to enable code to be removed when competing middleware is added.

### D. The SRPFJ Lowers Entry Barriers by Mandating Disclosure of Interfaces Between Windows and Middleware Products

As noted above, Microsoft bound its IE browser to Windows both contractually and technologically. By technologically binding IE to Windows, Microsoft raised barriers not only to distributing, but also to developing, competing middleware. For middleware developed by ISVs to be competitive with that which Microsoft develops, the independent middleware must be able to interoperate with Windows in all the ways that Microsoft's middleware products do. Such seamless interoperability, in turn, requires access to all of the interfaces by which the Microsoft middleware product interacts with Windows. If all such interfaces are disclosed, ISVs have the opportunity to

---

[3]Under the SRPFJ, Microsoft may determine "[t]he software code that comprises a Windows Operating System Product. . . ." Section IV.U. This prerogative, of course, confers no immunity from antitrust liability that may otherwise attach under the prohibitions of federal and state law. *Columbia Artists Management, Inc. v. United States*, 381 U.S. 348 (1965), *affg. per curiam*, 1963 Trade Cas. (CCH) ¶ 70,955 (S.D.N.Y. 1963) (if construed to authorize defendant to engage in resale price maintenance, "the [consent] decree is illegal and void as contrary to the letter and policy of the Sherman Act").

write middleware products that can benefit from Windows' operating system resources in the same ways and to the extent as Microsoft's middleware products do.  ISVs are then able to develop middleware products that OEMs and others could substitute for those that Microsoft offers, and such ISVs and others could make their own products available to users in seamlessly interoperating bundles, just as Microsoft does.

By technologically binding IE to Windows, Microsoft  rendered the interfaces that permit Microsoft's middleware products to interoperate with Windows "within" the Windows product. ISVs were, therefore, unable to gain access to them, and that severely impeded ISV efforts to develop competing middleware.

Both interface disclosure itself, and the timing of such disclosure, are critical to enabling ISVs to develop competitive middleware products.  Without timely access to interface information equivalent to that available to Microsoft's own middleware developers, ISVs will be unlikely to achieve timely and seamless interoperability.  In that event, the attractiveness of their middleware products as potential substitutes for Microsoft middleware would be substantially, perhaps decisively, diminished. Microsoft employed precisely this strategy against Navigator, even before Microsoft had technologically bound IE to Windows. As the District Court found, Microsoft conditioned the release of critical technical information that Netscape needed in order to make Navigator run well on the Windows platform on Netscape's agreement not to compete with Microsoft in "presenting a comprehensive platform for the development of network-centric applications." *United States v. Microsoft Corp.,* 84 F.Supp 2d 9, 33 (Finding of Fact ["FOF"] 88; *see generally* FOFs 79-92 at 30-34). When Netscape did not agree, Microsoft refused to provide the technical information that Netscape sought. *Id.*

12

To promote development of competing middleware, the SRPFJ requires Microsoft to disclose the interfaces, referred to as "application programming interfaces" or "APIs," that its own middleware uses to interoperate with Windows, and to provide technical documents relating to these APIs. Section III.D. API disclosure will enable ISVs to design competing middleware that works well with Windows.

The bundling of functionality into a single product may, however, offer advantages to consumers. Adding a flash cube to a camera, or a radio to a car, are two obvious examples. Moreover, although a monopolist, Microsoft, like all companies, should have incentives to innovate and to offer improved products; protecting that incentive includes recognizing that companies generally may decide for themselves the extent to which products and product features are disclosed, and the timing of such disclosure. Accordingly, the circumstances in which the courts may direct a monopolist to make such product disclosures inevitably raise hotly contested issues.

Recognizing these countervailing considerations, the SRPFJ includes a requirement that Microsoft middleware be "separately distributed" from the Windows operating system in order to trigger the company's obligation to disclose the APIs between that middleware and Windows. Section VI.J.1. Were Microsoft to refrain from separately distributing a particular middleware product included in Windows, it would not be required to disclose the APIs used by that middleware product.

That requirement represents a twofold judgment. First, it seems likely that Microsoft would have to resort to separate distribution of its middleware in any battle against the platform threats that the SRPFJ seeks to protect. That was, in fact, the way Microsoft responded to the threat posed by Netscape. The alternative would be for Microsoft to adopt a strategy in which only purchasers of new PCs, or of shrink-wrapped versions of Windows, receive a middleware product offered by

13

Microsoft.  However, under such a strategy, Microsoft would be unable to supply the middleware product to any of the millions of Windows users worldwide who comprise its installed user base. Microsoft would thereby put itself at a competitive disadvantage as suppliers of competing middleware offered attractive product features to the installed base of Windows users.  Second, to the extent that Microsoft distributes middleware products separately from its Windows operating system, there does not appear to be any technical or design impediment to requiring Microsoft to disclose the interfaces between the two products.

**E.    By Requiring Disclosure of Client-Server Connections, The Decree Prevents Microsoft from Impeding Server-Based Threats to Windows**

Seamless interoperability is critical not only between software products residing on the PCs employed directly by users, but also between "client" PCs and the software products that reside on "server" computers, which link PCs into networks or by which PCs connect to the Internet. As the District Court found, the development of such server-based network computing might eventually weaken the applications barrier to entry that protects Microsoft's monopoly.[4]  Microsoft has itself emphasized in this action that  the Internet and networks generally have become an increasingly important locus of applications. Such applications "run" partly or even primarily on the server, rather than on the PC client, and ISVs  write code to APIs exposed by such server-based applications.[5]

---

[4] "[T]he growth of server- and middleware-based applications development might eventually weaken the applications barrier to entry. This would not only make it easier for outside firms to enter the market, it could also make it easier for non-Microsoft firms already in the market to present a viable alternative to Windows." *United States v. Microsoft Corp.,* 84 F.Supp 2d at 25 (FOF 56).

[5] *See* Microsoft's Proposed Findings of Fact ¶ 286, in which Microsoft relies on Bill Gates' own prediction in 1997: "The fact is that applications can be run on the server [a]gainst an HTML client [that is, web browsing software].... Most applications will have very little client [*i.e.*, PC] code in the future."

If such a development came to fruition, interfaces exposed by non-Microsoft software running on servers might offer precisely the kind of middleware platform for applications that Netscape's Navigator browser offered, and precisely the same kind of threat to Microsoft's Windows monopoly that Navigator presented. The significance of server-based applications as a source from which a competitive challenge to Windows may be mounted is, therefore, clear. Server-based applications may be the functional equivalent of PC middleware.

Microsoft markets operating systems and applications for servers and other computers and devices, as well as for PCs. Thus, Microsoft has incentives to use its PC operating system monopoly to undercut any server-based threats to its dominance.[6] And, Microsoft's Windows monopoly gives it an extremely powerful fortress from which to suppress such threats. Software running on the server, like applications running on the PC, must "talk to" and generally be compatible with Windows. By withholding interfaces between its monopoly PC operating system product and its server software, Microsoft can impede efforts by producers of non-Microsoft server software to deploy products that interoperate with Windows operating systems running on PCs as well as Microsoft server software does.

For example, Microsoft has not disclosed key interfaces between its Windows 2000 PC operating system product and its server software products. These interfaces relate to important security and system management functions of its Windows 2000 PC products. These functions

---

[6]As the Department of Justice pointed out in its Competitive Impact Statement, any threat to Microsoft's dominance from PC client-side middleware would also have a server component: "The competitive significance of most Non-Microsoft Middleware, including the browser and Java Virtual Machine against which much of Microsoft's illegal conduct was directed, was and will continue to be highly dependent on content, data and applications residing on servers and passing over networks such as the Internet or corporate networks to that middleware running on personal computers." Section III.E.

incorporate a security technology called Kerberos, which is an open, extensible standard developed by university-affiliated computer scientists and published by the Internet Engineering Task Force. However, Microsoft has "extended" — *i.e.,* modified — the Kerberos standard as incorporated into Windows 2000 in ways that it has not disclosed. As a result, the ability of non-Microsoft server software to interoperate with Windows 2000 running on PCs is currently limited in significant respects.

Because of the potential competitive significance of these marketplace conditions, the Settling States attach great importance to forward-looking relief that prevents a recurrence of the "browser war" in the "PC to server" sector of the industry. Accordingly, Section III.E of the SRPFJ obligates Microsoft to disclose the Communications Protocols implemented in Windows, which are used to communicate with Microsoft server operating system products. This disclosure is conceptually analogous to the API disclosure called for between the Windows operating system and Microsoft middleware.

**F.     The Purpose of the Decree's Licensing Provisions
         Is to Facilitate Microsoft's Disclosures**

Section III.I of the SRPFJ complements these disclosure provisions. This section sets out the licensing framework to which Microsoft must adhere in licensing entities seeking disclosure of "any intellectual property rights owned or licensable by Microsoft that are required to exercise any of the options or alternatives expressly provided to them under the Final Judgment." The overriding purpose of this Section is to ensure that such intellectual property rights are made available to all such entities on terms that do not frustrate the disclosure provisions of the SRPFJ.

16

Under Section III.1.1, Microsoft is entitled to royalties and other terms that are "reasonable and non-discriminatory." Microsoft may not use this subsection to collect monopoly rents by demanding licensing fees reflecting the economic value of the information to be disclosed pursuant to the SRPFJ as viewed from the perspective of Microsoft's monopoly position in the PC operating system market.

## Point III

### THE DECREE'S ENFORCEMENT PROVISIONS
### ARE POWERFUL AND COMPREHENSIVE

A review and analysis of the comments submitted regarding the enforcement and compliance provisions of the SRPFJ confirms that those provisions are powerful and comprehensive enough to accomplish the objectives of the decree. Indeed, these provisions are probably the strongest ever crafted in an antitrust case.

Two preliminary observations may put our responses to comments in context. First, while we attempt to respond fully below to the comments submitted, some concrete questions are best answered as experience with application of the SRPFJ develops (assuming its approval by this Court). The enforcement task to which the SRPFJ is addressed is, with respect to the scope, complexity, and duration of the business activities covered, a novel one. The scheme for enforcement and compliance may require more detailed rules and practices to translate its provisions into operation. For example, a set of practices to enable the Technical Committee ("TC") to resolve compliance issues that come to its attention from marketplace participants may need to developed. The possible need for operating procedures does not, however, detract from the comprehensive quality of the enforcement mechanism.

17

Second, certain commenters argue, either explicitly or implicitly, that ultimate responsibility to enforce the SRPFJ should rest with someone other than the plaintiffs, such as a special master. For the reasons set forth below, the Settling States disagree with that view, and the SRPFJ does not adopt it. The SRPFJ expressly provides that "[t]he Plaintiffs shall have exclusive responsibility for enforcing this Final Judgment." Section IV.A.[7]

## A.    The Role of the Technical Committee in Enforcement

By way of brief summary, the SRPFJ creates the three-person TC "to assist in enforcement [of] and compliance" with the decree. Section IV.B.l. One member will be selected by the United States and the Settling States, one by Microsoft, and the third by the other two members. The TC is empowered, among other things: (1) to interview any Microsoft personnel; (2) to obtain copies of any Microsoft documents – including Microsoft's source code – and access to any Microsoft systems, equipment, and physical facilities; and (3) to require Microsoft to provide compilations of documents, data and other information and to prepare reports for the TC. Section IV.B.8.b and c. The TC itself is authorized to hire staff and consultants to carry out its responsibilities. Section IV.B.8.h. Microsoft also is required to provide permanent office space and other support facilities for the TC at its Redmond, Washington campus. Section IV.B.7. In other words, for the five year term of the decree, the TC will be the on-site eyes and ears of the government enforcers.

Several commenters misunderstand the nature of the TC's enforcement role as contemplated by the SRPFJ. They conceive of the TC itself as the primary enforcement body under the SRPFJ, and on the basis of this mistaken premise argue that it is not well-suited for the task. *See, e.g.* Comments

---

[7]For purposes of this discussion, we use the term "plaintiffs" in the sense used by the SRPFJ to refer to the United States and the Settling States, collectively.

of America Online/Time Warner, Vol. I, Tab 2 at 51.  But, as noted above, plaintiffs themselves have the enforcement responsibility. The TC's primary task is to assist the plaintiffs in their discharge of that responsibility.

While there is no template in prior case law for the enforcement relationship between the TC and the plaintiffs, the central enforcement rationale for establishing the TC is to enable a continual process of cooperation and consultation to develop. The TC members and their staff may communicate regularly with appropriate representatives of the plaintiffs, both orally and through prescribed reports, with regard to all aspects of their activities.[8] They may seek advice and guidance from plaintiffs; conversely, plaintiffs may direct the TC's activities in specified directions.  In this way, the TC will be plaintiffs' permanent, on-site presence. Insofar as the TC needs formalized procedures to function, they can be developed in close cooperation with plaintiffs.

At the same time, it is well to recognize that the TC is *not* plaintiffs' only means to monitor and enforce compliance. The SRPFJ also grants plaintiffs all of the visitorial powers customary in antitrust consent decrees, including access to all documents and source code, the opportunity to interview Microsoft officers, employees and agents, and the right to require written reports from Microsoft on matters within the scope of the SRPFJ. *See* Section IV.A.2.[9]

However, the TC's assistance to plaintiffs in monitoring and enforcement – and, as discussed below, to third parties in resolving complaints – is important in several respects.  First, the TC will provide technical expertise not only in matters of software design and programming, but also through

---

[8]Section IV.B.9 exempts the plaintiffs from the obligation that the TC members otherwise have to refrain from disclosing information obtained in the course of their duties.

[9]In addition, the SRPFJ requires Microsoft to undertake internal compliance obligations. Section IV.C.

19

its ability to retain staff and consultants (all paid for by Microsoft) in *any* area in which expertise is needed to monitor and enforce the decree. Second, in their capacity as full-time, on site monitors, TC members and staff will have the ability to gather information and to acquire familiarity with relevant facts, and with Microsoft's actual business operations, which would be impractical for plaintiffs to acquire through traditional enforcement methods. For example, to facilitate its monitoring role, the TC may develop ways to assure that it regularly receives internal Microsoft communications.

Several commenters note, correctly, that interpretation of the SRPFJ is largely a legal matter. From this, they contend that the TC, which will consist of persons with technical and business expertise, rather than lawyers, is ill-equipped to determine whether Microsoft has complied with the decree. *See, e.g.,* Computer and Communicatons Industry Association, Vol. 1, Tab 8, at 90-91. But, again, these comments misunderstand the TC's role. Plaintiffs will make the judgments needed to assess compliance. The TC's expertise and experience under the decree will be available to inform those judgments.

Several commenters have suggested vesting authority to enforce the SRPFJ in a special master, who would combine both investigative and adjudicative functions. *See, e.g.,* America Online/Time Warner, Vol. 1, Tab 2 at 51-52. But we know of no precedent for the United States or the Settling States to delegate enforcement authority for an antitrust conduct decree to a third party. Any such delegation in this case would be inappropriate and ill-advised. Enforcement decisions under the SRPFJ may affect a broad range of behavior and conduct in the information technology sector. In turn, judgments involving considerations of antitrust enforcement policy that the SRPFJ may require should be made by the United States and the Settling States as public enforcement officials – not by a court-appointed authority.

Several commenters argue that the SRPFJ affords Microsoft the ability unduly to influence or even to "co-opt" the TC. Specifically, commenters object to those provisions of the SRPFJ that allow Microsoft to select a TC member, and to the fact that the TC will be paid for and largely located on-site at Microsoft's corporate headquarters. *See, e.g.,* Computer and Communications Industry Association, Vol. 1, Tab 9, at 90; KDE League, Vol. 2, Tab 21, at 3; James Love and Ralph Nader, Vol. 2, Tab 27, at unnumbered page 5 of 6.

However, Microsoft's influence over the membership of the TC is limited, and subject to oversight and control by the plaintiffs. Section IV.B.3. While Microsoft may appoint one TC member directly, the individual chosen to serve in this unprecedented capacity should be presumed to be one of integrity, who will faithfully discharge what are expected to be weighty responsibilities. In all events, a TC member may be removed at any time "[i]f the United States determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment." Section IV.B.5. This provision itself highlights the TC's enforcement role, as Microsoft has no comparable authority.

The SRPFJ also establishes terms of employment for TC members which are designed to insulate them from any undue influence by Microsoft, and to enable them to function, in conjunction with the plaintiffs, as effective compliance monitors. Each TC member will enter into an agreement with the United States on behalf of the plaintiffs which "grants the rights, powers and authorities necessary to permit the TC to perform its duties under this Final Judgment." Section IV.B.6. Microsoft will pay all the fees and expenses for the TC, indemnify each TC member against any claims arising out of the TC's duties, and provide facilities at Microsoft's headquarters (and elsewhere, if needed) for the TC. To discourage Microsoft from mounting any unwarranted court

challenge to the TC's costs and expenses, the SRPFJ authorizes the TC to recover *its* litigation expenses, including attorneys' fees, unless the Court expressly finds that the TC's opposition to Microsoft's challenge was "without substantial justification." Section IV.B.8.i. With these provisions, there is no realistic risk that a TC member's independence will be compromised.

Commenters have also expressed the view that the TC will lack the range of expertise or the resources to monitor compliance effectively. John Giannandrea, Vol. 1, Tab 15, at 6; J.J. Gifford, Vol. 1, Tab 16, at 5. And commenters have argued that the SRPFJ's compliance and enforcement structure will generate delays that preclude timely enforcement, both because the SRPFJ sets no deadlines to resolve complaints and because, in their view, plaintiffs themselves will have to start any enforcement effort "from scratch" to replicate the investigation already conducted by the TC. America Online/Time Warner, Vol. 1, Tab. 2 at 51; American Antitrust Institute, Vol. 1, Tab 3; at 42, 43; Robert Litan et al., Vol. 2 Tab 25, at 54-55; RealNetworks, Inc., Vol. 3, Tab 37, at 32; SBC Communications, Vol. 3, Tab 39 at 112. These concerns are coupled with objections to the SRPFJ's prohibition on admitting any "work product, findings or recommendations by the TC ... in any enforcement proceeding before the Court for any purpose. ..." Section IV.D.4.d. This prohibition, these commenters argue, not only delays enforcement, but deprives the Court of valuable evidence. None of these concerns is well-founded, however.

First, the SRPFJ enables the TC to retain, at Microsoft's expense, such staff and consultants as may be "reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment." Section IV.B.8.h. Thus, as the TC may benefit from the input of economists and other experts, as has been suggested — or insofar as it may require staff or consultants to perform its duties — the SRPFJ expressly empowers the TC to retain that assistance.

The SRPFJ does prohibit the direct admission into evidence in enforcement proceedings of the TC's work product, findings, and recommendations. But concerns that this prohibition will negatively affect the timeliness and effectiveness of enforcement under the SRPFJ are equally unwarranted. Under the SRPFJ, the TC will be able to monitor Microsoft's activities on-site and more directly than has likely ever been the case in an antitrust decree. The familiarity with Microsoft's products and practices thus acquired should mean a significant savings in the time required to resolve complaints submitted to the TC.

Under the SRPFJ,  the condition attached to the TC's unprecedented opportunity to  monitor so closely is the prohibition on direct use of the TC's work product in court. However, in view of the close working relationship that the SRPFJ contemplates between the plaintiffs and the TC, that condition will not hinder the plaintiffs from mounting timely and effective enforcement efforts as needed. Because the TC and the plaintiffs may consult on any issue or complaint before the TC at *any* stage of the TC's work,  much time-consuming duplication of enforcement effort can be avoided. There will be no need  for  plaintiffs  to  start "from scratch" where the TC has already laid the foundation for any enforcement action.  Significantly, the SRPFJ does not preclude plaintiffs from using, relying on, or making any derivative use of the TC's work product or findings in connection with any activities relating to enforcement of the decree. Accordingly, the TC's efforts may inform any subsequent enforcement action by plaintiffs in ways that obviate unnecessary delay, and that allow plaintiffs efficiently to replicate TC work in ways that are admissible in court..  For example, nothing in the RPFJ prohibits the plaintiffs from using the TC's work for internal purposes.  Thus, plainitiffs may use the TC's work product to guide and short-cut work by a non-TC expert who is retained for enforcement purposes.

23

Indeed, the enforcement alternative to the TC favored by some commenters — investigations conducted under the aegis of a special master, followed by judicial hearings before that same special master — might well be less expeditious than the enforcement framework contemplated by the SRPFJ. Proceedings before special masters often include all the acoutrements of judicial proceedings – document requests, depositions, resort to compulsory process and the like – as well as typical judicial procedural protections. Furthermore, any decision by the special master would presumably be subject to judicial review. *See* Rule 53(e)(2), Fed. R. Civ. P. In consequence, nothing about the special master alternative suggests reason to believe it would produce faster — or better — results than those produced through the SRPFJ's mechanisms.

The SRPFJ also contemplates that the TC may assist in voluntary resolution of complaints submitted to it by third parties. *See* Sections IV.B.8.d.; IV.D.4. In so doing, however, the TC will continue to act as an enforcement auxiliary to the plaintiffs, rather than as a neutral mediator. Section IV.D.4.b. underlines this point. It provides for comprehensive consultations between the TC and plaintiffs regarding any investigations of complaints received. With respect to Microsoft, however, the TC is bound only to allow it "an opportunity to respond to the substance of the complaint and to determine whether the complaint can be resolved without further proceedings."

The TC may also play an important role in meeting the needs of ISVs who have questions or concerns with respect to the interoperability of their software products with Windows arising out of the disclosures that Microsoft is required to make pursuant to Sections III.D. and E. of the SRPFJ. Specifically, the TC "may study, interrogate and interact with [Microsoft's] source code in order to perform its functions and duties, including the handling of complaints and other inquiries from non-parties." Section IV.B.8.c.

24

Commenters have objected to the "secrecy" in which they contend the TC is required to operate because, they claim, it will prevent the dissemination of useful information developed by the TC to interested industry third parties in the course of the complaint process and otherwise. *See, e.g.,* Computer and Communications Industry Association, Vol. 1, Tab 9, at 91. However, two points should be taken into account in evaluating the confidentiality restrictions to which the TC is subject, which are set forth in Section IV.B.9.[10]

First, the TC and its staff are, as noted above, essentially enforcement auxiliaries of the plaintiffs. The restrictions on disclosing information obtained in the course of the TC's activities do not differ significantly from those customarily applicable to confidential information obtained in the course of the government's enforcement of an antitrust decree. Generally, such information is not disclosed unless and until such enforcement reaches the stage of an application to the Court. Then, questions of continued confidentiality of information in the application, or in resulting judicial proceedings, are generally determined under applicable decisional law, which balances the competing considerations. The SRPFJ adopts essentially the same structure.

Second, the SRPFJ is not intended definitively to resolve all issues arising concerning the potential need for the TC to impart information to third parties in response to its review of any third-party complaints. Section IV.B.8.g. makes clear that the TC may communicate with complainants

---

[10] Section IV.B.9 provides: "Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC, or as a person assisting the TC, to anyone other than Microsoft, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgement and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than Microsoft and the Plaintiffs except as allowed by the Protective Order entered in the Action or by further order of this Court."

regarding the resolution of their inquiries: "TC members may communicate with non-parties about how their complaints or inquiries might be resolved with Microsoft, so long as the confidentiality of information obtained from Microsoft is maintained."   Section IV.B.9, quoted in footnote 10, expressly envisions "further order[s] of this Court" if the disclosure instructions of the existing Protective Order in the case prove unduly to restrict the TC's handling of third-party inquiries or complaints.

**Conclusion**

Accordingly, the Settling States respectfully submit that the SRPFJ satisfies the public interest standard required by the Tunney Act.  The Court should enter the decree.[11]

Dated: New York, New York
      February 27, 2002

          Respectfully submitted,


          ELIOT SPITZER
          Attorney General of the State of New York


          _____

          JAY L. HIMES
          Assistant Attorney General
          Chief, Antitrust Bureau

          RICHARD L. SCHWARTZ
          Assistant Attorney General
          120 Broadway
          New York, New York 10271
          (212) 416-8282

          On Behalf of the Settling States

---

[11]In a motion filed February 26, 2002 in *State of New York v. Microsoft Corp.*, Civil Action No. 98-1233 (CKK), Microsoft seeks an Order dismissing the Non-Settling States' demand for equitable relief in their on-going case.  To assure no misapprehension, the Settling States wish to state that they regard Microsoft's dismissal motion as without merit.  Under prevailing law, neither the willingness of the Department of Justice and the Settling States to agree to a proposed consent decree, nor the Court's approval of that proposed decree (should that be the eventual result in this case), disables the Non-Settling States from exercising their right to have this Court resolve the remedy issues raised in *State of New York* on the merits. Indeed, after Microsoft argued for reversal of the June 2000 judgment in the consolidated case based in part on the lack of what it regarded as a sufficient remedies hearing -- and after the D.C. Circuit unanimously upheld Microsoft's liability for unlawful monopoly maintenance -- Microsoft should not be heard to contend that the Non-Settling States themselves should now be denied a hearing on the remedy that *they* seek.

27

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of February 2002, copies of the Memorandum of Law

of the Settling States in Support of the Proposed Final Judgment were served upon:


John L. Warden, Esq.                    (overnight courier)
Sullivan & Cromwell
125 Broad Street
31st Floor
New York, New York 10004-2498

Charles F. Rule, Esq.                   (overnight courier)
Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20004-2505

*Counsel for Defendant Microsoft Corporation*


Renata B. Hesse, Esq.                   (overnight courier)
United States Department of Justice
Antitrust Division
601 D Street, N.W.
Suite 1200
Washington, D.C.  20530

*Counsel for Plaintiff The United States of America*




                                        _____
                                        Richard L. Schwartz