IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>                           Defendant. | Civil Action No. 98-1232 (CKK)<br><br>Next Court Deadline:<br>March 6, 2002 Tunney Act Hearing |

**DEFENDANT MICROSOFT CORPORATION'S SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF THE SECOND REVISED PROPOSED FINAL JUDGMENT**

Pursuant to the Court's Order dated February 13, 2002, Defendant Microsoft Corporation ("Microsoft") respectfully submits this Supplemental Memorandum in support of the Second Revised Proposed Final Judgment ("SRPFJ"). Microsoft believes it is necessary to supplement the Memorandum it filed on February 27, 2002 in one respect only.

On February 27, 2002, the United States, the Settling States, and Microsoft filed a Stipulation replacing the Revised Proposed Final Judgment ("RPFJ") submitted to the Court on November 6, 2001 with the SRPFJ. The SRPFJ contains several clarifications that the United States concluded were appropriate in light of its review of the public comments. In addition to the refinements in the language of the RPFJ, the SRPFJ also incorporates one minor substantive change -- the deletion of RPFJ Section III.I.5. There appears to be a misunderstanding in some quarters as to the import of that change and its genesis. This misunderstanding has been fostered by the non-settling States in their Motion for Limited Participation in Light of the Deposition of Richard Fade, which the Court granted on February 28, 2002. Microsoft submits this Supplemental Memorandum to make the record clear.

## I. The Deletion of Section III.I.5 of the RPFJ

Section III.I.5 was a very narrow provision.  In the context of disclosing any APIs or related Documentation (under Section III.D) or making available Communications Protocols (under Section III.E) to third parties, Section III.I.5 would have permitted Microsoft to seek from those third parties a license back of any intellectual property that those third parties had that Microsoft might indirectly infringe *as a result of making available its APIs or Communications Protocols*.  Section III.I.5 would have enabled Microsoft to obtain a license "no broader than . . . necessary to insure that Microsoft can provide . . . options or alternatives" under Sections III.D and III.E.  Microsoft believed when the RPFJ was negotiated and continues to believe that it was perfectly reasonable for the company to seek protection against claims of indirect infringement for doing what Sections III.D and III.E obligate the company to do.  Cross-licensing of intellectual property rights is utterly routine in technology licenses.

Nevertheless, the United States advised Microsoft that a number of Tunney Act comments read Section III.I.5 much more broadly than the parties intended.  For example, some commenters complained that the section would allow Microsoft to misappropriate third parties' technology and then force the technology's owner to give up its right to sue Microsoft for direct infringement.  The United States expressed concern that some third-party middleware developers might decline to take advantage of Microsoft's obligation under the RPFJ to disclose APIs and Communications Protocols because of a misunderstanding as to the meaning of the provision.  In order to meet the United States' concern, Microsoft agreed to delete the provision.

## II. Section III.I.5 Had No Relation to OEM Complaints about Uniform Terms.

In their Motion for Limited Participation in the Tunney Act proceeding, the non-settling States have argued that Microsoft negotiated for Section III.I.5 in order to obtain the right to include a patent non-assertion provision ("NAP") in its decree-mandated uniform Windows license agreements with OEMs.  The non-settling States' argument has no basis in fact.

Section III.I.5 had nothing to do with the NAP. First, a NAP is not a patent license.[1] Second, the licensing of Windows to OEMs has nothing to do with Microsoft's obligations under Sections III.D and III.E. Third, as the non-settling States know well, there was no discussion at all in the settlement talks of the idea that Section III.I.5 related to the NAP. (Indeed, the NAP was discussed only in the context of Microsoft's explanation that OEMs with varying patent portfolios were likely to be dissatisfied with any uniform NAP provision that they could not negotiate individually with Microsoft because of Section III.B.) The non-settling States know that Microsoft has successfully negotiated for NAPs in its Windows licenses with all OEMs (not just the "tiny" ones, as the non-settling States mistakenly say) since at least 1995. In fact, antitrust enforcement agencies have reviewed the NAPs in Microsoft's licenses with OEMs, and they have recognized the procompetitive benefits of the provisions. (See the discussion, *infra,* at III.).

Notwithstanding their participation in the settlement talks (and thus understanding of the facts set forth above), the non-settling States have sought to take advantage of the fact testimony of Richard Fade, a Microsoft executive, to craft an argument concerning the legal import of Section III.I.5. Mr. Fade manages Microsoft's business relationships with its OEM customers. He is not engaged in product development or developer relations. As such, he has no responsibility for disclosing APIs under Section III.D or making Communications Protocols available under Section III.E and he therefore does not require a working knowledge of Section III.I.5. In the course of being interrogated about the company's relations with OEMs and its effort to comply with Section III.B of the RPFJ, Mr. Fade, a non-lawyer, mistakenly accepted the

---

[1]  The non-settling States continue to misstate the meaning of the NAP. The non-settling States contend that the NAP prohibits OEMs from suing for any infringement relating to Windows XP regardless of whether that operating system is put in a game console or a set top box, regardless of whether Microsoft competes with the OEMs in building such products and regardless of whether the patents in question read on hardware or software. All of these assertions are false.

interrogator's false premise that Section III.I.5 was related in some way to Microsoft's long-standing practice of including a NAP in its Windows license agreements.

### III. Section III.B of the SRPFJ Requires Microsoft To Have a Uniform NAP.

Section III.B of the SRPFJ alone is the reason that Microsoft has insisted on a uniform NAP in negotiating Windows licenses with OEMs since December 16, 2001.[2] That section of the SRPFJ (which was contained in the RPFJ as well) requires Microsoft to provide Windows Operating System Products to Covered OEMs "pursuant to uniform license agreements with uniform terms and conditions," of which the NAP is one.

The persistence of the non-settling States in suggesting that Microsoft negotiated for Section III.B in order to be able to impose onerous terms on OEMs is disingenuous at best. It was the non-settling States, along with the other Plaintiffs, who insisted on Section III.B. Microsoft steadfastly resisted the Plaintiffs' entreaties to include Section III.B on two primary grounds: first, there is no basis in the Court of Appeals' decision to justify such a provision, and second, Microsoft believed that its OEM customers would be unhappy if they were unable to negotiate different terms and conditions that reflected their widely varying business needs.

Once Section III.B was put in place, it was inevitable that its "one size fits all" mandate would displease OEMs who were long accustomed to negotiating license terms with Microsoft. As the evolution of the NAP term (chronicled in the Declaration of Richard Fade, which was appended to Microsoft's Response to the Non-settling States' Motion for Limited Participation (September 22, 2002)) demonstrates, Microsoft has endeavored to be responsive to

---

[2] Presumably because the non-settling States understand that the analogous provision in their proposed relief (Section 2 of the Non-Settling States Remedial Proposals ) would greatly exacerbate the problem, they assert that Microsoft negotiated other provisions to enable the company to impose onerous terms on OEMs -- namely, Section III.I.5 and the requirement in Section III.A of the RPFJ that OEMs be given at least two opportunities to cure before being terminated for a breach of their license. As has already been explained, Section III.I.5 bears no relationship to the NAP. If anything Section III.A is even more remote. The limitations imposed on Microsoft by Section III.A, such as the requirement that Microsoft provide OEMs with opportunities to cure breaches, do nothing to help Microsoft obtain a NAP in its Windows licenses.

OEM complaints by adjusting uniform terms such as the NAP (before the issue was raised in Mr. Fade's deposition). Microsoft has also solicited additional feedback from OEMs to evaluate what changes to make in the next version of its uniform license.

While Microsoft can adjust the uniform terms to reflect feedback from OEMs, Section III.B prohibits Microsoft from tailoring those provisions to meet the unique circumstances of each of the top 20 OEMs. So long as that is the case, some OEMs will benefit (and of course will not complain in this Tunney Act proceeding or anywhere else) and some OEMs -- typically the biggest -- will not benefit and will take every opportunity to complain. As Microsoft explained in its Response to the Non-Settling States' Motion for Limited Participation (dated February 22, 2002) and in its Memorandum in Support of the SRPFJ (dated February 27, 2002), that is the inevitable result of any provision that seeks to eliminate all of Microsoft's flexibility to tailor terms to reflect the special circumstances of a given OEM. Section III.B alone is the cause of the problem, and the presence, *vel non*, of Section III.I.5 is simply irrelevant. Having negotiated so hard for such a provision (albeit refusing to settle when Microsoft caved to their demand), the non-settling States' hypocritical attempt to shift the blame to Microsoft should not be countenanced. [3]

---

[3] The analogous provision in the non-settling States' proposed relief (Section 2.a) would make the problem far worse. Unlike Section III.B in the SRPJF, the non-settling States' analog would be extended (1) to nearly every aspect of Microsoft's relationship with OEMs and (2) to virtually every class of Windows licensee, including retailers, value-added resellers, systems integrators, and even large corporate end-users. Somehow Microsoft would have to develop a single uniform license to apply to vastly disparately-situated licensees. The "pain" of Section III.B of the SRPFJ, which is largely confined to the top OEMs, would be spread not just to more OEMs but to all manner of other licensees.

DATED:   March 1, 2002                                  Respectfully submitted,

_____

| | |
|---|---|
| William H. Neukom | John L. Warden (Bar No. 222083) |
| Thomas W. Burt | Richard J. Urowsky |
| David A. Heiner, Jr. | Steven L. Holley |
| MICROSOFT CORPORATION | Richard C. Pepperman |
| One Microsoft Way | SULLIVAN & CROMWELL |
| Redmond, Washington 98052 | 125 Broad Street |
| (425) 936-8080 | New York, New York  10004 |
| | (212) 558-3000 |
| Dan K. Webb | |
| Bruce R. Braun | Bradley P. Smith (Bar No. 468060) |
| WINSTON & STRAWN | SULLIVAN & CROMWELL |
| 35 West Wacker Drive | 1701 Pennsylvania Avenue, N.W. |
| Chicago, Illinois 60601 | Washington, D.C.  20006 |
| (312) 558-5600 | (202) 956-7500 |
| Charles F. Rule (Bar No. 370818) | *Counsel for Defendant* |
| Douglas W. Baruch (Bar No. 414354) | *  Microsoft Corporation* |
| FRIED, FRANK, HARRIS, SHRIVER   & JACOBSON | |
| 1001 Pennsylvania Avenue, N.W. | |
| Suite 800 | |
| Washington, D.C. 20004-2505 | |
| (202) 639-7300 | |

6