UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,

     v.

MICROSOFT CORPORATION,

    Defendant.

Civil Action No. 98-1232 (CKK)

**MEMORANDUM OPINION**

On May 9, 2002, the United States filed its "Certificate of Compliance with the Tunney Act," certifying that "it has complied with the provisions" of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("Tunney Act"). United States Certificate of Compliance at 1. In so certifying, the United States leaves to this Court the final task of determining whether the "Second Revised Proposed Final Judgment" ("SRPFJ") resolves the above-captioned case in a manner that comports with the public interest. Preliminary to that determination, however, are two threshold issues. First, the Court must address whether the Tunney Act applies to this Court's consideration of the SRPFJ. Second, the Court is obliged to examine whether the provisions of the Tunney Act have, in fact, been satisfied.[1] Upon review of the record in this case, the

---

[1] The Court undertakes this determination, in part, because of the significant public objection to the entry of the proposed consent decree. In considering the parties' compliance with the Tunney Act, the Court focuses on those objections which are most clearly and frequently articulated in the public's comments and by amici curiae. In most, if not all, instances, the particular comments and concerns are not unique to a single individual or entity, but instead are echoed by numerous members of the public. Given the volume and the redundancy of the comments, rather than attribute those comments which the Court addresses herein to specific individuals and entities, the Court will address the public's comments and

voluminous filings of the United States, Microsoft, and amici curiae, the comments submitted by the public pursuant to 15 U.S.C. § 16(b), and the relevant law, the Court concludes that the Tunney Act applies to this case. The Court further concludes that the parties have complied with the Tunney Act's provisions such that this matter is ripe for the Court's public interest determination.

## I. BACKGROUND

On May 18, 1998, the United States filed a civil complaint alleging that Microsoft had engaged in anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. On that same date, a group of state plaintiffs filed a separate civil complaint alleging similar violations of federal law, as well as violations of the corresponding provisions of their various state laws. Shortly thereafter, the two cases were consolidated and proceeded jointly through discovery and trial on the merits. On November 5, 1999, Judge Thomas Penfield Jackson entered 412 findings of fact, *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ("*Findings of Fact*"), and on April 3, 2000, Judge Jackson entered conclusions of law, finding Microsoft liable for violations of Sections 1 and 2 of the Sherman Act and the corresponding state law provisions, *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) ("*Conclusions of Law*"). On June 7, 2000, Judge Jackson entered final judgment in the consolidated cases and imposed a remedy for Microsoft's antitrust violations. *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000).

Microsoft appealed, and the D.C. Circuit considered the consolidated cases *en banc*. Following extensive briefing and two days of oral argument, the D.C. Circuit issued a unanimous

concerns generally.

*per curiam* decision affirming in part, reversing in part, vacating the remedy decree in full, and remanding in part for remedy proceedings before a different district court judge.[2]  *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).  Following reassignment, on September 28, 2002, this Court ordered the parties to enter into intensive settlement negotiations.  *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (D.D.C. Sept. 28, 2001) (order setting a schedule for settlement discussions).  On that same date, the Court entered a schedule for discovery and commencement of evidentiary proceedings, in the event that the cases were not resolved through settlement.

The United States and Microsoft were able to reach a resolution in *United States v. Microsoft Corp.*, No. 98-1232 (D.D.C.), in the form of a proposed consent decree, which was filed with the Court as the "Revised Proposed Final Judgment" on November 6, 2001.  The settlement negotiations were partially successful with regard to the companion case, *State of New York, et al. v. Microsoft Corp.*, No. 98-1233 (D.D.C.); a portion of the Plaintiff States joined the settlement between the United States and Microsoft.  Those states which opted not to join the settlement proposed a remedy distinct from that presented in the proposed consent decree.  As a result, the Court vacated the discovery schedule with regard to *United States v. Microsoft Corp.* and deconsolidated that case from its companion case.  *See United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (D.D.C. Nov. 2, 2001) (vacating the Scheduling Order with regard to Civil Action No. 98-1232); *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (Feb. 1, 2002)

---

[2]The D.C. Circuit affirmed in part Judge Jackson's finding of Section 2 liability for illegal monopoly maintenance.  *Microsoft*, 253 F.3d at 46.  The appellate court reversed Judge Jackson's finding of Section 2 liability for attempted monopolization and remanded his finding of Section 1 liability for unlawful tying.  *Id.*  The United States opted not to pursue the tying claim on remand.

(deconsolidating cases).  Rather than proceed to an evidentiary hearing on the issue of remedy, as did some of the plaintiffs in *State of New York, et al. v. Microsoft Corp.*, the United States and Microsoft commenced the process for obtaining judicial approval of the proposed consent decree pursuant to the Tunney Act, 15 U.S.C. § 16(b)-(h).  Additional facts relevant to the Court's discussion of the parties' compliance with the Tunney Act are recounted as appropriate below.

## II.  TUNNEY ACT, 15 U.S.C. § 16(b)-(h)

At the center of the inquiry before the Court is the Antitrust Penalties and Procedures Act, 15 U.S.C. § 16(b)-(h).  The aforementioned statute, commonly referred to as the Tunney Act, applies to "[a]ny proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws."  15 U.S.C. § 16(b).  Concerned with "the integrity of and public confidence in procedures relating to settlements via consent decree," H.R. Rep. No. 93-1463, at 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6536, Congress enacted the Tunney Act to prevent "judicial rubber stamping" of proposed consent decrees, *id.* at 8, *reprinted in* 1974 U.S.C.C.A.N. at 6538.  *See also United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995) (citing legislative history).  The Tunney Act mandates that, prior to entry of a consent decree between the United States and the party charged with violation of the antitrust laws, "the court shall determine that the entry of such judgment is in the public interest."  15 U.S.C. § 16(e).

True to its name, the Antitrust Procedures and Penalties Act mandates compliance with a number of procedures before the Court can render its public interest determination as to the proposed penalties.  *See generally* 15 U.S.C. § 16(b)-(h).  The United States must first publish the

proposed consent decree, accompanied by a "competitive impact statement,"[3] in the Federal

Register.  *Id.* § 16(b).  Section 16(b) further mandates that the United States file with the Court

those materials and documents which it considers to be "determinative in formulating" the

proposed consent decree.  *Id.*  Subsection (c) requires the United States to provide the public with

notice of the proposed consent decree and competitive impact statement by publishing summaries

of the two documents in "newspapers of general circulation of the district in which the case has

been filed, in the District of Columbia, and in such other districts as the court may direct."

*Id.* § 16(c).  Following publication in the Federal Register, the public has an opportunity to submit

comments to the United States regarding the proposed consent decree.  *Id.* § 16(b).  The United

States is required to "receive and consider any written comments relating to the proposal for the

consent judgment submitted under subsection (b) of [Section 16]."  *Id.* § 16(d).  Ultimately, the

comments must be published in the Federal Register and filed with the District Court.  *Id.* § 16(b).

In concert with its receipt and consideration of the public comments, the United States is obliged

to publish a response to the comments in the Federal Register and to file the response with the

District Court.  *Id.* § 16(d).

Although the Tunney Act burdens the United States with numerous requirements, the Act

also demands certain action by the defendant proposing entry of a consent decree.  Subsection (g)

mandates that the defendant "file with the district court a description of any and all written or oral

communications by or on behalf of such defendant . . . with any officer or employee of the United

States concerning or relevant to [the proposed consent decree]."  *Id.* § 16(g).  The Tunney Act

exempts from the subsection (g) disclosures "any such communications made by counsel of

---

[3]Defined *infra* Section II.B.2.

5

record alone with the Attorney General or the employees of the Department of Justice."

*Id.* § 16(g).

**A.      Applicability of the Tunney Act**

Since announcing a settlement in this case, the parties have maintained that the Tunney Act governs the Court's consideration of the proposed consent decree. *See generally* Stipulation and Revised Proposed Final Judgment. Similarly, the Court has proceeded under the presumption that the Tunney Act applies to the Court's review of the proposed consent decree. *See United States v. Microsoft Corp.*, No. 98-1232 (D.D.C. Nov. 8, 2001) (order setting schedule for compliance with the Tunney Act). Notwithstanding this presumption, it would be unwise to embark upon a Tunney Act analysis of the public interest in this case without first examining whether the Tunney Act governs these proceedings. Accordingly, the Court commences its analysis by considering whether the procedural posture of this case–which has proceeded through the liability stage and awaits only an order of remedy–affects the applicability of the Tunney Act to the Court's review of the proposed consent decree.

By simply reading the statute and applying the language to the facts of this case, there seems little room to argue that these proceedings are not governed by the Tunney Act. Once again, the Tunney Act applies to "*[a]ny* proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws." 15 U.S.C. § 16(b) (emphasis added). Despite this clear statutory language, "[i]t has been variously suggested the Act does not apply to proposals that arise after the taking of testimony begins; . . . and after litigation through judgment and appeal . . . ." United States Mem. at 12. Much of the ammunition for this argument derives from the language used by then-Justice William Rehnquist in his dissent from summary affirmance in *Maryland v. United States*, 460

6

U.S. 1001 (1983).  Concerned with the constitutionality of the Tunney Act, Justice Rehnquist,

joined by Chief Justice Warren Burger and Justice Byron White, observed that "[t]he [Tunney]

Act applies only when a case has been settled." 460 U.S. at 1004 (Rehnquist, J., dissenting).

Justice Rehnquist therefore concluded that, in Tunney Act cases, "by definition, there has been no

judicial finding of relevant markets, closed or otherwise, to be opened or of anticompetitive

activity to be prevented."  *Id.*  Seeming to reflect the fact that, traditionally, most consent

judgments in antitrust cases are entered before trial, *see* H.R. Rep. No. 93-1463, at 6 (1974),

*reprinted in* 1974 U.S.C.C.A.N. 6535, 6536 ("As an annual average since 1955, approximately 80

percent of antitrust complaints filed by the Antitrust Division of the Department of Justice are

terminated by pre-trial settlement . . . ."); S. Rep. No. 93-298, at 5 (1973) ("Approximately 80

percent of all complaints filed by the Antitrust Division of the Department of Justice are settled

prior to trial by the entry of a consent decree."), Justice Rehnquist's comments assume that all

settlements in antitrust cases will occur prior to any judicial findings.  *Maryland v. United States*,

460 U.S. at 1004.  Thus, by implication, argue some, Justice Rehnquist's comments indicate that

the Tunney Act cannot apply where the Court has already identified a monopoly and imposed

liability for illegal monopoly maintenance.

     Justice Rehnquist's comments, although worthy of examination, do not prevent

application of the Tunney Act to these proceedings.  The comments were offered in dissent and

therefore are not binding upon this Court as precedent.[4]  More importantly, Justice Rehnquist's

---

     [4]The D.C. Circuit has, at least implicitly, taken the view that the Tunney Act may be
construed in a manner that avoids the "constitutional difficulties" identified by Justice Rehnquist
in his dissent from *Maryland v. United States*.  *Microsoft*, 56 F.3d at 1459 (noting Justice
Rehnquist's dissent and construing the degree of discretion held by the district judge under the
Act).

comments did not concern the distinction between pre-trial settlements and post-trial settlements, a distinction upon which those dissenting from application of the Tunney Act rely heavily to support their arguments.  At most, Justice Rehnquist's comments serve to emphasize the unusual nature of this case.  Indeed, the Department of Justice represents to the Court that, "[t]he United States has never before initiated a Tunney Act proceeding so late in a lawsuit."  United States Mem. at 12 n.9.  Nevertheless, the mere fact that Justice Rehnquist, in commenting on a distinct legal issue, did not consider the possibility of a post-liability proposal for consent judgment does not itself render the Tunney Act inapplicable to these proceedings.

More instructive on the applicability of the Tunney Act than Justice Rehnquist's comments in dissent are the statute's structure and legislative history.  First, the plain language of 15 U.S.C. § 16(b) is drawn broadly to apply to "[a]ny proposal for a consent judgment." 15 U.S.C. § 16(b).  Nothing in the language of this subsection, expressly or implicitly, indicates that the Act's provisions are inapplicable to consent decrees proposed after commencement of trial but in advance of a final judgment.  *Id.*

Furthermore, as the United States points out, the statute's structure belies any argument that the statute was written to apply only to consent judgments submitted in advance of the taking of testimony.  The statutory provisions referred to as the "Tunney Act" have been incorporated into the larger statutory scheme of the Clayton Act.  Thus, the provisions codified at 15 U.S.C. § 16(b)-(h) can also be characterized as subsections (b) through (h) of Section 5 of the Clayton Act.  While a seemingly minor point, the incorporation of the Tunney Act into the Clayton Act takes on significance when attempting to interpret the statutory provisions so as to "avoid a reading which renders some words altogether redundant."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).  The subsection immediately preceding the 1974 additions that bear Senator Tunney's

name, Section 5(a) of the Clayton Act, reflects an understanding of the term "consent judgments" which necessarily includes court-approved resolutions entered after testimony has been taken. 15 U.S.C. § 16(a) ("*Provided*, [t]hat this section shall not apply to consent judgments or decrees entered before any testimony has been taken.") (emphasis in original).  If the taking of testimony in this case renders it too late for introduction of a proposed "consent judgment," the proviso in subsection (a) would be surplusage.  As "[t]he cardinal principle of statutory construction is to save and not to destroy," in "giv[ing] effect, if possible, to every clause and word of a statute," the Court cannot read the reference to "consent judgments" in 15 U.S.C. § 16(a) to be limited to pre-testimony settlements.  *United States v. Menache*, 348 U.S. 528, 538-39 (1955) (internal citations and quotation marks omitted).

The meaning of "consent judgments" in subsection (a) impacts upon the Court's interpretation of the use of "consent judgment" in subsection (b) by operation of the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."  *Commissioner v. Lundy*, 516 U.S. 235, 250 (1996) (quotation marks omitted).  This rule dovetails with the "save and not destroy" principle, described above, such that the Court cannot read the term "consent judgment" in subsection (b) to exclude judgments entered subsequent to the taking of testimony.  Lending further credence to this interpretation are the "interrelationship and close proximity of these provisions of the statute."  *Id.*  Having chosen to place seven additional subsections into Section 5 of the Clayton Act, between former subsections (a) and (b),[5] Congress did not likely intend the term "consent judgment" to carry a meaning in the new subsection (b) different from that employed in subsection (a).

---

[5]Former subsection (b) was recodified as subsection (i) of 15 U.S.C. § 16.

9

Although the Court need not look to the legislative history because the statute is unambiguous on its face, *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002), examination of the legislative history surrounding the seven subsections that comprise the Tunney Act supports the Court's broad reading of "consent judgment."  Both houses of Congress heard testimony relating to consent decrees filed in judicial proceedings after the taking of testimony.  For example, Thomas E. Kauper, described as "the chief spokesman for the Antitrust Division," 119 Cong. Rec. at 24,599, while testifying before a subcommittee of the Senate Committee on the Judiciary, noted that although "most consent decrees . . . come within a period of less than a year after the filing of the case . . . a consent decree may come much later.  It may come after trial, even." *Antitrust Procedures & Penalties Act:  Hearings on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the Senate Comm. on the Judiciary*, 93rd Cong. 117 (1973) ("*Senate Hearings*") (statement of Thomas E. Kauper, Asst. Attorney General, Antitrust Div., Dep't of Justice).  Similarly, in testimony before the House Subcommittee on Monopolies & Commercial Law, while questioning the power of the judiciary to perform all that was required by the bill, Representative Edward Hutchinson remarked that a court's evaluation of the "public interest" would be particularly difficult in a case where, due to changed circumstances, the government opted to settle in the midst of a trial on the merits. *Consent Decree Bills: Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies & Commercial Law of the House Comm. on the Judiciary*, 93rd Cong. 41 (1973) ("*House Hearings*") (statement of  Representative Edward Hutchinson).  Moreover, in testimony before the same House subcommittee, Former Federal Trade Commission Chairman Miles Kirkpatrick noted that, in some instances, prosecutors at the Antitrust Division of the Department of Justice may choose to settle "after the partial trial of the case itself," based upon a realization that "there are

10

certain aspects of its case that do not have the strengths that were initially believed to be present." *Id.* at 145 (statement of Miles W. Kirkpatrick). These statements support the view that Congress was aware that, in certain cases, a proposal for a consent decree may be filed after substantial judicial proceedings on the issue of liability. As a result, the Court can readily infer that, given the absence of language specifically exempting such cases from the Tunney Act's requirements, Congress intended the Tunney Act to apply in those rare cases.

Of particular interest in the legislative history is the testimony of Judge J. Skelly Wright, who raised the "El Paso Pipeline litigation" as an "example" of a case where the "great influence and economic power" wielded by an antitrust violator was used to exert "significant pressure" on the government, and the government "succumbed to [the] pressure." *Senate Hearings*, 93rd Cong. at 147 (statement of Judge J. Skelly Wright); 119 Cong. Rec. at 24598 ("In the El Paso case–perhaps the leading atrocity in the whole litany of antitrust suits–after 17 years of inconclusive litigation, the U.S. Supreme Court, in language which some have described as unique for that body, accused the Antitrust Division of 'knuckling under' to the El Paso Natural Gas Corp."). In referencing the El Paso Pipeline litigation, Judge Wright sought to emphasize the usefulness of the legislation pending before the subcommittee.[6] Judge Wright's example is only

---

[6]The El Paso Pipeline litigation caused a scandal when, following a remand from the Supreme Court with clear instructions to "provide for 'divestiture without delay,'" the parties proposed a settlement in the form of a consent decree with "no divestiture in any meaningful sense." *Cascade Natural Gas Corp. v . El Paso Natural Gas Co.*, 386 U.S. 129, 131 (1967). The strength of Judge Wright's example of the El Paso Pipeline litigation is somewhat undercut by the fact that the Supreme Court ultimately rejected the proposed consent decree without the assistance of the Tunney Act on the grounds that it conflicted with the very specific mandate of that Court. *Cascade*, 386 U.S. at 142-43. Despite this holding, the Court expressly recognized the Attorney General's authority, in the absence of a contradictory mandate, to "settle suits after, as well as before, they reach [the Supreme Court]." *Cascade*, 386 U.S. at 136. The Tunney Act's legislative history makes clear that the Act was not intended to abrogate the Attorney General's settlement authority, but instead to "reinforce[] the fundamental policies of the

effective if the proposed legislation is understood to apply to settlements entered after testimony

has been taken; otherwise, the El Paso Pipeline litigation would serve only to exemplify a

problem that the proposed legislation would not have resolved.  Judge Wright's testimony

regarding the El Paso Pipeline litigation proved persuasive to Congress and was relied upon by

Senator Tunney in describing the need for the Antitrust Penalties and Procedures Act.  119 Cong.

Rec. at 24,598.

Drawing from Judge Wright's example of the perceived need for legislation applicable

both before and after the taking of testimony in an antitrust case, it is clear that the ultimate

purpose of the legislation would be no better served by a construction limiting its application to

pre-trial resolutions of antitrust cases.  To the contrary, the legislation's broad purpose in

"transform[ing] a procedure which was generally accomplished in a series of private, informal

negotiations between antitrust lawyers and attorneys for the defendant, into one that is exposed to

the full light of public awareness and judicial scrutiny" would be undermined by such a limitation.

93 Cong. Rec. at 24,598.  This conclusion is particularly apt given that post-testimony resolutions

of antitrust cases require levels of public awareness and judicial scrutiny which are at least equal

to those applied to pre-testimony settlements.

Undoubtedly, presentation of a consent decree after a finding of liability, but in advance of

a remedies-specific evidentiary hearing, is not the norm.  Still, mere abnormality does not

invalidate application of the Tunney Act in this instance.  Based on the plain language, structure,

and legislative history of the statute, the Court concludes that the provisions of the Tunney Act

and the review described thereunder are applicable to this case.  Accordingly, the Court will

---

Antitrust Division . . . [and] make[] governmental aspiration a legal reality."  93 Cong. Rec. at
24599.

proceed with an inquiry into and analysis of the parties' compliance with the procedures set forth

in 15 U.S.C. § 16(b)-(h).

Such inquiry and analysis are appropriate in this case and are authorized, if not required,

by the Tunney Act itself. *See United States v. General Contracting Co.*, 527 F. Supp. 1101, 1104

(E.D. Va. 1981) ("The Court is of the opinion that the record should affirmatively show that both

parties have complied with the requirements of the statute . . . ."). As noted above, pursuant to

subsection (e) of the Tunney Act, prior to entry of any consent judgment covered by the Tunney

Act, the Court must "determine that the entry of [the proposed consent] judgment is in the public

interest." 15 U.S.C. § 16(e). Implicit in the Court's obligation to determine that the consent

decree comports with the public interest is the requirement that the Court satisfy itself of the

parties' compliance with the Tunney Act. Any other conclusion would diminish the effectiveness

of the Act and the Court's inquiry thereunder. Reinforcing this view is the fact that, with the

exception of subsection (h),[7] each subsection of the Tunney Act involves the Court at some level.[8]

---

[7]Subsection (h) pertains not to the court considering entry of the proposed consent decree, but to courts which may preside over other antitrust proceedings involving the same defendant. 15 U.S.C. § 16(h). Subsection (h) renders inadmissible against any defendant in any antitrust action "[p]roceedings before the district court under subsections (e) and (f) . . . and the competitive impact statement filed under subsection (b)." *Id.*

[8]Subsections (b) and (d) require the United States to "file" certain materials with the Court. 15 U.S.C. § 16 (b), (d). Subsection (c) leaves to the Court's discretion the determination of the districts in which the summaries of the proposed judgment and competitive impact statement must be published. *Id.* § 16(c). Subsections (e) and (f) govern the Court's public interest determination, instructing that, in making this determination, the Court may consider the "competitive impact of such judgment" and may "review any comments including any objections filed with the United States under subsection (d) . . . and the responses of the United States to such comments and objections." *Id.* § 16(e), (f). Subsection (g) requires not only that the defendant file with the Court a description of its communications with the United States, but requires the defendant to "certify to the district court that the requirements of [the] subsection have been complied with," *id.* § 16(f).

Thus, given the structure of the Tunney Act, the duties imposed upon the Court, and the persistent involvement of the Court at every stage of the Tunney Act process, the Court deems it appropriate and necessary, prior to its evaluation of the public interest, to assess whether the parties have satisfied their obligations under the Act.

**B.    Subsection (b):  Determinative Documents, Competitive Impact Statement, and Publication in the Federal Register**

Subsection (b), the first provision of the Tunney Act, outlines the requirements for the initial filing of the proposed consent decree with the District Court and its publication in the Federal Register.  15 U.S.C. § 16(b).  The subsection further mandates that any written comments received in response to the proposed consent decree, along with the government's responses thereto, are to be filed with the District Court and published in the Federal Register.  *Id.*  Both the proposed consent decree and the public comments must be filed with the Court and published in the Federal Register not less than sixty days prior to the effective date of the proposed judgment. *Id.*

On November 6, 2001, the United States filed a "Stipulation" and "Revised Proposed Final Judgment" with the Court.  The Stipulation provided that the Court could enter the proposed final judgment "at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other proceedings." Stipulation and Revised Proposed Final Judgment at 1.  The United States filed its competitive impact statement with the Court on November 15, 2001.  Pursuant to 15 U.S.C. § 16(b), the United States published the proposed final judgment, along with its competitive impact statement, in the Federal Register on November 28, 2001.  Revised Proposed Final Judgment and Competitive Impact Statement, 66 Fed. Reg. 59,452 (Nov. 28, 2001).

14

The United States received 32,392 comments on the proposed final judgment, United States Certificate of Compliance at 2, and provided the full text of these comments to the Court on February 28, 2002, *id.* at 3.[9]  Due to the massive public response, publication of the comments in the Federal Register was more difficult than appears to have been contemplated by the statute's authors.  Notwithstanding this fact, on March 1, 2002, the United States submitted the full text of the public's comments for publication in the Federal Register, and on May 3, 2002, the public comments appeared in the Federal Register pursuant to that submission.  United States Certificate of Compliance at 4; Public Comments, 67 Fed. Reg. 23,654 (Books 2-12) (May 3, 2002).  Thereafter, on May 9, 2002, the United States published in the Federal Register an "addendum containing the correct text of thirteen (13) comments for which either an incomplete or incorrect electronic version had been included in the original submission to the Federal Register." Addendum to Public Comments, 67 Fed. Reg. 31,373 (May 9, 2002); United States Certificate of Compliance at 4.  Accordingly, the Court concludes that subsection (b)'s requirement that the United States publish the public's comments in the Federal Register has been satisfied.[10]

1.   *Determinative Documents*

Beyond the fairly basic requirement that the United States publish third-party comments in the Federal Register, subsection (b) mandates that the United States file with the Court and make available to the public any "materials and documents [it] considered determinative in

---

[9]The Court notes that the United States has gone to great lengths to make the relevant information available to the public and to simplify the process for the submission of comments by the public, including posting the relevant information on the Department of Justice website and accepting comments from the public via e-mail.  *See* United States Mem. at 21 n.25; United States Certificate of Compliance at 3-4.

[10]The United States' compliance with the requirement that it respond to the public's comments and publish such response in the Federal Register is discussed *infra* Section II.C.2.

formulating" the proposed consent decree.  15 U.S.C. § 16(b).  The United States maintains that, in this case, there exist no such "determinative documents."  United States Mem. at 18.  Some individuals and entities filing comments dispute the United States' contention, insisting that the United States has misconstrued the term "determinative documents" as it appears in Section 16(b).

While there is little case law available to guide this Court with respect to many other provisions of the Tunney Act, there is case law from the D.C. Circuit which provides some guidance, however limited, on this provision of the Act.  In particular, the case law provides direct guidance as to the meaning of "determinative documents."  15 U.S.C. § 16(b).  In *Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997), the appellate court considered an intervening party's challenge to the sufficiency of the United States' "determinative document" disclosure.  In response to the intervenor's challenge, the court rejected the position that "the Tunney Act requires the government to disclose whatever documentary evidence it has collected in the course of its investigation."  118 F.3d at 784.  The court stated:

> [T]he government sees the provision as referring only to documents, such as reports to the government, that individually had a significant impact on the government's formulation of relief--i.e., on its decision to propose or accept a particular settlement. The reference to what the "United States considered *determinative*" seems to point toward the government's view;  surely it rules out the claim to *all* the investigation and settlement material, and confines § 16(b) at the most to documents that are either "smoking guns" or the exculpatory opposite.  The legislative history in fact supports the government's still narrower reading . . . [and] displays a firm intent to preserve the government's ability to negotiate settlement agreements, yet a broad disclosure requirement would directly interfere with that ability.  The advantages of settlement to a defendant would be seriously undermined if it were sure to result in a discovery bonanza for private claimants.

*Id.* at 784-85 (internal citations and quotations omitted) (emphasis in original).  Drawing from this passage, the United States explains its failure to identify any "determinative documents" on the

grounds that it "did not consider *any* document to be a 'smoking gun or its exculpatory opposite.'"  United States Mem. at 31 (quoting *Massachusetts School of Law*, 118 F.3d at 784) (emphasis in original).

Although *Massachusetts School of Law* is instructive as to the meaning of "determinative," that case does not provide a clear standard by which a court may assess the government's compliance with subsection (b).  The language of Section 16(b) makes clear that the calculus by which documents are to be deemed "determinative" is left entirely to the United States.  In other words, the statute calls for documents "which the United States considered determinative," not documents which the Court or other parties would consider determinative. 15 U.S.C. § 16(b).  Accordingly, it is difficult to determine the degree of deference accorded to the government's evaluation of which documents are "determinative."  The opinion in the 1995 *Microsoft* decision instructs that, in general, the government's determinations in the Tunney Act context are entitled to some deference or "due respect."  *Microsoft*, 56 F.3d at 1461.  Concordant with this respect for the United States' assessment pursuant to Section 16(b) is an expectation that the United States will identify the documents in good faith and according to a reasonable standard.[11]

---

[11]"[A]t least one court has decided that the Government's conclusion that there are no determinative documents is subject to independent judicial review, and that disclosure of the documents the court deems determinative may be ordered."  *United States v. Alex Brown & Sons, Inc.*, 169 F.R.D. 532, 540-51 (S.D.N.Y. 1996), *aff'd sub nom. United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998), (citing *United States v. Central Contracting Co.*, 531 F. Supp. 133, 537 F. Supp. 571 (E.D. Va. 1982)).  This view appears to conflict with the general attitude of deference expressed in the *Microsoft* case, *Microsoft*, 53 F.3d at 1459 ("[T]he district court is not empowered to review the actions or behavior of the Department of Justice; the court is only authorized to review the decree itself."), and has been rejected by other courts.  *See, e.g.*, *Alex Brown & Sons*, 169 F.R.D. at 540-51.

The Court notes that, in similar situations, it is not uncommon for the Court to defer to the government's reasonable interpretations of a statute and the ensuing application of such interpretations.  *See, e.g.*, *General Services Admin. v. Federal Labor Relations Authority*, 86 F.3d

The United States' conclusion that there are no "determinative documents" is not

unexpected and comports generally with the record of the case, particularly given that "[t]he range

of materials that are 'determinative' under the Tunney Act is fairly narrow." *Bleznak*, 153 F.3d at

20.  Because this case was litigated to liability, the documents heavily relied upon by the United

States in making its case against Microsoft have already been aired.  The record of this case

supports the government's position that there exists no document so significant that it could be

considered alone, or in combination with other documents,[12] to be a "smoking gun."  In the

absence of any allegation of bad faith or reason to conclude otherwise, *see Hyperlaw, Inc. v.*

*United States*, 1998 WL 388807, at *3, 159 F.3d 636 (D.C. Cir. 1998) (unpublished table

decision), the Court concludes that the United States has satisfied its disclosure obligations with

regard to "determinative documents."  15 U.S.C. § 16(b).

2.    *Competitive Impact Statement*

As noted above, one of the first steps in Tunney Act compliance is the publication of a

competitive impact statement in the Federal Register at least sixty days prior to the effective date

---

1185, 1188 (D.C. Cir. 1996) ("We will defer to an agency's interpretation of its statute even if
proffered outside administrative adjudication or rulemaking so long as we are assured it is the
'official interpretation.' We have even deferred to 'agency counsel's litigative positions' where
we were certain that they did not differ from the agency's.").

   [12]At least one court has taken the position that Section 16(b) "determinative documents"
include documents that individually could not be considered determinative, but may be viewed
as "determinative" in the aggregate.  *See General Contracting Co.*, 537 F. Supp. at 575-77.  This
position has been rejected in other jurisdictions, *see, e.g.*, *Alex Brown & Sons*, 169 F.R.D. at 541
("*Central Contracting*'s broad definition of 'determinative documents' may conflict with
Congress's intent to maintain the viability of consent decrees."), and appears to conflict with the
law of this Circuit, as articulated in *Massachusetts School of Law*.  There, the D.C. Circuit
rejected the intervenor's position that the government must provide "evidentiary material on the
defendant's alleged antitrust violations" and thereby nullified, by implication, most arguments
that documents that in the aggregate may prove significant should be disclosed under the
"determinative documents" provision of Section 16(b).  118 F.3d at 784.

of the final judgment.  15 U.S.C. § 16(b).  Subsection (b) of Section 16 requires that the

competitive impact statement recite:

> (1) the nature and purpose of the proceeding;
> (2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;
> (3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;
> (4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;
> (5) a description of the procedures available for modification of such proposal; and
> (6) a description and evaluation of alternatives to such proposal actually considered by the United States.

*Id.*  The United States filed its competitive impact statement (the "CIS") with the Court on

November 15, 2001, and published it in the Federal Register on November 28, 2001.  Revised

Proposed Final Judgment and Competitive Impact Statement, 66 Fed. Reg. 59,452 (Nov. 28,

2001).

There appears to be no dispute that the United States satisfied the requirements set forth in

15 U.S.C. § 16(b)(1) and (2).  Section I of the CIS sets forth the "nature and purpose of the

proceeding," 15 U.S.C. § 16(b)(1), by providing a brief procedural history of the case and

explaining that entry of the proposed final judgment will terminate the action.  CIS at 2.  As

required by Section 16(b)(2), Section III of the CIS describes in detail the "practices . . . giving

rise to the alleged violation of the antitrust laws."  15 U.S.C. § 16(b)(2); CIS 5-17.  Section III

the CIS proceeds methodically through the district and appellate court proceedings, the factual

background of the case, and the harmful effect of Microsoft's anticompetitive conduct.  CIS at 5-

17.  The Court, therefore, is satisfied that the first two requirements of Section 16(b) have been

met.  Accordingly, the Court shall turn its attention toward the more controversial aspects of the

CIS.

Section IV of the CIS is directed at "explain[ing] the proposal for consent judgment" pursuant to subsection (b)(3).  15 U.S.C. § 16(b)(3).  Occupying the bulk of the CIS, Section IV deconstructs each section and definition in the proposed final judgment, detailing the scope of the decree and the conduct it prohibits.  CIS at 17-60.  Despite the exhaustive detail of Section IV, some individuals and entities filing comments have asserted that the analysis contained therein is insufficient to satisfy Section 16(b)(3).

Upon examination of the relevant portion of the CIS, the comments, and the legislative history, the Court concludes that the information provided by the United States in Section IV comports with the underlying goals of subsection (b)(3).  The legislative history explains that the purpose of requiring the United States to provide this information is to "encourag[e], and in some cases, solicit[], additional information and public comment that will assist the court in deciding whether the decree should be granted."  119 Cong. Rec. at 24,600.  The reports from both Houses of Congress agree that the purpose of this portion of the Act, in conjunction with subsections (c) and (d), is to "encourage additional comment and response by providing more adequate notice to the public."  S. Rep. No. 93-298, at 5 (1973); H.R. Rep. No. 93-1463, at 7 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6538.  The House Report goes on to "stress[] that effective and meaningful public comment is also a goal."  H.R. Rep. No. 93-1463, at 7 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 6538.  According to the Senate Report on the bill, "additional participation by interested parties in the approval of consent decrees" serves as a means to counterbalance the "great influence and economic power" available to antitrust violators.  S. Rep. No. 93-298, at 5 (1973).

Given that the Department of Justice received over 32,000 comments from the public,

many of which are lengthy and detailed, it is difficult to see the basis for an argument that the CIS did not accomplish the goals set forth above.  By the same token, upon close examination of the complaints relating to the sufficiency of Section IV of the CIS vís-a-vís subsection (b)(3), it is apparent that those individuals and entities raising such complaints want the United States to do the impossible.  Namely, certain individuals and entities insist that the CIS is insufficient because it does not explain how the proposed consent decree will reconstruct the marketplace in the absence of Microsoft's anticompetitive behavior.  Of course the proposed consent decree cannot be expected to reconstruct the marketplace in a "but for world."  *Microsoft*, 253 F.3d at 79 ("[N]either the plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct.").  Thus, the Court finds little merit in this criticism of the CIS.  While the CIS does not include an exhaustive economic analysis of the impact of the proposed final judgment, the document explains in detail the anticipated effect of the judgment's terms upon the behavior of Microsoft and other participants in the relevant market.[13]  In doing so, the CIS provides more than sufficient information to inform the public's comments regarding the proposed final judgment in this case.

Turning to the United States' obligations pursuant to Section 16(b)(4), Section VI of the CIS provides a cursory statement of the "remedies available to private litigants" by reciting that private litigants may sue for treble damages pursuant to Section 4 of the Clayton Act.  CIS at 63.

---

[13]Admittedly, by comparison to the competitive impact statement filed in conjunction with the settlement of the *AT&T* case, *United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd without opinion sub nom*, *Maryland v. United States*, 460 U.S. 1001 (1983), the CIS filed by the United States in this case does not contain the same level of detail with regard to the anticipated competitive impact of the proposed decree.  *Compare* Competitive Impact Statement, 47 Fed. Reg. 7170 (Feb. 17, 1982), *with* Revised Proposed Final Judgment and Competitive Impact Statement, 66 Fed. Reg. 59,452 (Nov. 28, 2001).  However, the fact that the United States included more detail in a particular section of the *AT&T* competitive impact statement does not necessarily render insufficient the less-detailed statement filed in this case.

The brevity of Section VI raises questions as to what additional information the government might have included.  Seizing upon this opportunity, some members of the public have argued that the disclosure pursuant to subsection (b)(4) should examine the effect of the settlement upon the findings of fact and legal conclusions in this case.

Examination of the plain language of the Act reveals that such a disclosure, while certainly desirable legal advice for potential plaintiffs, is not required by the terms of the statute.  Section 16(b)(4) provides that the competitive impact statement must disclose "the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding."  15 U.S.C. § 16(b)(4).  As is apparent from its language, Section 16(b)(4) gives no indication that the United States must disclose the impact of the proposed final judgment on private claims, requiring only that the government identify the remedies available to private claimants.[14]  As the final judgment itself does not provide any private remedies and the United States has identified the available statutory remedy, the Court concludes that the United States has satisfied its obligations pursuant to Section 16(b)(4).

Subsection (b)(5) requires that the government provide a "description of the procedures available for modification" of the proposed final judgment.  15 U.S.C. § 16(b)(5).  Section VII of the CIS offers such a description, noting that the proposed decree provides that the Court shall

---

[14]Indeed, it would seem that any pronouncement by the United States as to the impact of the proposed consent judgment upon the claims of private parties would serve little practical use.  It is well settled that "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement."  *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 529 (1986).  Thus, the United States need not restate the basic principle that the consent decree will not preclude claims by private parties.  Likewise, there is little usefulness in requiring the United States to speculate as to the collateral estoppel effect of the consent decree upon any findings of fact and conclusions of law which may exist in a given case.  The authority for such a determination is best reserved for the courts, not the Department of Justice.

retain jurisdiction and that the parties may apply to the Court at any time for modification of the decree.[15]  CIS at 65.  As there seems little basis for objection to the CIS on this point, the Court finds that Section VII of the CIS satisfies subsection (b)(5) of 15 U.S.C. § 16.

As recounted above, subsection (b)(6) requires the United States to provide a "description and evaluation" of alternatives to the proposed final judgment that were "actually considered by the United States."  15 U.S.C. § 16(b)(6).  The purpose of this provision, as with other provisions of the competitive impact statement, is to provide the public with the "basic data about the decree" such that "members of the public with a direct interest in the proceeding" are able "to understand what is happening and make informed comments [or] objections to the proposed decree during the 60-day period."  119 Cong. Rec. at 3452.

Rather than an exhaustive study, this portion of the competitive impact statement need only "outlin[e] the alternatives considered to the proposed consent judgment."  119 Cong. Rec. 36,337, 36,341 (1974).  Likewise, the discussion of alternatives "actually considered" is not parallel in nature to the description of the proposed final judgment mandated by Subsection (b)(3). *Compare* 15 U.S.C. § 16(b)(3), *with* 15 U.S.C. § 16(b)(6).  That is, this portion of the CIS, unlike the portion governed by subsection (b)(3), need not contain any description or evaluation of the "anticipated effects on competition" of the alternatives.  *Id.*  Such a description and evaluation were contemplated by the bill as originally proposed, 119 Cong. Rec. 3449 (1973), but were removed by amendment prior to passage, 119 Cong. Rec. at 24,604.  Congress determined not to require a description and evaluation of the anticipated effects on competition based upon the rationale that:

---

[15]Although not expressly noted in the CIS, in retaining jurisdiction, the Court may *sua sponte* raise the issue of modification with the parties.

> [t]he language . . . would require the staff of the Antitrust Division to speculate publicly as to the various effects upon competition which would be generated by various alternatives to the proposed consent judgment. These anticipated effects quite clearly can be speculated upon by the district court considering a proposed consent judgment or by other interested parties. . . .
>
> There is no reason, however, to require the staff of the Antitrust Division, at the peril of later embarrassment, to make a public prediction as to the competitive effects of various alternatives which it has considered. It is sufficient if the various alternatives are disclosed to the court and to the public.

*Id.* Any suggestion that such a description is required thus contradicts both the plain language of the statute and the legislative history.

The United States identifies Section V as the relevant portion of the CIS for purposes of evaluating its compliance with subsection (b)(6). This section of the CIS outlines the three major alternatives considered by the United States. The first of these is the somewhat obvious alternative of proceeding to litigate the issue of an appropriate remedy. CIS at 60. The government explains that it weighed this alternative and determined that the advantages of a prompt and certain resolution through settlement, combined with the relief specifically obtained through the proposed final judgment, rendered the proposed final judgment a more attractive option than litigation. *Id.* at 60-61.

The second alternative described in the CIS concerns, in general terms, the remedies ordered by the Court in June of 2000. This alternative can be divided into two subsets, one concerning the "break-up of Microsoft into two businesses," *id.* at 61, and the other based upon the interim conduct remedies[16] ordered by the Court, *id.* at 61-62. The government explains that it considered the viability of the "break-up" option upon remand to the District Court by the D.C. Circuit and determined that "the need for prompt, certain, and effective relief" weighed against

---

[16]The term "interim conduct remedies" paraphrases the appellate court's characterization of the original remedy decree entered in this case which included "interim restrictions on Microsoft's conduct." *Microsoft*, 253 F.3d at 396.

continuing to demand divestiture.  *Id.* at 61.  With regard to the conduct remedies, the United

States explains that a remedy based upon the interim conduct restrictions was considered during

the settlement discussions that produced the SRPFJ.  *Id.*  On this point, the government remarks

that the behavioral restrictions contained in the SRPFJ are modeled after those earlier conduct

restrictions, albeit with "additions and deletions that take into account the current and anticipated

changes in the computer industry, as well as the decision of the D.C. Circuit, which reversed

certain of the District Court's liability findings."  *Id.* at 61-62.

The third alternative described by the United States is best summarized as a list of various

conduct restrictions that might have been included in a remedy proposal.  Among these conduct

restrictions are (1) mandatory licensing of the Windows source code to original equipment

manufacturers (OEMs); (2) disclosure of the entire Windows source code, either within or without

a secure viewing facility; (3) a requirement that Microsoft distribute certain "Non-Microsoft

Middleware" with the Windows Operating System; (4) a requirement that Microsoft distribute the

Windows Operating System without any "Microsoft Middleware or corresponding functionality";

(5) mandatory continued support of "industry standards, if [Microsoft] chooses or claims to adopt

them or extends or modifies their implementation"; and (6) a waiver by Microsoft of intellectual

property rights related to "APIs, communications interfaces, and technical information," where

such rights would "prevent, hinder, impair or inhibit middleware from interoperating with the

operating system or other middleware."  *Id.* at 62-63.  The government explains that it rejected

these remedies following an examination of "their potential to remedy the harms proven at trial

and upheld by the D.C. Circuit; their potential to impact the market beneficially or adversely; and

the chances that they would be imposed promptly following a remedies hearing."  *Id.* at 63.

Considered in conjunction with the plain language of the statute, as clarified further by the

legislative history, the Court finds the discussion in Section V of the CIS more than sufficient to enlighten the public for purposes of meaningful comment.  Accordingly, the Court concludes that the United States has complied with 15 U.S.C. § 16(b)(6).  Having reviewed Section 16(b), the relevant portions of the legislative history, the relevant portions of the public comments, and the competitive impact statement filed in this case, the Court concludes that the United States has fulfilled its requirements pursuant 15 U.S.C. § 16(b).

**C.**     **Other United States Requirements**

*1.      Publication of Summaries*

Subsection (c) of 15 U.S.C. § 16 requires publication of certain information "for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct."  15 U.S.C. § 16(c).  Specifically, the publication must provide a summary of the proposed consent judgment and the competitive impact statement, a list of the materials and documents made available pursuant to subsection (b) for "purposes of meaningful public comment, and the place where such materials and documents are available for public inspection."  *Id.*  As noted above, the United States did not identify any determinative materials or documents.  *See supra* Section II.B.1.  Thus, the government's newspaper publications consisted primarily of "a summary of the terms of the proposed Final Judgment and Competitive Impact Statement."  United States Certificate of Compliance at 1.

Pursuant to the Tunney Act and an Order of this Court, *Microsoft*, No. 98-1232, Order at 2, (Nov. 8, 2001), the United States published summaries of the proposed consent decree and the CIS in the *Washington Post*, from November 16-22, 2001; in the *New York Times*, from November 17-23, 2001; and in the *San Jose Mercury News*, from November 17-23, 2001.  United

States Certificate of Compliance at 1-2.  By doing so, the United States satisfied the requirements

of 15 U.S.C. § 16(c).

>    2.    *Publication of Public Comments and Responses to Public Comments*

The subsection (b) requirement that the United States respond to the public's comments is

repeated and elaborated upon in subsection (d) of 15 U.S.C. § 16.  Subsection (d) requires the

government to "receive and consider any written comments relating to the proposal" during the

sixty-day period specified in subsection (b).  15 U.S.C. § 16(b), (d).  After the period for public

comment closes, the government must file with this Court and publish in the Federal Register its

responses to such comments.  As recounted above, the United States received over 32,000

comments from the public.  Seemingly undaunted by the magnitude of the task of responding to

all of the comments, with painstaking care, the government sorted these comments by subject

matter and responded in detail.  *See generally* United States Response to Public Comments.  This

extensive response was filed with the Court on February 27, 2002, and published in the Federal

Register on March 18, 2002.[17]   United States Response to Public Comments, 67 Fed. Reg. 12,208

---

[17]The United States' March 18, 2002, publication in the Federal Register was accompanied by the United States' Memorandum in Support of Entry of Proposed Final Judgment, a Stipulation and Second Revised Proposed Final Judgment reflecting the modifications agreed to by the parties in response to the public's comments, and the Memorandum Regarding Modifications Contained in the Second Revised Proposed Final Judgment.  United States Response to Public Comments, 67 Fed. Reg. at 12,208.

The alterations to the proposed decree do not fundamentally change the substance of the decree.  To the contrary, the modifications are intended to clarify the document and to avoid unintended consequences brought to light through the public comment process.  The modifications, therefore, are the logical outgrowth of the original proposed decree.  Treating the proposed consent decree as "analogous to agency rulemaking notice and comment," *Hyperlaw*, 1998 WL 388807, at *3, 159 F.3d 636, the Court concludes that the proposed consent decree, as amended, need not be subjected to new notice and comment procedures prior to entry.  *United States v. Thomson Corp.*, 949 F. Supp. 907, 915 n.7 (D.D.C. 1996) ("There is, however, nothing in the statute or in the case law that requires . . . further publication and opportunity for comment [on a modified decree.]"); *cf. Massachusetts School of Law*, 118 F.3d at 778 (noting that the district court found the proposed settlement to be in the public interest where modifications were

(March 18, 2002).  Having reviewed the public comments and the United States' response thereto, the Court has no doubt that the government's thorough response satisfies subsection (d).

**D.     Microsoft Requirements**

Although most of the requirements set forth in the various subsections of 15 U.S.C. § 16 require action by the United States or the Court, one subsection–subsection (g)–requires action by the defendant.  Subsection (g) provides:

> Not later than 10 days following the date of the filing of any proposal for a consent judgment under subsection (b) of this section, each defendant shall file with the district court a description of any and all written or oral communications by or on behalf of such defendant, including any and all written or oral communications on behalf of such defendant, or other person, with any officer or employee of the United States concerning or relevant to such proposal, except that any such communications made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone shall be excluded from the requirements of this subsection. Prior to the entry of any consent judgment pursuant to the antitrust laws, each defendant shall certify to the district court that the requirements of this subsection have been complied with and that such filing is a true and complete description of such communications known to the defendant or which the defendant reasonably should have known.

15 U.S.C. § 16(g).  The legislative history of this subsection reflects congressional understanding that "all but a few communications between [a]ntitrust defendants and the government are perfectly proper."  S. Rep. No. 93-298, at 7 (1973).  Notwithstanding this recognition, Congress determined that the disclosures would be useful since it is the "few" improper communications between antitrust defendants and the government that "cast doubt on the entire enforcement process."  *Id.*

The Court notes at the outset that, contrary to the insistence of some individuals and entities filing comments, the disclosures required by Section 16(g) serve primarily to assist the Court in assessing the public interest, rather than to inform public comment.  The Court reaches

---

made to the consent decree subsequent to the public comment period).

this conclusion based upon the structure of the statute, which requires that the United States publish summaries of the CIS and the proposed consent decree in "newspapers of general circulation," but does not require the same of the defendant with regard to its Section 16(g) disclosure.  Furthermore, the United States is expressly required to "ma[k]e available to the public at the district court" the proposed consent decree and the determinative documents.  15 U.S.C. § 16(b).  Although the defendant must also "file with the district court" its subsection (g) communications, in contrast to subsection (b), subsection (g) omits language indicating that the purpose of the filing is to make it available to the public.  *Compare* 15 U.S.C. § 16(b), *with* 15 U.S.C. § 16(g).  In any event, the Court concludes, as detailed below, that Microsoft's Section 16(g) disclosure sufficiently informs both the Court and the public in accordance with the Tunney Act.

Microsoft filed its Section 16(g) disclosure with the Court on December 10, 2001. Microsoft's disclosure describes in very general terms two "communications by or on behalf of" Microsoft "with any officer or employee of the United States concerning or relevant to" the proposed final judgment in this case.  *See* Microsoft Section 16(g) Disclosure at 2.  The first communication described therein pertains to daily meetings between counsel for Microsoft and counsel for the United States and the Plaintiff States in *State of New York, et al. v. Microsoft Corp.* that took place from late September 2001 through early November 2001 as part of Court-ordered settlement discussions.  *Id.*  After October 12, 2001, the Court-appointed mediator, Eric Green, and his colleague, Jonathan Marks, participated in the meetings and from October 29, 2001, through November 2, 2001, a Microsoft Vice President, Will Poole, participated in some of the meetings.  *Id.*  In addition, Microsoft's disclosure statement identifies a meeting on October 5, 2001, between counsel for Microsoft and representatives of the United States and the Plaintiff

States in *State of New York, et al. v. Microsoft Corp.*, regarding "a variety of technical questions." *Id.* Four Microsoft employees attended this meeting, as did one of the technical experts for the United States and the Plaintiff States.

At a hearing held in this case pursuant to 15 U.S.C. § 16(f) ("Tunney Act hearing"), the Court inquired as to the time period covered by Microsoft's Section 16(g) disclosure. Tunney Act Hrg. Tr. at 91-92. Microsoft clarified that the disclosure "covered the period commencing" September 28, 2001, and ending with the date of the filing of the disclosure. Microsoft Supp. Section 16(g) Disclosure at 1. Based upon this inquiry and comments made by the Court during the Tunney Act hearing, Microsoft opted to supplement its December 10, 2001, disclosure to include relevant communications during the period commencing with the issuance of the D.C. Circuit's mandate on August 24, 2001, through the filing of the disclosure statement. Microsoft's supplemental disclosure describes one additional "communication"–a meeting on September 27, 2001, between counsel for Microsoft and representatives of the United States Department of Justice and the Plaintiff States. *Id.* According to Microsoft, "[t]he meeting did not concern the terms of a possible settlement of this action, but was preliminary to such discussions." *Id.* Microsoft has certified that, "it has complied with the requirements of 15 U.S.C. § 16(g) and that [its] submission is a true and complete description of such communications known to Microsoft." Microsoft Section 16(g) Disclosure at 2.

Some individuals and entities filing comments relevant to the proposed final judgment have questioned the sufficiency of Microsoft's Section 16(g) disclosures. The most salient of these concerns relates to Microsoft's interpretation of the phrase "any officer or employee of the United States." 15 U.S.C. § 16(g). Microsoft reads this language to mean communications with any officer or employee of the Executive Branch. Certain of the commenting individuals and

entities disagree with Microsoft's narrow reading and take the position that Section 16(g) requires

disclosure of communications between the defendant and officers and employees of not only the

Executive Branch, but also the Legislative and Judicial Branches.  Having reviewed the statute

and the legislative history, the Court cannot agree.

Basic principles of statutory construction instruct that "[i]n analyzing a statute, [the Court]

begin[s] by examining the text, not by psychoanalyzing those who enacted it."  *Carter v. United

States*, 530 U.S. 255, 271 (2000) (internal quotations and citations omitted); *Braxtonbrown-Smith*,

278 F.3d at 1352 ("In construing a statute, the court begins with the plain language of the

statute.").  Accordingly, the Court commences its examination with the plain language of the

statute, and specifically, the words "United States."  Applying once again the "normal rule of

statutory construction that identical words used in different parts of the same act are intended to

have the same meaning," *Lundy*, 516 U.S. at 250, the Court looks to the use of the words "United

States" elsewhere in the Tunney Act.  In the remainder of the Tunney Act, the "United States"

plainly refers to the Executive Branch, as it is the body charged with enforcing the antitrust laws.

Indeed, application of the subsection (g) disclosure provision to the other two branches of

government is counterintuitive given that neither of these branches controls the nature or degree

of enforcement of the antitrust laws.  15 U.S.C. § 16(b)-(h).  Only the Executive Branch, acting

through the Department of Justice, has the capacity to bring suit as the United States to enforce

the antitrust laws and the capacity to enter into a settlement of such a suit.  Thus, examining the

plain language of the statute and applying standard cannons of statutory construction, there is

support for the conclusion that Section 16(g) requires disclosure of a defendant's communications

with the Executive Branch, but not with the remaining two branches of government.[18]

Neither party has identified any case in which the Section 16(g) disclosure has included contacts beyond those with the Executive Branch, nor has the Court located any such case. Moreover, none of the 47 comments designated as the "most extensive" by the Department of Justice, United States Mem. at 22, identifies a case in which the Court required the defendant to disclose communications with the Legislative or Judicial Branches of government.  Notably, Microsoft is no stranger to Section 16(g) disclosures, having filed such a disclosure in *United States v. Microsoft Corp.*, No. 94-1564 (D.D.C.).  The disclosure filed by Microsoft in that case did not reflect any contacts between the corporation and the legislative branch, and, as the case law demonstrates, on that record, the D.C. Circuit ultimately "remanded [to the District Court] with instructions to enter the proposed [consent] decree." *Microsoft*, 56 F.3d at 1462.  Given the plain language of the statute and the manner in which it has been interpreted by the D.C. Circuit, the Court will construe the statute to apply to communications only with the Executive Branch.

Some of the entities and individuals filing comments raise the additional concern that Microsoft's Section 16(g) disclosures are not sufficiently detailed to comply with the statute.  The

---

[18]Regrettably, the relevant legislative history neither confirms nor refutes this conclusion. In this instance, "[a]s is often the case, the legislative history . . . supports conflicting inferences and provides scant illumination." *Carter*, 530 U.S. at 270 n.9.  The legislative history relevant to subsection (g) is largely concerned with protecting against the loss of public confidence in the fairness of the proposed settlement.  H. Rep. 93-1463, at 9 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 6540.  In its report on the bill, the House Committee on the Judiciary interpreted subsection (g) to apply only to the Executive Branch, describing the provision as encompassing communications with "officers or employees of all government agencies other than the Department of Justice." *Id.* at 12, *reprinted in* 1974 U.S.C.C.A.N. at 6543.  In contrast, in introducing the legislation, Senator Tunney commented that the requirements of Section 16(g) apply "equally to contact with any branch of Government, including the Congress."  93 Cong. Rec. at 3453.  Given this ambivalence, the Court does not consider the legislative history to be instructive and instead bases its interpretation on the plain language of the statute, construed according to standard rules of statutory interpretation.

Court finds little support for this position in the language of the statute and legislative history.

Beyond the simple instruction that Microsoft "file a description," the Tunney Act does not

identify any details that must be contained in this "description."  15 U.S.C. § 16(g).  The statute is

silent as to whether the defendant must provide such details as the time and place of the

communication, the identities of the individuals involved with the communication, and the

substance of the communication.  *Id.*  Recalling that the Tunney Act is intended to enable the

Court to "obtain the necessary information to make its determination that the proposed consent

decree is in the public interest" while still "preserv[ing] the consent decree as a viable settlement

option,"  S. Rep. 93-298, at 6 (1973), the Court recognizes that it would be inconsistent with the

statute's purpose to require defendants to provide excessive detail pursuant to subsection (g).  In

this light, Section 16(g) may be understood to require the disclosure of information sufficient to

inform the Court as to whether there has been some improper contact between the United States

and the defendant.[19]  The details demanded by some of the individuals and entities filing

---

[19]The Court notes that Microsoft's memorandum in support of the SRPFJ is misleading in
its assertion that the Court has some independent awareness of Microsoft's communications with
the government because "the Court was very much involved in the [negotiation] process from its
inception."  Microsoft Mem. in Supp. of the Second Rev. Proposed Final Jmnt. at 45.  The extent
of the Court's involvement in the settlement process is entirely clear from the record in this case:
the Court ordered the parties to engage in intensive settlement discussions; the Court appointed a
mediator; and the Court received status reports from the parties in order to ensure compliance
with the Court's order regarding settlement discussions.  At no time was the Court aware of any
of the details surrounding the discussions, nor was the Court fully informed as to the identities
and roles of the various participants in these discussions.  Thus, as the Court made clear at the
Tunney Act hearing, the Court wholly rejects Microsoft's contention that "the Court's
knowledge of the negotiations–who was involved and how the settlement was reached–was
almost certainly more extensive than in any United States antitrust settlement ever submitted for
review under the Tunney Act."  *Id.*; Tunney Act Hrg. Tr. at 84-85 ("The Court: [M]y court orders
accurately reflect my level of involvement.  It was limited to ensuring that the parties were
engaged in good-faith effort.  The very limited information I  was privy to from the parties and
the mediator didn't concern the substance of the settlement or specifics as to contacts between
the parties.").  In response to Court inquiry on the subject, Microsoft abandoned its position that
the Court possessed special knowledge of the settlement discussions.  Tunney Act Hrg. Tr. at 84-

comments go well beyond this basic function and likely would do little to inform the Court's

assessment of the public interest.  Although Microsoft clearly could have been more fulsome in its

descriptions, because the statute does not mandate the release of particular details relevant to a

defendant's communications with the United States, the Court finds that Microsoft's disclosure is

sufficient to satisfy Section 16(g).[20]

Of less concern to the Court than the sufficiency and detail of Microsoft's disclosures is

the argument that Microsoft's disclosures were somehow untimely.  Microsoft, acting pursuant to

a Court order, filed its Section 16(g) disclosure ten days after publication of the proposed consent

decree in the Federal Register, during the sixty-day comment period.  *See Microsoft*, No. 98-1232

(D.D.C. Nov. 8, 2001) (Scheduling Order).  A more precise reading of the statute would have

required Microsoft to file its Section 16(g) disclosure ten days after the proposed decree was filed

with the District Court.  15 U.S.C. § 16(b), (g).  Accordingly, if Microsoft's disclosure was poorly

timed, the error lies with the Court.[21]  This error, however, is not fatal because the timing of the

Section 16(g) filing is not prejudicial to the parties, the Court, or the public.  The public was

---

85 ("Mr. Warden (for Microsoft): Your Honor's factual statements with respect to your position
during the settlement negotiation period is [sic] entirely factually accurate.").  Moreover, even if
the Court had some special knowledge of the settlement process, and again it does not, such
knowledge would not excuse Microsoft from its statutory obligation pursuant to 15 U.S.C.
§ 16(g).

[20]The United States has consistently refused to take a position on the sufficiency of
Microsoft's Section 16(g) disclosure.  *See, e.g.*, United States Responses to Public Comments at
39-40.  Indisputably, Section 16(g) places the burden of disclosure squarely upon the defendant
and does not require the United States to confirm its agreement with the defendant's disclosures.
Nevertheless, in the face of an abundance of criticism, the continued silence of the United
States–a party with relevant knowledge–is less than encouraging.

[21]The Court notes, however, that both the United States and Microsoft are familiar with
Section 16(g)'s requirements, having dealt with those requirements in previous litigation.
Neither party questioned the Court's order regarding the timing of the filing of Microsoft's
Section 16(g) disclosures.

apprised of any relevant communications well in advance of the close of the public comment

period.  Likewise, the Court was informed of such contacts well in advance of the Tunney Act

hearing and with sufficient time to consider the disclosures and inquire of their completeness prior

to the effective date of the proposed settlement.  Accordingly, the Court concludes that Microsoft

has complied with Section 16(g) in a manner sufficient to inform the Court's public interest

determination.[22]

---

[22]Some third-parties have raised an issue as to whether one of Microsoft's attorneys could
properly be considered "counsel of record" and therefore exempt from the disclosure
requirements in Section 16(g).  This issue arises because the attorney, Mr. Charles F. Rule, a
former Assistant Attorney General in charge of the Antitrust Division, has previously worked as
a lobbyist.  Tunney Act Hrg. Tr. at 99.  The exact dates of Mr. Rule's lobbying activities are not
clear from the record, and it is unclear whether Mr. Rule ever worked as a lobbyist on
Microsoft's behalf.  *Id.* at 97-99.  At the Tunney Act hearing and in its submission to the Court in
support of entry of the proposed decree, Microsoft stated clearly that Mr. Rule's representation of
Microsoft in conjunction with this case is in his capacity as a lawyer, rather than as a lobbyist.
*Id.*; Microsoft Mem. in Supp. of the Second Rev. Proposed Final Jmnt. at 40-42.  The Court
notes in this regard that Mr. Rule has represented Microsoft at various stages in these
proceedings, both in litigation and in settlement negotiations.  Microsoft Mem. in Supp. of the
Second Rev. Proposed Final Jmnt. at 40-42.  Accordingly, the Court is satisfied that Mr. Rule's
communications are properly treated as communications by "counsel of record" for purposes of
subsection (g) and are therefore exempt from that subsection's reporting requirements.
The Court notes that in conjunction with its discussion of Mr. Rule in its memorandum,
Microsoft again invokes the erroneous and misleading assertion that the Court "knew . . . of Mr.
Rule's involvements in the negotiations and that he was acting as Microsoft's counsel in these
communications."  *Id.* at 40.  As noted *supra* note 19, the Court did not have any particularized
knowledge with regard to the involvement of counsel in the settlement negotiations, nor would
any such knowledge, if it existed, permit Microsoft to circumvent the disclosure requirement in
subsection (g).

**III. CONCLUSION**

For the reasons detailed above, the Court concludes that the Tunney Act applies to the proposed consent decree filed in this case and that the matter is ripe for the Court's public interest determination.  As this Memorandum Opinion is preliminary to the Court's final assessment of the public interest, this Opinion is not accompanied by an Order.


July 1, 2002

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

36