UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

   Plaintiff,

    v.

MICROSOFT CORPORATION,

   Defendant.

Civil Action No. 98-1232 (CKK)

**MEMORANDUM OPINION**

Remaining in this case for the Court's determination is the resolution of a single issue: whether entry of the final judgment proposed by the parties is in the public interest. The Court makes this determination pursuant to the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. § 16(b)-(h). In a previous Memorandum Opinion, the Court reviewed the pertinent procedural history and determined that the parties had satisfied the other requirements of the Tunney Act. *See generally United States v. Microsoft Corp.*, No. 98-1232, slip op. (D.D.C. July 1, 2002). Having reviewed the voluminous record in this case and considered the factors enumerated in 15 U.S.C. § 16(e), the Court finds that, with the exception of the provisions relating to the retention of the Court's jurisdiction, the proposed consent decree is in the public interest. Accordingly, the Court conditionally approves the proposed consent decree as the final judgment in this case, pending the prompt agreement by the parties to a modification of the Court's retention of its jurisdiction.

# I.  PROCEDURAL HISTORY

On May 18, 1998, the United States filed a civil complaint alleging that Microsoft had engaged in anticompetitive conduct in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  On that same date, a group of state plaintiffs filed a separate civil complaint alleging similar violations of federal law, as well as violations of the corresponding provisions of their various state laws.  Not long after filing, the two cases were consolidated and thereafter, proceeded jointly through discovery and a trial on the merits.  On November 5, 1999, Judge Thomas Penfield Jackson entered 412 findings of fact, *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) (hereinafter cited as "*Findings of Fact*"), and on April 3, 2000, Judge Jackson entered conclusions of law, finding Microsoft liable for violations of §§ 1 and 2 of the Sherman Act and the corresponding state law provisions, *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000).  On June 7, 2000, Judge Jackson entered final judgment in the consolidated cases and imposed a structural remedy of divestiture for Microsoft's violations of the Sherman Act. *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000).

Microsoft appealed, and the United States Court of Appeals for the District of Columbia Circuit determined to consider the appeals in the consolidated cases *en banc.*  Following extensive briefing and two days of oral argument, the appellate court issued a unanimous *per curiam* opinion affirming in part, reversing in part, vacating the remedy decree in full, and remanding in part for remedy proceedings before a different district court judge.  *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (*en banc*).  Following reassignment, on September 28, 2001, this Court ordered that the parties enter into intensive settlement negotiations.  *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (D.D.C. Sept. 28,

2001) (setting a schedule for settlement discussions).  On that same date, the Court entered a schedule for discovery and commencement of evidentiary proceedings, in the event that the cases were not resolved through settlement.  *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (D.D.C. Sept. 28, 2001) (setting discovery guidelines and schedule).

The United States and Microsoft were able to reach a resolution in *United States v. Microsoft Corp.*, No. 98-1232 (D.D.C.), in the form of a proposed consent decree, filed with the Court as the "Revised Proposed Final Judgment" on November 6, 2001.  As a result, the Court vacated the discovery schedule with regard to *United States v. Microsoft Corp.* and deconsolidated that case from its companion case, *State of New York, et. al. v. Microsoft Corp.*, No. 98-1233 (D.D.C.).  *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (D.D.C. Nov. 2, 2001) (vacating the Sept. 28, 2001, Scheduling Order with regard to Civil Action No. 98-1232); *United States v. Microsoft Corp.*, Nos. 98-1232 and 98-1233 (Feb. 1, 2002) (deconsolidating cases).  Rather than proceed to an evidentiary hearing on the issue of remedy along with some of the plaintiffs in *State of New York, et. al. v. Microsoft Corp.*,[1] the United States and Microsoft commenced the process of obtaining judicial approval of the proposed consent decree pursuant to the Tunney Act, 15 U.S.C. § 16(b)-(h).

The November 6, 2001, filing of the Revised Proposed Final Judgment ("RPFJ") was

---

[1]In the former companion case, *State of New York, et al. v. Microsoft Corp.*, the States of New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin have entered into a conditional settlement with Microsoft as to the issue of remedy. Those Plaintiff States–"Settling States"–are awaiting approval by this Court of the settlement in this case before entry of the settlement in *State of New York, et al v. Microsoft Corp.* pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  Because the proposed final judgment addresses the Settling States as well as the United States in its terms, the Court, where appropriate, refers to both the United States and the Settling States as "Plaintiffs" in this Memorandum Opinion.

accompanied by a "Stipulation" entered into by the United States, Microsoft, and the Settling States.  The Stipulation provided that the Court could enter the proposed final judgment "at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other proceedings."  Stipulation and Revised Proposed Final Judgment at 1.  The United States filed its "competitive impact statement" ("CIS") with the Court on November 15, 2001.  Pursuant to 15 U.S.C. § 16(b), the United States published the proposed final judgment, along with the CIS, in the Federal Register on November 28, 2001.  Revised Proposed Final Judgment and Competitive Impact Statement, 66 Fed. Reg. 59,452 (Nov. 28, 2001).  On December 10, 2001, Defendant Microsoft filed with the Court its "description of . . . written or oral communications by or on behalf of [Microsoft] . . . with any officer or employee of the United States concerning or relevant to" the proposed consent decree.  Thereafter, Microsoft supplemented this description on March 20, 2002.

The United States received 32,392 comments on the proposed final judgment and provided the full text of these comments to the Court on February 28, 2002.  On March 1, 2002, the United States submitted the full text of the public's comments for publication in the Federal Register, and on May 3, 2002, the public comments appeared in the Federal Register pursuant to that submission.  United States' Certificate of Compliance at 4; Public Comments, 67 Fed. Reg. 23,654 (Books 2-12) (May 3, 2002).  On May 9, 2002, the United States published in the Federal Register an "addendum containing the correct text of thirteen (13) comments for which either an incomplete or incorrect electronic version had been included in the original submission to the Federal Register."  Addendum to Public Comments, 67 Fed. Reg. 31,373 (May 9, 2002); United States Certificate of Compliance at 4.  The United States certified compliance with 15 U.S.C. §16

4

(b)-(d) on May 9, 2002.  On July 1, 2002, this Court confirmed the applicability of the Tunney

Act to these proceedings and found that the parties had complied with the Act's requirements

such that the matter was ripe for the Court's determination of the public interest.  *See United*

*States v. Microsoft Corp.*, No. 98-1232, slip op. (D.D.C. July 1, 2002).[2]

## II.  TUNNEY ACT

### A.    Tunney Act

Concerned with the appearance of impropriety engendered by the secrecy of consent

decree negotiations in antitrust cases, in addition to exposing to "sunlight" the process by which

such consent decrees are negotiated, 119 Cong. Rec. at 24599, Congress determined that the

judiciary should do more than merely "rubber stamp" proposed consent decrees in antitrust cases,

H. Rep. No. 93-1463, at 8 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6536; S. Rep. No. 93-

298, at 5 (1973).  *See also United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995)

(quoting legislative history).  Accordingly, § 16(e) of Title 15 mandates that, prior to the entry of

a consent judgment proposed by the United States in an antitrust action, the district court must

determine that "entry of such judgment is in the public interest."  15 U.S.C. § 16(e).  Subsection

(e) specifically requires the Court to "make an independent determination as to whether or not

entry of a proposed consent decree is in the public interest."  S. Rep. 93-298, at 5; *Microsoft*, 56

F.3d at 1458 (quoting legislative history).

---

[2]Pursuant to the stipulation filed with the Court on November 6, 2001, Microsoft began complying with portions of the proposed final judgment on December 16, 2001, as if "it were in full force and effect."  Stipulation at 2.  On August 28, 2002, the United States submitted  a "Notice" to the Court advising "the Court of Microsoft's compliance with various milestones established by the Second Revised Proposed Final Judgment ('SRPFJ')."  Notice at 1 (Aug. 28, 2002).  In general terms, the Notice indicates that Microsoft is in compliance with its requirements and "takes seriously its obligations under the SRPFJ."  *Id.* at 7.

"The court's role in protecting the public interest is one of ensuring that the government has not breached its duty to the public in consenting to the decree." *United States v. Bechtel*, 648 F.2d 660, 666 (9th Cir. 1981). In making this determination, the Court "may consider" the following:

> (1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
> (2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e). The D.C. Circuit characterized these considerations more simply as an inquiry into the "purpose, meaning, and efficacy of the decree." *Microsoft*, 56 F.3d at 1462.

The D.C. Circuit identified a number of issues to which the district court should pay particularly close attention in its examination of the decree and corresponding assessment of the public interest. "A district judge pondering a proposed consent decree . . . should pay special attention to the decree's clarity," as it is the district judge who must "preside over the implementation of the decree." *Id.* at 1461-62. Based on a similar rationale, district courts are expected to "pay close attention" to the enforcement provisions in a proposed consent decree. *Id.* at 1462. Where there exist third-party claims that entry of the proposed decree will cause affirmative harm, the district court should at least pause or "hesitate" in order to consider these claims before reaching a conclusion that the proposed decree is appropriate. *Id.*

Notwithstanding the district court's focused consideration of these and other issues, the Court must recall that its "authority to review the [proposed] decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place." *Id.* at

6

1459-60.  Accordingly, the Court must accord deference to the "government's predictions as to the effect of the proposed remedies."  *United States v. Thomson Corp.*, 949 F. Supp. 907, 914 (D.D.C. 1996) (quoting *Microsoft*, 56 F.3d at 1461); *see also United States v. Western Elec. Co.*, 900 F.2d 283, 297 (D.C. Cir. 1990) ("[A]lthough we see no doctrinal basis for the district court to defer to the DOJ's interpretation of the decree or its views about antitrust law, it is to be expected that the district court would seriously consider the Department's economic analysis and predictions of market behavior.").  In this vein, "a proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of public interest."  *United States v. AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982) (quotation marks omitted), *aff'd without opinion sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *accord Microsoft*, 56 F.3d at 1460; *Bechtel*, 648 F.2d. at 666.

Having so identified the general standard in Tunney Act cases, this Court must inquire as to whether that standard applies equally and without modification in this case.  The instant case is more complicated than the usual case in that it contradicts the rule that "because it is a settlement [and] there are no findings that the defendant has actually engaged in illegal practices . . . it is therefore inappropriate for the [district court] judge to measure the remedies in the decree as if they were fashioned after trial."  *Microsoft*, 56 F.3d at 1460-61 (emphasis omitted).  In this case there has been a trial, and there have been findings of liability on numerous grounds.  *See Microsoft*, 253 F.3d 34.  Therefore, it seems entirely appropriate to "measure the remedies" based upon the post-trial liability findings in this case.  *Microsoft*, 56 F.3d at 1461.  Accordingly, the findings of liability provide an essential foundation to this Court's analysis, as a "discrepancy

between the remedy and undisputed facts of antitrust violations could be such as to render the decree 'a mockery of judicial power.'" *Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 782 (D.C. Cir. 1997) (quoting *Microsoft*, 53 F.3d at 1462); *accord Thomson*, 949 F. Supp. at 913 ("[T]he court is to compare the complaint filed by the government with the proposed consent decree and determine whether the remedies negotiated between the parties and proposed by the Justice Department clearly and effectively address the anticompetitive harms initially identified.").

While this is not to say that the circumstances of this case call for a review of the proposed decree in the absence of deference, the Court cannot simply proceed as if this were a case based upon untested allegations.  In the ususal case "[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case." *Microsoft*, 56 F.3d at 1460-61.  Yet in this case, many, though certainly not all, of the strengths and weaknesses of the government's case have already been exposed.  In this regard, the Court cannot overlook the fact that the appellate court sustained liability against Microsoft for violation of § 2 of the Sherman Act.  *Microsoft*, 253 F.3d 59-78.  Therefore, without applying a wholly distinct standard, this Court must remain ever-mindful of the posture of this case when assessing the proposed consent decree for determination of the public interest.

Given the liability findings, part of the public interest analysis will require consideration of the extent to which the proposed consent decree "meets the requirements for an antitrust remedy." *AT&T*, 552 F. Supp. at 153.  "[A] remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' *Ford Motor Co.* [*v. United States*], 405 U.S.

[562,] 577 [1972], . . . to 'terminate the illegal monopoly,[3] deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future,' [*United Shoe*, 391 U.S. at 250]." *Microsoft*, 253 F.3d at 103. Although this inquiry is usually reserved for cases which are litigated through remedy, such as *State of New York, et al. v. Microsoft Corp.*, No. 98-1233 (D.D.C.), consideration of these "objectives," to the extent they are applicable to the facts of this case, remains appropriate because liability has been established in this case. Still, the Court's assessment of the remedy's ability to satisfy these objectives is tempered by the deference owed to the government in the Tunney Act context. *See generally Microsoft*, 56 F.3d 1448.

Applying these principles to the instant case, because the district court has rendered findings of fact and liability which have been reviewed on appeal, the Court examines, in general terms, the correspondence between the liability findings and the conduct restrictions in the proposed consent decree. In conjunction with this inquiry, the Court is particularly attentive to the clarity of the proposed decree's provisions, the enforcement mechanisms, and to claims that

---

[3]The Court notes that the objective of "terminat[ing] the illegal monopoly," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968), is incompatible with the facts of this case. Neither the district court, nor the appellate court concluded that Microsoft had unlawfully obtained its monopoly. *See Microsoft*, 253 F.3d 34; *Microsoft*, 87 F. Supp. 2d 30; *see also Microsoft*, 56 F.3d at 1452 (observing in the precursor to this case that "the government did not allege and does not contend–and this is of crucial significance to this case–that Microsoft *obtained* its alleged monopoly position in violation of the antitrust laws") (emphasis in original). Moreover, as noted by the appellate court, "the District Court expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior." *Microsoft*, 253 F.3d at 107 (citing *Findings of Fact* ¶ 411). In this context, outright termination of the monopoly is a questionable remedial goal, as such action would exceed the limits of the controversy presented to the Court. Accordingly, the Court's inquiry into the extent to which the proposed consent decree "terminates the illegal monopoly," *United Shoe*, 391 U.S. at 250, will be limited, and the Court will instead focus upon terminating the illegal *maintenance* of the monopoly.

9

harm will result from the implementation of the proposed decree.  *Microsoft*, 53 F.3d at 1461-62.

## III.  DISCUSSION

## A.      Court of Appeals Opinion

In most cases, judicial analysis of the public interest in a Tunney Act proceeding

commences, quite logically, with an examination of the allegations laid out in the complaint.  *See,*

*e.g., Thomson*, 949 F. Supp. at 909-11 (describing complaint).  Indeed, the district court is

without authority to "reach beyond the complaint to evaluate claims that the government did *not*

make and to inquire as to why they were not made."  *Microsoft*, 56 F.3d at 1459.  In light of the

procedural posture of this case, however, the complaint in this case is of little moment, as

proceedings have far surpassed the allegations stage.  Instead, the opinion of the appellate court

provides the underpinning for this Court's analysis of the proposed decree.  As a result, the Court

pauses to summarize and recount the pertinent portions of the appellate opinion in this case.

Where appropriate, a more detailed examination of the appellate court's opinion appears in the

context of the Court's discussion of the specific provisions of the proposed final judgment.

### 1.      *Market Definition*

The appellate court began its opinion by examining Plaintiffs'[4] § 2 Sherman Act claims

and specifically, whether the district judge had identified the proper market for purposes of

assessing Microsoft's monopoly power.  The appellate court concluded that the district court had

---

[4]In referring to "Plaintiffs" throughout this Memorandum Opinion, the Court refers to the United States, as well as the Plaintiff States in Civ. No. 98-1233, who entered into a settlement agreement with Microsoft.  *See supra* note 1.  The Court notes, however, that the appellate court's opinion applies not only to the claims brought by the United States and the Settling States, but also to those states who have opted to litigate the issue of remedy in *State of New York, et al. v. Microsoft*, No. 98-1233 (D.D.C.).

properly defined the relevant market as "the licensing of all Intel-compatible PC[5] operating

systems[6] worldwide." *Microsoft*, 253 F.3d at 52 (quoting *Microsoft*, 87 F. Supp. 2d at 36).

Having agreed with the district court's definition of the relevant market, the appellate court

adopted the district court's determination that "circumstantial evidence proves that Microsoft

possesses monopoly power." *Id.* at 56. The appellate court further noted that "if we were to

require direct proof [of monopoly power], . . . Microsoft's behavior may well be sufficient to

show the existence of monopoly power." *Id.* at 57.

### 2.   *Theory of Liability*

Integral to the appellate court's adoption of the market definition was its simultaneous

acceptance of Plaintiffs' theory of Microsoft's market dominance. Both the district and appellate

courts noted that Microsoft's lawfully acquired monopoly is naturally protected by a "structural

barrier," known as the "applications barrier to entry." *Id.* at 55. "That barrier . . . stems from two

characteristics of the software market: (1) most consumers prefer operating systems for which a

large number of applications have already been written; and (2) most developers prefer to write

---

[5]"PC" is short for "personal computer." *Findings of Fact* ¶ 1.

[6]The appellate court, relying upon the factual testimony presented to the district court, explained the functions of a PC operating system:

> Operating systems perform many functions, including allocating computer memory and controlling peripherals such as printers and keyboards. Operating systems also function as platforms for software applications. They do this by "exposing"–i.e., making available to software developers–routines or protocols that perform certain widely-used functions. These are known as Application Programming Interfaces, or "APIs." For example, Windows contains an API that enables users to draw a box on the screen. Software developers wishing to include that function in an application need not duplicate it in their own code. Instead, they can "call"–*i.e.*, use–the Windows API. Windows contains thousands of APIs, controlling everything from data storage to font display.

*Microsoft*, 253 F.3d at 53 (citations omitted).

for operating systems that already have a substantial consumer base." *Id.* (citing *Findings of Fact* ¶¶ 30, 36). This barrier creates a "chicken-and-egg" or network effects situation, which perpetuates Microsoft's operating system dominance because "applications will continue to be written for the already dominant Windows,[7] which in turn ensures that consumers will continue to prefer it over other operating systems." *Id.* Because "[e]very operating system has different APIs,"[8] applications written for one operating system will not function on another operating system unless the developer undertakes the "time consuming and expensive" process of transferring and adapting, known in the industry as "porting," the application to the alternative operating system. *Id.* at 53.

Plaintiffs proceeded under the theory that certain kinds of software products, termed "middleware,"[9] could reduce the "self-reinforcing cycle," *Findings of Fact* ¶ 39, by serving as a platform for applications, taking over some of the platform functions provided by Windows and thereby "weaken[ing] the applications barrier to entry," *id.* ¶ 68. One of middleware's defining

---

[7]"In 1985, Microsoft began shipping a software package [for the PC] called Windows. The product included a graphical user interface, which enabled users to perform tasks by selecting icons and words on the screen using a mouse." *Findings of Fact* ¶ 7. In 1995, Microsoft introduced an updated version of its Windows software known as "Windows 95." *Id.* ¶ 8. Similarly, in 1998, Microsoft released "Windows 98." *Id.* Since that time, Microsoft has continued to update, revise, and re-create its "Windows" PC operating system.

[8]"APIs" are applications programming interfaces. As Judge Jackson explained:
[An] operating system supports the functions of applications by exposing interfaces, called "application programming interfaces," or "APIs." These are synapses at which the developer of an application can connect to invoke pre-fabricated blocks of code in the operating system. These blocks of code in turn perform crucial tasks, such as displaying text on the computer screen.
*Findings of Fact* ¶ 2.

[9]Such software takes the name "middleware" because "it relies on the interfaces provided by the underlying operating system while simultaneously exposing its own APIs to developers" and, therefore, is said to reside in the middle. *Findings of Fact* ¶ 28.

characteristics as a software product is its ability to "expos[e] its own APIs." *Findings of Fact*

¶ 28.  Eventually, reasoned Plaintiffs, if applications were written to rely on the middleware API

set, rather than the Windows API set, the applications could be made to run on alternative

operating systems simply by porting the middleware.  Ultimately, by writing to the middleware

API set, applications developers could write applications which would run on any operating

system on which the middleware was preset.  Plaintiffs focused their attention primarily upon two

such middleware threats to Microsoft's operating system dominance–Netscape Navigator[10] and

the Java technologies.  *Microsoft*, 253 F.3d at 53.  The district and appellate courts accepted

Plaintiffs' theory of competition despite the fact that "neither Navigator, Java, nor any other

middleware product could [at that time], or would soon, expose enough APIs to serve as a

platform for popular applications."  *Id.*; *Findings of Fact* ¶¶ 28-29.

      **3.**      ***Four-Part Test for Liability***

      Having concluded that the district court properly identified the relevant market as the

market for Intel-compatible PC operating systems and properly excluded middleware products

from that market, the appellate court turned its attention to the issue of whether Microsoft

responded to the threat posed by middleware in violation of § 2 of the Sherman Act.  Specifically,

the appellate court set out to determine whether Microsoft "maintain[ed], or attempt[ed] to . . .

maintain, a monopoly by engaging in exclusionary conduct."  *Microsoft*, 253 F.3d at 58.  The

appellate court recounted that the district court answered that inquiry in the affirmative, finding

---

      [10]"Although certain Web browsers provided graphical user interfaces as far back as 1993, the first widely-popular graphical browser distributed for profit, called Navigator, was brought to market by the Netscape Communications Corporation ('Netscape') in December 1994." *Findings of Fact* ¶ 17.

Microsoft liable for violating § 2 of the Sherman Act:

> by engaging in a variety of exclusionary acts . . . [s]pecifically . . . : (1) the way in which it integrated [Internet Explorer] into Windows; (2) its various dealings with Original Equipment Manufacturers ("OEMs"), Internet Access Providers ("IAPs"), Internet Content Providers ("ICPs"), Independent Software Vendors (ISVs), and Apple Computer; (3) its efforts to contain and to subvert Java technologies; and (4) its course of conduct as a whole.

*Id.* In order to review the district court's findings on this point, the appellate court outlined a four-part test for determining whether particular conduct can be said to violate antitrust law. "First, to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers." *Id.* at 58 (emphasis in original). Second, the plaintiff must "demonstrate that the monopolist's conduct harmed competition, not just a competitor." *Id.* at 59. Third, "the monopolist may proffer a 'procompetitive justification' for its conduct." *Id.* (quoting *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 483 (1992)). If this justification stands unrebutted by the plaintiff, the monopolist may escape liability. Therefore, the fourth prong of the inquiry requires that the plaintiff "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.* The appellate court stressed that, although evidence of intent is relevant "to understand the likely effect of the monopolist's conduct," when assessing the balance between the anticompetitive harm and the procompetitive effect, the trial court should focus on the "effect of [the exclusionary] conduct, not the intent behind it." *Id.*

Using this framework, the appellate court addressed Microsoft's challenge to each of the findings by the district court. The appellate court examined the district court's four basic areas of findings with regard to § 2 liability in an order different from that of the district court. The Court presents these holdings, in the order addressed by the appellate court.

#### 4.      Original Equipment Manufacturer ("OEM") Licenses

Commencing its analysis with the "[l]icenses [i]ssued to [o]riginal [e]quipment

[m]anufacturers,"[11] *id.* at 59, the appellate court focused upon three license provisions

"prohibiting the OEMs from:  removing any desktop icons, folders, or 'Start' menu entries; (2)

altering the initial boot sequence; and (3) otherwise altering the appearance of the Windows

desktop," *id.* at 61 (citing *Findings of Fact* ¶ 213).  Into the category of "otherwise altering the

appearance of the Windows desktop," the appellate court subsumed the automatic launch of an

alternative user interface, the prohibition against the addition of icons and folders different in size

and shape from those used by Microsoft, and the prohibition on the use of the "Active Desktop"

feature[12] to display third-party brands.  *Id.* at 62; *see also Findings of Fact* ¶ 213.  Of these license

provisions, the appellate court concluded that, "with the exception of the one restriction

prohibiting automatically launched alternative interfaces, all of the OEM license restrictions at

issue represent uses of Microsoft's market power to protect its monopoly, unredeemed by any

legitimate justification."  *Id.* at 64.  In commencing its next area of analysis, the appellate court

noted with regard to the license restrictions imposed upon OEMs that they "have a significant

effect in closing rival browsers out of one of the two primary channels of distribution."  *Id.*

#### 5.      Integration of Internet Explorer ("IE") and Windows

The appellate court next turned its attention toward the "[i]ntegration of [Internet Explorer

---

[11]Manufacturers of PCs are known as "original equipment manufacturers" or "OEMs." *Findings of Fact* ¶ 10.

[12]"The Active Desktop was a Microsoft feature that, if enabled, allowed the Windows user to position Web pages as open windows that appear on the background, or 'wallpaper' of the Windows desktop."  *Findings of Fact* ¶ 314.

("IE")][13] and Windows."  *Id.*  At the outset of its analysis, the appellate court took a narrow view

of the district court's determination, noting that the district court's "broad[]" condemnation of

"Microsoft's decision to bind 'Internet Explorer to Windows with . . .  technological shackles'" is

supported by only three specific actions taken by Microsoft.  *Id.* (quoting *Microsoft*, 87 F. Supp.

2d at 39).  The appellate court identified these three as (1) "excluding IE from the 'Add/Remove

Programs' utility"; (2) "designing Windows so as in certain circumstances to override the user's

choice of a default browser other than IE"; and (3) "commingling code related to browsing and

other code in the same files, so that any attempt to delete the files containing IE would, at the

same time, cripple the operating system."  *Id.* at 64-65.  Pursuant to its four part test for liability,

the appellate court concluded that Microsoft could be held liable for the first and the third of these

actions.  *Id.* at 65-67.  As to the second of these actions, the override of the user's choice of

default in certain circumstances, the court determined that Microsoft had proffered a

procompetitive justification that went unrebutted by Plaintiffs, namely that the override was the

result of "valid technical reasons" which justified the override in a "few out of the nearly 30

means of accessing the Internet."  *Id.* at 67 (quotation marks omitted).  Finding that Plaintiffs had

neither rebutted Microsoft's procompetitive justification, nor demonstrated that the

anticompetitive effect of the challenged act outweighed such justification, the appellate court held

that "Microsoft may not be held liable for this aspect of its product design."  *Id.*

---

[13]Internet Explorer is Microsoft's Web browser.  *Findings of Fact* ¶ 17.

### 6.    Agreements with Internet Access Providers ("IAPs")

Directing its attention to Microsoft's "agreements with various IAPs,"[14] which the district

court "condemned" as exclusionary, the appellate court identified five Microsoft actions

specifically relied upon by the district court for this condemnation:

> (1) offering IE free of charge to IAPs[;] . . . (2) offering IAPs a bounty for each
> customer the IAP signs up for service using the IE browser[;] . . . (3) developing
> the IE Access Kit ("IEAK"), a software package that allows an IAP to "create a
> distinctive identity for its service in as little as a few hours by customizing the [IE]
> title bar, icon, start and search pages," *Findings of Fact* ¶ 249[;] . . . (4) offering the
> IEAK to IAPs free of charge, on the ground that those acts, too, helped Microsoft
> preserve its monopoly[,] [*Microsoft*, 87 F. Supp. 2d] at 41-42[;] . . . (5) agree[ing] to
> provide easy access to IAPs' services from the Windows desktop in return for the
> IAPs' agreement to promote IE exclusively and to keep shipments of internet access
> software using Navigator under a specific percentage, typically 25%. *See* [*Microsoft*,
> 87 F. Supp. 2d] at 42 (citing *Findings of Fact* ¶¶ 258, 262, 289).

*Id.* at 67-68.  Grouping the first four of these actions together as "Microsoft's inducements," the

appellate court held that these four actions merely "offer[ed] a consumer an attractive deal" and,

therefore, could not be treated as anticompetitive.  *Id.* at 68.  In contrast, the appellate court

agreed with the district court that Microsoft's exclusive contracts with IAP's "are exclusionary

devices, in violation of § 2 of the Sherman Act."  *Id.* at 71.

### 7.    Agreements with Internet Content Providers ("ICPs"), Independent Software Vendors ("ISVs"), and Apple

The appellate court next considered Microsoft's "dealings with ICPs, which develop

websites; ISVs, which develop software; and Apple, which is both an OEM and a software

developer."  *Id.* at 71.  The "deals" at issue in this portion of the case are grants of "free licenses

---

[14]"PCs typically connect to the Internet through the services of Internet access providers ('IAPs'), which generally charge subscription fees to their customers in the United States." *Findings of Fact* ¶ 15.

to bundle IE with [the ICPs' and ISVs'] offerings" and the exchange of "other valuable

inducements for [ICPs' and ISVs'] agreement to distribute, promote, and rely on IE rather than

Navigator." *Id.* (quoting *Microsoft*, 87 F. Supp. 2d at 42-43) (brackets and quotation marks

omitted). The district court held these agreements to be anticompetitive in violation of § 2 of the

Sherman Act because they had the effect of "directly induc[ing] developers to focus on

[Microsoft's] own APIs rather than ones exposed by Navigator." *Id.* (quoting *Microsoft*, 87 F.

Supp. 2d at 42-43) (quotation marks omitted).

At the outset of its analysis in this context, the appellate court concluded bluntly that

"[w]ith respect to [Microsoft's] deals with ICPs, the District Court's findings do not support

liability." *Id.* In contrast, the appellate court sustained the district court's finding of liability with

regard to Microsoft's agreements with ISVs because Plaintiffs made "a *prima facie* showing that

the deals have an anticompetitive effect," and Defendant did not successfully rebut this showing.

*Id.* at 72. In particular, the appellate court found that the exclusive provisions in these so-called

"First Wave Agreements" with ISVs foreclosed a substantial share of the market for Navigator.

*Id.*

Turning its attention in this context finally to Microsoft's relationship with Apple, the

appellate court concluded that Microsoft's agreement with Apple was exclusionary in violation of

§ 2 of the Sherman Act. *Id.* at 72-74. The appellate court recounted that in mid-1997, Microsoft

and Apple entered into an agreement which obligated Microsoft to continue to release "up-to-

date" versions of its office productivity software for Apple's systems, Mac Office. *Id.* at 73

(quoting *Findings of Fact* ¶¶ 350-52). The agreement further obligated Apple to make IE the

default browser. *Id*. (quoting *Findings of Fact* ¶¶ 350-52). Pursuant to this same agreement,

Apple promised not to install Navigator during the "default installation," and not to "position icons for non[-]Microsoft browsing software on the desktop of new Macintosh PC systems or Mac OS upgrades." *Id.* (quoting *Findings of Fact* ¶¶ 350-52).  Similarly, the agreement prohibited Apple "from encouraging users to substitute another browser for IE, and state[d] that Apple [would] 'encourage its employees to use IE.'" *Id.* (quoting *Findings of Fact* ¶ 352) (brackets omitted).  The appellate court concluded that "[t]his exclusive deal between Microsoft and Apple ha[d] a substantial effect upon the distribution of rival browsers." *Id.*  Given the absence of a "procompetitive justification for the exclusive dealing arrangement," the appellate court affirmed the district court's finding of § 2 liability based upon Microsoft's exclusive deal with Apple.  *Id.* at 74.

### 8.      *Java*

The appellate court grouped the next category of Microsoft conduct under the heading "Java" in reference to "a set of technologies developed by Sun Microsystems" ("Sun").  *Id.*  The Java technologies are described as "another type of middleware posing a potential threat to Windows' position as the ubiquitous platform for software development." *Id.* (citing *Findings of Fact* ¶ 28).  The appellate opinion recounts that the district court identified four steps taken by Microsoft to "exclude Java from developing as a viable cross-platform threat:  (a) designing a [Java Virtual Machine ("JVM")][15] incompatible with the one developed by Sun; (b) entering into

---

[15]"The Java technologies include:  (1) a programming language;  (2) a set of programs written in that language, called the 'Java class libraries,' which expose APIs;  (3) a compiler, which translates code written by a developer into 'bytecode';  and (4) a Java Virtual Machine ('JVM'), which translates bytecode into instructions to the operating system. [*Findings of Fact*] ¶ 73.  Programs calling upon the Java APIs will run on any machine with a 'Java runtime environment,' ['JRE'] that is, Java class libraries and a JVM. *Id.* ¶¶ 73, 74." *Microsoft*, 253 F.3d at 74.  The terms "JRE" and "JVM" are sometimes used interchangeably to refer to the Java

contracts, the so called 'First Wave Agreements,' requiring major ISVs to promote Microsoft's

JVM exclusively; (c) deceiving Java developers about the Windows-specific nature of the tools it

distributed to them; and (d) coercing Intel to stop aiding Sun in improving the Java technologies."

*Id.* Of these actions, the appellate court concluded that all but the first action were

anticompetitive in violation of § 2. *Id.* at 74-78. With regard to the first enumerated action, the

incompatible JVM, the appellate court held that because the incompatible JVM did not have an

anticompetitive effect which outweighed the procompetitive justification for the design, it could

not provide a basis for antitrust liability. *Id.* at 75.

Specifically, with regard to the First Wave Agreements, the appellate court observed that

the district court had found the agreements, "although not literally exclusive . . . were exclusive in

practice." *Id.* at 75. Although the district court did not enter precise findings as to the effect of

the First Wave Agreements upon rival Java distribution, the appellate court determined that "the

record indicates that Microsoft's deals with the major ISVs had a significant effect upon JVM

promotion." *Id.* In the absence of procompetitive justification, the appellate court imposed

liability for this aspect of the First Wave Agreements. *Id.* at 76.

As to the Java developer tools, the appellate court's imposition of liability focused not

upon the fact that the tools created programs which were not cross platform, but upon the fact that

Microsoft deceived software developers about the Windows-specific nature of the tools. *Id.* at

76-77. The appellate court found that Microsoft's deception was intentional and without

procompetitive explanation. *Id.* at 77. As a result, the appellate court imposed liability for

Microsoft's deception. *Id.*

─────────────────────

platform. The court uses the term JVM throughout this Memorandum Opinion for that purpose.

### 9.     Intel

As noted above, the appellate court's final imposition of liability arose out of a "threat" by Microsoft directed at Intel.  *Id.* at 77.  "Intel is [a firm] engaged principally in the design and manufacture of microprocessors."  *Findings of Fact* ¶ 95.  A segment of Intel's business develops software, with the primary focus upon "finding useful ways to consume more microprocessor cycles, thereby stimulating demand for advanced Intel microprocessors."  *Id.*  The appellate court recounted that in 1995, Intel was in the process of "developing a high performance, Windows-compatible JVM."  *Microsoft*, 253 F.3d at 77.  Furthering its efforts to combat the cross-platform threat of Java to the Windows platform, Microsoft repeatedly "urged Intel not to help Sun by distributing Intel's fast, Sun compliant JVM."  *Id.*  Eventually, Microsoft "threatened Intel that if it did not stop aiding Sun . . . then Microsoft would refuse to distribute Intel technologies bundled with Windows."  *Id.*  Intel capitulated after Microsoft threatened to support an Intel competitor, AMD, if Intel's efforts with Java continued.  *Id.*

The appellate court acknowledged Microsoft's anticompetitive intent, as well as the anticompetitive effect of Microsoft's actions toward Intel.  *Id.*  Microsoft did not offer a procompetitive justification for its treatment of Intel, but "lamely characterize[d] its threat to Intel as 'advice.'"  *Id.*  Rejecting the characterization of Microsoft's threat as mere "advice," the appellate court found the district court's imposition of liability to be supported by both fact and law.  *Id.* at 77-78.  On this basis, the appellate court imposed § 2 liability for Microsoft's threat to Intel.

Corresponding to the above-described imposition of liability pursuant to § 2 of the Sherman Act, the appellate court imposed liability upon Microsoft for violations of the relevant

"state law counterparts of" the Sherman Act.  *Id.* at 46.  Beyond these findings, the appellate court

did not find Microsoft liable for any additional antitrust violations.  Specifically, the appellate

court reversed the district court's conclusion that Microsoft's "course of conduct" as a whole

constitutes a separate violation of § 2.  *Id.* at 78.  In addition, the appellate court rejected the

district court's finding of attempted monopolization and remanded the § 1 tying claim for further

proceedings at the district court level.[16]  Plaintiffs opted not to pursue the tying claim on

remand.[17]  Joint Status Report (Sept. 20, 2001) at 2.

### 10.    *Vacating the District Court's Order of Remedy*

Following its review of the district court's conclusions with regard to liability, the

appellate court considered the district court's choice of remedy.  Over the objection of Defendant

Microsoft, the district court decided to consider the merits of Plaintiffs' remedy proposal in the

absence of an evidentiary hearing.  *Microsoft*, 253 F.3d at 98-99; *see also Microsoft*, 97 F. Supp.

2d at 61.  The district court did so based on the rationale that Microsoft's evidentiary proffers

largely concerned "testimonial predictions about future events" which would be of little use to the

court in identifying an "optimum remedy."  *Microsoft*, 253 F.3d at 99 (quoting *Microsoft*, 97 F.

Supp. 2d at 62).  Based upon its finding of liability for illegal monopoly maintenance, attempted

---

[16]Plaintiffs' complaint also included a separate claim of "monopoly leveraging" under § 2 of the Sherman Act.  Judge Jackson granted summary judgment in favor of Microsoft as to this claim on the grounds that the theory runs "contrary to both economic theory and the Sherman Act's plain language."  *United States v. Microsoft*, 1998 WL 614485, at * 27 (D.D.C. Sept. 14, 1998).

[17]Plaintiffs' tying claim alleged that "Microsoft's contractual and technological bundling of the IE [W]eb browser (the 'tied' product) with its Windows operating system ('OS') (the 'tying' product) resulted in a tying arrangement that was per se unlawful."  *Microsoft*, 253 F.3d at 84.

monopolization, and illegal tying, the district court entered a remedy "nearly identical to plaintiffs' proposal" mandating the divestiture of Microsoft Corporation into an "Operating Systems Business" and an "Applications Business." *Id.* at 99-100 (quoting *Microsoft*, 97 F. Supp. 2d at 64). The original decree entered by the district court, often referred to as the Initial Final Judgment ("IFJ"), also included a number of "interim restrictions on Microsoft's conduct." *Id.* at 100. The interim restrictions included, *inter alia*, mandatory disclosure "to third-party developers the APIs and other technical information necessary to ensure that software effectively interoperates with Windows," *id.* (describing IFJ § 3.b), a prohibition on Microsoft's ability to enter into contracts which oblige third parties to limit their "'development, production, distribution, promotion, or use of, or payment for' non-Microsoft platform level software," *id.* (quoting IFJ § 3.e), and a "'Restriction on Binding Middleware Products to Operating System Products' unless Microsoft also offers consumers 'an otherwise identical version' of the operating system without the middleware," *id.* (quoting IFJ § 3.g).

The appellate court found three fundamental flaws in the district court's order of remedy, each of which alone justified vacating the remedial decree. The appellate court first concluded that the failure to hold an evidentiary hearing in the face of disputed facts concerning the remedy violated the "cardinal principle of our system of justice that factual disputes must be heard in an open court and resolved through trial-like evidentiary proceedings." *Id.* at 101. The appellate court rejected the district court's conclusion that evidentiary proceedings would not be useful, noting that "a prediction about future events is not, as a prediction, any less a factual issue." *Id.* at 102. Moreover, noted the appellate court, "drafting an antitrust decree by necessity 'involves predictions and assumption concerning future economic and business events.'" *Id.* (quoting *Ford*

*Motor Co.*, 405 U.S. at 578).

In addition to the failure to hold an evidentiary hearing, the appellate court faulted the district court for its "fail[ure] to provide an adequate explanation for the relief it ordered." *Id.* at 103. Finding the trial court's devotion of "a mere four paragraphs of its order to explaining its reasons for the remedy" insufficient, the appellate court observed that the initial remedy was not accompanied by an explanation of the manner in which the remedy would accomplish the objectives of a remedial decree in an antitrust case. *Id.* In this regard, the appellate court recited that "a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' *Ford Motor Co.*, 405 U.S. at 577, to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future,' [*United Shoe*, 391 U.S. at 250]." *Id.* (internal citations in original).

Lastly, the appellate court concluded that the substantial modifications to the liability imposed by the district court merited a new determination of the remedy for the surviving antitrust violations. In particular, the appellate court noted that of the three original findings of liability, only liability for illegal monopoly maintenance in violation of § 2 of the Sherman Act had survived, and even this aspect of liability had been modified. *Id.* at 103-04. The appellate court determined that where "sweeping equitable relief is employed to remedy multiple violations, and some–indeed most–of the findings of remediable violations do not withstand scrutiny" the remedy decree must be vacated because there no longer exists a rational connection between the liability imposed and the remedy ascribed thereto. *Id.* at 105. Accordingly, the appellate court remanded the case for this Court to resolve any factual disputes surrounding a

remedy and for this Court to exercise its "broad discretion" in imposing the "relief it calculates will best remedy the conduct . . . found to be unlawful." *Id.*

      *11.     Causation and Remedy*

      In its appeal, Microsoft "urge[d]" the circuit court to "reverse on the monopoly maintenance claim, because [P]laintiffs never established a causal link between Microsoft's anticompetitive conduct, in particular its foreclosure of Netscape's and Java's distribution channels, and the maintenance of Microsoft's operating system monopoly." *Id.* at 78.  Relying heavily on the treatise on antitrust law authored by Phillip E. Areeda and Herbert Hovenkamp, the appellate court determined that liability in this case could be established through an "infer[ence]" of causation.  *Id.* at 79 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 651c, at 78 (1996)).  Applying this "rather edentulous test for causation" the appellate court identified two relevant inquiries, the satisfaction of which would result in liability:

> (1) whether as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power and (2) whether Java and Navigator reasonably constituted nascent threats at the time Microsoft engaged in the anticompetitive conduct at issue.

*Id.*  On the record from the district court, the appellate court readily concluded that both inquiries had been satisfied and that liability must be imposed.  *Id.*

      The appellate court noted, however, that "Microsoft's concerns over causation have more purchase in connection with the appropriate remedy issue, *i.e.*, whether the court should impose a structural remedy or merely enjoin the offensive conduct at issue." *Id.* at 80.  Again relying upon Areeda and Hovenkamp, the appellate court focused upon the structural remedy that had been imposed by Judge Jackson and identified a relationship between the evidence of causation and the imposition of "radical structural relief":

> As we point out later in this opinion, divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain.  Absent some measure of confidence that there has been an actual loss to competition that needs to be restored, wisdom counsels against adopting radical structural relief.  *See* 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 653b, at 91-92 ("[M]ore extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, raise more serious questions and require a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power.").

*Id.* (internal citation omitted).  Later in the opinion, the appellate court again quoted from Areeda and Hovenkamp, highlighting the need for "a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power" where the remedy is structural relief.  *Id.* at 106 (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 653b, at 91-92) (emphasis added by appellate court).  The appellate court instructed that in the absence of "a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position in the OS market . . . the antitrust defendant's unlawful behavior should be remedied by 'an injunction against the continuation of that conduct.'"  *Id.* (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a, at 67).

In effect, the appellate court appears to have identified a proportionality between the severity of the remedy and the strength of the evidence of the causal connnection.  Accordingly, the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition."  *Id.* (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a, at 67).  Similarly, because structural relief is "designed to eliminate the monopoly altogether," 3 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 650a, at 67, "wisdom counsels against adopting radical structural relief" in the "absen[ce] of some measure of confidence that there has been an actual loss to competition that needs to be restored," *id.*  Instead, the court crafting a

remedy must assess the strength of the causation evidence that established liability and "tailor" the relief accordingly.  *Microsoft*, 253 F.3d at 107.

As the Court recounted above, the United States, along with nine State Plaintiffs, reached an agreement on the issue of remedy.  As a result, these Plaintiffs opted not to litigate further the issue of remedy.  The United States proceeded to seek approval of the settlement agreement and the entry of the agreement as the final judgment in this case pursuant to the Tunney Act, 15 U.S.C. § 16(b)-(h).  Having determined that the issue is ripe for the Court's consideration, the Court addresses the proposed final judgment and the public interest in the paragraphs below.

**B.**      **Second Revised Proposed Final Judgment**

The Second Revised Proposed Final Judgment (SRPFJ) which the parties seek to have entered as a final judgment in this case sets forth a number of restrictions upon Microsoft's conduct which are intended to remedy the effects of Microsoft's anticompetitive behavior. Section III of the SRPFJ, entitled "Prohibited Conduct," contains the substance of these restrictions, organized into subsections by letters.  SRPFJ § III.A-J.  Sections III.A, B, and F can be grouped together according to the similarity of their terms and the manner in which the terms compliment each other.  Each of these sections restricts Microsoft's ability to utilize its market power as a means, via retaliation and coercion, to protect its monopoly.

*1.*      *Anti-Retaliation and Uniform Licenses*

Section III.A bars Microsoft from "retaliat[ion]" against OEMs by altering its commercial relationship with that OEM or "withholding newly introduced forms of non-monetary Consideration . . . from that OEM" in certain circumstances.  *Id.* § III.A.  In particular, the provision bars retaliation where Microsoft knows the OEM "is or is contemplating":

1.　developing, distributing, promoting, using, selling, or licensing any software that competes with Microsoft Platform Software or any product or service that distributes or promotes any Non-Microsoft Middleware;

2.　shipping a Personal Computer that (a) includes both a Windows Operating System Product and a non-Microsoft Operating System, or (b) will boot with more than one Operating System; or

3.　exercising any of the options or alternatives provided for under this Final Judgment.

SRPFJ § III.A.  The provision further requires Microsoft to provide written notice to a "Covered OEM"[18] and at least "thirty days' opportunity to cure" prior to termination of that OEM's Windows Operating System Product license.  *Id.*  However, where Microsoft has already provided "two or more such notices during the term of [the Covered OEM's] Window's Operating System Product License," Microsoft is not obligated to provide "such a termination notice and opportunity to cure."  *Id.*

There are two exceptions to subsection A.  First, and without controversy, the provision shall not be construed to "prohibit Microsoft from enforcing any provision of any license with any OEM or intellectual property right that is not inconsistent with th[e] Final Judgment."  *Id.*  Second, and more significantly, the provision does not prohibit Microsoft from "providing Consideration to any OEM with respect to any Microsoft product or service where that Consideration is commensurate with the absolute level or amount of that OEM's development, distribution, promotion or licensing of that Microsoft product or service."  *Id.*

The United States identifies § III.A as a provision broadly drawn so as to "ensure[] that OEMs have contractual and economic freedom to make decisions about distributing and

---

[18]"Covered OEMs" is a defined term.  Pursuant to § VI.D, "'Covered OEMs' means the 20 OEMs with the highest worldwide volume of licenses of Windows Operating System Products reported to Microsoft in Microsoft's fiscal year preceding the effective date of the Final Judgment."  SRPFJ § VI.D.

supporting non-Microsoft middleware products without fear of coercion or retaliation by

Microsoft." United States Mem. in Support of the RPFJ (hereinafter cited as "United States

Mem.") at 57. Section III.A focuses on OEMs because of the significance of the OEM channel as

a means of distributing rival middleware and operating systems. *Id.* The exception in § III.A for

consideration commensurate with the promotion of or other similar support for Microsoft's

products is intended to preserve "permissible collaborations between an OEM and Microsoft to

promote Microsoft products and services." United States Response to Public Comments

(hereinafter cited as "United States Resp.") at 78. For example, explains the government, "an

OEM that collaborates with Microsoft on developing a particular product through extensive

testing, or offers advertising or other promotion, may be compensated for its greater role through

a higher level of Consideration for that product than one that is not developing or supporting that

product." *Id.* Given this reasoned explanation, the Court concludes that the exception in § III.A

for compensation commensurate with an OEM's promotion or similar support for a Microsoft

product is appropriately tailored to permit procompetitive agreements between Microsoft and

OEMs.

### a.      *"Microsoft Platform Software"*

The Court pauses its discussion of § III.A at this point to examine the term "Microsoft

Platform Software," which is the first of a number of carefully defined terms used throughout the

SRPFJ. The proposed final judgment defines Microsoft Platform Software as the combination or

alternative of two other defined terms. *See* SRPFJ § VI.L. "'Microsoft Platform Software' means

(i) a Windows Operating System Product and/or (ii) a Microsoft Middleware Product." *Id.* Each

of the two terms used in the definition of "Microsoft Platform Software" raises its own

definitional issues, with the more complex issues arising in conjunction with latter of the two.

Accordingly, the Court will examine each definition in turn.

> ### i.      *Windows Operating System Product*

The SRPFJ defines a "Windows Operating System Product" as

> the software code (as opposed to source code) distributed commercially by Microsoft for use with Personal Computers as Windows 2000 Professional, Windows XP Home, Windows XP Professional, and successors to the foregoing, including the Personal Computer versions of the products currently code named "Longhorn" and "Blackcomb" and their successors, including upgrades, bug fixes, service packs, etc. The software code that comprises a Windows Operating System Product shall be determined by Microsoft in its sole discretion.

SRPFJ § VI.U.  Controversy swirls around the SRPFJ's definition of "Windows Operating System Product" largely because of the final sentence in the definition, which leaves to Microsoft's discretion the determination of which code shall comprise a Windows Operating System Product.  This controversy, to quote the Immortal Bard, is really "much ado about nothing."  The criticism of this aspect of the definition arises from an interpretation which views the final sentence as a form of absolution for Microsoft from any liability for the illegal tying of two distinct products based upon the design of its Windows operating system product.  Such criticism is misplaced.

The definitions in the final judgment in this case do not possess the power to alter the application of the antitrust laws to Microsoft's conduct or its products.  The power to determine which software code constitutes a "Windows Operating System Product" for purposes of the SRPFJ cannot logically be viewed as a grant of special rights or immunity from prosecution under the antitrust laws for illegal tying.  Quite simply, the code that Microsoft identifies as a "Windows Operating System Product" has no impact upon the ability of the Department of

Justice, or any future plaintiff, to allege that the product identified as a "Windows Operating System Product" for purposes of the SRPFJ is an illegal amalgamation of two separate products under § 1 of the Sherman Act.  Likewise, the definition of "Windows Operating System Product" in the SRPFJ cannot curtail the ability of a court to determine that Microsoft has illegally tied two products which are separate under the antitrust laws.  Instead, the definition merely recognizes that, as a practical matter, Microsoft retains the power to determine which software code it will include in the products marketed as "Windows."

The definition of "Windows Operating System Product" is similarly misunderstood as enabling Microsoft to somehow manipulate which code is included in the definition in order to avoid classification as a "Microsoft Middleware Product."  According to this misreading of the definition, Microsoft could avoid inclusion of a particular piece of code within the definition of "Microsoft Middleware Product," SRPFJ § VI.K, by simply declaring that the code is part of a "Windows Operating System Product."  The fatal flaw in this reading of the definition is the presumption that "Microsoft Middleware Product" and "Windows Operating System Product" are mutually exclusive terms; that is not the case.  Software code can simultaneously fall within both the "Windows Operating System Product" and "Microsoft Middleware Product" definitions. *Id.* § VI.K, U.  Once again, therefore, the definition of "Windows Operating System Product" merely recognizes that Microsoft, as the distributor of a product called "Windows," has the discretion to determine which code to include in its distribution of that product.

### ii.    *"Microsoft Middleware Product"*

As recounted above, the latter portion of the definition of "Microsoft Platform Software" rests upon the definition of "Microsoft Middleware Product."  In the SRPFJ, "Microsoft

Middleware Product" means:

1.    the functionality provided by Internet Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger, Outlook Express and their successors in a Windows Operating System Product, and

2.    for any functionality that is first licensed, distributed or sold by Microsoft after the entry of this Final Judgment and that is part of any Windows Operating System Product

   a.    Internet browsers, email client software, networked audio/video client software, instant messaging software or

   b.    functionality provided by Microsoft software that —

      i.    is, or in the year preceding the commercial release of any new Windows Operating System Product was, distributed separately by Microsoft (or by an entity acquired by Microsoft) from a Windows Operating System Product;

      ii.    is similar to the functionality provided by a Non-Microsoft Middleware Product; and

      iii.    is Trademarked.[19]

Functionality that Microsoft describes or markets as being part of a Microsoft Middleware Product (such as a service pack, upgrade, or bug fix for Internet Explorer), or that is a version of a Microsoft Middleware Product (such as Internet Explorer 5.5), shall be considered to be part of that Microsoft Middleware Product.

SRPFJ § VI.K.  The first portion of this definition captures various types of functionality

provided by one of a set of existing, named products and their successors.  The functionalities in

this list go beyond the functionality provided by the Java technologies and Netscape's Navigator,

---

[19]Trademarked is defined in the SRPFJ to have the following meaning:
distributed in commerce and identified as distributed by a name other than Microsoft® or Windows® that Microsoft has claimed as a trademark or service mark by (i) marking the name with trademark notices, such as ® or ™, in connection with a product distributed in the United States; (ii) filing an application for trademark protection for the name in the United States Patent and Trademark Office; or (iii) asserting the name as a trademark in the United States in a demand letter or lawsuit. Any product distributed under descriptive or generic terms or a name comprised of the Microsoft® or Windows® trademarks together with descriptive or generic terms shall not be Trademarked as that term is used in this Final Judgment.  Microsoft hereby disclaims any trademark rights in such descriptive or generic terms apart from the Microsoft® or Windows® trademarks, and hereby abandons any such rights that it may acquire in the future.
SRPFJ § VI.T.

the middleware technologies which were the focus of the liability findings in this case, and

include a broad range of existing middleware technologies.

The latter portion of the definition enables inclusion in the decree of future technologies,

provided the new technologies meet certain requirements.  To fall within the prescient portion of

the definition, the software code must first be distributed as part of any "Windows Operating

System Product," the definition of which the Court discussed above.  *Id.*  The rationale for this

requirement is quite clear, as Windows is Microsoft's product in the monopoly market.  If the

Microsoft software has not been included in Windows, it lacks a fundamental relationship to the

theory and imposition of liability in this case.  The second element of such future functionality is

that it must also be distributed separately from a Windows Operating System Product.  The

government's rationale for this requirement derives from its view that the "competitive

significance of middleware products such as browsers and media players will be relatively small

if they are not distributed in any form separate from a Windows Operating System Product."

United States Resp. at 44.  This view results from the fact that, absent separate distribution,

Microsoft will remain unable to reach the "large installed base of Windows machines" and can

only impact users willing to upgrade to new versions of the operating system.  *Id.*  Even then,

Microsoft releases new operating systems at fairly long intervals and, in the absence of separate

distribution, will be unable to update and release new versions of products provided originally

with the operating system.  *Id.* at 44-45.  Therefore, according to the government, the

competitively significant middleware portions of Windows, of necessity, will be distributed

separately.

The third element of the definition is based upon yet another defined term requiring that

the "Microsoft Middleware Product" provide similar functionality to that provided by a "Non-Microsoft Middleware Product."  SRPFJ § VI.K.  In this instance, the definition of "Non-Microsoft Middleware Product"[20] is indisputably broad, incorporating anything which can be reasonably identified as "middleware" and which has achieved a certain level of popularity.  *Id.* § VI.N.

Finally, the requirement that Microsoft trademark the future functionality derives from the government's recognition of the "business reality that Microsoft often names and markets the technologies that it wishes developers and consumers to adopt."  United States Resp. at 53.  The government further explains that, in its view, "Microsoft has little incentive to bury its new products inside other applications in order to avoid having it meet the Trademark standard."  *Id.* These explanations address and rebut to the Court's satisfaction criticisms of the "trademarked" requirement in the definition of "Microsoft Middleware Product."

### b.    *Anti-Retaliation:  Original Equipment Manufacturers ("OEMs")*

Having examined the various components of the definition of "Microsoft Platform Software," the Court returns to its original inquiry into the effect of § III.A.  The government asserts, and the Court sees little basis to disagree, that § III.A will prevent Microsoft from hindering an OEM's ability to choose to support products which have the capacity to threaten

---

[20]The SRPFJ defines "Non-Microsoft Middleware" as
a non-Microsoft software product running on a Windows Operating System Product (i) that exposes a range of functionality to ISVs through published APIs, and that could, if ported to or made interoperable with, a non-Microsoft Operating System, thereby make it easier for applications that rely in whole or in part on the functionality supplied by that software product to be ported to or run on that non-Microsoft Operating System, and (ii) of which at least one million copies were distributed in the United States within the previous year.
SRPFJ § VI.N.

Microsoft's operating system monopoly.  Contrary to some criticism, the Court regards the limited scope of this provision, in that it addresses only competition relative to Microsoft's dominant role as a platform for applications, as entirely appropriate given the middleware theory of liability pursued in this case.  *See generally Microsoft*, 253 F.3d 34.  The Court further regards § III.A as presenting clear and enforceable terms.

The only lingering concern held by the Court is that § III.A does nothing to prevent Microsoft from making threats of retaliation.  The factual findings and liability in this case evidence that Microsoft has used not only actual retaliation, but threats of retaliation in coercing certain kinds of behavior.  *See, e.g., id.* at 77-78 (discussing Microsoft's "threat to Intel").  Given the power Microsoft wields as a monopolist, it would be appropriate to prohibit Microsoft from stifling competition with threats of bad treatment.  The United States explains the absence of any ban on threats rather logically, noting that where the retaliation itself is prohibited, any threat of retaliation is empty and, therefore, without power.  United States Resp. at 75.  While a rational explanation, the Court regards a ban on threats of retaliation, at a minimum, as more comforting to business entities dealing with Microsoft when making decisions about supporting Microsoft competitors.  Nevertheless, it is a far cry from making a "mockery of judicial power" that the remedy in this case does not include a ban on threats of retaliation.  *Microsoft*, 56 F.3d at 1462.  Accordingly, this criticism matters little in the Court's assessment of the public interest, as a consent decree need not reflect the Court's own choice of a remedy, but instead, giving due respect to the government's view of the effect of the remedial proposal, need only reflect a certain consonance with the liability allegations, or more appropriately in this case, the liability findings.  *See id.* at 1461.

**c.      *Anti-Retaliation:  Independent Software Vendors ("ISVs") and Independent Hardware Vendors ("IHVs")***

Section III.F mirrors § III.A to some extent, in that it too prohibits retaliation, but § III.F applies to Microsoft's conduct towards ISVs and IHVs.  SRPFJ § III.F.  Pursuant to § III.F.1:

> Microsoft shall not retaliate against any ISV or IHV because of that ISV's or IHV's:
> a.      developing, using, distributing, promoting or supporting any software that competes with Microsoft Platform Software or any software that runs on any software that competes with Microsoft Platform Software, or
> b.      exercising any of the options or alternatives provided for under this Final Judgment.

*Id.* § III.F.1.  Inasmuch as § III.F.1 mirrors § III.A, criticism with regard to the absence of a ban on threats of retaliation is equally applicable.  For the reasons discussed with regard to § III.A, however, the Court need not tarry long on the absence of such a prohibition.  In all other respects, the protections in § III.F reflect the liability findings against Microsoft for retaliating against ISVs and IHVs.  *See Microsoft*, 253 F.3d at 72-73 (discussing Microsoft's dealings with Apple), 77-78 (describing Microsoft's "threat to Intel"[21]).  Furthermore, because § III.F.1 prohibits retaliation responsive to IHVs' or ISVs' support for software which "competes" with not only "Microsoft Platform Software," but "any software that runs on software that competes with Microsoft Platform Software," its protections are broadly drawn.  SRPFJ § III.F.1.  Simultaneously, however, § III.F.1 remains appropriately grounded in its reflection of the monopoly market in this case and does not stray inappropriately into markets unrelated to the market in which liability was imposed.  *Id.*  The Court observes, in this regard, that there is little justification for protection against retaliation for software which does not "compete" with the monopoly product or run on

_____

[21]In the *Findings of Fact*, Judge Jackson noted that Intel is both an IHV and an ISV. *Findings of Fact* ¶ 95 ("Although Intel is engaged principally in the design and manufacture of microprocessors, it also develops some software.").

software which "competes" with the monopoly product.  The Court, therefore, finds that the protections afforded by § III.F.1 are appropriately drawn so as to advance the public interest.

### d.      Uniform Licenses

Section III.B is said to strengthen § III.A by mandating that Microsoft provide uniform license terms to Covered OEMs.  SRPFJ § III.B.  The uniform royalties are to be established in a schedule, which is accessible to Plaintiffs and the covered OEMs.  *Id.*  Notwithstanding the general uniformity of the licenses, Microsoft may provide volume discounts based upon the volume of the OEM's licenses of a Windows Operating System Product or group of such products.  *Id.* § III.B.2.  The licenses may also include discounts so long as the discounts are uniform among the Covered OEMs.[22]  *Id.* § III.B.3.  The discounts must also be based on objective, verifiable criteria and may not be inconsistent with other portions of the SRPFJ.  *Id.* This section simplifies the complex royalty licenses so as to prevent Microsoft from using the license terms as a means by which to coerce and control the OEMs into favoring Microsoft products.  United States Mem. at 57.  Still, the provision is limited such that larger OEMs may, quite reasonably, receive different treatment than some of the smaller OEMs.  *Id.*

The strongest criticism of § III.B argues that it should forbid Microsoft's practice of using market development allowances ("MDAs") and other discounts.  Vociferous though this criticism may be, it ignores the fact that there is no liability in this case which regards the use of MDAs themselves, or in conjunction with other anticompetitive behavior, to be an antitrust violation. *See Microsoft*, 253 F.3d 34.  Quite to the contrary, the United States takes the view that MDAs

---

[22]However, Microsoft may establish a two tiered discount schedule, one for the ten largest Covered OEMs, and another for the eleventh through the twentieth Covered OEMs. SRPFJ § III.B.3.a.

and similar discounts, when not misused, constitute "efficient behavior that has little or no potential to be used by Microsoft for anticompetitive purposes."  United States Resp. at 81.  Other provisions of the SRPFJ protect against the potential for misuse of MDAs, via retaliation or selective rewarding, such that there is little justification, and certainly no necessity, for a ban on Microsoft's use of MDAs and other discounts.  Moreover, MDAs and similar discounts are prohibited any time they are inconsistent with any other term of the SRPFJ.  SRPFJ § III.B.3.

By mandating uniformity, the SRPFJ sacrifices the ability of OEMs to negotiate the most favorable terms.  The Court recognizes that despite the obvious benefit to be gained by uniformity in licenses, undoubtedly, there are some which would be happier with the freedom to negotiate. Yet, the Tunney Act, and the case law which follows, dictate that it is for the United States to weigh the benefits of such a trade in the first instance, and that, barring a breach of duty in consenting to the decree, *Bechtel*, 648 F.2d at 666, the Court should respect the government's "predictions as to the effect of the proposed remed[y]."  *Microsoft*, 56 F.3d at 1461.  Adhering to this guidance, the Court cannot say that the imposition of uniform licenses and the preservation of Microsoft's ability to utilize MDAs and similar discounts approach a breach of duty by the government.

In sum, the Court finds the above-described provisions in the SRPFJ to be an effective means of protecting against Microsoft's utilization of its monopoly position to retaliate against companies that choose to support products that have the capacity to threaten Microsoft's monopoly.  In particular, the Court finds that the definitions discussed in this section, though they appear throughout the SRPFJ, namely "Windows Operating System Product," "Microsoft Middleware Product," and "Microsoft Platform Software," comport with the theory of liability in

this case and, in many instances, exceed the actual scope of the liability in some ways, such that a number of products not directly involved in Microsoft's anticompetitive conduct are addressed in the proposed final judgment.  The Court finds that, to the extent that these definitions encompass products beyond the scope of the liability findings, such breadth is appropriate, and likely necessary, to ensure that the anticompetitive conduct ceases and to prevent its reoccurrence.  *See Bechtel*, 648 F.2d at 666 ("It is not contrary to the public interest, as contemplated by the [Tunney Act], to enter a decree that is not necessary, or that grants relief to which the government might not be strictly entitled.  The public does not suffer because [the defendant] consented to limitations on its activities that could not otherwise be imposed.").

### 2.    *Flexibility in OEM Licenses*

### a.    *Icons, Shortcuts, and Menu Entries*

Unlike Sections III.A and III.B, which bear a more general relation to the liability findings, the conduct enjoined in § III.C correlates closely to Microsoft practices which were found to violate § 2 of the Sherman Act.  Rather than a blanket prohibition on the license restrictions which were found to be anticompetitive, § III.C provides substantial, though not absolute, flexibility to OEMs in configuring personal computers.  Subsection C.1 prohibits restriction on an OEM's installation and display of icons, shortcut, and menu entries for any "Non-Microsoft Middleware or any product or service . . . that distributes, uses, promotes, or supports any Non-Microsoft Middleware, . . . anywhere . . . in a Windows Operating System Product where a list of icons, shortcuts, or menu entries for applications are generally displayed." SRPFJ § III.C.1.  Section VI.M. defines "Non-Microsoft Middleware" broadly as:

> a non-Microsoft software product running on a Windows Operating System Product that exposes a range of functionality to ISVs through published APIs, and that could,

if ported to or made interoperable with, a non-Microsoft Operating System, thereby make it easier for applications that rely in whole or in part on the functionality supplied by that software product to be ported to or run on that non-Microsoft Operating System.

*Id.* § VI.M.  Excluded from the mandated flexibility in § III.C.1 is Microsoft's ability to limit the icons, shortcuts, or menu entries placed in a particular area according to the functionality provided by the product, so long as the limitation is non-discriminatory with respect to Microsoft and non-Microsoft products.  *Id.* § III.C.1.  In practical terms, this limitation means, for example, that if Microsoft has created a menu list for software providing email capability, the OEM is not free to configure Windows to place icons for programs which do not provide email capability in that area.  This limitation is intended to balance Microsoft's concerns with protecting consumer clarity and the provision of OEM flexibility.  United States Resp. at 89-90.  The government notes that the prohibition on discrimination in the application of this exception prevents Microsoft from "prescrib[ing] the functionality so narrowly that it becomes, in effect, discriminatory."  *Id.* at 91.  Likewise, the non-discrimination language precludes Microsoft from "completely forbid[ding] the promotion or display of a particular Non-Microsoft Middleware Product on the ground that Microsoft does not have a competing product itself."  *Id.*  "To do so," explains the government, "would be discriminatory."  *Id.*

The Court has reviewed the common complaint of some individuals and entities filing comments that the term "functionality" used in SRPFJ § III.C.1 is too vague to be enforced.  In short, the Court disagrees.  Admittedly the term is broad and somewhat flexible, but in this area of technology, overly restrictive terminology will prove useless as the technology continues to evolve.  Therefore, the Court takes the view that the phrase "particular types of functionality" carries sufficient meaning to be applied effectively and without confusion.  SRPFJ § III.C.1.

40

Section III.C.1 provides flexibility in product configuration while preserving for Microsoft control over the appearance of its product at the outermost edges.  The core freedom of configuration provided in § III.C.1 far outweighs the limited exception to this freedom where such configuration works a bizarre and unjustified result.  Accordingly, the Court takes the view that § III.C.1 will redress the illegal conduct, promote competition, and further the public interest.

### b.        Size and Shape of Icons

Section III.C.2. enables installation and display of shortcut icons of any size or shape, provided the shortcut "do[es] not impair the functionality of the user interface."  *Id.* § III.C.2.  This provision, like the one described above, provides OEM flexibility, while eliminating the most extreme manifestations of that flexibility.  Once again the central complaint about subsection C.2 involves an allegation of vagueness.  Some individuals and entities argue that there is insufficient clarity in what it means to "impair the functionality of the user interface."  *Id.*

The appellate court displayed a certain limited respect for Microsoft's configuration of the user interface when it held that the prevention of "drastic alteration of Microsoft's copyrighted work" was a valid basis for one of Microsoft's license restrictions.  *Microsoft*, 253 F.3d at 63.  At the same time, the appellate court rejected Microsoft's general claim that its license restrictions "merely prevent OEMs from taking actions that would reduce substantially the value of Microsoft's copyrighted work."  *Id.*  The exception in § III.C.2 for alterations which "impair the functionality" of the user interface attempts to strike a balance between these polar examples.  In the Court's view, there is no ambiguity in the language of § III.C.2, and the Court cannot say that its effect is inconsonant with the liability in this case.  Quite to the contrary, this provision appears to strike the appropriate balance between OEM freedom, Microsoft's interests in

41

protecting the functionality of its product against drastic alteration, and the appellate court's imposition of liability.

### c.     *Automatically Launched Software*

Section III.C.3 concerns licensing restrictions which are oddly reminiscent of restrictions for which the appellate court did not impose antitrust liability, namely the automatic launch of an alternative user interface at the conclusion of the boot sequence.  *Id.*  The appellate court observed that the automatic launch of software which replaces the Microsoft user interface worked a "drastic alteration" of Microsoft's copyrighted product, while Microsoft's restriction had only a "marginal anticompetitive effect."  *Id.*  As a result, the appellate court rejected the imposition of liability for Microsoft's prohibition in its OEM licenses of this practice.  *Id.* Notwithstanding this similarity, § III.C.3. applies to more than the automatic launch of an alternative user interface, regulating the automatic launching of any non-Microsoft Middleware Product "at the conclusion of the initial boot sequence or subsequent boot sequences, or upon connection to or disconnections from the Internet" without regard to whether such automatically launched product disturbs the Microsoft user interface.  SRPFJ § III.C.3.  This provision protects automatic launching of Non-Microsoft Middleware Products only where "a Microsoft Middleware Product that provides similar functionality would otherwise be launched automatically at that time" and imposes stringent limitations upon such automatic launching.  *Id.* Where such Non-Microsoft Middleware is permitted to automatically launch, § III.C.3. requires that the middleware either provide no user interface or a user interface that resembles the corresponding Microsoft Middleware Product interface.  *Id.*

In response to complaints regarding the restrictive nature of § III.C.3, the United States

invokes the D.C. Circuit's rejection of liability for the automatic launching of an alternative user interface as a justification for the limitations in that provision. *Microsoft*, 253 F.3d at 63. As explained by the United States, this provision attempts to strike a balance between Microsoft's interest in "preventing unjustified drastic alterations to its copyrighted work" and allowing new innovations and product features. United States Resp. at 94. The most obvious flaw in this rationale, however, is that § III.C.3 is not directed exclusively at the launching of alternative user interfaces, but includes the launching of software products which launch automatically, but do so within the general parameters of the Microsoft user interface. SRPFJ § III.C.3. Despite some acknowledgment of this flaw, the United States argues that the restrictions in § III.C.3 are tolerable because they "govern[] only the original OEM configuration," such that the end user can click on an icon to enable the automatic launching of Non-Microsoft Middleware notwithstanding the restrictions in § III.C.3. United States Resp. at 94. Given this ability, argues the United States, § III.C.3 reflects a "reasonable compromise" between Microsoft's concerns for ease of use and the liability findings in this case. *Id.*

In the Court's view, the restrictions in § III.C.3 give too much credence to Microsoft's purportedly "valid interest" in providing consistent product characteristics valued by users. *Id.* The appellate court rejected a remarkably similar concern proffered by Microsoft in an attempt to justify the other license restrictions imposed by Microsoft upon OEMs. *Microsoft*, 253 F.3d at 63-64. The appellate court's rejection in this regard can be read to include any restriction on the automatic launching of software which does *not* replace the Microsoft user interface. *Compare id.* at 64 ("In sum, we hold that with the exception of the one restriction prohibiting automatically launched alternative interfaces, all the OEM license restrictions at issue . . . violate § 2 of the

Sherman Act."), *with Findings of Fact* ¶ 213 ("Third, Microsoft prohibited OEMs from installing

programs, including [but not limited to] alternatives to the Windows desktop user interface, which

would launch automatically upon completion of the initial Windows boot sequence.").  Moreover,

this Court cannot help but recognize that this provision has the potential to empower Microsoft to

control, or at least regulate, the pace of innovation with regard to middleware products designed

to launch automatically, but which do not replace the user interface and, thereby, run afoul of the

appellate court's opinion.

       Importantly, however, the Court does not assess the proposed final judgment in a vacuum.

In this regard, although the Court might have crafted a different remedy, the Court cannot

conclude that the government has violated the public trust in agreeing to the terms set forth in

§ III.C.3.  *See Bechtel*, 648 F.2d at 666.  When considered as part of the greater whole of the

proposed decree which offers OEM freedoms not clearly implicated in the appellate court's

ruling, the Court can only conclude that the United States conceded this aspect of OEM flexibility

in exchange for other freedoms which, in the government's view, will more effectively benefit

competition.  *See Microsoft*, 56 F.3d at 1461.  "Just as the Court may not second guess the

government's choices about what claims to bring in the first place, it should not treat differently

those concessions proposed in a consent decree that might have been achieved at trial from those

that might not have been achievable."  *Thomson*, 949 F. Supp. at 927.  Although liability was

established in this case, there remained litigation surrounding the issue of remedy, during which

there would have been no guarantee that the United States would obtain all of the provisions it

desired.  The risks inherent in litigation are likely to be reflected in some portion of the proposed

decree, and these risks are appropriately weighed by the government, rather than the Court, in the

first instance.  *See AT&T*, 552 F. Supp. at 151.  Giving limited deference to the assessment of the

United States which takes the view that Microsoft has a valid interest in "having a computer boot

up quickly the first time it is turned on," United States Resp. at 94, the Court does not deem this

particular provision, though it is likely one of the proposed decree's more obvious weaknesses, to

so conflict with important public policy or antitrust law that it removes the proposed decree from

"the reaches of the public interest,"  Microsoft, 56 F.3d at 1458 (quoting statement originally in

*United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).

### d.    *Internet Access Provider ("IAP") Offers in the Initial Boot Sequence*

In general, subsection C.5 is aimed at remedying the restrictions on OEM modification of

the initial boot sequence–"the process that occurs the first time a consumer turns on the

computer," *Microsoft*, 253 F.3d at 61, which were found by the appellate court to violate § 2.  *Id.*

at 61-64.  The appellate court noted that this restriction "prevents OEMs from using [the initial

boot sequence] to promote the services of IAPs."  *Id.* at 62.  This restriction hinders the

distribution and/or promotion of non-Microsoft middleware which was often used by the IAPs in

their internet access software.  *Id.*  Removal of this restriction will once again allow OEMs to

promote various IAPs by inserting an option for choosing an IAP during the initial boot sequence.

As with subsection C.3, subsection C.5 of § III lifts a restriction directly implicated in the

appellate court's liability findings, but does not do so completely.  Section III.C.5 enables OEMs

to offer an IAP service of their choosing during the initial boot sequence, but only where the offer

complies with Microsoft's "reasonable technical specifications."  SRPFJ § III.C.5.  The appellate

court concluded that Microsoft's prohibition on the inclusion of IAP registration offers in the

initial boot sequence were without procompetitive justification.  *Microsoft*, 253 F.3d at 63-64.  In

particular, the appellate court rejected Microsoft's arguments that OEM alterations created "quality issues," *id.* at 64 (quoting Defendant's Trial Exhibit 2395), and caused consumer confusion because the district court found that OEMs, not Microsoft, bear the additional support costs associated with such a result. *Id.* (citing *Findings of Fact* ¶ 159). Given this holding, there is little basis in the liability findings for the retention of Microsoft's power to impose "reasonable technical specifications" on an OEMs' insertion of an IAP offer in the initial boot sequence.

Despite this observation, however, the same analysis which applied to subsection C.3 applies to subsection C.5 of § III. That is, the Court cannot say that the limited retention of discretion permitted by Microsoft with regard to the insertion of IAP registration offers is so flawed that it renders the entire decree, or even this particular section of the decree, outside of the public interest. *See AT&T*, 552 F. Supp. at 150-51. Rather, the Court observes once again, that this limited retreat from the full feasible relief which the United States might have obtained through litigation reflects the give and take of a negotiated settlement. *Id.* at 151. Moreover, the preservation of Microsoft's ability to impose "reasonable technical specifications" upon registration sequences inserted into the boot sequence is less objectionable than the reservation of Microsoft authority in § III.C.3 because the exception from § III.C.5 subjects Microsoft to an objective standard of reasonableness. If the technical specifications are objectively "unreasonable," Microsoft is without power to impose them. As a result, the Court is convinced that the freedom provided to OEMs by the opportunity to insert IAP registrations during the initial boot sequences, even as limited by § III.C.5, will have the procompetitive effect of enabling promotion and distribution of non-Microsoft middleware. *See Microsoft*, 253 F.3d at 62. The Court regards it unlikely that Microsoft's imposition of "reasonable technical specifications"

upon this freedom will undercut substantially its value to competition.

>    *e.*        ***Alternative Operating Systems and Other Alternatives under the Final Judgment***

Subsection C.4 of § III, prohibits Microsoft from restricting an OEM's ability to "[o]ffer[]

users the option of launching other Operating Systems from the Basic Input/Output System or a

non-Microsoft boot-loader or similar program that launches prior to the start of the Windows

Operating System Product." SRPFJ § III.C.4.  In effect, § III.C.4. provides OEMs with the option

of launching competing operating systems and prevents Microsoft from interfering with OEM

decisions to do so.  Lastly, § III.C.6. provides protection for OEMs which exercise any of the

options provided to them pursuant to § III.H. of the SRPFJ, which the Court discusses in greater

detail below.  *Id.* § III.C.6.  The Court sees little worthy of criticism in these final provisions of

subsection C, each of which should serve to provide OEM flexibility, which in turn, should

encourage competition.

>    *f.*        ***End-User Access***

Like subsection C, subsection H of § III is aimed at providing flexibility in the OEM

channel of distribution for non-Microsoft middleware, as well as for consumers in configuring

their own Windows installation.  Scheduled to take effect not later than twelve months from the

submission of the SRPFJ to the Court, subsection H concerns the addition, removal, and

placement of shortcuts, icons, and menu entries.  *Id.* § III.H.  As recounted above, the appellate

court found that Microsoft's restrictions on icon appearance and placement, folders and menu

entries, and other alterations of the appearance of the desktop had the effect of "impos[ing]

significant costs upon the OEMs." *Microsoft*, 253 F.3d at 62.  As a result of these additional

costs, Microsoft "reduced rival browsers' usage share not by improving its own product but,

rather, by preventing OEMs from taking actions that could increase rivals' share of usage." *Id.*
The appellate court rejected Microsoft's proffered procompetitive justifications for these
restrictions and, therefore, found them to be exclusionary in violation of § 2 of the Sherman Act.
*Id.* at 63-64.

Section III.H.1(a) requires that Microsoft permit end users and OEMs "to enable or
remove access to each Microsoft Middleware Product or Non-Microsoft Middleware Product by
. . . displaying or removing icons, shortcuts, or menu entries on the desktop or Start menu, or
anywhere else in a Windows Operating System Product where a list of icons, shortcuts, or menu
entries for applications are generally displayed." SRPFJ § III.H.1(a).  In derogation of this
provision, Microsoft reserves the right to restrict the display of icons, shortcuts, and menu entries
in any list of the same "specified in the Windows documentation as being limited to products that
provide particular types of functionality, provided that the restrictions are non-discriminatory
with respect to non-Microsoft and Microsoft products." *Id.*  The government explains that this
exception is intended to "capture broad categories of products" so as to avoid consumer confusion
by ensuring orderly placement of product icons, shortcuts, and menu entries.  United States Resp.
at 99.  As is plain from the language of the exception, Microsoft may not use these product
categories to discriminate between its own products and its competitors' products.  SRPFJ
§ III.H.1(a).

Section III.H.1(a) is responsive to the appellate court's finding of anticompetitive
behavior in Microsoft's exclusion of IE from the Add/Remove Programs utility.  *Microsoft*, 253
F.3d at 67.  The government posits that the provision will "alter Microsoft's current practice of
creating an artificial distinction between . . . Non-Microsoft Middleware Products and Microsoft

Middleware Products." United States Resp. at 98.  On this rationale, the government predicts that

users will be able, with the assistance of the SRPFJ, "to make choices on the merits about

Microsoft and Non-Microsoft Middleware Products." *Id.*  As with § III.C.1, § III.H.1(a) reserves

for Microsoft the right limit the insertion of particular icons, shortcuts, and menu entries in lists or

other areas of Windows which are reserved for particular functionality.  SRPFJ § III.H.1(a).

Once again, the Court does not regard such a limitation as inappropriately restrictive of OEM and

end-user ability to configure Windows.  The limitations imposed by Microsoft must be non-

discriminatory and may not be used to benefit Microsoft software over third-party software.  *Id.*

As a result, the Court rejects any contention that such a limitation will hinder the appropriately

procompetitive effect of the remedial provision.  On this basis, the Court finds that § III.H.1(a)

advances the public interest.

Section III.H.1(b) also requires Microsoft to allow end users and OEMs to enable or

remove access to middleware products by "enabling or disabling automatic invocations pursuant

to § III.C.3 of the SRPFJ that are used to launch Non-Microsoft Middleware Products or

Microsoft Middleware Products." *Id.* § III.H.1(b).  Again, § III.C.3. concerns the automatic

launch of Non-Microsoft Middleware.  *Id.* § III.C.3.  The "mechanism" for such enabling or

disabling must offer an unbiased choice between each Microsoft Middleware Product and Non-

Microsoft Middleware Product and may offer such an unbiased choice as between all Microsoft

Middleware Products as a group and Non-Microsoft Middleware Products as a group.  *Id.*

§ III.H.1.(b).  The Court finds this provision unobjectionable and appropriately procompetitive.

### i.   *Designation of a Non-Microsoft Middleware Product in Place of a Microsoft Middleware Product*

The second subpart of § III.H. requires Microsoft to allow end users and OEMs to

"designate a Non-Microsoft Middleware Product to be invoked in place of [a] Microsoft

Middleware Product (or vice versa)" in certain circumstances.  *Id.* § III.H.2.  This provision

requires that the option be presented to end users "via an unbiased mechanism" and to OEMs "via

a standard OEM preinstallation kits" in any situation "where the Windows Operating System

Product would otherwise launch the Microsoft Middleware Product in a separate Top-Level

Window and display either (i) all of the user interface elements or (ii) the Trademark of the

Microsoft Middleware Product."  *Id.*  As exceptions to the foregoing, Microsoft may invoke a

Microsoft Middleware Product where the product would be "invoked solely for use in

interoperating with a server maintained by Microsoft" or "that designated Non-Microsoft

Middleware Product fails to implement a reasonable technical requirement."  *Id.* § III.H.2(a)-(b).

The government explains that the central goal and the anticipated effect of § III.H.2 are that

Microsoft will be required to "implement and respect default settings in a number of

circumstances."  United States Resp. at 101.

 Critics of § III.H.2 complain that Microsoft could engineer its software to avoid falling

within the requirements of a "separate Top-Level Window" displaying either "all of the user

interface elements" or the "Trademark of the Microsoft Middleware Product."  SRPFJ § III.H.2.

Microsoft's ability to circumvent this provision through its product design, argue some, will

undercut the usefulness of the affirmative portion of § III.H.2.  The government explains that

these qualifications exist to "ensure that access to defaults exists whenever the alternative

Microsoft product would be launched as the full 'product' . . . rather than when just a portion of

the product's underlying functionality is launched to perform functions in Windows itself . . . or

otherwise where the end user might not necessarily be aware that he or she is using a specific

Microsoft Middleware Product. "  United States Resp. at 102.

The most obvious flaw in this criticism of § III.H.2 is that such criticism fails to recognize that the provision offers relief beyond that which might be regarded as necessary to redress the liability in this case.  Microsoft prevailed on its assertion that the override of a user's choice of a default browser was justified, and as a result, the appellate court did not ascribe liability for Microsoft's failure to provide true defaults, *Findings of Fact* ¶ 171 ("While Windows 98 does provide the user with the ability to choose a different default browser, it does not treat this choice as the 'default browser' within the ordinary meaning of the term.").  *See Microsoft*, 253 F.3d at 67.  Despite this holding, § III.H.2 addresses the acknowledged anticompetitive effect of the override of non-Microsoft defaults, *id.* at 65, by requiring Microsoft to make non-Microsoft products the "default" in certain circumstances.  SRPFJ § III.H.2.  This requirement in § III.H.2 exceeds even the scope of the facts addressed during the liability phase because the mandatory setting of defaults applies to multiple types of software functionality, not merely Web-browsing functionality.  *See Microsoft*, 253 F.3d 34.  Moreover, the government views the limited nature of § III.H.2 as one of the strengths of the provision, rather than its weakness.  In this regard, the government notes that paramount in § III.H.2 is the ability to "provide certainty and a bright line regarding when Microsoft is obligated to provide and respect a default setting."  United States Resp. at 102.  Based on the foregoing, and deferring to the government's view that § III.H.2 will have a procompetitive effect because of the clarity in its terms, however circumscribed, the Court cannot say that the United States has erred or strayed from the realm of acceptable remedies in sacrificing some flexibility in order to achieve the "bright line" drawn by the provision.

With regard to the latter portion of § III.H.2, the Court notes that subsections H.2(a) and

(b) appear to reflect the two findings by the appellate court as to liability or, more specifically, the lack thereof.  The relationship between subsection H.2(a) and the appellate opinion in this case is somewhat subtle, but the United States explains that automatic invocation of a "Microsoft Middleware Product . . . solely for use in interoperating with a server maintained by Microsoft (outside of the general context of Web browsing)" derives from the appellate court's holding that Microsoft did not violate § 2 in designing its product to override a user's browser preference in conjunction with invocation of the Windows "Help" system, *Microsoft*, 253 F.3d. at 67. *See* United States Resp. at 104-05.  The government avers that "[t]he current Windows Help system, as well as other parts of the Windows interface, rely on interoperating with servers maintained by Microsoft." *Id.* at 104.  While the Court might not have interpreted the appellate court's holding to require the precise exception in § III.H.2(a), the Court cannot say that the provision is inappropriate, and certainly, the provision does not conflict with the appellate court's holding. Rather, the provision is remarkable in that it tracks an exception to liability, which was carefully carved out by the appellate court, without sacrificing the effectiveness of the provision itself.

The link between § III.H.2(b)'s "reasonable technical requirement" language and the appellate court's finding with regard to Microsoft's "override the user's preferences" is somewhat less subtle. *Microsoft*, 253 F.3d. at 67.  Addressing whether Microsoft's product design to "override the user's choice of a default browser in certain circumstances" was anticompetitive, the appellate court concluded that Microsoft's proffered "valid technical reasons" were sufficient to outweigh any anticompetitive effect of the override. *Id.*  As a result, the appellate court did not ascribe liability for this aspect of Microsoft's product design. *Id.*  Section III.H.2(b) tracks the appellate court's liability holding on this point, while simultaneously countering any

anticompetitive effects of the product design by requiring that Microsoft provide the unfulfilled technical requirements to any ISV requesting them.  SRPFJ § III.H.2(b).  Given the close relationship between § III.H.2(b) and the appellate opinion in this case, the Court finds little merit in the criticism of the provision in the public's comments.  Like the exception in § III.H.2(a), the exception in subpart H.2(b) acknowledges the nuances of the appellate court's holding and yet maintains the potency of the restrictive portion of the provision.  In doing so, § III.H comports with the public interest.

### ii.     *Automatic Alteration of OEM Configuration*

The final provision in § III.H., subsection 3, prohibits a Windows Operating System Product from automatically altering an OEM's icon, shortcut, or menu-entry configuration without first seeking confirmation from the user.  *Id.* § III.H.3(a).  Furthermore, pursuant to § III.H.3(b), the Windows Operating System Product may not seek confirmation from the end user for such a non-user initiated change in configuration until "14 days after the initial boot up of a new Personal Computer."  *Id.* § III.H.3(b).  Any request for confirmation pursuant to this section must be unbiased with regard to Microsoft Middleware Products and Non-Microsoft Middleware.  *Id.* § III.H.3.

Section III.H.3 is written carefully to enable a feature in Microsoft's latest version of Windows, the "Clean Desktop Wizard," to remove unused icons from the desktop.  CIS at 48; United States Resp. at 107.  The 14-day grace period received wide criticism in the public's comments for its brevity, which, argue critics, devalues space on the desktop.  The government explains that this time-frame was chosen as a "reasonable compromise between the need to use desktop icons to promote Non-Microsoft Middleware, and the needs of users who would prefer to

be presented with the choice of moving unused icons to a folder." United States Resp. at 108. The government further asserts that there are other valuable areas in Windows within which non-Microsoft middleware products can be promoted. *Id.* While the former explanation offered by the government is valid, the Court finds the latter rationale weak given the role that placement on the desktop played in the liability proceedings. *See, e.g.*, *Microsoft*, 253 F.3d at 61 (finding that the inability to remove desktop icons for IE protected Microsoft's monopoly), 68-71 (holding that Microsoft's exclusive agreements with IAPs concerning desktop placement foreclosed a substantial share of the market). The more salient point made by the government is that the trigger and the confirmation for change must be unbiased with respect to Microsoft products and non-Microsoft products, such that the "Clean Desktop Wizard" should not be viewed as a tool for the suppression of non-Microsoft middleware products. United States Resp. at 107-08. Moreover, the government explains that the utility does not delete the icons, but merely moves the icons from the desktop into a folder from which they may be retrieved if the user changes his or her mind. *Id.* at 108-09. The Court notes in addition that there is no ascription of liability for Microsoft's alteration of user preferences and that the closest conduct to any such alteration–the override of defaults–is conduct for which Microsoft was absolved of liability. *Microsoft*, 253 F.3d at 67. In sum, the Court is not compelled to conclude that the preservation of a consumer option for a desktop "clean-up" tool is discordant with the public interest, so long as there exist adequate protections to ensure that the tool is not used as a sword with which Microsoft can attack its competitors.

> **g.** ***Sections III.C and III.H: Remedy for Commingling Liability***

Taking a more broad view of Sections III.C and III.H, the United States posits that these

sections "remedy Microsoft's anticompetitive commingling of browser and Windows operating

system code by requiring Microsoft to redesign its Windows Operating System Products to permit

OEMs and end users effectively to remove access to Microsoft Middleware Products (Section

III.H) and to allow competing middleware to be featured in its place (Section III.C)."  United

States Resp. at 114.  The invocation of anticompetitive conduct in this context refers to the

appellate court's affirmance of the following district court finding:

> [T]he District Court condemned Microsoft's decision to bind IE to Windows 98 "by
> placing code specific to Web browsing in the same files as code that provided
> operating system functions."  [*Findings of Fact*] ¶ 161;  *see also id.* ¶¶ 174, 192.
> Putting code supplying browsing functionality into a file with code supplying
> operating system functionality "ensure[s] that the deletion of any file containing
> browsing-specific routines would also delete vital operating system routines and thus
> cripple Windows . . . ."  *Id.* ¶ 164.  As noted above, preventing an OEM from
> removing IE deters it from installing a second browser because doing so increases the
> OEM's product testing and support costs;  by contrast, had OEMs been able to
> remove IE, they might have chosen to pre-install Navigator alone.  *See id.* ¶ 159.

*Microsoft*, 253 F.3d at 65-66 (ellipsis in original).  Rejecting Microsoft's factual assertion that it

does not commingle browsing and non-browsing code, the appellate court reiterated that

"commingling has an anticompetitive effect; . . . the commingling deters OEMs from

pre-installing rival browsers, thereby reducing the rivals' usage share and, hence, developers'

interest in rivals' APIs as an alternative to the API set exposed by Microsoft's operating system."

*Id.* at 66.

The government correctly notes that the basis for the appellate court' condemnation of

commingling is its anticompetitive effect and that, in the absence of such effect, it is not at all

clear that the practice of commingling would be of antitrust concern.  United States Resp. at 115.

This observation is significant because, in this instance, the government proposes a remedy which

does not simply proscribe the conduct found to be anticompetitive in violation of § 2.  Instead, the

remedy for Microsoft's commingling liability is more closely aligned with alleviating the anticompetitive effect of the conduct, rather than simply banning the conduct itself.

This approach receives much criticism in the public's comments on the proposed consent decree.  In general terms, these comments insist that Microsoft should be required to "un-commingle," or make removable, much of the software code in its Windows operating system. Not surprisingly, the United States rejects this criticism and insists that it has never pursued a position that would have required the removal or removability of code.  *Id. at* 115-16; *see also Microsoft*, 97 F. Supp. 2d at 68 (IFJ requiring the removal of end-user access, *not* code removal). Indeed, even the *Findings of Fact* support the view that code removal is unnecessary:  Judge Jackson noted in ¶ 165 that "from the user's perspective, uninstalling Internet Explorer [via the 'Add/Remove' function] was equivalent to removing the Internet Explorer program from Windows 95."  *Findings of Fact* ¶ 165.  The United States takes this view one step further, asserting that, contrary to theories advanced by some individuals and entities filing comments, "[t]he basis for commingling liability, and remedy, in this case is the presence, from the user's perspective, of the product, and consequent confusion and other deterrents to installation of additional, rival middleware products; the mere presence of APIs is not enough."  United States Resp. at 119.

Non-party cries for removal of software code as a remedy appear to reflect a substantive misunderstanding of the commingling liability in this case, which did not condemn Microsoft for including middleware functionality along with a product offering operating system

functionality.[23]  The remedy then, need not separate the functionalities, rather, it need only protect against any anticompetitive effect of the manner in which the functionalities have been bundled. In this case, the anticompetitive effect was found to be a disincentive to OEMs to install non-Microsoft middleware products.  If that disincentive can be removed, then the remedy is within the realm of appropriate relief.  *See* 2 PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 325a, at 246 (2d ed. 2000) ("[T]he decree . . . will not embody harsh measures when less severe ones will do.").

The United States predicts that §§ III.C and III.H will enhance competition between Microsoft middleware and non-Microsoft middleware, *see, e.g.*, CIS at 29, 45, and the Court is obliged to give some amount of deference to this prediction.  *Mass. School of Law*, 118 F.3d at 782; *Microsoft*, 56 F.3d at 1461.  In fact, the Court sees substantial merit in the government's explanation of the relationship between the theory of liability advanced by Plaintiffs, Judge Jackson's *Findings of Fact*, the district and appellate courts' findings of liability on this point, and the proposed consent decree's focus on end-user access, rather than code removal or redesign. Accordingly, the Court rejects the view that a remedial decree which does not mandate the "un-commingling" of code necessarily renders the remedy inappropriate, inadequate, or discordant with the public interest.

Adding emphasis to the foregoing conclusion is one final and important consideration–the effect of the remedy upon consumers and other participants in this segment of the industry.  In

---

[23]Any such condemnation would likely be reflected in the imposition of liability for illegal tying, rather than liability for illegal for monopoly maintenance.  *Cf. generally United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998).  Such a tying claim was offered by Plaintiffs pursuant to a *per se* analysis and was ultimately rejected by the appellate court. *Microsoft*, 253 F.3d at 89.

addition to its prediction that §§ III.C and III.H will effectively remedy commingling, the United

States predicts that a "blanket prohibition" of the practice "would impose a wholly unnecessary

and artificial constraint on software design and could have adverse implications for consumers."

United States Resp. at 119-20.  The government goes on to predict that:

> [C]hanges to the operating system that would be required to implement such a blanket
> prohibition likely would have adverse effects not only upon Microsoft and its
> customers but also upon third parties that already have designed software to rely on
> the present operating system code.  A flat prohibition on commingling in this
> particular case, without due regard to the competitive impact of that commingling,
> therefore likely would be harmful, not helpful.

*Id.* at 120.  The Court is hard pressed to reject a remedy on the grounds that it lacks a provision

which has the potential to give rise to such dire consequences.  Indeed, courts considering

antitrust remedies are advised to pay special attention to the potential of any remedy to inflict

harm upon third parties.  *See Microsoft*, 56 F.3d at 1462.  Moreover, the Court acknowledges that

a remedy requiring code removal would disregard the repeated admonition offered by the

appellate court in an earlier *Microsoft* opinion that its is undesirable for the Court to inject itself

into matters of product design.  *Microsoft*, 147 F.3d at 949-50 and n.13 (identifying a "limited

competence of courts to evaluate high-tech product designs and the very high cost of error"

associated therewith); *but see Microsoft*, 253 F.3d at 65 ("Judicial deference to product

innovation, however, does not mean that a monopolist's product design decisions are *per se*

lawful.").  Based on the foregoing, the Court will not reject the SRPFJ on the ground that it does

not include a blanket prohibition against commingling Web-browsing code with operating system

code.  To the contrary, the Court finds that the end-user focus of the remedy comports with the

public interest as it minimizes potential for harm to third parties and, nevertheless, carries a great

potential for the advancement of competition.

### 3.   Agreements with Internet Access Providers ("IAPs"), Internet Content Providers ("ICPs"), Independent Software Vendors ("ISVs"), and Others

### a.   Exclusive Agreements

Section III.G of the SRPFJ governs Microsoft's ability to enter into agreements with IAPs, ICPs, ISVs, IHVs,[24] and OEMs which require any such entity to distribute, promote, use or support, "exclusively or in a fixed percentage," any Microsoft Platform Software.  SRPFJ § III.G.1.  Subsection G.1 prohibits Microsoft from entering into any exclusive or fixed percentage agreement except where "Microsoft in good faith obtains a representation that it is commercially practicable for the entity to provide equal or greater distribution, promotion, use, or support for software that competes with Microsoft Platform Software."  *Id.*  This portion of the consent decree is aimed at remedying the liability findings against Microsoft for entering into exclusive contracts with IAPs and ISVs.  Citing to the "First Wave Agreements," the appellate court first deemed anticompetitive Microsoft's promise to ISVs to give "preferential support . . ., other technical information, and the right to use certain Microsoft seals of approval," *Microsoft*, 253 F.3d at 71, in exchange for the ISVs' exclusive use of IE as the default browser and the ISVs' exclusive "use of Microsoft's 'HTML Help,' which is accessible only with [IE]," *id.* at 71-72.[25]
The appellate court further determined that Microsoft's agreement with Apple, "which is both an

_____

[24]An "IHV" is an "independent hardware vendor that develops hardware to be included in or used with a Personal Computer running a Windows Operating System Product."  SRPFJ § VI.H.

[25]In contrast, the appellate court declined to find Microsoft liable for entering into similar deals with ICPs on the grounds that Plaintiffs "failed to demonstrate that Microsoft's deals with the ICPs have a substantial effect upon competition."  *Microsoft*, 253 F.3d at 71.

OEM and a software developer,"[26] *id.* at 71, for Apple's exclusive use of IE as the default browser

was anticompetitive in violation of § 2. *Id.* at 72-74. Lastly, once again citing to the "First Wave

Agreements," the appellate court concluded that "to the extent Microsoft's First Wave

Agreements with ISVs conditioned receipt of Windows technical information upon the ISVs'

agreement to promote Microsoft's JVM exclusively," *id.* at 75, the agreements were

"exclusionary, in violation of the Sherman Act." *Id.* at 76.[27]

Some individuals and entities filing comments contend that the "commercially

practicable" representation in § III.G.1 is too easily evaded and, therefore, will be ineffective.

The United States responds by explaining the manner in which the provision will function. The

government first explains that the provision will prevent Microsoft "from guaranteeing that rival

technology will not become broadly available," United States Resp. at 133, by "mak[ing] it

logically impossible for Microsoft to seek–much less get–any form of exclusive distribution,

promotion, use, or support on all of a third party's products, no matter how much Microsoft is

willing to pay." *Id.* at 134. In this regard, § III.G.1 is shown to appropriately permit contracts

with other participants in the industry which cannot be said to be anticompetitive. The

---

[26]Although identified as an OEM in the appellate court's opinion, the Court observes that Apple does not fit into the definition of OEM provided in the SRPFJ because it does not license Microsoft's operating system product. SRPFJ § VI.O. The Court remains unconcerned by this fact because the protections afforded to OEMs concern their licensing of Windows, and therefore, it would make little sense to include Apple within the purview of these protections. *See, e.g.*, SRPFJ § III.A-C, H. Moreover, Apple appropriately receives protections afforded to ISVs. *Id.* §§ III.D, F-G, I and VI.I.

[27]The proposed consent decree's prohibition on exclusive or fixed-percentage agreements extends beyond the specific findings of liability to apply to ICPs and IHVs. This extension is appropriate, as "[t]he public does not suffer because [the defendant] consented to limitations on its activities that could not otherwise be imposed." *Bechtel*, 648 F.2d at 666.

government goes on to debunk the contention that Microsoft can extract the "commercially practicable" representation by pressuring the party with which it is contracting, as such tactics would not satisfy the "good faith" requirement in § III.G.1.  *Id.* at 133-34.  The "good faith" requirement prevents Microsoft from pressuring or coercing any such entity into making the necessary representation.  *Id.*  Similarly, Microsoft cannot simply include such representations as boilerplate language in its contracts as, once again, the "good faith" requirement will not have been met.  *Id.*

The appellate court expressly observed in conjunction with its discussion of Microsoft's illegal exclusive contracts that "exclusivity provisions in contracts may serve many useful purposes," such that they are "a presumptively legitimate business practice."  *Microsoft*, 253 F.3d at 69.  "[E]xclusive contracts are commonplace–particularly in the field of distribution–in our competitive, market economy, and imposing upon a firm with market power the risk of an antitrust suit every time it enters into such a contract, no matter how small the effect, would create an unacceptable, and unjustified burden on any such firm."  *Id.* at 70.  Because antitrust law does not condemn all exclusive contracts, even if entered into by a monopolist, the Court regards it as entirely appropriate for the remedy in this case to prohibit only those contracts that have a significant degree of foreclosure of the market.  In this light, § III.G.1 is shown to be a provision which carefully balances the prohibition of anticompetitive conduct and the preservation of opportunities for symbiotic relationships between Microsoft and third parties which are not likely to be anticompetitive in their effect.

### b.    *Placement on the Desktop*

To further remedy Microsoft's anticompetitive exclusive deals with IAPs, subsection G.2

of Section III prohibits agreements with IAPs and ICPs that condition placement on the desktop (or elsewhere in Windows) on a promise to refrain from distribution, promotion, or use of any software that competes with certain functionality offered by Microsoft as part of its operating system–Microsoft Middleware.  SRPFJ § III.G.2.  Accordingly, subsection G.2 provides broad protection for present and future middleware which competes with Microsoft Middleware. Section III.G.2 directly addresses the liability finding against Microsoft for entering into contracts with IAPs for prominent desktop placement in exchange for the IAPs' exclusive promotion of Microsoft's browser.  *Microsoft*, 253 F.3d at 68-71.  Subsection G.2 broadens the remedial decree beyond the liability finding with regard to IAPs to protect ICPs as well, despite the fact that liability with regard to Microsoft's agreements with ICPs was ultimately rejected by the appellate court.  *Microsoft*, 253 F.3d at 71.  This expansion beyond the liability is not over-broad and reflects a means of prohibiting Microsoft from engaging in conduct which is closely related to the conduct for which Microsoft was found liable.  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (holding that an injunction that "goes beyond a simple proscription against the precise conduct previously pursued . . . is entirely appropriate").

     ***c.     Joint Ventures, Joint Development Agreements, and Joint Services Agreements***

The latter portion of § III.G makes clear that neither subsection G.1 nor G.2 prohibits Microsoft from entering into agreements which limit competition within the context of a "bona fide joint venture . . . joint development or joint services arrangement with any ISV, IHV, IAP, ICP, or OEM for a new product, technology or service, or any material value add-on to an existing product, technology or service, in which both Microsoft and the [other entity] contribute significant developer or other resources."  *Id.* § III.G.  Also excepted from the purview of § III.G

are any agreements in which Microsoft licenses intellectual property from a third party. *Id.* This exception provides an incentive for Microsoft to license nascent technology from third-party vendors for distribution with Microsoft products. United States Resp. at 136-37. Such an exception protects the potential for third parties to benefit from Microsoft's broad distribution capability. *Id.*

The above-described limitations placed on subsections G.1 and G.2 receive some criticism to the effect that Microsoft will simply be able to label its agreements "joint ventures" so as to escape the limitations otherwise imposed by § III.G. As is often the case, these critics fail to carefully consider the precise wording of the provision. The words "bona fide" modify the joint ventures to which the exception applies. SRPFJ § III.G. Were Microsoft to simply label ordinary transactions as "joint ventures" because they involve some amount of collaboration, the "bona fide" requirement would not be met. Similarly, criticism of the use of the term "bona fide" fails to recognize that the term is a legal term which carries with it a particular legal significance. Therefore, there is nothing vague or ambiguous about its use. In a similar vein, comments which assert that the terms "joint development or joint services arrangement" are without meaning fail to take account of the language modifying these terms which makes clear that the joint activity must be aimed at new products, technologies, or services, or a material value add-on to existing technology, and that the parties to the arrangement must each contribute significant resources. *Id.* The exception is tailored to permit joint activities that are genuinely procompetitive and, indeed, recognizes that non-compete clauses may be appropriate where two firms legitimately share resources to create new or improved opportunities for consumers. United States Resp. at 136. Given these considerations, the permissive exceptions to the restrictive portion of § III.G. are

shown to be far more narrow in their application than most recognize.  Accordingly, the Court

sees little merit in the general criticism that the exceptions in § III.G for joint ventures, joint

development agreements, and joint services agreements are overly broad.

The more salient criticism of § III.G arises from the fairly broad exception of "any

agreements in which Microsoft licenses intellectual property in [sic] from a third party" from the

purview of the prohibitive portions of the provision.  SRPFJ § III.G.  Critics of this portion of the

SRPFJ contend that Microsoft can simply add an intellectual property license to an exclusive

agreement in order to circumvent the prohibitive portion of § III.G.  The United States explains

that the exception "permits Microsoft, in licensing new technology from an ISV for incorporation

into a Microsoft product, to ensure that the ISV will not also license the same technology to a

competitor who hopes to 'free ride' on Microsoft popularization of the technology."  United

States Resp. at 137.  In this regard, the government argues that the exception preserves

Microsoft's "incentives to invest in such popularization."  *Id.*

Although the government's explanation is reasonable, the government does not explain

why the exception for agreements in which Microsoft licenses intellectual property is not more

carefully tailored to address the circumstance referenced by the government.  Given the breadth

of the exclusion, it is possible that agreements which the government did not intend to exclude

from the prohibitory portion of § III.G, nonetheless, will be excluded.  The government appears

far less concerned about this potential over-breadth, than with the potential for the exception to

provide an unintended loophole.  In this regard, the government observes that a license of

intellectual property as a pretext for otherwise exclusionary terms would be subject to review by

the United States, and could result in a request for modification if the provision is abused.  *Id.*

The exception from § III.G of agreements in which Microsoft licenses third-party intellectual property provides an additional example of a provision which the Court, if called upon to craft a remedy, would likely not craft so broadly.  However, it scarcely bears repeating that a court presiding over a Tunney Act proceeding need not conclude that the terms of the consent decree "will *best* serve society," but only that the proposed decree is "within the reaches of the public interest."  *Microsoft*, 56 F.3d at 1460 (quoting *Western Elec. Co.*, 900 F.2d at 309) (emphasis in original).  Had the government been unable to offer a reasoned justification and predictive effect of the exception in § III.G for agreements in which Microsoft licenses intellectual property, the Court might well have concluded that the exception does not accord with the public interest.  The Court is not faced with such a circumstance.  The government has offered a legitimate justification for the balance struck between the prohibitive and permissive portions of § III.G, and the Court declines to second guess the wisdom of this balance.  Recalling that "[a]bove all, [a] consent decree . . . [is] the product[] of a negotiated settlement from which, presumably, no party obtained everything it wanted," *Thomson*, 949 F. Supp. at 914, the Court takes the view that this particular exception in § III.G of the SRPFJ may reflect one of those instances in which the government exchanged some degree of breadth for some other valuable benefit.  *See AT&T*, 552 F. Supp. at 151 ("Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and the elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.") (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).  Given the totality of the facts, the Court cannot conclude that the breadth of the exception in the latter portion of § III.G so far detracts from the remainder of the provision, and the other portions of the decree, that it falls beyond the

reaches of the public interest.

### d.        Limitations on Support for Competing Products

Section III.F.2[28] is aimed directly at Microsoft's dealings with ISVs.  Pursuant to § III.F.2

Microsoft may not condition any benefit or "grant of Consideration" on an ISV's "refraining from

developing, using, distributing, or promoting" software that competes with Microsoft Platform

Software.  *Id.* § III.F.2.  Excepted from the protections of § III.F.2, however, are agreements

which limit an ISV's "development, use, distribution, or promotion" of such competing software,

where such agreement is reasonable in its terms and "reasonably necessary to . . . a bona fide

contractual obligation of the ISV to use, distribute or promote any Microsoft software or to

develop software for, or in conjunction with, Microsoft."  *Id.* § III.F.2.

The government explains the exception in § III.F.2 as a means by which to "protect ISVs'

opportunity to engage in legitimate, procompetitive arrangements with Microsoft," such as a very

basic agreement whereby Microsoft "provides an ISV with funds for the promotion of Microsoft

software and prohibits the ISV from spending those funds to promote rival software."  United

States Resp. at 127-28.  In the face of criticism, the United States maintains that this exception

will not permit Microsoft to "enter into an agreement that provides an ISV with assistance in

promoting a Microsoft product on [the] condition that the ISV not also distribute, use, or promote,

a rival product, because such a limitation would not be reasonably related to the ISV's obligation

to promote the Microsoft product."  *Id.* at 128.  The government readily admits that the language

of this exception is somewhat "general[]" but contends that this generality is a "necessary trade-

off."  *Id.*  In this regard, the government argues that more precise provisions provide greater

---

[28]Section III.F.1 is discussed *supra* Part III.B.1.c.

opportunity for circumvention, while a provision like § III.F.2, which relies on "general but established legal terms," will provide the government and the Court with greater flexibility to consider the substance rather than the "mere form of Microsoft's future agreements with ISVs." *Id.* The government further notes that were there no such exception, § III.F.2 would prohibit lawful, procompetitive agreements with ISVs. *Id.* This explanation satisfies the Court that the terms of § III.F are not drawn contrary to the public interest.

Viewed in their entirety, §§ III.F and III.G not only prohibit the anticompetitive conduct identified by the appellate court with regard to ISVs, IAPs, and IHVs, but these provisions extend further, to address Microsoft's conduct with other participants in the industry even though Microsoft's dealings with these entities did not give rise to liability in this case. More importantly, these provisions strike a delicate balance between the prohibition of conduct found to be anticompetitive, or conduct closely related to conduct found to be anticompetitive, and the preservation of conduct that benefits other participants in the industry, as well as consumers. The Court regards it particularly necessary when addressing Microsoft's contracting power to ensure that procompetitive, mutually beneficial arrangements are not prohibited by the terms of an over-broad decree. Acknowledging that the United States has weighed these considerations in the first instance, the Court regards the balance struck as one which falls within the realm of an acceptable remedy.

### 4. *API Disclosure, Interoperability, and Related Provisions*

Sections III.D and III.E generally concern the disclosure of APIs, communications protocols, and other technical information for purposes of ensuring successful interoperation with Microsoft's Windows operating system. Subsection D requires Microsoft to disclose the "APIs

and related Documentation" used by "Microsoft Middleware" to interoperate with Windows. SRPFJ § III.D.  The provision defines "APIs" as "the interfaces, including any associated callback interfaces, that Microsoft Middleware running on a Windows Operating System Product uses to call upon that Windows Operating System Product to obtain any services from that Windows Operating System Product."  *Id.*  While the rationale for this type of disclosure rests, in part, upon the finding of liability for conditioning the provision of technical information on illegal, exclusive agreements, *Microsoft*, 253 F.3d at 71-72, it can be viewed more broadly to relate to the United States' theory of the case as a whole.  As recounted above, the United States proceeded to trial on the theory that Microsoft had acted anticompetitively in an effort to boost its own middleware and stifle rival middleware because those products posed a potential "platform threat."  The disclosure of interfaces and related technical information pursuant to § III.D ensures the ability of competitive products to interoperate effectively with the Windows operating system and in a manner which is not disadvantaged by comparison to Microsoft's middleware technology.  Accordingly, such disclosure has the potential to increase the ability of competing middleware to threaten Microsoft's operating system monopoly.

### a.   API Disclosures

One of the more prevalent criticisms of the SRPFJ arises in conjunction with § III.D, relating specifically to the use of the term "Microsoft Middleware."  As indicated above, § III.D mandates the disclosure of the APIs relied upon by "Microsoft Middleware to interoperate with a Windows Operating System Product."  SRPFJ § III.D.  The definition of "Microsoft Middleware" is very similar to the definition of "Microsoft Middleware Product," discussed *supra* Part III.B.1.a.ii.  The term "Microsoft Middleware" is used in this context, rather than "Microsoft

68

Middleware Product," because § III.D requires the identification of particular pieces of software code.

In order to identify specifically the appropriate pieces of code, the definition of "Microsoft Middleware" identifies the code that Microsoft distributes separately from Windows and trademarks or identifies as a major version of any Microsoft Middleware Product.  SRPFJ § VI.J. The oft-criticized separate distribution requirement provides not only a ready means by which to identify code, but acknowledges that the most competitively significant products will be distributed and updated at more frequent intervals than Microsoft's entire operating system product.  *See* United States Resp. at 44-45.  Similarly, the requirement of trademarking serves also to identify the competitively significant software, while simultaneously excluding security patches, fixes, or other small downloads.  *Id.* at 47-48.  Lastly, "Microsoft Middleware" must provide functionality which is the same or substantially similar to the functionality provided by a "Microsoft Middleware Product."  SRPFJ § VI.J.  Because a "Microsoft Middleware Product," by definition, is part of Windows, *id.* § VI.K, this last major requirement serves to ensure a close link to the monopoly market and Microsoft's product in that market.  *See* United States Resp. at 48-49.  On this point, the government explains, in particular, that its case was never intended to address products that Microsoft never distributed with its Windows operating system, and therefore, the relationship to Microsoft's monopoly product is entirely consonant with the theory of liability.  *Id.* at 48.  The government further explains that the parameters of "Microsoft Middleware" exceed mere application to the Microsoft counterparts to Navigator and Java, extending to a number of present and future middleware technologies.  Such expansion is appropriately forward-looking and accords with the general law of remedies in antitrust law.  *See*

*United Shoe*, 391 U.S. at 250.

Criticisms of this definition in the government's remedial decree are wide-ranging, with most sharing the view that the definition should apply to more Microsoft software. The United States has offered a reasoned justification for each limitation in the definition. These explanations are directly responsive to the criticism and serve to rebut all of the various accusations regarding the parameters of "Microsoft Middleware." In short, the Court is not convinced that the parameters of "Microsoft Middleware" and the ensuing impact upon Microsoft's obligations under the proposed final judgment are inappropriately drawn or are in conflict with the public interest.

Additionally, the definition of "API" receives criticism by those filing comments. API is defined in § III.D as "the interfaces, including any associated callback interfaces, that Microsoft Middleware running on a Windows Operating System Product uses to call upon that Windows Operating System Product in order to obtain any services from that Windows Operating System Product." SRPFJ § III.D. Some entities filing comments complain that the definition of API is too narrow. In his *Findings of Fact*, Judge Jackson described APIs as the "synapses at which the developer of an application can connect to invoke pre-fabricated blocks of code in the operating system." *Findings of Fact* ¶ 2. The definition in the SRPFJ is consistent with the description in the *Findings of Fact* and, given the liability which was affirmed by the appellate court, is appropriately limited in scope. In this regard, the Court notes that because liability in this case concerns middleware, it would far exceed that liability to require Microsoft to disclose interfaces between its operating system products and all applications and devices. Moreover, as the government explains, the definition of API is fairly broad such that "whatever Microsoft

70

Middleware uses to request services from a Windows Operating System Product, whether it includes something that could arguably be called a 'file format' or not, is the subject of disclosure." United States Resp. at 144. Accordingly, the Court concludes that the definition of API is sufficiently broad, yet appropriately tailored to reflect the extent of liability in this case.

Similarly, some entities filing comments complain that the definition of "Documentation" is too limited. The Court finds little merit in this complaint. "Documentation" is defined in the SRPFJ as "all information regarding the identification and means of using APIs that a person of ordinary skill in the art requires to make effective use of those APIs." SRPFJ § VI.E. The goal of this provision is clear; the "Documentation" should enable a software developer to utilize the APIs which are disclosed pursuant to § III.D. The Court is satisfied that the definition of "Documentation" is appropriately drawn to accomplish that legitimate goal.

One additional complaint relevant to this discussion concerns the timing of the disclosures mandated by § III.D. Section III.D provides for two alternatives relevant to timing, one for new major versions of Microsoft Middleware, and another for the release of a new version of a Windows Operating System Product. *Id.* § III.D. "In the case of a new major version of Microsoft Middleware, the disclosures . . . shall occur no later than the last major beta test release of that Microsoft Middleware." *Id.* The United States explains that the "last major beta test release for various Microsoft Middleware Products" will likely occur "anywhere from two to seven months prior to the commercial release of the product." United States Resp. at 153. The government further explains that earlier release of the information is not feasible, despite the fact that developers within Microsoft may have earlier access to the APIs. *Id.* at 154. This is so because the API is often not finalized, tested, and fully documented at that stage, and may, in fact,

continue to change.  *Id.*  Any alteration to the API threatens not only to destroy the usefulness of

the disclosure for software developers, but has the capacity to hinder developers in the creation of

software.  *Id.*  Given these bases, it does not seem unreasonable to fix a time for disclosure which

will ensure that the disclosed information is stable and unlikely to be subjected to future

alteration.

"In the case of a new version of a Windows Operating System Product, the obligations

imposed by this Section shall occur in a Timely Manner."  SRPFJ § III.D.  "Timely Manner"

appears in the definition section and "means at the time Microsoft first releases a beta test version

of a Windows Operating System Product that is made available via an MSDN subscription

offering or of which 150,000 or more beta copies are distributed."  *Id.* § VI.R.  The government

explains that the timing of disclosures relevant to the release of new Windows Operating System

Products reflects the "approximate current MSDN subscription base" such that disclosure is

triggered by the distribution of 150,000 beta copies of the software.  United States Resp. at 155.

Once again, given the explanations in the government's response to public comments, the timing

of disclosures pursuant to § III.D does not seem to be unreasonable or unjustified.

Disclosure beyond these parameters, while potentially useful to other industry participants

in combating Microsoft's dominance in the operating system market, is not absolutely required by

the liability in this case.  Indeed, the disclosures in § III.D are not clearly directed at the redress of

a specific finding of liability, but instead advance the more general antitrust remedial goal of

"eliminating the effects of the illegal conduct."  *Nat'l Soc'y Prof'l Eng'rs*, 435 U.S. at 698.  Both

the United States and Microsoft acknowledge that, at present, Microsoft discloses, supports, and

evangelizes many Windows APIs.  *See* Microsoft Mem. in Support of the SRPFJ at 29; United

States Resp. at 140.  Of course, Microsoft has a clear business incentive to do so, as it is this

disclosure, in part, which makes the Windows platform attractive to applications developers.

United States Resp. at 140-41.  As the United States explains, the mandated disclosures in § III.D

will be useful "in those cases where Microsoft may have a strategic interest in withholding APIs

that outweighs Microsoft's natural incentive to disclose them–namely, where Microsoft's own

middleware is competing with rival middleware that threatens the applications barrier to entry."

*Id.*  In this regard, § III.D appropriately requires disclosure of "the most competitively significant

APIs . . . used by competing [middleware] products, not those used by completely different types

of software."  *Id.* at 140.

### b.     *Communications Protocols*

In a similar vein § III.E requires that Microsoft license, for purposes of interoperating or

communicating with a Windows Operating System Product, any communications protocol

installed on a Windows client which is used to interoperate or communicate with a Microsoft

server operating system product without the addition of software code to the client.  SRPFJ

§ III.E.  This aspect of the proposed consent decree, like § III.D, is forward-looking and seeks to

address the "rapidly growing server segment of the market."  United States Mem. at 59.  A

"growing number of applications . . . run on servers, rather than on the desktop."  Sibley Decl.

¶ 56.  These technologies "represent[] a strong source of competition to Microsoft in the business

computing segment and may yet make a serious attack on the applications barrier to entry in the

desktop PC market."  *Id.*  Hence, the goal of this disclosure is to ensure that rival middleware can

interoperate with servers running Microsoft's server operating system software and thereby

compete vigorously with Microsoft middleware.  *Id.*  In addition, enabling non-Microsoft

middleware to interoperate with Microsoft's operating systems in the server segment ensures that

Microsoft does not "incorporat[e] into Windows features or functionality with which only its own

servers can interoperate, and then refus[e] to make available information about those features

non-Microsoft servers need in order to have the same opportunities to interoperate with the

Windows operating system."  United States Mem. at 58-59.

Although this aspect of the remedy plainly exceeds the scope of liability it is appropriately

forward-looking.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132-33 (1969);

*Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947).  Certainly it cannot be said that the

disclosures specified in Sections III.D and E are a blanket prohibition on all future violations of

the antitrust laws.  *See Zenith Radio*, 395 U.S. at 133.  To the contrary, these provisions are

closely connected with the theory of liability in this case and further efforts to "ensure that there

remain no practices likely to result in monopolization in the future."  *United Shoe*, 391 U.S. at

250.  As a result, the provisions plainly fall within the public interest.

### c.      *Interoperation*

Somewhat controversial in § III.D and E is the fact that the SRPFJ does not include a

definition of "interoperate."  Entities raising this concern assert that the CIS offers some

explanation of the term, but in the absence of a definition in the SRPFJ, there is no guarantee that

the term will be given the meaning ascribed in the CIS.  In the CIS, the government explains that

"[t]he effect of Section III.D. is to assure Non-Microsoft Middleware meaningful access to the

same services provided by the operating system as those available to Microsoft Middleware."

CIS at 35.  Similarly, with regard to § III.E, the CIS explains that subsection E "ensures that ISVs

will have full access to, and be able to use, the protocols that are necessary for software located

74

on a server computer to interoperate with, and fully take advantage of, the functionality provided by any Windows Operating System Product." *Id.* From this language, it appears that the United States defines the ability to "interoperate" as the ability to "fully take advantage of functionality" or as the ability to have "meaningful access" to services. *Id.* at 35-36. Adding further confusion, the government, in its responses to the public comments offers that § III.E is intended to "allow for the possibility of seamless two-way interoperability." United States Resp. at 165.

Critics note, and the government acknowledges, that Microsoft has espoused a different understanding of "interoperate" in its submissions to the European Union. United States Resp. at 164. Nevertheless, the government insists that it has reached a "meeting of the minds" with Microsoft as to the intended meaning of "interoperate" and its effect in the SRPFJ. *Id.* The government further notes that, in an effort to clarify the meaning of "interoperate," it agreed with Microsoft to add language to § III.E., supplementing the term such that "interoperate" became "interoperate, or communicate." *Id. at* 164-65; *compare* RPFJ § III.E, *with* SRPFJ § III.E. This addition provides a very simple definition of "interoperate" in the text of the decree, clarifying the parties' intent.

Courts reviewing proposed consent decrees pursuant to the Tunney Act are obliged to pay close attention to any potential ambiguity, particularly since it is the district court which must enforce the decree. *Microsoft*, 56 F.3d at 1462-63. Aware of the criticism of the lack of definition of "interoperate," the Court inquired of Microsoft as to whether there was some ambiguity in the decree or a lack of agreement with the government. Hearing Transcript ("Tr.") at 81-82 (March 6, 2002). Microsoft, responded carefully, stating that, "the competitive impact statement and the extraordinarily lengthy response to comments . . . were prepared without any

input from or consultation with Microsoft." *Id.* at 82.  Further noting that "[i]t is impossible that

two different people or parties would write any document in exactly the same way," Microsoft

nevertheless expressed its agreement with the government that the parties "have a meeting of the

minds" and "certainly agree with the scope and operation of the judgment." *Id.* at 82-83; *see also*

United States Resp. at 164.

Taking the parties as their word, the Court is not compelled to conclude that the parties

lack agreement or that the SRPFJ is ambiguous simply because Microsoft has advanced a

different understanding of a particular term in an unrelated forum.  So long as Microsoft and the

United States have a common understanding in this case, the fact that Microsoft advanced a

different position in some other context is not relevant.  Moreover, a clear definition of the term

appears in § III.E, as a result of the addition of the words "or communicate" in order to clarify the

meaning of the term "interoperate," SRPFJ § III.E ("Microsoft shall make available . . . any

Communications Protocol that is . . . (i) implemented in a Windows Operating System Product

installed on a client computer, and (ii) used to *interoperate, or communicate*, natively . . . with a

Microsoft server operating system product.") (emphasis added).  *See* United States Mem.

Regarding Modifications at 5-6; United States Resp. at 164-65.  Accordingly, the use of the term

in § III.E, at present, does not appear to carry ambiguity.  Moreover, as the parties' intent will

control the interpretation of this decree, *see Microsoft*, 147 F.3d at 945 n. 7, and given the

clarification and ensuing revision, there seems little risk of dispute as to the parties' intent should

the use of the term prove troublesome in the future.

The use of the term "interoperate" in § III.D presents a slightly harder problem, as the

parties did not augment the use of the term "interoperate" in § III.D with the word

"communicate." The government's submission is unhelpful on this point, as it refers only to the use of the term "interoperate" in § III.E and does not mention the term's use in § III.D. Nevertheless, the Court cannot conclude that the lack of definition for the term renders the provision ambiguous. Microsoft's obligations are fixed in § III.D primarily by the definition of API, rather than the use of the term "interoperate;" the term "interoperate" serves only to circumscribe the purpose for which the API must be disclosed. SRPFJ § III.D. The definition of API which appears in § III.D strongly indicates the meaning to be given to "interoperate" by its reference to "obtaining services from." *Id.* Therefore, rather than require a separate definition, the use of the term "interoperate" in § III.D is apparent from its context. Based on this fact and the parties' agreement that they have a "meeting of the minds," the Court is satisfied that Microsoft's obligations under § III.D are sufficiently clear.

It is worthy of note, at this juncture, that § III.E is directed at a segment of the industry which was addressed in a very limited manner during the liability trial and was not related to the imposition of liability. The government explains the inclusion of this provision based upon the rationale that "the United States believed that the RPFJ's effectiveness would be undercut unless it addressed the rapidly growing server segment of the market." United States Mem. at 59. Given the forward-looking nature of § III.E, and the limited relation of servers to the liability imposed in the case, the Court recognizes that the protections in § III.E evidence the successful efforts of the United States to obtain a decree which not only redressed the specific conduct found to violate the antitrust laws, but to obtain protection which is prospective in its focus. Such a prospective remedy is particularly warranted in this case given the rapid pace of change in the software industry. *See Microsoft*, 253 F.3d at 49. In the absence of this type of provision and the other

prospective provisions in the SRPFJ, it is quite possible that the core of the decree would prove prematurely obsolete.  Instead, Plaintiffs and Microsoft appear to have proposed a decree that acknowledges the continuing change in the industry and expands appropriately from the imposition of liability.  Although the government may not have been "strictly entitled" to such expansion, this fact cannot itself render the decree in conflict with the public interest, as contemplated by the Tunney Act.  *Bechtel*, 648 F.2d at 666.

> ### d.      Reasonable, Non-Discriminatory Licenses

Closely related to the disclosures mandated by § III.D and E is § III.I, which concerns the terms pursuant to which Microsoft must license its intellectual property rights in conjunction with it obligations under the SRPFJ.  Subsection I provides that Microsoft shall offer licenses to the relevant entities (ISVs, IHVs, IAPs, ICPs, and OEM) of "any intellectual property rights owned or licensable by Microsoft that are required to exercise any of the options or alternatives expressly provided to them under this Final Judgment."  SRPFJ § III.I.  Such licenses shall be "reasonable and non-discriminatory" in all regards, including the amount of royalties and monetary consideration, and shall be limited in scope such that they are no broader than necessary.  *Id.* § III.I.1-2.  In addition, pursuant to § III.I, Microsoft may reserve the right to prohibit the transfer, assignment, or sublicense of the intellectual property right conferred by the license.  *Id.* § III.I.3. As is apparent from the terms of subsection I and the government's explanation, this provision "ensure[s] that Microsoft cannot use its intellectual property rights to undermine the competitive value of its obligations in Sections III.D and E, while at the same time [it] permit[s] Microsoft to take legitimate steps to prevent unauthorized use of its intellectual property."  United States Resp.

at 171.[29]

One significant complaint about this provision is that Microsoft should not be entitled to *any* royalty in exchange for its disclosures. The Court finds little merit in this position. To prohibit Microsoft from charging a reasonable royalty would require Microsoft to give away significant amounts of valuable intellectual property rights. The Court does not agree that the liability in this case supports, much less requires, such a drastic and draconian remedy. *See Microsoft*, 253 F.3d at 106 ("Mere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition") (quoting 3 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 650a, at 67). The appellate court established "a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market only through inference." *Id.* at 106-07. While this "edentulous" test was sufficient for the imposition of liability, *id.* at 79, the relative potency of the causal connection established during the liability phase cannot be overlooked in a discussion of remedy, *id.* at 80 ("Microsoft's concerns over causation have more purchase in connection with the appropriate remedy issue . . . .").

Based on the specific circumstances in this case, the Court finds that the requirement that Microsoft license its intellectual property at reasonable and non-discriminatory rates is entirely appropriate. Because "reasonableness" is generally recognized as an objective standard, *see Stringer v. Black*, 503 U.S. 222, 237 (1992), its incorporation into the SRPRJ serves to limit

---

[29]During the public comment period, some entities lodged complaints about RPFJ § III.I.5, which required a cross-license of certain intellectual property rights. In response, the United States and Microsoft agreed to amend § III.I to remove subsection I.5 in its entirety. *Compare* SRPFJ § III.I, *with* RPFJ § III.I.

substantially the terms that Microsoft may impose in licenses of information disclosed pursuant to the final judgment.  Greater specificity as to the terms of the licenses would likely be inappropriate, as case law on the subject of licenses and antitrust remedies advises that courts are best excluded from "the administration of intricate and detailed rules" relating to business affairs. *United States v. Paramount Pictures*, 334 U.S. 131, 163 (1948) ("The judiciary is unsuited to affairs of business management . . . .").  Moreover, the disclosure and licensing of intellectual property serves primarily to "unfetter" the market from the effects of Microsoft's illegal conduct, rather than redress very particular exclusionary conduct.  *Ford Motor Co.*, 405 U.S. at 577. Therefore, the disclosure and license of such information in the absence of a reasonable royalty would impose an unduly confiscatory remedy upon Microsoft.

> **e.**      ***Source Code Access***

Related to these disclosure provisions are the complaints of individuals and entities that those receiving such disclosures are not afforded access to the Windows operating system source code.  This complaint reflects the fact that the IFJ originally entered by Judge Jackson, thereafter vacated by the appellate court, included a provision mandating access by representatives of OEMs, ISVs, and IHVs to "relevant and necessary portion of the source code" in order "[t]o facilitate compliance, and monitoring of compliance" in conjunction with efforts to enable interoperation.  *Microsoft*, 97 F. Supp. 2d at 67.  In this regard, the IFJ required Microsoft to make the relevant portions of the source code accessible at a "secure facility" where appropriate persons could "study, interrogate and interact" with the code.  *Id.*  The SRPFJ, like the IFJ, utilizes access to the source code as a means of enforcement, but limits such access to a special committee which serves Plaintiffs, rather than permitting access by representatives of the OEMs,

ISVs, and IHVs.  SRPFJ § IV.A.2.  Hence, the same goal–ensuring compliance–is accomplished,

albeit through a slightly different means.  This shift in focus is abundantly appropriate given that

it is Plaintiffs who are responsible for enforcement of the decree, not third parties in the

marketplace who will likely benefit from the decree's provisions.  To the extent entities or

individuals desire access to the Microsoft source code for purposes other than ensuring

compliance with the consent, such a use is discordant with the intent underlying the provision,

and its predecessor in Judge Jackson's IFJ.  As a result, the Court finds the absence of source

code access for OEMs, ISVs, and other third parties to be of little concern.

> ### *f.*     *Security-Based Limitations*

Subsection J limits Microsoft's disclosures under the SRPFJ to ensure that the mandated

disclosures do not result in the release of information which "would compromise the security of a

particular installation . . . of anti-piracy, anti-virus, software licensing, digital rights management,

encryption or authentication systems, including without limitation, keys, authorization tokens or

enforcement criteria."  *Id.* § III.J.1(a).  In addition, subsection J excludes from disclosure any

API, interface, or other information which Microsoft is "lawfully directed" by a "governmental

agency of competent jurisdiction" not to do so.  *Id.* § III.J.1(b).  The chief complaint about these

so-called "security carve-out" provisions is that they are more broad than is necessary to

accomplish the goal of ensuring security.  Such complaints ignore the limitations in the provision

that require the release of information to work an *actual* compromise of security, rather than a

potential, hypothetical, or likely compromise of security.  Similarly, as the government explains,

the provision applies to "particular installations," meaning "end-user installations or a specific,

narrowly-prescribed subset of installations" and not all installations using a particular product or

functionality.  United States Resp. at 179.  Accordingly, the Court finds complaints about § III.J.1

unpersuasive.

Subsection J further limits Microsoft's disclosure obligations with regard to a specific

subset of the APIs and communications protocols that Microsoft will have to disclose.  The

provision specifies that Microsoft may condition licenses relating to "anti-piracy systems, anti-

virus technologies, license enforcement mechanisms, authentication/authorization security, or

third party intellectual property protection mechanisms of any Microsoft product" on the

requirement that the licensee:

> (a) has no history of software counterfeiting or piracy or willful violation of
> intellectual property rights, (b) has a reasonable business need for the API,
> Documentation or Communications Protocol for a planned or shipping product,
> (c) meets reasonable, objective standards established by Microsoft for certifying
> the authenticity and viability of its business, (d) agrees to submit, at its own expense, any
> computer program using such APIs, Documentation or Communication Protocols to
> third-party verification, approved by Microsoft, to test for and ensure verification and
> compliance with Microsoft specifications for use of the API or interface, which
> specifications shall be related to proper operation and integrity of the systems and
> mechanisms identified in this paragraph.

SRPFJ § III.J.2.  Plainly, the thrust of this provision is to provide some protection for Microsoft

from companies or individuals which may seek to make improper use of the API documentation

and communications protocol disclosures made pursuant to the SRPFJ.  Contrary to some

comments, nothing in this provision authorizes Microsoft to discriminate against certain

individuals or companies based on their development philosophy or not-for-profit status.  Instead,

subsection J.2 strikes a balance between protecting Microsoft's intellectual property rights and

effecting the mandates of the decree.  Indeed, the fears of some that they will face exclusion

based upon having been sued for patent infringement and lost are unfounded, as such a suit is not

itself evidence of "*willful* violation of intellectual property rights."  *Id.* (emphasis added).  Subpart

(c) of § III.J merely offers Microsoft some flexibility in establishing reasonable and non-

discriminatory standards for determining that an individual or entity has not requested a license of

intellectual property for some improper or illegitimate purpose that threatens Microsoft security.

Nothing in the phrasing "reasonable, objective standards" authorizes Microsoft to use this term of

the proposed decree to discriminate or oppress industry participants at its whim.  *Id.*

Concomitantly, subpart (d) does not entitle Microsoft to the licensee's intellectual property, but

instead provides for independent third-party testing and verification relevant to Microsoft

specifications and only where the specifications are "related to the proper operation and integrity

of the systems and mechanisms identified in [§ III.J.2]."  *Id.*  The government explains that the

cost of such independent testing is to be borne by the licensee because "with other third-party

testing programs in the software industry, the cost is usually borne by the organization submitting

the program."  United States Resp. at 183.  As all of these provisions constitute reasonable means

of balancing competing interests, the Court fails to see any substantial merit in the complaints and

comments of the provision's detractors.

### 5.    *Term of Decree*

Section V of the SRPFJ provides that the decree "will expire on the fifth anniversary of

the date it is entered by the Court."  SRPFJ § V.A.  Section V further empowers Plaintiffs to

apply to the Court "for a one-time extension" of the five-year term of the decree "in any

enforcement proceeding in which the Court has found that Microsoft has engaged in a pattern of

willful and systematic violations."  *Id.* § V.B.

Though simple in language and effect, the proposed term of the decree, five years from the

date of entry by the Court, has also met with significant criticism.  Critics argue that the five-year

term is too short.  These individuals and entities contend that there is no basis to deviate from the

general policy of the Antitrust Division to avoid negotiation of decrees of less than ten years in

duration.  *Antitrust Division Manual* at IV-54 (3d ed. Feb. 1998) ("With regard both to the

preparation of proposed draft decrees by staff as well as to decree proposals that may be made by

defendants, note that the Division's standard decree language requires that the consent decree

expire on the tenth anniversary of its entry by the court. The staff should not negotiate any decree

of less than 10 years' duration, although decrees of longer than 10 years may be appropriate in

certain circumstances.").  The government responds that each decree must be tailored to fit the

circumstances of the case, United States Resp. at 203 (citing *Antitrust Division Manual* at IV-51

("While the scope of relief obtained in prior antitrust cases may be viewed as precedent, the

theory behind equitable relief is that it should be fashioned to fit the particular facts of the case at

issue."), and notes that the Antitrust Division has imposed five-year terms in numerous other

decrees, *id.* (citing cases).

     The government justifies departure from the standard ten-year term in this case because of

the pace of technological change in the computer industry.  United States Resp. at 202.  At this

point in the case, there can be no dispute that the industry has shown a great capacity for rapid

change.  As the D.C. Circuit noted in June of 2001:

> [J]ust over six years have passed since Microsoft engaged in the first conduct
> plaintiffs allege to be anticompetitive.  As the record in this case indicates, six years
> seems like an eternity in the computer industry. By the time a court can assess
> liability, firms, products, and the marketplace are likely to have changed dramatically.
> This, in turn, threatens enormous practical difficulties for courts considering the
> appropriate measure of relief in equitable enforcement actions, both in crafting
> injunctive remedies in the first instance and reviewing those remedies in the second.

*Microsoft*, 253 F.3d at 49.  The government observes that absent a departure from the ten-year

term, there exists a substantial risk that the decree will become highly regulatory in nature.

United States Resp. at 203.  Given these considerations, it is difficult to fault the government for

departing from the usual ten-year term in this instance.

### 6.      Compliance and Enforcement

The final portions of the SRPFJ detail the procedures for enforcement of the decree.  As

noted above, precedent instructs the Court to "pay close attention" to provisions that address

enforcement of a consent decree.  *Microsoft*, 56 F.3d at 1462.  Although divided into numerous

parts and subparts, virtually every aspect of the enforcement and compliance mechanisms

interrelates with some other aspect, such that the provisions can be best understood when viewed

as a whole, rather than piecemeal.  Accordingly, the Court will commence its careful analysis of

the compliance and enforcement provisions in the proposed consent decree with detailed

descriptions of the provisions.  Once this background is established, the Court will examine the

most common and salient complaints about the compliance and enforcement provisions and

assess whether these complaints render this aspect of the decree to be in discord with the public

interest.

### a.      Technical Committee and Compliance Officer

The initial focus of this portion of the consent decree concerns the "Technical Committee"

which serves to "assist in enforcement of and compliance with" the terms of the consent decree.

SRPFJ § IV.B.1.  The three committee members are to be "experts in software design and

programming."  *Id.* § IV.B.2.  The independence of the committee members is ensured by the

exclusion from candidacy of any individual employed by Microsoft or a Microsoft competitor in

the past year, or retained as a consulting or testifying expert by any person in this action or other

85

action adverse to Microsoft.  *Id.*  In addition, committee members shall not perform any work for Microsoft or a Microsoft competitor for two years after serving on the committee.  *Id.*

Section IV.B establishes a detailed procedure for the selection of the three committee members, with each side selecting one member, and those two members selecting the third member.  *Id.* § IV.B.3.  All members of the committee must be appointed by the Court to serve. *Id.*  Committee members shall serve for a 30-month term, which is renewable at the option of the party that initially selected that member of the committee.  *Id.* § IV.B.4.  The third member may be reappointed or replaced pursuant to the same procedure by which that member was selected. *Id.*

Although the Technical Committee serves Plaintiffs, Microsoft is responsible for the cost and expense of the service of the committee, including the payment of reasonable fees and expenses.  *Id.* § IV.B.6.  In addition, Microsoft is obligated to provide each committee member with a permanent office and related facilities on its corporate campus in Redmond, Washington. *Id.* § IV.B.7.  At the further cost and expense of Microsoft, the committee may, with approval of the government, hire impartial staff and consultants to assist the committee in performing its duties.  *Id.* § IV.B.8.h.

The committee is empowered broadly to "monitor Microsoft's compliance with its obligations under [the] Final Judgment."  *Id.* § IV.B.8.a.  In concert with this broad grant of authority, the proposed final judgment specifies that the committee may, on reasonable notice to Microsoft, interview Microsoft personnel; inspect and copy Microsoft documents; access Microsoft systems, equipment, premises, and facilities; and require Microsoft personnel to compile data, reports, or other information.  *Id.* § IV.B.8.b.  The proposed final judgment further

specifies that the Technical Committee shall have access to Microsoft source code and that the committee may study, interrogate, and interact with the source code in conjunction with its duties. *Id.* § IV.B.8.c.

As evidenced by the reporting requirements attendant to the Technical Committee's duties, the committee is answerable to the government. The proposed final judgment mandates that the committee provide bi-annual reports to Plaintiffs regarding the actions undertaken by the committee in furtherance of its duties. *Id.* § IV.B.8.e. Such reports shall include an identification of the business practices reviewed and the ensuing recommendations of the committee to Microsoft. *Id.* Notwithstanding this reporting obligation, the committee must also provide a written report to the government immediately upon "reason to believe that there may have been a failure by Microsoft to comply with any term" of the judgment. *Id.* § IV.B.8.f.

The Technical Committee is empowered to receive complaints from Microsoft's "Compliance Officer" as well as from third parties or the government. *Id.* § IV.B.8.d. When the committee receives complaints from third parties, it may communicate with these parties regarding their complaints, but the committee is ultimately obliged to maintain confidentiality with regard to information obtained from Microsoft. *Id.* § IV.B.8.g. In fact, the proposed final judgment mandates that the committee and its consultants and staff enter into confidentiality agreements with Microsoft such that all information gathered by the committee from Microsoft is not disclosed beyond Microsoft, Plaintiffs, or the Court. *Id.* § IV.B.9. In this regard, the committee is expressly banned from making public statements relating to its activities. *Id.* § IV.B.10.

As the Technical Committee is the enforcement arm of the government, the substantial

counterpart to the committee is the Microsoft Internal Compliance Officer.  In contrast to the

impartiality of the Technical Committee, however, the Compliance Officer is far more closely

aligned with Microsoft.  The Compliance Officer will be an employee of Microsoft responsible

for administering Microsoft's antitrust compliance program and "helping to ensure compliance"

with the decree.  *Id.* § IV.C.  In accordance with the general duty to supervise Microsoft's

compliance, the Compliance Officer is specifically obligated under the proposed consent decree

with distributing a copy of the final judgment to all present officers and directors of Microsoft and

their successors.  SRPFJ § IV.C.3.  The Compliance Officer must ensure that such officers and

directors are "annually briefed on the meaning and requirements of [the] Final Judgment and the

U.S. antitrust laws and advising them that Microsoft's legal advisors are available to confer with

them regarding any question concerning compliance with [the] Final Judgment or under the U.S.

antitrust laws."  *Id.* § IV.C.3.c.  Likewise, the Compliance Officer must obtain from each such

officer and director "an annual written certification that he or she:  (i) has read and agrees to abide

by the terms of [the] Final Judgment; and (ii) has been advised and understands that his or her

failure to comply with [the] Final Judgment may result in a finding of contempt of court."  *Id.* §

IV.C.3.d.  In concert with these duties, the Compliance Officer must maintain records of the

above-described distribution and certification.  *Id.* § IV.C.3.e.  Lastly, the Compliance Officer is

specifically obliged to receive complaints from third parties and the government concerning

Microsoft's compliance and to maintain a record of all such complaints and the action taken by

Microsoft with respect to each such complaint.  *Id.* § IV.C.3.g-h

      In addition to these core duties, both the Technical Committee and the Compliance Officer

are obliged to take certain action in conjunction with efforts toward the voluntary resolution of

disputes.  Along with the government, the Technical Committee and the Compliance Officer may receive complaints from third parties regarding Microsoft's compliance with the terms of the decree.  *Id.* § IV.D.  The Compliance Officer and the Technical Committee may also receive complaints from each other and from the government.  *Id.*  In order to facilitate the communication of such complaints and inquiries by third parties, the Compliance Officer is responsible for providing information on Microsoft's web site regarding the submission of complaints and for enabling the submission of complaints and inquiries to the Compliance Officer via the website.  *Id.* §§ IV.C.3.f. and IV.D.3.b.  Within thirty days of the receipt of such complaint, Microsoft may "attempt to resolve it or reject it" and must then "promptly advise the [Technical Committee] of the nature of the complaint and its disposition."  *Id.* § IV.D.3.c.

Correspondingly, when the Technical Committee receives complaints, it shall investigate such complaints and consult with the government regarding such investigation.  *Id.* § IV.D.4.  During the investigation, the Technical Committee shall meet with the Compliance Officer in an effort to allow Microsoft to respond to the substance of the complaint and, thereby, reach an informal resolution of the complaint where possible and appropriate.  *Id.*  Where the committee finds merit in a complaint, it shall so advise Microsoft and Plaintiffs and propose a cure.  *Id.* § IV.D.4.c.  Notably, the work product, findings, and recommendations of the committee are not to be admitted in "any law enforcement proceedings before the Court for any purpose," and members of the committee are prohibited from testifying in any capacity before a court or other tribunal.  *Id.* § IV.D.4.d.  Similarly, any information gathered by or any report from the Technical Committee is to be treated as highly confidential pursuant to the Protective Order entered in this case.  *Id.* § IV.B.9.

Notwithstanding all of the procedures in place with regard to the Technical Committee, ultimately the power to enforce the terms of the decree rests with the government.  SRPFJ § IV.A. Accordingly, representatives of the government may,[30] in complete disregard of the Technical Committee, subject to lawful privilege, investigate and inspect Microsoft source code, books, accounts, correspondence, memoranda, and the like in conjunction with enforcement.  *Id.* § IV.A.2.  The government may interview Microsoft employees and agents and require submission of written reports.  *Id.*  Although Plaintiffs possess "the authority to seek such orders as are necessary from the Court to enforce [the] Final Judgment," on the occasion that the United States alleges a violation of §§ III.C, III.D., III.E, or III.H, it must first provide Microsoft with the opportunity to cure prior to seeking an order from the Court.  *Id.* § IV.A.4.  Any such cure will not constitute a defense to enforcement with respect to "knowing, willful or systematic violations."  *Id.*

Having thoroughly reviewed the provisions specific to compliance and enforcement proposed by the parties, the Court turns its attention to the merits of these provisions.  The most common complaints about the compliance and enforcement scheme concern the Technical Committee, with the overall rallying cry that the committee will be an ineffective tool for delay. In sum, in the Court's view, much of the criticism in this regard misunderstands the role of the Technical Committee.  Although Microsoft plays a role in the selection of the committee's members and the committee is portrayed as "independent" in many regards, the proposed decree itself, as well as the parties' filings make clear that the committee exists to assist the government

---

[30]The SRPFJ provides this power equally to the United States and the Settling States but requires that the States shall consult first with the "States' enforcement committee to minimize the duplication and burden of the exercise of [such] powers, where practicable."  SRPFJ § IV.A.

in enforcing the decree.  *See, e.g.*, United States Resp. at 191-93; Microsoft Mem. in Support of

the SRPFJ at 61; CIS at 56-58.  The impartial or independent nature of the committee's members

exists primarily to enable investigation of third-party complaints for purposes of enforcement.

Impartiality of the committee will likely foster an environment of cooperative resolution, rather

than one of persistent conflict and litigation.  Otherwise, attempts at enforcement have a greater

potential to take on the tenor of adversary proceedings, resolved in most instances with great

difficulty and delay.

Importantly, the Technical Committee is not intended as a substitute for the enforcement

authority of the United States.  As explained at the Tunney Act hearing, the proposed consent

decree "does not . . . cede the enforcement powers of the Department of Justice to some other

entity."  Tr. at 39.  Instead, the proposed decree appropriately devises a mechanism for the

provision of impartial and expert compliance assessment to the parties charged with enforcement.

Such assistance, which comes at a cost to Defendant only, can only assist Plaintiffs' enforcement

efforts and should not be viewed as a hindrance or a cause of delay.  Dovetailing with the

misunderstanding of the role of the Technical Committee are complaints regarding the

qualifications for the committee's members.  Because the SRPFJ sets forth only minimum

qualifications with regard to technical expertise, some entities and individuals complain that the

committee will be unskilled at interpretation of the decree–which requires legal expertise.  As the

legal interpretation of the decree is properly left to the parties, with ultimate authority resting with

the Court, the focus on the technical expertise of the Technical Committee is far from troubling.

Although the committee will investigate technical issues and advise the government, the

responsibility remains with the government to examine the terms of the decree and assess in the

first instance whether, as a legal matter, the decree has been violated.  Should the government

take the view there has been a violation, it is the government, not the Technical Committee,

which must present that view to the Court.

Similarly misunderstanding the role of the Technical Committee, some entities filing

comments complain that the Technical Committee is not required to inform third parties of the

status or ultimate resolution of their complaints.  Once again, the committee serves Plaintiffs–the

entities properly responsible for enforcing the decree, not third parties.  Certainly third-party

input will be significant in assessing compliance and ensuring the decree's overall effectiveness.

The decree, therefore, provides wide avenues for third-party input.  Still, third-party concerns

cannot supplant the ultimate enforcement role of the government, nor should third-party

complaints burden mechanisms established for the government's and ultimately the Court's

benefit.

Another significant criticism regarding the Technical Committee finds its roots in the bar

on the use of Technical Committee "work product, findings or recommendations" in judicial

proceedings.  Those who find fault in this aspect of the decree tend to interpret the bar broadly,

speculating that there exists a "fruit of the poisonous tree" rule, such that any information in the

hands of the committee cannot be utilized by Plaintiffs in formal enforcement proceedings before

the Court.  Such an interpretation ignores the plain language of the provision and the unequivocal

intent of the parties.  The government was clear on this point on numerous occasions.  The

limitation on the use of Technical Committee work product does not preclude the government

from "utilizing, relying on, or making derivative use of the [Technical Committee's] work

product" in conjunction with its own enforcement activities, CIS at 58, nor does the provision

preclude Plaintiffs from obtaining Microsoft documents from the committee for use in an enforcement proceedings.  Tr. at 46.  In short, the prohibition on the use of committee work product is most accurately described as "a narrow recognition that the opinions or conclusions reached by the committee as a whole or by members of the committee would not be admissible, but the information that they gather certainly would be used by [the government] and introduced into evidence by [the government]."  *Id.* at 46-47.

### b.        *Retention of Jurisdiction*

One of the more salient concerns raised in the comments is the fact that neither Microsoft, nor the government, are obliged under the proposed decree to report to the Court regarding Microsoft's compliance with the decree.  Compounding this omission from the decree is the limited nature of the clause specifying the degree to which the Court retains jurisdiction.  Section VII provides in full:

> Jurisdiction is retained by this Court over this action and the parties thereto for the purpose of enabling either of the parties thereto to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, to enforce compliance, and to punish violations of its provisions.

SRPFJ § VII.  The D.C. Circuit recently made clear that "district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order."  *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002).  The *Pigford* court further explained that the district court's power over a consent decree, reflecting the hybrid between judicial order and contract, is limited to two sources.  A district court may interpret and enforce a decree to the extent authorized by the decree itself or by the related order.  *Id.* at 923.  Additionally, a district court may modify a decree pursuant to Rule 60(b)(5) of the Federal Rules

93

of Civil Procedure.  *Id.*  This latter power is circumscribed by the Rule's requirements that such

modification is appropriate if "it is no longer equitable that the judgment should have prospective

application."  Fed. R. Civ. P. 60(b)(5); *Pigford*, 292 F.3d at 925.  As the D.C. Circuit recounted

the present state of the law, "a significant change in circumstances [may] warrant[] revision of [a]

decree," *id.* (quoting *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 383 (1992)), though any

such revision must be "suitably tailored to the changed circumstance[s]," *id.* (quoting *Rufo*, 502

U.S. at 370).

A strict reading of § VII would appear to limit this Court's jurisdiction to "enabling either

of the parties thereto to apply to this Court . . . for further orders and directions as may be

necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any

of its provisions, to enforce compliance, and to punish violations of its provisions."  SRPFJ § VII.

This language does not clearly vest the Court with the authority to act *sua sponte* to order

certifications of compliance and other actions by the parties.

Such a circumstance is not acceptable to the Court.  The Court considers it imperative, in

this unusually complex case, for the Court's retention of jurisdiction to be clearly articulated and

broadly drawn.  Such clarity and broad reservation of power are necessary to ensure that the

Court may require action of the parties when it deems appropriate and need not wait for the partes

to file a motion before action is taken.  The government, in its colloquy with the Court, indicated

its view that the Court would be free to require the government to file reports with the Court on

issues relating to the "progress of enforcement of the decree," Tr. at 47-48, but the retention of

jurisdiction in § VII does not reflect this view.  Indeed, counsel indicated that the parties

expressly opted *not* to identify the specific mechanism for reporting to the Court based upon the

view that they "didn't think it was [their] place to tell the [C]ourt how often [it] might want reports from [the parties]." *Id.* at 48.  Counsel went on to explain that they "didn't think that Microsoft and [the government] should be negotiating that, but rather wait to hear from [the Court] on that," anticipating that if the Court "ha[s] any concerns at all [it] will let [the parties] know and [they] will fix it." *Id.*

As the proposed final judgment is presently drafted, the Court is not convinced that it has retained the authority, on its own volition, to inform the parties of a particular concern and to require additional action by the parties.  Given the parties apparent intent to the contrary, the Court cannot conclude that this aspect of the proposed final judgment is in the public interest.  As this Court "must preside over the implementation of the decree," the Court "is certainly entitled to insist" upon precision in the decree's reflection of the intent of the parties.  *Microsoft*, 56 F.3d at 1461-62.  As a result, this Court takes the view that the proposed final judgment should be amended to reflect the intent expressed to the Court at the March 6, 2002, hearing.  In the absence of a clear reflection of the parties' intent with regard to the Court's involvement, the Court is unable to find that the decree is in the public interest.

As the Court "can foresee difficulties in [the] implementation" of a decree wherein the retention of jurisdiction does not make clear the Court's power to act *sua sponte* as may be appropriate or necessary, the Court must "insist that [this] matter be attended to." *Id.* at 1462.  The Court suggests that the public interest would be served if Microsoft and the United States (and the Settling States) would agree to amend the proposed final judgment to reserve for the Court, in addition to the powers presently specified in the proposed final judgment, the power to *sua sponte* issue orders or directions regarding to the final judgment, including, but not limited to

orders regarding the construction or carrying out of the final judgment, the enforcement of compliance therewith, and the punishment of any violation thereof. Such an amendment would not appear to work a fundamental change to the parties' agreement and would ensure that the Court retains the power intended by the parties and which the Court deems necessary to ensure effective implementation of the final judgment in this case.

Because the Court has found all other aspects of the proposed final judgment to be in the public interest, the Court is loathe to reject the proposed consent decree on this defect alone. Rather, the more prudent course appears to be a conditional approval of the consent decree, dependent upon the parties' prompt agreement to the modification proposed by the Court, or some similar modification. Accordingly, out of an abundance of caution, the Court will condition its approval of the consent decree pending an alteration to § VII which makes clear that the Court may take appropriate action regarding enforcement of the decree on its own volition and without prompting by the parties. In the presence of such a provision, there will be no doubt that the Court may require certifications of compliance, the regular status reporting, and other action by the parties as the Court deems necessary or appropriate.

## IV. CONCLUSION

In conclusion, the Court is compelled to comment more generally on the terms of the proposed remedy. First, the Court commends the parties for their intense efforts at reaching a settlement and their willingness to try to do so in the face of previous failures. Second, and more importantly, praise is due based solely on the quality of the fruits of their collaborative labors. While the proposed final judgment, in general, is appropriately crafted to address the anticompetitive conduct, as well as conduct related thereto, the Court regards the document as

laudable not for these traits alone, but for the clear, consistent, and coherent manner in which it accomplishes its task.  Far from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct, the proposed final judgment adopts a clear and consistent philosophy such that the provisions form a tightly woven fabric. The proposed final judgment takes account of the theory of liability advanced by Plaintiffs, the actual liability imposed by the appellate court, the concerns of the Plaintiffs with regard to future technologies, and the relevant policy considerations.  The product, although not precisely the judgment the Court would have crafted, with the exception of the reservation of jurisdiction, does not stray from the realm of the public interest.

Based on the foregoing, the Court finds that, with the exception of § VII of the SRPFJ, the Court is satisfied that the parties have reached a settlement which comports with the public interest.  With regard to § VII, the Court's only reservation concerns the retention of jurisdiction. Accordingly, the Court will conditionally approve the proposed consent decree as the final judgment in this case.  Such conditional approval will become final following the submission by the parties of an amendment to § VII which reflects the parties' intention that the Court retain jurisdiction to take action *sua sponte* in conjunction with the enforcement of the decree.  Upon receipt of such an amendment, if satisfied with the proposal, the Court will enter the proposed final judgment, as amended, as the final judgment in this case.  The Court provides in a separate Order that the parties shall indicate their intent on this issue in a written submission filed with the Court not later than November 8, 2002.

November 1, 2002

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge