IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>      v.<br><br>MICROSOFT CORPORATION,<br><br>                   Defendant. | Civil Action No. 98-1232 (CKK)<br><br>Next Court Deadline: July 24, 2003, Status Conference |

**JOINT STATUS REPORT ON MICROSOFT'S COMPLIANCE
WITH THE FINAL JUDGMENTS**

The United States of America, Plaintiff in *United States v. Microsoft*, CA No. 98-1232

(CKK), and the Plaintiffs in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), the States of

New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and

Wisconsin (the "New York Group"), and the States of California, Connecticut, Florida, Iowa,

Kansas, Massachusetts, Minnesota, Utah, West Virginia, and the District of Columbia (the

"California Group") (collectively, "Plaintiffs"),[1] together with Defendant Microsoft hereby file a

Joint Status Report on Microsoft's Compliance with the Final Judgments, pursuant to this

Court's Order of May 14, 2003.

---

[1]The Commonwealth of Massachusetts and the State of West Virginia are not part of the California Group for the purpose of this Joint Status Report on Microsoft's Compliance with the Final Judgments. On or about June 20, 2003, West Virginia dismissed with prejudice its appeal of the States' Final Judgment. In addition, West Virginia has reached a negotiated settlement with Microsoft in the case entitled *State of West Virginia v. Microsoft Corporation*, West Virginia Circuit Court of Boone County, Civil Action No. 01-C-197 (and related consumer class actions), which has been preliminarily approved by that court. This settlement includes a provision whereby West Virginia will release Microsoft from antitrust liability for conduct prior to December 31, 2002. As a result, West Virginia has advised the California Group that it will not be participating in enforcement of the States' Final Judgment. Massachusetts is still prosecuting its appeal of the States' Final Judgment.

## I. Introduction

On November 1, 2002, this Court entered a Final Judgment as to the California Group in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK) ("States' Final Judgment"), and on November 12, 2002, this Court entered separate Final Judgments as to the United States in *United States v. Microsoft*, CA No. 98-1232 (CKK) and as to the New York Group in *New York, et al. v. Microsoft*, CA No. 98-1233 (CKK) (collectively the "Consent Judgment") (all three judgments are also collectively referred to as the "Final Judgments"). The Consent Judgment and the States' Final Judgment differ particularly with regard to compliance and enforcement mechanisms. Sections IV.A.1 of the Final Judgments grant Plaintiffs exclusive responsibility for enforcing their respective Final Judgments. In connection with its monitoring of Plaintiffs' enforcement efforts, this Court ordered Plaintiffs to submit compliance status reports to the Court every six months, and further ordered that these reports contain certain relevant information. Order at 1-3 (May 14, 2003). This is the first of these reports. Section II discusses Plaintiffs' efforts to enforce the Final Judgments and section III describes the organization and function of the Technical Committee; both of these sections were authored by Plaintiffs. Section IV discusses Microsoft's efforts to comply with the Final Judgments; this section, along with the corresponding attachments, was authored by Microsoft.

## II. Plaintiffs' Efforts To Enforce The Final Judgments

### A. Monitoring Microsoft's Compliance With The Final Judgments

Since the United States and the New York Group submitted their Revised Proposed Final Judgment to this Court on November 6, 2001, as later entered as the Consent Judgment with one amendment on November 12, 2002, these Plaintiffs have vigorously monitored Microsoft's compliance. Since this Court entered the States' Final Judgment in *New York, et. al. v. Microsoft*

on November 1, 2002, the California Group has also been vigorously engaged in monitoring Microsoft's compliance.  Plaintiffs have (1) assembled teams of attorneys and economists to monitor compliance; (2) monitored Microsoft's compliance with each Section of the Final Judgment, most recently focusing particularly on Sections III.B, III.C, III.D, III.E, and III.H; (3) coordinated enforcement efforts by entering into an Information Sharing Agreement after entry of the Final Judgments; and (4) reviewed and investigated complaints from industry, and met with complainants and Microsoft about the substance of the complaints when necessary.[2]  In addition, the United States and the New York Group have established and organized the Technical Committee.  The California Group has also prepared a consumer information and complaint website, which should be launched in the near future.

To assess overall Microsoft's compliance, Plaintiffs the United States and the New York Group initiated periodic status reviews with Microsoft.  The first of these occurred in July 2002, and the second in March 2003.  Since entry of the Final Judgments, the California Group and the Technical Committee have also attended these monitoring meetings.  At these two-day meetings held on Microsoft's Redmond campus, Microsoft reports on the status of all of its compliance activities under the Final Judgments, including training of Microsoft employees and establishing complaint tracking systems, and Microsoft's efforts to comply with the requirements under the Final Judgments regarding OEM licensing, API disclosures, licensing of Communications Protocols, and other provisions of the Final Judgments.  Another status review is tentatively scheduled for the Fall of 2003.

---

[2]As discussed in section II.B of this Joint Status Report, Plaintiffs have, for the most part, coordinated their efforts to monitor Microsoft's compliance with the Final Judgments since these Final Judgments were entered. When Plaintiffs have not coordinated such efforts, that is noted in this report.

1.  *Plaintiffs' Efforts to Monitor Microsoft's Compliance with Sections III.A, III.F, and III.G*

Plaintiffs have reviewed and monitored Microsoft's compliance with these Sections, which prohibit Microsoft from retaliating against and entering into certain exclusive or otherwise restrictive agreements with OEMs, ISVs, IHVs, and other entities covered under the Sections. Plaintiffs have analyzed Microsoft's relationship and contracts with these entities, most typically as part of an investigation into a complaint concerning another Section of the Final Judgments, for compliance with Sections III.A, III.F, and III.G. For example, in analyzing Microsoft's agreements with ISVs and IHVs, Plaintiffs have looked for instances where Microsoft may have retaliated against an ISV or IHV for supporting software that competes against Microsoft's Platform Software or entered into an agreement with an ISV that conditions a grant on the ISV refraining from supporting such software in violation of Section III.F. Plaintiffs have also looked for instances where Microsoft entered into an exclusive dealing agreement with an IAP, ICP, ISV, or OEM in violation of Section III.G. Furthermore, Plaintiffs have stayed abreast of Microsoft's dealings with OEMs to ensure Microsoft does not retaliate against an OEM in violation of Section III.A.

2.  *Plaintiffs' Efforts to Monitor Microsoft's Compliance with Sections III.B and III.C*

Microsoft has established a set of license agreements that govern the licensing of Windows Operating Systems Products for all OEMs. In May 2003, in accordance with its regular yearly update of these agreements, Microsoft released an updated version of these agreements after affording OEMs an opportunity to comment on draft versions. Plaintiffs have requested and received from Microsoft a copy of all comments by OEMs on these license agreements. Plaintiffs have reviewed these comments and the agreements to ensure that the

terms and conditions, including the royalties, comply with Section III.B. Based on this review, Plaintiffs recently requested that Microsoft provide additional information regarding two sections of these license agreements.

Plaintiffs have also reviewed these agreements to ensure that Microsoft has not restricted any OEM licensee from exercising any of the options and alternatives listed in Section III.C, such as installing icons of non-Microsoft middleware on the Windows desktop or Start menu.

3.      *Plaintiffs' Efforts to Monitor Microsoft's Compliance with Section III.H*

Section III.H requires Microsoft, among other things, to allow end users and OEMs to enable and remove access to each Microsoft Middleware Product or Non-Microsoft Middleware Product, to designate a Non-Microsoft Middleware Product to be invoked in place of a Microsoft Middleware Product in certain instances, and to ensure that a Windows Operating System Product does not automatically alter an OEM's configuration of icons, shortcuts, or menu entries without seeking confirmation from the user. Plaintiffs have consulted with various third parties and conducted internal analyses of Microsoft's Windows XP, Windows 2000, and related service packs to ensure that Microsoft meets the requirements of Section III.H. The United States and the New York Group have also consulted with the Technical Committee regarding Microsoft's compliance with this Section. Plaintiffs' analysis of Microsoft's compliance with Section III.H. remains ongoing, and several outstanding issues are still being resolved.

Plaintiffs' work has included, among other things, analyzing the placement, display, and functionality of Microsoft's Set Program Access and Default ("SPA&D") feature, which is designed to allow end users and OEMs to enable and remove access to Microsoft Middleware Products or Non-Microsoft Middleware Products and to designate Non-Microsoft Middleware Products to be invoked in place of a Microsoft Middleware Product in certain instances. In

response to concerns raised by Plaintiffs, Microsoft has made three substantial changes to its implementation of the SPA&D tool.  First, for Windows XP, the SPA&D icon will be placed permanently on the main Start menu.  Originally, the SPA&D icon was submerged within the "All Programs" submenu of the Start menu, or in a section of the Start menu that varied with usage and was not permanent.  Users can now download an update from Microsoft's website that updates the location of the SPA&D icon; this change will also be included in Windows XP Service Pack 2 when it is released.  Second, Windows XP Service Pack 1 can now be downloaded with non-Microsoft web browsers; Microsoft's Internet Explorer web browser is no longer required.  Third, Microsoft has made Help files relating to the SPA&D tool available on its web site.  These Help files are also available in the Help search mechanism on an end user's computer when the user is connected to the Internet.   Microsoft will also include this Help content in Windows XP Service Pack 2.

4.     *Plaintiffs' Efforts to Monitor Microsoft's Compliance with Section III.D*

Plaintiffs have also sought to ensure that Microsoft is disclosing appropriately the Application Program Interfaces ("APIs") to ISVs, IHVs, IAPs, ICPs, and OEMs, as required under Section III.D.  To do so, Plaintiffs have reviewed relevant portions of the Microsoft Developer Network (MSDN) and related documentation, and have consulted with third parties. The United States and the New York Group have also consulted with the Technical Committee. This review has also involved issues relating to Section III.J, as Microsoft has elected to withhold a single API pursuant to Section III.J.1 and classify one additional API as falling under Section III.J.2.

5.     *Plaintiffs' Efforts to Monitor Microsoft's Compliance with Sections III.E, III.I, and III.J*

Plaintiffs' enforcement efforts have recently been devoted largely to investigating

Microsoft's compliance with Section III.E, which also implicates Sections III.I and III.J. Section III.E, in conjunction with Sections III.I and III.J, requires Microsoft to license certain Communications Protocols on reasonable and non-discriminatory terms.[3] As this Court recognized, this Section is designed to ensure that "rival middleware can interoperate with servers running Microsoft's server operating system software and thereby compete vigorously with Microsoft middleware." *United States v. Microsoft*, 231 F. Supp. 2d 144, 189 (D.D.C. 2002).

When Microsoft first informed the United States and the New York Group of the parameters of Microsoft's Communications Protocol Licensing Program (the "MCPP"), Microsoft outlined the structure of the MCPP and the procedure it used to identify the Communications Protocols to be licensed, emphasizing that such a program is unique and unprecedented in the industry.[4] Microsoft also submitted first drafts of the MCPP's licensing documentation to the United States and the New York Group during that time. The California Group was first informed of the parameters of the MCPP in January of 2003, shortly after entry of the States' Final Judgment.

Since receiving the licensing documentation, Plaintiffs have worked diligently to review the license terms and to seek input from industry on whether these terms are commercially reasonable. Plaintiffs have been in constant communication with potential licensees and other

---

[3]Section III.E specifically states: "Starting nine months after the submission of this proposed Final Judgment to the Court, Microsoft shall make available for use by third parties, for the sole purpose of interoperating or communicating with a Windows Operating System Product, on reasonable and non-discriminatory terms (consistent with Section III.I), any Communications Protocol that is, on or after the date this Final Judgment is submitted to the Court, (i) implemented in a Windows Operating System Product installed on a client computer, and (ii) used to interoperate, or communicate, natively (*i.e.*, without the addition of software code to the client operating system product) with a Microsoft server operating system product."

[4]Microsoft has identified 113 Communications Protocols to offer for license under the MCPP and one Communications Protocol that will not be offered pursuant to Section III.J.1 of the Consent Judgment. Of the 113 Communications Protocols identified for licensing, eleven will be offered under additional license terms pursuant to Section III.J.2 of the Consent Judgment.

companies in the industry (the United States alone has contacted almost 100 companies) in order to gain feedback on the MCPP's license terms.  To encourage industry input the United States issued two Compliance Advisories, the first on August 5, 2002 and the second on April 21, 2003, copies of which are attached as Attachment A.  Plaintiffs have also hired knowledgeable consultants and conducted independent research in order to assess whether the licenses are being offered on reasonable and non-discriminatory terms, as the Final Judgments require.  In addition, the United States has issued Civil Investigative Demands to third parties and, pursuant to its investigative authority under the Consent Judgment, letters to Microsoft to gather more information on the MCPP.

As a result of these efforts, Plaintiffs have identified numerous concerns with the MCPP generally and with certain license terms and requirements specifically and have raised these concerns with Microsoft over the past several months.  In response, Microsoft has made many significant changes to the MCPP.  Most notably, Microsoft (1) eliminated the requirement that a potential licensee must sign an NDA to review the license terms; (2) developed an Evaluation Agreement that allows potential licensees to view the Communications Protocol technical documentation before signing a license; (3) eliminated the MCPP's overly-stringent entry criteria; (4) modified a significant license term that could have deterred prospective licensees who choose to work with the open source community; (5) improved license terms regarding the timing of technical disclosures so that licensees are able to obtain technical information at the same time as other licensees and Microsoft partners; (6) substantially narrowed the licensee's covenant not to sue; (7) extended the rights granted to a licensee after expiration of the license; (8) modified the license warranties to ensure that the licensee receives the appropriate technical documentation in the appropriate form; and (9) completely reworked the licenses to eliminate

unnecessary complexity.  In addition, at Plaintiffs' insistence, Microsoft is undertaking changes

to the MCPP's royalty structure and rates, which will result in further changes to the licensing

terms.  Discussions on this issue have been occurring over the past several weeks and, although

progress has been made, Plaintiffs remain concerned about the royalty structure and rates

proposed by Microsoft.  Plaintiffs will be prepared to provide the Court with an update on the

status of this issue at the July 24 Status Conference.  Plaintiffs are continuing to solicit industry

feedback, work with their consultants, and hold discussions with Microsoft in order to improve

all of the terms of the MCPP.

       Plaintiffs are most concerned with Microsoft's implementation of the requirement of

Section III.E that it license certain Communications Protocols on reasonable and non-

discriminatory ("RAND") terms.  Plaintiffs note that Microsoft was required to do so in a timely

manner, i.e., "[s]tarting three months after the entry of this Final Judgment . . . ."  *New York v.*

*Microsoft Corp.*, 224 F. Supp. 2d 76, 173, 269 (D.D.C. 2002).  Implementation of RAND terms

is of particular concern to Plaintiffs because Section III.E was intended by the Court to be the

"most forward-looking provision in the Court's remedy" and directed toward "unfettering the

market and restoring competition."  *Id.* at 226; *see also United States v. Microsoft*, 231 F. Supp.

2d at 191-92 (recognizing that Section III.E is prospective and "particularly warranted in this

case given the rapid pace of change in the software industry[;]" and stating that without it and

other prospective provisions "it is quite possible that the core of the decree would prove

prematurely obsolete").  As noted above, at Plaintiffs' urging, Microsoft has made, and has stated

that it will continue to make, changes to the MCPP terms.  While Plaintiffs are continuing to

work with Microsoft to improve the MCPP so that the Communications Protocols are licensed

under RAND terms, Plaintiffs recognize that further steps may need to be taken, either pursuant

to agreement or order of the Court, to account for Microsoft's delayed implementation.

### B.    Plaintiffs' Information Sharing Agreement

In addition to monitoring Microsoft's compliance with each Section of the Consent Judgment, Plaintiffs entered into an Information Sharing Agreement (the "Agreement") to assist all Plaintiffs in their compliance and enforcement activities. This Agreement, the details of which are set out in Plaintiffs' *Joint Status Report on Coordinating Enforcement of the Final Judgments*, submitted to the Court on April 17, 2003, allows for certain information to be shared among Plaintiffs, such as analyses of third-party complaints, communications made by a Plaintiff to Microsoft or a third party, or recommendations concerning potential violations of the Final Judgments received from the Technical Committee by the United States or the New York Group or from the Compliance Committee by the California Group. In addition, the Agreement sets requirements and provides recommendations for coordinating compliance and enforcement activities. Since Plaintiffs signed the Agreement, they have worked together in monitoring Microsoft's compliance with the Final Judgments.[5] This has proven to be beneficial in lessening the burden on third parties, Microsoft, and Plaintiffs, in addition to facilitating a more efficient enforcement of the Final Judgments.

### C.    Complaints Regarding Microsoft's Compliance with the Final Judgments

The United States has received a number of letter, email, and telephone communications regarding *United States v. Microsoft*, CA No. 98-1232. Since the close of the Tunney Act public comment period on January 28, 2002, many members of the public have continued to

---

[5]Through the Agreement, the California Group has received many documents from Microsoft and the United States related to compliance and enforcement of the Final Judgments. In addition, the California Group maintains an enforcement committee pursuant to the States' Final Judgment to coordinate their enforcement of that Final Judgment. The California Group has also exercised its independent authority to request documents directly from Microsoft under the States' Final Judgment, and has participated in interviews between the United States and the New York Group, and Microsoft and third parties.

communicate their beliefs about the appropriateness of the original lawsuit, the settlement, and Microsoft's business practices.[6] If these complaints are unrelated to the Consent Judgment, Microsoft's compliance with the Consent Judgment, or the United States' enforcement of it, the United States treats these complaints like any other communication to the United States unrelated to Microsoft. The complaints are assigned to an attorney or paralegal, and if appropriate to do so, investigated and answered with a written response sent to the complainant. Complaints that involve the Consent Judgment, Microsoft's compliance with the Consent Judgment, or the United States' enforcement of it, however, are handled by the team of attorneys, economists, and paralegals responsible for enforcing the Consent Judgment.

Since January 28, 2002, the United States has received 194 complaints referring to the Consent Judgment, Microsoft's compliance with the Consent Judgment, or the United States' enforcement of it.[7] As described below, the United States has categorized these as substantive and non-substantive.

The non-substantive complaints refer to or involve the Consent Judgment but do not raise an issue of Microsoft's compliance with, or the United States' enforcement of, the Consent Judgment. These complaints do not, for example, relate to any specific provisions of the Consent Judgment or raise issues with Microsoft's compliance with the Consent Judgment. This category would include general comments contending that the Consent Judgment is of insufficient scope

---

[6]The microsoft.atr@usdoj.gov e-mail box, which was used to receive Tunney Act comments, is now closed. The Antitrust Division's web site instructs all persons wishing to communicate with the Division about Microsoft's compliance with the Consent Judgment to e-mail comments to newcase.atr@usdoj.gov.

[7]This number excludes all spam and all communications that, although sent to the address for comments on the proposed Final Judgment, to the Department of Justice New Case Unit or to the Technical Committee, may mention Microsoft but are essentially unrelated to the Consent Judgment or *United States v. Microsoft*, CA No. 98-1232 (CKK), generally or compliance with the Consent Judgment. These communications dealt with Microsoft acquisitions or contained general comments along the lines of "Microsoft is terrible" or "Microsoft is great." Two comments have been received by the TC and are included in this category of excluded comments.

or that it goes too far in limiting Microsoft's conduct. There were 176 complaints falling into this category. For all such complaints received after the November 12, 2002, entry of the Consent Judgment, a simple response acknowledging receipt has been sent. The United States' goal is to send such responses within one week of receipt.

The second category, substantive complaints, contains a relatively small number of complaints that raise specific issues relating to Microsoft's compliance with, or the United States' enforcement of, the Consent Judgment. There were eighteen complaints in this category.

Generally, the United States adheres to the following process for handling these substantive complaints. Within three weeks of receiving such a complaint, the United States seeks to evaluate and acknowledge receipt of the complaint. If the United States is able to analyze the complaint without seeking further information from Microsoft, the complainant, or a third party, it will resolve the complaint and communicate that resolution with the complainant in a short time period, typically one or two weeks. For many complaints raising specific allegations or questions regarding Microsoft's compliance with the Consent Judgment, however, the United States will need to request further information from either the complainant or Microsoft or, in some cases, both. The United States may also need to request information from third parties. Requesting and analyzing that information, as well as formulating a resolution of the complaint, requires a longer time frame, the length of which is heavily dependent upon the complexity of the issues involved. The United States also follows the procedures outlined in the Information Sharing Agreement, including seeking the complainant's consent to share the complaint with the states who are parties to that Agreement and, where the complainant consents, coordinating any follow-up on the specific complaint with those states.

Of the eighteen substantive complaints received up to this date, two required no further

information and have been resolved. The remainder, sixteen, have required some manner of investigation. The majority of the complaints in this category focused on the MCPP. Some referred to specific terms of the MCPP license and the royalty structure and cost, while others addressed the application of a non-disclosure agreement to the MCPP, a requirement Microsoft has since eliminated. All complaints relating to the MCPP that were not expressly limited to the non-disclosure agreement issue have been investigated with one or more interviews or telephone conferences with the complainant. In addition, a few complaints not involving the MCPP remain active, requiring further information from either the complainant or Microsoft.

The New York Group does not believe that it has received any substantive complaints relating to the Consent Judgment that were not also directed to the United States. The New York Group conferred with the United States regarding the investigation of such complaints.

The California Group has received complaints similar to those received by the United States and the New York Group. These complaints, approximately fourteen in number, have been or are being investigated by the California Group, in some cases jointly with other Plaintiffs. These complaints implicate Sections III.A, B, C, E, and F of the States' Final Judgment.

## III.    The Technical Committee

Section IV.B of the Consent Judgment requires Plaintiffs United States and New York Group to "create and recommend to the Court for its appointment a three-person Technical Committee to assist in enforcement of and compliance with this Final Judgment." The Technical Committee's ("TC") three primary duties, as described under the Consent Judgment, are to (1) monitor Microsoft's compliance with the Consent Judgment, (2) accept, investigate, mediate, report, respond to, and/or recommend resolution of complaints from the United States and the

New York Group, third parties, and Microsoft's Compliance Officer, and (3) conduct technical investigations and report on those investigations as requested by the United States and the New York Group.  This Court appointed the three members of the TC, after recommendation by the United States and the New York Group, on February 14, 2003.  *See* Minute Order (Feb. 14, 2003).  Since their appointment, the TC members have, in conjunction with the United States and the New York Group and in accordance with the Consent Judgment, developed an organizational plan and established procedures to monitor Microsoft's compliance.

A. **The Technical Committee's Organizational Plan**

The Organizational Plan (the "Plan") outlines the TC's duties as mandated by the Consent Judgment, addresses communications with others, and discusses other operational issues and procedures.  The Plan states that the TC intends to fulfill its duties by examining Microsoft's products, software code, and internal business plans, in addition to interviewing Microsoft personnel.  The TC may also hire consultants and support staff, will procure equipment when needed, and will establish procedures for investigating and tracking issues and complaints.  To accomplish these tasks, the TC has established its main offices, including a testing lab, in Bellevue, Washington, with satellite offices both on-site at the Microsoft campus and in Palo Alto, California.

The Plan provides that the TC will establish communication and status reporting practices both within the TC and externally, pursuant to Section IV.B.8 of the Consent Judgment, where applicable.  The TC's external communications will be with (1) the United States and the New York Group on all aspects of the TC's operations; (2) Microsoft to request information, discuss complaints, and discuss resolutions of complaints; and (3) third parties in connection with its investigations of third-party complaints.  The TC will not, in accordance with Section IV.B.10 of

the Consent Judgment, make any public statements relating to its activities.

Finally, the Organizational Plan establishes ways in which the TC will measure its success. The TC recognizes that, in its role as mediators of complaints, it can measure success by its ability to resolve compliance issues without involving the Court. This will require working in confidence and in cooperation with both third-party complainants and Microsoft. Another means for measuring success will be assessing its ability to discover proactively issues of Microsoft's compliance, if such issues arise, before third parties may be adversely impacted. A third measure of success will be the reactions of the United States and the New York Group (and, ultimately, the Court) to the TC's work.

**B.      Procedures Adopted By The Technical Committee To Monitor Microsoft's Compliance**

To fulfill its duty "to monitor Microsoft's compliance with its obligations under [the] final judgment," *see* Consent Judgment, Section IV.B.8.a, the TC has adopted a number of procedures and practices.

*1.      TC Interactions with Microsoft and the United States and the New York Group*

The TC will access Microsoft personnel, source code, documents, equipment, and/or facilities as necessary to fulfill its duties pursuant to Sections IV.B.8.b and c of the Consent Judgment. The TC will provide reasonable notice to Microsoft when it requests access under this provision by contacting a designated person within Microsoft's legal department, usually the Compliance Officer. The TC will copy the United States and the New York Group on all communications with Microsoft. The TC already has begun contacting Microsoft, has access to numerous Microsoft systems, and has conducted several meetings with Microsoft personnel.

The TC communicates regularly with the United States and the New York Group. These Plaintiffs and the TC hold a telephonic conference every two weeks to address the TC's

activities.  In addition, there is constant informal communication between these Plaintiffs and the TC, almost daily, on a variety of issues.  All of the TC's activities will be reported in the TC's reports to the United States and the New York Group, such as the TC's six-month status report submitted to these Plaintiffs pursuant to Section IV.B.8.e of the Consent Judgment.  The first of these status reports, covering the period from November 12, 2002 to May 12, 2002 was submitted on May 21, 2003.  The TC will include in these reports any complaint activity and a summary of all of the TC's activities in the prior six months.  The TC's communications with the United States and the New York Group regarding complaints brought to the TC under Section IV.D.4 of the Consent Judgment will be handled in the manner described below.  In addition, pursuant to Section IV.B.8.f of the Consent Judgment, the TC will report to the United States and the New York Group in a separate writing immediately whenever it (or any individual TC Member) has reason to believe that Microsoft may not be in compliance with any term of the Consent Judgment.

> 2.    *TC Determinations and Resolution of Internal TC Disagreements*

The TC Members are establishing procedures for communicating internally to make intra-organizational determinations.  The procedures establish that when there is a consensus on determinations among the three Members, which the TC Members are committed to working hard to achieve, the TC will communicate in a unified voice to either the United States, the New York Group, Microsoft, or third parties.  When there is not a consensus, the TC will make a determination by majority vote.  With such a determination, the TC will still unify in its external communications, and avoid highlighting its differences.[8]  The TC members are also in constant

---

[8]When the difference of opinion is on Microsoft's failure to comply with the Consent Judgment, however, each TC member will make his individual opinion known to the United States and the New York Group.  Moreover, in matters of judgment, there are no constraints placed on the ability of any individual TC member to communicate with the United States or the New York Group.

communication with each other, usually daily, either through email, telephone, or in person. In addition, the procedures call for the three members to have regularly scheduled weekly meetings and 90-day quarterly reviews.

### 3. TC's Procedures for Third-Party Complaints

The TC will handle third-party complaints with the goal of achieving a voluntary dispute resolution, and by taking the following steps. After receiving a complaint under Section IV.D of the Consent Judgment, whether it is received directly or indirectly through Plaintiffs the United States and the New York Group or Microsoft, the TC will determine whether the complaint is within the scope of the Consent Judgment. If the complaint is not within the scope of the Consent Judgment, the TC will send an appropriate response within one week of receipt. This response will indicate that no action will be taken, but also recommend other means of resolution for the complainant when available.

If the complaint merits further investigation, the TC will acknowledge the complaint by letter and determine the complainants' confidentiality needs within one week of receipt. Next, the TC will conduct an internal study of the complaint and assign one TC member with primary responsibility for investigating the complaint and communicating with the complainant. This TC member may elect to communicate with the complainant about resolution with Microsoft, *see* Consent Judgment, Section IV.B.8.g, or with others for additional information, *see, e.g.*, Consent Judgment, Section IV.B.8.h. This TC member will (where required by the Consent Judgment) meet with Microsoft's Compliance Officer to allow Microsoft to respond and possibly resolve any complaints informally. *See* Consent Judgment, Section IV.D.4.b. The TC will also confer with the United States and the New York Group about the complaint. *See id.* The TC will investigate the complaint in a timely manner, yet the time will vary depending on the nature of

the complaint and the complexity of the issue. When the TC has reached a conclusion about the complaint, the TC will communicate that conclusion to the complainant in writing. Within a week of doing so, the TC will report in writing to the United States and the New York Group whether the issue has been resolved or further action is needed.

### 4. *Proactive Monitoring of Microsoft's Compliance*

In addition to addressing complaints and its other duties, the TC is committed to monitoring Microsoft's compliance proactively. It will educate itself on Microsoft's products and activities in areas relevant to the Consent Judgment through meetings and discussions with Microsoft and industry and through its access to Microsoft's documents, source code, personnel, and premises, as granted under Sections IV.B.8.b and c of the Consent Judgment. This proactive monitoring will involve analyzing Microsoft's products prior to release when possible by receiving from Microsoft each product's release schedule for internal "alpha" releases, external "beta" releases, release candidates, and manufacturing releases. The results of such monitoring will be communicated to the United States and the New York Group on a regular basis as described above.

## IV. Microsoft's Efforts To Comply With The Final Judgments

### A. Microsoft's Compliance

Pursuant to an agreement among the United States, the New York Group and Microsoft, Microsoft began complying with the proposed final judgment on December 16, 2001. Microsoft took additional steps in order to comply with the requirements of the Final Judgments entered by the Court in November 2002. Microsoft has devoted substantial resources to complying with the Final Judgments, drawing upon the expertise and time of software developers and business personnel within its Windows division, OEM Sales group personnel, licensing lawyers and

antitrust lawyers within its legal department, outside counsel and outside consultants. Microsoft also has established a committee of senior executives and lawyers to monitor the company's compliance with the Final Judgments. As required by the Final Judgments, the company has established two Compliance Officers and a new Antitrust Compliance Committee of its Board of Directors. Microsoft's Chief Executive Officer, Steven A. Ballmer, has sent e-mail to all Microsoft employees underscoring the importance of full compliance with the Final Judgments and Mr. Ballmer has reiterated that point in meetings with senior officers of the company.

The steps Microsoft has taken to comply with the Final Judgments are summarized below.

1.     *OEM Business Terms (Sections III.A. and B.)*

Section III.B. of the Final Judgments eliminated any possibility that Microsoft could vary the terms of a Windows license in order to coerce an OEM to favor Microsoft middleware. Section III.B. mandates that all Windows license agreements with Covered OEM's be "uniform" and that royalties be determined in accordance with a royalty schedule made available to the Plaintiffs and Covered OEMs. In addition, any market development allowances or other discounts from the specified royalty schedule must be made available uniformly to Covered OEMs and based upon objectively verifiable criteria.

Pursuant to Section III.B., Microsoft prepared a single form of Windows license agreement for OEMs prior to December 16, 2001. As existing OEM license agreements thereafter expired, Microsoft licensed Windows to OEMs only pursuant to this new uniform license agreement. Microsoft updated these agreements in May of 2002 and 2003 and will continue to update the uniform terms in the spring of each year. Although the requirements of Section III.B. are limited to "Covered OEMs" (a term defined to include only the twenty largest

OEMs) Microsoft decided to license Windows to all OEMs with which it has a direct relationship pursuant to its new uniform license agreement.

Royalties owed by the Covered OEMs are determined in accordance with a royalty schedule that Microsoft has posted to a website that is accessible to the Covered OEMs and the Plaintiffs, as required by the Final Judgments. Although not required by the Final Judgments, the website also includes the uniform license agreement and other materials that are relevant to the licensing process so that licensing is transparent to OEMs.

Microsoft also has complied with the requirements of Section III.B. relating to market development agreements. Discounts provided to OEMs in order to increase the consumer appeal of new personal computers running Windows are made available on a uniform basis based on objectively verifiable criteria.

Section III.A. prohibits Microsoft from retaliating or threatening to retaliate against an OEM because of an OEM's decision to distribute or otherwise to promote any software that competes with Microsoft Platform Software. Unlike Section III.B., which can be (and has been) implemented programmatically, compliance with Section III.A. can be achieved only through training and ongoing oversight of relevant Microsoft employees. Microsoft has conducted extensive mandatory training for its OEM Sales group personnel concerning Microsoft's obligations under the Final Judgments, with particular emphasis on Section III.A. and other OEM-related provisions. Since December 2001, Microsoft has trained its domestic OEM Sales personnel at its headquarters in Redmond, Washington, and has trained its international OEM Sales personnel at regional training sessions held in Germany, Switzerland, Mexico and Japan. Training will continue to be an ongoing process, both via live training by Microsoft lawyers and senior OEM Sales group personnel and via online training tools that Microsoft has developed for

this purpose.  Microsoft's licensing and antitrust lawyers work directly with OEM Division personnel to address and resolve any ongoing questions.

2.    *Windows Modification Rights (Section III.C.)*

Section III.C. states that Microsoft may not restrict OEMs from exercising specified options or alternatives when installing non-Microsoft software on new personal computers containing Windows.  Nothing in any Microsoft agreement with any OEM entails such restrictions.  To the contrary, on December 14, 2001, Microsoft sent letters to OEMs amending all existing Windows license agreements to expressly grant all of the license rights specified in Section III.C.

OEM flexibility to modify or configure Windows generally is provided by the "OEM Preinstallation Kit User's Guide" or "OPK" that Microsoft prepares for each new release of Windows, including interim updates.  The OPK is incorporated by reference in the uniform Windows license agreements mandated by Section III.B.  Since December 2001, Microsoft has released OPKs for two Windows updates:  Windows 2000 Professional Service Pack 3 (in June 2002) and Windows XP Service Pack 1 (in September 2002).  Both of those OPKs authorize OEMs to exercise all of the options or alternatives specified in Section III.C.

Finally, Microsoft provided OEMs with a supplemental addendum to the OPK effective on December 1, 2002 that expressly grants to OEMs the additional license rights required under the States' Final Judgment (Sections III.C.3. and C.5., respectively).

3.    *API Disclosures (Section III.D.)*

Section III.D. provides that starting with Service Pack 1 of Windows XP, Microsoft must disclose to ISVs and others certain previously internal interfaces within Windows (namely, those called by any of the components of Windows defined in the Final Judgments as Microsoft

Middleware). Microsoft released Service Pack 1 of Windows XP in September 2002. In August 2002, Microsoft published documentation for approximately 290 new APIs via the Microsoft Developer Network (MSDN). These new APIs are now available for use by ISVs developing non-Microsoft middleware or any other kind of software that runs on Windows. To identify the relevant interfaces, Microsoft developed new software tools and drew upon the expertise of more than 50 Windows software developers and program managers. Approximately 50 professional technical writers were involved in preparing the documentation that explains the functions of the new APIs and how to use them.

4.      *Licensing of Communications Protocols (Section III.E.)*

Section III.E. requires Microsoft to make available licenses to Communications Protocols that Windows clients use to communicate with Windows servers, on reasonable and non-discriminatory terms, for the purpose of allowing third party products to interoperate with those Windows clients. Through a careful process which was necessarily manual in nature, Microsoft identified more than 100 Communications Protocols encompassed by Section III.E. Microsoft has developed a program under which third parties can license all of these Communications Protocols or, if they prefer, subsets to enable specific tasks performed by Windows servers, such as file services, print services or media streaming. Under this program, known as the Microsoft Communications Protocol Program, or MCPP, Microsoft provides licensees with technical documentation that describe each Communication Protocol, as well as licenses to Microsoft's relevant patents, copyrights and trade secrets pertaining to the licensed Microsoft technology. The technical documentation that Microsoft developed comprises more than 5,000 pages, and was produced by approximately ten technical writers working full-time for nine months.

Microsoft made licenses for the Communications Protocols available beginning in August

2002, in accordance with the timing requirements of the Final Judgments.  To date, four ISVs

have signed license agreements with Microsoft.  EMC Corporation, with annual revenues of

more than $5 billion, is a leader in information storage systems, software, networks, and services

and is expected to implement Microsoft's Communications Protocols in its storage devices.

Network Appliance, Inc., with annual revenues of more than $850 million, is a leader in unified

storage solutions for enterprises in open network environments.  Microsoft anticipates that

Network Appliance will implement Microsoft's Communication's Protocols in its popular file

servers and media caching servers, among other products.  VeriSign Inc., with annual revenues of

more than $1.2 billion, develops and markets security, telecommunications and directory

services.  Starbak Communications Inc., with annual revenues in the range of $5 million,

provides streaming media services to facilitate video conferencing and other distribution of

digital content.

All protocol licenses that Microsoft has made available to any MCPP licensee are

available to any other software or hardware developer who wishes to obtain the same license to

implement Microsoft's Communications Protocols.  Microsoft is also prepared to negotiate

mutually satisfactory licenses tailored to particular needs of prospective licensees subject to the

company's obligation under Section III.E. to ensure that all licenses are reasonable and non-

discriminatory.

In addition to feedback that Microsoft obtained directly from licensees and prospective

licensees concerning its protocol licensing program, Microsoft has also received significant

feedback from the Plaintiffs, including feedback based on Plaintiffs' discussions with  industry

participants.  Microsoft has worked diligently to substantially rewrite its license agreement for

the Communications Protocols and to restructure the royalties in order to accommodate

Plaintiffs' concerns.  In addition, as part of its evangelization program related to protocol licensing, Microsoft has provided a significant amount of information regarding the license program on its website, and will provide potential licensees an opportunity to review the confidential protocol specifications prior to licensing them. This close cooperation has already lead to significant changes to the licensing program, as noted by Plaintiffs.  Microsoft is committed to continuing to improve the licensing program as appropriate.[9]

5.      *Access to Microsoft Middleware Products and Defaults (Section III.H.)*

Section III.H. requires Microsoft to allow end-users and OEMs to enable or remove access to components of Windows identified as Microsoft Middleware Products (such as Internet Explorer) and to configure available non-Microsoft Middleware Products to launch by default in place of Microsoft Middleware Products.  Microsoft designed, developed and distributed a new feature in Windows, called "Set Program Access and Defaults" (SPA&D), that satisfies the requirements of Section III.H.  Microsoft has also provided OEMs with license rights that enable them to perform the modifications contemplated by Section III.H.

In compliance with the timing requirements of the Final Judgments, Microsoft delivered the new SPA&D feature in Service Pack 3 for Windows 2000 (released in August 2002) and Service Pack 1 for Windows XP (released in September 2002).  OEMs can now configure their new personal computers so that end-user access to "middleware" features of Windows, such as Internet Explorer, Window Media Player and Windows Messenger, is removed.  In this way, OEMs can provide essentially "exclusive" promotion on new personal computers to non-Microsoft software products that provide capabilities similar to built-in features of Windows.

---

[9] More detailed information about the protocol licensing program including, specifics of the protocols available for licensing and copies of the licensing agreements may be found on the MCPP website available to the public at <<http://members.microsoft.com/consent/Info/default.aspx>>.

End-users can further customize Windows by altering access to "middleware" and changing default configurations using the SPA&D feature, and they can make such configuration changes as often as they please. Although not required by the Final Judgments, the SPA&D feature enables end-users to restore the configuration chosen by the OEM with a single click. End-users may also choose a configuration that automatically removes access to all Microsoft Middleware Products, setting non-Microsoft software installed on the computer as the default for these capabilities. End-users may also choose to enable or remove access as to some Microsoft Middleware Products (and set defaults) and not others, as they please. Finally, end-users may choose a "Microsoft Windows" setting, which enables access to all of the features of the operating system as Microsoft designed it. Although not required by the Final Judgments, Microsoft designed the "Microsoft Windows" setting so that it also enables access to *all* non-Microsoft "middleware" on the computer.

6.      *Contract Provisions (Sections III.F. and G.)*

Sections III.F. and III.G. of the Final Judgments impose obligations upon Microsoft relating generally to its contractual and other business relationships with various third parties. Among other things, these provisions ban retaliation against third parties who compete with Microsoft Platform Software and ban any agreements by which a third party would be committed to distribute or otherwise to promote Microsoft Platform Software exclusively or in any fixed percentage. As described more fully below, Microsoft has undertaken extensive training of its lawyers and relevant business personnel to ensure that contracts and other business arrangements adhere to the strictures of Sections III.F. and III.G. In order to monitor compliance with these provisions, Microsoft implemented an internal compliance certification process in April 2002 called DealPoint within the Microsoft Windows Division that requires the lead business person

and lead attorney responsible for each agreement to certify the agreement's compliance with the Final Judgments.

### 7.      *Training*

On February 12, 2003, Microsoft commenced its annual antitrust and compliance training program for its officers and directors, as required by the Final Judgments. Additional training sessions for officers and directors were conducted in April and June of this year. A few Microsoft officers were provided one-on-one training at their request. All officers and directors of the company completed their first annual training as of June 30, 2003.[10]

In addition to the foregoing, Microsoft has conducted an extensive training program for Microsoft employees who are not officers or directors (the Final Judgments require training only for Microsoft officers and directors). Since November 2001, Microsoft has conducted more than 275 training sessions worldwide (on average, about two to three sessions per week). More than 12,500 employees have been trained in more than sixty countries.[11] Such training sessions will continue for employees on a worldwide basis throughout the term of the Final Judgments.

### 8.      *Complaints Received by Microsoft*

As required under Section IV.D.3.b. of the Consent Judgment, Microsoft launched a website which enables third parties to submit a complaint or inquiry concerning Microsoft's compliance with the Final Judgments.[12] The website was launched under the supervision of Microsoft's Compliance Officer. Third parties may submit a complaint or inquiry on-line or by

---

[10] Officers of the company had previously attended briefings on obligations under the Proposed Settlement Agreement prior to entry of the Final Judgments.

[11] Some employees have attended more than one session.

[12] Information how to submit a complaint or inquiry may be found at <<http://www.microsoft.com/legal/settlementprogram/CDCompliance.asp>>. The establishment of the website is only required under the Consent Judgment; no parallel provision exists under the States' Final Judgment.

mail.

Since launching the website, Microsoft has received seven "complaints" and ten inquiries. Only one "complaint" relates directly to Microsoft's obligations under the Final Judgments. The complainant, an individual, took issue with the scope of Communications Protocols made available for license under Section III. Microsoft responded to this matter by agreeing to clarify the documentation for certain Communications Protocols. The complainant has suggested that Microsoft's response is insufficient. Microsoft is carefully examining this matter and will take further steps if warranted.

The remaining sixteen "complaints" and inquiries were not substantive. They address such matters as general usability issues with software products supplied by Microsoft or other companies, and Microsoft's settlement of various class action lawsuits against the company. One inquiry, submitted by a testifying expert for the plaintiffs in a class action law suit against the company, asked about the scope of the required API disclosures. Another inquiry asked how to seek a refund for a Microsoft software product.

Microsoft's Compliance Officer under the Consent Judgment forwarded a copy of these "complaints" and inquiries (along with Microsoft's responses) to representatives for the U.S. Department of Justice and the New York Group. Such complaints and inquiries were also forwarded to the Technical Committee. This Compliance Officer will continue to provide updates about "complaints" and inquiries received to these parties on a monthly basis.

### B.     Microsoft Compliance Officers

*1.     Appointment of Antitrust Compliance Committee and of Compliance Officers*

On December 13, 2001, Microsoft appointed Dave Dadoun, a former attorney at the Federal Trade Commission and currently a lawyer in Microsoft's Law and Corporate Affairs

department, as the Compliance Officer under the Consent Judgment. Since that date, Mr. Dadoun has managed Microsoft's training of officers and directors and fulfilled the other Compliance Officer duties established by the Consent Judgment.

Pursuant to the requirements of the States' Final Judgment, on November 8, 2002, Microsoft established an Antitrust Compliance Committee (ACC) of the corporation's Board of Directors.[13] The ACC is comprised of three independent directors, Dr. James I. Cash (chairman of the ACC) of the Harvard Business School and chairman of Harvard Business School Publishing, Raymond Gilmartin, chairman, president and CEO of Merck & Co., and Ann McLaughlin Korologos, former U.S. Secretary of Labor and currently a senior advisor at Benedetto, Garland & Co.

On March 9, 2003, the ACC appointed Odell Guyton, a former Assistant U.S. Attorney, to be the Compliance Officer under the States' Final Judgment. Mr. Guyton has been, and will continue to be Microsoft's Director of Compliance, generally charged with ensuring that the corporation establishes and maintains an effective, best practices compliance program, to prevent and detect violations of the law and other misconduct, and to promote ethical practices. In his additional role as Compliance Officer under the States' Final Judgment, Mr. Guyton reports directly to Microsoft's CEO and the ACC. Pursuant to Section IV.B.4., the Compliance Officer may be removed only by Microsoft's CEO with the concurrence of the ACC.

The ACC meets regularly with Mr. Guyton, as well as with the General Counsel and other members of management and Microsoft's legal team to receive reports regarding compliance programs and processes in place, complaints received about compliance with the States' Final Judgment and Microsoft's responses to them, and any violations reported to the

---

[13] The ACC Charter can be found at <<www.microsoft.com/msft/governance/antitrustcomm.mspx>> and is attached as Attachment B.

Plaintiffs. Since it was constituted, the ACC has met five times, most recently for a day-long briefing on Microsoft's compliance with the Final Judgments. The ACC can authorize the conduct of further inquiries into matters reported to it for the purpose of ensuring the adequacy of Microsoft's fulfillment of its obligations under the States' Final Judgment. Generally, the process for monitoring compliance is the same for both Compliance Officers. The flow of information within the corporation relating to compliance efforts is provided in the attached flowcharts (Attachments C and D).

2.    *Supervisory and Administrative Duties of the Compliance Officers*

The Final Judgments impose certain requirements on the Compliance Officers to supervise Microsoft's compliance program and conduct additional duties outlined below. As described below, Microsoft's Compliance Officers have been fully engaged in supervising compliance with the Final Judgments and ensuring that its requirements are fulfilled.

Since entry of the Final Judgments the Compliance Officers have:

•    Delivered a copy of the Final Judgments and additional materials describing the conduct prohibited and required under the Final Judgments to all Microsoft officers and directors (December 2002);

•    Briefed all Microsoft officers and directors on the meaning and requirements of the Final Judgments and antitrust laws and informed them that Microsoft's legal advisors are available to confer with them regarding any question concerning compliance with the Final Judgments and antitrust laws (completed on June 30, 2003);

•    Obtained written certification from each officer and director that he or she (i) has read, understands and agrees to abide by the terms of, and has to his or her knowledge not violated the Final Judgments, and (ii) has been advised and understands that his or her

failure to comply with the Final Judgments may result in a finding of contempt of court (December 2002);

- Delivered such required materials and written certification to newly appointed officers (ongoing);

- Maintained a record of all officers and directors to whom a copy of the Final Judgments and additional explanatory materials have been distributed and from whom a written certification has been received (ongoing);

- Established a website which enables third parties to submit a complaint or inquiry concerning Microsoft's compliance under the Consent Judgment (December 2002); and

- Maintained a record of all complaints or inquiries concerning the Final Judgments and action taken by Microsoft with respect to each such complaint (ongoing).

In addition to the foregoing, Microsoft's Compliance Officers are routinely informed of matters pertaining to the Final Judgments. Such monitoring activities include, by way of example: (i) notifications of new officer appointments, (ii) access to the confidential website for the uniform licensing and royalty terms for Covered OEMs (extended to all royalty OEMs), (iii) notifications of any changes to the OEM license agreements, (iv) implementation and review of ongoing training programs, (v) notification and review of complaints received, and (vi) periodic briefings on other matters concerning Microsoft's compliance obligations under the Final Judgments.

July 3, 2003

Respectfully submitted,

FOR THE STATES OF NEW YORK,
OHIO, ILLINOIS, KENTUCKY,
LOUISIANA, MARYLAND, MICHIGAN
NORTH CAROLINA, AND WISCONSIN

FOR THE UNITED STATES
DEPARTMENT OF JUSTICE'S
ANTITRUST DIVISION

_____

_____

ELIOT SPITZER
*Attorney General of New York*
JAY L. HIMES
*Chief, Antitrust Bureau*
RICHARD L. SCHWARTZ
HOWARD WETTAN
*Assistant Attorneys General*
120 Broadway
New York, New York 10271
(212) 416-6229

PHILLIP R. MALONE
RENATA B. HESSE
PAULA L. BLIZZARD
PATRICIA A. BRINK
JOAN V. FARRAGHER
AARON D. HOAG
JEFFREY D. NEGRETTE
BARBARA J. NELSON
JEFFREY J. VANHOOREWEGHE
*Trial Attorneys*
U.S. Department of Justice
Antitrust Division
600 E Street, N.W.
Suite 9500
Washington, D.C. 20530
202/514-8276

FOR THE STATES OF CALIFORNIA,
CONNECTICUT, IOWA, KANSAS,
FLORIDA, MINNESOTA, UTAH,
AND THE DISTRICT OF COLUMBIA

_____

KATHLEEN FOOTE
Senior Assistant Attorney General
Office of the Attorney General of California
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102-3664
415/703-5555

FOR DEFENDANT MICROSOFT
CORPORATION


BRADFORD L. SMITH
MARY SNAPP
DAVID A. HEINER, JR.
Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052
(425) 936-8080

_____
CHARLES F. RULE
Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania, Ave.
Washington, DC 20004
(202) 639-7300

STEVE L. HOLLEY
RICHARD C. PEPPERMAN, II
Sullivan & Cromwell
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendant*
*Microsoft Corporation*