IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 98-1232 (CKK) |
| v. | Next Court Deadline: January 23, 2004, Status Conference |
| MICROSOFT CORPORATION, | |
| Defendant. | |

**JOINT STATUS REPORT ON MICROSOFT'S
COMPLIANCE WITH THE FINAL JUDGMENTS**

The United States of America, Plaintiff in *United States v. Microsoft*, CA No. 98-1232 (CKK), and the Plaintiffs in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), the States of New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin (the "New York Group"), and the States of California, Connecticut, Florida, Iowa, Kansas, Minnesota, Utah, and the District of Columbia (the "California Group") (collectively "Plaintiffs"), together with Defendant Microsoft hereby file a Joint Status Report on Microsoft's Compliance with the Final Judgments, pursuant to this Court's Order of May 14, 2003.[1]

---

[1] As explained in the July 3, 2003 Joint Status Report, the Commonwealth of Massachusetts and the State of West Virginia are not part of the California Group for the purpose of this Joint Status Report on Microsoft's Compliance with the Final Judgments. On or about June 20, 2003, West Virginia dismissed with prejudice its appeal of the States' Final Judgment. In addition, West Virginia has reached a negotiated settlement with Microsoft in the case entitled *State of West Virginia v. Microsoft Corporation*, West Virginia Circuit Court of Boone County, Civil Action No. 01-C-197 (and related consumer class actions), which has been preliminarily approved by that court. This settlement includes a provision whereby West Virginia will release Microsoft from antitrust liability for conduct prior to December 31, 2002. As a result, West Virginia has advised the California Group that it will not be participating in enforcement of the States' Final Judgment. Massachusetts is still prosecuting its appeal of the States' Final Judgment.

I.      **Introduction**

At the October 24, 2003 Status Conference, the Court directed the Plaintiffs to file a status report on January 16, 2004 updating the Court on activities relating to Microsoft's compliance with the Final Judgments entered in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), and in *United States v. Microsoft*, CA No. 98-1232 (CKK).  Previous reports filed on April 17, 2003, July 3, 2003, and October 16, 2003 informed the Court as to the Plaintiffs' efforts to enforce the Final Judgments and Microsoft's efforts to comply with the Final Judgments.

To facilitate its monitoring of the Final Judgments, this Court previously ordered that Plaintiffs' six-month reports contain certain relevant information.  Order at 1-3 (May 14, 2003). This is the second of the six-month reports.[2]  Section II of this report discusses Plaintiffs' efforts to enforce the Final Judgments, keyed to the requirements of the Final Judgments; this section was authored by Plaintiffs.  Section III discusses Microsoft's efforts to comply with the Final Judgments; this section was authored by Microsoft.  Neither Plaintiffs nor Microsoft necessarily adopts the views expressed by the other.

II.     **Plaintiffs' Efforts to Enforce the Final Judgments**

   A.   **Section III.E (Licensing of Communications Protocols)**

At the October 24, 2003 Status Conference, Plaintiffs informed the Court that they continued to investigate and evaluate Microsoft's compliance with Section III.E of the Final Judgments.  Since that time, Plaintiffs have gathered information to evaluate whether the current Microsoft Communications Protocol Program ("MCPP") licensees will further the remedial goals of Section III.E.  This process has included interviewing most of these licensees and, in some

---

[2] The status report filed on October 16, 2003 served as an interim report to provide the Court with updates on activities related to Sections III.E, III.B, and III.H of the Final Judgments.

cases, issuing compulsory process for documents and other information. In addition, Plaintiffs have interviewed a number of companies that considered the MCPP but have not yet signed a license. The Technical Committee ("TC") members have participated in and assisted with this activity.

By way of summary, Plaintiffs are concerned that the current licensing program has thus far fallen short of satisfying fully the goals of Section III.E. Plaintiffs' investigation has revealed that additional work still needs to be done to develop and improve the MCPP. Plaintiffs have recently communicated to Microsoft a number of suggested improvements in the Microsoft licensing program and Plaintiffs understand that Microsoft is in the process of making additional changes in response to Plaintiffs' comments. Plaintiffs will update the Court at the January 24, 2004 Status Conference on their discussions with Microsoft and Microsoft's recent activities. We elaborate on these views in the following subsections.

### 1.     Remedial Goals of Section III.E

The Final Judgment requires Microsoft to offer licenses to use the Communications Protocols ("CPs") that fall within the purview of Section III.E. The remedial goals of Section III.E were summarized in this Court's opinion in *New York v. Microsoft Corp.*, 224 F. Supp.2d 76, 172-73 (D.D.C. 2002):

> As the Court concluded *supra*, Parts III.B.3.a, III.C.1, server operating systems can perform a function akin to that performed by traditional middleware because they provide a platform for applications running "for" use on a PC. The mandatory disclosure of the communications protocols relied upon by Microsoft's PC operating system to interoperate with its server operating systems will advance the ability of non-Microsoft server operating systems to interoperate, or communicate, with the ubiquitous Windows PC client. Advancement of the communication between non-Microsoft server operating systems and Windows clients will further the ability of these non-Microsoft server operating systems to provide a platform which competes with Windows itself.

The Competitive Impact Statement filed by the United States sets forth its view of the role of Section III.E: "This provision will protect opportunities for the development and use of non-Microsoft middleware by ensuring that competing, non-Microsoft server products on which such middleware can be hosted and served will have the same access to and ability to interoperate with Windows operating system products as do Microsoft's server operating systems." Revised Proposed Final Judgment and Competitive Impact Statement, 66 Fed. Reg. 59,452 at 59,469 (Nov. 28, 2001).

Accordingly, the remedy embodied in Section III.E is intended to provide developers of server operating system products, and other server software that interoperates with the Windows PC client, with the opportunity and ability to achieve access to the Windows PC client equivalent to that of Microsoft's server software. If software developers avail themselves of that access, middleware solutions residing on servers can be introduced, and that could increase competition to Windows.

### 2. Remedial Effect of Current Licensees

Plaintiffs have considered the potential that the current licensees represent in the marketplace to fulfill the goals of Section III.E. To date, eleven companies have signed MCPP licenses, including three since the last status conference. On signing a license, most licensees receive access to the Technical Documentation for all the CPs available under the MCPP. However, on bringing a product to market, the royalty owed to Microsoft is based on the protocols actually used by the licensee's product as grouped into functional tasks, which may be a subset of the available protocols.[3] Thus, for example, a licensee product that streams media to the Windows

---

[3] The 14 tasks consist of (1) file services, (2) media streaming services, (3) terminal services, (4) certificate services, (5) authentication services, (6) collaboration server, (7) digital rights management server,

desktop would fall under the Media Streaming Services task. In contrast, a licensee product that interacts with the Windows desktop in a variety of ways probably would fall under the General Server task. Current licensees have informed Microsoft that the uses that they intend to make of the CPs correspond to the following tasks:

- Media Streaming      - 6 licensees[4]
- File Server          - 2 licensees
- Terminal Services    - 2 licensees
- General Server       - 1 licensee
- Certificate Services - 1 licensee

Since Microsoft modified the MCPP last summer, including the royalty structure and rates, the program has developed a larger group of licensees. The fact remains, however, that a majority of the licensees appear to be developing a relatively narrow set of products. Plaintiffs do not by any means intend to suggest that the development work and products that the current licensees make or intend to make using the CPs are of no or little value in the marketplace. Rather, bearing in mind the Court's articulated remedial goals for Section III.E, Plaintiffs are concerned that the development efforts of the current licensees are not likely to spur the emergence in the marketplace of broad competitors to the Windows desktop. To date, the MCPP appears unattractive to potential licensees with well-defined plans to build products that could enable software on servers to fully utilize the connectivity to the Windows desktop afforded by the CPs available through Microsoft's program.[5]

---

(8) multi-player games server, (9) proxy/firewall/NAT server, (10) rights management server, (11) systems management server, (12) virtual private network server, (13) print/fax server, and (14) web server.

[4] One licensee has indicated it intends to develop products under 2 tasks; thus, the total number of tasks adds up to 12, one more than the 11 licensees.

[5] Plaintiffs are evaluating whether the MCPP royalty structure may favor narrow usage by charging a lower percentage of revenue for a limited use of the CPs. For example, the royalty for a media streaming server is approximately one-half that of a general server.

In addition to this overarching issue, Plaintiffs are evaluating other aspects of Microsoft's licensing effort which are relevant to assessing whether or not the current MCPP program can be expected to achieve its intended goals. First, at least three MCPP licensees had prior licenses for the same or similar technology with Microsoft. Second, Microsoft had previously licensed its media streaming CPs through another licensing program. In other words, Microsoft believed that its own business interest in enabling certain industry members to use its media technology outweighed whatever risks might have been associated with doing so. Accordingly, for both these groups of licensees, the MCPP licenses may simply represent a continuation of both the status quo and the business choices Microsoft made before the finding of liability and the imposition of a remedy. On the other hand, these MCPP licensees may be receiving additional benefits that they might not have received without the remedy, such as lower royalties, rights to CP updates and the ability to use the same or a newer version of the same technology on a going-forward basis.

Third, two companies – EMC and SCO – took their licenses in the context of developing broader relationships with Microsoft. On May 19, 2003, SCO provided Microsoft with a license covering SCO's UNIX technology, including patent and source code licenses.[6] The EMC/Microsoft MCPP license was signed in conjunction with the announcement of an

---

[6] Press Release, SCO, SCO Announces UNIX Licensing Deal with Microsoft (May 19, 2003) at http://ir.sco.com/ReleaseDetail.cfm?ReleaseID=109360. Also, during the October 24, 2003 Status Conference, the Court referred to SCO as being "connected to the open source" Linux community. Transcript of Status Conference at 6 (Oct. 24, 2003). SCO's relationship with that community has become largely hostile. The SCO Group is currently seeking to enforce intellectual property rights against users of Linux client and server technology. Over the past six months, SCO has informed thousands of Linux end users that certain Linux products may violate UNIX intellectual property owned by SCO. Press Release, SCO, SCO Announces New Initiatives to Enforce Intellectual Property Rights (Dec. 22, 2003) at http://ir.sco.com/ReleaseDetail.cfm?ReleaseID=125089.

arrangement between the two companies covering information storage, management, and protection generally.[7]

At the same time, a small number of licensees apparently are planning to use the CPs in ways that appear more closely connected to furthering the remedial goals of Section III.E. In general, these companies do not fall into any of the categories discussed above. While it is possible that all of the MCPP licensees may develop products that could create or support platform threats, Plaintiffs remain concerned that the prospects for the current group of licensees necessarily developing new products of this type are uncertain.

### 3. Views from Prospective Licensees

Plaintiffs have also investigated the reasons that other companies considered the MCPP, but decided not to enter into a license. Many companies have expressed one or more of the following concerns: (1) some particular aspect of the licensing program is not attractive (royalties too high, need source code rather than a specification, too many limitations on use of CPs, etc.); (2) the Microsoft CPs are not necessary for the companies' product development; or (3) the company for various reasons did not invest the business and legal expertise to evaluate the MCPP or the technology.

Certain significant companies have expressed serious concerns about many aspects of the MCPP. Plaintiffs have sought and will continue to seek additional information from these

---

[7] According to EMC, "EMC and Microsoft have been working together since February 2000 to help customers better utilize their information storage, management and protection resources through common operating environments. . . . Most recently, EMC and Microsoft are helping customers get the most value from Windows Storage Server 2003 with the EMC NetWin 200 entry-level network attached storage (NAS) solution. . . . EMC automated networked storage serves as the core storage platform for the Microsoft Partner Solution Center in Redmond, Washington. EMC is a Microsoft Gold Certified Partner for Service and a Gold Certified Partner for Software." Press Release, EMC, EMC Announces Support for Microsoft Exchange Server 2003 (Oct. 21, 2003) at http://www.emc.com/news/press_releases/view.jsp?id=1887.

companies to evaluate whether the MCPP could be improved to address their concerns. The decision-making of some of these companies has been and continues to be subject to many outside influences, including the pendency of the European Commission's investigation into Microsoft. In addition, some companies believe that, while Section III.E covers some of the technology necessary to build a successful product, other necessary Microsoft technology is outside the scope of Section III.E. For these companies, a MCPP license is necessary but not sufficient.

### 4. Improving the MCPP

At this time, Plaintiffs have determined that further improvements need to be made to the licensing program. While the Microsoft team has steadily increased its efforts to evangelize and promote the program, additional steps could enhance the MCPP's chance of success. The team that Microsoft has devoted to "selling" the MCPP has done excellent work. However, Plaintiffs believe that certain aspects of the MCPP itself unnecessarily hamper these diligent efforts to sell the program. These aspects need to be improved to remove barriers to potential licensees.

First and foremost, the license and licensing program remain overly complex. Companies are reluctant to invest the legal and technical resources to review the license terms and to determine if the license is in their business interest. Comparing the MCPP with other Microsoft intellectual property licensing programs:

- the license is long – approximately 50 pages versus 25 for Windows Media Player 9 license;
- the royalties are complex – a percentage of revenue with minimums and maximum versus a flat per-unit fee; and

– the scope of use is limited and difficult to comprehend. As Microsoft has implemented the MCPP, a licensee must specifically request and then negotiate with Microsoft for an extension to be able to use the CPs more broadly.

Plaintiffs have requested that Microsoft rework the license, bringing the MCPP closer to other Microsoft licensing programs – notably, closer to those programs that create competitive advantages for Microsoft. Particularly, Plaintiffs have requested that Microsoft shorten and simplify the license, extend the scope of use so that licensees do not have to sign an extra agreement to use the CPs in ways necessary for their products, and develop streamlined methods for companies to understand the technology they are seeking to license.

Plaintiffs believe that these steps would improve the licensing program by decreasing barriers that now exist for some potential licensees. Microsoft has agreed to make additional modifications to the MCPP in an attempt to address these concerns. However, given the diverse issues raised by potential licensees, as well as the influence of external considerations in some companies' decision-making relating to the MCPP, Plaintiffs cannot foresee with confidence that the improvements will be sufficient and remove the need for further changes.

### 5. New Complaint Regarding the Sufficiency of the Technical Documentation

Plaintiffs have received an additional complaint regarding the sufficiency and completeness of the Technical Documentation that Microsoft provides to MCPP licensees. This complaint is being handled largely by the TC. Based in part on this complaint and in part on the TC's own proactive efforts, TC members, together with a consultant, reviewed and evaluated portions of the technical documentation available in the MCPP. Associated communications with the complainant have also taken place. In addition to assisting in addressing this particular

complaint, this TC project will form the basis for dialog between the TC and Microsoft regarding ways to improve the sufficiency of the documentation generally, so as to assist licensee implementation efforts. We anticipate reporting more fully on this complaint, and on the TC's more general efforts in this area, at the next status conference.

    B.    **Sections III.A and III.B (OEM Relations and Windows Licensing Terms)**

As reported in previous Status Reports, Plaintiffs have received complaints about two aspects of Microsoft's license agreements with OEMs that govern the licensing of Windows Operating Systems Products. Plaintiffs have requested and received from Microsoft additional information regarding two sections of these license agreements. Upon further analysis, Plaintiffs have determined that one of these issues does not raise issues of Microsoft's compliance with the Final Judgments. With respect to the second issue concerning a non-assertion of patents provision included in the uniform OEM license, Plaintiffs have received an additional complaint and continue to gather information and analyze the issues presented.

    C.    **Section III.H (Competing Middleware and Defaults)**

Regarding Section III.H, Plaintiffs have reached a satisfactory conclusion with Microsoft concerning the feature within Windows XP called "Shop for Music Online," which allows a user to go online to purchase compact discs from retailers. Plaintiffs had been concerned that the feature invokes Microsoft's Internet Explorer, rather than the user's chosen default browser, in a manner inconsistent with Section III.H. Plaintiffs discussed their concerns with Microsoft. Without necessarily agreeing with Plaintiffs' position, Microsoft has informed Plaintiffs that it will remove the override of the user's default browser and expects to have this modification to

Windows XP available to consumers in February or March, through a "Windows Update" download.

### D. Complaints Regarding Microsoft's Compliance with the Final Judgment

In the time since the Joint Status Report filed on October 17, 2003, the United States has received 27 communications by letter, email, or telephone, referring to the Final Judgment. Of these, 21 were categorized as non-substantive, meaning that they refer to or involve the Final Judgment, but do not raise an issue of Microsoft's compliance with, or the United States' enforcement of, the Final Judgment. For these non-substantive complaints, a simple response acknowledging receipt has been sent.

Substantive complaints are those that raise an issue with Microsoft's compliance with, or the United States' enforcement of, the Final Judgment. There were six substantive complaints which will require additional investigation, and that investigation has commenced. In addition, the United States has continued to investigate certain complaints received but not resolved prior to the October 17, 2003 Joint Status Report. Of these, a few remain open pending discussions with Microsoft. The majority of the open complaints relate to the MCPP. The others have been resolved.

The New York Group does not believe that it has received any substantive complaints relating to the Final Judgments that were not also directed to the United States, or received through the States' website, established by the California Group. The New York Group has conferred with the United States and the California Group regarding the investigation of such complaints.

Since the last status conference the California Group has not received any additional substantive complaints concerning the Final Judgment, although the website located at http://www.microsoft-antitrust.gov continues to received consumer complaints and inquiries. The

California Group has investigated several substantive complaints identified in the Interim Joint Status Report dated October 17, 2003.

Regarding the complaints concerning the inability for users to uninstall Windows Messenger from Windows XP, Microsoft has provided instructions on how to prevent Windows Messenger from running in Windows XP at the following link: http://support.microsoft.com/?kbid=302089.

Regarding the complaints concerning the difficulty of end users to purchase desktop computers without Microsoft Windows pre-installed, this complaint appears related to Marketing Development Program funds that Microsoft provides to OEMs. Under the MDP Microsoft provides financial incentives per units distributed to OEMs that meet specific milestone criteria established by Microsoft (*e.g.*, logo design, advertising copy). However, these MDP funds are reduced by $1 per unit if any desktop computer is sold by the OEM without a license to an operating system (Windows or otherwise). According to Microsoft, this provision is directed towards software piracy concerns. As structured, the MDP does not appear on its face to violate the explicit terms of the Final Judgment with respect to the pre-installation of operating systems.

     **F.**    **Activities of the Technical Committee**

Besides participating in Plaintiffs' efforts to evaluate the industry's response to the MCPP, since the last status conference, the TC has pursued a number of assignments. The TC continued reviewing the behavior of Windows with respect to honoring user default middleware choices, a core aspect of III.H of the Final Judgment. This on-going project – which has thus far identified several system conditions warranting further study – is also likely to result in dialog with Microsoft. As part of this effort, the TC received from Microsoft the source code for Windows, and the TC members, along with others involved in Plaintiffs' enforcement activity, participated in

a rigorous workshop to begin familiarizing themselves with the source code. The TC further received from Microsoft the current developmental version of the company's next operating system, named "Longhorn," which the TC is reviewing as part of its III.H project.

In addition, the TC has assisted in complaint review and analysis, including the resolution of the Shop for Music Online complaint, reported above. Finally, November 30, 2003 marked the close of the TC's first year of operation. Microsoft has funded the second year of TC activity, based on the TC's current budget projections. The TC has hired an additional staff member. It also submitted to the DOJ and the New York Group its second six-month report.

### III.    Microsoft's Efforts to Comply with the Final Judgments

Microsoft has made full compliance with its obligations under the final judgments a top priority of the company, and the company continues to devote substantial resources to its compliance work. To that end, Microsoft is in constant communication with the Plaintiffs in an effort to respond to their questions and address any concerns they may present. With respect to Section III.E in particular, Microsoft is in the process of making changes to its protocol licensing program that are responsive to the suggestions Plaintiffs have made. *See* page 3, *supra*.

#### A.    Section III.E (Licensing of Communications Protocols)

As required by Section III.E, Microsoft has created technical documentation for all of the relevant communications protocol technology in Windows, and made that technology, along with all Microsoft intellectual property rights necessary to implement it, available to the industry at large for licensing. As a result, every software developer now has the "opportunity and ability to achieve access to the Windows PC client equivalent to that of Microsoft's server software." *See* page 4, *supra*. Any developer who believes it would be beneficial to its product development

efforts to utilize Microsoft's protocol technology for interoperating with Windows desktop operating systems may now do so.

Microsoft is gratified that eleven companies have thus far elected to license Microsoft's protocol technology. Although developers are and must be free to choose whether or not to build upon Microsoft's protocol technology, Microsoft is working hard to promote the availability of the licenses and to close licenses with developers who express interest in the program. The company is currently in active discussions with more than 20 additional potential licensees (but can make no prediction concerning how many will opt to enter into a license).

Microsoft continues to cooperate with the Plaintiffs to make changes to the MCPP to make licensing easier and more attractive. Microsoft will soon be releasing a much shorter license agreement, making approximately two dozens protocols available on a royalty-free basis, making certain others available for a fixed fee or fixed fee per unit, and changing the evaluation program to make it easier for prospective licensees to review samples of the technical documentation.

Other concerns raised by the Plaintiffs relate primarily to whether protocol licensing will achieve the remedial goals of the decree, as opposed to the reasonableness of the MCPP license terms. In Microsoft's view, these concerns relate largely to matters that (I) should not be viewed as diminishing the likely beneficial effect of the MCPP or (ii) are beyond Microsoft's control.

The Plaintiffs have observed, for example, that some companies have told them that the Microsoft protocols are not necessary for the company's product development. As Microsoft has explained in previous submissions, developers can choose among a variety of efficient ways to achieve interoperability with Windows that do not require them to license Microsoft's protocol technology, including developing their own technology or using industry-standard protocols built in to Windows. Section III.E required Microsoft to provide developers with a new option — the

opportunity to build upon the same protocol technology that Microsoft uses to achieve interoperability between its client and server operating systems — and Microsoft has done that. To the extent that the inability to use Microsoft's protocol technology was ever an impediment to developing products that interoperate well with Windows, that impediment has been removed. Plaintiffs have also commented on the "relatively narrow" nature of the products that some MCPP licensees have chosen to develop using the licensed protocols, while noting that "the MCPP licensees may develop products that could create or support platform threats." *See* page 7, *supra*. Microsoft has no ability to control the product development decisions of licensees. Using the Microsoft protocol technology, however, developers are plainly free to build the kinds of products that the Plaintiffs view as creating or supporting platform threats to Windows. Indeed, Microsoft's licenses permit use of Microsoft's protocol technology in any kind of server software.

      The Plaintiffs have also expressed concern that some MCPP licensees had previously licensed similar technology from Microsoft prior to entering their MCPP license. That does not diminish the significance of their MCPP licenses or of the MCPP generally. Firms previously licensing older protocols now benefit from access to newer generation technology, more favorable terms, extended license durations, reduced royalties, and a broader grant of rights. Moreover, the technology is now available to the industry at large, rather than the smaller number of firms with which Microsoft chose to do business in the past. Plaintiffs' observation that Microsoft made available licenses to its streaming media protocols before establishing the MCPP is particularly germane here. Those licenses were made available to one narrow category of companies: those developing "dedicated caching appliance" servers, which are used to store media files. The streaming media protocol technology available under the current MCPP is the latest generation

technology, and is available to anyone for use in any kind of server, including server operating systems that compete directly with Microsoft server products.

Finally, the Plaintiffs have expressed concern that certain licensees, such as EMC and SCO, have relationships with Microsoft that are broader than their MCPP licenses. Microsoft has relationships with a wide variety of firms in the PC ecosystem. Microsoft believes that it should be willing to explore broader relationships with those prospective MCPP licensees who are interested in such relationships. Such relationships will typically entail additional technology sharing or product development arrangements, which should be seen as beneficial. Microsoft's willingness to explore a broader relationship does not reduce those firms' ability or incentives to use the licensed protocols in furtherance of the remedial goals of the Final Judgments.

### B.     Complaints and Inquiries Received by Microsoft

Microsoft has received three inquiries and complaints since the October 17, 2003 Interim Joint Status Report was filed with the Court. All three of these matters were entirely unrelated to any of Microsoft's compliance obligations under the Final Judgments. After completing its compliance review of these submissions and closing the matters, Microsoft forwarded each of

them (along with any response provided by Microsoft) to the Plaintiffs and the TC for further review.  None of these submissions required any further action by Microsoft.

January 16, 2004

Respectfully submitted,

| FOR THE STATES OF NEW YORK, OHIO, ILLINOIS, KENTUCKY, LOUISIANA, MARYLAND, MICHIGAN NORTH CAROLINA, AND WISCONSIN | FOR THE UNITED STATES DEPARTMENT OF JUSTICE'S ANTITRUST DIVISION |
|---|---|
| ELIOT SPITZER<br>*Attorney General of New York*<br>JAY L. HIMES<br>*Chief, Antitrust Bureau*<br>RICHARD L. SCHWARTZ<br>HOWARD WETTAN<br>*Assistant Attorneys General*<br>120 Broadway<br>New York, New York 10271<br>212/416-6229 | PHILLIP R. MALONE<br>RENATA B. HESSE<br>PAULA L. BLIZZARD<br>PATRICIA A. BRINK<br>JOAN V. FARRAGHER<br>AARON D. HOAG<br>JEFFREY D. NEGRETTE<br>BARBARA J. NELSON<br>JEFFREY J. VANHOOREWEGHE<br>*Trial Attorneys*<br>U.S. Department of Justice<br>Antitrust Division<br>600 E Street, N.W.<br>Suite 9500<br>Washington, D.C. 20530<br>202/514-8276 |

FOR THE STATES OF CALIFORNIA,
CONNECTICUT, IOWA, KANSAS,
FLORIDA, MINNESOTA, UTAH,
AND THE DISTRICT OF COLUMBIA

_____
KATHLEEN FOOTE
*Senior Assistant Attorney General*
Office of the Attorney General of California
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102-3664
415/703-5555

FOR DEFENDANT MICROSOFT
CORPORATION

BRADFORD L. SMITH
MARY SNAPP
DAVID A. HEINER, JR.
Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052
425/936-8080

_____
CHARLES F. RULE
Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania, Avenue, N.W.
Washington, DC 20004
202/639-7300

STEVE L. HOLLEY
RICHARD C. PEPPERMAN II
Sullivan & Cromwell
125 Broad Street
New York, New York 10004
212/558-4000

*Counsel for Defendant*
*Microsoft Corporation*