IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>     v.<br><br>MICROSOFT CORPORATION,<br><br>                  Defendant. | Civil Action No. 98-1232 (CKK)<br><br>Next Court Deadline:<br>    October 26, 2005 Status Conference |

**JOINT STATUS REPORT ON MICROSOFT'S
COMPLIANCE WITH THE FINAL JUDGMENTS**

The United States of America, Plaintiff in *United States v. Microsoft*, CA No. 98-1232 (CKK), and the Plaintiffs in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), the States of New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin (the "New York Group"), and the States of California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, and the District of Columbia (the "California Group") (collectively "Plaintiffs"), together with Defendant Microsoft, hereby file a Joint Status Report on Microsoft's Compliance with the Final Judgments, pursuant to this Court's Order of May 14, 2003.

**I.      INTRODUCTION**

At the June 6, 2005 Status Conference, the Court directed the Plaintiffs to file a Status Report updating the Court on activities relating to Microsoft's compliance with the Final Judgments entered in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), and in *United States v. Microsoft*, CA No. 98-1232 (CKK).[1]

The last Status Report, filed June 1, 2005, served as an interim report, containing information on selected activities relating to enforcement of the Final Judgments. The current report is the fifth of the six-month reports requested by the Court and contains information that the Court has requested in each six-month report. Order at 1-3 (May 14, 2003). Section II of this Report discusses Plaintiffs' efforts to enforce the Final Judgments;[2] this section was authored by Plaintiffs. Section III discusses Microsoft's efforts to comply with the Final Judgments; this section was authored by Microsoft. Neither Plaintiffs nor Microsoft necessarily adopts the views expressed by the other.

---

[1] Plaintiffs filed previous reports on April 17, 2003, July 3, 2003, October 17, 2003, January 16, 2004, April 14, 2004, July 9, 2004, October 8, 2004, January 25, 2005, and June 1, 2005 to inform the Court as to the Plaintiffs' efforts to enforce the Final Judgments and Microsoft's efforts to comply with the Final Judgments.

[2] This report outlines Plaintiffs' enforcement efforts relating to Sections III.C, E, G, and H. Although Plaintiffs continue to monitor Microsoft's efforts to comply with Sections III.A, B, and D, Plaintiffs do not have any matters relating to those Sections to report to the Court at this time.

## II. UPDATE ON PLAINTIFFS' EFFORTS TO ENFORCE THE FINAL JUDGMENTS

### A. Section III.E (Communications Protocol Licensing)

Plaintiffs' attention concerning Section III.E and the Microsoft Communications Protocol Program ("MCPP") continues to focus on efforts to improve the technical documentation provided to licensees. The Technical Committee ("TC") and the California Group's technical consultant Craig Hunt play a crucial role in this process. As described in previous status reports, Plaintiffs and Microsoft agreed to undertake two projects in parallel; the goal of these two projects was to ensure that the resulting technical documentation is complete, accurate, and usable.

#### 1. *The TC's Prototype Implementation Project*

The Court will recall that the first project involves the TC, in collaboration with Mr. Hunt, creating prototype implementations of each task covered by the MCPP. As the discussion below demonstrates, the TC's work in creating these prototypes is identifying areas of the technical documentation that warrant improvement or correction. Plaintiffs are pleased with both the progress made by the TC and Microsoft's cooperation in the project. The United States and the New York Group receive monthly reports on the status of the project from the TC, while Mr. Hunt is actively involved in this project and reports back to the California Group. The TC and Microsoft have met on a weekly basis to address matters arising from the TC's prototype implementation work, and have conferred regularly on this part of the project. The TC has developed internal systems to record and track issues arising from its prototype implementation work. The TC further has developed a bridge to Microsoft's own project tracking system,

thereby allowing it to monitor the progress of an issue after the TC has submitted it to Microsoft. There are fifteen TC staff members and one consultant dedicated to this activity.

The TC and Microsoft have established service level goals ("SLGs"), which prescribe a time frame for Microsoft's first response once the TC submits an issue to Microsoft. The SLG system relies on the TC's process of dividing issues identified in the course of its work into three categories: (1) high priority – defined as issues that block TC implementation of the relevant prototype; (2) medium priority – defined as substantive issues that do not block TC implementation because they can be worked around (either temporarily or due to the TC's direct access to Microsoft technical resources for this project), though these issues might impede a licensee's implementation efforts; and (3) low priority – defined as all other issues, including typographical errors. The SLGs are calibrated according to the issue category. Microsoft has committed to address high priority issues within seven calendar days from assignment of the issue to the appropriate Microsoft technical person, medium priority issues within seventeen days, and low priority issues within thirty-two days. Microsoft has met these SLGs 100% of the time for the issues that the TC has presented to them since the SLG system was introduced in mid-July. The SLG system enables Microsoft and the TC to focus immediately on issues that are holding up the TC's implementation work. Institution of the SLGs has generally reduced Microsoft response time to all issues submitted by a fairly significant amount. There is also an earlier backlog of issues from the pre-SLG period that the TC and Microsoft are working to eliminate.

From the onset of this project in March through September 2005, the TC submitted over 550 issues to Microsoft. To date, approximately four-fifths of the issues have been classified as medium priority, with the remaining issues fairly evenly divided between high priority and low

priority issues. As of September 30, there are approximately 350 issues that have not yet been closed. In roughly a quarter of these cases, Microsoft and the TC have agreed on the required change to the technical documentation, and those changes need only to be published in the documentation released to licensees on a monthly basis. The remaining issues are at various stages – being researched by Microsoft, awaiting further consideration by either the TC or Microsoft, or subject to discussion between the two for resolution. After an issue is closed in a manner that requires change to the technical documentation, the TC tracks the issue to make sure that the change appears in a monthly revision of the technical documentation. To date, over 115 issues have been resolved by Microsoft publishing changes to the technical documentation. The vast bulk of these resolved issues were considered medium priority, while approximately five were considered high priority and approximately ten were considered low priority. These improvements in the documentation are already in the hands of licensees. A substantial number of issues have also been closed with no change to the documentation required; for example, in some of these cases the TC has been able to locate the necessary information in sources other than the technical documentation itself.

    The TC's current project schedule contemplates completing this project by the end of July 2006. The adjustment of the completion date (as described in the January 25, 2005 status report, the project as originally contemplated was scheduled to take one year and be completed by February 2006) is largely due to three factors: (1) the time required for the TC to locate and hire the required number of quality engineers for the project; (2) the number of issues encountered in using the technical documentation, which is higher than initially estimated by the TC; and (3) the amount of time the engineers must spend documenting issues they are encountering and pursuing

their correction, a process which has taken more of the engineers' time than anticipated.  With the project now fully staffed, progress has been steady and on track due to the diligence of the TC, its staff, and Microsoft.  The TC implementation work is providing licensees with improved versions of the Technical Documentation as Microsoft distributes regular monthly revisions.  However, the experience of the TC and its staff during the roughly eight months of this project has confirmed the Plaintiffs' preliminary, pre-project assessment that the Technical Documentation still requires further work in order to provide confidence that licensees would be able to implement the relevant protocols, and Microsoft is working cooperatively with the TC in this regard.

2.  *Microsoft's Protocol Analyzer Project ("Troika")*

The second project, code-named "Troika," calls on Microsoft to create a series of Network Monitor (or "NetMON") protocol parsers and to use these parsers in conjunction with other proprietary components to compare the information in the documentation against actual client-server network traffic.  Plaintiffs reported in the January 31, 2005 Status Report that Microsoft had committed to undertake and complete this project in approximately one year.  Troika was intended to complement the TC's prototype implementation project to assure the overall completeness and accuracy of the technical documentation, as well as to provide licensees with useful tools as the parsers were developed and released to licensees throughout the course of the year.  Since the last status conference, the Plaintiffs – through the TC and Mr. Hunt – have received from Microsoft additional details regarding Microsoft's project schedule for Troika.  At a meeting with the TC and Mr. Hunt on September 20, Microsoft provided a revised schedule for the Troika with a completion date of October 2006.  Even this projected end date, however, would appear to be a best-case scenario as there are significant technical and conceptual obstacles

that Microsoft has not yet fully resolved.  As a result, Plaintiffs have little confidence that the target date is achievable or that this project will result in substantial improvements to the technical documentation in a timely manner.  While Plaintiffs do not doubt that Microsoft has devoted significant resources to this project, it is now clear that Microsoft initially underestimated the complexity and difficulty of the project by a substantial degree.  Plaintiffs are in the process of discussing with Microsoft ways in which the process could be modified so that it could be completed in a reasonable time period, while still generating the benefits to licensees originally envisioned when the program was developed.

As a result of the September 20 meeting, the TC prepared and submitted to Microsoft a detailed memorandum that includes a series of action items.  These items are designed to assist in overcoming Troika's limitations and problems, and to facilitate the TC's monitoring of Microsoft's activity.  Microsoft and the TC met on October 7 to discuss these issues.  The meeting was productive and Microsoft has agreed to work with the TC to address these issues.

       3.  *Release of the Technical Documentation in an Alternate Format*

As reported in prior Status Reports, in response to concerns expressed by the Plaintiffs and the TC, Microsoft has developed a PDF-based version of the technical documentation.  Microsoft released this alternative PDF format to licensees in "beta" form for testing in June and Plaintiffs understand that the final release of the PDF format documentation to licensees is imminent.  The TC itself reviewed the PDF alternative and evaluated its search and indexing functionality, which were found satisfactory, and a significant improvement over the previous form of the documentation.

**B.     Section III.C and III.H (Competing Middleware and Defaults)**

Plaintiffs, in conjunction with the TC and Mr. Hunt, continue their efforts to assure Microsoft's compliance with Sections III.C and III.H of the Final Judgments, which are intended to offer OEMs and end users the opportunity to select the middleware programs of their choice, including programs not made by Microsoft.

As described in prior status reports, in response to Plaintiffs' concerns Microsoft has agreed to make two changes to Windows relating to the presence of icons and shortcuts for Microsoft middleware: first, disabling access to a Microsoft middleware application will now remove shortcuts to that application from a greater number of locations than previously; and second, an icon for the default browser (or a generic icon, if necessary) will replace the Internet Explorer icon in the commonly used parts of the operating system when Internet Explorer is not the default web browser. Microsoft has informed Plaintiffs that it has completed the code implementing the agreed-upon changes. For testing purposes, those changes will be part of the next beta release of Internet Explorer 7 before being rolled out with the final release of Internet Explorer 7; these changes will also be reflected in the next release of Windows Media Player.

As reported in prior Status Reports, Plaintiffs have regular, frequent discussions with Microsoft concerning Windows Vista (previously code-named Longhorn), the successor operating system to Windows XP. The TC and its staff had a series of meetings with Microsoft over the summer, during which the parties discussed various issues regarding middleware and handling of defaults. Plaintiffs are very encouraged by the direction of these discussions and believe there is an opportunity to substantially improve the methods for setting default middleware applications in Windows Vista, as compared to the current Set Program Access & Defaults

("SPA&D") mechanism used in Windows XP.

Under SPA&D's existing design, when the current user sets his or her middleware choices, the settings made apply to all other users with accounts on that computer. In effect, the current user's choices override those that other users may previously have made on that computer. This is referred to as a "per machine" approach to system settings. The TC has urged Microsoft to change SPA&D so that an individual current user will be able to set only his or her own middleware choices, without overriding the choices of other users with accounts on the same computer. This "per user" approach to system settings, is consistent with one that Microsoft is developing more generally in Windows Vista. The TC has shared additional ideas and concepts with Microsoft addressing how the successor to the SPA&D could offer users improved functionality in managing program defaults. For example, the TC has urged Microsoft to improve the usefulness of SPA&D by including in it those Microsoft programs that are not classified as "Microsoft Middleware" pursuant to the Final Judgments because they are not distributed with Windows itself. In this vein, Microsoft has agreed to add the next release of MSN Explorer to SPA&D, and is considering incorporating other Microsoft programs as well. Plaintiffs will review progress on these issues, including development schedules, at their next regularly-scheduled general compliance meeting with Microsoft, which will take place in early November. The TC will also continue to discuss these issues with Microsoft on a regular basis.

As part of its effort to understand the way that middleware applications register in Windows, the TC developed a database of registry settings used by middleware and a detailed procedure for populating the database. The database contains a set of recommended settings that an application of each middleware type would be expected to make, and sets of vendor settings,

which are the actual settings made by Microsoft and third-party middleware applications. The TC also created a software program, the "ISV tool," that third-party software developers ("ISVs" in the terminology of the Final Judgments) could use to check the settings their code makes against the recommended settings from the TC database of registry settings, and to compare their settings with those made by similar middleware. The TC provided both the database and the ISV tool to Microsoft for testing and review. There is an on-going discussion amongst Plaintiffs, the TC, and Microsoft of making the ISV tool, or a more developed version of it, available to ISVs to assist them in writing middleware applications that register correctly in, and work well with, Windows. The TC and Microsoft are also discussing the changes to this tool that will be necessary to address differences in the way Windows Vista treats middleware compared to Windows XP, particularly with respect to the "per user" versus "per machine" issue described above.

As noted in the prior status report, the TC outlined a proposed new article for MSDN, which would assist ISVs in writing their middleware applications to replace Microsoft middleware. The article has been completed and is now in the final stages of the Microsoft process leading to its posting on MSDN. The TC also submitted to Microsoft a number of suggested changes to middleware-related articles, currently found on MSDN, to correct, clarify, or improve the instructions available to ISVs. Microsoft has informed the TC that it is making the recommended changes.

Discussions between Microsoft and the TC have also covered a series of additional middleware and default-related subjects that concern, generally, Windows' recognition (or override) of user choices in certain contexts, as well as understanding the mechanism that causes middleware and other applications to appear in the Most Frequently Used section of the Windows

Start Menu.  The TC will continue to discuss these matters with Microsoft on a regular basis, and Plaintiffs will advise the Court should the discussion result in Microsoft's agreement to make further changes.

Plaintiffs recognize that some of the changes under discussion are substantial – particularly surrounding the redesign of the SPA&D and the switch from "per machine" to "per user" treatment of defaults – and that these changes will require significant development efforts and testing.  Plaintiffs also understand that the architectural shift from "per machine" to "per user" defaults will require ISVs to revise their software to take full advantage of these features.

The middleware and default projects described in this section, if successfully developed and implemented, have the potential to offer a much improved user experience, and to further the goals of the Final Judgments by making it easier for users to manage their middleware preferences.  Plaintiffs are committed to continued consultation with Microsoft and are gratified by Microsoft's openness in discussing these issues and its willingness to make substantial changes to accomplish the objectives of the Final Judgments.

### C. Section III.G (IHV Promotion of Competing Software)

Microsoft informed Plaintiffs that it had received a complaint regarding a new marketing effort pursuant to which Microsoft provides manufacturers of portable music players with a CD containing, among other things, Windows Media Player for retail distribution with the music players.  When Microsoft circulated a draft of the specification to a number of manufacturers, the draft specification said that if the company chose to include the CD with its music players, it had to do so on an exclusive basis; that is, the company could not also distribute those music players with additional software, including alternate media players.  Upon receiving the complaint,

Microsoft quickly rectified the issue by circulating the final distribution agreement to all companies that had received the draft specification. The distribution agreement explicitly states that the program is not exclusive, and that if portable music device manufacturers choose to participate in the program, they are still free to include any software they wish to in addition to the CD from Microsoft. Microsoft highlighted the non-exclusive nature of the program again for the hardware companies in circulating the final version of the program specification approximately ten days later. While it is unfortunate that the draft specification contained the exclusivity provision, Microsoft took quick steps to correct this error and Plaintiffs do not believe any further action is required.

**D.     Additional Activities of the TC**

A majority of the TCs efforts have focused on improving the MCPP technical documentation and working with Microsoft to understand and improve the treatment of middleware and defaults in Windows, as described in detail above. *See supra* §§ II.A, II.B.

In addition, the TC has received beta versions of Vista and Internet Explorer 7. The TC continues to track features of Vista, and will put Internet Explorer 7 through its regular test regime, to assure compliance with the Final Judgments. The TC continues to receive third-party complaints and to resolve them in accordance with the procedures set forth in the July 3, 2003 Status Report. Since the last Status Report, one additional complaint regarding the treatment of default settings has come to the TC's attention. Thus far, however, neither the TC nor Microsoft has been able to replicate the conditions underlying the complaint. Unless that can be done, further investigation is unlikely.

### E.    Complaints Regarding Microsoft's Compliance with the Final Judgments

Since the prior full Status Report, filed on January 25, 2005, twenty-five complaints have been received by the United States. Twenty-four of the complaints were non-substantive and did not raise any issues regarding Microsoft's compliance with, or the United States' enforcement of, the Final Judgment. Each of the non-substantive complaints received a simple response acknowledging their receipt. The one complaint that could be considered substantive was rendered moot by subsequent developments. The New York and California Groups do not believe that they have received any additional substantive complaints since the prior full Status Report.

### III.    UPDATE ON MICROSOFT'S COMPLIANCE WITH THE FINAL JUDGMENTS

Microsoft continues to make full compliance with its obligations under the Final Judgments an important priority throughout the company, and devotes substantial resources to its compliance work. Although issues inevitably will arise, Microsoft has worked diligently and cooperatively to respond to and resolve all inquiries from Plaintiffs and others. Plaintiffs' section of this report reflects this cooperation and Microsoft's continued commitment to comply fully with the Final Judgments and to go even further in a spirit of accommodation.

In this section of the report, Microsoft focuses on its compliance work relating to Section III.E. In addition, this section briefly summarizes the activities of the compliance officers under the Final Judgments, as well as the complaints and inquiries received by Microsoft since the June 1, 2005 Status Report.

**A.     Section III.E (Communications Protocols Licensing)**

  1.     *MCPP Status Update*

Of the 23 MCPP licensees, a total of 12 are shipping products under the MCPP — this includes three additional licensees who have started shipping products since the last Status Report. In addition to the 23 licensees referenced above, there remain two companies that have taken advantage of the royalty-free protocol license offered on MSDN — Orbital Data Corporation and Atlas Development Corporation. Microsoft will continue to update Plaintiffs and the Court on any new developments.

  2.     *Technical Documentation*

As indicated in Plaintiffs' section of this report, Microsoft continues to work closely with the Technical Committee and Plaintiffs to improve the technical documentation. Although Microsoft has always been confident that it has been in compliance with its obligation to make Communications Protocols "available for use" as required by Section III.E, Microsoft previously agreed to a comprehensive process designed to assist Plaintiffs in verifying the completeness and accuracy of the technical documentation. These efforts primarily involve two projects, which are described in Plaintiffs' section of the report.

    a.     *The Technical Committee's Prototype Implementation Project*

As Microsoft indicated at the outset of the process, creating from scratch technical documentation of the magnitude, scope, and complexity that III.E requires would be a substantial–and ongoing–undertaking. At the time the technical documentation was created, and still today, Microsoft has been confident in its accuracy and usability. To date, Microsoft is unaware of any existing or potential licensee that has been unable to use any Communication

Protocol because of flaws in the technical documentation.  Nonetheless, as Microsoft has consistently advised the Court, Microsoft also expected and understood that the documentation would not be perfect, which is why the license agreements include the Correction Assistance provisions to address just such imperfections.

Additionally, in every case of which Microsoft is aware, use of new documentation will inevitably uncover "bugs" and only through experience can those bugs be corrected and the documentation improved.  The Prototype Implementation Project undertaken by the Technical Committee, with the participation of Mr. Hunt, is designed to expedite the process of uncovering and correcting bugs.  As indicated by Plaintiffs, the project seems to be a success in that regard.  Moreover, by establishing that software developers using the documentation can develop implementations of the Communications Protocols, the project has served to verify the usefulness of the documentation.

> b. *Microsoft's Protocol Analyzer Project ("Troika")*

The Troika project was intended to be another, complementary effort to verify the accuracy of the documentation.  At the time Microsoft agreed to the Troika project, nothing like it had ever been undertaken.  Quite frankly, Microsoft did not fully appreciate the scale, complexity, cost, and duration of the project.  Further, Microsoft overestimated the capability of existing technologies to meet the requirements of the effort.  At the same time, Microsoft had not yet calculated the volume of data that would have to be managed and evaluated to accomplish the original scope of the project. As Microsoft's engineers have gone further into the effort, the enormity of the task has become much better understood.  Even as Microsoft has pumped additional resources into the effort – currently over 30 full-time equivalents are dedicated to the

15

project – the time to complete the project has grown. It is now clear that the project as originally designed cannot be completed until October 2006, a little less than a year longer than what Microsoft originally anticipated. In light of these obstacles, Microsoft and Plaintiffs are engaged in discussions as to whether the full scope of Troika as originally contemplated represents an efficient use of resources and whether similar or better results can be achieved more efficiently through simplifications to the Troika project or through other endeavors.

### B.     Compliance Officers

Since the Initial Status Report was filed on July 3, 2003, the compliance officers have continued to ensure that newly-appointed Microsoft officers and directors receive copies of the Final Judgments and related materials (ongoing), that Microsoft officers and directors receive annual briefings on the meaning and requirements of the Final Judgments (completed for the most recent year in June 2004) and complete the required certifications (completed during December 2004 and January 2005), and that required compliance-related records are maintained (ongoing). In addition, the compliance officers are actively engaged in Microsoft's ongoing training programs and monitor matters pertaining to the Final Judgments.

### C.     Complaints and Inquiries Received by Microsoft

Microsoft has received eight complaints or inquiries since the June 1, 2005 Status Report. As with prior inquiries and complaints received, virtually all of these matters were unrelated to any of Microsoft's compliance obligations under the Final Judgments. Only one submission related to Microsoft's obligations under the Final Judgments. As reported in Plaintiffs' section of this report, Microsoft worked with Plaintiffs to respond to and resolve this concern in a timely fashion.

October 19, 2005

Respectfully submitted,

FOR THE STATES OF NEW YORK, OHIO, ILLINOIS, KENTUCKY, LOUISIANA, MARYLAND, MICHIGAN NORTH CAROLINA, AND WISCONSIN

FOR THE UNITED STATES DEPARTMENT OF JUSTICE'S ANTITRUST DIVISION

_____

ELIOT SPITZER
*Attorney General of New York*
JAY L. HIMES
*Chief, Antitrust Bureau*
*Assistant Attorney General*
120 Broadway
New York, New York 10271
212/416-6229

_____

RENATA B. HESSE
PATRICIA A. BRINK
PHILIP A. GIORDANO
AARON D. HOAG
ADAM T. SEVERT
*Trial Attorneys*
U.S. Department of Justice
Antitrust Division
600 E Street, N.W.
Suite 9500
Washington, D.C. 20530
202/514-8276

FOR THE STATES OF CALIFORNIA, CONNECTICUT, IOWA, KANSAS, FLORIDA, MASSACHUSETTS, MINNESOTA, UTAH, AND THE DISTRICT OF COLUMBIA

_____

KATHLEEN FOOTE
*Senior Assistant Attorney General*
Office of the Attorney General of California
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102-3664
415/703-5555

           FOR DEFENDANT MICROSOFT
           CORPORATION

| | |
|---|---|
| BRADFORD L. SMITH | CHARLES F. RULE |
| MARY SNAPP | Fried, Frank, Harris, Shriver & Jacobson LLP |
| DAVID A. HEINER, JR. | 1001 Pennsylvania, Avenue, N.W. |
| Microsoft Corporation | Washington, DC 20004 |
| One Microsoft Way | 202/639-7300 |
| Redmond, Washington 98052 | |
| 425/936-8080 | STEVE L. HOLLEY |
| | RICHARD C. PEPPERMAN II |
| | Sullivan & Cromwell |
| | 125 Broad Street |
| | New York, New York 10004 |
| | 212/558-4000 |
| | |
| | *Counsel for Defendant* |
| | *Microsoft Corporation* |