IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 98-1232 (CKK) |
| v. | Next Court Deadline: |
| | November 30, 2005 |
| | Supplemental Status Conference |
| MICROSOFT CORPORATION, | |
| Defendant. | |

## SUPPLEMENTAL JOINT STATUS REPORT ON
## MICROSOFT'S COMPLIANCE WITH THE FINAL JUDGMENTS

The United States of America, Plaintiff in *United States v. Microsoft*, CA No. 98-1232 (CKK), and the Plaintiffs in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK), the States of New York, Ohio, Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin (the "New York Group"), and the States of California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, and the District of Columbia (the "California Group") (collectively "Plaintiffs"), together with Defendant Microsoft, hereby file this Supplemental Joint Status Report on Microsoft's Compliance with the Final Judgments.

At the October 26, 2005 Status Conference, the Court directed the parties to file this supplemental report to update the Court on the status of Microsoft's protocol analyzer project, "Troika." This report also provides the Court with information on several additional matters discussed at the Status Conference.

I.      **COMMUNICATIONS PROTOCOL LICENSING**

A.      **Project Troika**

As first described in the January 25, 2005 Joint Status Report, in early 2005 Plaintiffs and Microsoft agreed on a two-part plan to ensure the completeness and accuracy of the technical documentation provided to Microsoft Communications Protocol Program ("MCPP") licensees, thereby addressing Plaintiffs' concerns regarding the quality of the documentation.  The two projects that comprised this plan were designed to be conducted in parallel and were expected to identify (and remedy) different types of documentation issues.  The first project, to be conducted by the Technical Committee ("TC"), involved a prototype implementation effort.  The second project was to be conducted by Microsoft, which named the project "Troika."  Troika was designed with two major objectives in mind: (1) to develop protocol parsers[1] that would aid licensees in implementing the protocols; and (2) to develop an automated validation tool that could be used by Microsoft in conjunction with the parsers to help verify the accuracy and completeness of the technical documentation.  The parties believed the parsers would be useful to licensees in product development and testing, though they are not essential to implement protocols using the technical documentation.   Moreover, while it is not essential to use Microsoft parsers in order to validate the technical documentation, conceptually it appeared at that time to Microsoft that with some additional work, the parser development project could be extended to support the envisioned system for validating the technical documentation.

---

[1] Generally speaking, the purpose of a parser is to dissect and analyze network traffic. The MCPP parsers will help a licensee detect traffic generated by its products that implement MCPP protocols.  This can enable a licensee to better understand how its products are performing.

Although Microsoft originally hoped to complete Troika by the end of 2005, the project proved much more technically complex than Microsoft had anticipated and required much more time to complete than Microsoft had estimated at the outset.  Microsoft has concluded that the technical challenges encountered in developing this complex and unique set of parsers for dual purposes, the volume of the test data (tens of terabytes), and dependencies between the parser development project and the validation tool development project all contributed to slowed progress on the project.  With experience, it became clear to Microsoft that it would take more than a year longer than had originally been anticipated to complete the entire scope of the original project.

In the October 19, 2005 Joint Status Report, Plaintiffs and Microsoft informed the Court that Troika was behind schedule and would not be completed until October 2006, rather than approximately February 2006 as originally reported to the Court in the January 25, 2005 Status Report.  Plaintiffs conveyed their concerns that Troika faced a number of significant unresolved technical and conceptual obstacles that left Plaintiffs with little confidence that Microsoft could achieve this revised schedule.  Plaintiffs and Microsoft reported that they were discussing how the project could be revised so that it could be completed in a timely manner while still achieving the desired objectives.  Accordingly, at the October 26, 2005 Status Conference, the Court directed Plaintiffs and Microsoft to file a report on the progress of those discussions.

Since the status conference, Plaintiffs and Microsoft have agreed upon a course of action to address the projected delays in the Troika schedule.  This plan incorporates four major elements.

*First*, Microsoft, the Plaintiffs, and the TC have agreed to split the parser development and validation efforts into distinct and independent initiatives, thereby eliminating technical dependencies between the projects. Plaintiffs, through the Technical Committee, will assume responsibility from Microsoft for the validation phase of the Troika project. Rather than using the NetMON parsers being developed by Microsoft, the TC envisions using standard, commercially proven hardware to capture test data. The TC then intends to analyze that data using customized software based on rules derived from (1) a machine-digestible form of the technical documentation,[2] (2) the experience of the TC prototype engineers, and (3) analysis of the Windows source code itself.

By removing all interdependencies between Microsoft's parser development project and the validation project and using standardized hardware, Plaintiffs believe that the TC's validation project is more likely to produce useful results in a shorter time period. Equally important, this approach should still achieve the original goal of the validation phase — verifying that the technical documentation accurately and completely describes the protocols covered by the MCPP. The TC is currently developing a detailed plan for the validation phase of the project; this plan will be completed in December 2005.[3]

---

[2] Microsoft agreed to deliver to the TC, on an agreed schedule, these enhanced versions of the technical documentation, which contain highly structured information regarding the format and values of the protocol elements comprising the MCPP. The TC's validation effort will depend on the timely and accurate availability of this information, which was itself an element of Microsoft's original Troika project. Microsoft will provide the TC with a schema and semantic description of the markup by November 18, 2005, and a schedule for the markup according to the schema by November 28, 2005.

[3] The TC shifted engineers from the prototype implementation project to the validation project to enable the TC to immediately start work on the validation project. The TC intends not only to replace these individuals but also to increase the engineering staff devoted to the

The TC plans to evaluate the network traffic from the same Windows test labs in India that Microsoft planned to use. Use of this data source depends on favorable results from detailed analysis of traffic during both the test run currently underway in India and the next run of the test labs in January. Microsoft has been extremely responsive to the TC's requirements, enabling the gathering of key statistical information during the current test run.[4] Other data sources will probably be used as well, particularly if the protocol coverage from the India test labs data is found to be low or modest. While the precise scope of the plan may need to be adjusted as the TC obtains further information regarding the India test labs, Plaintiffs believe that the TC will be able to ensure that the project achieves the desired validation goal in a reasonable period of time.

*Second*, Microsoft will complete the parser development portion of Troika pursuant to a revised schedule that anticipates final delivery of the parsers to licensees by July 2006 rather than October 2006. Microsoft is in the process of adding significant additional resources and staffing to ensure the success and timely completion of the parser development project. Specifically, Microsoft is adding additional resources to several key areas, including: development and testing for the NetMON engine; development and testing for protocol parsers; and project management and coordination for the NetMON engine and parser development.

Microsoft will deliver protocol parsers to licensees on a rolling basis, with additional parsers becoming available each month pursuant to a detailed schedule. Microsoft will work with

---

prototype implementation project. Additional engineers will be hired for the validation project as well. This will ensure that adequate resources are committed to both aspects of the TC's work, thereby permitting each project to proceed apace.

[4] The ability of the TC to proceed with the data collection and analysis during the next run of the test lab in January 2006 depends on Microsoft's continued cooperation in upgrading the test lab equipment to ensure sufficient and reliable data capture capacity.

the TC to prioritize parser development, subject to technical constraints (e.g., the development of the NetMon engine and ordering dependencies inherent in the protocols themselves). Parsers will be delivered first in a pre-release form, allowing licensees to provide feedback that Microsoft can use to improve the parsers. Microsoft has committed to providing the release version of each parser to MCPP licensees approximately two months after it delivers the pre-release version. Microsoft will begin delivering the pre-release versions to licensees in February 2006, delivering approximately one-quarter of the pre-release parsers to licensees each month until May 2006. In turn, Microsoft will deliver approximately one-quarter of the final parsers to licensees during each month from April 2006 to July 2006. Below is a chart providing details of the rolling release schedule:

| Release Date | Pre-Released Parsers | Final Parsers |
|---|---|---|
| February 2006 | 20 | - |
| March 2006 | 24 | - |
| April 2006 | 21 | 20 |
| May 2006 | 20 | 24 |
| June 2006 | - | 21 |
| July 2006 | - | 20 |

With insight from its past experience, Microsoft is more confident in the milestones set forth in the latest proposal. Moreover, Microsoft believes it has developed an aggressive but realistic approach to generating results from the project incrementally and as soon as possible. The TC's assumption of responsibility for the revised validation project, and the resulting elimination of the technical dependencies between the two projects, will allow Microsoft to increase its focus on developing parsers for licensees (rather than for validation) and will enable

Microsoft to deliver parsers to licensees significantly earlier than would have been possible under the original combined project.[5]   The revised proposal also allows Microsoft to concentrate on incorporating improvements into the technical documentation recommended by the TC and providing those changes to licensees as early as possible.

The process of developing the parsers, which involves use of the technical documentation, also provides an opportunity to obtain information from the parser developers about the technical documentation.  In turn, that information will be used by the Microsoft documentation writers to improve the technical documentation.  In recognition of this, Microsoft and the TC are developing formalized procedures to manage feedback from parser developers.  Microsoft will work with the TC to develop these procedures, train the parser developers appropriately, and ensure that there is a systematic method for parser writers to report issues relating to the technical documentation.  As time in the schedule allows, and as requested by the TC, Microsoft will compare previously developed parser code to the technical documentation in light of these "ground rules" and will submit any resulting issues to the documentation team to improve the documentation.  In addition, Microsoft will work with the TC to determine by the end of December 2005 an appropriate testing methodology for the parsers.

*Third*, Microsoft will increase the resources dedicated to responding to the TC and to making resulting changes to the technical documentation in connection with both the TC's new validation project and the TC's original prototype implementation project.  This increase is required as the scope of the TC's work — and therefore the number of issues discovered by the

---

[5] For example, under the revised plan the parsers will no longer need to include functionality that is specific to supporting the automated validation engine.

TC and submitted to Microsoft — is expected to expand significantly with the TC assuming responsibility for the validation phase of the project.

*Fourth*, subject to the Court's approval, Microsoft will file a monthly report with the Court beginning January 15, 2006 describing: (1) the status of the parser development project; and (2) Microsoft's cooperation with the TC's prototype implementation project and the new TC validation project described above.  Microsoft will consult with Plaintiffs and the TC regarding the format of these reports.[6]

Plaintiffs believe that these four measures greatly increase the likelihood that the two key goals of Troika — delivering parsers to licensees and validating the technical documentation through the use of network traffic — will be achieved in a timely fashion and that licensees will benefit from continued improvements to the documentation.  Plaintiffs will promptly notify the Court if their expectations regarding the substance or the timing of these measures no longer appear practical.

**B.    Categorization of Technical Documentation Issues**

As the parties reported to the Court in the October 19 Status Report, the TC categorizes the technical documentation issues it refers to Microsoft as either high, medium, or low priority. During the October 26 Status Conference, the Court asked whether the parties could provide additional information regarding the "high priority" issues that the TC is reporting to Microsoft as

---

[6] At the last Status Conference, Plaintiffs reported that the TC planned to hire an individual to monitor Microsoft's Troika project.  Because the revised plan described in this report will shift the validation phase from Microsoft to the TC, and further envisions Microsoft submitting monthly progress reports to the Court, Plaintiffs do not believe that it will be necessary for the TC to commit an engineer to monitoring Microsoft's portion of the project on a full-time basis.

a result of its prototype implementation efforts.  The TC categorizes each issue as high, medium, or low priority based on the importance of resolving the issue quickly for the TC's implementation project, as the categorization triggers different time periods for Microsoft's response pursuant to the established service level guidelines ("SLGs").  Most "high priority" issues are situations in which the TC determines either that  (1) the protocol description contains incorrect or missing data values, or (2) the documentation needs additional clarifying or contextual information.  It is important to note that in classifying an issue as "high priority," the TC is indicating its view that the issue must be resolved more quickly, so that the TC can make progress on its prototype project.  However, an MCPP licensee would not necessarily differentiate between high and medium priority issues in the same way; for this reason, a medium priority issue is not necessarily less serious in an absolute sense than a high priority issue. Generally speaking, however, low priority issues are less serious than medium or high priority issues, as the low priority category includes typographical and other errors where the correct answer is fairly clear.[7]

---

[7] By way of clarification of the SLG time periods described in the October 19, 2005 Status Report, the TC allows 3 days after an issue is submitted to Microsoft for Microsoft to assign it internally, regardless of the issue's priority classification.  Microsoft's initial SLG response time, measured from the date the issue is assigned internally, is then 7 days for high priority issues, 14 days for medium priority (not 17 as previously reported), and 32 days for low priority.  Since the Status Conference, the TC and Microsoft have agreed to establish a 14 day SLG for each subsequent response until the issue is resolved and simply awaiting publication, regardless of the issue's priority.  This SLG applies to the TC as well as to Microsoft.

9

### C.     Additional MCPP Licensee Support

Microsoft's development and release of software parsers will provide MCPP licensees with a useful tool to assist in their development work.  To further assist licensees in using the technical documentation, Microsoft will provide each licensee with 500 hours of free premier technical and consulting support for the MCPP protocols.  This added level of support is available at the licensees' discretion and can be used at any time during the term of a licensee's MCPP licensing agreement.  This "free of charge" support expands beyond the documentation correction assistance already available free of charge under MCPP agreements and will include additional information and assistance regarding the protocols described in the technical documentation. This added support will include:

•       Access to a designated technical account manager ("TAM") to serve as a licensee's point of contact for MCPP documentation and protocol questions.  The TAM also will function as the coordinator for all additional protocol support services.

•       Developer support, including advice, guidance, and information regarding issues relating to implementation of the MCPP protocols described in the technical documentation, such as:

    o       Helping licensees understand the contents and structure of the technical documentation.

    o       Providing advice, guidance, and information regarding the operation of MCPP protocols in Windows, including assistance in debugging and verifying the actual operation of MCPP protocols between Windows server and client operating system products.  The TAM also will have access to relevant Microsoft source

10

codes regarding the MCCP protocols in Windows in order to better serve licensees,

o　　Providing assistance in analyzing and verifying the actual operation of MCPP protocols between the licensees' licensed server products and Windows client operating system products.

• 　Facilitating access to other Microsoft technical resources, such as lab facilities and workshops relating to MCPP protocols.

Microsoft will promote the availability of this additional support to existing licensees and potential licensees through its ongoing licensee "evangelism" organization.  Internally, the delivery of this additional MCPP protocol support will take advantage of existing support organization processes and personnel and will be implemented via a special add-on to the usual Partner Advantage agreements used by that organization.

**D.　　Release of Technical Documentation in PDF**

Plaintiffs and Microsoft reported in the last Status Report that final release of the technical documentation in PDF form to licensees was "imminent."  This release in fact took place on October 24.

11

## II.   UPDATE BY MICROSOFT REGARDING ITS INTERNAL COMPLIANCE POLICIES AND PROCEDURES

Microsoft would like to update the Court on the new initiatives it is undertaking to enhance its compliance-related efforts, especially in light of the recent Easy Start CD complaint addressed by the parties and reviewed by the Court during the last Status Conference.  As the Plaintiffs advised the Court, Microsoft's compliance efforts were also a separate topic of discussion at the meeting earlier this month in Redmond.  The new initiatives described below are designed to complement the company's ongoing compliance work.

As context, since 2001 Microsoft has employed a variety of mechanisms to ensure full compliance with the Final Judgments.  These mechanisms fall broadly into five categories: (1) employee training; (2) review and certification of contractual agreements; (3) legal counseling and ongoing review of other business practices relevant to the Final Judgments, including relevant product development decisions; (4) an external website and a confidential and anonymous internal employee hotline for reporting of compliance concerns; and (5) broader periodic evaluations, including by senior management and the company's Board of Directors.

Based on the Court's feedback at the last Status Conference, Microsoft has undertaken several steps to strengthen further its compliance work.  This includes a comprehensive internal review by the Department of Legal and Corporate Affairs ("LCA"), as well as a "fresh look" at the company's compliance procedures by a former high-ranking antitrust official who has not previously been involved in the company's antitrust compliance work.  A number of initial recommendations have emerged, and the company is acting now to implement them.  The company will take additional steps, as appropriate, based on other recommendations that emerge

12

from this review process.  In addition, Microsoft's management reviewed these issues with the
Antitrust Compliance Committee of the Board of Directors on November 1, and it will do so
again at the Committee's meeting scheduled for December 13.

The sections below describe each of the company's current compliance initiatives and new
steps that are being added.

## A.      Employee Training

Microsoft has run a broad employee training program since late 2001, the goal of which is
to educate personnel as to their obligations under the Final Judgments and compliance with the
antitrust laws in general.  The aim of the program is to bring awareness to employees about the
company's obligations under the Final Judgments and help create a sense of personal
responsibility for each employee.  Among other things, the training enables employees to identify
situations in which they should request legal review on a particular matter.

### 1.      *Training for officers and directors*

In accordance with the Final Judgments, all corporate officers and directors at Microsoft
are required to complete annual antitrust compliance training.  The training addresses Microsoft's
obligations under the Final Judgments and, more generally, the antitrust laws.  In addition,
company officers receive annual certification materials that provide a comprehensive overview
and explanation of Microsoft's compliance obligations under the Final Judgments.  New officers
timely receive certification materials and attend one-to-one compliance orientation meetings with
Odell Guyton, a former Assistant U.S. Attorney, who is the Director of Compliance for the
company and is responsible for the company's overall compliance program on all matters
concerning corporate compliance.  Additional in-house Microsoft lawyers are also available, and

at the request of officers, conduct one-to-one training sessions to ensure that all questions and concerns are addressed.  Several officers have requested and received one-to-one training.

### 2. *Broader Training Sessions for Microsoft Personnel*

Microsoft also offers an extensive training program for Microsoft employees who are not officers or directors.  Although this is not an explicit requirement under the Final Judgments, the company concluded early in the implementation process that broad antitrust training is important to heighten employee awareness regarding Microsoft's compliance obligations.  Since November 2001, Microsoft has conducted approximately 580 training sessions worldwide, equivalent to about one training session every other business day.  These sessions have included mandatory training for the organizations whose business affairs principally relate to the Final Judgments.  This includes the entire organization formerly known as the "Windows Platform" division (now part of the "Platform and Services Division" ("PSD")), in addition to the OEM organization.

To date, more than 28,000 attendees have been trained around the globe, including from the United States, Europe, Asia, and Latin America.  In 2005 alone, 7,715 attendees have been trained in 108 separate training sessions.  Additional training sessions are scheduled for the remainder of 2005 and will continue for employees on a worldwide basis throughout the term of the Final Judgments.

Microsoft's senior management has concluded that, in light of a recent company re-organization and the issues discussed at the last Status Conference, similar training sessions should now be provided regularly to other parts of the company's business organizations.  As a result of this re-organization, business groups may have some additional responsibility for marketing or other activities that previously were handled primarily by the Windows Platform and

OEM organizations.  It is therefore important to expand employee training for these groups.

Given these developments, mandatory antitrust training will be rolled out to all new groups under the newly formed PSD division, rather than only the Windows Platform and OEM groups.  Pursuant to a requirement set by Jim Allchin, co-president of the PSD division, this training will include MSN, which is now part of PSD.

In addition, in response to the Microsoft internal corporate restructuring, Entertainment and Devices Division President Robert Bach (who has responsibility for leading the company's digital music strategy) is requiring that all employees of his division attend similar training. Mr. Bach and his direct reports recently participated in this training with Dave Dadoun, a former antitrust attorney at the Federal Trade Commission and currently a senior lawyer in LCA. Mr. Dadoun serves as the Compliance Officer under the Consent Judgment.  The first broader training session for the E&D division is scheduled for December 8, 2005.  Multiple training sessions are scheduled for the E&D and PSD divisions through February.

In addition, Microsoft will continue its practice of offering quarterly training sessions for new employees in the PSD division (which now includes the MSN business unit) and will expand this practice to new E&D employees.  In order to ensure that these training objectives are met, Microsoft's in-house attorneys and compliance officers will receive, on a regular basis, lists of new employees in these divisions so that each new employee receives timely and appropriate notifications about the mandatory training sessions.

**B.      Review and Certification of Contractual Agreements**

To ensure compliance with Sections III.F and G of the Final Judgments, Microsoft commenced an internal compliance certification process in April 2002 called "Consent Decree Compliance Certification" ("CDCC"), which is implemented through an internal tool known as "DealPoint."  The CDCC process requires that the lead business person and lead attorney responsible for each agreement certify the agreement's compliance with the Final Judgments. Contract review and certification is currently mandatory for the entire PSD organization (as it was for the former Windows Platform division).  This process requires that employees take individual responsibility for the company's compliance obligations by evaluating whether an agreement is subject to the company's obligations under the Final Judgments, and then being held accountable for the deal by certifying it is compliant with the Final Judgments.

As an additional step, the company's management has decided that certification in DealPoint now will be required for the newly formed E&D division.  This will ensure that this division's contracts also conform with the CDCC's requirements.

To date, more than 14,000 agreements have been certified through the DealPoint system. At the time DealPoint was created, Microsoft also formed an internal committee that conducts ongoing reviews of a random sample of agreements certified in the DealPoint program.  This mechanism is an additional screen to ensure there are no issues with agreements certified under the program.  It will be applied to the contracts of both the PSD and the E&D divisions.

### C.     Additional Legal Review to Ensure Compliance

In November 2001, after Microsoft entered into a settlement agreement with the DoJ and several states, the company immediately began implementing mechanisms to ensure its compliance with the proposed settlement agreement.  This includes extensive legal oversight of company activity, including the partnering of Microsoft's in-house counsel team with business teams to ensure consistency and timely delivery of advice regarding compliance issues.  In addition, product development decisions that are regulated by the Final Judgments are consolidated and reviewed by senior management, acting with the benefit of legal advice on the company's compliance obligations.

Given the issues discussed at the recent Status Conference, the company's senior management has decided to supplement these steps by developing and implementing a new online checklist that will serve as an additional safeguard for employees in the PSD and E&D organizations to use prior to distributing any external "beta" agreements, or program specifications to a third party.  The checklist is designed to flag for legal review any agreement or program involving the Windows Desktop Operating System (or platform components of Windows, referenced here as "Windows") that concerns third party obligations regarding the use or support of Windows, or that might be construed to restrict support of software that competes with Windows.  This proactive tool will provide additional help for employees in these organizations to identify possible issues and obtain advice of counsel before they surface externally to third parties.  This tool will reach over 20,000 employees within the company.

### D.        Processes for Receiving and Processing Inquiries and Complaints

As required under Section IV.D.3.b of the Final Judgments, Microsoft maintains a website that enables third parties to submit a complaint or inquiry concerning Microsoft's compliance with the Final Judgments (third parties also may submit complaints by mail).  The website was launched under the supervision of Microsoft's Compliance Officer.  Microsoft works with the Plaintiffs to respond to and resolve any substantive inquiries.  Microsoft has received more than 100 matters since launching the website in the summer of 2002, but only five raised any substantive issues under the Final Judgments.  No substantive complaint remains outstanding.

Microsoft also maintains company reporting mechanisms for Microsoft employees and others to confidentially or anonymously report any compliance issues or concerns they may have. These resources are available on a 24-hour-a-day basis and are maintained by Microsoft's Office of Legal Compliance, which publishes and communicates these resources to Microsoft employees through various means.

### E.        Broader Periodic Review by Senior Management and the Board of Directors

Pursuant to the requirements of the States' Final Judgment, Microsoft established an Antitrust Compliance Committee ("ACC") of the corporation's Board of Directors.  The ACC includes three independent directors: Dr. James I. Cash (chairman of the ACC), former James E. Robinson Professor of the Harvard Business School and chairman of Harvard Business School Publishing; Raymond Gilmartin, former chairman, president and CEO of Merck & Co.; and Ann McLaughlin Korologos, former U.S. Secretary of Labor and currently a senior advisor at Benedetto, Garland & Co.

On March 9, 2003, the ACC appointed Odell Guyton to be the Compliance Officer under

the States' Final Judgment.  The Committee also retained as special counsel Lance Liebman, a

professor at the Columbia University School of Law.  The ACC meets regularly with Mr. Guyton,

as well as with Brad Smith, Senior Vice President, General Counsel, Corporate Secretary, and

Chief Compliance Officer for the company.  It also meets regularly with other Microsoft

personnel involved in compliance activities.

The ACC's most recent meeting, which took place in New York on November 1, 2005,

consisted of a seven-hour review of all of the company's antitrust issues, including the issues

discussed at the most recent Status Conference.  In addition to all of the Committee members and

company management, the meeting was attended by two additional independent members of the

company's Board of Directors and a high-ranking former antitrust official who is taking a fresh

look at the company's compliance measures.  The Committee will meet again on December 13, at

which time it will review any additional compliance recommendations from either the company's

internal review or the independent review by the former antitrust official.

The company also established an internal "Regulatory/Legal Review" committee to

monitor compliance of various obligations under the Final Judgments.  The Regulatory/Legal

Review committee provides business oversight and accountability in ensuring that the complex

technical requirements under these provisions are satisfied, in close coordination with LCA.  The

committee consists of senior management in PSD, including participation of division co-president

Jim Allchin and many of his direct reports, and senior leadership within LCA, including Deputy

General Counsel and Vice President, Mary Snapp (lead lawyer for PSD) and Deputy General

Counsel, Dave Heiner (lead lawyer for the Antitrust Group).  In addition, other employees, such

as engineers, may attend as appropriate for any given agenda.  The Regulatory/Legal Review

committee meets once or twice a month to review Microsoft's ongoing compliance with the Final

Judgments and the antitrust and competition laws in general. Among other things, the

Regulatory/Legal Review committee established an "APIscan" tool, which is used by developers

to identify all APIs that must be disclosed in accordance with Section III.D. Under its direction, it

also established mechanisms to ensure that all required protocols are identified and made available

in accordance with the terms of Section III.E.

Under the direction of co-President Jim Allchin, Microsoft has developed additional

engineering processes and tools to further ensure compliance under the Final Judgments.  These

processes and tools ensure that new releases of Windows remain compliant with the company's

obligations under the Final Judgments.  These tools are required to be used broadly by engineers

in the PSD organization that are responsible for the engineering, development, and release of

Windows.  In addition, a business unit of approximately fifty staff within PSD is devoted to

working on compliance with the Final Judgments.  This unit is comprised of business managers,

engineers, and documentation specialists that work closely with LCA on a daily basis to educate

employees and monitor engineering practices.  Among other things, this unit has expertise in the

protocol licensing and API disclosure requirements and is closely involved in resolving issues with

the TC and other compliance matters.

LCA has additional processes to ensure the company remains in full compliance with the

Final Judgments. First, LCA is closely aligned with the business teams across organizations. This

partnership ensures that from the top down LCA works in concert with the business and provides

appropriate legal review of matters on an ongoing basis.  Second, the Antitrust Group is

comprised of seven full-time lawyers who devote their time exclusively to antitrust compliance

matters.  The Antitrust Group works closely with other lawyers within LCA (as well as with

business leaders), worldwide, in providing ongoing legal review and advice to ensure compliance

with the Final Judgments and antitrust laws.  Taken together, the business and legal teams form a

robust compliance review network that provides broad coverage with respect to ongoing

monitoring of the company's obligations under the Final Judgments.

November 18, 2005

Respectfully submitted,

FOR THE STATES OF NEW YORK,  
OHIO, ILLINOIS, KENTUCKY,  
LOUISIANA, MARYLAND, MICHIGAN  
NORTH CAROLINA, AND WISCONSIN

FOR THE UNITED STATES  
DEPARTMENT OF JUSTICE'S  
ANTITRUST DIVISION

_____

ELIOT SPITZER  
*Attorney General of New York*  
JAY L. HIMES  
*Chief, Antitrust Bureau*  
*Assistant Attorney General*  
120 Broadway  
New York, New York 10271  
212/416-6229

_____

RENATA B. HESSE  
PATRICIA A. BRINK  
PHILIP A. GIORDANO  
AARON D. HOAG  
ADAM T. SEVERT  
*Trial Attorneys*  
U.S. Department of Justice  
Antitrust Division  
600 E Street, N.W.  
Suite 9500  
Washington, D.C. 20530  
202/514-8276

21

FOR THE STATES OF CALIFORNIA,
CONNECTICUT, IOWA, KANSAS,
FLORIDA, MASSACHUSETTS, MINNESOTA,
UTAH, AND THE DISTRICT OF COLUMBIA

_____

KATHLEEN FOOTE
*Senior Assistant Attorney General*
Office of the Attorney General of California
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94102-3664
415/703-5555

FOR DEFENDANT MICROSOFT
CORPORATION

BRADFORD L. SMITH
MARY SNAPP
DAVID A. HEINER, JR.
Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052
425/936-8080

_____

CHARLES F. RULE
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania, Avenue, N.W.
Washington, DC 20004
202/639-7300

STEVE L. HOLLEY
RICHARD C. PEPPERMAN II
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
212/558-4000

*Counsel for Defendant*
*Microsoft Corporation*