UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .

        Plaintiff,          .

                    .  CA No. 98-1232 (CKK)

    v.          .  Washington, D.C.

                    .  Tuesday, June 26, 2007

MICROSOFT CORPORATION,          .  10:35 a.m.

        Defendant.          .

. . . . . . . . . . . . . . .

STATE OF NEW YORK, et al.,

        Plaintiffs,

                      CA No. 98-1233 (CKK)

    v.

MICROSOFT CORPORATION.



        Defendant.


. . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Department of Justice:   AARON D. HOAG, ESQ.
                             U.S. Department of Justice
                             600 E Street, NW
                             Suite 9300
                             Washington, D.C. 20530
                             202-616-0944


APPEARANCES con't. on next page.

APPEARANCES, con't.


For Microsoft:                    CHARLES F. RULE, ESQ.
                                  JONATHAN S. KANTER, ESQ.
                                  Cadwalader, Wickersham & Taft LLP
                                  1201 F Street, NW
                                  Washington, D.C.  20004
                                  202-862-2400

For the New York Group:           JAY L. HIMES, ESQ.
                                  Bureau Chief, Antitrust Bureau
                                  State of New York
                                  Office of the Attorney General
                                  120 Broadway
                                  New York, New York  10271-0332
                                  212-416-8282

For the New York Group:           ELLEN S. COOPER, ESQ.
                                  Assistant Attorney General
                                  Chief, Antitrust Division
                                  Office of the Attorney General
                                  200 St. Paul Place
                                  Baltimore, Maryland  21202
                                  410-576-6470

For the California Group:         STEPHEN HOUCK, ESQ.
                                  Menaker & Herrmann LLP
                                  10 E. 40th Street
                                  New York, New York  10016

For the California Group:         CRAIG FARRINGER, ESQ. (California)
                                  LAYNE LINDEBAK, ESQ. (Iowa)



Court Reporter:                   JACQUELINE M. SULLIVAN, RPR
                                  Official Court Reporter
                                  U.S. Courthouse, Room 6818
                                  333 Constitution Avenue, NW
                                  Washington, D.C. 20001
                                  202-354-3187


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

```
1                    P R O C E E D I N G S
2         THE COURT:  Good morning, everyone.
3         COURTROOM DEPUTY:  Civil case 98-1232, the United
4    States of America versus Microsoft Corporation, and civil case
5    98-1233, State of New York, et al, versus Microsoft Corporation.
6         Counsel, would you please come forward and identify
7    yourself for the record?
8         MR. HOAG:  Good morning, your Honor.  Aaron Hoag for
9    the United States.  With me at counsel table is James Terney.
10         MR. HIMES:  Jay Himes for the New York Group, and
11    Ellen Cooper as well.
12         MR. HOUCK:  Steve Houck for the California Group.
13    Kathleen Foote from the California attorney general's office,
14    and Layne Lindebak from the Iowa attorney general's office.
15    Also present in the courtroom are Craig Farringer, Don Reznicop,
16    and Susan Fond from the D.C. attorney general's office, and
17    Jessie Kaplan from the Massachusetts attorney general's office,
18    and finally Kristen Olson from the Minnesota attorney general's
19    office.
20         MR. RULE:  Good morning, your Honor.
21         THE COURT:  Good morning.
22         MR. RULE:  Rick Rule, Cadwalader, Wickersham & Taft,
23    representing Microsoft.  With me today at counsel's table is
24    Jonathan Kanter from my firm, also Dave Hiner, vice president
25    and deputy general counsel at Microsoft.  Kevin Keogh, senior
```

1    attorney at Microsoft, and as is our custom now, Bob Muglia, who

2    is senior VP, service and tools division at Microsoft.

3         THE COURT:  All right.  When we were last in court on

4    March 13th, and that was for an interim compliance status

5    conference in the two cases, the United States and then the

6    states, this is one of our full status hearings on compliance.

7    I would note that this November that's approaching there will be

8    final judgment expirations on some of the sections, although not

9    on one of them, so we're now moving towards the end in terms of

10   making sure that we've covered everything.  Section 3(e) is the

11   one that has been extended and has become the focus of the

12   parties and the source of most of the issues for the last

13   hearings.  Microsoft, as I've indicated in the last two

14   hearings, is implementing a broad reset plan to rewrite the

15   technical documentation under the direction of Bob Muglia.

16        Following the March hearing there were two

17   supplemental reports that Microsoft filed, one in April and one

18   in May, and then of course the joint status report which I

19   request.  The parties' joint status report details new

20   developments, particularly with respect to, and this has been

21   the focus, 3(e), which is the communication protocols and

22   technical documentation, 3(c), which is Middlewear and Vista,

23   3(d) was the APIs, and 3(h), which is defaults.  Although the

24   other sections are continued to be monitored, A, B, and G, we

25   don't seem to have any matters relating to those sections to

1    report at present.  When I talk about the TC, I'm talking about

2    the technical committee, and that includes Mr. Hunt, so it

3    should be a combination.

4            Several issues were left from the last status.  Among

5    others, one to ensure that the audit process that was conducted

6    by Microsoft to ensure that all the necessary protocols are

7    included in the MCPP, steps were going to be taken by the

8    technical committee in that regard, and they have, to make sure

9    that this audit process actually encompassed everything, and I

10   believe one additional protocol was identified by Microsoft.

11   Whether Microsoft is devoting sufficient resources to the

12   process, particularly the rewrite of the technical

13   documentation, I want to hear from the plaintiffs on this.  I

14   don't see any complaints in the status report.  I don't know

15   whether that means that they're satisfied at this point.  The

16   California Group was going to survey the MCPP licensees as to

17   various issues that related to compliance with the final

18   judgment.  They've done some of that and I understand there will

19   be further information will be provided along the way.  There

20   was also one major complaint that was being reviewed, and that

21   is addressed in the report.

22           So it's been my practice, I'll briefly go over the

23   issues in the status report, any questions I have, and then call

24   on the parties to either add, correct, or answer either my

25   summary or my questions.  I'll start with what has been the

1    focus for quite some time now, which is 3(e), the communications

2    protocol licensing and really the technical documentation, and

3    in terms of I'm going to focus strictly on what steps have been

4    taken and that are reflected in the joint status report, so I

5    won't go back over the old ones.  The reset project seems to be

6    proceeding according to the schedule.  Microsoft has timely

7    delivered the initial availability documents for milestones one,

8    two, three, and four, as well as the Longhorn milestone, and

9    they expect to produce the initial availability documents for

10   milestone five on schedule, which would be July 20th, and the

11   online bill for the Longhorn milestone and milestones four and

12   five on July 3rd, August 10th, and September 28th respectively.

13   Microsoft plans to add one additional Longhorn server protocol

14   and to produce the initial availability documentation for that

15   protocol with the milestone for online bill release and the on-

16   line bill for the new protocol with the milestone five online

17   billed release, so in essence they're moving along in a timely

18   fashion.

19          Microsoft has also continued to work on providing the

20   TC with an XML markup of the technical documentation to be used

21   in connection with the TC's testing efforts.  In the April 16th

22   report Microsoft reported that the technical committee had

23   identified errors in Microsoft's initial XML markups, and I'd

24   ask Microsoft to make those corrections.  Microsoft now reports

25   that it's made considerable progress in revising the XML markup,

1    has resolved nearly all of the outstanding issues and will

2    continue to modify the XML markup as the TC's testing work moves

3    forward.

4              Plaintiffs report they're encouraged by the quality of

5    the new documents.  The TC has completed its initial review of

6    the quality of milestones three and four documents as well as

7    the Longhorn milestone documents and has found that Microsoft is

8    maintaining the quality levels it had achieved with the

9    milestone two documents.  Plaintiffs still continue to note,

10   however, that it won't be possible to draw any final conclusions

11   about the quality of the rewritten documents until significant

12   additional testing is completed, but evidently they're

13   encouraged and Microsoft evidently has been able to keep up with

14   the flow of the new TDIs being filed by the TC, and the

15   plaintiffs attributed this to an improvement in the quality of

16   the reset documentation over the old one and so the TDIs against

17   the new documents are evidently less complex and easier to

18   resolve, and second, an improvement in Microsoft's process for

19   handling the TDIs.

20             As noted last time, the parties reached an agreement

21   to address the plaintiffs' concerns regarding the delays and the

22   rewrite project schedule.  And the agreement included two

23   components.  They've now begun to implement that.  Plaintiffs

24   reported back in March that the TC and Mr. Hunt would conduct a

25   review of Microsoft's MCPP audit in order to determine whether

1   all the protocols are included.  They decided if the TC

2   determined that additional steps were necessary to ensure that

3   all required protocols were included, Microsoft, the plaintiffs,

4   and the TC would discuss the results of the report and its

5   recommendation.  In addition, plaintiffs and Microsoft agreed

6   that the TC will be able to testify in court in any enforcement

7   proceeding relating to this work, even though the final judgment

8   prohibits such testimony.  Since that status conference the TC

9   has retained two consulting firms.  One was to review the

10  Microsoft MCPP audit process, and we would be expecting to hear

11  the findings in the next joint status report.  I would like to

12  know when that is likely to occur.  In addition, the TC has

13  retained the second consulting firm to develop methods for

14  searching Windows source code to identify communications

15  protocols that should have been considered for inclusion in the

16  MCPP, and then I'll compare that with the list generated by

17  these methods, which the list that Microsoft has developed, and

18  that seems to be the way that you're going to doublecheck to

19  make sure that we've included everything in it.

20          Plaintiff also had reported the last time that they

21  had agreed to a potential extension of the royalty holiday, so

22  if ultimately after this audit process plaintiffs determine in

23  their sole discretion that the Longhorn milestone documentation

24  is not substantially complete, then the previously agreed to

25  royalty holiday will be extended by eighteen months for all the

MCPP licensees.  If the plaintiffs determine that the complete set of revised technical documentation is not substantially complete, then the royalty holiday will be extended by three years for all licensees, and so before that they make a decision about whether they're complete or not they'll have some discussions and they'll see if they can resolve this, but certainly the audits I think, which should be helpful in that regard.

In terms of the TC's prototype implementation activity, they're continuing to use the rewritten documentation in their prototype implementation activity.  They're reporting new TDIs following that priority level system that we had set out in the earlier report.  Currently there's a total of 182 TDIs that are outstanding, 44 of which were self-identified by Microsoft.  Of these 28 are priority one TDIs.

In terms of testing and validation, Microsoft continues to address the TDIs in the old documentation as part of the process of rewriting the technical documentation, and it's also reviewing the online bill documentation from each milestone to ensure that the previously existing TDIs are addressed in the new documents.  Microsoft has now closed all of the old TDIs addressed by milestone one and milestone two documentation and has proposed resolution for all of the outstanding TDIs that were addressed in the milestone three documentation.  And as I understand it, the TC is reviewing this

1    at this point in terms of these resolutions.  According to

2    Microsoft the total number of outstanding old TDIs has continued

3    to drop as anticipated.

4         Microsoft has also completed its development of a

5    preliminary cluster of test suites by the target date of March

6    31st.  It's continuing its work to release additional test

7    clusters on a quarterly basis.  The next one should come out at

8    the end of June, so I assume sometime this week if it hasn't

9    already come out.  Microsoft has continued with the interoff

10   mobility lab, plugfast events.  Evidently the file server

11   protocols plugfast took place in April/May.  Feedback evidently

12   was of a positive nature.  And there are additional ones that

13   will be considered.

14        In terms of other updates, the MCPP status, Microsoft

15   reports that there are 41 companies licensing communications

16   protocols pursuant to 3(e), two additional ones since the report

17   have executed royalty bearing MCPP licenses, bringing the total

18   number of licensing requirements to 29.  They're also continuing

19   to try and engage other prospective licensees.  Four other

20   companies have taken advantage of the royalty-free protocol

21   license offered on MSDN, bringing that total to twelve.  A total

22   of thirteen licensees are shipping products under the MCPP.

23   Nine licensees have signed up with Microsoft to receive free

24   technical account manager support and five have signed up for

25   Windows source code access at no additional charge, and then

1    finally, twelve have signed the Longhorn server development

2    agreement.

3            The California Group, which we had discussed last time

4    we were here, has done a survey of the MCPP licensees, and that

5    was prompted by some of the questions I had at both of the

6    December and the March conferences, and the California Group

7    sent interrogatories to the MCPP licensees in order to get

8    answers to the Court's questions as well as some other

9    information about the MCPP.  I understand the majority of the

10   licensees have responded, and that the California Group intends

11   to submit an additional report in a few months that will

12   evaluate the intended remedial effect of the final judgment in

13   terms of whether, to the extent that we can, see whether the

14   goals have been accomplished in section 3(e).  In this report

15   they provide the following information relating to the issues

16   raised during the previous status conference:

17           On the interim operability lab I had a question as to

18   why it wasn't being particularly used.  Plaintiffs believe that

19   the lab appears to present its highest value to a licensee at

20   this stage and develop when the MCPP using product is ready for

21   evaluation testing and due to this window ongoing access of the

22   lab to licensee remains a useful feature even though it doesn't

23   seem to have been used as often as we had thought.  A new

24   licensee standstill as we sort of noted.  Three additional

25   licenses have been executed in 2007 all for the proxy slash

firewall task.  Plaintiffs believe this development is likely
due to the evangelism in regard to this work and the fully
paid-up royalty structure that's available only for that
particular task.  The shipping product standstill, 13 out of the
29 total licensees have shipped products under the MCPP and the
California Group survey elicited three distinct reasons as to
why others haven't shipped products.  Two licensees have only
executed the licensees recently.  They haven't had time to
develop the product.  Three have executed the licenses only for
research or review so the product development was not their
purpose, and three have decided that the business need hasn't
been sufficient to justify development of an MCPP product.

There were a couple of additional observations from
the survey.  Plaintiffs report that the observe pattern of tasks
for which licenses have been signed remains concentrated largely
the same set as reported back in January 2004.  In addition,
plaintiffs report that of the six general server licensees three
have shipped or are developing products, two have accessed the
technical documentation, and one is no longer in business.  As
to the remaining limited purpose task licensees, it appears to
the California Group that the products being developed remain
relatively narrow in functionality.  Six of the licensing
describe their MCPP products as competitors with limited
features built into Windows servers, while nine describe their
products as compliments to Windows server operating system.

1    I think this was useful information and I appreciate

2  it and I'd be interested to see the next stage of that.  I have

3  just a couple of questions in this regard.

4    Have all of the details been worked out regarding the

5  changes to basically the version of milestone one documents?

6  There were some issues related to that.  It looks like milestone

7  two and the others are moving forward, but have the changes been

8  retroactively applied to the milestone one documents and are the

9  plaintiffs satisfied with that?  Based on the parties' report it

10  appears that the rewrite project has thus far been successful on

11  two fronts.  In terms of judging the quality of the rewritten

12  documents because the new products are resolving the majority of

13  the old TDIs and the new TDIs seem to be less complex, so am I

14  correct that that is a correct, you know, is that observation

15  consistent with what the plaintiffs think?  In terms of the new

16  TDIs, 182 have been identified.  Are you satisfied with that

17  number or is that too high, is that reasonable, and what's to be

18  expected in Microsoft's response?  And does it show that the

19  quality has improved?  Is there any relationship there?  And are

20  plaintiffs satisfied with Microsoft's explanation of how the on-

21  line bill documents resolved the TDIs raised by the old

22  documentation?  Was the TC given a chance to review the

23  preliminary cluster of tests developed by Microsoft?  What's the

24  plaintiffs' and the TC's reaction to these preliminary ones and

25  are they satisfied with the current approach?  Do the plaintiffs

1    have any additional conclusions relating to the California

2    group's survey, and I'd be interested in terms of how you plan

3    on going forward with that or how you plan on capturing some of

4    the data, and what was the reaction of the licensees that

5    participated in the interoperability lab during the first week

6    of June?  Microsoft had indicated that they were getting a

7    positive feedback, but I think some of the people from the

8    plaintiffs' representative went, and I'd be interested in terms

9    of what their assessment was.  Also, I take it Microsoft has

10   indicated what resources have been devoted to these tasks.  I

11   didn't see anything in the report that was a complaint about the

12   staffing levels, so I'd be curious to know from the plaintiffs

13   as to whether they see their resources maintaining at the levels

14   that they should, decreasing, increasing, you know, however that

15   is worked, and then I can hear from Mr. Muglia has anything he

16   wants to add in terms of what I've discussed.

17           In terms of moving to 3(c), which is the competing

18   Middlewear, plaintiffs continue to monitor the developments

19   regarding Vista and the TC and Microsoft are both working to

20   ensure that Middlewear ISVs achieve Vista readiness.  Plaintiffs

21   report that the TC has recently focused its efforts on meeting

22   with a range of third-party Middlewear ISVs to demonstrate the

23   tools that the TC has developed that can assist the ISVs in

24   properly registering their products and Vista.  The TC also

25   provides assistance with any default programs interface problems

1    that the ISVs are having, so that has turned out to be very

2    helpful.  And evidently the Middlewear companies have uniformly

3    reported that these meetings have been very productive and the

4    TC has observed a marked improvement in the manner in which

5    these firms' products register for the default mechanisms in

6    Vista so obviously this has been a good accomplishment.

7              In light of the impending expiration of the relevant

8    portions of the final judgment, the TC has identified a number

9    of remaining Middlewear-related bugs and requests that Microsoft

10   address these issues before November.  Microsoft is committed to

11   fix these bugs sufficiently in advance of the expiration of

12   those relevant portions of the final judgment so that the TC can

13   actually test the fixes and be able to decide in a timely manner

14   whether there is still any remaining issues or not that

15   Microsoft needs to address or the Court.

16             Also importantly, plaintiffs report that the TC has

17   begun a series of discussions with Microsoft relating to the

18   transition of the TC's testing methods and tools on the

19   expiration of the Middlewear-related portions of the final

20   judgment.  And I would agree that with the plaintiffs that from

21   Microsoft needs to continue to apply the Middlewear-related

22   principles embodied in the final judgment after its expiration,

23   so it's important that Microsoft internalize the methods and

24   tests that the TC has actually developed over the past five

25   years.  Otherwise that work is going to be lost, and I

understand that there has been a dialogue that has started to

achieve that goal, and I think that's very important.  So I'd

like to have you address the goal of internalizing these methods

and tests that the TC has developed.

In addition, Microsoft reports that it's been working

cooperatively to address a number of changes requested by the TC

concerning Windows XP, the OEM installation kit, and other

Microsoft applications that Microsoft and the TS have been

meeting on a weekly basis to address all of these and try to

resolve them.  They've resolved evidently a number of them on

the OEM preinstallation kit and hope to resolve the rest in the

coming weeks.

Finally, Microsoft reports that it has agreed to make

changes to Windows XP, to Middlewear products, and the Windows

live messenger, and these changes will be available for review

by the TC and eventually released to the public, and I want to

make sure that all of these things get done so that we have

enough time to see that they're done, you're tested, you're

satisfied, and, you know, that it expires with everybody feeling

that this work has been done since we're coming near the end.

Does Microsoft have an estimate for when it expects to

begin or complete its resolution of the additional

Middlewear-related bugs that the TC has identified, are

plaintiffs satisfied that we're moving along and we will have

all of these questions answered before the expiration of the

relevant portions of the final judgment, anything further to add on that?

The next section is about complaints.  There were two that were brought up at the last hearing.  In the previous status report plaintiffs indicated they had received reports and testimony of a class action.  Plaintiffs' expert, and I don't know whether it's C-o-m-e-s, I assume it's Comes versus Microsoft Corporation, which was in the Iowa district court, and that contained allegations that Microsoft has failed to disclose certain APIs as required by Section 3(d) of the final judgment. And plaintiffs were going to look into it, review the material with the expert and consider it.  Plaintiffs now report, and I'm assuming that's both sets of plaintiffs, that after examining the materials and meeting with the expert that plaintiffs and the TC have concluded that at this time there's no evidence that Microsoft has not fully disclosed the APIs required by the final judgment.  Plaintiffs have left the door open, as I understand it, if further evidence comes to light that they want to provide them, but at least at this point it appears, and I'm assuming, as I said, that it's both.

Now, in addition, plaintiffs previously reported without indicating the complainant that they were investigating a Middlewear-related complaint.  That complaint was filed by Google and relates to the desktop search functionality in Windows, Windows Vista, that enables users to search for files

1    located on their computer.  It's referred to as instant search

2    in Microsoft's promotional materials.  Plaintiffs report that

3    Google's complaint contends that this desktop search is a new,

4    quote, Microsoft Middlewear product, unquote, under the final

5    judgment and therefore certain things would have to be done, and

6    that Microsoft has violated the final judgment by failing to

7    adhere to the requirements of Section 3(c) and Section 3(h), as

8    it pertains to this new Microsoft Middlewear product.

9    Plaintiffs report that after completing their investigation of

10   Google's complaint they worked together to reach an agreement

11   with Microsoft with the goal of promoting user and OEM choice

12   for desktop search in Vista.  Plaintiffs report that they were

13   unable to agree among themselves evidently on whether these

14   enhancements to existing desktop search functionality merely

15   upgraded existing functionality or rather convert desktop search

16   into a functionality first licensed after entry of the final

17   judgment which would mean the final judgment wouldn't apply to

18   it.  The plaintiffs have pointed out that it was not necessary

19   for them to reach a joint resolution of the question of whether

20   there was or was not a violation as to whether the desktop

21   search is a new Microsoft Middlewear product to negotiate the

22   agreement that evidently has been reached, and as I understand

23   it the plaintiffs collectively, I believe is the language that

24   was used, is satisfied that the agreement will resolve any

25   issues concerning Google's complaint pursuant to the final

1   judgment provided that Microsoft implements it as promised, and

2   as I understand the agreement as stated in the report, Microsoft

3   will create a mechanism for end users and OEMs to select a

4   default program to handle desktop search.  ISVs will be able to

5   register their desktop search products for this default in the

6   same way that they can register third party web browsers and

7   media players as the default in Windows today.  The default

8   desktop search program will be launched whenever Windows

9   launches a new top-level window to provide search results.  It

10  will include an existing location on the start menu that the

11  user can select to display additional search results in a new

12  window.  Windows Vista also includes search boxes located in the

13  upper right-hand corner of various windows in the operating

14  system.  In these windows when a user enters a query the search

15  results will continue to be displaced using the internal Vista

16  desktop search functionality.  However, Microsoft has agreed to

17  add a link that if clicked will launch the default desktop

18  search program and display results from that program.

19          Now, and as I understand it, Microsoft will inform

20  ISVs, OEM, end users, that the desktop search index in Vista is

21  designed to run in the background and cede precedence over

22  computing resources over to any other software product and will

23  emphasize that there's no technical reason by OEMs and end users

24  can't if they want to install additional desktop search products

25  on their system and Microsoft will provide technical information

that will enable other desktop search companies to design their products to optimize their priorities on the computer and minimize any impact on performance.  Microsoft will deliver, it wasn't totally clear to me whether this was part of the agreement, but Microsoft will deliver the required changes in a service pack one of Windows Vista currently anticipates it in beta form by the end of the year.

Now, let me just indicate that the day before the hearing Google filed a motion for leave to file an Amici brief, as I understand it in the Amici brief they've indicated that the plaintiffs don't oppose the Court's granting the filing of the brief.  It indicated the defendants opposed it.  Defense did file an opposition last night.  I'm assuming that Google will respond.  I'll rule on this once it's fully briefed.  Since it came in at the eleventh hour frankly I focused more on what we have in front of us.  Google seemingly relies on the description of the resolution in the status report.  Obviously that's not a detailed technical description.  It's provided for the Court, and they also seem to be concerned about the nature of the resolution and its implementation.  I will say this much, I mean, the plaintiffs as far as I'm concerned stand in the shoes of the consumer so those are the ones that are protecting the interests in this particular case, and the focus of the suit is the consumer's interest.  Google is not a party in this case and the mechanism that has been set up for third-party complaints is

1    to bring them to the attention of the plaintiffs who have as

2    resources the TC and Mr. Hunt, so with that they evidently, the

3    plaintiffs and Microsoft without resolving whether there's a

4    violation reached a resolution of the complaint, which is

5    collectively, as I understand, satisfies the plaintiff.  I mean,

6    the Court relies on all of these issues on the plaintiffs to

7    bring to the Court's attention any enforcement issues in this

8    case.  This has been resolved without having to litigate and

9    therefore it hasn't been presented that way, so presumably,

10   however, Google as the complainant will be told in greater

11   detail the exact nature of the resolution and will not have to

12   rely on the status report.  If it hasn't already been provided

13   this information I'm assuming it will be forthcoming and there

14   will be an opportunity to discuss it with plaintiffs, the

15   technical people that are available to the plaintiffs, and any

16   of the people that are with Microsoft.  Whether the resolution

17   agreed to needs to be monitored in the future to ensure its

18   intended effect and implementation I think is an issue for the

19   plaintiffs to consider and to advise the Court if they deem it

20   appropriate and necessary, and in all likelihood with the

21   approaching end of November and the expiration of 3(c) and (h)

22   in the final judgment I probably will have I think at least two

23   other sessions in court to make sure that this is moving along

24   the way it should, both in terms of the technical documentation

25   but also in terms of the other sections, so frankly there will

1   be opportunities for the plaintiffs to, you know, take a look at
2   it, but I do rely on the plaintiffs as the representative of the
3   consumers to present matters to me.
4        There have been various other complainants that have
5   been received by the U.S.  Fourteen out of the fifteen were
6   nonsubstantive, didn't raise issues regarding Microsoft's
7   complainant, and one which we've talked about as the Google
8   complaint.  In terms of the New York and the California groups,
9   they don't believe that they've received any ones that have not
10  already been reported, so I guess the question I have is, you
11  know, are the plaintiffs collectively satisfied with the way
12  this has been resolved in terms of focusing on how to resolve it
13  and not litigating it, but the resolution is what I'm talking
14  about, and so anything that you want to raise about that I think
15  would be appropriate.
16       There's a compliance report in terms of Microsoft
17  indicating what the compliance officers have continued to ensure
18  relating to training for newly-appointed officers' and
19  directors' annual briefings on the requirements and that they
20  keep compliance-related records are maintained.
21       I will set dates for the next status hearings in light
22  of the expiration since most of it's going to be the final
23  judgment unless I hear otherwise, except for the one section.  I
24  probably would do it, and we'll talk about this at the end, I
25  probably will do it sometime in early September and then early

1    November I think are probably times to make sure, I want to make

2    sure that some of the issues that need to be resolved get sent

3    to the plaintiffs, the TC, Mr. Hunt, in enough time to be able

4    to have them review and come back and tell me if there are any

5    issues or if there's any need to, you know, extend in any way

6    the final judgment on these sections, so I've set out what I

7    have, so let me hear from the federal.  If I've misstated

8    anything let me know.  If you want to add anything I'd

9    appreciate hearing from you on any of the questions I've asked

10   or anything additional you want to bring to my attention.  I'll

11   start with the federal.

12            MR. HOAG:  Thank you, your Honor.  I don't have

13   anything to add to what you have so accurately summarized to

14   what we put in our joint status report.  Rather I think I'll

15   just try to answer hopefully at least a number of the questions

16   that you raised starting with the materials related to 3(e) and

17   communications protocols which is where you started.

18            The first question you asked I think at the very

19   beginning is whether the plaintiffs are satisfied that the

20   resources that the complainants are devoting to compliance with

21   3(e) are in fact adequate to the tasks that they have

22   undertaken, and I think, as your Honor said at the last status

23   conference, we'll judge the adequacy of their resources by

24   whether they're actually achieving success or not.  All the

25   things going on the reset project and their ability to handle

1   new technical documentation issues seem to be going relatively

2   smoothly, so at this point in time I think that's how we're

3   going to judge whether they're applying enough resources to the

4   matter or not.

5           THE COURT:  All right.

6           MR. HOAG:  Your Honor asked about the timing for the

7   report that the technical committee is conducting on the audit.

8   They're going back to look at the audit that Microsoft conducted

9   and see whether it was done in an adequate fashion.  They've

10  retained the consulting companies that are going to assist them

11  in doing that and hope to be able to report back by the time of

12  the next status conference.  If it's in early September that

13  might be a little tight so I don't know if they'll be quite

14  finished yet with their review or whether they'll be just

15  approaching the end, but I think it will be roughly around that

16  time period.

17          THE COURT:  If we could persuade them to do it for

18  that time that would be very helpful.

19          MR. HOAG:  I think it would be very helpful and we'll

20  certainly make every effort to provide that information at that

21  point in time and work together with Microsoft to complete it in

22  that time.

23          THE COURT:  I prefer, it would be very helpful to get

24  it then because even though I get reports in the meantime I

25  don't want to leave it to November.  I'll do something in early

1    November.  I don't want to have it come up at that point.  I'd

2    rather have some sense, particularly if it turns out you think

3    something is missing.  We need to deal with that pretty shortly.

4         MR. HOAG:  Absolutely, and we want to deal with it

5    obviously as soon as possible because this project for the reset

6    is rapidly approaching its conclusion of the overall rewrite of

7    the documentation, so obviously we want to find out quickly if

8    there's anything missing from that.

9         Your Honor asked whether all the details have been

10   worked out regarding the changes to the templates back in the

11   original documentation.  For when it was rewritten there were a

12   number of issues we had identified in some of our status reports

13   and they all in fact have been worked out and my understanding

14   is that one of them has been worked out so that everyone's

15   agreed what has to be done.  It's a matter of I think there's

16   one thing that's still being actually completed, but there's the

17   full agreement as to what needs to be done in order to address

18   those changes and go back and apply them to the old

19   documentation.

20        Just discussing the overall success of the technical

21   documentation rewrite project, I think you've correctly

22   identified what we view as sort of the two of the main criteria

23   for assessing the success of this project, which is whether it's

24   resolving the old documentation issues and whether the new

25   technical documentation issues that are being discovered are

1    less complex and more easily able to be solved, and certainly

2    appears that at this point in time I think both those things are

3    true.  They're closing down the old issues, the TC has an

4    opportunity to review those issues before they're actually

5    closed with respect to the old documentation and the new

6    technical documentation issues they've been able to keep up with

7    the quantity that we're discovering and I don't think anyone

8    expected that no new issues were not going to be discovered.

9    That would not have been realistic for a project of such

10   complexity, but the fact that they're able to keep up and close

11   those issues going over time I think is definitely an

12   encouraging sign, so we're cautiously optimistic on that front.

13           The TC did have a chance to look at the test suite

14   project that Microsoft has undertaken in the first cluster that

15   they've made available, and that project seems to be, I think it

16   looks like it's going to be actually quite useful for licensees

17   as another test on the overall quality and accuracy of the

18   documentation, so they're encouraged by that and look forward to

19   Microsoft continuing that task, which it's a significant task so

20   it's certainly going to take some time, but the end results I

21   think are going to be valuable in improving the documentation.

22   I don't have any other observations on 3(e).  I don't know if

23   your Honor had any particular other questions on 3(e) matters

24   that you wanted to address to the United States.

25           THE COURT:  I guess did you have any comments about

1    the California Group survey?

2              MR. HOAG:  No.  I think it collects together a lot of

3    information that we've heard perhaps anecdotally or one at a

4    time and puts it together so to that extent it's helpful.  We

5    haven't drawn any conclusions from it as to any, you know, the

6    overall efficacy of the program, and we'll look forward to

7    seeing what the California Group has to say about that in the

8    filing they've discussed in a month or two from now, so I think

9    we'll probably set forth the more full answer when we have a

10   chance to see what conclusions they might have drawn.

11             THE COURT:  I guess we'll move on to the next one.

12             MR. HOAG:  That's all I had on 3(e).

13             On Middlewear-related matters, we completely agree

14   that it's very important that Microsoft has committed to

15   continue to apply the principles of the final judgment with

16   respect to Middlewear going forward even after the expiration of

17   these provisions, and in order for that to be a success we

18   really think it is critical that they take advantage of both

19   learning that the TC and Mr. Hunt have developed over the past

20   several years relating to Middlewear.  They've developed a

21   number of tools that we've discussed from time to time.  They

22   have large sets of test suites and test cases that they run

23   against all the products and for it to fully bear fruit it will

24   be important that all that knowledge is transitioned over to

25   Microsoft and that they sort of incorporate it into their normal

1    business operating procedures, so we're very hopeful that those

2    discussions are going to be productive.  I know they're taking

3    it quite seriously and there will be many future meetings on

4    this very subject over the next several months before the decree

5    expires with respect to the Middlewear provisions.

6              THE COURT:  Is the something that can be done before

7    the expiration on 3(c)?

8              MR. HOAG:  I think most of it can.  I think that, I

9    mean, the TC is still going to be around, so to the extent that

10   Microsoft has questions certainly the TC members will still have

11   a lot of that knowledge, but I think the goal is to transfer all

12   of that expertise, all the tools that the TC uses and the

13   knowledge that they've developed before the decree actually

14   expires, and I think that's assuming that Microsoft is

15   cooperative, which they've been so far, that that's a very

16   achievable goal.

17             THE COURT:  Okay.

18             MR. HOAG:  Your Honor pointed out that there are a

19   number of sort of bugs relating to XP that are still -- that are

20   outstanding that Microsoft is going back to fix now and we fully

21   agree that it's important that those fixes can be made available

22   to us in sufficient time that we can test them before the

23   relevant provision of the final judgment would otherwise expire,

24   so they have committed to do that.  We'll have a chance to look

25   at those fixes, the code that fixes them, analyze them, be sure

1    that as we're approaching November that there are no outstanding

2    issues at all, and if there are that we'll have a good

3    opportunity to come back to the Court and ask for any relief

4    that might be necessary on those fronts.

5         THE COURT:  All right.

6         MR. HOAG:  And finally, I can point out that you asked

7    whether the Iowa issue raised in the Iowa class action was

8    resolved for all the plaintiffs, and I can confirm it was, that

9    we're all satisfied that Microsoft has not failed to disclose

10   any EPIs that it's required to under the final judgment, and

11   we're also all satisfied that the Google complaint has been

12   resolved by the relief that we described in the final -- in our

13   joint status report, and of course we already have and will

14   continue to make available more details to the complainant and

15   have further discussions with the complainant to address their

16   questions.

17        THE COURT:  My assumption is correct that they're

18   going to get much more information?

19        MR. HOAG:  Right.  I think they already have had some

20   conversations, as I understand it.  Mr. Rule can explain in more

21   detail with Microsoft at a more technical level, and we'll

22   certainly continue to have that.  It's not our intent to close

23   them off from being involved in the process.  They did raise the

24   complaint, so we'll give them as much information as we possibly

25   can about how it's being addressed.

1          THE COURT:  Can I make an assumption that the TC which

2     includes Mr. Hunt was involved in coming to this resolution and

3     thought that it resolved it?

4          MR. HOAG:  Absolutely, yes.

5          THE COURT:  Okay.  All right.  Are there any issues at

6     this point in terms of any concerns about it not being

7     implemented until some time later after the decree?

8          MR. HOAG:  Right.  Microsoft has committed that

9     they're going to make again available a beta of this code so

10    we'll have a chance to actually see how it works and see whether

11    they've been able to make the changes that they promised to

12    make, and then of course we'll be back before the Court in

13    September and it sounds again like in November, and if it turns

14    out that there's any need to bring it under a more formal

15    provision we can certainly do so at that time, but at this point

16    in time we'll at least have a chance to see the code and see

17    whether it works and see whether it's necessary or not.

18         THE COURT:  As a practical matter I wasn't clear when

19    I was reading the report whether you actually would have

20    information prior to the expiration to indicate -- to give you

21    sufficient information to come to some conclusions as to whether

22    the desired effect actually occurred was going to happen and

23    that it was actually going to get implemented.

24         MR. HOAG:  I think we will have that information, and

25    certainly if we don't we'll definitely be back here, but I think

```
 1    that we will have the information that's required to let us

 2    assess whether Microsoft has done what they promised to do, and

 3    I'd also point out that the solution, as we understand it and as

 4    our technical people understand it, is relatively

 5    straightforward in the matter implementing it, so we're

 6    optimistic that in that sense it will be relatively straight-

 7    forward to Microsoft to go back and do it.  It's not one that

 8    requires major changes of the underlying architecture of Windows

 9    or something very complicated.

10              THE COURT:  Anything else you wanted to add?

11              MR. HOAG:  That was all I had.

12              THE COURT:  Let me do my usual order.  I think Mr.

13    Himes is next and then Mr. Houck.

14              MR. HIMES:  Thank you very much.  I don't think that I

15    have a great deal to add.  You have heard that the reset process

16    is proceeding and the pace seems to be satisfactory at the

17    moment.  We are, you know, soon reaching the point where all of

18    the documents will be rewritten.  I would not want your Honor to

19    think that that means that the entire project is over.  It's of

20    course not.

21              THE COURT:  No, I understand.

22              MR. HIMES:  We still have TC staff people who are

23    dedicated to then working with those rewritten documents to

24    endeavor to implement protocol tasks, and that exercise will

25    continue for an extended period of time.  In fact, it's not
```

1    reported in the JSR itself, but we are increasing staff in

2    contemplation of having that material available to work with and

3    continue, plus the testing verification process has really just

4    begun and that's going to be -- promises to be a considerable

5    exercise and it's reflected simply in the fact that Microsoft's

6    own staffing on that end of the project sort of consistently

7    increases over time, so I would not want you to think that's

8    going to go away so quickly.  It's going to be around for a

9    while, and it's inevitable I think in the course of all that

10   work that there are going to be new TDIs and we'll work through

11   them, but right now things seem okay.

12           On the Google complaint, I agree we are collectively

13   satisfied and of course it does require implementation on

14   Microsoft's part and there is ongoing discussion to make sure

15   that that's accomplished and we have no reason to believe that

16   it won't be, but that is of course ongoing and how long it will

17   take we certainly expect to see the beta in the next few months

18   and before the November time period.  We will analyze it.

19   Whether anything more will be required is something that we'll

20   have to consider, I think as the final judgment approaches along

21   with these questions of the XP bugs as well.  All of that it

22   seems to me is of the same cloth, and if there's any need for

23   continued, you know, judicial involvement after the November

24   time period we'll discuss it with Microsoft.  I think unless

25   your Honor has questions we've pretty much addressed the matters

1    you've put in front of us.

2            THE COURT:  No, I think so.  In terms of you usually

3    focus on what the TC is doing and I think I have a good handle

4    on that.

5            Mr. Houck?

6            MR. HOUCK:  Good morning.

7            THE COURT:  Good morning.

8            MR. HOUCK:  As your Honor undoubtedly recalls, the

9    last time we were here you and I had a discussion about the

10   California group's role in enforcement matters.  One of the

11   things I said was that in general while we didn't always see eye

12   to eye with the other plaintiffs we did try to forge a common

13   point of view to present to the Court, and your Honor encouraged

14   us not to be shy about expressing our disagreements when we had

15   them, and I suppose I always knew how powerful a federal judge

16   was but didn't quite appreciate maybe how powerful that was

17   because we've obviously had a disagreement.  Whether it was the

18   power of your Honor's suggestion or something else, you know,

19   we've clearly had an issue between us that we've managed to work

20   through and I wanted to take a little bit of time today to

21   address that issue, which is a Google complaint, and then also

22   tell your Honor a little bit more about our report on

23   effectiveness, which again I think is probably an area that

24   we're not going to get total agreement among everybody in this

25   side of the courtroom.  I don't really propose to get into the

1    nitty gritty of our disagreement with the Department of Justice

2    about our analysis of Google's complaint, but I did want to give

3    your Honor a little bit of background so the Court understands

4    how it was that the California Group came out to the position

5    that's been presented to your Honor in the joint status report.

6    The California Group felt that the Google complaint did in fact

7    raise some very important issues under the final judgment.  A

8    fundamental objective of the final judgment as we understand it

9    is to protect Middlewear threats and the California Group has

10   observed very few if any Middlewear threats that have emerged

11   during the term of the final judgment with a potential to be any

12   kind of serious platform threat to Windows.  In our review

13   desktop search does have as much or more potential than any

14   other product that's arisen to represent that kind of threat.

15   It exposes APIs that have already been used by third-party

16   developers to write a number of applications, so it was very

17   important for us to protect the potential represented by desktop

18   search to the extent that we could within the confines of the

19   final judgment.

20          Another aspect of the Google complaint that certainly

21   attracted our attention was the resemblance to the way desktop

22   search was presented in Vista to the way IE was presented in

23   Windows, which of course led to the filing of the initial

24   lawsuit.  Another reason that we took a long hard look at the

25   complaint was the potential commercial importance of this

1    product.   Desktop search is closely related to web search which

2    is an important and lucrative business for a number of

3    companies, not just including Microsoft and Google, and desktop

4    search and web search were likely to converge even more in the

5    future so there is and was a lot of money at stake for

6    participants in this market.

7              THE COURT:   Hopefully a benefit for the consumer out

8    of this.

9              MR. HOUCK:   Pardon me?

10             THE COURT:   And hopefully a benefit to the consumer.

11             MR. HOUCK:   My last point I was going to say, the most

12   important point was to help consumers here.   That clearly is the

13   most important thing.   This, you know, there's a product over

14   time that's developed, great potential value for consumers, it's

15   improved significantly, it's a great benefit to them, and so our

16   overriding objective here and the reason we're interested in it

17   particularly is to make sure that all desktop search providers

18   had a fair opportunity to present their products on the Windows

19   desktop and the consumers had the opportunity to select the

20   product that they thought suited them the best, so there were a

21   number of considerations, but I left the most important for

22   last.   Your Honor jumped the gun a bit, but I did get there, so

23   the bottom line of all that was that we felt the Google

24   complaint really deserved our very close attention and we did

25   spend a lot of time, an awful lot of time collecting information

1    from all the various parties and talking to Microsoft lawyers

2    and technical people and the Google lawyers and technical

3    people, and they're all very cooperative and responsive and very

4    able and no doubt a good indication why both of these companies

5    are as successful as they are, so they were very helpful.

6           What were our objectives?  Your Honor correctly stated

7    that we perceive ourselves to be acting in the footsteps of

8    consumers so we were clearly not acting as advocates for Google

9    and we were not seeking to punish Microsoft.  What we were

10   trying to do was to enforce the final judgment and to do it in a

11   way that hopefully advances the underlying objectives of the

12   final judgment, so that was our outlook.

13          I think all the plaintiffs shared our view as to the

14   importance of this particular issue and we all spent a lot of

15   time collecting information and sharing our reviews, and the

16   analysis was not an easy one I don't think.  As I said, the role

17   of the plaintiffs is to enforce the final judgment and we're not

18   working on a blank slate with the authority to impose some kind

19   of solution that we think might in an ideal world represent the

20   best solution.  We're constrained by the language of the final

21   judgment which, as your Honor knows, was not language that we

22   wrote but that was in our final judgment that was written by

23   others, so we were contending with that language and this

24   particular language, you know, the various Middlewear

25   definitions in Section 3(h) were very technical and complicated

and aspirationally the language in a final judgment consent
decree is supposed to be clear and unambiguous maybe wasn't all
that clear here in part because it was written five years ago
and the way these products were presented on the desktop now is
a little bit different from the way they were when the final
judgment was written, so it was not an easy task to come to
grips with exactly how the final judgment should be applied in
these circumstances, and we did have some disagreements about
that, but as we indicated in the joint status report, we were
able to work to a resolution that satisfied everybody and that
we think maintains the goals of protecting consumer choice and
promoting competition.  The way the resolution will actually
advance these goals is not certain and depends on a number of
market developments with which are hard to predict and out of
our control, but we do think that the solution that we came to
has a number of potential benefits for consumers.  Under the
resolution Microsoft has agreed to establish unbiased mechanism
to allow OEMs and users to select default desktop search
products of their own choice.  It does provide greater access on
a desktop for nonMicrosoft desktop search products.  It does
reduce the conflict between the competing indexers, and
Microsoft had agreed to provide information to enable others to
take advantage of these changes.  So we believe that the changes
Microsoft has agreed to make, while perhaps not going as far as
Google would like, are at the very least potentially beneficial

to consumers and represent from our standpoint a reasonable

resolution of Google's complaint.  Given the uncertainty about

the outcome we've chosen to bring an enforcement action instead.

Your Honor had asked whether the commitment to make

the changes in service pack one was part of the agreement.  It's

my understanding that it is.  Your Honor also raised the

question of timing, which is a question of concern to us.

Obviously because the final judgment is about to expire and our,

as you know, our experience with Microsoft with respect to the

technical documentation has not been, you know, the best in the

world, but as Mr. Hoag said, you know, one of the goals here was

to get some changes that should be reasonably easy for Microsoft

to make.  We will be closely following what they do.  They've

promised to give us a beta before the final judgment expires,

and to the extent we feel that any further relief from the Court

is necessary we will have at least two more opportunities to

raise that with your Honor.

So with that I'm going to turn to the second subject I

wanted to talk about, which is our effectiveness report.  This

is a California Group initiative and, you know, apart from the

goal of desiring to answer the questions your Honor posed we

feel it's important for some other reasons.  This Court -- this

case is certainly one of the most important in the annals of

section to juris prudence.  It involves very important consumer

products.  This matter of great public interest has been

1   displayed over the last couple of weeks and as indicated by how

2   full the courtroom is today so we thought it would be a good and

3   useful thing to do to report back to the Court, give the Court

4   some idea of how we thought the final judgment has worked over

5   these past five years, and we're not quite as far along as we

6   hoped to be.

7          I wanted to give you some of the background about what

8   we've done.  After we left Court the last time our plan was to

9   interview all the licensees, and we heard from Microsoft that

10  Microsoft had some concerns about that.  Microsoft was unhappy

11  that it was being excluded from the process and they told us

12  they thought including them in an action would actually be

13  helpful because they would learn information that would help

14  them improve the MCPP, and because they thought licensees would

15  be actually more cooperative if they were involved.  We didn't

16  agree with that.  We told Microsoft that our purpose here was to

17  get information to enable us to report to the Court and they

18  were free to talk to the licensees on their own if they wanted

19  to get more information to help them improve the program and

20  indeed we thought actually that licensees would be less

21  cooperative if Microsoft were involved because, you know,

22  they're reliant on Microsoft, and in fact a number of them are

23  competitors of Microsoft, but we did accede to their concerns

24  and we changed our game plan somewhat and instead of conducting

25  the interviews what we did is we served interrogatories on the

1   licensees.  There were 29 licensees and as of the time the
2   status report was filed we had 17 responses, and in the
3   interrogatories was a question to the licensees that said do you
4   have any objection to Microsoft receiving the information in the
5   interrogatories, and just a few did but most have not, and so we
6   have supplied the interrogatory answers to Microsoft where
7   nobody has objected.  Our intention is to render in the next
8   couple of months some time over the summer a more complete
9   report to the Court that will contain more responses from our
10  licensees, but more significantly will contain our assessment
11  about, you know, what has been good about the final judgment,
12  maybe what has not worked, as well as some of the other parts.
13  Our intention is to make this fairly concise.  It's probably
14  going to be on the order of fifteen pages, I would think.  We're
15  not going to file it as part of a JSR because, as I said at the
16  outset, I don't think this is really conducive to that kind of
17  thing.  I don't know if the other parties are going to want to
18  respond, but it's probably not something we're going to get
19  unanimity or agreement on.  We're not even going to try to do
20  that.  It's going to be our assessment, and the other litigants
21  are welcome to provide their views to your Honor.  We did want
22  to give them our report, the other litigants, the other parties,
23  in sufficient time so they could provide your Honor with their
24  views if they want to on a timely basis, so we are probably
25  going to do that, and as I said, hopefully we'll have something

1    that we can file sometime during the summer, and that's what I

2    wanted to say.  So I'm done, unless your Honor has some

3    questions.

4          THE COURT:  No, I think that's it.  That's very

5    thorough.

6          All right.  I can hear from either, I don't know which

7    order you want to do this, Mr. Rule, whether you want to have

8    Mr. Muglia speak.  You speak.  I don't know whether Mr. Muglia

9    wants to add anything.  It's up to you, how you want to do this.

10          MR. RULE:  Good morning.  Let me take a shot and then

11    I'll ask Mr. Muglia to do clean-up, which he does well.

12          Your Honor, it's good to hear the report today, both

13    your Honor's summary of what was in the JSR and what the

14    plaintiffs said about 3(e) and the reset project, which I think,

15    as all have noted here, is going well.  The quality of the

16    documentation has improved.  The level of TDIs is stable and

17    manageable and it sounds like everyone is happy with how that is

18    going.  Mr. Muglia may have some more comments on that, but I

19    think that the bottom line on the report for 3(e) today is very

20    positive.  We're obviously going to continue to work very

21    closely with the plaintiffs as we have been and with TC and Mr.

22    Hunt, you know, to make sure that we continue on that path and

23    that we meet all of the remaining milestones and also with

24    respect to some of the other issues that were identified, that

25    they are addressed in a timely fashion, so I think that is

1    moving along well, and I guess I won't really address any more

2    of that.  I'll let Mr. Muglia do that unless your Honor has any

3    questions.

4              THE COURT:  No, that's fine.

5              MR. RULE:  I will move on to the so-called Google

6    complaint.  I'm not going to spend a great deal of time going

7    back through the background.  I think suffice it to say that

8    from Microsoft's standpoint this is an issue that we have spent

9    a lot of time looking at, thinking about, and we were very

10   confident that the search, desktop search feature in Vista was

11   compliant with the decree.  We've always been willing to discuss

12   it with the plaintiffs.  Desktop search is functionality that

13   has been in some form in the operating system going back

14   decades.  It is true that we've improved it as we've improved

15   other aspects of the functionality in Windows and it is

16   particularly good in Vista and we have noted the fact that it's

17   improved, but our view has been that improvements in

18   functionality do not change the functionality fundamentally and

19   so we were very confident that because of the definition of

20   Microsoft Middlewear product that desktop search didn't fit

21   within that rubric.  Moreover, as we have pointed out, for the

22   most part we felt that even if desktop search were deemed a

23   Microsoft Middlewear product Vista was largely compliant with

24   the decree, but nevertheless, and I think this is a testament to

25   five years of working with the plaintiffs, all the plaintiffs

1   and the technical committee, we felt that it was good to try to

2   come to a resolution.  The plaintiffs had some suggestions for

3   ways that they felt that Windows Vista could be improved from

4   their perspective with respect to desktop search and some

5   improvements in terms of access for third-party desktop search

6   applications.  It also, I think, came to all of our attention

7   that certain aspects of desktop search in Vista weren't fully

8   understood by OEMs and other ISVs and there was a misperception

9   for example that the indexer in the desktop search might somehow

10  be interfering with other folks' products, but Microsoft in

11  fact, as your Honor noted this morning and as the plaintiffs

12  have noted, designed the indexer to back off when the CPU is

13  being used by other applications including other indexers.  And

14  that's a good feature.  It's what we have come to call good

15  citizenship and part of the issue there is just informing the

16  world about that good citizenship.

17          Also, before turning to what we have agreed to do,

18  your Honor, I should note that from Microsoft's standpoint we

19  have tried, we have taken to heart what the decree is.  We've

20  made commitments to continue with those principles after the

21  decree expires.  And we have built them into our products even

22  when certain aspects aren't covered by the decree, and one of

23  the areas is search.  As your Honor knows in connection with IE

24  7, you know, we've designed our Internet search feature in such

25  a way as to give consumers choice.  There is, I don't want to

1    say we're completely unique, but we certainly have gone further

2    than others in terms of ensuring consumer choice in Internet

3    search.

4          With respect to the opportunities for third parties

5    desktop search, there are quite before any of the agreements we

6    reached with the plaintiffs many opportunities for ISVs to make,

7    get, provide access to their desktop application, desktop search

8    applications on Windows Vista.  They can put an entry in the

9    left side of the start menu when a user right-clicks on a folder

10   already ISVs are able to insert access to their search

11   application there.  They can put an icon for their desktop

12   search in the system tray, and some have even devised floating

13   search bars that appear at all times on the desktop even when

14   other windows are open.  Those features already existed.

15   Windows Vista was already capable of accommodating those

16   features in third parties.  Those access points will continue.

17   But as I say, the plaintiffs came to us and had some

18   suggestions, and again in that cooperative spirit we have worked

19   with them to address them.

20         And, your Honor, with your permission I'd like to go

21   into a little more detail than was in the JSR.

22         I should also say that I received a call on Friday

23   from Google's counsel asking about our perhaps with respect to

24   their motion and also asking for screen shots of the changes.

25   At the time we really didn't have any.  We've worked on some.

I'm going to hand your Honor a screen shot that sort of gives
you an idea of where the changes are.  I didn't have them on
Friday, but nevertheless I spent at least a half an hour on the
phone with Google's counsel going through in some detail what
the agreement entails and we certainly are willing to discuss
things with them.  Frankly that's the first time we've really
had access in this complaint process to Google because, as your
Honor knows, that's generally a process that the plaintiffs
manage and we don't, other than sort of hearing from them and
not necessarily knowing what complainants are saying or who the
complainants are, we try to be helpful in terms of providing
information, but in this case when we were contacted by Google's
counsel we were willing to provide them with information.  Your
Honor, to go beyond what is in the JRS I thought it might be
helpful to try to take a little bit of time and run through an
exhibit that's a screen shot, so let me hand two of those up
with your permission.

THE COURT:  Or if you want to stick them on the Elmo
you can do that as well.

MR. RULE:  We had perused these with the plaintiffs
yesterday so they have seen this.  This should be no surprise to
them.  But what you have here is a screen shot of a desktop from
Vista and I will take you through the different commitments that
Microsoft has made.

First, and this is the box at the bottom of the page,

I've numbered each one of the boxes according to the points.
Microsoft is going to create the concept of a default desktop
search that users can set by using --

THE COURT:  Do you want to put it on the Elmo?  It's
up to you if you want to.

MR. RULE:  If you'd like, your Honor.

THE COURT:  Sure.  I assume there's no problem,
because it's going to show up on everything.

MR. RULE:  As long as I assume it is not.  It will be
up when it's up on my --

THE COURT:  This is occasionally is the problem of I
loaned my courtroom out yesterday.

MR. RULE:  Your Honor, what I can do before we go to
that, I can address just a little bit more the discretion of the
good citizenship.

THE COURT:  Why don't we do this and this will warm up
hopefully.

MR. RULE:  The Microsoft indexer has been designed to
back off when the CPU is being used by other applications
including other desktop search applications.  Apparently there
has been either a lack of knowledge or some confusion about that
and I think the plaintiffs learned that some may have been
hesitant to install other desktop search applications for fear
that the desktop search functionality in Vista might somehow
slow it down.  What Microsoft has agreed to do is to make clear

1  to OEMs in writing that there really are no technical reasons

2  why another desktop search solution can't be installed when the

3  Microsoft indexer is running, so in effect we will be getting

4  that information to OEMs so that there will not be any.  At any

5  rate, so we are going to be providing that information to OEMs.

6      Also, Microsoft was asked by the plaintiffs and the TC

7  and Mr. Hunt to encourage other companies to adopt good

8  citizenship features that are used by the Microsoft indexer.

9  Accordingly we've agreed to provide third parties with the

10 technical information so that they can design their indexer to

11 minimize the disruption to the machine and to other applications

12 in the same way that Microsoft's indexer does today so hopefully

13 along with some of the other projects that we've worked with on

14 the TC will be able to help others make better products.

15     So, your Honor, let me now turn to how we have agreed

16 to make some changes in Windows Vista.  First, what we have

17 agreed is that we're going to make the user's choice of default

18 search selectable in the set your default programs utility on

19 the right side of the start menu just like you can with your

20 Internet browser, your media player and that sort of thing, so

21 you go in there.  Go to set your default programs and you will

22 be able to set your desktop indexer there.  Second, we as part

23 of this if you have selected some other program as your default

24 search there is in the start menu there's this search bar that

25 you can see down there on the left-hand side and above that the

1    search everywhere button.  You can type things in there in the

2    search bar and programs will come up and it's an easy way to

3    launch programs instead of having to go through the whole

4    cascading menus that most people are used to.  In addition, this

5    functionality has a search everywhere button and if you have

6    selected some third-party application as your desktop search

7    when you click the search everywhere button it will launch your

8    default desktop search.  Similarly, three, this box that is in

9    the middle of the window that's in the window of the desktop is

10   an explorer window that comes up when you launch various

11   programs and in that is a search capability.  What Microsoft has

12   agreed is that the search, there will be a search everywhere

13   link added to the explorer window and the default desktop search

14   will be launched when the user clicks that link.  Fourth, and

15   this is not something that was in the JSR, you will note that on

16   the right side of the start menu there is an entry called

17   search.  We're going to remove that, but as is the case today

18   the third-party search desktop search applications can register

19   to show up on the left side of the start menu so their

20   application can be launched from the left side of the start

21   menu.  Fifth, the currently when you right click over a folder

22   this menu shows up and there is a search entry there.  That

23   search entry will also be removed, but again as is currently the

24   case, third parties can have their search listed in this menu

25   and they will continue to be able to have that listed in the

menu and users will be able to launch third-party desktop search

applications by right-clicking over a folder and clicking on

that entry.

Finally, and this goes to the question of the indexer,

even though the indexer is designed to back off when other

applications are using the CPU, we have agreed to add a new

utility which the arrow is pointing to which would allow a user

to snooze the indexer for a period of time, and again at the

user's choice if a game or someone decides that they want the

indexer not to run at all for a short period of time.

So those, your Honor, are the changes, the ways in

which they show up in Windows.  This is an ongoing process,

though.  We are working and we'll continue to work on a virtual

daily basis with the TC, Mr. Hunt, their staffs, and the

plaintiffs to work through the details of all of this to come up

with a spec to come up with a timetable.  We have in fact, your

Honor, committed that this will go in SP1, which is going to be

released after the first of the year, and therefore we've also

committed to implementing these changes in beta code that we

will release to the plaintiffs before the expiration of the

decree and in time for them to satisfy themselves that we in

fact are implementing the changes that we've agreed to do.

THE COURT:  Do you have a timetable roughly at this

point?

MR. RULE:  At this point we don't.  Well, clearly

that's one of the topics I'm sure that will be addressed in the
coming weeks with the TC and Mr. Hunt to make sure that we're
all on the same page and that we do the things in a manner that,
you know, is useful to them and allows them to draw conclusions
before they have to come and say anything to your Honor, so
we're going to be working on that.

I also should just say that and just remind your Honor
that as Mr. Muglia is in effect senior man really kind of
watching over the developments under 3(e) Steven Sanoski (ph),
also senior vice president, has been tasked with overseeing
these aspects of the decree and he is very much involved in the
discussions we've been having with the plaintiffs, in the
agreement that was reached with the plaintiffs, and he will be
very much involved going forward as we work through the details
and implement this agreement with the plaintiffs.

Does your Honor have any other questions?

THE COURT:  No, that's fine, not at this point.

MR. RULE:  The last point that I will address just
briefly is the question of the survey and the California
plaintiffs' upcoming report.  We do appreciate the fact that the
plaintiffs were willing to share with us where licensees agreed.
The results of the survey, I think generally, you know, our
reading is it's neutral to favorable in terms of what the
licensees have had to say.  There have been some suggestions and
those are being passed along to the appropriate folks to make

1    sure that we address them.  But overall I think the survey, you

2    know, has been helpful and generally has been favorable.

3          With respect to the subsequent report that Mr. Hoag

4    discussed filing, I think I can say with some degree of

5    certainty that we would like to -- we were going to want to

6    respond to that.  Hopefully we can work out some scheduling for

7    that.  I think we probably would want at least two weeks to be

8    able to absorb and respond to what they have to say, but I

9    assume that we can work among all the parties to come up with a

10   way to address everything before your Honor's next joint status

11   conference.  And unless you have any more questions of me, your

12   Honor, I'll ask Mr. Muglia if he doesn't mind coming up.

13          THE COURT:  That's fine.

14          MR. MUGLIA:  Good morning, your Honor.

15          THE COURT:  Good morning.

16          MR. MUGLIA:  I just have a couple of responses to your

17   questions.  You asked about the 1823 TDIs and whether that was

18   what we would have expected, and I would say it is.  We are

19   pleased that as we move forward we're able to resolve the TDIs

20   that were reported from the old documentation and, you know, we

21   do expect that we'll continue to have influxion of new TDIs as

22   more documents are released and as tests are completed, but it

23   is our expectation that we can keep up with them and continue to

24   drive it down.  Also, with regards to the test suites, we were

25   able to release the first cluster on schedule at the end of the

1   first quarter and are expecting to release the next one at the

2   end of this month as planned.  The first one, the first cluster

3   of test suites was really our initial take at this.  I think

4   we've learned a great deal.  We've got a lot of good feedback

5   and interaction with the technical committee on this.  And it's

6   our expectation that we'll continue to learn as we go through

7   this new testing process.  It's now being done in the industry

8   and we've worked closely with the technical committee to

9   establish that.  As has been mentioned, I believe Mr. Hoag

10  mentioned this, it is expected that we'll continue this testing

11  process really into calendar 2008 and perhaps through 2008 to

12  fully complete the full set of tests.  However, we do believe

13  that the kinds of problems we'll have as we go along will, while

14  important, will not impede the licensees' ability to implement

15  product based on the protocols.  Unless your Honor has any other

16  questions for me, those are the only things I had to add to your

17  comments.

18          THE COURT:  And I take it that Microsoft is open then

19  to adopting and incorporating what the TCs have developed in

20  terms of their expertise and tools?

21          MR. MUGLIA:  Yes, absolutely.  In fact, as an example

22  of that, during the last quarter there was an issue at one point

23  on some TIs being filed against the exema markup that we had

24  been submitting and the technical committee had built an

25  excellent tool to really determine whether that was of the

1    quality that was required and we were able to resolve those

2    issues and in fact bring down the number of TDIs substantially

3    by in fact adopting the tool that the technical committee built

4    as a part of our own process, so we're more than open to taking

5    input from them and incorporating techniques and tools that they

6    have built into our development process in order to improve the

7    quality before we hand it off.

8                 THE COURT:  Okay.  Thank you.

9                 Anything anybody wants to respond to in terms of the

10   plaintiffs?  Okay.  All right.  Then from my perspective let me

11   say that this has been a productive report and a productive

12   period.  I'm happy to hear that the technical documentation is

13   moving forward as expected.  I do understand that it's going to

14   take some additional time, but I'm happy to hear that at least

15   the templates seem to be working and our new approach has at

16   least the ora of success, which I cannot say about some of the

17   earlier ones where we had problems with it, so I'm happy to hear

18   they seem to be adopting the correct approach there.  Obviously

19   in terms of the other sections of the final judgment that will

20   be expiring in November, I do want some focus on those to make

21   sure that they've been fully implemented.  Some we've spent a

22   lot of time with in the last probably two years and I want to go

23   back, make sure that we go back over the rest and look and see

24   what's there and make sure that everything is in place.  I look

25   forward with interest to the California /RART engine /OEU other

1   reports anybody /TWAOEPBLT produce on the he have a C /SEU of

2   the final judgment as to the sections that will be expiring or

3   anything else you want to provide the Court on that.  Since the

4   Court has not been presented with the issue of whether the

5   Google complaint implicated the final judgment I'm not going to

6   take any position on it or comment on it.  You've resolved it

7   and I'll wait to hear from the plaintiffs as the consumers'

8   representatives if they want or are requesting the Court to take

9   any particular action or provide any relief.

10          So let me set two dates.  I'd like to do it today so

11  that you can work with your schedules.  I think, and I don't

12  know whether we want to call them interim or whether we want to

13  call them, you know, fairly extensive reports, but I think one

14  in early September and one in early November in the -- you can

15  decide whether it's useful to focus more in both of these

16  reports.  Obviously I still like to hear about 3(e) but I do

17  want to make sure that the other sections that we haven't heard

18  too much about are fully considered, so in terms of dates what

19  about doing something the week of the 10th so it's not the week

20  involving Labor Day if people are taking off.  We could do

21  something -- I forgot whether Fridays were good or bad or would

22  you prefer another day?

23          MR. RULE:  I think it's fine.

24          THE COURT:  Yes, no.  Okay.  How about the 14th?  I

25  only have two things listed; is that correct?

1       COURTROOM DEPUTY:  That's correct.

2       THE COURT:  So if we did it like at 10:30 like we have

3 been doing it would that work?

4       MR. RULE:  Your Honor, can I just say I think the 14th

5 is fine.  I just want to let the Court know that Mr. Muglia will

6 not be available then, but I think since the focus will not be

7 on 3(e) that should work out okay.

8       THE COURT:  Okay.  I don't have a problem as long as

9 we have him back in November.  All right.  Okay.  I want to hear

10 something about 3(e) but I want to make sure that in terms of

11 doing things that we make sure that we have enough information

12 about the rest.

13       MR. HOAG:  Somebody pointed out it's the second day of

14 the Jewish holiday.

15       THE COURT:  I have various calendars.  I didn't bring

16 that out.  Is there a problem that week?  How about the Tuesday,

17 the 11th.  That should be early November.  Is that early enough

18 before the holiday?  Speak up if it's not.  It's okay.  All

19 right.  I'll make it 10:30 because I know some people come in in

20 the morning.  That will work.  Yes, no?

21       MR. HOAG:  Yes.

22       THE COURT:  Okay.  Defendants, does that work from

23 your end?

24       MR. RULE:  Yes.

25       THE COURT:  Okay.  All right.  So we'll do the

September 11th at 10:30 and then in terms of the November, I
think it expires what, the 8th, the 12th.  I meant to look
beforehand.  I think that's Veterans' Day.  We should have put
it not on a holiday.  I will go back and take a look.  I think
it's the 12th.  How about if we did it, say, November 5th, which
is a Monday.  That gives us a full week beforehand.  I'll shift
this /HARPBD.  If it turns out when you come in in September
that we have more things and we need to do it in October, but
unless you want to do it near the end of October would that be
better?  Do you have any feelings about it?  I mean, it's sort
of hard to anticipate what's the better time frame.  Why don't I
put it November 5th?  If it turns out once you get the September
you think we need to do something at an earlier point then just
let me know and we can move this around.

MR. RULE:  Your Honor?

THE COURT:  Yes?

MR. RULE:  Is there any way we can do it maybe
November 6th, because some people are traveling from the West
Coast.

THE COURT:  Sure, no problem.  All right.  So we'll
set it for November 6th and I'll do it at 10:30.  And I think
certainly November 6th should be, you know, the full report as
we have been moving, but I want a little bit more of a focus in
September.  Now, if everything is fine and there's no real
issues then obviously we can hear some more about it, but I

don't want 3(e) to drop off the radar screen.  If there's
nothing further, and what we've been doing I think is setting it
up a week before or a Wednesday, I'd say if you do about -- let
me just look.  Hold on.  When I would get reports so I have time
to look at them.

MR. RULE:  Your Honor, the one in September, could we
file it maybe the day before Labor Day?

THE COURT:  Sure.  That works.  So are you talking
about --

MR. RULE:  That's a Friday.

THE COURT:  The 31st.  You want to do it the Friday
before, like the 31st, August 31st?  Okay.  You could do it
earlier but no later than that, and then in the November report
I do think we should get it at least a full week before, so if
we could get it October 30th so the report will be August 31st,
hearing September 11th at 10:30, report October 30th, and the
hearing at November 6th at 10:30.  Obviously since we're having
a hearing the only reports then I would need in the interim
ones would be probably the July and August and then the other
reports will suffice, I think, unless something needs to be
brought to my attention that you want to file in the interim.
All right.  If there's nothing further then the parties are
excused.  Have a good day everybody.

(Proceedings concluded at about 12:12 p.m.)

- - -

1                    **I N D E X**

2

3     **WITNESSES:**

4     NONE.

5

6

7

8

9

10                  **E X H I B I T S**

11

12

13    Exhibit

14    <u>No.</u>              <u>Identification</u>           <u>Marked</u>      <u>Admitted</u>

15

16    None.

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3

 4        I, JACQUELINE M. SULLIVAN, Official Court Reporter,

 5   certify that the foregoing pages are a correct transcript from

 6   the record of proceedings in the above-entitled matter.

 7

 8

 9

10

11

12                  [signature: Jacqueline M Sullivan]

13                  JACQUELINE M. SULLIVAN

14

15

16

17

18

19

20

21

22

23

24

25
```