IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Plaintiff,

   v.

MICROSOFT CORPORATION,

       Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline:
   August 31, 2007 Joint Status Report

**REVIEW OF THE FINAL JUDGMENTS BY
THE UNITED STATES AND NEW YORK GROUP**

The United States of America, Plaintiff in *United States v. Microsoft*, CA No. 98-1232
(CKK), and the States of  New York, Louisiana, Maryland, Ohio, and Wisconsin (the "New
York Group"),[1] settling Plaintiffs in *New York, et. al. v. Microsoft*, CA No. 98-1233 (CKK),
hereby file this review of the consent Final Judgments.

**I.  INTRODUCTION**

At the June 26, 2007 Status Conference, the parties indicated their intent to provide the
Court with reports setting forth their respective assessments of the effect of the Final Judgments
in light of the expiration in November of most of the terms of the Final Judgments.[2]  This report

---

[1] For purposes of this Review, the New York Group does not include the States of
Illinois, Kentucky, Michigan, and North Carolina.

[2] At Plaintiffs' request, the Court agreed last year to extend for a minimum of two years
those portions of the Final Judgments relating to the communications protocol licensing program
required by Section III.E.  The remaining provisions of the Final Judgments will expire as
originally ordered on November 12, 2007.

contains the observations of the United States and New York Group on the current marketplace
conditions and on the overall effectiveness of the Final Judgments to date.

The Final Judgments aim to "eliminate Microsoft's illegal practices, to prevent
recurrence of the same or similar practices and to restore the competitive threat that middleware
products posed prior to Microsoft's unlawful conduct."  Competitive Impact Statement, at 17
(Nov. 15, 2001).  The United States and New York Group respectfully submit that the Final
Judgments have achieved these goals.  Most pertinent for the purposes of this Review, as we
detail below, the Final Judgments have safeguarded the ability of software developers to
develop, distribute, and promote competing middleware products.

## II.    BACKGROUND

### A.    *Microsoft's Unlawful Conduct*

The Court of Appeals upheld the District Court's determination that Microsoft had a
monopoly in the market for Intel-compatible personal computer operating systems.  *United
States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).  Microsoft's operating system monopoly
is protected, in part, by the "applications barrier to entry."  *See id.* at 55-56.  The applications
barrier to entry exists because an operating system serves as a platform for applications that
computer users desire to run on top of the operating system.  If a competing operating system
has a limited number of users, software developers have little incentive to develop applications
for that operating system.  Without a rich set of applications, it is unlikely that many consumers
will switch to the competing operating system.

Middleware products, however, offer the potential for eroding the applications barrier to
entry.  A middleware program is not an operating system, but rather is platform software that
runs on top of the operating system.  Middleware enables application developers to write

programs that run on the middleware platform rather than directly on the operating system; this allows the application to run on any operating system that the middleware runs on, without requiring the application developer to port its applications to multiple operating systems. Middleware therefore can facilitate the creation of a range of cross-platform applications, which in turn could make non-Windows operating systems more attractive to users and enable those operating systems to compete on their merits.

The Court of Appeals upheld the District Court's conclusion that Microsoft unlawfully maintained its operating system monopoly by engaging in a range of exclusionary conduct designed to quash the nascent threat to the applications barrier to entry posed by middleware products. In particular, Microsoft engaged in a campaign to eliminate the potential threat from the Netscape Navigator web browser by placing restrictions on OEMs, integrating Internet Explorer into Windows in a manner that did not permit users or the OEMs to remove access, and engaging in restrictive and exclusionary practices with respect to Internet Access Providers, ISVs, and Apple. Microsoft was also found to have attempted to mislead and threaten software developers in order to contain the competitive threat from "Java" middleware technologies. The Court of Appeals affirmed the District Court's conclusion that all of this exclusionary conduct violated Section 2 of the Sherman Act.

B.      *The Final Judgments*

To assess the effectiveness of the Final Judgments, the litigation context and the decrees' goals necessarily should be considered. This is especially true in light of the Court of Appeals' decision narrowing the liability findings against Microsoft and overturning the District Court's original remedy.

First, Plaintiffs alleged and proved that Microsoft *maintained* its monopoly position in

the Intel-compatible PC operating system market by unlawful exclusionary conduct.  The Court

of Appeals affirmed that Sherman Act § 2 violation.  There was no determination that Microsoft

*acquired* its Windows monopoly by illegal means, however.  *See United States v. Microsoft*

*Corp.*, 253 F.3d 34, 56 (D.C. Cir. 2001).

Second, although the Court of Appeals upheld the Sherman Act § 2 liability finding that

Microsoft unlawfully suppressed nascent competition from middleware — specifically,

Netscape's Navigator browser and Sun's Java technologies — the Court of Appeals did not find

that either middleware product necessarily would have developed in a way that eroded

Microsoft's Windows monopoly, absent Microsoft's unlawful conduct.  As discussed above, the

theory of the case was that if middleware were allowed to develop without artificial hindrance,

independent software developers could create competing middleware platforms that could be

ported to non-Windows operating systems.  Developers could then write software that runs on

one of the cross-platform middleware products, thereby allowing their applications to run on any

operating system supported by the middleware.  In turn, OEMs would be more likely to offer not

only non-Microsoft middleware products, but also PCs running competing operating systems.

Correspondingly, if non-Windows products proved more desirable to users, Microsoft's

Windows monopoly could, indeed, be eroded under a regime of marketplace competition.

Users then would have improved opportunities to select a client operating system based on the

merits of competing systems.

The Court of Appeals therefore ruled that Microsoft denied Netscape and Sun this

opportunity to compete on the merits, and, in so doing, to assist in breaking down the

applications barrier to entry that protects the Windows monopoly.[3]  Accordingly, besides assuring cessation of Microsoft's unlawful activity and preventing its recurrence, the over-arching objective of the Final Judgments are to create conditions in the market that afford non-Microsoft middleware opportunities to compete comparable to those that Microsoft denied to Netscape and Sun.[4]  The litigation, however, did not afford a basis for extinguishing Microsoft's Windows monopoly position or for reducing it by a particular amount.

As the United States explained in its Response to Comments — in a passage that the Court of Appeals specifically quoted and endorsed in upholding the remedy in *Massachusetts v. Microsoft*, 373 F.3d 1199, 1243 (D.C. Cir. 2004):

> [T]he key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future, and restore the competitive conditions created by similar middleware threats. In this context, the fruit of Microsoft's unlawful conduct was Microsoft's elimination of the ability of potentially threatening middleware to undermine the applications barrier to entry without interference from Microsoft. The RPFJ addresses and remedies precisely this issue.

Response to Comments ¶ 17 (Feb. 27, 2002).

Similarly, the New York Group explained in its memorandum supporting entry of the Final Judgments:

> A middleware product is not in itself a competitor to Microsoft's Windows operating system products.  Rather, it is the catalyst for a multi-step process that may, by lowering the applications barrier to entry, bring about conditions under which other PC operating system products can compete with Windows on their

---

[3] *See generally United States v. Microsoft*, 253 F.3d at 53-56, 78-80; *Massachusetts v. Microsoft*, 373 F.3d at 1233 ("the fruit" of Microsoft's "violation was Microsoft's freedom from the possibility rival middleware vendors would pose a threat to its monopoly of the market for Intel compatible PC operating systems").

[4] In this context, "middleware" includes functional equivalents, in the form of applications or services delivered via web-based servers.

> competitive merits.  Microsoft's unlawful conduct therefore consisted of
> destroying competitive threats while they were still in their infancy.  No certain
> prediction could or can be made whether such threats would in fact mature into
> actual competition in the PC operating system market.

Memorandum of Law of the Settling States in Support of the Proposed Final Judgment, at 6

(Feb. 27, 2002).

Thus, as the United States, New York Group, Court of Appeals, and this Court have all

emphasized, the goal of the Final Judgments is to protect the nascent threats to Microsoft's

monopoly that may come from middleware products against anticompetitive interference by

Microsoft.

## III.   REVIEW OF THE FINAL JUDGMENTS

### A.   *The Final Judgments Have Protected the Development of Competing Middleware Products*

Since the entry of the Final Judgments, there have been a number of developments in the

competitive landscape relating to middleware and to PC operating systems generally that suggest

that the Final Judgments are accomplishing their stated goal of fostering competitive conditions

among middleware products, unimpeded by anticompetitive exclusionary obstacles erected by

Microsoft.

Microsoft's Internet Explorer web browser faces renewed competition, primarily from

Firefox but also from a range of other products including Opera and Apple's Safari browser.  All

of these competing browsers are cross-platform and therefore allow applications delivered over

the Internet, either directly via the browser or as browser "plugins," to work on multiple

operating systems.

Increasingly, for example, web content is delivered through cross-platform browser plug-

ins such as Adobe's Flash and Apple's QuickTime.  Flash in particular has rapidly become a

popular vehicle for delivering multimedia content on websites such as YouTube.  Both technologies enable streaming of audio-video content over the web to multiple web browsers on multiple operating systems.[5]  Apple's iTunes software has also become enormously popular on Windows, competing with Microsoft's media middleware; a number of other media players, including those from Real and Yahoo, also provide Microsoft with substantial competition.

The increasing popularity of "software as a service" applications depends upon the ability to deliver these applications across a range of browsers and platforms.  A number of companies, for example, use the network-based customer-relations management service provided by Salesforce.com in place of or in addition to traditional software products that are installed on the companies' computers.  Another example of the growing provision of functionality over the Internet via the browser is web-based e-mail — from companies such as Yahoo, Google, and Microsoft itself — which has grown dramatically in popularity over the last several years.  Web-based e-mail typically works across platforms on a variety of browsers, and can obviate the need to install a separate e-mail software program on the user's computer.  Microsoft has largely responded to the competitive significance of web-based e-mail and related tools by developing its own web-based functionality, rather than necessarily by focusing on improving the e-mail client or other tools in the operating system itself.

The Final Judgments' requirements that Microsoft license Windows pursuant to uniform terms (Section III.B) and its prohibition on retaliation against OEMs for promoting competing middleware and operating systems (Section III.A) are directly designed to ensure that the OEM

---

[5] Microsoft has responded to Flash's success by launching a new competing browser plug-in called Silverlight.  Silverlight works on multiple browsers and operating systems, suggesting that Microsoft understands that Flash's universal operation is a competitive force in the marketplace to which Microsoft must respond.

distribution channel is open for Microsoft's competitors; these provisions are working as planned.  Recently, for example, Dell has begun to ship PCs loaded with the Linux operating system in place of Windows.  Lenovo has also announced plans to begin shipping computers with Linux.

Additional developments in the industry, which reflect both the increasing popularity of cross-platform technologies and expanded operating system competition, are also worthy of mention.  For example:   (1) Google offers its "Google Pack" software package, which includes popular products such Firefox, Adobe Reader, Skype, StarOffice, Picasa, Google Talk, RealPlayer and Norton Security Scan; (2) Apple's computers now run on Intel processors, a shift that has increased interest in computers running Apple's Mac OS X operating system among both consumers and enterprise customers; (3) virtualization software, which allows more than one operating system to run simultaneously on the same hardware, can make alternatives to Windows more attractive to users — already, software applications exist that allow users to run Windows applications or versions of Windows on Apple PCs; (4) software developers increasingly are writing applications that run on Linux; and (5) Microsoft itself has entered into agreements with Novell, as well as Linux distributors Linspire and Xandros, to promote interoperability.

To be sure, none of the products mentioned above — or the numerous other similar products that either compete with Microsoft middleware or run on top of competing middleware products — have to date resulted in a dramatic reduction in Microsoft's PC operating system market share.  Whether any particular non-Microsoft product or products now available will provide a sufficient platform to play a role in challenging Windows' monopoly position remains to be seen.  But it would misapprehend the purpose of the Final Judgments to rely on these facts

to argue that the Final Judgments have been ineffective.  Microsoft was never found to have acquired or increased its monopoly market share unlawfully.  Therefore, the Final Judgments were targeted to re-invigorating competitive conditions that Microsoft had suppressed, not to slicing off some part of Windows' market share.

Recognizing the Final Judgments' goal — to safeguard the threats to Microsoft's monopoly posed by competing middleware products — the fact that middleware and operating system competition is taking place today is encouraging and an indication that the Final Judgments are enabling the competition that they are designed to protect.  It is not possible to assess whether these developments will ultimately result in substantial long-term competition in the market for operating systems running on Intel-compatible PCs.  Ultimately, market conditions, product and industry developments, and user choice — in other words, competition — should determine the extent to which Microsoft's Windows monopoly is durable in the coming years.

B.   *Extension of Section III.E Will Give the Communications Protocol Licensing Program a Full Opportunity to Succeed*

The one area of the Final Judgments that has been fraught with difficulty since its inception is the communications protocol licensing provision contained in Section III.E.   By requiring Microsoft to disclose protocols used in server/client communications, Section III.E of the Final Judgments seeks to promote improved interoperability between Windows desktop PCs and companies offering networked services — either over the Internet or over other networks — from non-Windows servers or other products.  As noted above, these improvements in delivery of networked services can also translate into increased competition at the Windows desktop level.

It is hardly necessary to reiterate the many problems surrounding Microsoft's implementation of this provision to date.  Given these difficulties, it is premature to judge whether Section III.E has or will contribute substantially to the overall effectiveness of the Final Judgments.  This provision has been extended by a minimum of two years to ensure that it will have a full opportunity to succeed.

C.       *The Technical Committee Has Played a Vital Role in Supporting the Enforcement Efforts of the United States and New York Group*

The United States and New York Group believe that the Technical Committee and its staff have played an essential role in the enforcement of the Final Judgments.  The Technical Committee has developed a level of expertise relating to the matters covered by the Final Judgments that is truly extraordinary.  Their dedication and skills have played a key role in ensuring that Microsoft has lived up to its obligations.  The TC's middleware activity, in particular, has improved opportunities for user choice in Windows XP and Windows Vista, as well as heightened industry awareness of Vista's middleware mechanisms.  Equally important, the TC's initiative and determination have ensured that neither Microsoft nor the Plaintiffs have lost sight of the overall purpose and spirit of the Final Judgment in implementing its provisions.

Dated: August 30, 2007

Respectfully submitted,

FOR THE STATES OF NEW YORK,
LOUISIANA, MARYLAND, OHIO,
AND WISCONSIN

FOR THE UNITED STATES
DEPARTMENT OF JUSTICE'S
ANTITRUST DIVISION

_____

_____

ANDREW M. CUOMO
*Attorney General of New York*
JAY L. HIMES
*Chief, Antitrust Bureau*
*Assistant Attorney General*
120 Broadway
New York, New York 10271
212/416-8282

AARON D. HOAG
JAMES J. TIERNEY
SCOTT A. SCHEELE
PHILIP A. GIORDANO
ADAM T. SEVERT
*Trial Attorneys*
U.S. Department of Justice
Antitrust Division
600 E Street, N.W.
Suite 9500
Washington, D.C. 20530
202/514-8276