IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MICROSOFT CORPORATION,

    Defendant.

Civil Action No. 98-1232 (CKK)

Next Court Deadline: August 31, 2007
Joint Status Report

## MICROSOFT'S REPORT CONCERNING THE FINAL JUDGMENTS

Microsoft respectfully submits this report concerning the effects of the judgments entered by this Court on November 1 and 12, 2002 (the "Final Judgments"). In an effort to provide useful information to the Court, Microsoft and the plaintiffs have exchanged drafts of their respective reports. Accordingly, Microsoft's report addresses certain observations made in the report being submitted today by the States of California, Connecticut, Iowa, Kansas, Minnesota, the Commonwealth of Massachusetts and the District of Columbia (the "California Group").[1]

As the California Group acknowledges, "[v]arious provisions of the Final Judgment[s] (§§ III. A., B., F. and G.) prohibit Microsoft from engaging in specific types of conduct that the Court found to be anticompetitive . . . ." California Group's Report on Remedial Effectiveness at 5 (Aug. 30, 2007) (hereinafter, "States' Report"). It is equally undisputed that "Microsoft has not directly contravened these provisions." *Id*. To the contrary, "[m]ost,

---

[1] The States of Florida and Utah have declined to join the California Group's report regarding the effectiveness of the Final Judgments, although they heretofore have been included in what is referred to as the "California Group."

-2-

if not all, of the specific practices proscribed by the Final Judgment[s] were abandoned by Microsoft" even before the Final Judgments became effective. *Id.* By that measure — the normal way to assess the effectiveness of any antitrust decree — the Final Judgments have accomplished their task.

Moreover, over the life of the Final Judgments, fundamental changes have taken place in the information technology ("IT") industry that the California Group fails to note. Those changes reflect dynamic competitive forces at work. Of particular note, original equipment manufacturers ("OEMs") distribute numerous non-Microsoft software products on their new personal computers ("PCs"), and server-based applications that can be accessed via web browsers from a variety of different operating systems have attracted widespread attention from developers and users alike. These developments reflect the goals of the Final Judgments. These developments also have impacted the applications barrier to entry said to protect Microsoft's leading share in PC operating systems.

Rather than recognizing the procompetitive changes that have occurred since November 2002, the California Group suggests that the Final Judgments should have done more, ensuring that Microsoft's market share was diminished. That, however, was not the objective of the Final Judgments and should not be the standard by which the effectiveness of the Final Judgments is assessed. Microsoft did not achieve its position in the PC operating systems market unlawfully; rather, the Court found that Microsoft *maintained* that position by specific anticompetitive means. Having prohibited Microsoft from further employing those or similar means, and having created mechanisms to facilitate competition with Microsoft, the Final Judgments created an environment in which market forces can determine the relative

success and thus the market shares of participants. Measured by that standard, the Final Judgments have been a success.

## ANALYSIS

The Final Judgments have done exactly what they set out to do, *i.e.*, remedy practices engaged in by Microsoft that were found to be anticompetitive by this Court and the Court of Appeals and provided for additional relief that goes beyond the scope of what was at issue in the liability phase of the case (e.g., affecting Middleware Products such as email and instant messenger, which were not at issue during the liability phase of the case). The Final Judgments were never designed to reduce Microsoft's share in any putative market. As a result, it is inappropriate to criticize the Final Judgments on the ground that they have "had little or no discernible impact in the marketplace as measured by the most commonly used metric — market shares." States' Report at 2.[2] That "metric" misconstrues the purpose of the Final Judgments and overlooks significant changes that have occurred in the IT industry since the Court entered the Final Judgments almost five years ago.

In fact, the "applications barrier to entry" that was found to protect Microsoft's share in the market for Intel-compatible PC operating systems *has* been impacted over the last five

---

[2] To lend support to their argument that the Final Judgments have failed, the California Group quotes from a book written by Herbert Hovenkamp. (*See* States' Report at 2, 5.) What they fail to mention is Professor Hovenkamp's view that the Final Judgments were a failure from the outset because they "do[] not prohibit all of the practices that the circuit court expressly condemned." HERBERT HOVENKAMP, THE ANTITRUST ENTERPRISE: PRINCIPLE AND EXECUTION 298-99 (2005). This view presumably is not shared by this Court or the Court of Appeals. Professor Hovenkamp freely acknowledges that he "was consulted prior to trial by the government agencies" pursuing Microsoft. IIIA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶776c, at 242 n.27 (2d ed. 2002). Similarly, Harry First, who was also quoted by the California Group, was Chief of the Antitrust Bureau of the New York Attorney General's Office during the liability phase of this case, attending portions of the trial as a representative of the plaintiffs.

years — a process that has been facilitated by provisions of the Final Judgments. As a result of these changes, even the California Group acknowledges the decline in Microsoft's market share in both PC operating systems and web browsers. *See* States' Report at 2-3.

### A. The Final Judgments Addressed the Anticompetitive Acts at Issue in this Case.

The Final Judgments were not designed to bring about fundamental structural changes in the IT industry or to override choices made by consumers about which PC operating systems or other software products they would use. Nor was it an objective of the Final Judgments to reduce Microsoft's share of PC operating systems to any particular level. Rather, the Final Judgments were designed to remedy the 12 acts found to be anticompetitive by this Court and the Court of Appeals and provide additional relief consistent with the theory of liability pursued by the Plaintiffs. The goal was to eliminate the foreclosure effects of practices found to be anticompetitive so that free market forces could prevail, and so it is with regard to those specific practices that the efficacy of the Final Judgments must be assessed. The relevant question is whether the acts have stopped — a question the California Group has answered in the affirmative by noting that Microsoft "abandoned" the challenged activities "after they were called into question during the liability phase of the case." States' Report at 5.

At the time it entered the Final Judgments, this Court recognized that it would be "incompatible with the facts of this case" to impose remedies designed to terminate Microsoft's monopoly, because "[n]either the district court, nor the appellate court concluded that Microsoft had unlawfully obtained its monopoly." *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 153 n.3 (D.D.C. 2002); *see also* Response of the United States to Public Comments on the Revised Proposed Final Judgments ¶ 60 n.70 (Feb. 27, 2002) ("[P]laintiffs

never alleged, and neither the District Court nor the Court of Appeals found, that Microsoft *acquired* its monopoly unlawfully.") (emphasis in original) (hereinafter "U.S. Response to Public Comments"). Similarly, the Court found that "[n]either the evidentiary record from the liability phase, nor the record in this portion of the proceeding, establishes that the present success of IE is attributable entirely, or even in predominant part, to Microsoft's illegal conduct." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 185 n.81 (D.D.C. 2002).

The Court of Appeals ratified this Court's views when it rejected the argument that the Final Judgments "fail[] to 'terminate the illegal monopoly' or deprive Microsoft of the fruits of its violations." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1224 (D.D.C. 2004). As the Court of Appeals noted, "'the key to the proper remedy in this case is to end Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar nascent threats in the future, and restore the competitive conditions created by similar middleware threats.'" *Id*. at 1243 (quoting U.S. Response to Public Comments ¶ 17). The Final Judgments have met these objectives.

### B. The Final Judgments — Along with Other Fundamental Market Changes — Have Diminished the Applications Barrier to Entry.

The IT industry has undergone substantial changes over the last five years with regard to (i) the distribution of non-Microsoft software products by OEMs and (ii) the emergence of server-based applications. These changes have affected the applications barrier to entry.

#### 1. Distribution of Third-Party Software Products That Compete with Functionality in Windows.

The experience of the last five years establishes that the kinds of software products referred to as "middleware" in the Final Judgments have continued to proliferate. This is so

despite the fact that Windows includes the same or similar functionality as that provided by various third-party software products, including web browsers and media players.

Today, OEMs regularly install and promote products and services that compete with Microsoft offerings, including products and services that are directly competitive with components of Windows defined as "middleware" in the Final Judgments. This behavior has been facilitated by Sections III.A, B, C and H.1 of the Final Judgments, which were designed to ensure that OEMs would be free to install and promote non-Microsoft software products. Experience in the marketplace shows that these provisions of the Final Judgments have been effective.

PCs sold by major OEMs today typically contain dozens of pre-installed software products from companies other than Microsoft. A survey recently completed by the economic consulting firm LECG shows that PCs from the seven leading OEMs — which together account for more than three-quarters of PCs sold in the United States for home and small office use — contained an average of 35 pre-installed non-Microsoft software products. *See* David S. Evans & Albert L Nichols, The Behavior of PC OEMs and Growth of Server/Network Computing Five Years After the Final Judgments in *U.S. v. Microsoft* § II.B.1 (Aug. 30, 2007) (hereinafter "Evans/Nichols Report") (attached hereto as Exhibit A). These OEMs regularly pre-install Sun's Java virtual machine, media players (often two or more), anti-virus and security software, image editing software, games, and various utilities. The sheer volume of non-Microsoft software products installed on new PCs demonstrates that OEMs are a significant and effective channel of distribution for third-party software products.

Moreover, whether through pre-installation by OEMs on new PCs or through other readily available distribution channels, the prevalence of products that compete with the five

"Microsoft Middleware Products" specifically called out in the Final Judgments — *i.e.*, web browsers, Java virtual machines, audio/video players, email and instant messaging — has increased substantially over the last five years. Indeed, research completed by Professor Marco Iansiti of the Harvard Business School shows that in the last few years, such non-Microsoft products have gained usage share in four of the five relevant segments. *See* Expert Report of Marco Iansiti ("Iansiti Report") ¶ 6 (Aug. 29, 2007) (attached hereto as Exhibit B). Although predetermining competitive outcomes and engineering particular share levels were not goals of the Final Judgments, share declines among Microsoft Middleware Products that have occurred since the Final Judgments were entered confirm that distribution channels are open to competitors.

      a.    **Web browsers.** Since the Final Judgments were entered by the Court in November 2002, Microsoft's share of web browser usage has decreased, while usage of rival web browsers has increased. As the California Group acknowledges, "[l]argely due to the success of Mozilla's Firefox web browser" — an open-source product that was developed from the source code of Netscape Navigator — "Microsoft's usage share has slipped from 95% in 2002 to 85% in 2006 . . . ." States' Report at 2-3. Other industry statistics confirm that by June 2007, Internet Explorer's worldwide usage share had fallen to 84.7%, while Firefox acquired a share of 12.7%. *See* Iansiti Report ¶ 12. As the California Group notes, Apple has launched a "Windows-compatible version of its Safari web browser," which already has started to gain popularity. States' Report at 3 n.6. In addition, the Opera web browser also increased its usage share between 2002 and 2007. *See* Iansiti Report ¶ 16.

      b.    **Java Virtual Machines ("JVMs").** Microsoft no longer has a license from Sun Microsystems, Inc. ("Sun") to develop or distribute its own JVM with Windows.

Accordingly, no new PCs shipped today contain a Microsoft JVM. This gap has largely been filled by Sun's own JVM, which now is installed on more than 91% of new PCs. *See* Iansiti Report ¶ 18.

        **c.**    **Audio/Video Players.** Since the Final Judgments were entered, numerous alternatives to Windows Media Player have been made available to consumers and those alternatives are in active use. Apple QuickTime and RealPlayer are installed on the majority of internet enabled PCs. They also account for a significant amount of usage share for media players, with Apple's QuickTime and iTunes and RealPlayer currently being used by 28.5%, and 21.6% of users respectively. *See* Iansiti Report ¶¶ 22-23. Meanwhile, other media players such as WinAmp, DivX and Flash continue to gain users. *See id*. ¶¶ 24-25.

The enormous popularity of Apple's iPod and iPhone — which only work with Apple's iTunes software — has shown that distribution of software with Windows is not necessary to achieve widespread usage. In addition to preinstallations by OEMs, millions of consumers download iTunes and install it on their Windows-based PCs because they need iTunes to load music and videos on their iPods and iPhones. The fact that Windows Media Player is a component of Windows has done nothing to slow the adoption of Apple's technology. As the Final Judgments intended, these distribution channels are wide open to Apple.

        **d.**    **Email.** Internet-based email services — such as Yahoo! Mail, Google's Gmail, Hotmail, and AOL Mail — have grown dramatically since the Final Judgments were entered. Such Internet-based email services now substantially exceed client-based email products — such as Outlook Express and Windows Mail — based on the overall number of email boxes in existence. *See* Iansiti Report ¶ 26. Consumers like the convenience

of being able to access their email from any computer, something that is easy to do with Internet-based email services.  Not surprisingly, this trend toward Internet-based email services has reduced the relative percentage of Outlook Express users.

                **e.**       **Instant Messaging.**  Since 2002, Microsoft has continued to lag behind the traditional leader in instant messaging, AOL.  At present, there are 27.2 million MSN Messenger and Windows Messenger users, compared to 52.8 million AOL Instant Messenger users.  *See* Iansiti Report ¶ 31.  Further competition in this segment has come from Yahoo! Messenger and the new Google Talk messaging service, which has attracted a substantial number of users since it was launched in 2006.  In 2006, Yahoo! Messenger had 21.4 million users, and Google Talk attracted 800,000 users in a single year.  *See id.* ¶ 32.  Moreover, Windows Vista does not include instant messaging functionality.  The new Windows Live instant messaging software will be distributed using the same channels available to other software vendors.

              **2.**       **Use of Communications Protocols To Facilitate Server-Based Applications That Are Operating System Agnostic.**

Both this Court and the Court of Appeals acknowledged that the provision in the Final Judgments "requiring the disclosure of communications protocols" was the "'*most* forward-looking' in the decree."  *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1222 (D.D.C. 2004) (quoting *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 173 (D.D.C. 2002) (emphasis in original)).  As such, this Court noted that it would be inappropriate to transform "into a drastic structural remedy" the provision requiring Microsoft to document and license the communications protocols used by Windows server operating systems to provide various services to Windows client operating systems.  *New York v. Microsoft*, 224 F. Supp. 2d at 178.

Contrary to the suggestion of the California Group, Section III.E of the Final Judgments was not focused on competition *among server operating systems*. *See* States' Report at 3. Rather, both this Court and the Court of Appeals found that licensing specifications for communications protocols "sought not to achieve complete interoperability but only to 'advance' the ability of non-Microsoft server operating systems to interoperate with Windows *and thereby serve as platforms for applications*." *Massachusetts v. Microsoft*, 373 F.3d at 1224 (emphasis added). Section III.E of the Final Judgments thus requires "only the disclosures necessary to provide a basic link between non-Microsoft operating systems and PCs running Windows." *Id.*

There has been a dramatic increase over the last five years in the extent to which non-Microsoft operating systems serve as platforms for applications. These applications are operating system agnostic in that they can be accessed from any standard web browser. Many such applications rely solely on standard Internet protocols such as TCP/IP and HTTP and others rely on new Web services protocols being developed by a range of companies, including IBM, Microsoft and Sun, so the role of Section III.E in fostering this development is unclear. Nevertheless, the prospect of applications running on servers as a mechanism for overcoming the applications barrier to entry has become a competitive reality over the last five years.

Server-based applications provide a wide range of services to users of Windows and other PC operating systems through interfaces supplied by standard web browsers. Such applications are not dependent on the application programming interfaces ("APIs") exposed by Windows and thus do not contribute to the applications barrier to entry. Popular server-based applications include, among many others, Web-based email, instant messaging,

productivity applications, online banking, digital photo editing and sharing applications, and social networking tools like MySpace and Facebook. Such server-based applications can be accessed without regard to the operating systems or underlying hardware platform employed by a particular user. All that is required is the ability to communicate using standard Internet protocols like TCP/IP and HTTP and to display information in standard Internet formats like HTML and XML. According to a recent Gartner report, the development of these server-based applications is proceeding at such a rapid pace that by the year 2011 the percentage of such operating system agnostic applications is expected to exceed the percentage of applications written for a particular operating system. *See* Iansiti Report ¶ 62 (citing Gartner, "Why the Client OS Matters Well Beyond 2011," August 2006).

      The trend toward server-based applications that can be accessed from essentially any PC demonstrates that "server/client computing" is emerging as a serious competitor to Windows as a platform for developing applications. The entire notion that developers were forced to write to the APIs exposed by Windows, and that this constituted a significant barrier to entry that protected the market position of Windows, is being called into question by the emergence of server-based applications that are operating system agnostic. Companies such as Google achieved major success after the Final Judgments were entered by offering client agnostic applications that are accessible over the Web. Such companies rely entirely on a server-based application model. It is notable that Google uses hundreds of thousands of servers to provide search and many other services to millions of Windows users, and virtually all of those servers are running on Linux. *See* Evans/Nichols Report § III.B.7.

      While neither the Court nor the parties could have predicted the precise mechanism by which server-based applications would develop, the increasing prevalence of server-based

applications clearly has had the consequence of increasing the alternatives to PC operating systems as a platform for developing software products.

## CONCLUSION

For the foregoing reasons, the Final Judgments have been effective in eliminating the practices found by this Court to be anticompetitive.

Dated: August 30, 2007

Respectfully submitted,

FOR DEFENDANT
MICROSOFT CORPORATION


/s/ Charles F. Rule
Charles F. Rule (DC Bar No. 370818)
Jonathan S. Kanter (DC Bar No. 473286)
CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street, NW
Washington, DC 20004
(202) 862-2420

Bradford L. Smith
Mary Snapp
David A. Heiner, Jr.
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052
(425) 706-8080

Steven L. Holley
Richard C. Pepperman II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000