IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

        Plaintiff,

           vs.

MICROSOFT CORPORATION,

        Defendant.
_____

CA No. 98–1232 (CKK)
Washington, DC
January 28, 2009
10:50 a.m.


STATE OF NEW YORK, ET AL,

        Plaintiff,

           vs.

MICROSOFT CORPORATION,

        Defendant.
_____

CA No. 98–1233 (CKK)


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE COLLEEN KOLLAR–KOTELLY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Department of Justice:    AARON D. HOAG, ESQUIRE
                          ADAM SEVERT, ESQUIRE
                          U.S. Department of Justice
                          600 E Street, NW
                          Suite 9300
                          Washington, DC 20530
                          (202) 307–6153


APPEARANCES continued on following page.

APPEARANCES, continued


For Microsoft:                CHARLES F. RULE, ESQUIRE
                              JONATHAN S. KANTER, ESQUIRE
                              Cadwalader, Wickersham & Taft
                              1201 F Street, NW
                              Washington, DC  20004
                              (202) 862-2420


For Microsoft:                KEVIN KEHOE, ESQUIRE
                              JUDY JENNISON, ESQUIRE
                              CRAIG SHANK
                              ERICH ANDERSON
                              ROBERT MUGLIA


For the New York Group:       ELLEN S. COOPER, ESQUIRE
                              Assistant Attorney General
                              Chief, Antitrust Division
                              Office of Attorney General
                              200 St. Paul Place
                              Baltimore, MD  21202
                              (410) 576-6470


                              RICHARD L. SCHWARTZ, ESQUIRE
                              Deputy Bureau Chief, Antitrust
                              Office of Attorney General
                              120 Broadway, suite 2601
                              New York, NY  10271-0332
                              (212) 416-8284


For the California Group:     STEPHEN HOUCK, ESQUIRE
                              Menaker & Herrmann LLP
                              10 E. 40th Street
                              New York, NY  10016


For the California Group:     CRAIG FARRINGER ESQUIRE (Calif)
                              LAYNE LINDEBAK, ESQUIRE (Iowa)
                              ADAM MILLER, ESQUIRE (Calif)
                              KATHERINE E. BRITTON, ESQ.(DC)

Court Reporter:                    Lisa M. Hand, RPR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6505
                                   333 Constitution Avenue, N.W.
                                   Washington, DC  20001
                                   (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1              P R O C E E D I N G S

2         COURTROOM DEPUTY:  Civil case 98-1232, the United

3    States of America versus Microsoft Corporation, et al., and

4    Civil case 98-1233, State of New York, et al. versus Microsoft

5    Corporation, et al.  Counsel, please identify yourselves for

6    the record.

7         MR. SEVERT:  Good morning, Your Honor.  Adam Severt

8    for the United States.  With me at counsel table is Aaron

9    Hoag.

10        THE COURT:  Okay.

11        MS. COOPER:  Good morning, Your Honor.  Ellen

12   Cooper for the New York Group, and with me at counsel table is

13   Richard Schwartz from New York.

14        THE COURT:  Good morning.

15        MR. HOUCK:  Good morning, Your Honor.  Steve Houck

16   for the California Group.  And just following up on your

17   comment, I wanted to note that like the proverbial postman, my

18   colleagues from the west and the midwest braved the rain,

19   snow, sleet and hail to take their appointed positions in the

20   courtroom today.  And that would be Adam Miller from

21   California, sitting at counsel table, and Layne Lindeback from

22   Iowa.  We also have here today, with a little less difficulty,

23   two folks from the D.C. Attorney General's Office, Katherine

24   Britton and Craig Farringer.

25        THE COURT:  All right.  You're probably more

1    accustom to the weather than we are.

2            MR. RULE:  Good morning, Your Honor.  Charles Rule,

3    Cadwalader, here representing Microsoft.  With me today is my

4    partner, Jonathan Kanter.  As well, showing their hardiness

5    from the Pacific northwest, are folks from Microsoft, Bob

6    Muglia, who Your Honor knows, who is now the President of the

7    Server and Tools Business at Microsoft.  Next to him is Kevin

8    Kehoe, Senior Attorney in the Law and Corporate Group at

9    Microsoft.  Judy Jennison who is next to Kevin, who is a

10   Senior Attorney as well in that group.  And then on the bench

11   we have Erich Anderson, who is Vice-President and Deputy

12   General Counsel, and next to him is Craig Shank.

13           THE COURT:  All right.  I will note that Mr. Himes

14   wrote to me and indicated that he was leaving the AG's office

15   and going into private practice, so I would have new people

16   addressing me.  All right.  As has been my practice over the

17   years, I'll summarize the status of the compliance and

18   certainly as a court hearing.  Based on the reports, I have a

19   few questions and then I'll call on counsel.

20           When we were last in court on September 25th, that

21   was a full compliance status hearing and this is an interim

22   one, which generally is more focused.  And we're looking also,

23   now that we're in 2009, that the provisions that are still

24   extant will be expiring on November 12th.  Since the full

25   compliance hearing, Microsoft has filed reports in October,

1     November and December, and then in January the Joint Status

2     Report as well.

3            The specific focus, as it has been for quite a

4     number of years at this point, is the developments with

5     respect to Section III.E and the middleware-related provisions

6     of the Final Judgment.  Although other aspects of the sections

7     are being reviewed, those seem to be the principal ones.

8     Again, when I talk about the TC, I'm also including Mr. Hunt

9     who has worked with them.  So, let me start with -- and it's

10    actually a fairly short report in terms of the focus of what

11    we need to talk about.

12           III.E, in terms of the reset project.  Since we

13    were last here, Microsoft and the TC had finalized the two

14    templates that will govern the preparation of the system

15    documents.  Microsoft also developed a project plan to

16    complete all 19 system documents.  Those should be done, as I

17    understand it, by June 30th of this year, and includes seven

18    milestones along the way for Plaintiffs and the Court to

19    track.  And on each of the completion of the milestones, the

20    newly created documents will be made available to licensees

21    immediately on request and included in the next readily

22    scheduled revisions to the documentation.

23           At this point, Microsoft has completed system

24    documents in the first two milestones.  The TC has begun

25    reviewing those documents.  There will be feedback to

1    Microsoft.  And Microsoft reports it's going to be on track to

2    deliver Milestone 3 in -- I guess later in February.  So,

3    that's good news as long as these documents are good and are

4    doing what we're supposed to.

5              On December 5th of '08, Microsoft delivered to the

6    TC the updated technical documents in anticipation of the

7    release of Windows 7 beta.  And there's 30 new technical

8    documents, 87 updated technical documents, and I guess between

9    the scope of the work of looking at the Windows 7 documents

10   and the new system documents, the TC evidently decided to set

11   up a different review strategy.  So, it's going to shift its

12   focus going forward, giving the direct review of the documents

13   to the TC's engineers.  And then you will, as I understand it,

14   continue to use validation and prototyping methods to

15   supplement the direct review.  Evidently the TC feels this is

16   the most efficient method for identifying issues with the

17   documentation and will also allow you to look at Windows 7,

18   which is very important, as well, more thoroughly.

19             The prototype implementation activity as of

20   December 31st, '08, there were a total of 1660 outstanding

21   TDIs in the rewritten documentation, 301 were Priority 1

22   submitted by the TC, 776 were self-identified by Microsoft.

23   Microsoft points out that it spans the entire range of

24   rewritten MCPP documentation, and it should be considered in

25   the context of 20,000 pages.  I have a few questions on that

 1   one, but I'll get back to it.

 2           In terms of testing of Cluster 7, that was

 3   completed on September 30th.  The results were reviewed with

 4   the TC in October of '08.  In addition, testing for Cluster 8

 5   was completed in early January, and they were reviewed with

 6   the TC on January 20th.  And then the next one, as I

 7   understand it, will be March 31st.  And they will be using

 8   newly created technical documentation, including Windows 7,

 9   will be tested using a similar method.

10           Microsoft is planning an active directory plug-fest

11   for this week, five confirmed attendees.  The MCPP status,

12   their total of 51 companies now licensing patents for

13   Communications Protocols, and 41 of those have royalty bearing

14   licenses, so the number has gone up slowly, but gone up.  As

15   aware of 14 patent licensees shipping products under the MCPP,

16   and Microsoft reports that 28 licensees have signed up to

17   receive the free Technical Account Manager support, and eight

18   have signed up for Windows source code access.

19           Evidently, as of January 21st documents describing

20   the protocols available have been downloaded over 270,000

21   times, which is quite an impressive figure.  I am concerned,

22   obviously, about the TDIs, and I realize that the more you

23   look at it, the more these things are reviewed, but I am

24   concerned that we do have a November 12th date looming now in

25   this year.  And I want to make sure that we see this as

1    getting resolved before that.

2           And I guess the next thing is whether -- my other

3    question is whether Plaintiffs agree that Microsoft is on

4    track on these various milestones, and the reviews that you

5    have been doing, the ones that you did testing validation on

6    Cluster 7 back in October and January, and you'll be doing one

7    in March.  Are you satisfied with what is being produced?

8    That's important to know.

9           The next area is the competing middleware, and this

10   is the Plaintiffs but not the United States, have received

11   complaints about certain marketing programs that were

12   announced by Microsoft from several companies that manufacture

13   and sell a variety of products that work with Windows.

14   Microsoft has informed the Plaintiffs that a number of changes

15   have been made to these programs, I assume in response to

16   this, it wasn't quite clear looking at the reports.  And the

17   other additional changes are being considered and Plaintiffs

18   are monitoring it.

19          So, my first question is, of course, are the

20   Plaintiffs satisfied with the changes?  Are they directed and

21   responsive to what the concerns are that have come up in terms

22   of these marketing programs?  Any reactions based on the TC's

23   testing of Windows 7 or the beta of IE 8?  There don't seem to

24   be any new issues on the default browser override, if that's

25   correct.  And has the TC provided Microsoft with the new codes

1    for its simulator tool.

2              And the last one we had been talking quite a bit

3    about, an ongoing confidential inquiry about a matter that

4    evidently involved cross platform gaming, which Plaintiffs are

5    now reporting has been resolved to their satisfaction and

6    without any intervention from me.  And, evidently, Microsoft

7    has agreed to provide additional compliance training to some

8    of the employees in the Windows organization who interact with

9    hardware vendors.  And one of Microsoft's executives will

10   publicly affirm at an appropriate industry meeting scheduled

11   to take place within the next two months, Microsoft's ongoing

12   commitment to support game developers on Windows, whether or

13   not those developers choose to use other platforms as well.

14   So, that seems to be resolved.

15             Compliance officers, other than this one thing that

16   evidently you're picking up in terms of doing it.  The other

17   thing is, there are media reports about cuts in jobs for

18   Microsoft, hopefully they're not in my area.  And I want to

19   make sure that the commitment that has been made that we've

20   been working on with Mr. Muglia continues and that we don't

21   wind up with people being sliced from there, particularly,

22   where, once again, deadlines are looming.

23             So, that's pretty much it.  I think those are the

24   key things that I saw in there.  I have raised a few

25   questions, but I'm interested in knowing the Plaintiff's

1    reactions to the various things that have been produced so

2    far.  So, let me start, as I always do, with Justice and then

3    I'll move through the group.

4              MR. SEVERT:  Thank you, your Honor.  As you noted

5    in your opening remarks, Mr. Himes is not with us today, he

6    has finally followed through on his repeated threats and left

7    the New York Attorney General's office.  I just wanted to note

8    for myself, and I know Mr. Hoag and the rest of us with the

9    United States, that it was a pleasure working with Mr. Himes

10   and we will certainly miss him.  I also want to introduce

11   Ellen Cooper who is going to be -- who has been working on

12   this case for some time.

13             THE COURT:  Yes.  I certainly recognize her.

14             MR. SEVERT:  Ms. Cooper will be taking a more

15   active leadership role with the New York Group, and we look

16   forward to continuing to work with her in her new role.

17             THE COURT:  So, she's the new Mr. Himes?

18             MR. SEVERT:  There is no new Mr. Himes, Your Honor.

19             THE COURT:  Although, I think he's probably

20   somewhat irreplaceable.  I always enjoyed his answers to my

21   questions and things that he brought up.  Go ahead.

22             MR. SEVERT:  To shift -- to focus on your

23   questions, let me start with III.E.  You mentioned that the

24   TDI numbers have been rising steadily.  I think from our

25   perspective we view these as normal fluctuations in the

1    numbers of TDIs and don't view it as a cause for concern at

2    this point.

3                THE COURT:  Okay.

4                MR. SEVERT:  In terms of -- are we still on track

5    for November of this year.  I can tell you we haven't reached

6    that question yet.

7                THE COURT:  Okay.

8                MR. SEVERT:  But we will be engaging with Microsoft

9    over the next few months talking about what the path for the

10   path to completion looks like.

11               THE COURT:  Are you satisfied with the work that

12   has been produced pursuant to these milestones?  I'm assuming

13   that people are satisfied with the two templates because we've

14   now moved forward.

15               MR. SEVERT:  Yes, Your Honor.

16               THE COURT:  So, where are we in terms of the

17   documentation that's been related to the milestones?

18               MR. SEVERT:  Sure.  You had asked about the Cluster

19   7 and 8, and we are very satisfied with the work that has gone

20   on there.  And, in fact, that has generated a number of TDIs

21   from that -- from that effort.  The thing that's too early to

22   talk about yet is the system documents.  We've received four

23   from Microsoft to date, and because of how complex they are,

24   it will be still some more time before we are able to --

25   before we are in a position to comment on the quality of those

1    documents.  So, I think that's sort of the focus for the TC

2    right now is the system documents.

3            And as Your Honor noted in your remarks, they have

4    shifted their focus to this direct review, which will allow

5    them to really focus on both the system documents and the

6    Windows 7 documents, both the documents that are new for

7    Windows 7 and have been changed for Windows 7, which we view

8    as very high priority for the industry.

9            THE COURT:  I agree.

10           MR. SEVERT:  The other thing I just wanted to

11   briefly address, unless you had any other questions on III.E?

12           THE COURT:  No.

13           MR. SEVERT:  Your Honor had asked about the

14   announced job cuts at Microsoft, and when we read that we

15   asked the same question and had been assured that none of the

16   layoffs are involved in any of the Final Judgment efforts.

17           THE COURT:  Okay.  I'm sure that the European union

18   would have something to say about it, too.  Go ahead.

19           MR. SEVERT:  Any further questions, Your Honor?

20           THE COURT:  No.  The only other thing was in terms

21   of the one complaint about the marketing program.  Reading the

22   report, it wasn't clear to me whether you were satisfied with

23   the response that Microsoft has come up with.

24           MR. SEVERT:  Your Honor, are you referring to the

25   marketing program or the cross --

 1              THE COURT:  Oh, that's not you.  That's right.

 2     Sorry, I forgot.  I keep forgetting.  It's not the U.S., it's

 3     the wrong person.

 4              MR. HOUCK:  I'll address that, Your Honor.

 5              THE COURT:  That's right.  I forgot about that.

 6              MR. SEVERT:  Thank you.

 7              THE COURT:  Okay.  Ms. Cooper.

 8              MS. COOPER:  For my maiden speech, Your Honor, I

 9     don't really have very much to say in this matter.  We're

10     largely in agreement with the Department of Justice in terms

11     of how we view how things are going with, in particular, the

12     system documents and the TDIs.  And Mr. Houck is going to be

13     addressing the questions that you raised about the middleware

14     complaints.

15              THE COURT:  Okay.  All right.  Mr. Houck.

16              MR. HOUCK:  I'd like to begin with two personal

17     notes, one is that we also will miss Mr. Himes and his

18     excellent work, and the other thing is to congratulate

19     Mr. Muglia, who now is one of the very most senior people in

20     Microsoft, he has a very impressive title.  So, I want Your

21     Honor to know you've got a top level guy sitting right here.

22              THE COURT:  All right.

23              MR. HOUCK:  First, briefly, with regard to the

24     documents, the last time I was here we did express some

25     concern about what we perceived to be the level of commitment

1   to Microsoft and Microsoft to working on this.  I don't have

2   that concern this time.  Indeed, we are quite pleased as we

3   see it from and hear it from Mr. Hunt and the technical

4   committee, that Microsoft is working hard to get the documents

5   into shape.  We obviously remain concerned, as Your Honor

6   does, about the level of the TDIs, but are satisfied that

7   Microsoft is working well with the TC to get them down.

8          Now, Your Honor mentioned the November date that is

9   coming up, and I actually promised Mr. Rule I was going to

10  stay away from this subject today, and I will largely, but

11  Your Honor raised it.

12         THE COURT:  I raised it only in that we're now in

13  the year once again.

14         MR. HOUCK:  So, I just want to give you a little

15  information, hopefully without breaking my promise to

16  Mr. Rule.  Actually, we're not really prepared to discuss it

17  anyhow, but I will tell you what we told him, which is that we

18  are thinking very hard about this.  We, too, are aware that

19  that date is coming up.  And what our objective is is to be in

20  a position to talk with you about this the next time we meet.

21  So, that's all I'll say, and I apologize to Mr. Rule.

22         THE COURT:  Okay.  You can always respond to the

23  Court and not break your promise to fellow counsel.

24         MR. HOUCK:  Your Honor trumps Mr. Rule, as far as

25  I'm concerned.  I did want to talk a little bit about the

16

1   marketing complaints which Your Honor alluded to, and Your

2   Honor said you weren't clear about them, and that's not your

3   fault.  I think the JSR was deliberately vague about what they

4   are with some reason.

5           THE COURT:  Okay.

6           MR. HOUCK:  I will start off by saying that in the

7   six plus years that we've been enforcing the decree, this

8   particular issue is one in which we've gotten the most number

9   of complaints and heard the most anxiety about what Microsoft

10  is doing.  And the subject matter, very generally, is various

11  Microsoft marketing programs that impact or potentially impact

12  non-Microsoft middleware and applications in the OEM channel.

13  And I don't really want to say too much more about that

14  because the programs are changing, but I at least wanted to

15  give you enough to orient you to what it is that we're

16  addressing.

17          THE COURT:  Okay.

18          MR. HOUCK:  And we have had complaints, both from

19  significant ISVs and from significant OEMs about this.  I

20  thought it might also be a little bit helpful to try to put

21  this in some chronological context for Your Honor.  I actually

22  first raised this back at the June 2008 Joint Status

23  Conference, and Your Honor probably doesn't remember it

24  because I raised it in a very glancing way.  I said we had

25  heard some concerns about some Microsoft marketing programs --

1         THE COURT:  I don't think they were actually in the

2    report and you had raised them separately.

3         MR. HOUCK:  That's correct.  So Your Honor does

4    have a very good memory.  And after the conference we were

5    going to meet with Microsoft just to try to find out what was

6    happening.  At that point in time in the spring, that was

7    really largely the problem, I think.  It was very unclear to

8    ISVs and OEMs exactly what Microsoft had in mind.  I guess the

9    communication wasn't very clear, and subsequently Microsoft

10   remedied that and made it clearer.  But the result of that

11   was, I think that the concerns deepened out there when they

12   actually realized what these programs were.  And so we did

13   hear quite a number of complaints and concerns at the end of

14   the summer and in the early fall.

15        And as I think I mentioned to Your Honor before, we

16   have quarterly –– we call them all-hands meetings in Redmond

17   where we talk about various issues, and we asked Microsoft to

18   put this on the agenda, and that meeting was last month in

19   December in Redmond.  When we got there it was a fairly brief

20   conversation because Microsoft told us that they had made some

21   significant changes in the programs and were about to announce

22   them.  Which they did.  And, indeed, those changes I think did

23   move things in a positive direction, but nevertheless, since

24   then we have still been hearing from OEMs and ISVs that they

25   continue to have concerns about these programs.

1              Microsoft had also told us when we met in Redmond

2      that they were considering additional changes.  So,

3      essentially where we are right now is we're looking at a

4      program that seems to us to be not finally settled, in a bit

5      of flux.  And even yesterday I sent an e-mail to Microsoft

6      with some questions to help clarify for us how these programs

7      work, to get some information from them about how they are

8      working, and about their impact on ISVs.  And we continue to

9      talk with Microsoft, and we're setting up -- even this morning

10     before we came in here, we talked about setting up a time to

11     discuss some of these concerns.

12              THE COURT:  Okay.

13              MR. HOUCK:  So, that's the reason it's a little bit

14     vague.

15              THE COURT:  No.  Usually the system we've set up is

16     that you have an opportunity to resolve it and if you don't

17     then you come to me.

18              MR. HOUCK:  We're still talking and the programs

19     are still being shaped, so we're not prepared to discuss them

20     substantively yet but we just wanted to let Your Honor know

21     this is happening and we're working on it.

22              THE COURT:  But at least it sounds like -- what I

23     couldn't tell from the report is whether -- the changes that

24     Microsoft was making, you viewed at least as responsive to

25     your concerns.

1             MR. HOUCK:  Yes, we do.  And they were affirmative

2   positive changes, but they haven't eliminated all our

3   concerns, so we're still discussing it with them.

4             THE COURT:  And then the one that we've been

5   talking for quite some time has been resolved successfully.

6             MR. HOUCK:  Correct.

7             THE COURT:  All right.  Anything else?

8             MR. HOUCK:  Thank you very much.

9             THE COURT:  Okay.  Mr. Rule.

10             MR. RULE:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. RULE:  I want to thank Steve for certainly

13   keeping his word, although, I grant Your Honor -- responding

14   to your questions is more important.  I also want to

15   acknowledge Mr. Himes' absence here for the first time, and I

16   think I can honestly say we will miss him, too.  But we're

17   glad that Ms. Cooper has stepped into his shoes, figuratively

18   speaking, and we look forward to working with her on an

19   ongoing basis as well as with all of our other colleagues on

20   the Plaintiff's side.

21             Your Honor, again, just a brief note before I hit

22   the two areas that you have raised in your questions.  Again,

23   when we come here every three months or so, we talk about

24   issues that have arisen.  I think it's always heartening to

25   hear Your Honor also report some other statistics that I think

1    reflect the fact, and certainly we should pay some attention

2    to, that the program by certain measurements, that is to say,

3    the MCPP program is working.

4           I think the 270,000 downloads that Your Honor

5    noticed is a pretty impressive number.  I think in one of our

6    interim reports, I believe in November, we pointed out that in

7    a blog entry on Samba -- one of the main developers of Samba

8    made the point that while they're still working for

9    interoperability, the bottleneck may be due to the other

10   factors other than the MCPP program, and that they don't think

11   it's due to missing documentation.  So, I think that's

12   positive.

13          THE COURT:  That is.

14          MR. RULE:  So, there are some I think real

15   positives in this program that we don't want to lose sight of

16   and we hope Your Honor doesn't lose sight of either.  Moving

17   to the TDI issue, Your Honor, I'm going to let Mr. Muglia

18   address that in some detail.  But as I understand it, the

19   number of TDIs that are being reported are sort of to be

20   expected, given certain other developments, like the testing

21   program for Microsoft, the fact that we have produced to the

22   Plaintiffs the new Windows 7 documents, 30 new documents and

23   87 updated documents.  And a change in allocation of resources

24   at the TC.

25          Mr. Muglia can address that more, but we are

1    confident that the quality is there and that this process is

2    improving that quality.  And, also, I'll let Mr. Muglia

3    address the commitment of the company.  That notwithstanding

4    Microsoft, like many other companies these days, has announced

5    some layoffs, those layoffs will not affect the company's

6    commitment to this Court and its obligations under the decree.

7            Let me move to the marketing issue, which I will

8    address, and is not really Mr. Muglia's area, so I will

9    attempt to address that.  We are going to continue to discuss

10   this with the Plaintiffs, so let me say that at the outset,

11   and work with them.  But I think it's worthwhile putting this

12   into a little bit of context.  Your Honor may recall that when

13   Windows Vista was first introduced there were issues that

14   revealed themselves in the marketplace of some consumer

15   dissatisfaction and things like boot times and compatibility

16   of the programs.

17           And it's an issue that Microsoft, and frankly,

18   everybody in the PC ecosystem was very concerned about and

19   very focused on, and Microsoft is going to address those

20   issues very directly and hopefully very successfully in

21   Windows 7.  But as part of that process there were issues of

22   compatible boot time, and Microsoft wanted to work with the

23   OEMs and the ISV community to alleviate, if not eliminate,

24   those issues, and to that extent -- to that end they developed

25   certain tests.  And initially asked OEMs to engage in some

1   testing and reporting with the expectation that in future

2   cycles those -- compliance with those tests, meeting those

3   tests, would factor into receiving marketing dollars.

4          The purpose of this was goodness, which is to say,

5   to improve the performance of PCs for consumers, which we

6   think benefits everyone in the ecosystem, but we did get

7   feedback from the industry, as well as from regulators.  And

8   based on that, Microsoft took certain steps to avoid certain

9   unintended business consequences from the way the program was

10  designed originally.  And principally that meant that no

11  longer will -- we are not intending to tie marketing dollars

12  to compliance with the test, we're still asking OEMs to test

13  and report, but marketing dollars will not be tied to the

14  outcome of those tests.

15         This is an ongoing process.  We're going to

16  continue to talk to ISVs.  We're going to continue to talk to

17  OEMs.  They're going to continue to talk to us, that's

18  absolutely clear.  And we're going to continue to talk to the

19  regulators and the folks who we are working with.  And we'll

20  continue to try to refine the program to make sure that it

21  accomplishes its objective, which is improving the PC

22  ecosystem, making PCs more attractive to consumers, and moving

23  forward along that line, which I think is something that we

24  can all agree is a good thing, but make sure that it doesn't

25  have unintended consequences.  So, we look forward to working

23

1    with the Plaintiffs and others to make sure that this effort

2    achieves its objective.

3              THE COURT:  All right.

4              MR. RULE:  I'll ask Mr. Muglia to come up unless

5    Your Honor has any other questions?

6              THE COURT:  No, I'll wait to see how it works out

7    since at this point the Plaintiffs and the TC seem satisfied

8    with the initial response, I'll wait to see how it develops.

9              MR. RULE:  All right.  Thank you.

10             THE COURT:  Mr. Muglia.  Let me start by

11   congratulating you.

12             MR. MUGLIA:  Thank you, Your Honor, and good

13   morning.

14             THE COURT:  Good morning.

15             MR. MUGLIA:  Well, let me first address the

16   question that you asked about the impact of the job cuts, the

17   recent announcement of Microsoft and job cuts on this program.

18   And, once again, give you my assurance that in no way will any

19   changes in staffing that Microsoft is taking or also any

20   changes we're doing in some of the contract development that

21   we may be spending, will that affect our commitment to the

22   program and our continued application of resources to meet all

23   the objectives of the program that we're working on with the

24   TC and the Plaintiffs.  I've said before, this is our highest

25   priority and it will remain so through everything.

1           THE COURT:  All right.

2           MR. MUGLIA:  In terms of the TDIs and the question

3  of the current number.  I will start by saying again that

4  we're working through an engineering process and if Your Honor

5  might recall in our past two sessions I had indicated that it

6  was likely that the number of outstanding TDIs would continue

7  to increase as we move forward with our testing process.  We

8  were aware that the last two quarters of last year, the last

9  two clusters of tests that completed at the end of September

10  and the end of December had the largest number of documents

11  coming through the process.  So, it was our expectation based

12  on the TDIs that we had been finding on an ongoing rate that

13  the number of TDIs would increase through this period, and in

14  fact they have.  We have largely -- our engineering teams have

15  largely kept up with that and are working through the process

16  of resolving those TDIs on an ongoing basis.

17           Now, as we move forward with our own testing, we

18  are in the process of the final testing cluster on the

19  original Blue Line project, and there are actually somewhat

20  less number of documents in this test cluster than there had

21  been in the previous ones.  So, it's our expectations that our

22  incoming rate of TDIs, as reported by Microsoft, will decrease

23  during this period -- during -- between now and March.  And

24  then post that we will begin in full our efforts of testing

25  the Windows 7 based documentation.

1              The other thing that is important that has been

2    noted a couple of times today is that the technical committee

3    has shifted some of its resource as they move from defining

4    the templates on the systems documents and some other

5    projects, they have shifted their resource on to directly

6    testing the documents -- the protocol documents, and this has

7    caused a recent increase in the number of TDIs they have

8    reported.

9              We remain committed to working with the technical

10   committee and resolving those issues as quickly as possible.

11   It is our expectation that we will be able to continue to do

12   so.  I don't know at this point exactly what their incoming

13   rate will be in the coming months and quarters, but regardless

14   of what it is, it is our commitment that we'll resolve all of

15   those issues on an ongoing basis.  So, this is part of a

16   standard engineering process.  We are actually winding down

17   our test work on the original Blue Line documents.  The TDI

18   rates will reduce associated with that wind down, but they

19   will increase as we go to Windows 7.

20             THE COURT:  All right.

21             MR. MUGLIA:  Are there any other questions that

22   Your Honor might have on TDIs?

23             THE COURT:  No, I think that's it.

24             MR. MUGLIA:  And there was one other question that

25   Your Honor has asked, and I don't think it was answered at

26

1    this point, which is that there was a simulator tool that the

2    TC had built.  And Your Honor asked the question whether that

3    had been supplied to Microsoft, and the answer to that is yes,

4    and our engineers are working on that right now and doing

5    validation on that.  And we expect to be able to release that

6    broadly to the community shortly.

7              THE COURT:  All right.

8              MR. MUGLIA:  Anything else, Your Honor?

9              THE COURT:  No, I think that covers it.

10             MR. MUGLIA:  Thank you very much.

11             THE COURT:  Is there anything else anybody wants to

12   say?  If not, I think we seem to be moving.  I'm happy to hear

13   that the staffing is going to remain at the level that they

14   are.  I'm happy that the templates have been completed and

15   everybody seems to have set out a plan and we're working

16   towards it.  What I'd like to do in terms of -- with the

17   idea -- the ever-looming November date, is to suggest that in

18   terms of our next periods to come in, without picking a date,

19   would be to bring you in in April, July and October.  Does

20   that work in terms of how -- I'm trying to figure out sort of

21   a system in terms of having certain goals that will be

22   completed.  We can shift these around if these are not the

23   months that -- it would be better to have different months in

24   terms of what you'd report on.  But certainly to have it in

25   October, with the idea that the November date would be coming

```
 1   up, just to sort of see where we are and not have this done at
 2   the last minute.
 3            But if that would be -- as I said, we can pick
 4   dates specific within those months.  But are those months that
 5   would work in terms of what you have projected to finish or do
 6   you want to put different dates?  Because we basically have
 7   about three other -- it seems to me, three other, one full
 8   one, one interim and sort of the last full one -- if that
 9   works. Okay.
10            MR. HOUCK:  That works for the Plaintiffs, Your
11   Honor.
12            THE COURT:  As I said, you know better in terms of
13   when these things are -- when accomplishments will be done so
14   that you'd be in a position to report it to the Court.  Do you
15   want to pick -- we can pick the three days in the months now
16   or we could just pick April and take a look -- it may be that
17   moving out is harder to do.
18            MR. RULE:  Your Honor, I think we are prepared to
19   pick the April date.  I think it's a little more difficult
20   with Mr. Muglia's schedule to pick the others.
21            THE COURT:  Not a problem.  And I forgot whether
22   it's better for you all to -- I should know this by now, but
23   where it is --
24            MR. HOUCK:  Monday or Friday isn't better for the
25   people flying.
```

 1          THE COURT:  I think what happened is we wind up

 2   having to change -- did we change this date from last week?

 3   We had already set it.  Okay.  I had to reschedule some things

 4   because I'm on another court and I needed to do that.  How

 5   about if we did April 10th?  I'm not sitting on the 24th.

 6   April 10th, does that work?

 7          MR. HOUCK:  That's a Friday, and I think the west

 8   coast people prefer the middle of the week.

 9          THE COURT:  Oh, middle of the week.  I'm sorry.  I

10   thought you didn't want -- I thought you wanted Monday --

11          MR. RULE:  Your Honor, just speaking on behalf of

12   our west coast contingent, I believe their west coast

13   contingent -- the April 10th works, so --

14          THE COURT:  Do you want to talk for a few minutes?

15   The 23rd and 24th don't work for me.

16          MR. HOUCK:  April 10th works.  Ellen says it's Good

17   Friday Easter weekend.

18          THE COURT:  That's not a good.  It's also sometimes

19   a spring recess day for the Court, so let's pick another time.

20   We don't want to pick tax time, the 15th, unless you want to

21   do it the 16th, or we can do it the 22nd.

22          MR. RULE:  That works for us.

23          THE COURT:  The 16th?

24          MR. RULE:  No, the 22nd.

25          THE COURT:  I can do it the 22nd.  Does that work?

1          MR. HOUCK:  Yes, Your Honor.

2          THE COURT:  So, we'll do it April 22nd, and we'll

3    do our 10:30 time.  Okay.  Then I'll see you back at that

4    point.  And I would just ask if you can get the report done,

5    say, by April 16th, that will work.  All right.  If there's

6    nothing else then let me excuse you all.  Have a good day and

7    safe journey back.

8    END OF PROCEEDINGS AT 11:30 A.M.

9

10

11                    C E R T I F I C A T E

12          I, Lisa M. Hand, RPR, certify that the

13    foregoing is a correct transcript from the record of

14    proceedings in the above-titled matter.

15

16

17

18                              _____

19                              Lisa M. Hand, RPR

20

21

22

23

24

25