UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .
                                   .  CA No. 98-1232 (CKK)
     v.                            .
                                   .  Washington, D.C.
MICROSOFT CORPORATION,             .  Thursday, August 13, 2009
                                   .  11:05 a.m.
          Defendant.               .
                                   .
. . . . . . . . . . . . . . .      .

STATE OF NEW YORK, et al.,         .
                                   .
          Plaintiffs,              .
                                   .  CA No. 98-1233 (CKK)
     v.                            .
                                   .  Washington, D.C.
MICROSOFT CORPORATION,             .  Thursday, August 13, 2009
                                   .  11:05 a.m.
          Defendant.               .
                                   .
. . . . . . . . . . . . . . .      .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Department of Justice:   ADAM T. SEVERT, ESQ.
                             JAMES TIERNEY, ESQ.
                             U.S. Department of Justice
                             600 E Street, NW
                             Suite 9300
                             Washington, D.C. 20530
                             202-616-0944

For Microsoft:               CHARLES F. RULE, ESQ.
                             JONATHAN S. KANTER, ESQ.
                             NGOC HULBIG, ESQ.
                             ERICH ANDERSON, ESQ.
                             Cadwalader, Wickersham & Taft, LLP
                             700 Sixth Street, NW
                             Washington, D.C. 20001
                             202-8620-2420

```
For Microsoft:              KEVIN KEHOE
                            ROBERT MUGLIA
                            JUDY JENNISON

For New York Group:         ELLEN COOPER, ESQ. (Maryland)
                            Assistant Attorney General
                            Chief, Antitrust Division
                            Office of Attorney General
                            200 St. Paul Place
                            Baltimore, Maryland 21202
                            410-576-6470

For California Group:       STEPHEN HOUCK, ESQ. (California)
                            Menaker & Herrmann LLP
                            10 E. 40th Street
                            New York, New York 10016

                            KATHLEEN E. FOOTE, ESQ.
                            Department of Justice
                            Office of the Attorney General
                            455 Golden Gate Avenue, Suite 11000
                            San Francisco, California 94102-7004
                            415-703-5555

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 4808-B
                            333 Constitution Avenue, N.W.
                            Washington, D.C. 20001
                            202-216-0313
```

**Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.**

P R O C E E D I N G S

    THE DEPUTY CLERK:  Civil case 98-1232, the
United States of America versus Microsoft Corporation, and civil
case 98-1233, State of New York et al. versus Microsoft
Corporation.  Counsel, would you please come forward and
identify yourself for the record.

    MR. SEVERT:  Good morning, Your Honor.  Adam Severt
for the United States.  With me at counsel table is Jim Tierney.

    THE COURT:  All right.

    MS. COOPER:  Good morning, Your Honor.  Ellen Cooper
from the State of Maryland for the New York Group.

    THE COURT:  Okay.

    MR. HOUCK:  Stephen Houck, Your Honor, for the
California Group, and we're pleased to have back with us at
counsel table today Kathleen Foote from the California Attorney
General's Office.

    THE COURT:  Welcome back.

    MR. RULE:  Good morning, Your Honor.  Rick Rule,
Cadwalader, for Microsoft.  With me at counsel table is Fred
Wurden, who is the lead executive in charge of the Microsoft's
documentation effort; Bob Muglia, who you will be hearing from
shortly; Kevin Kehoe, compliance officer in the legal department
at Microsoft; Judy Jennison, also in the legal department.

    On the back bench is Erich Anderson, deputy general
counsel, Ngoc Hulbig and Jonathan Kanter, also from Cadwalader.

1            THE COURT:  All right.

2       Okay.  As has been my practice, I'll summarize the status

3  of compliance since the last court hearing.  I'll then have some

4  questions and I'll call on counsel.  This is an interim status

5  hearing, and it's quite focused and short, it looks like.

6       All right.  On April 22, which was the last time we were in

7  court on these cases, I held a full compliance status hearing.

8  As has been the recent case, the focus of that hearing was on

9  the projects undertaken under Section III.E, the communications

10  protocol licensing provisions of the final judgments.  I also

11  granted the parties' joint motions to extend Section III.E and

12  its supporting provisions of the final judgments, as well as the

13  surviving non-III.E provisions of the New York and California

14  Group final judgments for an additional 18 months.  In other

15  words, all of them will go through and including May 12 of 2011.

16       Microsoft has filed supplemental reports regarding its

17  compliance in May, June, and July, and the parties have also

18  filed a joint status report in anticipation of this hearing.  As

19  I've indicated, it's an interim status hearing.  The joint

20  status report focuses on recent enforcement activities, also on

21  developments with respect to Section III.E and the middleware

22  related provisions.  Although the plaintiffs are monitoring some

23  of the other sections, those are the principal ones.  And again,

24  when I talk about the TC, I'm of course including Mr. Craig Hunt

25  from the California Group, the expert.

1        So let me start with the final judgments Section III.E,

2    which has been the focus of all of the recent hearings.  In

3    terms of the project schedule, Microsoft has been creating a set

4    of system documents as part of the technical documentation

5    rewrite project, and Microsoft delivered the final system

6    document on June 30, completing the technical documentation

7    rewrite project as scheduled.  They are also now available to

8    the public on MSDN.

9        The plaintiffs in the TC are currently reviewing the

10   complete set of documentations to decide whether they are

11   substantially complete.  Substantially complete doesn't mean

12   that they're finished and no additional work needs to be done,

13   but it should mean that the documents cover the information

14   required by the templates in a reasonably thorough manner.

15       Assuming the quality of the unreviewed documents is

16   comparable to the ones that have already been reviewed and there

17   are no unexpected discoveries by the TC, then plaintiffs expect

18   that by the end of the year they'll be in a position to

19   determine that the documents are substantially complete.

20       The TC has continued its technical documentation review,

21   having shifted, as we indicated before, the engineering

22   resources formerly used on the prototype implementation and

23   validation projects to the direct review of these documents.

24   The TC has been identifying TDIs at a higher rate than in the

25   past.  However, plaintiffs are reporting that they're seeing

positive signs regarding Microsoft's resolution rate of the
TDIs.

As of July 31, 2009, there were 2,355 outstanding TDIs in
the rewritten documentation, of which 580 were priority 1 TDIs
submitted by the TC.  Microsoft self-identified 281.  Microsoft
does note, as it has before, that the total number of TDIs spans
the entire range of rewritten MCPP documentation, the newly
released Windows 7 documentation, the review materials and
system documents, and that the number of TDIs should be
considered in the context of more than 30,000 pages of technical
documentation.

There has been progress processing the increased TDI
identification.  For example, the total amount of outstanding
TC-generated TDIs decreased by 238 in July.  The testing of the
new Windows 7 documents in MCPP will be spread out over the next
several testing clusters.  Microsoft expects the testing will be
completed in approximately June of 2010.

Microsoft's planning a plug-fest for the week of September
14 as part of the storage developer conference.  The
interoperability lab remains open, available for use by
licensees.  Two licensees, including Samba, have scheduled time
there.  And Microsoft reports that in terms of the MCPP status,
54 companies are licensing patents for the communications
protocols under Section III.E.  43 have royalty-bearing
licenses.  Microsoft is aware of 15 patent licensees shipping

1    products.

2         Microsoft also reports that 28 licensees have signed up to

3    receive pretechnical account manager support.  Eight have signed

4    up for the Windows source code access.  And obviously, much of

5    it is available to the public on the MSDN Web site.  As of

6    August 7, documents describing protocols made available have

7    been downloaded over 412,000 times.

8         So I'm pleased to see that Microsoft has timely delivered

9    all the system documents as scheduled.  Hopefully the quality

10   will be comparable to the ones that have already been reviewed.

11   I'm also pleased to see that Microsoft is making progress in

12   handling the increased TDIs generated by the TC, and the overall

13   number appears to start to be decreasing.  Plaintiffs have

14   indicated a, quote, positive sign, unquote, with respect to the

15   handling of the TDIs.

16        Are there anything -- if there's anything that the

17   plaintiffs want to address either in terms of the TDIs or the

18   latest documentation, I'll let you do so at the end.  We seem to

19   at least be on schedule.  Hopefully the quality of what's being

20   produced is what was expected.  But at least that seems to be

21   working.

22        In terms of the, I guess III.C, since the last status

23   conference, Windows 7 was finalized and released to

24   manufacturing on July 22.  Plaintiffs report that prior to the

25   release the TC performed detailed testing and interacted with

1    Microsoft on numerous occasions to suggest changes to the

2    Windows 7 consistent with the final judgment requirements, and

3    to date Microsoft has satisfactorily addressed the issues that

4    the TC has raised.

5        So I guess the question would be are the plaintiffs

6    satisfied with the changes to the code for its middleware

7    simulator tool, and has that been made available online, and

8    anything else you want to raise about that.

9        The last is a complaint.  The state plaintiffs report that

10    in May of 2009 they, along with the TC, received a complaint,

11    observed published reports, as did the Court, regarding how the

12    most recent version of Internet Explorer, which would be

13    Internet Explorer 8, was being installed on PCs running Windows

14    XP and Vista.

15        The complaint concerned, at least as I understand it, how

16    the users with a non-Microsoft default browser might

17    inadvertently have their default browser of choice switched to

18    Internet Explorer 8 while utilizing the Express as opposed to

19    the Custom option during the first run screen.  Even though it

20    was possible for the user to revert to the original default

21    browser, the state plaintiffs were concerned that the process

22    was confusing, particularly if you were an unsophisticated user.

23        The state plaintiffs report that the parties have agreed

24    that the Internet Explorer 8 first run process could be

25    improved.  Microsoft agreed to revise the Internet Explorer 8

first run process.  And so the date was August 11.  Hopefully,

and I'd like to hear whether Microsoft has revised the default

browser screen to offer the user a clear choice with respect to

the browser default setting before proceeding to the first run

screen.  And this revision is consistent with the upgrade from

Internet Explorer 6 to Internet Explorer 7.  So my question is

has this been done?  Does it resolve the complaint?

There have been some other -- Microsoft has received four

complaints, none of which relate to compliance obligations.  The

United States hasn't indicated that it received any complaints;

is that correct?  Also, looking at the report, it looks like the

necessary resources and staffing that Microsoft had devoted to

these efforts seems to have remained stable.  Do the plaintiffs

agree with that?  And then the compliance officers have

continued with their monitoring and training programs.

So I think that, from my perspective, reading the reports,

were the key points.  Let me hear from the government and then

we'll work through as we always have.

MR. SEVERT:  Thank you, Your Honor.  To just start

with your question regarding complaints, we've not received any

final judgment substantive complaints since the last conference.

THE COURT:  Okay.

MR. SEVERT:  I want to address your TDI question,

maybe give you a little bit more color on our description of

seeing -- of the positive signs we're seeing for the TDI

1    resolution.  As far as the latest set of documentation, I think

2    it's too early in our review of that last system document to

3    really have any comment on its quality.  But as far as the TDIs

4    go, I think since the TC ramped up its rate at which it was

5    finding TDIs in the May time frame, it's been about three, three

6    or four months since then, and over that period of time I think

7    it's fair to say that Microsoft has demonstrated its ability to

8    keep up with that increased flow of TDIs.

9         I think what needs to happen at this point is Microsoft

10   will need to increase its closure rate such that it can start to

11   decrease the backlog of TDIs so that the number outstanding goes

12   down.  I think we're at the point where Microsoft is keeping up

13   with the increased flow.  The next step is to work on the

14   backlog.

15        The other thing I will point out is that the TC project

16   plan envisions at some point in time before the expiration of

17   the final judgment the TC will stop identifying TDIs, and both

18   Microsoft and the TC will focus on TDI closure.  So there is a

19   mechanism for, if there is some backlog on the end, for those to

20   get resolved.

21             THE COURT:  Okay.

22             MR. SEVERT:  Is that helpful?

23             THE COURT:  Yes, definitely.

24             MR. SEVERT:  Thank you.

25             THE COURT:  All right.  Let me hear from the New York

1    Group.

2              MS. COOPER:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MS. COOPER:  The New York Group did receive one

5    complaint during this time period, but we are in the process of

6    fleshing out that complaint.  We have not yet determined in fact

7    whether this even comes within the final judgment.

8              THE COURT:  Is that in addition to the one that I

9    talked about that appears to be resolved or was to be resolved

10   by August 11?

11             MS. COOPER:  Yes, Your Honor.

12             THE COURT:  So it's an additional one?

13             MS. COOPER:  Yes.  It's a new complaint.  I would like

14   to elaborate a little bit on the IE8 issue, just to explain to

15   you what the situation was and what the resolution was.  This

16   spring, the state plaintiffs and the TC looked into a complaint

17   about how IE8 was being installed on Windows computers.  And

18   based on this complaint and some press reports, and also, I have

19   to say some experiences that the plaintiffs themselves had, we

20   felt that especially for unsophisticated users, the result was

21   often that users unintentionally ended up with IE8 as their

22   default browser.

23        So what happened was that IE8 was distributed for

24   downloading through a Windows update, and this was either termed

25   high priority or important, and in fact the screen said to users

1    that -- it said "browse and e-mail more safely."  So the context

2    was, the implication was that there were security issues

3    associated with IE7, and that by installing IE8, security on

4    your machine would be improved.

5         When users installed IE8 update, and then ran it to see if

6    the installation worked, they saw a screen that said "choose

7    your settings."  And this could either be done in a very simple

8    way through Express, or in a more complex way, through a Custom

9    installation, that required you to answer a lot of questions and

10   to know about multiple settings, which might be intimidating for

11   unsophisticated users.

12        So if you chose the Express mode, you were then presented

13   with a list of seven items that included as part of those seven

14   an entry that said default browser, Internet Explorer, and then

15   continuing down that path, made IE8 the default browser, even

16   though at the very beginning of the process there was a screen

17   that had informed users that IE8 would not affect default

18   settings.

19        So as we stated in the JSR, we talked to Microsoft.  We had

20   a number of discussions.  And without regard to whether this was

21   a violation of the final judgment or not, Microsoft agreed this

22   was a confusing process and agreed to make changes.  So to make

23   the choice of default more explicit, Microsoft agreed to stop

24   making IE the default browser from the Express setting screen,

25   and agreed to remove the line that said, "default browser:

Internet Explorer," remove that from the list of items in the Express setting.

And instead, what Microsoft agreed to do was to set out a much clearer choice for the user for resetting the default browser in a separate explicit dialogue box that will say, or it says now, "do you want to make Internet Explorer your default browser, yes or no."  And this choice appears before you get to the Express or Custom settings.

So this was done --  I believe it's already been done as part of a dynamic update, which is the way Microsoft distributes security updates.  Also, by the end of the month, Microsoft will, if they have not already, removed the confusing text that says Internet Explorer keeps your current settings.  So these changes will apply not only to IE8 installations on Vista and XP, but will also apply to Windows 7.

THE COURT:  Okay.  That's a very clear explanation. Thank you.

MS. COOPER:  You're welcome.

THE COURT:  All right.  Mr. Houck.

MR. HOUCK:  I plan to address both the issue raised by Mr. Severt, the technical documentation, and the issue spoken to by Ms. Cooper, IE8, and I don't think anything I'm going to say is going to be inconsistent with anything that either one of them has said.

As Your Honor recalled at the outset, in the last joint

1    status report we told Your Honor that we hoped to be able to

2    meet the May 2011 termination date, depending on two critical

3    assumptions, one being whether the new documents are in as good

4    a shape, approximately, as the old documents.  Since then the

5    new documents have been delivered, and based on our early

6    analysis of those documents, we have no reason to believe that

7    they're not as good as the old ones.  So that's certainly

8    encouraging.

9        The second factor was whether Microsoft would be able to

10   keep up with the higher rate of TDIs found by the TC.  In here

11   we think the results are perhaps somewhat mixed, but basically

12   encouraging.

13       As Your Honor knows, the California Group monitors very

14   closely the situation, principally through Craig Hunt and his

15   interaction both with the TC and with Microsoft, and we have

16   quarterly meetings in Redmond with the Microsoft personnel that

17   we find very useful, the last one of which was just a couple of

18   weeks ago.

19       TDI count is the principal data that we give to Your Honor

20   to kind of monitor where Microsoft is, and the question is how

21   should that be interpreted.  The TDI count as of July 31, which

22   is the last data Your Honor has, shows a number of 2,355, which

23   is down from the last Microsoft supplemental status report

24   rendered in June, but it's up from the last joint status report

25   which was submitted in April.

1    I think the best way to view the TDI data is that it

2   presents a snapshot at a particular time of what's going on.  So

3   one thing to remember is that it's a snapshot only, and what's

4   really critical here is whether Microsoft is going to be able to

5   move through all the TDIs and correct them by May 2011.

6    Now, one of the things a snapshot does not show is what's

7   going on behind the scenes.  And here I'm happy to report we are

8   quite satisfied with the effort we perceive Microsoft has been

9   putting into this.  I think they've been working diligently and

10   efficiently.  And as Your Honor knows, that hasn't always been

11   our view.  But at this point in time we're very pleased with

12   what we see.

13    What about the numbers themselves?  I think what they do

14   show is what Mr. Severt indicated, which is that Microsoft

15   generally has been able to keep up with the volume of TDIs being

16   reported by the TC.  Indeed, as of the last meeting we had in

17   Redmond a couple of weeks ago, the early indications were that

18   actually Microsoft might have achieved the important cross-over,

19   when they start clearing them faster than they're being

20   reported, so the backlog started going down.

21    But since that time the data has been a little bit mixed,

22   so I don't think we're quite there yet, and certainly not to the

23   point where we can assure Your Honor that there's a trend in

24   that direction.

25    So our conclusion for the California Group is we think

everyone is working pretty hard on this.  Unless something

unexpected happens, we're hopeful that perhaps the next time

we're here we'll see the backlog actually decreasing.  And the

bottom line is that at least at this point in time we see no

reason why Microsoft should not be able to do what's necessary

so that Your Honor will be rid of us after May of 2011.

Do you have any questions about that?

THE COURT:  No.  That's fine.

MR. HOUCK:  Okay.  I'll turn then to the IE8

situation.  And as Ms. Cooper described, essentially what

happened was in our view the way IE8 was delivered to users was

done in a fashion, particularly with respect to unsophisticated

users, it was done in a not entirely unbiased way that caused or

potentially caused users to change their default selection from

a non-Microsoft browser to IE8.

Also, as Ms. Cooper said, once we drew this situation to

the attention of the Microsoft lawyers, they responded quite

rapidly and made the changes that we suggested, and I can't

confirm for myself that the changes were made by August 11, but

I spoke to Mr. Keogh this morning and he assured me that they

were.  So I have reason to believe that they have been made.

But what I wanted to talk a little bit about is California

Group found this situation to be rather troubling, and I wanted

to explain to you why that was.  In the first place, it involved

the browser, which, as Your Honor well knows, was at the heart

1    of the liability case.

2         Secondly, it involved the browser at a particularly

3    sensitive time.  For the first time now really we're starting to

4    see some not insignificant competition in that space.  Google

5    for example has a new browser, and there are other browsers that

6    have market share, like Firefox.  And the browser is probably

7    more important than ever now, as cloud computing becomes more

8    and more important; it is the connection between the operating

9    system and the servers up there in the cloud.

10        Another point that concerned us was the delivery mechanism.

11   It was delivered through Microsoft's Windows update, so this is

12   a delivery mechanism that Microsoft has by virtue of its

13   monopoly position that's unavailable to any other browser

14   manufacturer.  And as Ms. Cooper said, this came through to

15   consumers as a high priority update, something that they should

16   do, and many unsophisticated users are afraid to select anything

17   other than an Express setting, and if you did that, you could

18   very easily find yourself with a new default, that is IE8 is

19   your default even though that was not your intention.

20        Also, it's noteworthy, all this happened after the

21   promulgation of the so-called 12 principles we've heard so much

22   about.  Microsoft has said they intended to compete more fairly,

23   on a level playing field.  And then finally, as Ms. Cooper

24   mentioned, the way IE7 was delivered was not problematical.  So

25   this change -- this is a change, and it was made with some

1   forethought, and the principal impact of the change seemed to be

2   to push users towards changing their default to Microsoft's Web

3   browser.

4        So for all those reasons, we did find this a bit troubling

5   and disconcerting and frankly disappointing at this stage of the

6   case.  As I mentioned before, we hope to leave the scene in May

7   of 2011, and we would have hoped that Microsoft could have

8   avoided -- should have avoided doing something like this at this

9   late stage of the litigation.  With that, I will sit down unless

10  Your Honor has some questions.

11            THE COURT:  No.  All right.  Mr. Rule.

12            MR. RULE:  Good morning, Your Honor.

13            THE COURT:  Good morning.

14            MR. RULE:  With respect to III.E, I'll just make the

15  point that we believe that the trend in terms of TDIs is

16  positive, but we also recognize that the proof is in the

17  pudding, as they say, and that we understand that the plaintiffs

18  and Your Honor will be looking at that, and we have every

19  intention and every hope of watching that backlog go down after

20  time, over time.  Mr. Muglia will address that to some greater

21  extent afterwards.

22       I should also point out, we have produced all the system

23  documents.  We're working with the TC on those, so it really is

24  now a question of making sure everybody is comfortable with the

25  full set of documents that we've agreed to produce.

1       With respect to the IE8 complaint, just to make it clear,

2   Microsoft believes it was in compliance with the decree.  When

3   IE8 was downloaded and installed on a machine, it did not affect

4   a user's choice of default browser.  It was only upon the launch

5   of IE8 for the first time that the user was presented with the

6   screens Express or Custom.  Express, it required a choice of the

7   user.  Express did say that it would set IE8 as the default.

8   The Custom, if you went through to deal with every one of your

9   settings, one of those settings was what your default browser

10  would be.

11      So it was presented to the user.  However, based on -- you

12  know, it was very shortly after it was introduced that we heard

13  from the plaintiffs, and we got feedback from others as well,

14  and based on that feedback, we basically implemented the changes

15  that Ms. Cooper discussed.

16          THE COURT:  So it's actually been done?

17          MR. RULE:  As the report indicates, there were two

18  different parts of the change that were to be implemented.  And

19  in the report it says the first one, which was presenting the

20  window that basically has no check boxes and requires the user

21  to decide if they want to set IE8 as a default, that part has

22  been implemented.  There's another aspect of it -- there's a

23  line in one of the opening screens that I think says that it

24  preserves your settings as they are.  That is to be changed on

25  the 25th of this month.

1    But the dates that are in the report have been -- the

2 August 11th date has been met.  That change has been

3 implemented.  The August 25th one, I have every reason to

4 believe that that will be implemented at the date that we

5 promised to implement it.

6    So, again, this is another example where we try to listen

7 to feedback, we try to listen to the plaintiffs.  Our position

8 has been that if you look at things like the Windows principles,

9 the interop principles, and our, you know, ongoing relationships

10 with regulators, we listen when they raise issues like this, and

11 where good arguments are presented for making changes that work

12 for consumers, we're willing to make those changes.  That would

13 be true, quite frankly, whether or not there was a decree.

14    And it's due to that sort of interaction, rather than the

15 decree, that those changes occur, and I have every reason to

16 believe that beyond May of 2011, that will continue.

17          THE COURT:  I take it, though, that this was a change

18 that was made for IE8 and was not an issue in IE7.  Was there a

19 particular reason why this was made?

20          MR. RULE:  As I understand it, IE8 was a major, if you

21 will, rewrite of Internet Explorer.  There were a lot of changes

22 that took place.  The thought was that giving users this choice

23 of Express that simply indicated that the result of choosing

24 Express when you first launch the browser would make IE8 your

25 default was a better consumer experience than adding an

additional window.  So it was intended to sort of respond to the

notion that sometimes consumers get a little -- I don't want to

say frustrated, but would rather have fewer windows rather than

more.

Again, we introduced it that way.  It was -- users who

chose the Express option were told up front at the top of the

sort of list of items that IE8 would be made the default, but

the plaintiffs came to us and indicated that consumers,

particularly unsophisticated ones, might be confused, and so we

took the step of adding the additional window to let them

affirmatively choose to make IE8 their default.

THE COURT:  Okay.  Anything else?

MR. RULE:  Nothing else, Your Honor.  Except to ask

Mr. Muglia to step up.

THE COURT:  All right.  Mr. Muglia.

MR. MUGLIA:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. MUGLIA:  It looks like most of the questions have

been fairly well addressed, but I would like to address the

question about the incoming rate and our ability to keep up and

what is happening in terms of a backlog.  As we've talked about

in the past, as long as people, either Microsoft or the

technical committee, are testing, there will be TDIs coming in.

And since they have, the technical committee has increased their

rate of focus on reporting TDIs and put their resources on that,

1    as has been stated, the incoming rate of TDIs has increased.

2        The good news about that is that we have adequate resources

3    within the team.  Mr. Wurden is the executive that runs the work

4    that we do on the technical documentation, including resolving

5    the TDIs, and the testing process that Microsoft has been

6    performing over the last several years.  And we have been able

7    to keep up with the incoming rate, and in fact, overall have

8    been able to bring it down somewhat.

9        One of the things that's important to recognize is that

10   when we produce a status report for Your Honor, we are doing

11   that on a particular day, and there is some level of variability

12   in terms of the number of outstanding TDIs at any given point,

13   because the TC is unable to resolve TDIs and close them until

14   the point where we release the documents in the final form to

15   them.

16       So as an example of this right now, of the -- at the report

17   that was issued, of the 2,355 TDIs that were open, 1,061 were

18   waiting for Microsoft to produce the final versions of the

19   documents in order for the TDIs, to close them.  So it's just an

20   indication that there's ongoing variability here.

21       The underlying point I want to emphasize, which I think has

22   been made by the plaintiffs, is that we feel very confident in

23   our ability to not just keep up with the incoming rate of the

24   TDIs, but bring them down over time.  The numbers will vary over

25   time based on the amount of incoming rate that the technical

committee has reported, and the given moment that the status

report is produced.

THE COURT:  All right.

MR. MUGLIA:  Are there any other questions,

Your Honor?

THE COURT:  No.  I think not.

MR. MUGLIA:  Thank you very much.

THE COURT:  I think this is a fairly short report and

focused.  I'm certainly pleased that the documentation was

completed on time, and I'm encouraged that it at least appears

at first blush that the quality of the documents are as expected

and therefore the deadlines hopefully can be met.

As with the others, and particularly California, in terms

of being satisfied with Microsoft's efforts on the TDIs, both in

terms of the new and the backlog, I'm also happy to see that,

and I realize that in these economic times keeping the resources

going is important, and I'm pleased to see that that has

continued.  That's very important in order to get this all

resolved.  And I would hope that as we proceed that the backlog

will continue to be reduced.

Without observing whether or not it's a violation of the

final judgments, on the IE8 issue, I would agree with the change

that the plaintiffs wanted and that Microsoft evidently agreed

without question in terms of making, that I think it is

important for users to have clear choices regarding default

1   browsers between non-Microsoft and Microsoft.  I realize there's

2   a balancing of how complicated you make the systems in terms of

3   being able to -- whether you make it Custom or Express, but I do

4   think that it's important, and it certainly is a key issue in

5   the case, that there be choices for the consumers.

6       So at this point, let me go ahead and set the next dates.

7   I was thinking, I have two fairly long criminal trials starting

8   in October through the end of the year.  Instead of doing in

9   November, would it work to do something in December?  I'm trying

10  to figure it out in terms of where we would be most likely to

11  have the most information.  It would be the full -- one of the

12  full committees, the full reports.

13      MR. HOUCK:  The first priority is to accommodate

14  Your Honor's schedule.

15      THE COURT:  No, but I'm just saying is there a

16  particular time frame where we would have more information than

17  others?

18      MR. RULE:  Your Honor, the only issue for us is

19  December is going to be difficult Mr. Muglia.  So if we were to

20  do a hearing in frankly November or December, we would probably

21  bring Mr. Wurden, who's close to these issues anyway, to answer

22  Your Honor's questions as Mr. Muglia has.  So if we were to do

23  it then, that's how we would have to handle Mr. Muglia's role.

24  Mr. Muglia will be available in early January.  So it's really

25  up to Your Honor as to --

1          THE COURT:  Well, I guess the question from you is the

2    importance of having Mr. Muglia.  I can do it -- December would

3    just be easier.  I have two back-to-back trials and it's sort of

4    iffy how long they're all going to --

5          MR. HOUCK:  Mr. Muglia is a tough act to follow, but

6    we'd be more than happy with Mr. Wurden.  December works for us.

7          THE COURT:  All right.  Would it be possible to do it

8    sometime the week of the 14th?  I choose that only because I

9    should definitely be done by then.  Famous last words.  And I

10   forget, is Wednesday usually a better day for you all?  So we'd

11   be talking about the 16th.  Does that work?  Do you want to look

12   at your calendars?

13        And I do want to thank you for allowing me to move it.

14   We've had these Guantánamo Bay merits hearings which have

15   shifted around, which have shifted other schedules, and we

16   needed to move you.  I try not to do that because I know it's a

17   lot of work with a lot of parties.

18          MR. SEVERT:  Your Honor, the 16th is okay for the

19   plaintiffs.

20          THE COURT:  That work for everybody?  Okay.  Mr. Rule,

21   does that work for you, or not?

22          MR. RULE:  It should be fine for us.

23          THE COURT:  Okay.  Then we'll set it up at 10:00,

24   which is our usual time.  I made 11 -- do you want 10:30 in

25   terms of people coming in?

1          MR. RULE:  Our folks come in from the West Coast

2     generally, so they'll be here from the night before.

3          THE COURT:  How about from you all?

4          MR. SEVERT:  Your Honor, 10:30 is slightly better for

5     the plaintiffs.

6          THE COURT:  Sure.  Why don't I just double-check.

7        (The Court conferring with the deputy clerk.)

8        Why don't I make it at 11:00.  So I'll continue it to

9     December 16 at 11:00, and then we would be getting the report in

10    December 9, the week before, if that works.  Okay?

11       All right.  Parties are excused.  See you back then.

12       (Proceedings adjourned at 11:46 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE