IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ECF**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 98-1232 (CKK) |
| MICROSOFT CORPORATION, | ) |
| Defendant. | ) |

**FILED**

FEB 2 2 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLAINTIFF LITIGATING STATES' MOTION FOR LIMITED PARTICIPATION IN LIGHT OF THE DEPOSITION OF MR. RICHARD FADE

Plaintiff Litigating States California, Connecticut, Florida, Iowa, Kansas, Massachusetts, Minnesota, Utah, West Virginia, and the District of Columbia (hereinafter "Plaintiff Litigating States") respectfully move for an order granting them leave to participate in the Tunney Act proceeding (No. 98-1232) for the limited purpose of bringing to the Court's attention, through this brief and the attached exhibits, the critical information first revealed in the deposition of Mr. Richard Fade, Microsoft's Senior Vice-President in charge of the OEM Division. The relevant portions of Mr. Fade's deposition are attached as Exhibit A and discussed herein.[1]

---

[1] Microsoft originally denoted the entire Fade deposition as "Highly Confidential," slightly delaying the filing of this memorandum. Following discussions of the parties concerning the Plaintiff Litigating States' planned filing of a motion to remove the "Confidential" designation, Microsoft today agreed to remove the designation on the relevant pages, with limited redactions.

As  Mr. Fade has now attested, Microsoft has profited from the settlement with the federal government by using the Revised Proposed Final Judgment ("RPFJ") as a sword to extract valuable concessions from the Original Equipment Manufacturers ("OEMs") that Microsoft had previously been unable to secure in the absence of the RPFJ.  Mr. Fade admitted that, as matters now stand, the settlement with the federal government and the RPFJ are "wrong" and "untoward" as they have enabled Microsoft to secure a net benefit from the settlement of its antitrust liability.  Further, significant evidence exists that, in negotiating the RPFJ, Microsoft intended to profit from the antitrust verdict against it by identifying certain concessions that it had not been able to secure from its customers and negotiating provisions into the RPFJ that Microsoft could then rely on to require such beneficial terms in its future licenses. Such revelations provide critical evidence not simply in the litigation being pursued by the Plaintiff Litigating States, but in the Tunney Act proceedings as well.

## FACTS

During the afternoon of February 8, 2002, Mr. Sullivan informed the Court that the Plaintiff Litigating States were proceeding on Track 2 and therefore would not be participating in the Tunney Act proceedings.  Yet, hours later on the West Coast in the deposition of Mr. Fade, Plaintiff Litigating States first learned information vital to both proceedings.

Mr. Fade testified that, having entered into the RPFJ with the federal government on November 6, 2001, Microsoft began to voluntarily comply with the

proposed decree by adopting new license terms for all of its OEMs effective December 16, 2001. *See* Fade Dep.[2] at 41-3, 81; Fade Dep. Exh. 5. In consultation with Mr. Ballmer, Microsoft's CEO, and Mr. Beluzzo, Microsoft's President, Mr. Fade was in charge of developing the new licensing rate schedule and terms. *See* Fade Dep. at 37-40.

Mr. Fade explained that, in setting the new rate terms, he and his assistants did calculations and prepared spreadsheets to ensure that, after the RPFJ, Microsoft made exactly the same revenue as before the decree. *See* Fade Dep. at 66-9, 76-8. [3] Microsoft retained the market power and the complete freedom after the RPFJ to set rates as it desired and in fact set the pricing to ensure that Microsoft lost no money as a result of its antitrust violation and the RPFJ. *See* Fade Dep. at 65-66. Revenue was kept flat:

> Q.  Did you or he [Mr. Beluzzo] discuss trying to set the price so the net result was as close as possible the same revenue as previously?
>
> A.  Yeah. For it to be flat, no gain for Microsoft.
>
> Q.  And no loss?
>
> . . . .
>
> A.  Yes.
>
> Fade Dep. at 66.

---

[2] Citations to "Fade Dep." can be found in Exhibit A attached hereto. Citations to "Fade Dep. Exh." refer to the exhibits introduced at the Fade deposition and are also attached hereto in Exhibit B.

[3] Microsoft has now failed to produce such documents for the past eleven days, always promising but never performing. Plaintiff Litigating States are preparing a motion to compel.

Microsoft well knew that this Court would face the question of whether to approve the settlement with the federal government.  Mr. Fade and Mr. Beluzzo felt that it was important that Microsoft "not be seen as taking advantage of the Consent Decree" because if in fact Microsoft benefited from the settlement with the federal government, that settlement could best be described as "untoward" and "wrong":

> Q.    It's an important notion because it would not have the proper appearance were the net result of the Consent Decree entered with the government that Microsoft gained monetarily from that Decree.
>
> A.    We felt it was important that we not be seen as taking advantage of the Consent Decree.
>
> Q.    Since because of the decree you were changing your prices, you didn't want to be seen as . . . actually making money on the decree, correct?
>
> A.    Yeah.  We didn't want to be seen as opportunistic or doing something untoward.
>
> . . . .
> Q.    Now, explain why you thought that.  What would be wrong?
>
> A.    It just seemed imprudent and untoward to do that, that the company would be benefiting from the action with the government....  It seemed that it would be wrong to use that as a means to create financial gain for the company.
>
> . . . .
>
> Q.    And so if in fact Microsoft has benefited from the settlement, then the settlement can best be described as untoward and wrong?
>
> A.    If, in fact, you can substantiate that fact, then I would generally go along with that.

Fade Dep. at 53, 55, 58.[4]

Although Microsoft well understood the "imprudence" of gaining revenue from a settlement that still had to be approved by a court, Microsoft plainly felt less constrained in taking full advantage of the other opportunities for gain presented by the RPFJ. The RPFJ thus presented the opportunity for Microsoft to change not simply the pricing structure but also other terms and conditions in its OEM licenses. Although the OEMs reasonably might expect that a consent decree with the federal government would in some manner decrease Microsoft's power over the OEMs and its ability to simply dictate the terms governing their relationship, as Mr. Fade attested, the RPFJ has had the opposite effect. Although the OEMs, Microsoft's customers, might also reasonably expect to see some net benefit in their relationship with Microsoft following a consent decree, Mr. Fade again admitted that the RPFJ has produced the opposite result. Microsoft took advantage of the opportunities presented by the language of the RPFJ to adopt significantly more onerous licensing terms and to impose them on the OEMs. As Mr. Fade testified, every one of the twenty covered OEMs under the RPFJ – the twenty top customers for Microsoft and twenty top PC makers in the world – believes that Microsoft has benefited from the RPFJ at their expense.

> Q.    And as a group you've now said that those top 10 OEMs are ... less happy with the agreement that was produced as a result of the Consent Decree with the federal government.

---

[4] After noting the importance of not being "seen as taking advantage of the Consent Decree", Mr. Fade admitted that Microsoft plans to re-evaluate even this initial pricing decision this August and could raise prices at that time. *See* Fade Dep. at 67-8.

A.      Yes.

Q.      — than they were with the prior state of the world?

A.      Yes.

Q.      And so as to that group they've had a net loss with regard to Microsoft, correct?

A.      In their eyes I believe they think they have.

. . . .

Q.      You made them all angry, correct?

A.      Well, yes.  They're all unhappy they've lost their prior language.

. . . .

Q.      So the two categories [of covered OEMs] are those that are very unhappy and the category of those that are not that unhappy within the top 20, correct?

A.      With their terms and conditions of their license, correct.

Q.      But they're all at least somewhat or are very unhappy with the new license agreement that's come out as a result of the settlement with the government, correct?

A.      Probably.

Fade Dep. at 99, 125, 126-7.

In particular, as Mr. Fade further attested, the most valuable net gain for Microsoft from the new licensing terms and the biggest loss for the OEMs was the OEMs' loss of the ability to enforce their patents against Microsoft.  As part of the onerous new provisions, Microsoft inserted a rigorous "non-assertion of patents" or "NAP" provision, precluding the OEMs from enforcing their patents against

Microsoft.  Microsoft had previously been limited in its ability to produce its own hardware and to compete with OEMs based on the patents owned by the OEMs. Microsoft thus had tried for years as part of their licensing terms to force the OEMs to agree not to enforce their patents against Microsoft.  Through their vigorous negotiations, the major OEMs previously had always successfully resisted providing this valuable concession to Microsoft.  Yet armed with the RPFJ, which referred to both cross-licensing by OEMs in Section III.I(5) and uniformity of OEM licenses in Section III.B, Microsoft informed the OEMs that there could be no negotiation of any of the new uniformly onerous terms and that the new NAP provision was required by the RPFJ.  The RPFJ allowed Microsoft to impose terms it previously could not secure in its absence.  Mr. Fade discussed each of these points in his deposition:

> Q.     [D]o  you convey the message to the OEMs that although they don't like the terms that these terms . . . come as a result of the settlement with the Department of Justice and therefore they are not negotiable?
>
> A.     Correct.
>
> . . . .
>
> Q.     The non-assertion of patent is one of the issues . . . they most complained about now, correct?
>
> A.     Yes.
>
> Q.     And [it] is one of the reasons that they would most say they would have preferred the license agreement that existed prior to the settlement with the Department of Justice over this one, correct?
>
> A.     Yes.

Q.    But [it] is one of the many terms that you say they have to accept as a result of the resolution with the Department of Justice, correct?

A.    Correct.

. . . .

Q.    Is it fair to say that for these large OEMs the non-assertion of patent provision was made far more onerous in this new licensing agreement?

A.    More distasteful to them than their prior negotiated language, yes.

Q.    And more advantageous to Microsoft than the prior language, correct?

A.    In some cases, yes.

Q.    Can you name one of the 10 largest for whom the new language is not  more advantageous to Microsoft?

A.    No, not off the top of my head.

Q.    It's more advantageous to Microsoft in all cases?

A.    Fine.

Q.    And that came as a result of having to change your licensing terms because of the settlement agreement with the Department of Justice, correct?

A.    That's right.  The new language was part of the rewrite of the license.

. . . .

Q.    So you're then telling them the settlement is calling for these new license terms, correct?

A.    I believe that to be accurate.

Q.    So you've now informed them that . . . the new licensing terms are required by the settlement agreement, correct?

A.    I believe that's right.

. . . .

Q.    So one of the top . . . provisions that the OEMs thought most benefited Microsoft was the new non-assertion of patent provision?

. . . .

A.    Correct.

. . . .

Q.    [I]n responding to the objections of OEMs who otherwise would have –

A.    Negotiated.

Q.    – negotiated –

A.    Yes.

Q.    – you have taken protection from the negotiation in the fact that the Consent Decree has been signed with the Department of Justice and therefore your hands are tied.  Is that fair?

A.    That is fair.  I've been honest with them.

Q.    And the net result of . . . having the Consent Decree with the Department of Justice is that the top 20 OEMs now have an agreement that we've already agreed they would prefer that they didn't have and that they believe hurts them and benefits Microsoft, correct?

A.    You're right, yes.

. . . .

Q.    My question is [whether] . . . the provision of Microsoft's new licensing terms that . . . the major OEMs have found so onerous, in fact so onerous that they would prefer to have the old licensing terms, simply implements and takes advantage of section I(5) of the Revised Proposed Final Judgment which allows Microsoft to require OEMs to give up intellectual property rights.

. . . .

A.      . . . . The answer is yes, I believe we probably thought it was covered by the phrase.

. . . .

A.      . . . . There was non-assertion of patent license language in every one of those licenses.  The new language that we presented on December 16 in the new documents was stronger and more far reaching than those customers had.  I agree with that.

Q.      The desire for a much more far reaching NAP provision, non-assertion of patent is not a new desire, correct?

A.      No, that's right.

Q.      It's an old desire, correct?

A.      It is a desire that is expressed in our standard document, that's right.

Q.      And in previous years, because of the negotiations with the OEMs, [you] have been unable to achieve as far reaching a non-assertion of patent provision as you would have liked, correct?

        A.      That's correct.

. . . .

Q.      But now because there was the settlement agreement, the Consent Decree with the Department of Justice, you were able to point to that Consent Decree to say you now have to take this provision and there's no negotiation, is that correct?

A.      Because of the Consent Decree, yes.

Fade Dep. at 130, 131, 132-3, 136-7, 140-1.

These non-assertion of patent rights were not only long sought after by

Microsoft, but of significant value, to enable Microsoft to compete with OEMs.

Microsoft increasingly competes with the OEMs in the production of hardware –

- 10 -

such as the Xbox, which is simply a PC – and, by so doing, Microsoft can exert yet greater leverage over the OEMs and potentially control this primary channel of software and middleware distribution.

> Q.     Is Microsoft beginning to produce more equipment otherwise produced by OEMs, such as the X Box?
>
> A.     Yes.

Fade Dep. at 152.

It is obviously difficult to get OEMs, for whom Microsoft controls the lifeblood of their existence, to testify in either a Tunney proceeding or in the Plaintiff Litigating States' case.  But their e-mails and letters to Mr. Fade spoke for them at the Fade deposition.  Thus, Hewlett-Packard wrote on January 16, 2002 to Mr. Fade to express its "extreme[ ] concern" about several of the terms of the new licensing agreement, which Microsoft had told them it had imposed "pursuant to the Consent Decree":

> "Hewlett-Packard Company is extremely concerned about a number of issues that currently exist between our two companies. . . .
>
> The Microsoft OEM team has told us that the new versions of OEM agreements Microsoft has distributed pursuant to its proposed Consent Decree with the Department of Justice are intended to provide 'uniform terms' for all OEMs and are not negotiable. . . . . These agreements also resurrect terms that  required extensive negotiation over a period of more than six months before they were in the form that Hewlett-Packard signed in our current, active OEM agreements. . . . Microsoft continually asks us to sign agreements that, like the new OEM agreements place unacceptable limitations on our rights and offer us unacceptable protection and assurances from Microsoft.

. . . .

The following are the main categories of issues:

- Intellectual Property Protection – The protection of HP's patent portfolio is our paramount concern. The patent non-assertion provision in the new Business Terms Document effectively takes away HPs property without paying for it. . . .

-Warranty and Indemnification Requirements – . . . .

- Windows Pricing Structure – . . . .

. . . .

As I am sure you recall, we spent months negotiating the current BTD, which was signed this past summer and is effective for two years. The negotiations over the "non-assertion of patents" provision were escalated to the highest levels of management in both HP and Microsoft before the provision was finalized. . . . A broad "non-assertion of patents" provision such as that which appears in your new BTD amounts to one-half of a patent cross-license flowing from HP to Microsoft, without compensation and without reciprocity. . . ."

Fade Dep. Exh. 4.[5]

Gateway similarly faxed Microsoft a sheet detailing dozens of concerns

with the new terms that had been imposed without negotiation pursuant to the

RPFJ and which secured valuable patent rights and other revenues for Microsoft.

"MS Uniform Terms and Conditions: Questions and Concerns" (January 21, 2002),

(025677-79), attached as Exhibit C hereto. In one entry, for example, Gateway

---

[5] Hewlett-Packard designated this document as "Highly Confidential," but agreed to remove that designation from the cited portions to avoid litigating the issue of its status. The document has thus been heavily redacted to comply with HP's designation. The remaining terms are sufficient to illustrate the point at issue without generating unnecessary litigation. The complete document can be filed under seal if the Court desires.

asked: "Why should the covenant not to sue be applicable if MS manufactures or markets a hardware product infringes a COMPANY Patent?"  *Id.* at 025677.

Given Mr. Fade's admissions that Microsoft lost no revenue as a result of the RPFJ while using the Decree to extract valuable other concessions from the OEMs, and the numerous corroborative documents, Mr. Fade reluctantly admitted that Microsoft indeed has benefited from the RPFJ.  And he conceded that, as matters now stand, the RPFJ and settlement with the federal government are "wrong" and "untoward" for having enabled Microsoft to profit not only from its illegal conduct, but also from the remedy imposed in theory to correct that conduct:

> Q.    [Y]ou were answering questions earlier . . . that price-wise . . . the net result of the settlement with the Department of Justice would be flat – do you recall that?
>
> A.    Yes, I do.
>
> Q.    You did not assign any value, did you, in that answer to the value of any patent rights that Microsoft was able to acquire through the settlement with the Department of Justice, did you?
>
> A.    I did not.
>
> Q.    So if otherwise the net price benefits to Microsoft or harm to Microsoft were flat as a result of the Department of Justice settlement, and if Microsoft also as a result of that Department of Justice settlement acquired valuable patent rights . . . then that would make the total benefits flowing from the consent Decree positive, more than flat, correct?
>
> A.    Probably would.  Yes.
>
> . . . .
> Q.    And . . . those patent rights would be valuable, correct?
>
> A.    Yes.

. . . .

Q.    And whatever value that is something you hadn't factored when you answered earlier that . . . as a matter of price the benefits or deficits coming from the Consent Decree were flat for Microsoft, correct?

A.    Yeah.

Q.    So if you add positive to flat you end up with a positive number, correct?

A.    You do . . .
. . . .
Q.    And as it stands right now, under the current license –

A.    Documents.

Q.    – terms that you have now given to each of your major OEMs as required by the settlement agreement with the Department of Justice, you have acquired valuable non-assertion of patent rights, correct?

A.    We have.

Q.    And as it therefore stands as implemented after the Consent Decree, when you add the value of those non-assertion of patent rights to what was otherwise a flat resolution for Microsoft, the net result is positive for Microsoft, correct?

A.    Correct. . . .

Q.    And as you testified . . . before, if the net result of the Consent Decree with the Department of Justice was a net positive for Microsoft, that would be untoward and wrong, correct?

A.    That's right, Howard.  That's why we're changing the language.

Q.    So as you sit here today, with the license terms that you've now put in place with your OEMs, . . . . until you make some changes in your license agreements that are not mandated by anyone, the net result of the settlement with the Department of Justice would be wrong and untoward because it benefited Microsoft?

A.    I wouldn't say that.  You might.

Q.    No, you just did.

. . . .

Q.    But as it stands now there is a net positive to Microsoft?

A.    If the old language stands, yes, there would be.

Q.    . . . . [I]f the result of the Consent Decree was that there was a net positive in Microsoft from it, then the settlement with the Department of Justice would be both wrong and untoward?

A.    I think my prior answer –

Q.    Until changed.

A.    Okay.

Q.    Until changed, is that fair?

A.    It is fair. . . .

Q.    I'm just assessing the Consent Decree with the Department of Justice that right now unless Microsoft can change something –

A.    Feel like we're a little ahead.

Q.    It's not my question of feeling.  I think the analysis is –

A.    With this NAP it feels like we're a little ahead.

Q.    And –

A.    Though it was anticipated by the document itself.

Q.    So the document did anticipate that you might be a little ahead?

A.    I don't know if the document anticipated that.  It just said it granted us the right to ask for reciprocal indemnification.  That's what it did. . . .

Fade Dep. at 153-5, 157-61.

But there is more.  As Mr. Fade's deposition demonstrates, there is significant evidence that Microsoft did not simply cleverly profit from and learn to make a net advantage out of language that was included in the RPFJ.  There is evidence indicating that Microsoft instead reached a settlement and negotiated the language of the RPFJ with the intent of profiting from its terms.  Mr. Fade thus admitted that the desire to secure the broad waiver of patent rights from the OEMs was an "old desire."  Fade Dep. at 150.  This desire long pre-dated and was well-known during the negotiations over a settlement.  *Id.*  And both Mr. Fade and members from Microsoft's legal team provided input on the negotiations and "how particular terms would affect OEMs."  Fade Dep. at 145.  When asked whether, "in fact, in negotiating the provision of the Revised Proposed Final Judgment, the negotiators were aware that Microsoft desired to put in these more far reaching [NAP] terms," Mr. Fade could only answer "I don't think that's the case."  Fade Dep. at 149.  Mr. Fade admitted, however, that he did not know whether Microsoft's desire for the rigorous NAP provision led the Microsoft negotiators to secure the agreement to Section I (5) in the RPFJ or, alternatively, whether only after the finalization of the RPFJ, Microsoft simply decided to take advantage of that provision to insist on securing the OEM's patent rights.  But he admitted that the longstanding desire for a strong NAP provision and the inclusion of the provision in the negotiation of the RPFJ are closely intertwined:

> Q.    Whether the term in the Revised Proposed Final Judgment that now allows Microsoft to get the intellectual property of the OEMs was negotiated in order to allow the new far reaching and more onerous term . . . to be put in [the licensing documents]  . . ., or whether . . . you

decided to put in the more far reaching and onerous terms of the license agreement because it appeared in the settlement agreement, you don't know which came first, correct?

. . . .

A.   That's what I am trying to say.

Q.   But, in any event, they go hand in hand?

A.   In any event, it appears that that was allowed under I(5).

Fade Dep. at 149.

Although more evidence is needed, the evidence gathered to date indicates that Microsoft may not only have profited from its negotiation, but negotiated in order to profit.

## ARGUMENT

I.   **Plaintiff Litigating States Should be Granted Limited Participation to Place Before the Court this Brief and the Evidence Gathered in the Deposition of Mr. Richard Fade.**

In making its public interest determination under the Tunney Act, the Court is vested with broad discretion as to the manner of taking evidence. The Act explicitly authorizes the Court, for example, to allow "limited participation in proceedings before the court by interested persons or agencies . . . or participation in any other manner and extent which serves the public interest as the court may deem appropriate." 15 U.S.C. § 16(f)(3). The Court is authorized therefore to accept this brief and the attached excerpts as part of the record of the Tunney hearing, even following de-consolidation of the Tunney case and the Track Two case and without the Plaintiff Litigating States seeking or being granted intervention as a party. *Id.* (allowing the limited intervention to be as a party, as amicus curiae, to

examine witnesses or documentation or in any other manner that serves the public interest). Accepting this brief and evidence from the Plaintiff Litigating States and adding it to the Tunney record will assist the Court in its evaluation of the RPFJ and thereby will serve the public interest.

## II.    The Evidence from the Fade Deposition Demonstrates that the RPFJ Should Be Rejected.

Since the announced settlement between Microsoft and the federal government, Plaintiff Litigating States have devoted their entire effort to Track Two:  proposing language for an appropriate remedy and preparing to demonstrate at the March 11 hearing that the Plaintiff Litigating States' Remedial Proposal, and not Microsoft's Remedial Proposal, is the proper remedy to be imposed in Civil Action No 98-1233.  The deposition of Mr. Fade was scheduled originally to take evidence as to the appropriateness of the States' Remedial Proposals in light of the findings and decisions in the prior proceedings.

During the course of that deposition, Plaintiff Litigating States learned facts that had been unimagined and that present a separate basis for requiring the rejection of the RPFJ.  This separate basis is, to some degree, unrelated to the analysis of the States' Remedial Proposals at issue in Civil Action No. 98-1233.  Plaintiff Litigating States learned that the net effect of the imposition of the RPFJ has in fact been to provide a net benefit for Microsoft and a net harm to those – Microsoft's customers, competitors and consumers – whom a decree is intended to benefit.

As Mr. Fade admitted, Microsoft well recognized the "imprudence," while this Court was considering whether or not to approve the proposed Consent Decree, of using the RPFJ to force new rates that would increase Microsoft's revenue and profit. And Mr. Fade admitted that, even as a senior Microsoft executive, he would find such a resolution "untoward" and "wrong." Thus, until at least this coming August when, after the antitrust actions have been completed, Microsoft plans to announce new prices under the RPFJ, Microsoft sought to avoid the impression that it had used the RPFJ to profit. (At the same time, Microsoft ensured that the RPFJ would not decrease Microsoft's revenue or profit).

Yet Microsoft plainly felt less constrained in using the RPFJ as a sword to reap material benefits by relying on the Decree to impose other new terms on the OEMs that represented significant value for Microsoft and significant net harm to the OEMs. In some cases, Microsoft cited to specific provisions in the RPFJ to insist on the onerous new terms—for example, citing I (5) of the RPFJ in support of the new non-assertion of patents provision or citing III (A) of the RPFJ for including a provision allowing termination of the OEM's license after two notices of a breach (regardless of any cure). In other cases, Microsoft appears simply to have catalogued the most favorable provisions to Microsoft that previously existed in any OEM's licensing terms (no matter how small the OEM) and then cited the need for uniformity based on the RPFJ to impose such terms on every OEM and to claim that no negotiation was permissible.

The benefits to Microsoft and the harm to third parties from the RPFJ (from Microsoft's use of that decree) are in fact dramatic.  As Mr. Fade agreed, all of the covered OEMs have protested the new licensing terms as profiting Microsoft at their expense.  While the issue of the non-assertion of patents was perhaps the clearest example, as the long list e-mailed by Gateway to Microsoft, *see* Exhibit C, and the letter from Hewlett-Packard to Microsoft, Fade Dep. Exh. 4, attest, Microsoft has used the RPFJ to secure many other new concessions.  But the non-assertion of patent issue alone gives some idea of the value of the RPFJ to Microsoft and the harm to third party customers and ultimately consumers.  Microsoft had long sought to impose on the major OEMs the requirement that the OEMs could not assert their patents against Microsoft.  These patents concern both hardware produced by the OEMs and the convergence of software with hardware.  Although minor OEMs that did not have significant patents may have agreed to such provisions, the major OEMs had all previously successfully negotiated limits by which they were protected against Microsoft taking advantage of their patents to increasingly compete against the OEMs.  In fact, as Microsoft has expanded usage of the PC from the office and the den to the family room with the Xbox and television set-top boxes, Microsoft has increasingly brought pressure on the OEMs. The RPFJ has provided the license by which Microsoft can expand its hardware production to present a real threat to the OEMs, using the OEMs' own intellectual property.

When faced with the letters from third parties and questioning on the details of the new licensing terms that have been forced on the OEMs through the vehicle of the RPFJ, even Mr. Fade was forced reluctantly to concede that his prior use of the words "wrong" and "untoward" were a fair description of the RPFJ. But recognizing the potential damage from his testimony, Mr. Fade immediately began to dissemble, noting that the terms that Microsoft had just imposed on the OEMs using the RPFJ as a sword were being changed. And after the change, the RPFJ would no longer produce "wrong" and "untoward" results. Fade Dep. At 156-59. This claim by Mr. Fade misses the mark for two reasons.

First, even if Microsoft now changes its business terms in response to the daylight now shining on the NAP provision and other provisions, the fact still remains that the RPFJ is drafted in a manner that simply enables Microsoft to secure a net benefit and impose a net harm on customers and consumers. That Microsoft now feels forced to temporarily alter these business terms only strengthens the notion that the RPFJ is flawed for allowing Microsoft to include them to achieve a net benefit in the first place.

Second, Mr. Fade's claims are contradicted by the record. After considerable study and input from the top levels of the company, Microsoft announced these new business terms just six weeks before Mr. Fade's deposition. In those few intervening weeks, Microsoft's actions demonstrated an unyielding commitment to enforce its brand new language against OEMs despite the clear and vocal resistance of those same OEMs up to the day of Mr. Fade's deposition.

Gateway, for example, went so far as to risk the loss of its Windows license and to force a show-down unprecedented in the history of Microsoft.

Gateway expressed concerns to Microsoft about dozens of provisions, including the NAP provision, soon after the terms were announced.  Gateway's license was due to expire on February 1, 2002.  Fade Dep. Exh. 3.  Gateway refused to sign its Business Terms Document, partly because of the inclusion this provision. Id.  As of January 30, 2002 – only eight days before Mr. Fade's deposition – Microsoft flatly refused to change the provision to meet Gateway's concern.  Fade Ex. 3.  On January 31, 2002, telling Gateway that it was required to sign the new agreements, Microsoft unilaterally provided Gateway with an "Interim License Agreement."  Fade Ex. 2; Fade Ex. 3.  That agreement incorporated by reference the new uniform licensing terms and stated that Gateway would be held to have manifested its acceptance of those terms if it shipped Windows "through the OEM channel" after January 31, 2002.  Fade Ex. 2.  As Mr. Fade stated in this deposition, the Interim License was an unprecedented, bold step by Microsoft.  Fade Dep. at 111.  Never before had an OEM believed the terms of the Windows license offered to it by Microsoft were so repugnant that it refused to sign a new Windows license agreement; never before had Microsoft responded by forcing the terms of its new licenses on that OEM without its consent.  Id.  Rather than change the new terms, Microsoft engaged in unprecedented action just eight days before Mr. Fade's deposition of forcing the new terms on an OEM without its signature and agreement.  Mr. Fade can take no proper solace in claiming, although the RPFJ

currently is "wrong" and "untoward" by facilitating Microsoft in profiting not simply from its misconduct but from the remedy as well, that that impropriety is being corrected.

Certainly a proposed Consent Decree that consists of language that allows the antitrust violator to profit by the imposition of the Decree is, without more, seriously flawed and should be rejected. Years of litigation, millions of dollars of expense, and victories in the District Court and Court of Appeals should not result in a net gain for the violator and harm to the victims.

But more exists. As detailed above, there is significant evidence that Microsoft did not just happen to take advantage of the RPFJ, turning a planned remedy into a reward. *See* pp. 16-17, *supra*. Microsoft's teams of in-house lawyers and executives advising on the negotiations may well have presented terms that the company had not been able to secure through individual negotiations and used the vehicle of the antitrust remedy intentionally to secure the net gain that the RPFJ has in fact provided.

Regardless of which scenario prevailed (or whether elements of both are true), the RPFJ must be rejected. In determining whether a proposed consent decree is in the public interest, a court should withhold approval of the decree "if any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise 'makes a mockery of judicial power.'" *Mass. Sch. of Law, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997). The Fade deposition leaves no doubt that the RPFJ injures third parties

and "otherwise 'makes a mockery of judicial power.'" *See also United States v. Microsoft*, 56 F.3d 1448, 1462 (D.C. Cir. 1995) ("certainly, if third parties contend that they might be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate").

As the Court of Appeals has explained, moreover, "a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972) and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)) (citation omitted).  As even Mr. Fade admitted, rather than deny Microsoft the "fruits of its statutory violation," the RPFJ has provided a sword for Microsoft to gather additional fruits and to reap a net gain.   And, rather than ensuring that "no practices likely to result in monopolization in the future" remain and "unfettering the market from anticompetitive conduct," the RPFJ has fostered new monopolistic practices and fettered the market with new anticompetitive practices by allowing Microsoft to secure additional leverage over OEMs, acquire their patent rights, and create a potential new threat to the primary distribution channel of middleware (while further entrenching the existing monopoly).

## CONCLUSION

For the reasons stated, the Plaintiff Litigating States' motion for leave to participate in the Tunney Act proceeding for the limited purpose of bringing the information recently uncovered in discovery should be granted. The RPFJ should be rejected.

Dated:  February 22, 2002

Respectfully submitted,

Brendan V. Sullivan, Jr. (Bar No. 12757)
Steven R. Kuney (Bar No. 253286)
Howard W. Gutman (Bar No. 375976)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for the Plaintiff Litigating States*
*California, Connecticut, Florida, Iowa,*
*Kansas, Massachusetts, Minnesota,*
*Utah and the District of Columbia*

Thomas Greene
Office of the Attorney General
  of the State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel:  (415) 703-5555

*For the Plaintiff Litigating States*

_Douglas Davis Avb_

Douglas L. Davis
Assistant Attorney General for the State
   of West Virginia
Consumer Protection/Antitrust Division
P. O. Box 1789
Charleston, West Virginia 25326-1789
Tel: (304) 558-8986

*Counsel for the Plaintiff Litigating State*
*West Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2002, copies of

Plaintiff Litigating States' Motion for Limited Participation in Light of the

Deposition of Mr. Richard Fade were served upon:

John L. Warden, Esq.          *(by overnight courier)*
Sullivan & Cromwell
125 Broad Street
31st Floor
New York, NY  10004-2498
Facsimile:  (212) 558-3588

Bradley P. Smith, Esq.        *(by hand delivery)*
Sullivan & Cromwell
1701 Pennsylvania Avenue, N.W.
7th Floor
Washington, D.C.  20006-5805
Facsimile:  (202) 293-6330

William H. Neukom, Esq.       *(by overnight courier)*
Executive Vice President
Law and Corporate Affairs
Microsoft Corporation
Building 8
One Microsoft Way
Redmond, WA  98052-6399
Facsimile:  (425) 936-7329

Dan K. Webb, Esq.             *(by overnight courier)*
Winston & Strawn
35 West Wacker Drive
Chicago, IL  60601
Facsimile:  (312) 558-5700

Charles F. Rule, Esq.         *(by hand delivery)*
Fried, Frank, Harris, Shriver & Jacobson
1001 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20004-2505
Facsimile: (202) 639-7003

*Counsel for Defendant Microsoft Corporation*

Philip S. Beck, Esq.                    *(by overnight courier)*
Bartlit Beck Herman Palenchar & Scott
Courthouse Place, Suite 300
54 West Hubbard Street
Chicago, IL  60610
Facsimile: (312) 494-4440

Renata B. Hesse, Esq.                   *(by hand delivery)*
United States Department of Justice
Antitrust Division
601 D Street, N.W.
Suite 1200
Washington, D.C.  20530
Facsimile: (202) 307-1454

*Counsel for Plaintiff The United States of America*

Jay L. Himes, Esq.                      *(by overnight courier)*
Chief, Antitrust Bureau
Office of the Attorney General of the State of New York
120 Broadway, Suite 2601
New York, NY  10271
Facsimile:  (212) 416-6015

Kevin J. O'Connor, Esq.                 *(by overnight courier)*
Assistant Attorney General
Office of the Attorney General of the State of Wisconsin
P. O. Box 7857
123 West Washington Avenue
Madison, WI  53703-7857
Facsimile:  (608) 267-2223

Beth Finnerty, Esq.                     *(by overnight courier)*
Office of the Attorney General of the State of Ohio
140 East Town Street, 12th Floor
Columbus, OH  43215
Facsimile: (614) 995-0266

Blake Harrop, Esq.　　　　　*(by overnight courier)*
Office of the Attorney General of the State of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601
Facsimile: (312) 814-2549

*Counsel for Plaintiff States of New York, Illinois, Kentucky,*
*Louisiana, Maryland, Michigan, North Carolina, Ohio*
*and Wisconsin*

Michael G. Pattillo, Jr.